UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────────

JONATHAN JACKSON,

                         Plaintiff,

                                               9:19-cv-00193
v.                                          (MAD/TWD)

J. RELF, et al.,

                         Defendants.
───────────────────────────────────────────────

APPEARANCES:                        OF COUNSEL:

JONATHAN JACKSON
Plaintiff, *pro se*
05-A-2182
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

HON. LETITIA JAMES            ERIK BOULE PINSONNAULT, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**<u>ORDER AND REPORT-RECOMMENDATION</u>**

## I.    INTRODUCTION

On February 13, 2019, *pro se* Plaintiff Jonathan Jackson ("Plaintiff"), an inmate in

custody of the New York State Department of Corrections and Community Supervision

("DOCCS"), commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his

constitutional rights while confined at Great Meadow Correctional Facility ("Great Meadow").

(Dkt. No. 1.)  On April 8, 2019, the District Court ordered the following claims survived initial

review and required a response: (1) Plaintiff's Fourteenth Amendment disciplinary due process

claim against Deputy Superintendent of Administration Relf ("Relf"); and (2) Plaintiff's Fourteenth Amendment due process claims against Corrections Officer Brockley ("Brockley") and Corrections Lieutenant Scarlotta ("Scarlotta") (collectively, "Defendants"). (Dkt. No. 7 at 20.[1])

In lieu of answering, on July 25, 2019, Relf and Scarlotta moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to plead sufficient facts to establish: (1) that he was deprived of a liberty interest; (2) the personal involvement of Scarlotta; and (3) entitlement to a declaratory judgment. (Dkt. No. 21, 21-1.[2]) Plaintiff opposed the motion. (Dkt. No. 27.) Similarly, on September 25, 2019, Brockley moved to dismiss the complaint pursuant to Rule 12(b)(6) on the grounds that Plaintiff failed to allege sufficient facts to establish: (1) that he was deprived of a liberty interest; (2) the personal involvement of Brockley; and (3) entitlement to a declaratory judgment. (Dkt. No. 29, 29-1.) Plaintiff opposed the motion. (Dkt. No. 32.) The Honorable Mae A. D'Agostino, United States District Judge, referred the motions to the undersigned for a report-recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

For the reasons that follow, the Court recommends Defendants' motions to dismiss be granted in part and denied in part.

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's office. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs. Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

[2] At the time Relf and Scarlotta moved to dismiss, Brockley had not yet been served. Brockley acknowledged service of the complaint on August 25, 2019. (Dkt. No. 25.)

## II.    FACTUAL BACKGROUND[3]

On July 13, 2018, Brockley performed a "suspicious cell frisk" of Plaintiff's cell and charged Plaintiff with wrongful possession of a weapon and contraband. (Dkt. No. 1 at ¶¶ 11-13.[4]) Prior to the search, Scarlotta had threatened Plaintiff that if he did not "take the blame" for a weapon found in the company trash can, "this could happen." (*Id.* at ¶ 18.)

On July 14, 2018, the inmate misbehavior report (or "ticket"), filed by Brockley, was delivered to Plaintiff, who was "cell confined." (*Id.* at ¶¶ 13, 15.) Relf was designated as the hearing officer for Plaintiff's Tier III disciplinary hearing. (*Id.* at ¶ 17.) The hearing commenced on July 20, 2018, and Plaintiff pleaded not guilty. (*Id.* at ¶ 18.)

During the hearing Relf displayed "outright bias." (*Id.* at ¶ 18.) Specifically, Relf credited the verbal testimony of Brockley and Scarlotta and the statement in the misbehavior report even though there was no physical evidence produced at the hearing or other verbal testimony. (*Id.*) During the hearing, Plaintiff made several objections, including: (1) there was no video footage of the cell search, strip frisk, or his interrogation by Scarlotta produced during the hearing even though Plaintiff had requested this material; (2) he was denied his right to call the three inmate witnesses whom he requested testify, and no refusal statement was introduced into the record showing that any of the witnesses refused to appear; (3) no photos of the alleged

---

[3] The following facts are derived from the complaint and exhibits attached thereto and are accepted as true for the purposes of deciding the pending motions to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (a complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference").

[4] A copy of the cell frisk/contraband receipt, dated July 13, 2018, is attached as Exhibit A to the complaint. (Dkt. No. 1-3 at 1-2.) An illegible copy of the inmate misbehavior report is attached as Exhibit B. (*Id.* at 5-6.) A certified copy of the inmate misbehavior report authored by Brockley on July 13, 2018, is attached as Exhibit A to the Declaration of Erik Pinsonnault ("Pinsonnault Declaration"). (Dkt. No. 21-2 at ¶ 2, pp. 2-4.)

weapon were introduced and Relf "never testified or placed on the record[ ] that she would

secur[e] any [testimony] to prove one . . . existed[;]" and (4) the hearing was extended twice,

resulting in it lasting over an eighteen day period, in violation of DOCCS Directive #4932.  (*Id*.)

On July 31, 2018, Relf found Plaintiff guilty and sentenced him to 270 days keeplock cell

confinement, of which 90 days were suspended and 90 days were deferred, as well as 270 days

loss of recreation, packages, commissary, and home telephone privileges.  (*Id*. at ¶ 19.[5])  At the

time the sentence was issued, Plaintiff had served eighteen (18) days in the special housing unit

("SHU"), "and was removed and placed under cell confinement for ninety-nine (99) days as per

the final disposition of [] Relf."  (*Id*.)  "Plaintiff was subjected to a total of one-hundred and

seventeen (117) days."  (*Id*.)

On October 12, 2018, the Director of Special Housing/Inmate Disciplinary Program

reversed Relf's disciplinary determination.  (*See* Dkt. No. 1-3 at 17.)  The reversal occurred

because Plaintiff was able to obtain "a copy of the B-Block Cell Search Log Book[,] . . . which[ ]

clearly shows that on 7/13/18, no contraband was found, recorded or reported."  (Dkt. No. 1 at ¶

20.)

## III.    DISCUSSION

### A.    STANDARD OF REVIEW

A defendant may move to dismiss a complaint for "failure to state a claim upon which

relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion

tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal

Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient

---

[5]  A copy of the hearing disposition is attached as Exhibit C to the complaint.  (Dkt. No. 1-3 at 7-12.)

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id*. at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face." *Id*. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d

66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Id*.

## B.    Declaratory Relief

As noted above, in addition to monetary damages, Plaintiff seeks a "Declaratory Judgment that the Defendants . . . violated Plaintiff's rights under the United States Constitution."  (Dkt. No. 1 at 12.)  Defendants argue Plaintiff's claim for declaratory relief should be dismissed because Plaintiff is no longer incarcerated at Great Meadow.  (Dkt. No. 21-1 at 12; Dkt. No. 29-1 at 12.)  In response, Plaintiff argues, *inter alia*, he "could at anytime be returned to Great Meadow" and, therefore, his request for declaratory relief should be granted.  (Dkt. No. 27 at ¶ 8; Dkt. No. 31 at ¶ 10.)

"It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility.  On the other hand, the transfer does not moot an action for damages."  *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996); *accord Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (quoting *Salahuddin*, 467 F.3d at 272).  "In *Shepard*, the Court concluded that speculation that a plaintiff may be transferred again in the future does not warrant a departure from the principle enunciated in *Salahuddin*."  *Francks v. Russo*, No. 9:18-CV-1282

(GTS/TWD), 2018 WL 6674293, at *4 n.6 (N.D.N.Y. Dec. 19, 2018) (citing *Shephard*, 662 F.3d at 610).

Here, inasmuch as Plaintiff is no longer incarcerated at Great Meadow, the Court finds any claim for declaratory relief is moot. *See, e.g.*, *Telesford v. Tamer*, No. 9:14-CV-1209 (GTS/DEP), 2016 WL 5338083, at *1 (N.D.N.Y. Sept. 23, 2016) (dismissing claims for declaratory and injunctive relief as moot due to the plaintiff's transfer to another facility); *see also Verley v. Wright*, No. 2016 No. 02 Civ. 1182 (PKC), 2007 WL 2822199, at *9 (S.D.N.Y. Sept. 27, 2007) ("To the extent that plaintiff seeks injunctive and declaratory relief directed at officials at [the transferring facility], those claims are now moot as plaintiff is no longer incarcerated [there].").

Therefore, the Court recommends granting Defendants' motions on this ground.

## C.    Fourteenth Amendment Procedural Due Process Claims

To state a procedural due process claim, a plaintiff must allege that he (1) possessed a liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. *See Wolff v. McDonnell*, 418 U.S. 539, 563-72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). A disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted).

As noted above, Defendants seek dismissal of the due process claims on the grounds that Plaintiff fails to allege a protected liberty interest and the personal involvement of Scarlotta and Brockley.  (Dkt. No. 21-1 at 7-12; Dkt. No. 29-1 at 7-12.)

### 1.      Liberty Interest

The threshold question in any prisoner disciplinary due process case is whether the plaintiff has alleged a protected liberty interest.  *See Marino v . Kages*, 973 F. Supp. 275, 277 (N.D.N.Y. 1997); *Tavares v. Amato*, 954 F. Supp. 2d 79, 92 (N.D.N.Y. 2013) ("To state a claim for procedural due process, there must first be a liberty interest which requires protection.").

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Connor*, 515 U.S. 472, 484 (1995); *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 276 (N.D.N.Y. 2018).  To constitute an "atypical and significant hardship," "the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." *Burroughs*, 325 F. Supp. 3d at 276.  The court should consider both the duration and the conditions of confinement when assessing the severity of the hardship.  *Id.*; *accord Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.") (citations omitted).

Thus, the duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*.  Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, general guidelines have been defined.  *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

The Second Circuit generally takes the position that "normal" confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey*, 197 F.3d at 589-90).[6] As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship."  *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration – between 101 and 305 days – 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required.") (citation omitted); *see also Cole v. New York State DOCCS*, 14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *19 (N.D.N.Y. Aug. 25, 2016) (noting that, under the guidance of the Second Circuit, "when the duration of restrictive confinement is less than 101 days, proof of 'conditions more onerous than usual' is required"), *report-recommendation adopted by* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016).  The Second Circuit has indicated that "the ultimate issue of atypicality is one of law."  *Sealey*, 187 F.3d at 585.

In this case, Defendants argue Plaintiff's complaint fails to state a liberty interest because the factual allegations and the documents he proffered in support thereof, while inconsistent, demonstrate Plaintiff served, at most, **91 days in keeplock** as a result of the subject ticket and

---

[6]  A New York state inmate confined in SHU is placed in a solitary confinement cell for 23 hours a day.  The inmate may exercise in the yard for one hour each day; is limited to two showers a week; and may not work or attend programming.  *See Colon*, 215 F.3d at 230; N.Y. Comp. Codes R. & Regs., tit. 7, §§ 304.1-.14.  An inmate on "keeplock" is confined to his cell, room or housing unit and does not enjoy full participation in the normal prison routine.  *See Gittens v. LeFevre*, 891 F.2d 38, 39 (2d Cir. 1989); *see also Holland v. Goord*, 758 F.3d 215, 218, n 2 (2d Cir. 2014); N.Y. Comp. Codes R. & Regs. tit. 7, § 251-1.6.

disciplinary proceeding.  (Dkt. No. 21-1 at 5, 7-10; Dkt. No. 21-9 at 5, 7-10.)  Defendants further argue that, where, as here, the duration of confinement is less than 101 days, a showing of "conditions more onerous than usual" is required to establish a protected a liberty interest and maintain Plaintiff has not provided any factual allegations, nor provided any documentary evidence, describing the conditions of his keeplock confinement, let alone that these conditions were more onerous than usual prison conditions or constituted an atypical hardship.  (Dkt. No. 21-1 at 8-9 (quoting *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009)); Dkt. No. 29-1 at 8-9.)

As to the duration of his confinement, Defendants contend Plaintiff's allegations and the documents he attached to his complaint provide inconsistent information.  (Dkt. No. 21-1 at 5-6; Dkt. No. 29-1 at 5-6.)  For example, Plaintiff alleges that, on July 13, 2018, the day of the incident, he was "physically placed" in the SHU for 18 days, and thereafter removed from SHU and placed under keeplock for 99 days.  (*See* Dkt. No. 1 at ¶ 19(B).)  However, the DOCCS Superintendent Hearing Disposition Rendered form, attached as Exhibit C to the complaint, indicates the start date for Plaintiff's keeplock confinement was July 13, 2018, the day of the incident.  (*See* Dkt. 1-3 at 8.)  Defendants further submit that the DOCCS Hearing Information Sheet also reflects that Plaintiff was keep-locked on July 13, 2018.  (*See* Dkt. No. 21-2 10.[7])  Defendants also point out that on Plaintiff's administrative appeal, attached as Exhibits E and F to the complaint, the hearing disposition was reversed on October 12, 2018—**91 days** after the date of the incident.  (*See id*. at 13-18.)

---

[7]  Defendants request that this document (Dkt. No. 21-3 at 19-10), attached as Exhibit C to the Pinsonnault Declaration, be considered on the dismissal motions because it has been incorporated into the complaint by reference.  (Dkt. No. 21-1 at 6 (citing *Brass v. Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)); *see also* Dkt. No. 21-9 at 6.)  The Court assumes Defendants submit this document as further evidence to refute Plaintiff's claim that he was "physically placed" in the SHU for 18 days, and thereafter removed from SHU and placed under keeplock for 99 days.  (Dkt. No. 21-3 at 19-10).

Based on the foregoing, Defendants deduce that Plaintiff's duration of disciplinary confinement was, at most, **91 days in keeplock**, and, therefore, below the "intermediate" range of confinement requiring the development of a detailed record of the conditions of confinement compared to general prison conditions.  (Dkt. No. 21-1 at 7-10; Dkt. No. 29-1 at 7-10.)

However, accepting the allegations in the complaint as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must on a Rule 12(b)(6) motion, the Court finds Plaintiff was subjected to 117 days of disciplinary confinement, consisting of 18 days in the SHU and 99 days in keeplock, a duration considered an "intermediate" range and, therefore, finds the cases replied upon by Defendants inapposite.  (*See, e.g.*, Dkt. No. 21-1 at 9-10 (collecting cases where the confinement at issue was "relatively short" *i.e.*, approximately 60 days in keeplock); *see also* Dkt. No. 29-1 at 9-10.)  *Cf. Gonzalez-Cifuentes v. Torres*, No. 9:04-cv-1470 (GLS/DRH), 2007 WL 499620, at *3 (N.D.N.Y. Feb. 13, 2007) (finding the plaintiff alleged a protected liberty interest based on his sentence of 90 days in keeplock and therefore, denied the defendants' motion on this ground).[8]

To be sure, it is unclear on this record when Plaintiff was housed in the SHU, if at all, but as Defendants acknowledge, it "appears possible" that Plaintiff spent 18 days in SHU while the hearing was pending.  (Dkt. No. 21-1 at 5 n.45; Dkt. No. 29-1 at 5 n.6.)  Further, it is also unclear on this record when Plaintiff was relieved of the sanctions imposed by Relf.  (*See also* Dkt. No. 7 at 6 n.3.)  At this juncture, the Court declines Defendants' invitation to assume Plaintiff was

---

[8]  The Court notes that consideration of the DOCCS Hearing Information Sheet does not result in a different outcome because "although the Court may properly consider the contents of a document in the context of a motion to dismiss, documentary evidence does not trump a plaintiff's contrary factual allegations."  *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 512 (S.D.N.Y. 2012) (citing *Roth v. Jennings*, 489 F.3d 499, 510–511 (2d Cir. 2007)).  As discussed above, Plaintiff's allegation that he was subjected to 18 days in the SHU *and* 99 days keeplock must be taken as true at this early stage.

relieved of all disciplinary sanctions on October 12, 2018, the date the July 31, 2018, hearing disposition was reversed. In sum, the Court finds Plaintiff has plausibly alleged **117 days of disciplinary confinement**.

Where, as here, the duration of the alleged confinement "is not long enough to constitute an atypical and significant deprivation by itself," the atypicality analysis turns on the conditions of the plaintiff's disciplinary confinement. *See Palmer*, 364 F.3d at 66. "For such a duration of confinement, the fact-finding required by the Second Circuit to determine whether this intermediate sentence constitutes an atypical and significant hardship cannot occur on a motion to dismiss." *Funches v. Russo*, No. 9:17-CV-1292 (LEK/DJS), 2018 WL 6982087, at *2 (N.D.N.Y. Nov. 2, 2018) (quoting *Koehl v. Bernstein*, No. 10 Civ. 3808(SHS)(GWG), 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (collecting cases), *report-recommendation adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011)), *report-recommendation adopted as modified by* 2018 WL 6381058 (N.D.N.Y. Dec. 6, 2018).

Moreover, Plaintiff does not rely solely on the length of his disciplinary confinement to establish a liberty interest. Although there are no allegations regarding the conditions of his confinement in the complaint, Plaintiff states in his responses to the pending motions that, *inter alia*, when he "arrived in SHU, he was not given his property for 4 days and when he got his propert[y] many of his possession were missing, walkman, clippers, slippers and clothes because Plaintiff did not have any shower slippers he could not use the shower but was forced to wash up in the sink, for 18 days." (Dkt No. 27 at 2; Dkt. No. 32 at 8.[9]) Similar allegations have been

---

[9] "[A] *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the extent those papers are consistent with the allegations in the complaint."). *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 93 (N.D.N.Y. 2013); *see also Locicero v. O'Connell*, 419 F. Supp.

found sufficient to survive a motion to dismiss. *See, e.g.*, *Smith v. Hamilton*, No. 9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at *3-4 (N.D.N.Y. July 12, 2016) (denying motion to dismiss where the plaintiff alleged that for 90 days he was confined to sixty foot square cell for twenty-three hours a day, and, in part, deprived of his personal property because "it was not clear" that the "deprivation" of "most" of plaintiff's personal property was a "normal" SHU condition); *James v. Gage*, No. 15-CV-106 (KMK), 2018 WL 2694436, at *15 (S.D.N.Y. June 5, 2018) (denying motion to dismiss where the plaintiff alleged being denied clothes, pain mediation, and "essential necessities"); *see also Ortiz*, 380 F. 3d at 655 (allegations the plaintiff was prevented from showering for weeks at a time and denied an hour of daily exercise during a 90-day confinement, "if proved, [ ] could establish conditions in SHU far inferior to those prevailing in the prison in general" (citation and quotation marks omitted)); *Funches*, 2018 WL 6982087, at *2 (denying motion to dismiss where the plaintiff alleged 120 days of disciplinary confinement and was given discolored drinking water); *cf. Elleby v. Martucello*, No. 9:16-CV-1335 (MAD/DEP), 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018) (granting motion to dismiss where the plaintiff was sentenced to 90 days in SHU and "did not allege that the conditions in which he was kept were more onerous than normal SHU conditions").

Based on the foregoing, the Court finds Plaintiff has, even if barely, alleged enough facts to plausibly state a liberty interest. *See, e.g.*, *Koehl*, 2011 WL 2436817, at *7 (concluding that allegations of 120 days in restrictive housing required discovery and development of record to determine "whether this intermediate sentence constituted an atypical and significant hardship" (citation omitted)); *Falls v. Campbell*, No. 17-CV-35 (KMK), 2019 WL 6251245, at *7

---

2d 521, 525 (S.D.N.Y. 2006) ("In the case of a motion to dismiss involving a claim by a *pro se* plaintiff, a court may look beyond the complaint to the plaintiff's opposition papers.").

(S.D.N.Y. Nov. 21, 2019) (denying motion to dismiss where the plaintiff was placed on keeplock status for 150 consecutive days after a series of disciplinary hearings and alleged he was "denied out-of-cell activities, such as recreation, showers, sick call appointments, and visits, "most of the time"); *cf. Keyes v. Annucci*, No. 9:18-cv-0372 (GTS/DJS), 2019 WL 4602240, at *13-14 (N.D.N.Y. Sept. 23, 2019) (denying the defendants' motion to dismiss as to the plaintiff that alleged 150 days of "normal" SHU confinement but granting the motion as to the plaintiff that alleged only 60 days of keeplock confinement with loss of package, commissary, phone and recreation privileges (other than one hour of recreation per day). Therefore, the Court declines to recommends dismissal of Plaintiff's due process claims for failure to state a liberty interest. *See, e.g.*, *Keyes*, 2019 WL 4602240, at *14 ("Because of the extended nature of this period of confinement [*i.e.*, an intermediate duration], the Court finds that a closer consideration of the conditions of confinement and the circumstances is warranted to determine whether even the mostly normal conditions alleged would be considered to impose an atypical and significant hardship.").

Accordingly, the Court recommends denying Defendants' motions on this ground. In so recommending, the Court expresses no opinion as to whether Plaintiff's Fourteenth Amendment due process claims against Defendants will survive a properly supported motion for summary judgment.

## 2.   Personal Involvement

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *Iqbal*, 556 U.S. at 676. "[A] Section 1983 plaintiff must 'allege a tangible connection

between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Here, Defendants argue Plaintiff's procedural due process claims against Scarlotta and Brockley fail as a matter of law for lack of personal involvement because, *inter alia*, their actions did not result in a due process violation at the hearing. (Dkt. Nos. 21-1 at 10-12; 29-1 at 10-12.) The Court disagrees.

As discussed on initial review, "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the [allegedly false] report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right[,]" the alleged creation of a false report may give rise to a constitutional claim. (Dkt. No. 7 at 18 (alteration in original) (citing *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015))); *see also Mitchell v. Senkowski*, 158 Fed. App'x 346, 349 (2d Cir. 2005) ("The issuance of false misbehavior reports and provision of false testimony against an inmate . . . violates due process only where either procedural protections were denied that would have allowed the inmate to expose the falsity of the evidence against him, . . . or where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights . . . ." (internal citations omitted)); *cf. Grillo v. Coughlin*, 31 F.3d 53, 56 (2d Cir. 1994) (noting that while "a fair hearing, conforming to the due process standards of *Wolff*, would 'cure' a constitutional violation otherwise resulting from a false accusation," evidence that a plaintiff "was not afforded a proper *Wolff* hearing" would render a case unsuitable for disposal on a motion for summary judgment).

In this case, Plaintiff claims Brockley authored the false misbehavior report and that both Brockley and Scarlotta falsely testified at the disciplinary hearing. (Dkt. No. 1 at ¶¶ 11-13, 18.)

15

Plaintiff states Relf "made it crystal clear, that she was finding [ ] Plaintiff guilty as charged solely based upon the testimony of" Brockley and Scarlotta. (*Id.* at ¶ 18.) Inasmuch as the Court finds Plaintiff plausibly alleged a protected liberty interest, and because at this time Defendants do not contend the disciplinary hearing conducted by Relf provided Plaintiff with all the procedural due process protections to which he was entitled, the Court finds Plaintiff has plausibly alleged the personal involvement of Brockley and Scarlotta. *See, e.g.*, *McGriff v. Keyser*, No. 17-cv-7307 (NSR), 2019 WL 6033421, at *9 (S.D.N.Y. Nov. 13, 2019) (denying motion to dismiss for lack of personal involvement where the defendant authored the misconduct report and participated in the disciplinary hearing).

Therefore, the Court recommends denying Defendants' motions on this ground. In so recommending, the Court expresses no opinion as to whether Plaintiff's Fourteenth Amendment due process claims against Scarlotta and Brockley will survive a properly supported motion for summary judgment.

## IV.    CONCLUSION

For the reasons stated above, the Court finds Plaintiff has plausibly alleged a protected liberty interest and the personal involvement of Scarlotta and Brockley. However, the Court finds Plaintiff's claims for declaratory relief are moot.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motions to dismiss (Dkt. No. 21 and Dkt. No. 29) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that Plaintiff's claim for declaratory relief be dismissed as moot; and it is further

**RECOMMENDED** that Plaintiff's Fourteenth Amendment due process claims against Defendants Relf, Brockley, and Scarlotta survive the motions to dismiss; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[10]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: January 6, 2020
     Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[10]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2018 WL 6674293
Only the Westlaw citation
is currently available.
United States District
Court, N.D. New York.

Shaquan FRANKS, Plaintiff,
v.
A. RUSSO, et al., Defendants.

9:18-CV-1282 (GTS/TWD)
|
Signed 12/19/2018

**Attorneys and Law Firms**

SHAQUAN FRANKS, Plaintiff, pro se, 12-
A-1370, Wende Correctional Facility, P.O. Box
1187, Alden, NY 14004.

**DECISION AND ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District
Judge

**I. BACKGROUND**
 **\*1** Pro se plaintiff Shaquan Franks
commenced this action in the United States
District Court for the Western District of
New York ("Western District") in May 2018,
by filing a complaint, together with an
application to proceed in forma pauperis
("IFP") and motion for preliminary injunctive
relief. Dkt. No. 1 ("Compl."); Dkt. No. 2
("IFP Application"); Dkt. No. 3 ("Preliminary
Injunction Motion"). [1]

By Decision and Order filed October 31, 2018,
Western District Judge Elizabeth A. Wolford

granted plaintiff's IFP Application and severed
and transferred the portion of plaintiff's claims
regarding events that occurred at Sullivan
Correctional Facility to the Southern District
of New York, and the portion of plaintiff's
claims regarding events that occurred at
Eastern Correctional Facility ("Eastern C.F."),
as detailed on pages 3, 6-9, and 24-52 of the
complaint, to the Northern District of New
York. *See* Dkt. No. 11 ("Transfer Order") at 8. [2]
This action was transferred to this District on
November 1, 2018. Dkt. No. 12.

**II. DISCUSSION**

 **A. Legal Standard for Review of the
 Complaint**
Section 1915(e) of Title 28 of the United States
Code directs that, when a plaintiff seeks to
proceed in forma pauperis, "(2) ... the court
shall dismiss the case at any time if the court
determines that – ... (B) the action ... (i) is
frivolous or malicious; (ii) fails to state a claim
on which relief may be granted; or (iii) seeks
monetary relief against a defendant who is
immune from such relief." 28 U.S.C. § 1915(e)
(2)(B).

Likewise, under 28 U.S.C. § 1915A, a court
must review any "complaint in a civil action
in which a prisoner seeks redress from a
governmental entity or officer or employee
of a governmental entity" and must "identify
cognizable claims or dismiss the complaint, or
any portion of the complaint, if the complaint ...
is frivolous, malicious, or fails to state a
claim upon which relief may be granted; or ...
seeks monetary relief from a defendant who is
immune from such relief." 28 U.S.C. § 1915A;
*see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d

Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

Therefore, the Court must determine whether plaintiff may properly maintain his complaint before permitting him to proceed. Although a court has the duty to show liberality towards pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), a court also has the responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. "Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(e) is appropriate to prevent abuses of the process of the court," *Nelson v. Spitzer*, No. 9:07-CV-1241 (TJM/RFT), 2008 WL 268215, at *1 n.3 (N.D.N.Y. Jan. 29, 2008) (citation omitted), as well as "to discourage the filing of, and waste of judicial and private resources upon, baseless lawsuits that paying litigants generally do not initiate because of the costs of bringing suit and because of the threat of sanctions for bringing vexatious suits under Federal Rule of Civil Procedure 11." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Id.* at 325.

**\*2** When reviewing a complaint, the court may also look to the Federal Rules of Civil Procedure. Rule 8 provides that a pleading that sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

**B. Summary of Plaintiff's Complaint**

The portion of this action that has been transferred to this District pertains to claims arising out of plaintiff's confinement at Eastern C.F. *See generally* Compl. The following facts related to plaintiff's confinement at Eastern C.F. are set forth as alleged by plaintiff in his complaint.

Plaintiff suffers from the eye disease "keratoconus." Compl. at 6. On October 4, 2017, while plaintiff was incarcerated at Eastern C.F., he was taken to the Albany Medical Center for a cornea transplant. *Id.* As a result of the surgery, plaintiff received twenty (20) stitches in his left eye, which was covered with an "eye shield." *Id.*

Upon plaintiff's return to Eastern C.F., he was housed in the facility hospital. Compl. at 6. Between October 4, 2017, and October 11, 2017, plaintiff was denied recreation even though defendant Doctor Mikhail Gusman informed "security staff" that it was permissible for plaintiff to engage in recreation. *Id.*

Plaintiff complained to Corrections Sergeant Nicholas Tacti (not a party) about being denied recreation, and was told by Corrections Lieutenant Kenneth Letus (not a party) on October 11, 2017, that he is "supposed to get rec[.]" Compl. at 6. However, defendant Doctor Loricchio Andola told plaintiff that he cannot receive recreation while in the facility hospital, and therefore had to choose between recreation and staying in the facility hospital. *Id.* Plaintiff stated to defendant Andola that he is entitled to recreation "by law." *Id.* In response, defendant Andola "kicked [plaintiff] out [of] the [facility] hospital and sen[t] [him] back to the [special housing unit]." *Id.*

The special housing unit ("SHU") was "very dirty[,]" which plaintiff communicated to unidentified nurses. Compl. at 7. Plaintiff also advised defendants Gusman and Andola about the "high risk" of him contracting an eye infection, but they "refuse[d] to send [him] back to the facility hospital cause they don't want to give [him] 'rec' while [he's] up there[.]" *Id.* Plaintiff "wrote this up" to the Superintendent of Eastern C.F., defendant William Lee, but "his high ranking authoritie[s] refuse[d] to intervene with the on going [sic] harassment of retaliation[.]" *Id.*

At an unidentified date, plaintiff suffered "a mental/emotional breakdown" and was prescribed medication for depression and anxiety. Compl. at 7. Despite suffering these adverse health conditions, plaintiff still did not receive a "reasonable accommodation" or have his medical permits "honored[.]" *Id.*

Defendant Lee and "his high ranking authoritie[s]" failed to intervene in the ongoing harassment "as a form of punishment[.]" Compl. at 8. At the same time, "Medical" continually denied plaintiff "adequate medical care[,]" and the "CO's" failed to follow the "PIMS program put in place by Albany even after [plaintiff] wrote a grievance on 'Lt. K. Simmons' for not moving [his] PIMS level up after [plaintiff] did [his] 30 days post adjustment[,]" and despite the fact that defendant DSS A. Russo "told them to move [his] PIMS level[.]" *Id.* Instead, and in response to plaintiff's grievance, Lt. K. Simmons had plaintiff "extracted" from his SHU cell, after which plaintiff was subjected to "excessive force" by unidentified corrections officials, who "popped" his stitches and injured his chest. *Id.* at 8-9, 22. As a result of the use-of-force incident and the refusal to provide plaintiff "reasonable accommodations," plaintiff lost vision in his left eye and thereafter began experiencing "real bad head pains[.]" *Id.* at 9.

**\*3** Liberally construed, plaintiff asserts the following claims arising out of his confinement at Eastern C.F.: (1) defendants Lee, Gusman, Andola, and Russo failed to make "reasonable accommodations" regarding plaintiff's medical condition, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), and the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; (2) defendants Lee, Gusman, Andola, and Russo denied plaintiff access to adequate medical care, in deliberate indifference to his serious medical needs, in violation of the Eighth Amendment to the United States Constitution; (3) defendants Lee, Gusman, and Andola subjected plaintiff to inadequate conditions of confinement, in violation of the Eighth Amendment to the United States Constitution; (4) non-party corrections officials subjected plaintiff to excessive force, in violation of the Eighth Amendment to the United States Constitution; and (5) defendants Lee, Gusman, Andola, and Russo denied plaintiff access to adequate medical care, and defendant Andola caused plaintiff to be transferred out of the facility hospital, in retaliation for plaintiff engaging in protected activity, in violation of the First Amendment to the United States Constitution.[3]

Plaintiff seeks monetary damages, as well as declaratory and injunctive relief. Compl. at 5. For a more complete statement of plaintiff's claims, reference is made to the complaint.

### C. Analysis

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ); Iqbal, 556 U.S. at 676. "[A] Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " Austin v. Pappas, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986) ) (other citation omitted). "[V]icarious liability is inapplicable to ...§ 1983 suits." Iqbal, 556 U.S. at 676.

Prior to Iqbal, the Second Circuit held that supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986) ).[4]

### 1. Eleventh Amendment Immunity

**\*4** The Eleventh Amendment has long been construed as barring a citizen from bringing

a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the Section 1983 claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

Furthermore, the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official

is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.").

Accordingly, to the extent that plaintiff seeks monetary damages under Section 1983 against any defendant in his or her official capacity, those claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment. [5]

## 2. Request for Injunctive Relief

"In the context of a claim for injunctive or declaratory relief, a plaintiff's allegation of past injury is insufficient to establish standing; instead the plaintiff must show a likelihood of future harm, a 'real and immediate threat of repeated injury.' " *Azim v. Vance*, 530 Fed. App'x 44, 45 (2d Cir. 2013) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 104 (1983) (internal quotation marks omitted) ) (summary order); *O'Shea v. Littleton*, 414 U.S. 488, 493-96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if unaccompanied by any continuing, present adverse effects."); *Parkell v. Senato*, 704 Fed. App'x 122, 125 (3d Cir. 2017) ("declaratory relief ... is 'by definition prospective in nature,' ... and cannot be issued to address past wrongs") (quoting *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 628 (3d Cir. 2013) ) (summary

2018 WL 6674293

order). "In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ). [6]

 **\*5** In this case, plaintiff requests injunctive relief in the form of an order directing that he be provided with a "reasonable accommodation for [his] disability[.]" Compl. at 5. Because plaintiff is no longer incarcerated at Eastern C.F., his request for injunctive relief against officials at this facility is moot. Accordingly, the portion of plaintiff's complaint seeking injunctive relief against officials from Eastern C.F. is dismissed without prejudice in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. "DSP Cheryl Morris" and "IOB Heidi Lewis"

Although plaintiff has listed "DSP Cheryl Morris" and "IOB Heidi Lewis" as defendants in the caption of his complaint, *see* Compl. at 4, he has not asserted any allegations in the body of his complaint that these defendants were personally involved in any alleged wrongdoing that occurred at Eastern C.F. Under such circumstances, dismissal of these defendants is appropriate. *Cipriani v. Buffardi*, No. 9:06-CV-889 (GTS/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails

to indicate what the defendant did to the plaintiff.") (citing *Gonzalez v. City of New York*, No. 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998) ); *see also Crown v. Wagenstein*, No. 96-CV-3895, 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

The Court would add only that " 'linkage in the prison chain of command' is insufficient" to implicate a state supervisory official in a Section 1983 claim. *Hernandez v. Keane*, 341 F.3d 137, 144-45 (2d Cir. 2003) (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) ); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) ("mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." (internal quotation marks omitted) ). Thus, plaintiff's identification of the job title of these defendants, and reference to "high ranking" officials in the section of his complaint discussing alleged wrongdoing at Eastern C.F., is insufficient to allege their personal involvement in any alleged constitutional violation.

Accordingly, defendants Morris and Lewis, and all claims asserted against them, are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. Defendant Russo

Plaintiff's only allegation regarding defendant Russo is that he, in response to plaintiff submitting a grievance against Lt. K. Simmons "for not moving [plaintiff's] PIMS level up after [plaintiff] did [his] 30 days post adjustment[,] ... told them to move [plaintiff's] PIMS level[.]" Compl. at 8. This allegation is entirely conclusory and, in any event, fails to plausibly suggest defendant Russo's personal involvement in any alleged constitutional violation. To the contrary, plaintiff's allegation plausibly suggests that defendant Russo attempted to assist him in obtaining the relief he sought relative to his "PIMS level."

Accordingly, defendant Russo, and all claims asserted against him, are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 5. ADA and Rehabilitation Act Claims Against Defendants Lee, Gusman, and Andola

**\*6** Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* (citing 42 U.S.C. § 12132).[7] "To assure those requirements are met, 'reasonable accommodation' may have to be provided to the qualified individual."

*Harris*, 572 F.3d at 73 (citation omitted). Similarly, the Rehabilitation Act protects a "qualified individual with a disability" from exclusion of participation, denial of the benefits, or subjection to discrimination "under any program or activity receiving Federal financial assistance," because of the individual's disability. 29 U.S.C. § 749(a). Although there are "subtle differences between the [A]cts," the purpose of both statutes is to prevent discrimination based upon disability and, as a result, courts generally apply the same legal standard for claims arising under Title II of the ADA and Title V of the Rehabilitation Act. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

"[T]o establish a prima facie violation of either statute, a plaintiff must show '(1) that [ ]he is a qualified individual with a disability; (2) that the defendants are subject to one of the Acts; and (3) that [ ]he was denied the opportunity to participate in or benefit from defendants services, programs, or activities, or was otherwise discriminated against by defendants, by reason of [his] disability.' " *D.K. v. Teams*, 260 F. Supp. 3d 334, 368 (S.D.N.Y. 2017) (quoting *Powell v. Nat. Bd. of Med. Examiners*, 364 F.3d 79, 85 (2d Cir. 2004) ). "Individuals in their personal capacities are not proper defendants on claims brought under the ADA or the Rehabilitation Act, although individuals can be sued in their official capacities under these statutes." *Keitt v. New York City*, 882 F. Supp. 2d 412, 456-57 (S.D.N.Y. 2011), *report and recommendation adopted by* 2011 WL 4526147 (S.D.N.Y. Sept. 29, 2011); *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98, 107 (2d Cir. 2001) ("neither Title II of the ADA nor § 504 of

the Rehabilitation Act provides for individual capacity suits against state officials.").

Liberally construed, plaintiff's complaint alleges facts which plausibly suggest that he suffered from a vision impairment during his confinement at Eastern C.F., and was denied access to recreation while housed in the facility hospital. Plaintiff does not allege that he was denied recreation after he was transferred to SHU. Thus, the allegations in the complaint plausibly suggest that plaintiff was denied recreation because he was housed in the facility hospital, and not because of his vision impairment. As a result, to the extent that, liberally construed, plaintiff's complaint can be read to encompass a claim against the named defendants in their official capacities, his claims are nonetheless deficient because he fails to allege facts which plausibly suggest that he was treated differently than other inmates because of his disability. *See Roberts v. City of New York*, No. 14-CV-5198, 2016 WL 4146135, at *9 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA claim where "[t]he complaint fail[ed] to allege that Plaintiff was excluded from participation in any program or activity, or otherwise treated differently, because of the disability"); *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514 at *19 (S.D.N.Y. Aug. 2, 2013) ("[T]he Court need not engage in an extensive analysis of the ADA requirements because Plaintiff makes absolutely no allegation that he was discriminated against, or that Defendants failed to provide him with a reasonable accommodation—i.e., railings on the walkway or an alternative to traveling through the walkway—because of his disability.... Thus, Plaintiff's ADA claim is DISMISSED.");

*Canales v. New York City Health & Hosps. Corp.*, No. 12-CV-3305, 2014 WL 2217001, at *5 n.5 (S.D.N.Y. May 12, 2014) ("As plaintiff does not allege he was treated differently because of any disability, the amended complaint fails to allege discriminatory animus for purposes of the ADA or the Rehabilitation Act."); *Rosado v. Herard*, No. 12-CV-8943, 2014 WL 1303513, at *6 (S.D.N.Y. Mar. 25, 2014) (dismissing ADA and Rehabilitation Act where plaintiff failed to "plead[ ] facts demonstrating that he was denied access to therapeutic group sessions because of a disability").

**\*7** Accordingly, plaintiff's ADA and Rehabilitation Act claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## 6. Equal Protection Claim Against Defendants Lee, Gusman, and Andola

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) ). To state

2018 WL 6674293

a viable claim for denial of equal protection, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Here, the complaint lacks allegations which suggest upon which basis plaintiff was unequally treated. Moreover, assuming that plaintiff has intended to assert an equal protection claim under a "class of one" theory, the complaint is devoid of any allegations that plaintiff was intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *See Village of Willowbrook*, 528 U.S. at 564. In fact, the complaint fails to identify any individuals treated differently than plaintiff under a similar situation. Instead, plaintiff alleges only that his Fourteenth Amendment rights were violated because he was denied "reasonable accommodations[.]" This conclusory allegation is not enough for the claim to survive sua sponte review. *See Iqbal*, 556 U.S. at 678 (concluding that a pleading that only "tenders naked assertions devoid of further factual enhancement" will not survive sua sponte review) (internal quotations and alterations omitted); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *see also Thomas v.*

*Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause."); *see also Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *4-5 (E.D.N.Y. Mar. 25, 2015) (dismissing the plaintiff's equal protection claim under the selective enforcement and class of one theories because the complaint "only discusse[d] the harmful actions [the defendants] took with respect to [the] [p]laintiff, but there [was] no discussion whatsoever of any similarities between [the] [p]laintiff and others"); *Tuitt v. Chase*, No. 9:11-CV-0776 (DNH/TWD), 2014 WL 2927803, at *8 (N.D.N.Y. June 27, 2014) ("While Plaintiff cursorily alleges that he 'suffered adverse treatment f[ro]m other inmates because he attempted to resolve ... issues through the use of grievances,' he does not identify any particular similarly situated individuals who received different treatment.... Such cursory allegations do not meet the plausibility standard required by *Twombly* and *Iqbal*.").

**\*8** Accordingly, plaintiff's Fourteenth Amendment equal protection claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 7. Medical Indifference Claims Against Defendants Lee, Gusman, and Andola

Claims that prison officials have intentionally disregarded an inmate's medical needs fall

under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102, 104 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.*; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing, inter alia, *Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ).

"In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety."

*Farmer*, 511 U.S. at 837; *see also Blyden*, 186 F.3d at 262 (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' ").

The protections afforded by the Eighth Amendment do not extend to remedy harms which may be inflicted as a result of conduct amounting to negligence or medical malpractice but not encompassing conscious disregard of an inmate's health. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

Additionally, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *Graham v. Gibson*, No. 04-CV-6088, 2007 WL 3541613, at *5 (W.D.N.Y. Nov. 14, 2007) ("Courts have repeatedly held that disagreements over treatment do not rise to the level of a Constitutional violation."); *Jones v. Westchester County Dept. of Corrs. Med. Dept.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' ").

**\*9** Here, the basis for plaintiff's medical indifference claim is unclear. Plaintiff alleges

that he was removed from the facility hospital and sent to SHU by defendant Andola on October 11, 2017, because he insisted on receiving recreation after he was told it was not allowed. Compl. at 6. Plaintiff further alleges that defendants Gusman and Andola allowed him to remain in SHU even though it was "very dirty" and placed him at a "high risk" of contracting an eye infection, because they did not want to allow him to reside in the facility hospital and receive recreation. *Id.* at 6-7. Plaintiff also alleges more generally that "Eastern Correctional Facility" denied him "reasonable accommodations" after he suffered "a mental/emotional breakdown." *Id.* at 7.

As an initial matter, plaintiff does not allege any facts which plausibly suggest that he was denied medical treatment, or experienced a worsening medical condition, while in SHU, and his allegation that he communicated with defendants Gusman and Andola about his concerns regarding the "very dirty" SHU environment plausibly suggests that these defendants visited plaintiff while he was confined there. Moreover, the refusal to treat plaintiff at his desired location does not state a claim for medical indifference. *See Purdie v. Graham*, No. 9:09-CV-971 (GTS/ATB), 2011 WL 941283, at *7 (N.D.N.Y. Jan. 19, 2011) ("The decision not to refer plaintiff to an outside hospital, and Nurse Quinn's decision that he required mental health treatment does not constitute deliberate indifference, even if contrary to plaintiff's preferences."), *report and recommendation adopted by* 2011 WL 940469 (N.D.N.Y. Mar. 16, 2011); *Ramey v. Perez*, No. 13-CV-0017, 2014 WL 407097, at *6 (S.D.N.Y. Jan. 31, 2014) ("Plaintiff believes that he should have been taken to the hospital,

but he has no right to receive the medical treatment of his choice; he only has the right not to be denied medical treatment altogether."); *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *10 n.15 (S.D.N.Y. May 10, 2018) ("[T]o the extent that Plaintiff would have 'prefer[red] a different treatment,' such as referring him to an outside hospital or calling poison control, these claims 'do[ ] not give rise to an Eighth Amendment violation,' " (quoting *Chance*, 143 F.3d at 703) ).

With respect to plaintiff's allegation that he suffered "a mental/emotional breakdown" at an unidentified date, such an allegation is entirely conclusory and affords no basis for the Court to evaluate whether this condition was objectively sufficiently serious. In any event, plaintiff also alleges that he was prescribed medication for depression and anxiety following his "breakdown." Compl. at 7. Thus, plaintiff has also failed to allege facts which plausibly suggest that any named defendant acted with subjective deliberate indifference with regard to plaintiff's "breakdown."

Lastly, plaintiff's allegation that he did not receive a "reasonable accommodation" or have his medical permits "honored" is also entirely conclusory. Plaintiff does not allege what "reasonable accommodations" he sought, what medical permits were not "honored," who denied him "reasonable accommodations" and refused to honor medical permits, or how his medical condition was impacted by these actions.

For these reasons, plaintiff's medical indifference claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. §

1915A(b) for failure to state a claim upon which relief may be granted.

### 8. Conditions-of-Confinement Claims Against Defendants Lee, Gusman, and Andola

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 303-04 (1991).

**\*10** Here, the Court has liberally construed the complaint to assert a conditions-of-confinement claim based on plaintiff's allegations that SHU was "very dirty" and exposed him to a "high risk" of an infection. These allegations, however, are entirely conclusory and do not plausibly suggest that the conditions of plaintiff's confinement placed him at a substantial risk of serious harm. Moreover, the complaint lacks any allegations which plausibly that defendants Gusman and Andola knew, by virtue of plaintiff's alleged communications with them about his concern over contracting an infection, that plaintiff's confinement conditions deprived him of basic human needs such that their alleged refusal to have plaintiff removed from SHU might plausibly suggest subjective deliberate indifference.

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 9. Excessive Force Claim

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson*, 501 U.S. at 296-97; *Estelle*, 429 U.S. at 104. This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden*, 186 F.3d at 262-63 (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ). [8]

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 832-33). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).

In this case, plaintiff alleges that Lt. K. Simmons had him "extracted" from his SHU cell, after which he was subjected to "excessive force" by unidentified corrections officials who "popped" his stitches and injured his chest. Compl. at 8-9, 22. Plaintiff has not named Corrections Lieutenant K. Simmons as a defendant. Nor has he identified any of the correctional officials who allegedly assaulted him, or sued them as "John Doe" or "Jane Doe" defendants. Moreover, it does not appear from the allegations in the complaint that any of the named defendants were personally involved in the alleged assault.

**\*11** Since only individuals personally involved in a constitutional deprivation face liability under Section 1983, plaintiff's failure to identify the parties responsible for allegedly assaulting him requires the dismissal of his excessive force claim. *See Roman v. Walsh*, No. 5:13-CV-1273 (GLS/ATB), 2014 WL 316724, at \*3, 7 (N.D.N.Y. Jan. 28, 2014) (adopting recommendation that excessive force claim be dismissed based on plaintiff's failure to "name[ ] any person responsible for the excessive force"); *Renelique v. Doe*, No. 99-CV-10425, 2003 WL 23023771, at \*12 n.7 (S.D.N.Y. Dec. 29, 2003) ("To the extent the Amended Complaint can be read to assert a deliberate indifference claim based on a denial of medical care to plaintiff after the March 24, 1997 assault, plaintiff has not named as defendants any individuals who were personally involved in the alleged incident. Since ... only the individuals personally involved in a constitutional deprivation face liability under Section 1983, plaintiff's failure to identify the parties responsible for allegedly denying him medical care after the March 24, 1997 assault requires the dismissal of this aspect of his deliberate indifference claim."); *see also* Fed. R. Civ. P. 10(a) ("the title of the complaint must name all the parties").

Accordingly, plaintiff's excessive force claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 10. Retaliation Claims Against Defendants Lee, Gusman, and Andola

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as

2018 WL 6674293

a constitutionally proscribed retaliatory act.' " *Davis*, 320 F.3d at 352 (*quoting Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (*quoting Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

The filing of a prison grievance is a constitutionally protected activity for the purpose of meeting the first prong of the retaliation test. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988) (same).

Here, plaintiff alleges that he complained to defendant Andola about not receiving recreation after she advised him that he was not entitled to recreation while in the facility hospital, and in response, she "kicked [plaintiff] out [of] the hospital and sen[t] [him] back to the SHU." Compl. at 6. Plaintiff further alleges that he was denied adequate medical care and

"reasonable accommodations" after he was removed from the facility hospital, and wrote to defendant Lee about ongoing harassment, which defendant Lee failed to remedy. *Id.* at 7-9.

As an initial matter, plaintiff does not allege that he had a right to remain in the facility hospital (or in general population) when he was transferred to SHU. Thus, the fact that plaintiff was transferred from the prison hospital to SHU does not, in and of itself, plausibly suggest that plaintiff's placement in SHU constituted adverse action. *See, e.g., Cruz v. Grosso*, No. 9:13-CV-0030 (FJS/TWD), 2014 WL 2176256, at *7 (N.D.N.Y. May 23, 2014) ("[T]he transfer of a prisoner is not considered an 'adverse action' unless it results in the prisoner being subjected to more onerous conditions."); *Warren v. Goord*, No. 99-CV-296, 2006 WL 1582385, at *15 (W.D.N.Y. May 26, 2006) (since complaint was "devoid of any allegations that the transfer [of inmate plaintiff to infirmary], by itself, resulted in any additional deprivation of privileges as required to support a finding that Warren's transfer resulted in some cognizable injury to Warren's First Amendment rights," transfer "d[id] not, as a matter of law, constitute action 'that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights,' and, thus, d[id] not provide the requisite 'adverse action' necessary to support the second prong of a First Amendment retaliation claim" (quoting *Dawes*, 239 F.3d at 493) ); *Ali v. Szabo*, 81 F. Supp. 2d 447, 467 (S.D.N.Y. 2000)(dismissing prisoner's retaliation claim where prisoner did not allege any injury as a result of defendant's action).

**\*12** Moreover, even assuming that transferring plaintiff to SHU may be considered adverse action, the complaint lacks allegations which plausibly suggest that the transfer occurred because plaintiff engaged in protected activity. Rather, the allegations in the complaint plausibly suggest that defendant Andola gave plaintiff a choice between recreation and remaining in the facility hospital, and caused plaintiff to be removed from the hospital after plaintiff communicated his desire for recreation.

For these reasons, plaintiff's retaliation claim against defendant Andola is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

Turning to plaintiff's retaliation claim based on allegedly being denied adequate medical care and "reasonable accommodations," plaintiff's allegations are entirely conclusory. Plaintiff fails to allege, for example, what medical treatment he sought that he was denied, who denied him such treatment, and when the alleged denial(s) occurred. The complaint also lacks any allegations which plausibly suggest that any treating official was aware of plaintiff's engagement in protected activity. Accordingly, plaintiff's retaliation claim based on allegedly being denied adequate medical care and "reasonable accommodations" is dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

Finally, with regard to plaintiff's retaliation claim against defendant Lee based on his alleged failure to remedy ongoing harassment, the law is well-settled that "[v]erbal harassment or threats are generally not considered adverse action for the purpose of a First Amendment retaliation claim." *McFadden v. Friedman,* No. 9:12-CV-0685 (GTS/CFH), 2015 WL 5603433, at \*17 (N.D.N.Y. Sept. 23, 2015) (citation omitted). While "verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific[,]" *id.*, the complaint in this case is devoid of any allegations which describe the alleged harassment in any detail. *See also Corley v. City of New York,* No. 1:14-CV-3202, 2017 WL 4357662, at \*19 (S.D.N.Y. Sept. 28, 2017) ("Plaintiff's allegations that he was 'repeatedly harassed' about kosher meals and that unit officers observed the food he ate, without more, are too vague to amount to an adverse action, however rude or upsetting they might have been."); *Bumpus v. Canfield,* 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.").

Because plaintiff has not adequately alleged that he was subjected to any adverse action as a result of his engagement in protected activity, plaintiff cannot succeed on a claim against defendant Lee based on a failure-to-remedy theory of liability. *See Toole v. Connell,* No. 9:04-CV-0724 (LEK/DEP), 2008 WL 4186334, at \*7 (N.D.N.Y. Sep. 10, 2008) (Peebles, M.J.), *report and recommendation adopted by* 2008 WL 4186334, at \*1 (supervisory defendant cannot be liable for failing to investigate or correct conduct that has already been found to be not actionable under

2018 WL 6674293

section 1983); *see also* *Linares v. Mahunik,* No. 9:05-CV-625 (GLS/RJT), 2006 WL 2595200, at \*11 (N.D.N.Y. Sept. 11, 2006), *report and recommendation adopted by* 2006 WL 2595200, at \*1 (plaintiff could not "sustain a supervisory liability claim as there was no wrong for [supervisor-defendant] to remedy since there [was] no constitutional violation").

**\*13** Accordingly, plaintiff's retaliation claim against defendant Lee is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### D. Opportunity to File an Amended Complaint

The Second Circuit has held that a district court "should not dismiss [a pro se plaintiff's complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (internal quotation omitted). As a result, the Court will afford plaintiff an opportunity to present a proposed amended complaint with respect to the claims dismissed without prejudice.

Any amended complaint submitted by plaintiff in response to this Decision and Order must set forth a short and plain statement of the facts he relies on in support of his claim that specific individuals named as defendants in that pleading engaged in acts of misconduct or wrongdoing which violated his constitutional rights and over which this Court may properly exercise jurisdiction. Plaintiff's amended complaint, which shall supersede and

replace in its entirety the original complaint, must be a complete pleading which sets forth all of the claims that plaintiff wants this Court to consider as a basis for awarding relief herein. Plaintiff's amended complaint must also be signed by him in accordance with Fed. R. Civ. P. 11.

Plaintiff is advised that his failure to file an amended complaint **within thirty (30) days** of the filing date of this Decision and Order will result in dismissal of this action without prejudice without further Order of the Court.

### III. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's Section 1983 claims for monetary relief against defendants in their official capacities are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e) (2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; [9] and it is further

**ORDERED** that if plaintiff wishes to proceed with this action he must file an amended complaint **within thirty (30) days** of the filing date of this Decision and Order as set forth above; and it is further

**ORDERED** that upon the filing of an amended complaint as directed above, the Clerk shall return the file to this Court for further review; and it is further

**ORDERED** that in the event plaintiff fails to file a signed amended complaint **within thirty (30) days** of the filing date of this Decision

and Order, the Clerk shall enter judgment dismissing this action without prejudice due to plaintiff's failure to state a claim upon which relief can be granted and to comply with the terms of this Decision and Order, without further order of this Court; and it is further

**\*14 ORDERED** that the Clerk shall **TERMINATE** each of the defendants from Wende Correctional Facility and Sullivan Correctional Facility because the claims against these defendants were not transferred to this District pursuant to the Transfer Order (Dkt. No. 11);

**ORDERED** that the Clerk serve a copy of this Decision and Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 6674293

## Footnotes

1    Plaintiff's complaint is not signed or dated. *See* Compl. at 17. Plaintiff's IFP Application is dated May 17, 2018. *See* IFP Application at 2. For purposes of this Decision and Order only, the Court will assume that plaintiff submitted his complaint for filing on or about the same date that he prepared his IFP Application. *See Vilchel v. Connecticut*, No. 3:07-CV-1344, 2009 WL 179804, at \*2 (D. Conn. Jan. 23, 2009) (applying "prison mailbox rule" based on the date of the inmate in forma pauperis application submitted with undated complaint).

2    The page numbers cited herein are those assigned by the Court's electronic filing system, CM/ECF. The allegations in plaintiff's complaint appear on pages 1-17. Pages 18-94 are exhibits to the complaint.

3    In addition to asserting claims against defendants Lee, Gusman, Andola, and Russo, plaintiff has also named as defendants "DSP Cheryl Morris" and "IOB Heidi Lewis." *See* Compl. at 4.

4    The Second Circuit has not yet addressed how the Supreme Court's decision in *Iqbal* affected the standards in *Colon* for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"); *see also Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) (expressing "no view on the extent to which [*Iqbal*] may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations[.]" (citing *Grullon*, 720 F.3d at 139) ). For purposes of this Decision and Order, the Court assumes that all five categories under *Colon* remain valid.

5    In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities). In this case, plaintiff has not alleged facts which plausibly suggest the existence of an ongoing violation of law or the Constitution with respect to his claims arising out of alleged wrongdoing at Eastern C.F. *See generally*, Compl.

6    In *Shepherd*, the Court concluded that speculation that a plaintiff may be transferred again in the future does not warrant a departure from the principle enunciated in *Salahuddin*. *See* 662 F.3d at 610.

7    A state prison is a "public entity" for purposes of the ADA and the Rehabilitation Act. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

8    In this regard, while "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." *Blyden*, 186 F.3d at 263 (citing

2018 WL 6674293

*Hudson,* 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7 (citing *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986) ); *see also Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973).

9       Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000); *see also Pucci v. Brown,* 423 Fed. App'x 77, 78 (2d Cir. 2011) (summary order). Amendment of the complaint to assert official capacity claims for monetary relief under Section 1983 would be futile.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5394752
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

Civil Action No. 9:14-CV-0539 (BKS/DEP)

|

Signed 08/25/2016

**West Codenotes**

**Recognized as Unconstitutional**

N.Y. Correct. Law § 24

**Attorneys and Law Firms**

FOR PLAINTIFF: RONNIE COLE, Pro Se, 91-A-9212, Five
Points Correctional Facility, Caller Box 119, Romulus, NY
14541.

FOR DEFENDANTS: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, 615 Erie Boulevard West,
Suite 102, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Ass't
Attorney General, Syracuse, NY 13204-2465.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** *Pro se* plaintiff Ronnie Cole has commenced this action
asserting civil rights claims arising out of his confinement in
the custody of the New York State Department of Corrections
and Community Supervision ("DOCCS") pursuant to 42
U.S.C. § 1983. Plaintiff's claims, which are multi-faceted,
arise out of events occurring at two separate DOCCS
facilities.

Currently pending before the court is a motion filed by
defendants requesting the entry of summary judgment
dismissing plaintiff's claims on a variety of grounds. For the
reasons set forth below, I recommend that defendants' motion
for summary judgment be granted in part, but otherwise
denied.

I. BACKGROUND [1]

[1]    The record herein contains few undisputed facts. Plaintiff
and defendants disagree on many of the events that
transpired and provide conflicting accounts of the
circumstances surrounding the relevant incidents. In
light of the procedural posture of the case, the following
recitation is derived from the record now before the court,
with all inferences drawn and ambiguities resolved in
the plaintiff's party's favor. *Terry v. Ashcroft*, 336 F.3d
128, 137 (2d Cir. 2003). To the extent that plaintiff's
deposition testimony is at odds with his memorandum of
law or submissions in his statement of facts, the court
will follow the rule that "a party may not create an
issue of fact by submitting an affidavit in opposition to a
summary judgment motion that, by omission or addition,
contradicts the affiant's previous deposition testimony."
*Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

Plaintiff is a prison inmate currently being held in the
custody of the DOCCS at the Five Points Correctional
Facility ("Five Points"). Dkt. No. 54-1 at 1. [2] Plaintiff is
serving a sentence for robbery, possession of stolen property,
criminal possession of a weapon, and promoting prison
contraband. Dkt. No. 45-15 at 1. Plaintiff's claims, however,
arise out of his previous confinement at the Walsh Regional
Medical Unit ("Walsh") and the Upstate Correctional Facility
("Upstate"). [3] *Id.* at 2.

[2]    Citations to page numbers refer to the pagination
generated by CM/ECF, not the page numbers generated
by the parties.

[3]    Upstate is a maximum security prison comprised
exclusively of special housing unit ("SHU") cells in
which inmates are confined for twenty-three hours
each day, primarily for disciplinary reasons. *Samuels v.
Selsky*, No. 01-CV-8235, 2002 WL 31040370, at *4 n.11
(S.D.N.Y. Sept. 12, 2002).

A. Use of Force Incidents at Walsh

On October 29, 2013, defendant Corrections Officer Anthony
M. Durante entered plaintiff's room to conduct a strip frisk
of plaintiff and a search of his area. Dkt. No. 29-1 at 15. [4]
At the time, plaintiff was in his pajamas and seated in his
wheelchair. Dkt. No. 45-3 at 27. Plaintiff maintains that
defendant Sergeant John A. Wagner followed Durante into
plaintiff's room in the E-Wing and blocked the door. [5] *Id.*
Plaintiff asserts that he attempted to comply with Durante's
orders and began to unbutton his shirt. *Id.* at 29. Plaintiff

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 37 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

claims that Durante said "Happy Anniversary," and struck plaintiff on the right side of his face. *Id.* at 30, 32. Plaintiff maintains that defendant Stephen M. LoRusso entered the room and joined defendants Durante and Wagner as they repeatedly hit, kicked, and punched plaintiff in the head, face, and neck. Dkt. No. 45-3 at 38-56. Defendants Durante and LoRusso then pulled plaintiff out of his wheelchair, lifted him overhead, and "slammed" him into the floor causing plaintiff to land on his abdomen. *Id.* at 52-56. As a result, plaintiff's urine bag broke. *Id.* at 53. Plaintiff asserts that restraints were applied and the assault terminated when the medical staff and other officers entered the room. Dkt. No. 45-3 at 57-59.

[4]    The record does not contain an affidavit authenticating or supporting the admissibility of the records annexed to plaintiff's amended complaint. Regardless, the court considers these records because defendants rely upon the records in support of their motion for summary judgment. *See Goris v. Breslin*, 2010 WL 376626, at *10, n.1 (E.D.N.Y. Jan. 26, 2010) (collecting cases).

[5]    Wagner claims that he was supervising the "suspicion search" that was ordered based upon information obtained by defendant Lieutenant Raymond Judway from a confidential informant. Dkt. No. 29-1 at 16.

**\*2**  Defendant Durante, by contrast, has executed a sworn affidavit in which he denies having assaulted the plaintiff. [6] *See* Durante Aff. (Dkt. No. 45-14) ¶3. Durante claims that plaintiff became agitated during the search and began swinging his closed fists at Durante. *Id.* Plaintiff struck Durante on the right side of his head and Durante responded by pushing the plaintiff. *Id.* ¶1, 3. As a result, plaintiff fell backwards into a locker. *Id.* Durante avers that a violent struggle ensued during which plaintiff bit him and grabbed his testicles. *Id.* ¶4. Plaintiff was ultimately subdued, and defendants Wagner and LoRusso placed him in mechanical restraints. Dkt. No. 45-14 ¶4; Dkt. No. 29-1 at 16.

[6]    That affidavit, which is included with defendants' motion, was given by defendant Durante in connection with a matter brought by the plaintiff in the New York Court of Claims.

Plaintiff also alleges that on or around December 16, 2013, he was assaulted in a room in the A-Wing at Walsh. Dkt. No. 45-3 at 125-26. Plaintiff claims that three officers "waterboarded" him while defendant Lieutenant Timothy Michaels was present. [7] *Id.* at 126.

[7]    Plaintiff's amended complaint neither names the three officers nor asserts a claim against them.

B. Facts Related to Plaintiff's Medical Treatment at Walsh [8]

[8]    In their motion, defendants offer a sworn affidavit from Nurse Administrator Kelly Rabideau, as well as certified copies of medical records submitted under seal. Dkt. No. 45-10; Dkt. No. 46. Defendants also offer a video recording that allegedly contains relevant facts. Dkt. No. 48. The video is certified, and plaintiff does not challenge its object to the authenticity. Dkt. No. 45-6.

On October 29, 2013, shortly after the use of force incident, plaintiff attempted to hang himself. Dkt. No. 45-15 at 3; Dkt. No. 54-1 at 4. He was examined by defendant Nurse Priscilla Peterson, who noted observing a swollen and reddened area over plaintiff's left eyebrow, neck, and left ankle. Dkt. No. 46 at 3. Plaintiff was thereafter placed on suicide watch. Dkt. No. 45-3 at 71; Dkt. No. 46 at 5; Dkt. No. 54-1 at 5. While plaintiff was on a "one-on-one" suicide watch, his behavior was documented every ten minutes. Dkt. No. 46 at 5-11.

On November 1, 2013, defendant Deputy Superintendent Amy A. Tousignant issued a property deprivation order depriving plaintiff of "all property." Dkt. No. 45-9 at 30-34. Tousignant noted that plaintiff refused to follow directions, and thus posed a threat to the safety and security of staff. Dkt. No. 45-9 at 30. The order remained in effect until November 14, 2013. Id. at 34.

It is at this point that the parties' versions of the relevant events again diverge. Defendants maintain that while on watch, plaintiff received a mattress, a clean urine bag, and was able to shower. Dkt. No. 54-1 at 5. Defendants claim that plaintiff refused to accept meals, medication, blood work, and lab tests. *Id.* at 5-11. Conversely, plaintiff maintains that when he returned to his room, it was equipped with only a mat, and the toilet was padlocked. Dkt. No. 45-3 at 74, 85. Plaintiff alleges that defendants refused to provide him with meals, a urine bag, or medication. *Id.* at 74-85. Plaintiff maintains that he was not informed that any blood work or lab tests were necessary. Dkt. No. 54-1 at 7.

On October 31, 2013, plaintiff was examined by defendant Dr. Raja Mara for complaints of pain in his left eye. Dkt. No. 46 at 1. Dr. Mara's findings were benign for a left eye injury. *Id.* Plaintiff took his prescribed medications on that date and the following day, spoke with personnel from the Office of

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 38 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

Mental Health, and was removed from the watch. [9] Dkt. No. 46 at 10; Dkt. No. 54-1 at 8-9.

[9]     The record does not indicate what prescribed medications were administered.

**\*3** The parties offer conflicting accounts of plaintiff's subsequent medical treatment. Defendants claim that Dr. Mara examined plaintiff on November 5, 2013, and that Cole reported that his left eye was "good." Dkt. No. 46 at 1. Defendants allege that a physical therapist attempted to examine plaintiff on November 18, 2013, but plaintiff refused to comply and demanded a wheelchair. Dkt. No. 46 at 107. Defendants further contend that plaintiff refused to attend an audiology consultative appointment and refused to allow defendant Nurse Rebecca Dutch to conduct an annual physical examination. Dkt. No. 46 at 26, 104.

Plaintiff counters by claiming that Dr. Mara did not examine him on November 5, 2013, and that he was not informed that he had an appointment with an audiologist or Nurse Dutch. Dkt. No. 54-1 at 9. Plaintiff also claims that he did not attend any examination by a physical therapist on November 18, 2013. Dkt. No. 54-1 at 9-10.

On December 17, 2013, plaintiff was examined by an audiologist based upon a referral from Dr. Mara and defendant Facility Health Service Director Yogendra Sharma. Dkt. No. 45-15 at 11; Dkt. No. 46 at 106; Dkt. No. 54-1 at 22. The audiologist reported that plaintiff had bi-lateral hearing aids and that plaintiff's left hearing aid was cracked and needed to be sent for repair. Dkt. No. 46 at 106. The estimated cost for the repair was $189.00. *Id.* Plaintiff was told that he was responsible for the cost of the repair, but refused to pay. *Id.* The left hearing aid was relinquished to the medical staff at Walsh. *Id.*

### C. Facts Related to Medical Treatment at Upstate
Plaintiff was transferred, with a wheelchair, to Upstate on December 19, 2013. Dkt. No. 54-1 at 11. Upon arrival, plaintiff was evaluated by a nurse who noted that he presented with a history that included urethral stricture, a MRSA infection, anti-social behavior, neuropathy, and "TB." Dkt. No. 46 at 99. Defendants contend that plaintiff told staff to "get the [expletive] away from me" while "swinging his urine bag around, picking at his wounds, and pulling at his catheter and dressings." Dkt. No. 46 at 90. Plaintiff was placed on a "watch" to be monitored for self-harm. Dkt. No. 46 at 90; Dkt. No. 54-1 at 12. Defendants assert that while plaintiff was on a

"one on one" watch, he refused to accept meals or medication, show his wounds to staff, or have his dressings changed. Dkt. No. 46 at 90, 91.

Plaintiff maintains that he was physically unable to pull at his catheter because he was in full restraints with waist chains and leg irons. Dkt. No. 54-1 at 12. Plaintiff claims that he did not threaten self-harm and disputes the assertions that he refused to comply with medical staff directives. Dkt. No. 54-1 at 12-13. Plaintiff asserts that defendants confiscated his wheelchair and provided an inadequate replacement. Dkt. No. 45-3 at 136-141. Plaintiff also claims that he was denied showers and meals from December 20, 2013 through December 24, 2013. Dkt. No. 45-3 at 146; Dkt. No. 54-1 at 14.

On December 24, 2013, plaintiff was transferred from the Upstate infirmary to a cell, via wheelchair. Dkt. No. 46 at 97. A sick call response was prepared, directing that: (1) medications would be issued three times daily; (2) Ensure would be issued four time each day; (3) the catheter would be changed monthly; and (4) dressing supplies would be provided on a daily basis. *Id.* at 98. A medical permit was also issued for the plaintiff providing for (1) a single cell, bottom bunk; (2) braces for plaintiff's right and left leg; (3) bilateral hearing aids; (4) gauze; (5) a catheter and drainage bag, (6) jock strap; and (7) dentures. *Id.* at 14.

#### 1. Medications and Supplies
**\*4** From December 30, 2013 through April 4, 2014, plaintiff received replacement batteries for his hearing aid. Dkt. No. 46 at 32, 37, 95; Dkt. No. 54-1 at 22. Plaintiff also received urine bags (with straps), [10] knee sleeves, a jock strap, dressing supplies, gauze, tubular dressings for his arms, Bacitracin, Clobetasol ointment, and a back brace. Dkt. No. 46 at 13, 28, 33, 34, 38, 39, 40, 42, 43, 53, 62, 67, 71. A medical permit was issued allowing plaintiff to use his wheelchair and occupy a handicapped cell. Dkt. No. 46 at 13, 67. Plaintiff was additionally prescribed various medications, including Zantac (used to treat ulcers), Oxybutynin (used to treat overactive bladder), vitamin-C, a multi-vitamin, Celexa (an anti-depressant), Ativan (used to treat anxiety), Prilosec, Omeprazole, Ranitidine (used to treat ulcers), Flunisolide spray, Hydroxyzine (used to treat anxiety), Diphenhydramine (an antihistamine), and Ensure formula. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received 25 mg of Atarax, prescribed to treat his skin disorder. *Id.* at 64, 69.

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 39 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

10    On February 25, 2014, plaintiff refused to accept a new urine bag and dressing and demanded an "extender" for the bag. Dkt. No. 46 at 37. The technician advised the plaintiff that "no such thing" exists. *Id.*

From January 1, 2014 through April 4, 2014, plaintiff repeatedly refused to accept his dressing supplies, meals, and medications. Dkt. No. 46 at 35, 41, 47, 49, 55-56, 67, 71, 123-130, 132, 133, 134, 136, 139, 140, 142-147, 153-156, 158, 159, 161; Dkt. No. 54-1 at 23. Plaintiff's prescriptions for medications and Ensure formula were discontinued due to non-compliance. Dkt. No. 46 at 34, 43, 45, 46.

### 2. Examinations and Consultations

On January 2, 2014, plaintiff was examined by Defendant Dr. G. Schroyer, and was diagnosed with neurodermatitis. Dkt. No. 46 at 68, 70. Dr. Schroyer prescribed two rolls of cling wrap for each extremity and a tubular retainer. *Id.* Dr. Schroyer also examined plaintiff's scrotum and noted that it was "intact with [a] thin layer of skin." *Id.* at 68. Plaintiff was directed to apply ointment daily and use a jock strap, "to be changed as needed." *Id.* Dr. Schroyer also ordered plaintiff's catheter to be changed monthly. Dkt. No. 46 at 68. Defendants contend that plaintiff refused all medications and dressings. Dkt. No. 45-15 at 12. Plaintiff claims that he did not receive the supplies or medications. Dkt. No. 54-1 at 23-24.

On January 6, 2014, plaintiff was transported to the nurses' office for a catheter change. Dkt. No. 46 at 62. When plaintiff saw the catheter that the nurse intended to use, he stated, "I can't use that kind, it'll give me an infection." *Id.* The nurse called the pharmacy technician to request a clear catheter, and was advised that one would need to be located. *Id.* Plaintiff refused the catheter change and said he would wait for a new one to arrive. *Id.* The nurse told plaintiff to apply ointment to the area under his scrotum. Dkt. No. 46 at 62. The notations in plaintiff's records indicate that two packets of ointment were issued, although plaintiff claims that he never received the ointment. Dkt. No. 46 at 62; Dkt. No. 54-1 at 27.

Plaintiff was scheduled for physical therapy consultations on January 8, 2014 and February 10, 2014. Dkt. No. 46 at 103, 108. The therapist noted, however, that plaintiff refused to attend on those dates. *Id.* Plaintiff claims that security issues prevented his attendance. Dkt. No. 54-1 at 29. On March 24, 2014 and April 43, 2014, plaintiff refused to attend physical therapy sessions. Dkt. No. 46 at 31, 73.

On January 14, 2014, plaintiff submitted a request for a reasonable accommodation. Dkt. No. 46 at 12. In it he asked for a wheelchair that "fits" with a cushioned seat and a shower chair. *Id.* On January 23, 2014, Dr. Schroyer denied plaintiff's request for a new wheelchair, noting that "current wheelchair meets pts needs." *Id.* at 12.

 **\*5**  On January 17, 2014, plaintiff was treated by a nurse for complaints of swelling in his left leg. Dkt. No. 46 at 53. The nurse did not detect any swelling, but observed very dry skin with open areas and "scant bloody drainage." *Id.* Plaintiff received cream for use on his arm and legs and was advised to treat the open areas with Bacitracin. *Id.*

Defendant Nurse Practitioner Mary Kowalachuk ("Kowalachuk") diagnosed plaintiff on February 4, 2014, with atopic dermatitis. Dkt. No. 46 at 42. On March 4, 2014, Kowalachuk attempted to change plaintiff's catheter. *Id.* at 34. While plaintiff was advised that he must be on the examination table for the nurse to perform the procedure, he refused to stand from his wheelchair. *Id.*

Defendant Facility Health Service Director V. Mandalaywala sent plaintiff to Alice Hyde Medical Center on March 22, 2014, after plaintiff accidentally pulled out his catheter while attempting to transfer from his wheelchair to the shower. Dkt. No. 46 at 76-84. Plaintiff was transported to the hospital for a procedure to reinsert his catheter. *Id.* at 32, 76-84. The procedure was successful and plaintiff returned to Upstate. *Id.*

On April 7, 2014, plaintiff was transferred to Five Points. Dkt. No. 46 at 30.

### D. Disciplinary Hearings

On November 1, 2013, plaintiff was issued a misbehavior report charging him with assault on staff, engaging in violent conduct, refusing a direct order, and failure to comply with a frisk search. Dkt. No. 29 at 14. A Tier III hearing was commenced on November 4, 2013 with defendant Captain Joseph Corey presiding, to address these charges.[11] Dkt. No. 45-9 at 40. On November 15, 2013, plaintiff was removed from the hearing allegedly due to disruptive conduct. Dkt. No. 29-1 at 31. Plaintiff was ultimately found guilty of all charges.[12] *Id.* at 41-42. Cole was sentenced on November 20, 2013, to serve eighteen months of disciplinary confinement in the facility's special housing unit ("SHU"), with a loss of privileges, and a recommended loss of good time credits. *Id.* at 40.

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 40 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

11    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

12    Plaintiff disputes the assertion that he was disruptive or that he pled guilty to the violent conduct charge, as defendants maintain.

Plaintiff appealed the disciplinary determination on November 20, 2013. *Id.* at 27-32. Defendant Director of Special Housing Albert Prack modified plaintiff's sentence on January 14, 2014. Dkt. No. 29-1 at 44. On February 11, 2014, Prisoners' Legal Services of New York forwarded correspondence to defendant Prack, on plaintiff's behalf, requesting reconsideration of the modification. Dkt. No. 29-1 at 46. Defendant Prack later reviewed and administratively reversed defendant Corey's decision on March 4, 2014. *Id.* at 59. Plaintiff was advised that a complete rehearing would commence "within 14 days of receipt of [that] notice." Dkt. No. 29-1 at 59.

**\*6** On March 20, 2014, defendant Hearing Officer Steven Bullis conducted a rehearing with respect to plaintiff's misbehavior report. Dkt. No. 29 ¶78. At the conclusion of that hearing plaintiff was found guilty of all charges. *Id.* Prack reversed Bullis' findings on June 2, 2014, noting that, "[t]he circumstances surrounding the incident required the hearing officer to get a mental health assessment." Dkt. No. 45-13 at 10.

As a result of the misbehavior report and two hearings, plaintiff remained in disciplinary SHU confinement for a total of 170 days. Dkt. No. 29 ¶28.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint, accompanied by an application for leave to proceed in forma pauperis ("IFP"), on May 8, 2014. Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge Mae A. D'Agostino issued an order granting plaintiff's IFP application

and approving the filing of his complaint subject to dismissal of claims that arose under the Americans With Disabilities Act, as amended ("ADA"), 42 U.S.C. § 12,101 *et seq.*, and claims for money damages pursuant to 42 U.S.C. § 1983 against the DOCCS and the defendants in their official capacities. *See generally* Dkt. No. 5. On June 16, 2015, the court granted plaintiff's subsequent motion to amend his complaint to assert section 1983 claims against the defendants in their individual capacities and an ADA claim against the DOCCS. *See generally* Dkt. No. 28.

On November 13, 2015, following the close of discovery, defendants moved for the entry of summary judgment seeking dismissal of the complaint on multiple grounds, including (1) failure to exhaust administrative remedies with respect to Eighth Amendment claims against defendants LoRusso and Michaels; (2) the absence of any evidence from which a reasonable factfinder could conclude that plaintiff sustained anything other than *de minimis* injuries as a result of the October 29, 2013 incident; (3) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants were deliberately indifferent to plaintiff's serious medical needs; (4) plaintiff's failure to demonstrate either the deprivation of a protected liberty interest or procedural due process associated with any such deprivation; (5) the lack of record evidence to give rise to a genuine dispute of material fact regarding whether defendants retaliated against plaintiff in violation of his First Amendment constitutional rights; (6) the lack of personal involvement of the supervisory defendants; (7) the failure to state a cause of action under the ADA; and (8) qualified immunity. Dkt. No. 45. Plaintiff filed his response in opposition to the motion on December 28, 2015. Dkt. No. 54. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3( c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Motions for Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. *Fed. R. Civ. P. 56(e)*; *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Administrative Remedies

As a procedural matter, defendants contend that plaintiff is precluded from judicial pursuit of his Eighth Amendment claims against defendants LoRusso and Michaels based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a). Dkt. No. 45-16 at 16-18.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81,

84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [13] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[13]   All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

The failure of a prisoner to satisfy the PLRA's exhaustion requirement gives rise to an affirmative defense that must be affirmatively raised by a defendant in response to an inmate suit. [14] *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

[14]   Defendants have interposed an exhaustion defense in their answer. Dkt. No. 34 &18.

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCCS, which is recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir. 1999)). The IGP consists of a three-step review process. First, a written

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 42 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident. 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision.§§ 701.4(b), 701.5(b), 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal*, 206 F.Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia, Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Despite the PLRA's mandate concerning exhaustion, there are circumstances under which the requirement can be excused. In its recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court noted that the requirement hinges upon internal remedies being actually available to a plaintiff inmate. *Ross*, 136 S. Ct. 1859. When internal administrative remedies are unavailable to an inmate, the PLRA's exhaustion requirement does not preclude commencement of an action. *Id.*

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available. Under the first, "an administrative procedure is unavailable when (despite what regulations are guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. *Id.* The Court went on to identify a third situation under which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Since the Supreme Court's decision in *Ross*, the Second Circuit has weighed in on the issue in a case involving a district court's determination that a plaintiff's complaint should be dismissed for failure to exhaust remedies where the inmate claimed to have submitted a grievance concerning

misconduct by corrections officers but received no response to the grievance, and took no further action with respect to it. *Williams v. Priatno*, ___ F.3d ___, No. 14-1477, 2016 WL 3729383 (2d Cir. July 12, 2016). In *Williams*, plaintiff alleged that on December 31, 2012, while confined in the Downstate Correctional Facility ("Downstate"), his personal items were confiscated, his legal papers were confiscated, and he was assaulted by corrections officers. *Id.* at *2. Plaintiff claimed that on January 15, 2013, while still at Downstate and confined in an SHU cell, he drafted a grievance detailing the misconduct and gave it to a corrections officer to forward to the grievance office. *Id.* One week later, not having received a response to the grievance, the plaintiff inquired of the facility superintendent, who was making rounds in the SHU, concerning the grievance, and was told that the superintendent had no knowledge of the grievance but would look into it. *Id.* Shortly after that conversation, plaintiff was transferred into another facility. Plaintiff never received a response to the grievance, nor did he ever appeal to the superintendent and/ or the CORC.

**\*9** After discussing the Supreme Court's decision in *Ross*, the Second Circuit in *Williams* reversed the dismissal of plaintiff's complaint, concluding that the pertinent provisions of the IGP, providing recourse in situations such as those presented, were opaque, therefore making the grievance process unavailable to the plaintiff. *Williams*, 2016 WL 3729383, at *5-6. Although not the centerpiece of its decision in *Williams*, the Second Circuit went on to note that the ambiguity associated with the prescribed mechanism for appealing a grievance that was never officially filed and answered was compounded by plaintiff's transfer and concluded that the procedures available to the plaintiff were so opaque and confusing as the incapable of use, thereby making the administrative remedies unavailable to the plaintiff. *Id.* at *7.

The initial burden of demonstrating non-exhaustion rests with the defendants. Once the defendants meet this burden, however, "it then becomes incumbent upon the plaintiff to counter with a showing of unavailability...". *See, e.g., Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *4 & n. 17 (N.D.N.Y. Mar. 31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw*, No. 09-CV-1354, 2011 WL 4345299, at *5 & n. 5 (N.D.N.Y. Aug. 10, 2011) (Lowe, M.J.) (citing cases), *report and recommendation adopted by* 2011 WL 4345296 (N.D.N.Y. Sept. 15, 2011) (McAvoy, J.); *Cohn v. KeySpan Corp.*, 713 F.Supp.2d 143, 155 (E.D.N.Y. 2010) (finding that, in the employment discrimination context, the defendants

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 43 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense).

### 1. Claims Against Defendant LoRusso

While acknowledging that plaintiff did file grievances generally addressing the October 2013 incident, defendant LoRusso maintains that the grievances fail to include or reference his claim that the officer used excessive force. Rather, defendant LoRusso contends that plaintiff's grievances against him related only to the destruction of property and, as such, do not suffice to meet the applicable exhaustion requirements. Dkt. No. 45-16 at 17.

Undeniably, there is no specific requirement within the IGP or otherwise that an inmate identify all persons alleged to be responsible for the acts giving rise to his or her constitutional claims. *Espinal v. Goord*, 558 F.3d 119, 126 (2d Cir. 2009). A grievance, however, must be sufficiently precise and illuminating in order to place defendants on notice of what, substantively, is claimed in order to permit a proper investigation. *Johnson*, 380 F.3d at 697 (quoting *Strong v. David*, 297 F.3d 646, 650 (2d Cir. 2002)).

In this instance, defendant LoRusso's argument lacks merit, as it overlooks both the fact that defendant LoRusso is named in plaintiff's grievances, and case law which firmly establishes that this alone does not necessarily provide a basis to conclude that a claim is unexhausted. *See Brownell v. Krom*, 446 F.3d 305, 311 n.1 (2d Cir. 2006). The undisputed record reveals that plaintiff filed several grievances related to the events that transpired at Walsh on October 29, 2013. [15] Dkt. No. 29-1 at 33; Dkt. No. 45-9 at 5, 7, 9, 10, 11, 12. Plaintiff claimed that he was assaulted on October 29, 2013 and complained that various DOCCS employees, including defendant LoRusso, failed to adhere to DOCCS policies related to searches and property. *Id.* While the use of excessive force by defendant LoRusso was not directly raised in plaintiff's grievances, defendant LoRusso does not dispute that he was present in plaintiff's cell on the day of the incident. As part of the investigation into the incident, LoRusso submitted a statement and reported that he responded to plaintiff's room and "immediately grabbed Cole's left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No.

29-1 at 17. According to the November 14, 2013 use of force report prepared in connection with the incident, LoRusso applied force against the plaintiff, including in the form of a body hold and mechanical restraints. Dkt. No. 45-9 at 46, 50, 51. LoRusso "maintained his hold on Cole's left hand and then forced it backward to Cole's lower back and assisted Sgt. Wagner in putting it in mechanical restraints." *Id.* at 15 46, 51. LoRusso then "rolled Cole onto his left side." *Id.*

[15]     The grievances were consolidated and referenced as Grievance No. MHK 12505-13.

**\*10** Having carefully examined the exhaustion issue in light of defendants' arguments, I cannot find as a matter of law that plaintiff has failed to fully exhaust available administrative remedies related to defendant LoRusso prior to filing this action. At best, drawing all inferences in plaintiff's favor, there is a triable issue as to whether plaintiff's grievance provided the requisite notice of the conduct at issue with respect to his claims against defendant LoRusso. *See Brownell*, 446 F.3d at 310-11. Accordingly, I recommend against dismissal of plaintiff's complaint on this basis.

### 2. Claim Against Defendant Michaels

Defendants contend that plaintiff is barred from pursuing a claim based upon a "failure to protect" theory against defendant Michaels based upon Cole's failure to file a grievance relating to that claim. Dkt. No. 45-16 at 18. Plaintiff asks the court to excuse his failure to exhaust the available administrative remedies prior to commencing this action and including a failure to protect claim against defendant Michaels because (1) he forwarded a grievance to Upstate regarding the waterboarding incident but the grievance was returned with the explanation that plaintiff "needed to send the grievance to the facility responsible for the waterboard action," and (2) plaintiff sent a grievance to Walsh/Mohawk C.F. regarding the incident but did not receive a response. Dkt. No. 54-2 at 16-17.

As was previously noted, despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff. *See Ross*, 136 S. Ct. at 1859-60. Thus, for example, exhaustion may be considered unavailable where the "plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly," but the IGP Supervisor failed to

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 44 of 187
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

advise plaintiff of his ability to ask for an extension". *Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *11 (N.D.N.Y. March 28, 2014).

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Hemphill*, 380 F.3d at 688 (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In opposition to defendants' motion, plaintiff asserts that he attempted, twice, to file a grievance against defendant Michaels, but his grievances were rejected. The record contains a January 6, 2014 letter from plaintiff to Mr. J. Lovelace, Senior Investigator at the Office of the Inspector General. Dkt. No. 29-1 at 101. In that correspondence, plaintiff advises that he forwarded a letter on December 24, 2013 regarding "crimes committed against my person" on December 19, 2013 "before ... administrative draft out." *Id.* at 101. In it, plaintiff refers to being "beat" and "drowning." *Id.* Plaintiff enclosed a grievance based upon the December 19, 2013 assault. *Id.* The record also contains a memorandum dated January 6, 2014 from the IGP Office informing plaintiff that Grievance No. UST 53210-14 related to harassment/ misconduct was being investigated. Dkt. No. 29-1 at 100. The record, however, does not contain a copy of that grievance.

Based upon the record, this court cannot conclude that plaintiff did not properly submit a timely initial grievance regarding defendant Michaels' alleged violation of plaintiff's rights at Walsh, and that the IGP was available to him. Mindful that a court should not resolve credibility issues when deciding a motion for summary judgment, and that the defendants bear the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, I conclude that there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance regarding his claim against defendant Michaels or whether his failure to do so should be excused under *Ross*.

### C. Excessive Force Claims

**\*11** Plaintiff claims that defendants Durante, Wagner, and LoRusso violated his Eighth Amendment rights through their use of excessive force against him. Dkt. No. 29 ¶100. Defendants argue that there is no medical evidence by which plaintiff can substantiate this claim, and that any injury he suffered was *de minimis*. Dkt. No. 45-16 at 15-16.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (quotation marks omitted); *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (quotation marks omitted). This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted); *accord, Blyden*, 186 F.3d at 262. The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases, rather than "whether a certain quantum of injury was sustained." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness.[16] *Wilkins*, 559 U.S. at 37; *Hudson*, 503 U.S. at 9.

16    This notwithstanding, "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (quotation marks omitted).

"The objective component [of the excessive force analysis] ... focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency' "). In assessing this element, a court must ask whether the alleged wrongdoing

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 45 of 187
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

is objectively harmful enough to establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated. This is true whether or not significant injury is evident.' " *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated[.]" *Wilkins*, 559 U.S. at 38. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

**\*12** In support of defendants' motion, they have included an affidavit from defendant Durante, in which he denies plaintiff's allegations and explains the necessity of applying force in order to maintain discipline. Dkt. No. 45-14. Durante avers that he entered plaintiff's room at approximately 9:40 a.m. to conduct a search. Dkt. No. 45-14 at 1. Plaintiff became agitated, jumped out of his chair, and swung his closed fists at Durante, striking the officer in the head. *Id.* Durante pushed plaintiff away, causing him to fall into a locker. *Id.* Durante recounts that during a violent struggle, plaintiff grabbed his testicles and bit Durante's left hand. Dkt. No. 45-15 at 2. Durante forced plaintiff onto the floor, chest first, and maintained pressure on plaintiff's shoulders. *Id.* Defendants Wagner and LoRusso then applied mechanical restraints. *Id.*

As was discussed earlier, an investigation was conducted regarding the incident, during which defendants LoRusso and Wagner provided statements. According to defendant LoRusso, he responded to plaintiff's room and "immediately grabbed Coles left arm with both hands and forced it to the small of his back despite much resistance from Cole. I then placed mechanical restraints on his left wrist and then assisted in rolling Cole on his left side." Dkt. No. 29-1 at 17. Additionally, defendant Wagner reported plaintiff did not comply with Durante's directives and that, "[f]orce had to be used to gain control of Inmate Cole." Dkt. No. 45-9 at 47.

While defendants explain that the use of force was necessary because plaintiff refused to comply with their efforts to conduct a search and attacked him, plaintiff disputed their version of the events when he testified during his deposition

that defendants used forced against him for reasons unrelated to restoring or maintaining discipline. Plaintiff testified that during an illegal cell search and strip search, defendants choked, kicked and punched him in the head, neck, face, legs, back and abdomen. Dkt. No. 45-3 at 32, 38, 40-43. He claims that the defendants pulled him out of his wheelchair, picked him up by his arms and "slammed" him to the ground on two occasions causing plaintiff's urine bag to break when he landed on his abdomen. *Id.* at 52-54. Plaintiff contends that the attack was in retaliation for filing grievances and lawsuits. Dkt. No. 45-3 at 25, 30, 50.

In further support of their motion, defendants also rely upon a surveillance video recording from Walsh.[17] Dkt. No. 48 (traditionally filed, not electronically filed). The video recording does not depict the use of force incident or any of the events surrounding the excessive force claim. Instead, it simply begins with plaintiff being escorted from his cell to another cell following the incident. Dkt. No. 48. As such, the court is unable to resolve any factual issues surrounding the use of force or determine which version of events to credit. *See Comeaux v. Sutton*, 496 Fed.Appx. 368, 372 (5th Cir. 2012) (holding that while the video depicted the plaintiff's injuries, the videotape did not offer any proof as to the need for or circumstances of force and thus, the court could not hold that the plaintiff's version of events was inconsistent with his injuries).

[17]      The video is not date or time stamped. The date on which it was recorded, however, is referenced in the audio portion of the video.

Plaintiff claims that as a result of the incident he sustained two black eyes and suffered bruising, swelling, and pain in his face, back, abdomen and wrist. Dkt. No. 45-3 at 66, 68. Defendants argue that plaintiff's injuries were *de minimis* because the medical records associated with the treatment administered by Walsh personnel and the video recording do not support plaintiff's allegations concerning the extent of his injuries. *See generally* Dkt. No. 45-2. Defendants ignore the fact, however, that plaintiff's injuries are but one factor to consider in the excessive force analysis. *See Wilkins*, 559 U.S. at 38 (finding that the extent of an inmate's injuries is but one factor to consider in determining whether a defendant's use of force was "unnecessary and wanton" because "injury and force ... are imperfectly correlated"). Although none of plaintiff's medical records reveal that he suffered anything but minimal injuries as a result of the alleged uses of force by the defendants, the dispositive inquiry is whether defendants

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 46 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

used force in a malicious and sadistic manner, rather than in a good-faith effort to maintain or restore order. On a motion for summary judgment, where the record evidence could reasonably permit a rational factfinder to find that corrections officers used force maliciously and sadistically, dismissal of an excessive force claim is inappropriate. *See Wright, 554 F.3d at 269* (reversing summary dismissal the plaintiff's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the Amedical records after the ... incident with [that officer] indicated only a slight injury") (citing *Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003)*).

**\*13** Based on the record now before the court, there exists a dispute of fact as to the basis for defendants' use of force. From the conflicting grounds given by the parties, this case would appear to squarely present an issue of credibility not appropriately resolved on motion for summary judgment. *Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)* (citing, *inter alia, Anderson, 477 U.S. at 255, 106 S. Ct. 2513*). Accordingly, I recommend that defendants' motion be denied to the extent that it seeks dismissal of this claim.

#### D. Failure to Protect Claim Against Defendant Michaels

In their motion defendants argue that plaintiff's claim against defendant Michaels for failing to protect him from harm at the hands of three unidentified corrections officers is subject to dismissal on the merits. A plaintiff asserting a failure to protect claim must prove that the defendant against whom the claim is asserted actually knew of and disregarded an excessive risk of harm to his health and safety. *Hayes v. New York City Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996)*. This "reckless disregard" to a plaintiff's health and safety can be proven by establishing "a pervasive risk of harm to inmates ... and a failure by prison officials to reasonably respond to that risk." *Knowles v. N.Y. City Dep't of Corrs., 904 F. Supp. 217, 222 (S.D.N.Y. 1995)* (quotation marks omitted). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle, No. 10-CV-0456, 2011 WL 5975027, at \*4 (N.D.N.Y. Nov. 29, 2011)* (Suddaby, J.) (citing *Jean-Laurent v. Wilkinson, 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)*).

Plaintiff claims that three officers, who are not named as defendants in this action, "held" him in the "A-Wing holding closet" at Walsh and "play[ed] there [sic] game of water boarding." Dkt. No. 29 at 16; *see also* Dkt. No. 45-3 at 126, 129. Plaintiff maintains that those unnamed individuals restrained him and placed a towel over his face while they poured water on him in an attempt to choke him. Dkt. No. 45-3 at 128-130. According to the plaintiff, defendant Michaels was present during the assault. *Id.* at 126. Defendants argue that this claim is "wild and unsupported," but do not offer any affidavit from defendant Michaels or any substantive argument in support of their request for dismissal of this claim. Dkt. No. 45-16 at 18. I therefore recommend against the entry of summary judgment dismissing plaintiff's claim against defendant Michaels for failure to protect him from harm.

#### E. Deliberate Medical Indifference Claim

In his complaint, plaintiff asserts claims addressed to the sufficiency of the medical care and treatment received by him at the relevant times. In their motion defendants also seek dismissal of this claim as a matter of law.

#### 1. Legal Standard Governing Deliberate Medical Indifference Claims

While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)* (quoting *Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)*). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble, 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

**\*14** A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by neglecting to provide adequate medical care must satisfy both objective and subjective requirements. *Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009)*; *Price v. Reilly, 697 F.Supp.2d 344, 356*

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 47 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

(E.D.N.Y. 2010). The Second Circuit has noted the following with respect to the objective requirement:

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The second inquiry of the objective test requires a court to examine the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation mark and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the inmate's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer*, 511 U.S. at 837); *see also Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

**\*15** It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment" and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y. 1998) (citation omitted). Accordingly, mere disagreement with prison officials regarding a course of treatment does not implicate a constitutional right or support a deliberate indifference claim under section 1983. *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970) (citation omitted).

## 2. Analysis

Addressing the first objective element of the governing test, defendants argue that plaintiff has failed to establish that he suffered from any serious injury and contend that there is no evidence that plaintiff suffered from a MRSA infection while confined at Walsh or Upstate. Dkt. No. 45-16 at 15. Plaintiff's medical records, submitted in support of defendants' summary judgment motion, however, belie defendants' argument. Those records indicate that plaintiff attempted suicide, was

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 48 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

positive for a MRSA infection suffered from asthma, urethral stricture, hearing loss, and neuropathy, and displayed an anti-social personality. Dkt. No. 46 at 99. Accordingly, a reasonable factfinder could conclude that plaintiff suffered from a serious medical need. *See McCluskey v. Vincent*, 505 Fed.Appx. 199, 202 (3d Cir. 2012) (holding that MRSA is a serious medical need); *Miller v. Ramineni*, No. 14-CV-1351(DNH/CFH), 2016 WL 1253684, at *4 (N.D.N.Y. Feb. 29, 2016), *report and recommendation adopted*, 2016 WL 1261125 (N.D.N.Y. Mar. 30, 2016) ("Several courts have concluded that MRSA constitutes a sufficiently serious medical condition.") (collecting cases); *see also Zimmerman v. Burge*, No. 06 CV 0176 (GLS/GHL), 2009 WL 9054936, at *6 (N.D.N.Y. April 20, 2009) (finding that objective element was satisfied because plaintiff attempted suicide and was diagnosed with depression).

a. Claims Against Walsh Defendants

Plaintiff claims that defendants Mara, Regional Medical Director Marshall Trabout, Dutch, Peterson, Health Care Assistant Joseph Henderson, and Nurse Administrator D. Williamson ignored his medical needs. In his deposition, plaintiff provided greater detail concerning this claim, testifying that defendants (1) refused to assess and treat his injuries after the excessive force incident; (2) failed to provide medication and medical supplies including Depends and urine bags; and (3) failed to repair his hearing aids.[18] See Dkt. No. 45-3 at 77, 97-105. Defendants assert that plaintiff refused to allow medical staff to administer blood tests and declined to attend scheduled appointments.

[18]    Defendants incorrectly summarize plaintiff's deliberate medical indifference claims against the Walsh defendants. Dkt. No. 45-10 at 2. They contend that as a result of the use of force incident, plaintiff sustained only minor injuries that were not sufficiently serious medical conditions requiring constitutional protections. Dkt. No. 45-16 at 12. However, plaintiff's Eighth Amendment claims are not limited to a failure to treat the injuries allegedly sustained by the plaintiff as a result of the October 29, 2013 incident.

The evidence before the court establishes that defendant Peterson examined plaintiff following the alleged assault, and documented her findings. Dkt. No. 29-1 at 12. From October 29, 2013 through November 1, 2013, plaintiff was monitored every ten minutes while on a "suicide watch." Dkt. No. 46 at 5-11. After plaintiff was discharged from the watch,

he was examined by defendant Mara, received medications and medical supplies, and attended a consultation with an audiologist. Dkt. No. 45-3 at 79-82.

**\*16** While there is a dispute regarding whether defendants failed to advise plaintiff of scheduled appointments, even viewing the evidence in a light most favorable to plaintiff, the failure to advise plaintiff of scheduled appointments does not constitute deliberate indifference. *See Johnson v. Woods*, No. 07-CV-1018 (DNH/DRH), 2010 WL 2039164, at *13 (N.D.N.Y. March 2, 2010). There is no evidence from which a rational factfinder could conclude that defendants knew that plaintiff would suffer serious harm if they failed to advise him of blood tests, an appointment with an audiologist, a consultative appointment with a physical therapist, or the need for an annual physical examination. At best, plaintiff's allegations state claims of negligence and medical malpractice which are not cognizable under 42 U.S.C. § 1983. *See, e.g., Farmer*, 511 U.S. at 835 ("[D]eliberate indifference describes a state of mind more blameworthy than negligence."); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("A showing of medical malpractice is ... insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness."); *Morris v. Hoke*, No. 87-CV-7812, 1992 WL 310792, at *2 (S.D.N.Y. Oct. 21, 1992) ("[T]he [plaintiff's allegations] would underlie, at best, a state claim of negligence or medical malpractice, not cognizable under 42 U.S.C.1983.").

With regard to plaintiff's allegations related to his hearing aids, the record reveals that on December 17, 2013, he attended a consultative appointment with an audiologist and was advised that his left hearing aid was cracked and needed repair. Dkt. No. 46 at 106. Plaintiff refused to pay the cast of the needed repair. *Id.* The record does not contain any evidence related to plaintiff's right hearing aid, and specifically whether it was functional at that time. On December 30, 2013, plaintiff received new batteries for his hearing aids. *Id.* at 95. Even assuming that plaintiff was deprived of his hearing aids for any period of time, his claim is deficient based upon his failure to provide any evidence establishing that he was unable to function due to the deprivation. *See Alster v. Goord*, 745 F.Supp.2d 317, 334 (S.D.N.Y. 2010) (finding that the plaintiff's allegations related to uncomfortable or inadequate hearing aids failed to rise to the level of a constitutional violation) (citations omitted); *see also Fate v. Goord*, 2012 WL 3104884, at *7 (S.D.N.Y. July 31, 2012) (holding that the "short waiting

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 49 of 187
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

period" before receiving hearing aids cannot be considered deliberate indifference).

In further support of his inadequate medical care claim, plaintiff recites facts related to the conditions of his cell. Plaintiff claims that the cell did not have a bed, his toilet was padlocked, he was denied meals, and he was forced to sleep on the floor. Dkt. No. 45-3 at 73-76. Even assuming these conditions existed, the evidence does not establish that plaintiff's medical conditions deteriorated due to those conditions. Moreover, this portion of his claim is also subject to dismissal since the record before the court does not establish that any named defendant was personally responsible for the conditions of plaintiff's cell, or that any named defendant possessed the authority to remedy those conditions. *See Savage v. Brue*, No. 05-CV-0857 (GLS/GHL), 2007 WL 3047110, at *12 (N.D.N.Y. Oct. 18, 2007) (holding that cell conditions were immaterial to Eighth Amendment medical claim because the complaint lacked allegations establishing that defendants were involved in decisions related to supplies or suggesting that the conditions contributed to plaintiff's serious medical condition).

The evidence now before the court also fails to disclose the precise involvement on the part of defendant D. Williamson in the alleged deprivation of treatment, and lacks factual assertions plausibly establishing that this defendant both knew of and disregarded an excessive risk to plaintiff's health or safety. Plaintiff vaguely testified that D. Williamson "failed to provide adequate medical care." Dkt. No. 45-3 at 183-84. This conclusory allegation is insufficient to establish defendant D. Williamson's role in the medical indifference alleged. *See Schwartz v. Dennison*, 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y. 2007) ("Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional policy."); *Graham v. Poole*, 476 F.Supp.2d 257, 261 (W.D.N.Y. 2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim.").

*17 In sum, plaintiff alleges deliberate indifference against Walsh defendants in only a skeletal and conclusory fashion and, for the most part, fails to point to specific deprivations that could rise to a level of constitutional significance. Aside from plaintiff's vague and unsupported deposition testimony, there is no evidence that defendants were deliberately indifferent to plaintiff's medical needs. Accordingly, I recommend that this portion of defendants' motion be granted,

and that plaintiff's medical indifference claims against defendants Mara, Trabout, Dutch, Peterson, Henderson and D. Williamson be dismissed.

### b. Claims Against Upstate Defendants

Plaintiff alleges that defendants Mandalaywala, Dr. Schroyer, Kowalachuk, Smith, Michaels, and Nurse M. Williamson were also deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. Specifically, plaintiff claims that those defendants (1) failed to treat his MRSA infection and wounds; (2) improperly discontinued medications; (3) confiscated plaintiff's wheelchair and denied his request for a suitable replacement; (4) attempted to provide a catheter that would have caused infection; and (5) failed to provide examinations or consultations with specialists. Dkt. No. 29 ¶65, 104, 105; Dkt. No. 45-3 at 159-167; Dkt. No. 54-2 at 10-11. Defendants contend that plaintiff's care at Upstate was appropriate, and that he was non-compliant with his treatment. Dkt. No. 45-16 at 11-15.

Having carefully reviewed the record, I conclude that no reasonable factfinder could find that the Upstate medical defendants were deliberately indifferent to plaintiff's medical needs. Between December 2013 and April 2014, plaintiff was treated by prison medical staff on virtually a daily basis for a variety of ailments. Plaintiff received vitamins, dietary supplements, and various medications to treat his skin disorder, ulcer, overactive bladder, depression, and anxiety. Dkt. No. 46 at 35, 42, 51, 59, 64, 94-95. Plaintiff also received dressing supplies including gauze, sleeves, tubular dressing, Bacitracin and Clobetasol ointment. *See generally* Dkt. No. 46. Plaintiff was examined by Dr. Schroyer, as well as members of the nursing staff, and was referred to a hospital to have his catheter reinserted. Dkt. No. 29-1 at 62-69. Plaintiff received a permit for a wheelchair, braces, and knee sleeves. Plaintiff's dissatisfaction with his treatment, type of wheelchair, and defendants' choice of a latex catheter rather than a silicone catheter falls short of establishing that defendants acted with a sufficiently culpable state of mind.

Addressing the discontinuance of medications, defendants explain that the decision to halt plaintiff's medications was based upon his non-compliance with staff directives and his continued refusal to accept medication. Plaintiff's deliberate indifference claims are undermined by his admission that he was not denied meals or medication, but rather, refused for fear it "would cause him more harm." Dkt. No. 54-2

at 10; *see Mortimer Excell v. Fischer*, No. 08-CV-0945 (DNH/RFT), 2009 WL 3111711, at \*5 (N.D.N.Y. Sept. 24, 2009) (dismissing the plaintiff's Eighth Amendment claim because the plaintiff was provided with food but refused to eat it for fear that it was drugged). Even assuming that defendants acted improperly in discontinuing plaintiff's medication, at most the error constitutes negligence, which is not actionable under 1983. *Johnson v. Connolly*, No. 07-CV-0158 (LEK/GHL), 2008 WL 724167, at \*5 (N.D.N.Y. March 17, 2008) (holding that allegations that medications were improperly discontinued amounts to negligence, not deliberate indifference).

**\*18** As to plaintiff's claim that he should have been referred to a urologist, a plaintiff's disagreement over the decision of whether an evaluation by a specialist is warranted in any particular case is the very kind of treatment decision which, courts have recognized, does not alone support a cognizable claim under the Eighth Amendment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703. There is no evidence in the record to suggest that an examination by a urologist was medically necessary, or that any different treatment would have eventuated as a result of such a visit. Simply stated, plaintiff's disagreement regarding the need for referral to a urologist does not state a claim against the defendants for deliberate indifference to his serious medical needs.

In sum, the record lacks any facts demonstrating that defendants' conduct exposed plaintiff to an excessive risk of harm, or that his condition deteriorated because of the defendants' actions. Accordingly, no reasonable factfinder could conclude that the Upstate defendants were deliberately indifferent to plaintiff's medical needs. Plaintiff's medical indifference claim against the Upstate defendants is therefore also subject to dismissal as a matter of law.

### F. Due Process Claims Against Defendants Tousignant and Michaels

Plaintiff claims that defendant Tousignant issued a deprivation order confiscating Cole's property, bed, braces and "anything in his cell" in violation of his Fourteenth Amendment rights. [19] Dkt. No. 45-3 at 119. Plaintiff also alleges that defendant Michaels issued an order depriving plaintiff of the use of his wheelchair without affording plaintiff his due process rights. Dkt. No. 29 ¶ 58; Dkt. No. 45-3 at 125.

[19] Defendants have not submitted any argument in response to this claim.

In the prison context, it is will established that the alleged destruction or loss of a plaintiff's personal property will not support a claim redressable under § 1983, provided that adequate post-deprivation remedies are available. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The deprivation of property does not constitute a Fourteenth Amendment violation because New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prisoners. *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

Here, plaintiff does not allege a destruction or loss of any personal property. Instead, he claims that he was temporarily deprived of access to his personal property and wheelchair. Even assuming the record supported plaintiff's allegations, there was an adequate post-deprivation remedy available to the plaintiff before the New York State Court of Claims. *See Davis v. New York*, 311 Fed.Appx. 397, 400 (2d Cir. 2009). Accordingly, I recommend dismissal of plaintiff's due process claims related to his deprivation of property.

### G. Due Process Claims Associated With the October 29, 2013 Misbehavior Report

Plaintiff claims that defendants Corey and Bullis deprived him of due process when presiding over his disciplinary hearings. [20] Dkt. No. 29 at ¶103. Defendants argue that plaintiff's due process claim is deficient as a matter of law. Dkt. No. 45-16 at 23-26.

[20] Plaintiff also asserts supervisory claims against Prack related to his disciplinary hearings. Those claims are discussed below. *See* pp. ___ – ____, *post*.

To successfully state a claim under 42 U.S.C. § 1983 for a denial of procedural due process, a plaintiff must show that he 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

#### 1. Liberty Interest

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 51 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

**\*19**  As to the first element, in *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [21] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions of that confinement, however, a court may not be required to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

[21]  In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at

232-33 n.5). In those circumstances the court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

Defendants concede that as a result of the two disciplinary hearings and determinations, plaintiff served 170 days of SHU disciplinary confinement, but allege that he was not deprived of a liberty interest because during that time, "he was offered daily medical attention and meals, which he claims to have refused to eat because he did not 'trust it.' " Dkt. No. 45-16 at 24. The record confirms that plaintiff spent 170 days in a SHU setting. Dkt. No. 29. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a constitutional significant liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky*, 292 Fed.Appx. 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were extraordinary, [22] defendants have not adduced any evidence with respect to the conditions of ordinary prison life in support of their motion. Because this evidence is lacking, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his disciplinary confinement. *See Reynoso*, 292 Fed.Appx. at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150-day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest during the course of his 170 day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 52 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

22     Plaintiff testified that, while confined in the SHU, he was denied showers, food, and water. Dkt. No. 45-3 at 145-150. Plaintiff also claimed that he remained on the "floor the whole time." *Id.* at 147.

### 2. Sufficiency of Process Associated with the October 29, 2013 Misbehavior Report and Ensuing Disciplinary Hearing

**\*20**  The procedural safeguards to which a prison inmate is entitled for being deprived of a constitutionally significant liberty interest are well-established, the contours of the requisite protections having been articulated by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally-mandated due process requirements include (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir. 1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination also must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

### a. False Misbehavior Reports

Plaintiff alleges that defendants Corey and Bullis violated his due process rights when they conducted hearings based upon a false misbehavior report. Dkt. No. 54-2 at 25. The mere allegation of the issuance of a false misbehavior report to an inmate is not cognizable under section 1983. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Similarly, an inmate does not possess a due process right to be free from having a hearing officer rely upon an alleged false misbehavior report at a disciplinary hearing. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988) ("It is well established that in the absence of other aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report."). This general rule recognizes that an inmate's procedural due process rights are adequately safeguarded by

the opportunity to challenge and present evidence to rebut the false accusations at a disciplinary hearing. *Freeman,* 808 F.2d at 953.

### b. November 2013 Hearing

#### i) Whether Plaintiff's Claims Relating To His First Disciplinary Hearing Are Negated By The Reversal And Subsequent Second Hearing

Defendants claim that the issue of whether plaintiff's due process rights were violated during the first hearing is a nullity due to the subsequent reversal of the resulting determination and commencement of a second hearing. Dkt. No. 45-16 at 25. In support of that position, they rely upon the Second Circuit's decisions in *Horne v. Coughlin,* 155 F.3d 26 (2d Cir. 1998). The underlying facts in *Horne* are strikingly similar to those in the case at bar. In that case, a first disciplinary hearing was conducted on December 19, 1984, resulting in a finding of guilt and a sentence of one year of SHU disciplinary confinement. *Horne,* 155 F. 3d at 28. That determination was ultimately reversed in May 1985. *Id.* A second hearing was conducted on May 9, 1985. *Id.* At the conclusion of that hearing, plaintiff was again found guilty and sentenced to serve three hundred days in SHU confinement, although that penalty was administratively modified to six months of SHU confinement. *Id.* Plaintiff in that case was credited with all of the time served as a result of the first hearing, and was released thirteen days after the modification on May 28, 1985, after having served six months of SHU confinement, including the time spent as a result of the first hearing.[23] *Id.* Under these circumstances, the Second Circuit concluded that it was unnecessary to address plaintiff's procedural due process claims arising out of the first hearing since "it became a nullity." *Id.* at 31.

23     That time spent in disciplinary confinement as a result of the first hearing was credited to the penalty ultimately dispensed after the second hearing is made clear in a footnote of the court's decision in *Horne,* in which it stated:

It should be clear from the discussion in the dissenting opinion that *Horne* did not spend five months of administrative confinement waiting for his second hearing. The 5 – month period he spent in SHU pursuant to his first disciplinary sentence (before it was voided), and the few days spent thereafter awaiting the second hearing, were all

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 53 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

credited to the service of his eventually six – month
sentence. As a result his 6 months were completed
and he was released from SHU thirteen days after
the six – month sentence was imposed on May 28,
1985 [sic]. Thus, the six months to which *Horne* was
ultimately sentenced was the only time he spent in
the SHU.

*Horne*, 155 F. 3d at 31, n. 4.

**\*21** In this matter, as in *Horne*, the record establishes that
plaintiff was confined in the SHU as a result of penalties
imposed following the November 2013 hearing, and remained
in SHU confinement until after the second hearing
commenced on March 20, 2014, at which he was again found
guilty. Accordingly, based upon the Second Circuit's decision
in *Horne*, it is unnecessary to determine whether plaintiff was
afforded due process in connection with his first hearing, and
his claims against defendant Corey are subject to dismissal on
this basis.

### ii) Plaintiff's Arguments Regarding The First Hearing

Even assuming *arguendo* that the plaintiff's first hearing
was not rendered a nullity, for purposes of the plaintiff's
procedural due process claims, I will address his substantive
arguments. In connection with the first hearing, plaintiff
claims that defendant Corey precluded him from questioning
witnesses and improperly removed him from the first hearing.
Dkt. No. 29 ¶103; Dkt. No. 54-2 at 26-27. Plaintiff argues
that Hearing Officer Corey's failure to call an inmate, nurses,
and Imam Muhammad violated his Fourteenth Amendment
rights. *Id.* Plaintiff claims that Muhammad was present in
his room after the assault, and would have offered testimony
concerning his injuries. Dkt. No. 45-3 at 109-110.

### aa. Right to Call Witnesses

Among the due process violations cited by plaintiff in support
of his procedural due process claim with regard to the
first hearing is a deprivation of his right to call witnesses.
While the Fourteenth Amendment guarantees an inmate's
right to call witnesses and present evidence in his defense
before being deprived of a cognizable liberty interest, that
right is not without bounds; the law requires only that an
inmate be permitted to present witness testimony only where
"permitting him [or her] to do so will not be unduly hazardous
to institutional safety or correctional goals." *Hill v. Selsky*,
487 F.Supp.2d 340, 342 (W.D.N.Y. 2007) (citing *Wolff*, 418

U.S. at 566, 94 S.Ct. at 2979). "[A] prisoner's request for a
witness can be denied on the basis of irrelevance or lack of
necessity." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d
Cir. 1991). "Prison officials may be required to explain, in a
limited manner, the reason why witnesses were not allowed
to testify." *Ponte v. Real*, 471 U.S. 491, 497 (1985). "The
burden is not upon the inmate to prove the official's conduct
was arbitrary and capricious, but upon the official to prove
the rationality of his position." *Fox v. Coughlin*, 893 F.2d 475,
478 (2d Cir. 1990).

During the first hearing, defendant Corey permitted plaintiff
to call defendants Peterson and Judway as witnesses. Dkt.
No. 45-9 at 42. On November 20, 2013, defendant Corey
completed the required Form 2176 with an explanation of
his decision not to call RN Hart, RN Schram, and Imam
Muhammad as witnesses. Dkt. No. 29-1 at 22. Corey noted
that Hart, Schram, and Muhammad did not witness the
alleged assault, and were not involved in the incident that
precipitated the hearing. *Id.* The fact that plaintiff was not
present to execute the witness interview form reflecting the
hearing officer's denial of plaintiff's request to call those three
witnesses does not give rise to a due process violation. [24]
"[A]s long as a hearing officer articulates a reason for not
calling a witness that is logically related to correctional goals,
due process does not require that he do so during the hearing."
*Brooks v. Rock*, No. 11-CV-1171 (GLS/ATB), 2014 WL
1292232, at \*29 (N.D.N.Y. Mar. 28, 2014) (citation omitted).

[24] Plaintiff does not dispute that he received the form.
While the record does not clearly establish when plaintiff
received the form, he was provided with the form at some
point, as is evidenced by the fact that it was annexed as
an exhibit to his amended complaint. Dkt. No. 29-1 at 22.

**\*22** Defendant Corey's decision not to call the requested
witnesses was reasonable. It is clear from plaintiff's testimony
that those witnesses were not present during the alleged
assault, and the record of plaintiff's injuries and treatment
adequately addressed their scope and extent. *See Wolff*, 418
U.S. at 466 (citing "lack of necessity" as a proper ground for
refusing to call a potential witness at a disciplinary hearing).
Finally, a careful review of the record does not suggest that
the result of plaintiff's hearing would have been any different
had defendant Corey permitted these witnesses to testify.
*See Lewis v. Murphy*, No. 12-CV-0268 (NAM/CFH), 2014
WL 3729362, at \*13 (N.D.N.Y. July 25, 2014) (holding that
the plaintiff alleged that his counselor failed to interview
witnesses but did not show how this shortcoming prejudiced
the results).

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 54 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

bb. Removal from Hearing

Plaintiff claims that defendant Corey improperly ordered his removal from the hearing. Dkt. No. 54-2 at 26. Defendants contend that even if the court determines plaintiff's Fourteenth Amendment rights were violated when excluded from the hearing, defendant Corey is entitled to qualified immunity. Dkt. No. 45-16 at 27.

The Second Circuit has not conclusively resolved whether an inmate has a due process right to be present at disciplinary proceedings, and district courts within the circuit have issued varying opinions regarding the issue. *See Vogelfang v. Capra*, 889 F. Supp. 2d 489, 514 (S.D.N.Y. 2012) ("[T]his Court finds it to be an open question in the Second Circuit whether there is an independent right of a prisoner to be present at all times during a disciplinary hearing, or whether such a right to be present exists only insofar as it is required to enable the prisoner to exercise his or her rights to call witnesses or present documentary evidence."); *Clark v. Dannheim*, No. 02-CV-6525L, 2011 WL 2973687, at *1 (W.D.N.Y. July 21, 2011) (collecting cases) ("[W]here an inmate disrupts a hearing, a hearing officer has discretion to order the inmate removed, particularly if the prisoner has been warned that continued unruly behavior may result in his expulsion."); *Mims v. Ufland*, No. 07 CIV. 1926, 2008 WL 2986497, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted) (holding that the limited right to be present at the hearing is not absolute, and can be waived if the inmate engages in disruptive conduct). In this district, courts have reasoned that the Supreme Court's decision in *Wolff* affords an inmate the limited right to be physically present at disciplinary hearings in order to exercise basic due process rights. *Johnson v. Doling*, No. 05 CV 376 (TJM/RFT), 2007 WL 3046701, at *8-9 (N.D.N.Y. Oct. 17, 2007) (citations omitted). That right is "necessarily be limited by penological interests;" however, the "per se denial of such right would undermine the requirement that disciplinary hearings be held 'at a meaningful time and in a meaningful manner.' " *Id.* (citing, *inter alia Wolff*, 418 U.S. at 566 (stating "we must balance the inmate's interest ... against the needs of the prison, and some amount of flexibility and accommodation is required")).

Defendants contend that plaintiff was removed from the hearing due to his "beligerent [sic] and disruptive" behavior. Dkt. No. 45-9 at 42-44. Plaintiff maintains that he was improperly removed from the hearing because defendant

Corey "didn't like the questions I was asking." Dkt. No. 45-3 at 111. Plaintiff avers that he did not yell, or struggle but "conduct[ed] [himself] as they were conducting themselves." *Id.* at 112. While a hearing officer retains the right to remove a disruptive inmate based on safety concerns, *see Ponte*, 471 U.S. at 495, the evidence before the court does not conclusively establish that plaintiff was disruptive during the hearing. The transcript of that disciplinary hearing is not part of the record before this court. Accordingly, there are genuine issues of fact as to whether plaintiff's due process rights were violated when defendant Corey removed him from the disciplinary hearing. Having made that determination, I must turn to the issue of whether Corey is entitled to qualified immunity with respect to this claim.

**\*23** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), abrogated on other grounds by (*Pearson*, 555 U.S. 223)). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry is informed by whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S.Ct. at 2093). The Supreme Court has said that an officer's "conduct violates

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 55 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S.Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendant Corey is entitled to qualified immunity based upon my conclusion that it was objectively reasonable for him to believe that his conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the disciplinary hearing, "the contours" of the right, or limited right, of an inmate to be present at his disciplinary hearing were not clearly established. *Webb v. Selsky*, No. 01-CV-149S, 2008 WL 796179, at *7-8 (W.D.N.Y. Mar. 24, 2008). In any event, a person in defendant Corey's position could have reasonably concluded that excluding plaintiff from the hearing would not violate any clearly established constitutional right. Accordingly, I recommend a finding that defendant Corey is entitled to qualified immunity.

#### c. March 20, 2014 Hearing

**\*24** Plaintiff contends that the second disciplinary hearing, which was conducted on March 20, 2014 by defendant Steven Bullis, was untimely as it did not commence within the fourteen days prescribed by the decision on appeal and 7 N.Y.C.R.R. § 251-5.1. Dkt. No. 54-2 at 25, 30. It is well-established that the violation of a state regulation is not cognizable under 42 U.S.C. § 1983. *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject only to overarching constitutional considerations, which require

only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin*, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips*, No. 04-CV-1160, 2007 WL 168238, at *6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable). Here, the undisputed record establishes that second hearing was commenced one day beyond the allotted time. Plaintiff has failed to produce any evidence suggesting that his procedural due process rights were violated by this brief delay.

During his deposition, plaintiff claimed that defendant Bullis refused to allow him to question witnesses and denied him due process when the hearing officer called witnesses before plaintiff was brought into the room. Dkt. No. 45-3 at 114. Plaintiff does not identify the witnesses in question or provide any argument related to the substance of the testimony. "It is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwaskinski v. Morse*, 201 F.3d 103, 109 (2d Cir. 1999) (citations omitted). "Nor does an inmate have a constitutional right of confrontation." *Id.* (citations omitted). Accordingly, I recommend that plaintiff's due process claims related to the second disciplinary hearing be dismissed.

#### H. Retaliation

In their motion, defendants also seek dismissal of retaliation claims asserted by the plaintiff. When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment, a section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). The Second Circuit has cautioned, however, that, because of "the ease with which claims of retaliation may be fabricated, courts should examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *accord, Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2013).

To establish a claim under section 1983 for unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct, (2) the defendants took adverse action against him, and (3) there was a causal connection between the protected activity and the adverse action-in other words,

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 56 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007). "[P]rison officials' conduct constitutes an 'adverse action' when it would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Alicea v. Howell*, 387 F.Supp.2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

As to the first element of the plaintiff's retaliation claim, it is well settled that the filing of grievances and lawsuits constitutes protected activity for purposes of a First Amendment retaliation analysis. *See Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 144 (2d Cir. 2001) ("It is undisputed that retaliation by prison officials against an inmate for the filing of a grievance can act as a deprivation of a constitutionally protected right."). Turning to the second element of the retaliation claim, plaintiff must establish that he suffered an adverse action. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). To establish the requisite connection between protected speech and adverse action, in order to satisfy the third element, the plaintiff must prove that the protected conduct was a "substantial and motivating factor to the adverse action taken by prison officials." *Bennett v. Goord*, 343 F.3d at 133, 137 (2d Cir. 2003).

**\*25** With respect to the third, causation element of a retaliation claim, several factors may be considered in determining whether the requisite nexus exists between the plaintiff's protected activity and a prison official's actions, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his ... motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at \*8 (N.D.N.Y. Jan. 24, 2013). While the chronology of events may favor the finding of a causal connection, a plaintiff may not rely upon temporal proximity alone to defeat summary judgment. *Faulk v. Fisher*, 545 Fed.Appx. 56, 58 (2d Cir. 2013) (finding that temporal proximity between protected conduct and an adverse action constitutes circumstantial evidence of retaliation). The evidence relating to the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action. *Baskerville v. Blot*, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002).

Plaintiff has asserted retaliation claims against defendants Durante, Wagner, LoRusso, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey. Defendants argue that plaintiff cannot support retaliation claims with the "speculative" assertion that those defendants were motivated, in general, by plaintiff's litigious behavior. Defendants contend that plaintiff's failure to cite to any specific grievances or complaints as the basis for his retaliation claim warrants an award of summary judgment. Dkt. No. 45-16 at 22-23.

### 1. Defendant Durante

Plaintiff alleges that defendant Durante used excessive force in retaliation for plaintiff filing grievances and a lawsuit. Dkt. No. 54-2 at 14. The record before the court contains evidence that plaintiff filed complaints in September 2010 and October 2010 related to threats, harassment, and assaults involving Durante. Dkt. No. 29-1 at 1. In September 2010, plaintiff filed a complaint in this district against "DOCS" and various employees related to his confinement at Mohawk C.F. [25] *See Cole v. New York State Dep't of Corr. Servs.*, No. 10-CV-1098 (NAM/TWD) (Dkt. No. 1) ("*Cole I*"). On March 23, 2011, plaintiff's amended complaint in that case was accepted for filing. *Id.* (Dkt. No. 16). In his amended complaint, plaintiff claimed, *inter alia*, that defendant Durante retaliated against him and violated his Eighth Amendment rights with harassment, threats, and excessive force claims arising from assaults that occurred in September 2010 and October 2010. *Id.* (Dkt. No. 16 ¶¶70, 74). On April 21, 2011, Durante acknowledged service of the amended complaint in that action. *Id.* (Dkt. No. 28). Plaintiff subsequently forwarded a letter to defendant Superintendent Paul M. Gonyea on July 16, 2012, accusing defendants LoRusso and Durante of harassment. Dkt. No. 29-1 at 7-10. Based upon these circumstances, I find that plaintiff engaged in protected conduct with the filing of complaints, grievances, and a lawsuit involving defendant Durante.

[25]     The DOCCS was formerly known as the Department of Correctional Services, or "DOCS."

As to the second element of the plaintiff's retaliation claim, it is clear that "an assault by corrections officers is sufficient to 'chill a person of ordinary firmness from continuing to engage in his First Amendment activity.' " [26] *Rivera v. Goord*, 119 F.Supp.2d 327, 339-40 (S.D.N.Y. 2000). While defendants do

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 57 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

not present any further arguments in support of dismissing plaintiff's retaliation claims, implicit in their motion is the suggestion that the record lacks evidence to establish the requisite nexus between the protected conduct and adverse action that is, that the protected conduct was a "substantial" or "motivating factor" in defendant Durante's decision to use force against plaintiff.

26    In their motion, defendants do not dispute that plaintiff suffered adverse actions.

**\*26** Plaintiff asserts that immediately before being assaulted by defendant Durante, the officer stated, "Happy Anniversary" in reference to prior assaults and a lawsuit that resulted from those assaults. Dkt. No. 45-3 at 30. Plaintiff also testified that defendant Durante told him that the assault was "payback" for grievances. Dkt. No. 45-3 at 54. While plaintiff has offered proof of his complaints and the filing of a lawsuit against Durante, the gap between the protected conduct asserted and the defendant's alleged retaliatory act is tenuous. *See Butler v. Raytel Med. Corp.*, 150 Fed.Appx. 44, 47 (2d Cir. 2005) (holding that a one year gap between complaint and adverse employment action is insufficient to support an inference of a causal relationship). However, when coupled with the statements attributed to Durante, which, if true, strongly suggest that he was motivated to assault plaintiff for filing the lawsuit, these circumstances present genuine issues of material fact concerning the nexus element of the retaliation test, thereby precluding the entry of summary judgment in connection with plaintiff's retaliation claim. *See Roland v. McMonagle*, No. 12-CV-6331, 2015 WL 5918179, at *6 (S.D.N.Y. Oct. 9, 2015) (finding an issue of fact as to retaliation despite the gap in time between the protected conduct and alleged attack as the plaintiff presented evidence that the defendants were aware of the complaints and mocked him for filing grievances during the attack). For this reason, I recommend against the entry of summary judgment dismissing plaintiff's retaliation claim against defendant Durante.

## 2. Defendant LoRusso

As it relates to defendant LoRusso, the record before the court does not contain any evidence that plaintiff filed a grievance against defendant LoRusso prior to the October 2013 incident, and LoRusso was not a named defendant in *Cole I*. For this report, I assume that plaintiff engaged in protected conduct, as it relates to defendant LoRusso, based upon the July 2012 letter to defendant Gonyea. What is

lacking, however, are any allegations of fact that connect the letter and the October 2013 incident. Plaintiff cannot rely solely upon the temporal proximity of the complaint and the alleged acts of misconduct by defendant LoRusso to survive summary judgment. Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the pleading stage. *Ethier v. City of Cohoes*, No. 02-CV-1584, 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033, 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005). Moreover, the thirteen months that elapsed between the alleged protected conduct, in July 2012, and the October 2013 incident, without more is insufficient to support a finding of the requisite nexus. *See, e.g., Nicastro v. N.Y. City Dep't of Design & Constr.*, 125 Fed.Appx. 357, 358 (2d Cir. 2005) (concluding that the plaintiff could not, at the summary judgment stage, establish even a *prima facie* case of retaliation where the adverse employment action occurred "almost ten months after" the plaintiff engaged in protected conduct and there was no other evidence of causation); *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552 (E.D.N.Y. 2015). Accordingly, I recommend that plaintiff's retaliation claim against defendant LoRusso be dismissed

## 3. Defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk

Plaintiff also claims that defendants Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, and Kowalachuk retaliated against him when they confiscated his wheelchair and hearing aids, refused to provide Depends, pajamas, or soap, failed to treat his MRSA infection, and were deliberately indifferent to his medical needs. Dkt. No. 29 at ¶105; Dkt. No. 45-3 at 174. Plaintiff asserts that their retaliatory conduct was motivated by plaintiff's prior grievances and lawsuit.

Based upon the record before the court, no reasonable factfinder could conclude that plaintiff suffered any significant adverse action. While, plaintiff was dissatisfied the medical treatment received from prison officials, the record establishes a willingness on defendants' part to respond to plaintiff's medical needs. Moreover, as discussed in depth above, plaintiff was not denied adequate or timely medical attention. Under these circumstances plaintiff did not suffer any adverse action as a result of defendants' medical treatment

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 58 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

and thus, as a matter of law, cannot sustain a retaliation claim based upon that treatment.

**\*27** I note, moreover, that even assuming plaintiff suffered any negative consequences from defendants' medical treatment, he has not cited to any evidence which would support the requisite nexus between his protected conduct and the adverse action. On July 26, 2012, plaintiff filed a grievance (MHK-12773-12) complaining of inadequate medical treatment, harassment, food tampering, and conspiracy. [27] *Id.* at 11. The record also establishes that plaintiff filed grievances in July 2012 and November 2013 related to his medical care at Walsh. Dkt. No. 29-1 at 11; Dkt. No. 45-9 at 9, 11. Plaintiff also filed numerous grievances related to his medical care at Upstate. *Id.* at 50, 51, 57, 96. However, the record does not contain any proof from which a reasonable factfinder could conclude that any action by these defendants was motivated by plaintiff's filing of grievances or the commencement of *Cole I.* These defendants were not named as defendants in *Cole I,* and are not referenced anywhere in plaintiff's amended complaint in that action. *See Cole I* (Dkt. No. 16). There is no evidence of any connection between these defendants and defendant Durante or the prior grievances nor, indeed, is there any record evidence that these defendants were even aware that plaintiff filed grievances or a lawsuit. The evidence now before the court fails to establish a connection between these defendants and plaintiff's grievance and lawsuit. Simply stated, the record is devoid of any evidence from which a reasonable factfinder could conclude that these defendants retaliated against plaintiff for the filing of grievances and a lawsuit.

[27]    The record contains a copy of a CORC decision dated February 20, 2013, resolving a grievance filed on July 26, 2012. Dkt. No. 29-1 at 11. The names of the Walsh medical staff and corrections officers identified in the grievance were redacted, however, and the record does not contain a copy of the original grievance.

#### 4. Defendants Wagner and Corey

With regard to defendants Wagner and Corey, plaintiff has failed to adduce any facts indicating that he engaged in protected conduct as it relates to these two defendants. The grievances at issue did not involve these defendants, and plaintiff had failed to offer any facts indicating these defendants knew that he had engaged in protected conduct. Indeed, plaintiff testified that he never saw defendant Wagner before the day of the alleged assault, and never filed any

grievance against defendants Corey or Wagner. Dkt. No. 45-3 at 48-49; 120-121.

Plaintiff claims that defendant Corey was aware of his prior grievances and complaints regarding harassment based upon his position as Deputy Superintendent of Security. This contention, however, is unsupported by the record or any competent evidence, and instead appears to be the product of sheer surmise on plaintiff's part. Because the record contains no evidence from which a reasonable factfinder could conclude that there exists a causal connection between plaintiff's grievances, complaints and lawsuit and adverse action by defendant Wagner or defendant Corey, I recommend that the court grant this portion of defendants' motion and dismiss plaintiff's retaliation cause of action as against these two defendants.

#### I. Personal Involvement/Supervisory Liability

Plaintiff asserts claims against defendants Judway, Upstate Deputy Superintendent of Administration Sandra Danforth, Sharma, Gonyea, Prack, and DOCCS Acting Commissioner Anthony Annucci. Those claims appear to be based solely upon their supervisory positions and plaintiff's contention that those defendants were aware of ongoing constitutional violations and failed to prevent them from continuing. *See, e.g.* Dkt. No. 29 at ¶102; Dkt. No. 54-2 at 18-19; Dkt. No. 45-3 at 122, 159, 168, 170. Plaintiff also maintains that defendant Annucci failed to transfer him out of Walsh after plaintiff settled his prior lawsuit. Dkt. No. 54-2 at 12. Defendants argue that the record before the court fails to establish their involvement in any constitutional violations.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [42 U.S.C.] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under section 1983. *See Ashcroft v. Iqbal,* 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,*

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 59 of 187
Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

**\*28**  It is well-established that individuals who are sued in their capacities as supervisors, cannot be liable for damages under section 1983 solely by virtue of being a supervisor. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003) ("[L]iability ... cannot rest on respondeat superior."); *Wright,* 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir. 2007), *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of plaintiff's allegations against the aforementioned supervisory defendants, plaintiff must offer evidence which would implicate their personal involvement in the constitutional violations.

### 1. Defendant Judway

Plaintiff claims that defendant Judway was personally involved in the use of force incident, and cites to Judway's testimony during the November 2013 disciplinary hearing as support for that allegation. Plaintiff maintains that Judway testified that he authorized defendants Durante and Wagner to "get Cole by any means necessary." Dkt. No. 45-3 at 66. Unfortunately, the record now before the court does not contain either a transcript from that hearing or an affidavit from defendant Judway. Though admittedly tenuous, assuming there was a constitutional violation related to the use of force incident, it is conceivable that a reasonable factfinder could credit plaintiff's claim and conclude that defendant Judway was personally involved. This could suffice to potentially support a finding of the requisite personal involvement on the part of defendant Judway to support a finding of liability against him. For this reason, I have recommended a finding that plaintiff has raised genuine questions of material fact regarding defendant Judway's personal involvement, sufficient to avoid summary judgment on this basis.

### 2. Defendant Gonyea

Plaintiff alleges that defendant Gonyea received notice that defendants Durante and LoRusso were threatening and harassing plaintiff in July 2012. Defendants' motion does not contain any declaration or affidavit from defendant Gonyea. Rather, defendants summarily state, without reference to the July 2012 letter, that Gonyea is being sued solely due to his position in the prison hierarchy. The court finds that defendants have failed to sustain their initial burden of proving that there are no material issues of fact with respect to Gonyea's personal involvement. Accordingly, I recommend defendants' motion with respect to defendant Gonyea be denied.

### 3. Defendant Prack

Plaintiff's claims against defendant Prack arise from the two disciplinary hearings conducted to address the November 1, 2013 misbehavior report, and his role in reviewing the resulting determinations. Plaintiff appealed the disciplinary determinations by defendants Corey and Bullis, and defendant Prack responded to those internal appeals. Dkt. No. 29-1 at 44, 59; Dkt. No. 45-13 at 10; Dkt. No. 54-2 at 18. With respect to the first disciplinary hearing, for the same reasons cited in support of my recommendation that plaintiff's claims against defendant Corey be dismissed, I also recommend dismissal of all claims against defendant rack arising out of that first disciplinary hearing. Turning to the second hearing, I have found no basis to conclude that the second hearing was conducted in a manner that failed to comport with due process. Accordingly, I recommend the court also grant defendants' motion with respect to plaintiff's due process claim asserted against Prack arising from the second hearing. *See, e.g., Lopez v. Whitmore,* No. 13-CV-0952 (BKS/ATB), 2015 WL 4394604, at *11 (July 16, 2015) (dismissing due process claim against defendant Prack "[b]ecause his only involvement in plaintiff's claims was to affirm the results of a disciplinary hearing that th[e] court ... found comported with due process").

### 4. Defendants Danforth and Sharma

**\*29**  Plaintiff asserts supervisory liability claims against defendant Sharma based upon his position as the Health

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 60 of 187
Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5394752

Service Director at Walsh. Dkt. No. 45-3 at 170. Plaintiff also claims that defendant Danforth was responsible for investigating plaintiff's complaints against the medical staff. *Id.* at 159. As was discussed above, I have recommended a finding that plaintiff failed to raise an issue of material fact with respect to his Eighth Amendment medical indifference claims, and that they are subject to dismissal. Accordingly, for the reasons set forth in Part III(I)(3) above, I recommend that that portion of defendants' motion for summary judgment seeking dismissal of plaintiff's supervisory claims against defendants Danforth and Sharma be granted.

### 5. Defendant Annucci

At his deposition, plaintiff testified that he is suing Acting Commissioner Annucci in this action for four reasons, alleging that Annucci (1) is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) failed to investigate the alleged assault on plaintiff; (3) failed to respond to letters from plaintiff; and (4) failed to transfer plaintiff out of Walsh after becoming aware of the prior lawsuit. Dkt. No. 45-3 at 121-122; Dkt. No. 54-23 at 12.

With regard to the failure to transfer plaintiff, "[a] supervisor's failure to transfer a prisoner out of a facility may constitute deliberate indifference where the supervisor 1) knows that the conditions of confinement expose the prisoner to serious risk of harm, and 2) the supervisor has the authority to transfer the prisoner to another facility." *Kane v. Pierce*, No. 106-CV-01564, 2009 WL 189955, at *3 (E.D. Cal. Jan. 26, 2009), *report and recommendation adopted*, 2009 WL 674127 (E.D. Cal. Mar. 16, 2009) (citations omitted).

Plaintiff's claims against Annucci are based upon plaintiff's unsupported assumption that Annucci received plaintiff's letters. Dkt. No. 45-3 at 123 ("I wrote him several times. He would refer back to the facility. He did nothing."). Indeed, there is no record evidence, including any testimony from plaintiff, regarding where, when, or by what means plaintiff forwarded a letter or complaint directly to Annucci. In any event, even assuming that Annucci received plaintiff's letters, Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks v. Smith*, No. 08-CV-0586 (TJM/GHL), 2011 WL 4055415, at *14 (N.D.N.Y. March 29, 2011) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement.").

For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### J. Defendant Judway

Plaintiff claims that defendant Judway failed to adhere to DOCCS policy when he authorized a strip search of the plaintiff without preparing the appropriate paperwork. Dkt. No. 29 at 49-51; Dkt. No. 45-3 at 66. The allegations in plaintiff's amended complaint related to defendant's failure to adhere to DOCCS's regulations or policies do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston*, 810 F.2d 353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson*, 628 F.Supp.2d 407, 411 (W.D.N.Y. 2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). I therefore recommend the dismissal of plaintiff's claims against defendant Judway based upon his alleged failure to comply with DOCCS policies and procedures.

### K. ADA Claims [28]

[28] Plaintiff does not specify what portions of the ADA are triggered by defendants' actions. Reading his amended complaint liberally, it appears that he brings this complaint under Title II of the Act.

**\*30** Title II of the ADA prohibits discrimination on the basis of disability by public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 45 (2d Cir. 2002). The protections offered under Title II extends to inmates in state correctional facilities like Upstate. *See Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) ("[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates[.]").

To establish a violation under the ADA, a plaintiff must demonstrate that (1) he is a qualified individual with a disability; (2) the defendant is subject to the ADA; and (3) he was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 61 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

otherwise discriminated against by defendants, by reason of a disability. *Henrietta D.*, 331 F.3d at 272. The ADA defines a "disability" in part as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(A). A "qualified individual with a disability" is one "who, with or without reasonable modifications to rules, policies or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

Plaintiff claims that his hearing impairment was diagnosed by prison officials and known to all defendants, and constitutes a disability. Dkt. No. 54-2 at 20; Dkt. No. 29-1 at 79-81. Defendants argue that the issue of whether plaintiff's hearing loss is a disability for the purposes of the ADA has already been resolved by the United States District Court for the Southern District. Dkt. No. 45-16 at 20. In *Cole v. Goord, et. al.*, No. 05 Civ 2902 (S.D.N.Y. filed August 29, 2009) ("*Cole II*"), the court dismissed ADA claims brought by the plaintiff, finding that he did not have a hearing disability. *See Cole v. Goord*, 2009 WL 2601369, at *8 (S.D.N.Y. Aug. 25, 2009). In doing so the court reasoned:

> Defendants acknowledge that Cole has some difficulty hearing and has been diagnosed with non-significant bilateral hearing loss by the audiologists who have examined him. (*See* Def. Rule 56.1 Statement, & 8.) But Cole has not demonstrated that this hearing loss "substantially limits" a major life activity as required by the ADA. With the hearing aids which defendants provided for him and which he wears daily, Cole can hear "clear[ly and] pick[ ] up everything." Because measures taken to correct or mitigate a physical impairment are relevant to whether an impairment substantially limits a major life activity, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also Fall v. New York State*

> *United Teachers*, 289 Fed. Appx. 419, 421 (2d Cir. 2008) (finding that plaintiff did not assert, or support with credible evidence, the proposition that her hearing loss was substantial when the corrective measures were employed), Cole has no hearing disability for purposes of the ADA.

*Id.* (internal citations omitted).

Issue preclusion, often referred to as collateral estoppel, bars a party that had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013); *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007), *cert denied*, 552 U.S. 1179, 128 S.Ct. 1218, 170 L.Ed.2d 59 (2008). Issue preclusion applies when

> **\*31**  (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.

*Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (quotation marks omitted); *accord, Proctor*, 715 F.3d at 414; *see also McKithen*, 481 F.3d at 105.

The burdens applicable to the factors informing the issue of collateral estoppel are variously allocated. The party seeking to invoke issue preclusion bears the burden of demonstrating that the nature of the issues are identical, and "they were necessarily decided in the prior action." *Kulak v. City of N.Y.*, 88 F.3d 63, 72 (2d Cir. 1996). The burden of demonstrating that the prior action did not afford a full and fair opportunity to litigate the issue, however, rests with the party opposing application of the doctrine. *Kulak*, 88 F.3d at 72. The determination of whether the previous action provided a full and fair opportunity to litigate requires consideration of several factors, including

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 62 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation.

*Shell v. Brun*, 362 F.Supp.2d 398, 400 (W.D.N.Y. 2005) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 500, 501 (1984)).

From the record now before the court, it is clear that plaintiff raised the claim now being asserted in *Cole II*, and that the precise claim now presented – that is, whether his hearing loss constitutes a disability under the ADA – was decided against him. There is nothing to suggest that plaintiff was not afforded a full and fair opportunity to litigate that claim in the prior proceeding. Even though *Cole II* was brought against different defendants, because the Southern District concluded that plaintiff did not suffer from a hearing disability for the purposes of the ADA, that determination is entitled to full faith and precludes plaintiff from mounting a challenge in this court. *See Garrett v. Angelone*, 940 F.Supp. 933, 940-41 (W.D. Va. 1996) ("Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, [the plaintiff] is estopped from rearguing this factual issue in any later litigation."). Moreover, there is nothing in the record to suggest that plaintiff's hearing loss has materially deteriorated. Indeed, in opposition to defendants' motion, plaintiff relies solely upon medical evidence from 2004 and 2009. Dkt. No. 29-1 at 79-81. Accordingly, I find no basis to disagree with the Southern District's determination, and on this basis I recommend granting defendants' motion for summary judgment dismissing plaintiff's ADA claims under the doctrine of collateral estoppel.

L. Negligence Claims

Plaintiff claims that defendants Mandalaywala, Kowalachuk, Smith, Schroyer, and Danforth were negligent when they failed to order "follow-up examinations" and provide plaintiff with treatment by a urologist. Dkt. No. 29 ¶106.

**\*32** By statute, New York vests state employees, including correctional employees, with immunity from suits for damages arising from conduct performed within the scope of their employment. N.Y. Corr. Law § 24. The relevant statute provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco*, 119 F.3d 183, 186-87 (2d Cir. 1997). Section 24 thus precludes claims against corrections personnel brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir. 1996). Because "a federal court applying pendent jurisdiction is forced to apply state substantive law to a state claim, this would result in inmates being prohibited from advancing such pendent claims along with their federal claims in federal court." *O'Diah v. Fischer*, No. 08-CV-0941, 2012 WL 987726, at *21 (N.D.N.Y. Feb. 28, 2012) (Homer, M.J.), *report and recommendation adopted by* 2012 WL 976033 (N.D.N.Y. Mar. 22, 2012) (McAvoy, J.). Additionally, because the New York State Court of Claims is one of "limited jurisdiction," hearing only claims against New York State, "[section] 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties." *Rucano v. Koenigsmann*, No. 12-CV-0035, 2014 WL 1292281, at *15 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J.). [29]

[29]

To be sure, the immunity afforded under section 24 is by no means absolute. Actions taken by corrections employees occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 63 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

provision. The circumstances presented in *Ierardi*, for example, involving a claim of sexual harassment by a special education teacher employed by the DOCCS against a corrections officer assigned to the same facility, serve to aptly illustrate the type of situation in which section 24 would not afford protection. *Ierardi*, 119 F.3d at 188-89.

In 2009, the Supreme Court held that section 24 violates the Supremacy Clause to the extent it delegates to the New York State Court of Claims jurisdiction to adjudicate civil rights cases arising under section 1983. *Haywood v. Drown*, 556 U.S. 729, 734-36 (2009). While the Supreme Court concluded that section 24 violates the Supremacy Clause as it applies to claims brought under section 1983, it did not find the statute unconstitutional when applied to claims arising under New York State law. Accordingly, "courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Corrections Law § 24." *Rounds v. Thompson*, No. 12-CV-0953, 2013 WL 3187074, at *4 (N.D.N.Y. June 20, 2013) (Sharpe, J.); *see also May v. Donneli*, No. 06-CV-0437, 2009 WL 3049613, at *5 (N.D.N.Y. Sept. 18, 2009) (Sharpe, J., adopting report and recommendation by Treece, M.J.) ("A claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the Haywood decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim.").

 **\*33** To determine whether section 24 is applicable to a corrections officer's alleged misconduct, "courts generally look at the factors associated with New York's scope of employment analysis." *Ierardi*, 119 F.3d at 187 n. 3 (citing *Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-0079, 2013 WL 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)). Those factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the

employer could reasonably have anticipated.

*Johnson*, 2013 WL 5347468, at *3 (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 128 (N.Y. 1979)). Ultimately, "an employee will be considered within the scope of his employment so long as he is discharging his duties, no matter how irregularly, or wi what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (N.Y. 1987) (quotation marks omitted).

In this case, all of plaintiff's allegations against the defendants now under consideration stem from events that occurred at Upstate while all defendants were on duty. Because each defendant in this case was "discharging his [or her] duties" relating to plaintiff's medical treatment, I find that the allegations in the amended complaint plausibly suggest that defendants were acting within the scope of their employment as DOCCS employees while undertaking the conduct alleged by plaintiff *Cepeda*, 513 N.Y.S.2d at 530. For this reason, I recommend that plaintiff's negligence claims arising under New York law be dismissed.

IV. <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff's amended complaint in this action contains an amalgamation of claims against various defendants ranging from the Acting Commissioner of the DOCCS down to corrections officers and medical personnel employed at the facilities in which he was confined at the relevant times. All of plaintiff's claims relate to or stem from the alleged use of excessive force at Walsh and plaintiff's medical treatment at Walsh and Upstate. Having thoroughly reviewed the record now before the court, I find that the record discloses the existence of fact issues regarding whether plaintiff failed to exhaust his administrative remedies with respect to his claims against defendants LoRusso and Michaels. Turning to the merits of plaintiff's claims, I find the existence of genuine issues of material fact precluding the entry of summary judgment dismissing plaintiff's excessive force cause of action against defendants Durante, LoRusso, and Wagner; failure to protect claim against defendant Michaels; and retaliation claims asserted against defendant Durante. [30]

| 30 | As the foregoing indicates, I have found that if the November 2013 were not viewed as a nullity, summary judgment dismissing that claim as against defendant Corey would be precluded based upon the finding of material issues of fact surrounding plaintiff's removal |

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 64 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....

2016 WL 5394752

from that proceeding. I nonetheless recommended a finding, however, under the circumstances of this case, that defendant Corey is entitled to qualified immunity since no reasonable person in his circumstances would conclude that removing plaintiff from the disciplinary hearing would clearly violate established constitutional principles.

**\*34** Turning to plaintiff's claims against defendants Gonyea and Judway, I find that plaintiff has demonstrated a sufficiently plausible basis for finding the requisite degree of personal involvement in the actions taken by these two defendants to avoid summary judgment. I also find, however, that neither plaintiff's amended complaint nor the record before the court discloses any basis for finding personal involvement on the part of defendants Annucci and Prack in the constitutional deprivations alleged.

I further find that plaintiff's claims of deliberate indifference against Walsh and Upstate employees are deficient because, even when accepted as true and interpreted in his favor, the evidence fails to reflect deliberate indifference to his condition, instead merely reflecting a disagreement and plaintiff's dissatisfaction with the course of his treatment. Additionally, I conclude that plaintiff's due process claims against Tousignant, Michaels, and Bullis; retaliation claims against LoRusso, Wagner, Sharma, Trabout, Mara, J. Henderson, P. Henderson, Tousignant, M. Williamson, Smith, Kumar, Schroyer, Kowalachuk, and Corey; ADA claims; and claims that defendant Judway violated DOCCS rules and policy are deficient as a matter of law, and thus I recommend that summary judgment be entered dismissing those claims. I also recommend that plaintiff's state law negligence claims are subject to dismissal based on N.Y. Correction Law § 24.

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 45) be GRANTED, in part, and that plaintiff's claims against defendants DOCCS, Annucci, Prack, Bullis, Corey, Tousignant, Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson, D. Williamson, J. Henderson, Danforth, Mandalaywala, Schroyer, Kowalachuk, Smith, and M. Williamson be DISMISSED and that plaintiff's retaliation claims against LoRusso and Wagner be DISMISSED, but that the motion otherwise be DENIED in all respects, and that the matter proceed with regard to plaintiff's excessive force claims against defendants Durante, Wagner, and LoRusso; retaliation claims against defendant Durante; supervisory claims against defendants Judway and Gonyea; and failure to protect claim against defendant Michaels based upon events occurring at Walsh.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated: August 25, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5394752

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5374125
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ronnie COLE, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al., Defendants.

9:14-CV-0539 (BKS/DEP)
|
Signed 09/26/2016

**Attorneys and Law Firms**

Ronnie Cole, 91-A-9212, Five Points Correctional Facility,
Caller Box 119, Romulus, NY 14541, Plaintiff, pro se.

Kevin M. Hayden, Esq., Hon. Eric T. Schneiderman, Office
of New York State Attorney General, 615 Erie Blvd. West,
Suite 102, Syracuse, NY 13204, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge.

 **\*1** Plaintiff Ronnie Cole, a New York State inmate,
commenced this civil rights action asserting claims under 42
U.S.C. § 1983 arising out of his confinement at the Walsh
Regional Medical Unit at Mohawk Correctional Facility and
Upstate Correctional Facility. In the Amended Complaint,
Plaintiff alleges Eighth Amendment excessive force, failure
to protect, and medical indifference claims; Fourteenth
Amendment due process claims; claims under the Americans
With Disabilities Act, 42 U.S.C. § 12101 et seq.; and New
York State negligence claims. Dkt. No. 29. On November 13,
2015, Defendants filed a motion for summary judgment under
Fed. R. Civ. P. 56(a). Dkt. No. 45. Plaintiff filed a response
in opposition on December 28, 2015. Dkt. No. 54. This
matter was referred to United States Magistrate Judge David
E. Peebles who, on August 25, 2016, issued a Report and
Recommendation recommending that Defendants' motion for
summary judgment be granted in part and denied in part.
Dkt. No. 58. Magistrate Judge Peebles advised the parties
that under 28 U.S.C. § 636(b)(1), they had fourteen days
within which to file written objections to the report, and
that the failure to object to the report within fourteen days

would preclude appellate review. Dkt. No. 58, pp. 100-01. No
objections to the Report-Recommendation have been filed.

As no objections to the Report and Recommendation have
been filed, and the time for filing objections has expired,
the Court reviews the Report and Recommendation for clear
error. *See* Petersen v. Astrue, 2 F. Supp. 3d 223, 228-29
(N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's
note to 1983 amendment. Having reviewed the Report and
Recommendation for clear error and found none, the Report
and Recommendation is adopted in its entirety.

For these reasons, it is

**ORDERED** that the Report and Recommendation (Dkt. No.
58) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 45) is **GRANTED IN PART AND DENIED IN
PART**; and it is further

**ORDERED** that Plaintiff's claims against Defendants
DOCCS, Annucci, Prack, Bullis, Corey, Tousignant,
Sharma, Trabout, Mara, Dutch, Peterson, P. Henderson,
D. Williamson, J. Henderson, Danforth, Mandalaywala,
Schroyer, Kowalachuk, Smith, and M. Williamson are
**DISMISSED**; and it is further

**ORDERED** Plaintiff's retaliation claims against Defendants
LoRusso and Wagner are **DISMISSED**; and it is further

**ORDERED** that the Defendants' motion is otherwise
**DENIED** in all respects and that the matter will proceed with
regard to Plaintiff's excessive force claims against Defendants
Durante, Wagner, and LoRusso; retaliation claims against
Defendant Durante; supervisory claims against Defendants
Judway and Gonyea; and failure to protect claim against
Defendant Michaels based upon events occurring at the Walsh
Regional Medical Unit; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon
the parties in accordance with the Local Rules.

 **\*2 IT IS SO ORDERED.**

Dated: September 26, 2016.

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 66 of 187

Cole v. New York State Department of Corrections and..., Not Reported in Fed....
2016 WL 5374125

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5374125

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 499620
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Juan Manuel GONZALEZ-CIFUENTES, Plaintiff,

v.

Constance TORRES, Key Board Specialist II;
Deputy Superintendent of Security; R. Doling;
Hearing Officer, Donald Selsky, Director,
Inmate Disciplinary Program; Gary Greene,
Superintendent, Marcy Correctional Facility; Glenn
S. Goord and Commissioner, State of New York
Department of Correctional Services, Defendants.

Civil Action No. 9:04-cv-1470 (GLS/DRH).
|
Feb. 13, 2007.

**Attorneys and Law Firms**

Juan Manuel Gonzalez-Cifuentes, North Babylon, NY,
Plaintiff Pro Se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Jeffrey P. Mans, Esq., Assistant Attorney General,
of counsel, Albany, NY, for Defendants The Capitol.

***ORDER***

GARY L. SHARPE, U.S. District Judge.

 **\*1** The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
David R. Homer, duly filed January 16, 2007. Following ten
days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation for
clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate
Judge David R. Homer filed January 16, 2007 is ACCEPTED
in its entirety for the reasons state therein, and it is further

ORDERED, that defendants' motion to dismiss (Docket No.
34) be GRANTED as to all moving defendants and all claims,
and it is further

ORDERED, that defendant Deputy Superintendent of
Security be DISMISSED from this action without prejudice,
and it is further

ORDERED, that the Clerk of the Court is to enter judgment
in favor of Defendants and close this case.

IT IS SO ORDERED

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se Juan Manuel Gonzalez-Cifuentes
("Gonzalez"), an inmate formerly in the custody of the New
York State Department of Correctional Services ("DOCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging that
defendants, six DOCS employees, violated his constitutional
rights under the First, Fourth, Fifth, Eighth, and Fourteenth
Amendments. Compl. (Docket No. 1). Presently pending is
(1) defendants' motion [2] to dismiss the complaint pursuant
to Fed.R.Civ.P. 12(c) (Docket No. 34), and (2) Gonzalez's
motion to compel discovery (Docket No. 31). For the
following reasons, it is recommended that defendants' motion
be granted and that defendant Deputy Superintendent of
Security be dismissed without prejudice. It is also ordered that
Gonzalez's motion be denied without prejudice.

[2]    The motion is made on behalf of all defendants
except defendant Deputy Superintendent of Security. *See*
section III *infra*.

**I. Background**

The facts as alleged in the complaint are assumed to be true
for the purposes of this motion. *See* Section II(A) *infra*.

In October 2001, while incarcerated at Great Meadow
Correctional Facility in Comstock, New York, Gonzalez sent

a $500 cash gift to the home of defendant Torres, a keyboard operator at Great Meadow. Compl. at ¶ 15. Torres took offense to the gift and retaliated against Gonzalez by filing a false inmate misbehavior report and having him placed in the Special Housing Unit ("SHU"). [3] *Id.* at ¶ 17, 19-20. While in SHU, defendants ordered a search of Gonzalez's prison cell and confiscated twenty-five of his personal letters from his family. *Id.* at ¶¶ 21-22. On October 31, 2001, Gonzalez was served by Torres with an inmate misbehavior report for charges relating to the sending of the $500 gift. *Id.* at ¶ 23. On November 13, 2001, after a Tier III hearing [4] before defendant Doling, Gonzalez was found guilty of harassing Torres and sentenced to ninety days in keeplock. [5] *Id.* at ¶ 24-28. Gonzalez appealed the hearing disposition, but it was affirmed by defendant Selsky. *Id.* at ¶ 29.

[3]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

[4]    DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

[5]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

 *2 Gonzalez also filed a grievance complaining that the $500 was not credited to his inmate account or put in his personal property, but the grievance was denied. *Id.* at ¶ 32-33. Gonzalez then filed an Article 78 proceeding [6] in New York Supreme Court, but that action was dismissed. *Id.* at ¶¶ 34, 38. On April 11, 2003, Selsky reversed the disposition of Gonzalez's November 2001 disciplinary hearing. *Id.* at ¶ 37. This action followed.

[6]    N.Y. C.P.L.R. art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the

actions and inactions of state and local government agencies and officials.

## II. Discussion

Gonzalez asserts eleven causes of action in the complaint, alleging, *inter alia,* that defendants retaliated against him by filing a false misbehavior report, illegally seized his photographs and money, denied him access to the courts, and repeatedly violated his due process and equal protection rights. See Compl. at ¶¶ 43-66. Defendants seek dismissal of all claims.

### A. Motion to Dismiss

"The test for evaluating a Fed.R.Civ.P. 12(c) motion is the same as that applicable to a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998); *Burke v. New York,* 25 F.Supp.2d 97, 99 (N.D .N.Y.1998) (Munson, J.). Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Dismissal is only warranted if it appears beyond a reasonable doubt that the nonmoving party can prove no set of facts in support of his or her claim which would be entitled to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). In evaluating whether these requirements are met, complaints prepared pro se are held to less stringent standards than formal pleadings drafted by lawyers. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

When a motion to dismiss is brought prior to an answer and discovery, a court is loath to grant the motion. *Lugo v. Senkowski,* 114 F.Supp.2d 111, 113 (N.D.N.Y.2000) (Kahn, J.) (citing *Wade v. Johnson Controls, Inc.,* 693 F.2d 19, 22 (2d Cir.1982)). This is true even if "the plaintiff is unlikely to prevail, unless the defendant can demonstrate that plaintiff is unable to prove facts which would entitle him [or her] to relief." *Id.* " 'This caution against dismissal applies with even greater force where the complaint is pro se, or where the plaintiff complains of a civil rights violation.' " *Lugo,* 114 F.Supp.2d at 113 (citation omitted); *see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477(2006).

### B. Fourteenth Amendment

In his complaint, Gonzalez repeatedly contends that he was denied "due process of law" in violation of the Fourteenth Amendment. Defendants' contend that Gonzalez has failed to state a cognizable due process claim.

### 1. Liberty Interest

**\*3** As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Liberally construing the complaint, Gonzalez's protected liberty interest appears to be his sentence of ninety days in keeplock. "The Second Circuit has held that at least where the period of confinement exceeded thirty days, "refined fact-finding" is required to resolve defendants' claims under *Sandin. Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000)). No such fact-finding can occur here on a motion to dismiss. Accordingly, defendants' motion on this ground is denied.

### 2. Due Process

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges, (2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Here, Gonzalez fails to allege any violation of the procedural protections required by *Wolff. See Wolff,* 418 U.S. at 563-64.

Liberally construing the complaint, Gonzalez's only objection to the disciplinary hearing was that he was found guilty of harassment without evidence to support the hearing officer's verdict. *See* Compl. at ¶¶ 49, 51. However, Gonzalez admits that he sent the $500 gift to Torres at her home address. *See id.* at ¶¶ 15, 47. Thus, Gonzalez's real objection to the disciplinary hearing is not lack of evidence but Doling's determination that the sending of $500 to Torres constituted "communication of a personal nature punishable as harassment." *Id.* at ¶ 27. Mere disagreement with the hearing officer's determination, or the fact that a hearing officer's determination was later overturned, does not, without more, constitute a violation of due process.

Therefore, it is recommended that defendants' motion on this ground be granted as to Gonzalez's due process claims.

### C. Equal Protection

Liberally construed, Gonzalez alleges that defendants discriminated against him because of his race (Hispanic) in violation of his equal protection rights under the Fourteenth Amendment. Comp. at ¶¶ 45, 47, 61. Defendants contend that this claim is without merit. *See* Defs. Mem. of Law (Docket No. 34) at 3, 6.

**\*4** The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. Civ. 95-1534(RSP/GJD), 1997 WL 151770, at \*3 (N.D.N.Y. Mar. 28, 1997). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005).

Here, Gonzalez makes only vague and conclusory allegations that he was denied the equal protection of the laws and thus has failed sufficiently to show an equal protection violation. *See De Jesus v. Sears Roebuck & Co., Inc.,* 87 F.3d 65, 70

2d Cir.1996). Equally significant here is that the complaint contains no allegation as to which inmates in a similar situation were treated differently than Gonzalez. *Oliver v. Cuttler,* 968 F.Supp. 83, 88 (E.D.N.Y.1997).

Therefore, it is recommended that defendants' motion on this ground be granted.

### D. Retaliation

Gonzalez contends that as a result of being Hispanic and sending $500 to Torres, defendants retaliated against him by filing a false misbehavior report and sentencing him to ninety days in keeplock. *See* Compl. at ¶ 47. Defendants contend that Gonzalez's conclusory allegations of retaliation must be dismissed as they fail to state a claim.

In order to state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). Retaliation claims are actionable because they may tend to chill an individual's exercise of constitutional rights. *Id.* at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient to overcome a motion to dismiss in a civil rights action. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

Here, Gonzalez contends that defendants retaliated against him "simply for being Hispanic and having exercised the right and privilege secured to him by the U.S. Constitution of giving money as a present to whoever he chose[s]...." Compl. at ¶ 47. First, neither of Gonzalez's alleged reasons for defendants' retaliation against him rise to the level of constitutionally protected conduct. Even liberally construed, nothing about the gift brings this conduct within the scope of the First Amendment right of association. That right protects "the right to create and sustain a family, marry, engage in childbirth, raise and educate one's children, and cohabitate with one's relatives...." *Braverman v. Suburban Scholastic Council,* No. 99-CV-1377, 2000 WL 554256, at *2 (N.D.N.Y. May 4, 2000). "The Constitution does not recognize a generalized right of social association." *Sanitation & Recylcing Indus. v. City of New York,* 107

F.3d 985, 996 (2d Cir.1997). At most, Gonzalez has alleged here a "generalized right of social association" and, therefore, his conduct falls outside the scope of the First Amendment. No other constitutional right could foreseeably be implicated here. Thus, Gonzalez fails sufficiently to allege a constitutionally protected activity as the genesis of the alleged retaliation.

**\*5** Second, Gonzalez alleges in only bare, conclusory terms that these alleged acts were taken in retaliation for his alleged constitutionally protected conduct. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ( "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone"). Thus, Gonzalez has not alleged specific facts that "give rise to a colorable suspicion of retaliation." *Id.*

Therefore, it is recommended that defendants' motion on this ground be granted as to gonzalez's claims of retaliation.

### E. Seizure of Property

Gonzalez contends that defendants searched his cell "without any reason or institutional interest" and seized twenty-five of his letters from his family. Compl. at ¶ 57. However, the Fourth Amendment does not prohibit such warrantless searches in a prison environment. *See Hudson v. Palmer,* 468 U.S. 517, 526 (1984) ("the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell"). Thus, even if searches of Gonzalez's cell and seizures of property occurred without a warrant or without probable cause as required by the Fourth Amendment, Gonzalez has no basis for a claim.

Gonzalez also contends that defendants must return the $500 he sent to Torres and the letters seized from his cell. Compl. at ¶¶ 42, 57, 59. "The Supreme Court has held that 'an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available.' " *Pitsley v. Comm'r of Corrs.,* No. Civ. 96-0372(RSP/DS), 1998 WL 178805, at *8 (N.D.N.Y. Apr. 13, 1998) (quoting *Hudson,* 468 U.S. at 533)). Because the State of New York allows inmates to pursue property deprivation claims in the New York Court of Claims, and Gonzalez could have done so here, Gonzalez has no viable §

2007 WL 499620

1983 claim. *See Pitsley,* 1998 WL 178805, at *8 (citing *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995)).

Therefore, it is recommended that defendants' motion on this ground be granted as to these claims.

### F. False Misbehavior Report

Gonzalez contends that "because of his race, Defendant Torres concocted a false misbehavior report" against him. Compl. at ¶ 45. However, an " 'inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Alnutt v. Cleary,* 913 F.Supp. 160, 166 (W.D.N.Y.1996) (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F .3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988)). Here, as discussed supra, Gonzalez fails properly to allege that defendants took any retaliatory action in response to his exercising a constitutional right and therefore fails to allege a constitutional violation.

**\*6** Therefore, it is recommended that defendants' motion on this ground be granted.

### G. Access to Courts

Liberally construed, Gonzalez contends that he was denied access to the courts in violation of the First Amendment. Compl. at ¶ 39.

All persons have a constitutional right of access to the courts. *Lewis v. Casey,* 518 U.S. 343, 350 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997). To establish a violation of the right of access to the courts, a prisoner must demonstrate that his or her efforts to pursue a legal claim were impeded. *Lewis,* 518 U.S. at 351; *Bourdon v. Loughren,* 386 F .3d 88, 92-93 (2d Cir.2004). A plaintiff must demonstrate not only that a defendant's conduct was deliberate and malicious but also that this conduct caused an actual injury such as the "dismissal of an otherwise meritorious legal claim." *Cancel v. Goord,* No. 00-CV-2042(LMM), 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis,* 518 U.S. at 351).

Here, Gonzalez alleges that Selsky attempted "to obstruct justice and deny Plaintiff access to the courts." Compl. at ¶ 39. However, Gonzalez identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense. He has thus failed sufficiently to allege any actual injury from this alleged incident, much less that Selsky's [or any other defendants] conduct was "deliberate and malicious." Thus, Gonzalez has no viable claim on this ground.

Therefore, it is recommended that defendants' motion on this ground be granted as to all such claims.

### H. Conspiracy

In his ninth cause of action, Gonzalez alleges that defendants conspired "to punish [him] because he was a Hispanic inmate and to deprive him of his right to due process and equal protection. Compl. at ¶ 61. To state a claim for relief under 42 U.S.C. § 1985(3), a plaintiff must show

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Mian v. Donaldson, Lufkin, & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). Here, even assuming that Gonzalez has sufficiently alleged an agreement among the defendants, for the reasons stated above, Gonzalez has failed sufficiently to allege as the objects of the conspiracy a deprivation of either due process or equal protection. *See* subsections II(B) & (C) *supra.* Moreover, Gonzalez only makes conclusory allegations of a conspiracy between the defendants. Thus, Gonzalez's conspiracy claims must fail. *See Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003) (holding that conclusory statements alone cannot support a conspiracy allegation).

**\*7** Therefore, it is recommended that Gonzalez's conspiracy claim be dismissed.

## I. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct did not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Gonzalez's allegations as true, he has not shown that defendants violated his constitutional rights.

Therefore, in the alternative, defendants' motion to dismiss on this ground should be granted.

## III. Unserved Defendant

Defendant Deputy Superintendent of Security has neither been served with process nor further identified. *See* Docket Entry dated Mar. 2, 2005 (summons issued). This defendant has not appeared in the action and was not a party to defendants' motion here. More than 120 days have now passed. Accordingly, it is recommended that the complaint be dismissed as to defendant Deputy Superintendent of Security without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

## IV. Gonzalez's Motion to Compel

Also pending is Gonzalez/s motion to compel discovery. Docket No. 31. If the recommendations herein are adopted by the district court, that motion will be moot. Accordingly, Gonzalez's motion is denied without prejudice to renewal if the district court denies defendants' motion as to any claim or defendant.

## V. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that:

1. Defendants' motion to dismiss (Docket No. 34) be **GRANTED** as to all moving defendants and all claims; and

2. Defendant Deputy Superintendent of Security be **DISMISSED** from this action without prejudice; and

**IT IS ORDERED** that Gonzalez's motion to compel (Docket No. 31) is **DENIED** without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

## All Citations

Not Reported in F.Supp.2d, 2007 WL 499620

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Report and Recommendation Adopted as Modified by Funches v. Russo,
N.D.N.Y., December 6, 2018

2018 WL 6982087
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trevis L. FUNCHES, Plaintiff,
v.
Anthony RUSSO, A. Polizzi, Jeremy Greene,
Jeff McKoy, and Cheryl Morris, Defendants.

Civ. No. 9:17-CV-1292 (LEK/DJS)
|
Signed 11/02/2018

**Attorneys and Law Firms**

TREVIS L. FUNCHES, Plaintiff, Pro Se, 02-A-2668,
Gouverneur Correctional Facility, Scotch Settlement Road,
P.O. Box 480, Gouverneur, New York 13642.

BARBARA D. UNDERWOOD, Attorney General of the
State of New York, OF COUNSEL: HELENA LYNCH,
ESQ., Assistant Attorney General, The Capitol, Albany, New
York 12224, Attorney for Defendants.

### REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** The Amended Complaint in this action alleges that
Plaintiff's civil rights were violated while in the custody of
the Department of Corrections and Community Supervision
("DOCCS") by Defendants, who are employees of DOCCS.
*See generally* Dkt. No. 10, Am. Compl. Following initial
review under 28 U.S.C. §§ 1915(e) & 1915(A), the claims
remaining in this action are: (1) Fourteenth Amendment due
process claims against Defendants Greene and Polizzi; and
(2) First Amendment retaliation claims against Defendants
Russo, Morris, and McKoy. Dkt. No. 19.

Defendants have now filed a Motion to Dismiss the Amended
Complaint in its entirety. Dkt. No. 30. Their arguments in
favor of dismissal are set forth at length in their Memorandum
of Law. Dkt. No. 30-1, Defs.' Mem. of Law. Plaintiff has
opposed the Motion. Dkt. No. 33, Pl.'s Opp. Defendants filed
a Reply Memorandum of Law. Dkt. No. 34, Defs.' Reply

Mem. Plaintiff then filed a Sur-reply. Dkt. No. 36, Pl.'s Sur-
reply. [1] Having considered the arguments of the parties, the
Court recommends that the Motion to Dismiss be denied.

[1]    There is no provision in the applicable rules for such a
filing, but given Plaintiff's *pro se* status, the Court has
considered the submission on this Motion.

### I. FACTUAL BACKGROUND

The Amended Complaint, as refined through prior decisions,
asserts due process and retaliation claims. For purposes of
providing context, the Court sets forth below the general facts
underlying each claim.

On June 30, 2017, Plaintiff was issued an inmate misbehavior
report charging him with violent conduct, creating a
disturbance, assault on an inmate, and refusing a direct order.
Dkt. No. 10-1 at p. 36. Defendant Greene was Plaintiff's
employee assistant prior to the hearing. Am. Compl. at
pp. 14-15. Plaintiff alleges that he requested numerous
documents from Greene, but that Greene refused to provide at
least some of that material to Plaintiff. *Id.* Plaintiff alleges that
he requested some of this same material from Polizzi, who
served as the hearing officer, and that Polizzi also failed to
provide copies of certain documents. *Id.* at p. 15. Plaintiff was
found not guilty of assaulting an inmate, but found guilty of
the other three charges. Dkt. No. 10-1 at p. 36.

Plaintiff's retaliation claims relate to two distinct factual
situations. Regarding Defendant Russo, the Amended
Complaint alleges that Russo, while investigating a grievance
filed by Plaintiff, openly questioned Plaintiff about the
number of grievances and/or complaints Plaintiff had filed.
Am. Compl. at p. 6. Plaintiff alleges that Russo then directed
a corrections officer to search Plaintiff's cell and confiscate
his hot pot to retaliate for those filings. *Id.* McKoy and
Morris are alleged to have retaliated against Plaintiff, for
prior complaints against correctional staff, by denying him
the ability to correspond with relatives who were also
incarcerated individuals although he had previously received
approval to do so. *Id.* at pp. 18-20.

### II. LEGAL STANDARD FOR RULE
### 12(b)(6) MOTION TO DISMISS

2018 WL 6982087

**\*2** On a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "the court reads the facts alleged in the complaint, assumes the truth of those facts, and decides whether those facts state a claim under the applicable legal standard." *Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229, 235 (2d Cir. 2015). In doing so, the court draws all inferences in favor of the plaintiff. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). "When considering motions to dismiss a *pro se* complaint such as this, 'courts must construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests.' " *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 145-46 (2d Cir. 2002) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) ) (internal alterations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## III. DISCUSSION

### A. Plaintiff's Due Process Claims

Defendants seek dismissal of the due process claim on the ground that Plaintiff has not alleged a protected liberty interest and, in the alternative, that he received all the process he was due. For the reasons that follow, the Court recommends that the Motion to be denied.

### 1. Whether Plaintiff had a Protected Liberty Interest

The threshold question in any prisoner disciplinary due process case is whether the plaintiff has alleged a protected liberty interest. *Marino v. Klages*, 973 F. Supp. 275, 277 (N.D.N.Y. 1997). Here, Defendants contend that because Plaintiff was sentenced to only 120 days in disciplinary confinement, he has not alleged such a liberty interest and his due process claim must be dismissed. They argue that for a disciplinary sentence of between 101 and 305 days, a plaintiff cannot establish that a liberty interest exists "without pleading

significant aggravating conditions." Defs.' Mem. of Law at p. 9 (citing cases).

Some courts have held, contrary to the cases relied upon by Defendants, that a 120 day SHU confinement adequately alleges a protected liberty interest to survive a Rule 12(b)(6) motion. *See, e.g., Marhone v. Cassel*, 2018 WL 4189518, at \*10 (S.D.N.Y. Aug. 31, 2018). Moreover, the allegation of 120 days of confinement places Plaintiff "within the guideline governing intermediate durations of confinement. For such a duration of confinement, the fact-finding required by the Second Circuit to determine whether this intermediate sentence constitutes an atypical and significant hardship cannot occur on a motion to dismiss." *Koehl v. Bernstein*, 2011 WL 2436817, at \*7 (S.D.N.Y. June 17, 2011), *report and recommendation adopted*, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011).

Plaintiff does not rely solely on the amount of time alone to establish a liberty interest in any event. He alleges that while confined he was given discolored drinking water. Am. Compl. at p. 17. DOCCS concedes that in the Special Housing Unit at Eastern "the water is stained at times," but alleges that it posed no health risks. Dkt. No. 10-2 at p. 13. Given these allegations, Plaintiff "should be afforded the opportunity to further demonstrate the conditions of his confinement against that of the general prison population to determine whether his allegations ... adequately establish a liberty interest." *Logan v. Harvey*, 2017 WL 9511179, at \*5 (N.D.N.Y. Sept. 26, 2017), *report and recommendation adopted*, 2017 WL 4621108 (N.D.N.Y. Oct. 16, 2017).

### 2. Whether Plaintiff Received Due Process

**\*3** In the context of an inmate disciplinary proceeding, due process requires that the inmate be: (1) afforded advance written notice of the charges against him; (2) provided a written statement supporting the disposition and reasons for the disciplinary action taken; (3) permitted to call witnesses and present documentary evidence; (4) provided a fair and impartial hearing officer; and (5) found guilty only if the disposition is supported by at least "some evidence." *Wolff v. McDonnell*, 418 U.S. 539, 563-64 (1974); *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (citing cases). Additionally, because Plaintiff was confined to a special housing unit prior to his disciplinary hearing, he was also entitled to an employee assistant. *Clark v. Gardner*, 256 F. Supp. 3d 154, 170 (N.D.N.Y. 2017).

Regarding Defendant Greene, Plaintiff's designated employee assistant, Plaintiff alleges that he provided constitutionally inadequate assistance. Am. Compl. at pp. 14-15. Liberally construed, the allegation in this regard is that Plaintiff requested that Greene provide certain documents to him in advance of the disciplinary hearing, but that Greene did not do so. *Id.* Defendants are correct in pointing out that due process does not require that every available document be provided to an inmate in advance of a disciplinary hearing. *See Rossi v. Stevens*, 2008 WL 4452383, at *10 (S.D.N.Y. Sept. 30, 2008). At this early stage of this litigation, however, what documents were and were not provided and the relevance of those allegedly not provided cannot be assessed. Plaintiff contends that he was denied material that was necessary for him to review to prepare his defense. "Taking Plaintiff's allegations as true, as the Court must on a motion to dismiss, Plaintiff has stated a due process violation relating to defendant['s] failure to provide him with proper assistance in preparing for his disciplinary hearing." *Brooks v. Prack*, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014); *see also Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998) (recognizing failure to provide requested documents may amount to denial of due process); *Samuels v. Fischer*, 168 F. Supp. 3d 625, 645 (S.D.N.Y. 2016) (similar) (citing cases).

Plaintiff's related claim that Polizzi did not remedy Greene's failure to provide documents that Plaintiff needed in support of his defense, Am. Compl. at p. 15, also survives the Motion. An inmate has the right to "present documentary evidence in his defense" at a prison disciplinary hearing. *Wolff v. McDonnell*, 418 U.S. at 566. That right is a limited one and material that is irrelevant or unnecessary may be excluded by the hearing officer, but "[t]he burden is on the prison official to demonstrate 'the rationality of his position.' " *Sloane v. Borawski*, 64 F. Supp. 3d 473, 486 (W.D.N.Y. 2014) (quoting *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990) ). Given Plaintiff's allegation that he was denied the opportunity for a "meaningful review" of relevant documents, Am. Compl. at p. 15, the mere assertion that Plaintiff was not entitled to receive every document he wished does not carry that burden on this Motion.

Plaintiff further contends that Polizzi denied him due process because the evidence did not support the guilty determinations. Am. Compl. at p. 17. Plaintiff's legal conclusion that there was insufficient evidence to find him guilty itself need not be credited as true on this Motion, but Plaintiff points to several factors - the absence of a weapon

and the lack of testimony regarding certain injuries allegedly inflicted by Plaintiff, for example - as potential grounds for concluding that there was insufficient evidence for the guilty determination. Am. Compl. at p.17; Pl.'s Opp. at p. 7 (asserting that there was no testimony regarding injuries). Plaintiff also contends that Polizzi improperly relied upon a decade-old incident in assessing this case and failed to call a witness requested by Plaintiff. Pl.'s Sur-reply at pp. 8-9. While Polizzi may ultimately be able to prove that the evidence supported his guilty determination (and that other required aspects of due process were complied with), given the allegations to the contrary by Plaintiff, the Motion to Dismiss on this ground must be denied.

### B. Plaintiff's Retaliation Claims

**\*4** Following initial review, Judge Kahn found that two distinct First Amendment retaliation claims could proceed: (1) a claim against Defendant Russo arising out of his investigation of Plaintiff's 2015 Grievance and (2) a claim against Morris and McCoy arising out of Morris' revocation of Plaintiff's correspondence privileges with his family members. Dkt. No. 19 at p. 22.

"To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action.' " *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ). The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ). This is true because retaliation claims are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Defendant Russo is alleged to have retaliated against Plaintiff by directing that Plaintiff's cell be searched and his hot pot confiscated because complaints made by Plaintiff had been

given to Russo for investigation. Am. Compl. at pp. 6-7. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d at 493).

> Even though district courts have found that cell searches alone are not actionable under § 1983, even if retaliatory, allegations that a defendant confiscated personal property and/ or legal papers during the course of a cell search have been found sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights.

*Guillory v. Haywood*, 2015 WL 268933, at *21 (N.D.N.Y. Jan. 21, 2015). In *Guillory*, the Court found allegations that a retaliatory cell search accompanied by the confiscation of personal property "states a plausible claim for retaliation" sufficient to withstand dismissal. *Id.* at *3 & 21; *see also Yunus v. Jones*, 2017 WL 9511176, at *9 (N.D.N.Y. Aug. 23, 2017), *report and recommendation adopted*, 2017 WL 5956762 (N.D.N.Y. Dec. 1, 2017).[2] Defendant Russo's Motion to Dismiss, therefore, should be denied.

[2]    It appears that the confiscated hot pot was replaced at some point, Am. Compl. at pp. 6-7, a fact that might be relevant to the ultimate resolution of Plaintiff's claim, but the circumstances and timing of the replacement are not clear and are the proper subject of discovery.

With regard to Defendant Morris, Plaintiff alleges that she told him "you have been writing numerous staff complaints and that needs to stop" and that "[s]hortly thereafter" Plaintiff's ability to communicate with certain family members was discontinued. Am. Compl. at p. 19. Plaintiff also specifically alleges that Defendant Morris personally had letters to Plaintiff's sons returned. *Id.* Morris seeks dismissal of the Amended Complaint on several grounds, Defs.' Mem. of Law at pp. 18-20, none of which is sufficient at this juncture to dismiss this claim.

**\*5** Morris contends that Plaintiff's claim is not plausible because it concerns complaints unrelated to her. *Id.* at pp.

18-19. The filing of complaints against prison staff by an inmate is clearly a protected activity. *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003). Retaliation because of such speech, regardless of whether the complaints directly concerned Morris, could be actionable and "at this stage in the proceedings, those allegations support the inference that the named Defendant[ ] in this action w[as] generally aware of Plaintiff's participation in a protected activity." *Alston v. Bellerose*, 2015 WL 4487973, *9 (D. Conn. July 23, 2015). This ground, therefore, is no basis for dismissal.

Morris also seeks dismissal of the Amended Complaint on the ground that Plaintiff's correspondence privileges would have been taken away regardless of any protected activity or retaliatory motive because proof that would be required to permit correspondence under the circumstances was not available. Defs.' Mem. of Law at p. 19. While this type of defense is certainly available in a retaliation claim, it involves burden shifting that often requires full discovery before a final determination can be reached. *Scott v. Coughlin*, 344 F.3d at 287.

Finally, Plaintiff alleges that Defendant McKoy retaliated against Plaintiff by failing to remedy Defendant Morris' deprivation of correspondence privileges. Am. Compl. at pp. 19-20. McKoy seeks dismissal of these claims both because the restriction on correspondence privileges was valid under relevant law and because McKoy ultimately reinstated those privileges. Defs.' Mem. of Law at pp. 20-22. As to the first of these arguments, Defendant focuses on the reasonableness of the DOCCS Directive governing correspondence between inmates. *Id.* Defendant argues that the Directive, which requires approval by a facility superintendent for inmate to inmate communication, is a reasonable restriction serving legitimate penological purposes. *See Dunn v. Todd*, 2017 WL 3311245, at *10 (N.D.N.Y. July 10, 2017). The policy, however, is not at issue in this case. Instead, the question is whether Plaintiff was retaliated against for other grievances he filed by being denied otherwise approved communications with family members. Plaintiff alleges here that the required approvals were in place and that he was nonetheless denied the ability to correspond. This Court must take that allegation as true on this Motion, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), and it is sufficient to defeat Defendant's apparent assertion that such communication had not been approved.

The second argument, that McKoy eventually did permit the requested correspondence, is also insufficient at this stage

of the litigation to warrant dismissal. It appears from the exhibits attached to the Amended Complaint that McKoy notified Plaintiff on November 1, 2017, that the necessary information had been verified regarding his correspondence privileges, but those same records indicate that it was more than a month prior that Plaintiff had made McKoy aware of the problem. Dkt. No. 10-1 at pp. 21-22. While it may be that McKoy can show that the proper procedures were followed in the interim, as he appears to assert in this Motion, such proof does not *a fortiori* establish a lack of retaliation. *Cf. Broich v. Inc. Village of Southampton*, 462 Fed. Appx. 39, 46 n. 4 (2d Cir. 2012) (noting that the fact that the entity may have had sufficient justification to act does not resolve the question of whether it would have acted in the absence of retaliatory animus); *Tuszynski v. Innovative Servs., Inc.*, 2005 WL 221234, at *2 (W.D.N.Y. Jan. 29, 2005) ("[I]t is well settled that a retaliation claim is not dependent on the ultimate merits of any underlying discrimination claim and that an employee may be successful in a retaliation claim even if he does not prevail in the discrimination claim.") (citing *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir. 1986) ).

**\*6** For these reasons, the Court recommends that the Motion to Dismiss be denied as to Plaintiff's retaliation claims.

### C. Qualified Immunity

Defendants alternatively seek dismissal on the ground that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 22-25. Qualified immunity provides a "shield[ ] ... from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.... To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted). Largely for the reasons identified above, dismissal on qualified immunity grounds is not appropriate here.

An inmate's right to due process during a prison disciplinary proceeding has long been clearly established. *Walsh v. Keane*, 1993 WL 454237, at *4 (S.D.N.Y. Nov. 1, 1993). Defendants' argument that there is no clearly established law that Plaintiff must be provided with copies of specific documents rather than having those documents read into the record, Defs.' Mem. of Law at p. 23, reads the right too narrowly. It is not the case that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Plaintiff has alleged that he was denied his clearly established right to access to certain materials prior to and during his hearing and those allegations are sufficient to withstand dismissal.

An inmate's right to be free from retaliation for filing grievances is also clearly established. *Rivera v. Senkowski*, 62 F.3d 80, 85 (2d Cir. 1995). Defendants' arguments for qualified immunity on this claim generally mirror the merits arguments considered above and for the same reasons previously identified, none of the Defendants can show that their alleged actions did not violate a clearly established right.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion to Dismiss (Dkt. No. 30) be **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

### All Citations

Slip Copy, 2018 WL 6982087

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Colon v. Annucci, S.D.N.Y., September 28, 2018

2011 WL 2436817
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Edward KOEHL,
v.
Dr. Fredrick BERNSTEIN, et al., Defendants.

No. 10 Civ. 3808(SHS)(GWG).
|
June 17, 2011.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Plaintiff Edward Koehl, proceeding *pro se,* brings this
action pursuant to 42 U.S.C. § 1983, alleging that various
defendants, including employees of the New York State
Department of Correctional Services ("DOCS") and the
New York State Division of Parole ("DOP"), violated his
constitutional rights during his incarceration at DOCS' Green
Haven Correctional Facility ("Green Haven"). Defendants
have now moved to dismiss the complaint pursuant to Fed R.
Civ. P. 12(b)(6). For the reasons stated below, the motion to
dismiss should be granted in part and denied in part.

I. *BACKGROUND*

    A. *Facts Alleged by Koehl*
For purposes of deciding the defendants' motion to dismiss,
the Court assumes the allegations in plaintiff's complaint are
true and draws all reasonable inferences from these facts in
favor of the plaintiff. *See, e.g., Global Network Commc'ns,
Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). In
light of Koehl's *pro se* status, the Court in some instances has
considered factual allegations contained in his memorandum
submitted in opposition to the defendants' motion where they
amplify claims made in the complaint. *See, e.g., Woods v.
Goord,* 2002 WL 731691, at *1 n. 2 (S.D.N.Y. Apr. 23, 2002)
(considering *pro se* prisoner's factual allegations in briefs as
supplementing the complaint); *Burgess v. Goord,* 1999 WL

33458, at *1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, 'a
court may not look outside the pleadings when reviewing
a Rule 12(b)(6) motion to dismiss. However, the mandate
to read the papers of pro se litigants generously makes it
appropriate to consider plaintiff's additional materials, such as
his opposition memorandum.' ") (quoting *Gadson v. Goord,*
1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997))
(additional citations omitted).

In October 2008, Koehl was transferred to Green Haven. *See*
Amended Complaint, filed July 16, 2010 (Docket # 6) at
10 ¶ 1 ("Am.Compl."). At Green Haven, defendant Robert
E. Ercole, who was a warden in the facility at the time,
"callously and deliberately assigned [him] to a double bunk
cell, top bunk, third floor." *Id.* at 10 ¶ 2. Koehl "was forced
to carry [his] property to the third floor, [which] aggravated
[his] previously complained of conditions." *Id.* As a result
of this incident, Koehl spent three days in the hospital. *Id.*
Upon release from the hospital, Koehl was again placed into
a double bunk, and his "bunk mates (2 out of 3), were chain
smokers, who smoked all day and night in the cell." *Id.* at
10 ¶ 3. Koehl filed grievances about the bunk problems,
but Ercole falsified records, stating that Koehl had signed a
waiver agreeing to double bunk in order to be transferred
to Green Haven. *Id.* Koehl spent 60 days in a double bunk,
during which time his counselor demanded that he sign a
waiver agreeing to remain in the double bunk and, when
Koehl refused, defendant Deputy Superintendent Richard
Cunningham signed an order in retaliation requesting that
Koehl be transferred to a facility seven hours away from his
family. *Id.* at 1, 10 ¶ 3.

**\*2** Defendant Dr. Weinstein conducted an electromyography
("EMG") of Koehl in October or November 2008 as a result
of Koehl's complaints to his assigned facility doctor, Dr. J.
Fein, regarding "extreme pain, numbness and weakness in
[his] arms, hands, legs, neck and back." *Id.* at 10 ¶ 4. Dr.
Weinstein informed Koehl that "nothing [wa]s wrong with
[him]," at which point Dr. Weinstein called Dr. Weinstein "a liar" and
produced a previous EMG, conducted on March 18, 2008,
which showed results different from the October or November
EMG. *Id.* Dr. Weinstein agreed to conduct an MRI after Koehl
stated that he was going to have his family file a complaint
with the DOCS Central Office. *Id.* Between June 2007 and
October 2008, Koehl repeatedly complained of extreme pain
and weakness, but defendants DOCS Commissioner Brian
Fischer and DOCS Chief Medical Officer Dr. Lester Wright,
*id.* at 2 ¶¶ 14–15, denied him "proper testing," including an
MRI of the spine, a CT scan, and neuro imaging, "[c]ontrary

to numerous recommendations via the Clinton [Correctional Facility] medical staff and outside providers," *id.* at 10–11 ¶ 4.

Defendant Dr. Fredrick Bernstein, the facility Medical Director, deliberately scheduled Koehl's MRI for December 30, 2008, a date on which Bernstein knew Koehl's family would be visiting from Staten Island. *Id.* at 1, 11 ¶ 5. Dr. Bernstein "orchestrated this conflict so [that] he [could] later state that [Koehl had] refused treatment." *Id.* On February 9, 2009, Koehl was administered an MRI which indicated he suffered from "degenerative disk disease." *Id.* at 11 ¶ 6. Neurosurgeons at Albany Medical Center ("the neurosurgeons") informed him that if he had "seen them several years" before, when he had "first complained of the symptoms, [his] prognosis would be much better." *Id.* The neurosurgeons told Koehl that surgery could only stop the condition from worsening and would not cure the disease. *Id.* On July 6, 2009, Koehl had surgery, *id.,* and several weeks later he met with Dr. Fein who scheduled Koehl for another appointment with the neurosurgeons, *id.* at 11 ¶ 7. In September 2009, the neurosurgeons "ordered steroids, xrays," "an EMG, and a new neck brace" for Koehl. *Id.* at 11 ¶ 7. The new brace "kept popping off" which "exacerbated Koehl's condition," and Dr. Bernstein "deliberately refused to order a new neck brace until" January 2010, after Koehl had filed a grievance, and "callously changed the type of xrays" that were ordered. *Id.* at 11 ¶ 7. In November 2009, Dr. Weinstein conducted an EMG and reported "that nothing was wrong." *Id.* However, Dr. Weinstein's "report and conclusions were knowingly false." *Id.* In a subsequent appointment with the neurosurgeons, Koehl was informed that his condition had "progressed for the worse," and the neurosurgeons ordered an MRI and CT scan to be conducted. *Id.* In order to save costs, Dr. Bernstein, Dr. Wright, and Fischer "callously and deliberately ignored the orders of the neurosurgeons and canceled the MRI." *Id.* at 11–12 ¶ 7. The CT scan, which was performed on December 10, 2009, "proved inconclusive" because it was conducted while Koehl was "still and facing front." *Id.* at 12 ¶ 7. On January 19, 2010, X-rays were taken at Putnam Hospital which indicated that some of Koehl's vertebrae had not fused and that the rods, clamps, and screws had come loose, pinching his spinal cord. *Id.* at 12 ¶ 8. On February 11, 2010, Koehl was again seen by the neurosurgeons. *Id.* Koehl informed these doctors that Dr. "Bernstein, [Dr.] Wright and Fischer [had] callously changed and/or ignored their orders." *Id* .

**\*3** Since he arrived at Green Haven, Koehl's "chronic and life threatening lung diseases have grown progressively worse" because he is "constantly ... exposed to unconstitutional levels of second hand tobacco smoke." *Id.* at 12 ¶ 10. Koehl complained to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and William Lee, Ercole's successor at Green Haven, *id.* at 1, who stated "that since prisoners are prohibited from smoking indoors, there are no [environmental tobacco smoke] problems in the housing blocks," *id.* at 12 ¶ 10. The low number of misbehavior reports issued at Green Haven for smoking in unauthorized areas demonstrates these defendants' callous and deliberate refusal to enforce the indoor smoking ban. *Id.* at 13 ¶ 10. Koehl has also repeatedly been denied access to his assigned pulmonary specialist and has been "denied proper testing and access to a qualified specialist." *Id.* at 13 ¶ 11. When he was allowed a pulmonary function analysis on February 27, 2009, it "showed a significant drop in [his] lung capacity." *Id.*

Koehl wears dentures. *Id.* at 13 ¶ 12. Because he has "no bottom ridge line, denture adhesive is a medical necessity." *Id.* Fischer and Dr. Wright will not provide Koehl with denture adhesive or with an implant and he is only able to obtain the adhesive by purchasing it in the facility commissary. *Id.*

Additionally, Fischer, Ercole, and Lee have denied Koehl appropriate clothing to wear during his daily period of outdoor recreation. *Id.* at 14 ¶ 13. In order for Koehl to obtain "life saving" clothing items he would have to pay for them. *Id.* Thus, he "cannot go outside for recreation without endangering [his] life." *Id.*

Cunningham, Ercole, and Lee have subjected Koehl to cruel and unusual punishment by ignoring medical orders and forcing him to "pack up all [of his] property and carry it from cell to cell." *Id.* at 10 ¶ 2; *id.* at 14 ¶ 14(a). On December 11, 2008, Koehl was moved from a double bunk cell to a single cell, *id* . at 14 ¶ 14(a); on December 24, 2008, he was moved from the first floor to the second floor, *id.* at 14 ¶ 14(a)(i); on April 16, 2009, he was moved to a cell on the third floor that contained "lead paint rust dust," *id.* at 14 ¶ 14(a)(ii); and between April 24, 2009 and February 2, 2010, he was moved to four different cells, *id.* at 14 ¶¶ 14(a)(iii)-(vi).

Cunningham and DOP employees Lester Edwards, Andrea Evans, Francis Herman, and Terrence X. Tracy "conspired to sabotage [Koehl's] application for Commutation of Sentence ... in retaliation for ... redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." *Id.* at 1, 2 ¶¶ 6–8; *id.* at 15 ¶ 14(b). When Koehl asked Cunningham why the legal mail he sent was

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 80 of 187
Koehl v. Bernstein, Not Reported in F.Supp.2d (2011)
2011 WL 2436817

always returned, Cunningham told him that because of all of Koehl's "past complaints and winning law suits against DOCS employees," Cunningham would "do whatever he [could] to stop [Koehl's] mail from leaving the facility." *Id.* While more than ten letters were sent in with the application from both Koehl's family and his DOCS spiritual advisor, the DOP only received one of these letters. *Id.* Tracy told Koehl that the DOP had "no record of ... receiving any letters." *Id.* In October 2009, Koehl submitted a FOIL request which confirmed that each letter had been received and sent to the DOP for processing. *Id.* Koehl's family subsequently submitted letters to the Governor and Evans, complaining about the non-receipt of the letters, but the Governor did not respond and Edwards, answering for Evans, "purposely refused to address the actual wording in the submitted complaints." *Id.* at 15–16 ¶ 14(b). On January 16, 2010, the DOP notified Koehl that his application for a commutation of sentence had been denied. *Id.* at 16 ¶ 14(b).

**\*4** Defendants Fischer, I. Russo, Andrew Harvey, and Joseph Brennan "conspired to issue [Koehl] a tier III misbehavior report in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter." *Id.* at 2 ¶¶ 9–11; *id.* at 16 ¶ 14(c). Russo issued this report, which stated that on October 9, 2006, Koehl had harassed Brennan. *Id.* at 16 ¶ 14(c). Koehl was denied the ability to view, obtain, or comment on any of the evidence presented to the committee reviewing the report and was found guilty of the allegations on March 7, 2007. *Id.* Koehl was assessed a sentence of 90 days in "the Box (SHU)" and his appeal was denied in June 2007. *Id.* at 17 ¶ 14(c).

At about the same time, defendants R. Hilliar and D. Sawyer "callously and deliberately advance[d] knowingly false and unsubstantiated charges via a tier II misbehavior report in retaliation for redressing grievances." *Id.* at 2 ¶¶ 12–13; *id.* at 17 ¶ 14(c). The report, issued by Hilliar, alleged that Koehl had harassed her. *Id.* Koehl "was not allowed access to any of [his] property and exculpatory evidence." *Id.* at 17 ¶ 14(c). On March 8, 2007, Sawyer conducted a hearing and Koehl was found guilty of the allegations in the tier II report. He was assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary to run consecutive in SHU with the" 90–day sentence, "totaling 120 days in SHU." *Id.* His appeal was denied on March 22, 2007, and on July 7, 2007, the "guilty verdict was reversed and ordered expunged from [his] records." *Id.*

### B. *Procedural History*

The original complaint in this action was filed on May 10, 2010, *see* Complaint, filed May 10, 2010 (Docket # 2) ("Compl."), and an amended complaint was filed on July 16, 2010, *see* Am. Compl. On November 1, 2010, defendants filed the instant motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *See* Notice of Motion to Dismiss, filed Nov. 1, 2010 (Docket # 25); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed Nov. 1, 2010 (Docket # 26) ("Def.Mem."); Declaration of Counsel, filed Nov. 1, 2010 (Docket # 27); Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, filed Nov. 1, 2010 (Docket # 28). Koehl filed a memorandum in opposition to this motion, *see* Plaintiff's Verified Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint Pursuant to F.R.C.P. Rule 12(b)(6) or (c), filed Dec. 29, 2010 (Docket # 46) ("Pl.Mem."); and defendants filed a reply brief, *see* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, filed Jan. 26, 2011 (Docket # 50) ("Def.Reply").

## II. *LAW GOVERNING MOTIONS TO DISMISS*

A party may move for judgment pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party has "fail[ed] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b) (6). Separately, Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this rule, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512 (2002)).

**\*5** Nonetheless, the Supreme Court has held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level ...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and brackets omitted); *see also id.* at 557 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks and brackets omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 81 of 187
Koehl v. Bernstein, Not Reported in F.Supp.2d (2011)

2011 WL 2436817

between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citations omitted).

In the case of *pro se* plaintiffs, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); *accord In re Sims,* 534 F.3d 117, 133 (2d Cir.2008); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a *pro se* party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

III. *DISCUSSION*

Koehl's amended complaint does not clearly identify the claims it purports to assert. In moving to dismiss the amended complaint in its entirety, the defendants have categorized the claims in the amended complaint and have made arguments seeking dismissal with respect to each. In his opposition papers, Koehl has not argued that any claims exist beyond those identified in the defendant's moving papers. Nor does the Court discern any such claims. Accordingly, we address each of the claims as identified in the defendants' moving papers.

A. *Eleventh Amendment*

Defendants have moved to dismiss Koehl's claims against the State of New York and the individual defendants in their official capacities based on the Eleventh Amendment. The Eleventh Amendment bars lawsuits by a citizen of a state against that state or its agencies, absent the state's consent or a statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99–100 (1984). It is well settled that Congress did not intend to abrogate state sovereign immunity when it enacted 42 U.S.C. § 1983. *See Quern v. Jordan,* 440 U.S. 332, 343–44 (1979). Koehl's complaint does not state whether he seeks damages against the individual defendants in their official or individual capacities. To the extent it seeks damages against any of the defendants in their official capacities, however, it would

be barred by the Eleventh Amendment. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities."); *Eng v. Coughlin,* 858 F.2d 889, 894 (2d Cir.1988) ("Eleventh Amendment immunity protects state officials sued for damages in their official capacity."). Accordingly, all claims against the State of New York for damages must be dismissed as well as any claims for damages against other defendants brought in their official capacities.

**\*6** We now consider Koehl's claims insofar as they are brought against defendants in their individual capacities.

B. *Fourteenth Amendment Due Process Claims*

Koehl alleges certain claims regarding discipline that was meted out to him. Koehl asserts that Harvey "callously and deliberately denied [him] all due process rights ... by refusing to allow [him] ... to view, obtain or comment on any of the" evidence used to find him "guilty" of the allegations outlined in the tier III misbehavior report. *See* Am. Compl. at 16 ¶ 14(c). Koehl further asserts that "instead of finding [him] guilty of the allegedly harassing passage stated in the misbehavior report, he [was] ... found guilty of an uncharged passage that appeared in the provided letter." *Id.* at 17 ¶ 14(c). He was sentenced to 90 days in the SHU and denied leave to appeal. *Id.*

Separately, Koehl alleges that Hilliar filed a false tier II misbehavior report against him and that he was wrongly convicted of the charge listed in that report. *Id.* He states that he "was not allowed access to any of [his] property and exculpatory evidence" and that the hearing officer informed him that he would be found guilty "no matter what." *Id.* Koehl was found guilty and assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary." *Id.* Koehl alleges that he commenced an Article 78 proceeding and that a judge of the New York State Supreme Court reversed the guilty verdict. *Id.* In his memorandum of law, Koehl asserts that after the tier II disposition, he was transferred to "Upstate CF," at which point he was informed that the 90 day SHU assessment and the 30 day keep-lock assessment were to "be added together" and that Koehl was to spend the entire 120 period in the SHU. Pl. Mem. at 24.

Koehl also contends that he endured a number of hardships in the SHU during this time, including the loss of three toenails and denial of his yarmulke and prayer book. *Id.* at 24–25.

Defendants argue that Koehl fails to establish a deprivation of a Fourteenth Amendment right to due process in the context of these prison disciplinary hearings as "he must establish that the confinement imposed on him created an atypical and significant hardship relative to ordinary incidents of prison life." Def. Mem. at 9 (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

### 1. *Law Governing Disciplinary Proceedings*
A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if 'disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin,* 515 U.S. at 484); *accord Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *accord Davis,* 576 F.3d at 133.

**\*7** In *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality. *See id.* at 587–88. *Sealey* aggregated the 18 and 83–day periods the plaintiff was kept in the SHU on the ground that "[w]herever the point is beyond which confinement in harsh conditions constitutes atypicality, a prison official must not be permitted to extend such confinement beyond that point without according procedural due process." *Id.* at 587. It noted that "if conditions were of sufficient harshness that confinement for 365 days constituted atypicality, an official who held a hearing for a prisoner already confined in such conditions for 364 days would normally have to accord procedural due process before continuing the confinement beyond an aggregate interval of 365 days." *Id.* at 587 n. 7; *see also Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that it was "possible that some or all of [plaintiff's sentences] should

be aggregated for purposes of the *Sandin* inquiry") (citation omitted). Other cases have similarly aggregated sentences based on separate violations. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 457 (S.D.N.Y.2006); *Charles v. Maleh,* 2006 WL 581206, at \*12 (D.Conn. Mar. 8, 2006). Thus, for purposes of this motion we will aggregate Koehl's sentences and treat the time spent in the SHU as 120 days.

"The Second Circuit has not established a bright-line rule as to how lengthy a term of disciplinary confinement (i.e., either 'keeplock' or SHU confinement) will be considered atypical and significant." *Bunting,* 452 F.Supp.2d at 455. Nevertheless, the Second Circuit has established "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer,* 364 F.3d at 64. Among these guidelines is that for confinements of "an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 65 (citations omitted)

As noted, Koehl has alleged that he spent 120 days in the SHU, thus placing him within the guideline governing intermediate durations of confinement. For such a duration of confinement, the fact-finding required by the Second Circuit to determine whether this intermediate sentence constitutes an atypical and significant hardship cannot occur on a motion to dismiss. *Gonzalez–Cifuentes v.. Torres,* 2007 WL 499620, at \*3 (N.D.N.Y. Feb. 13, 2007); *accord Thomas v. Calero,* 2011 WL 1532058, at \*8 (S.D.N.Y. Mar. 17, 2011) (finding that although plaintiff had "not alleged that the conditions of his confinement differed from normal SHU circumstances," his "confinement in SHU for 291 days [wa]s sufficient, for pleading purposes, to implicate a liberty interest") (291–day confinement); *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ( "[Plaintiff] has not alleged that the conditions of her confinement were more severe than normal SHU conditions .... However, such detailed factual allegations are not necessary to withstand a motion to dismiss.") (70–day confinement); *Harris v. McGinnis,* 2004 WL 2187137, at \*4 (S.D.N.Y. Sept. 30, 2004) (denying motion to dismiss even though "[t]he Complaint makes no representation as to the parameters of 'normal' conditions of confinement, and it is thus impossible to determine on the face of the Complaint that the keeplock conditions to which Plaintiff was subjected were not atypical within the meaning of *Sandin"* ) (151–days in keeplock). Even if it could be said that a prisoner has some obligation to describe his conditions of confinement in order to make out a due process claim, here

Koehl alleges that his confinement was in fact "atypical" and constituted a "significant hardship" because he was not allowed to attend his grandmother's funeral and was not allowed to communicate with his family. Am. Compl. at 17 ¶ 14(c). Accordingly, his pleading cannot be dismissed for failure to describe in detail the conditions of his confinement.

### 2. *Statute of Limitations*

**\*8** In New York, pursuant to New York Civil Practice Law and Rules § 214(5), a three year statute of limitations governs a section 1983 action. *Okure v. Owens,* 816 F.2d 45, 49 (2d Cir.1987), *aff'd,* 488 U.S. 235 (1989); *see Harris v. City of New York,* 186 F.3d 243 (2d Cir.1999). Defendants argue that any claim against Fischer, Russo, Harvey and Brennan based on the tier III report should be dismissed because the allegedly retaliatory report was issued in October 2006, outside the three year statute of limitations for section 1983 actions. *See* Def. Mem. at 14. In fact, although the incident on which the report was based occurred on October 9, 2006, the complaint alleges that the misbehavior report was not issued until February 21, 2007, and that Koehl was found guilty of the charges in this report on March 7, 2007. *See* Am. Compl. at 16 ¶ 14(c). It would thus appear that the hearing took place on March 7, 2007, and the resulting sentence was issued on that date. Koehl's original complaint in this action is dated March 3 and March 5, 2010. *See* Compl. at 18, 20. Under the rule that the complaint in a *pro se* prisoner case is deemed filed on the date it is delivered to prison officials for mailing, *see Dory v. Ryan,* 999 F.2d 679, 682 (2d. Cir.1993), any claim would had to have accrued by March 5, 2007, at the latest. Accordingly, the question arises whether the limitations period arose when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges.

While the analysis will be different to the extent a claim of retaliation is made—an issue we discuss in section III.C below—we conclude that because the due process claim arises out of the punishment that was meted out on the hearing date, any due process claim began to accrue on that date, and not on the date the misbehavior report was issued. Accordingly, we reject defendants' argument that Koehl's due process claim is untimely.

### 3. *Personal Involvement*

Defendants do not argue that Koehl's due process claim should be dismissed because he received sufficient process at the administrative hearings, and thus we do not address this prong of the due process analysis. Instead, their remaining defense is that the claims against Fischer, Russo, Brennan, and Hilliar should be dismissed because the complaint does not allege that they were personally involved in the due process violation. *See* Def. Mem. at 10. [1]

[1] Defendants have not moved to dismiss the due process claims against Harvey and Sawyer on the ground of lack of personal involvement. *See* Def. Mem. at 10; Am. Compl. at 16–17 ¶ 14(c).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ) (citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit, personal involvement can be shown by

> **\*9** evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring

*Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). More recently, the

Supreme Court held in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949. Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id. Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision. *See generally D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (citing cases and concluding that the five categories were not necessarily preempted by *Iqbal* ).

With regard to the tier III report, Koehl alleges that Russo, Brennan, and Fischer "conspired to issue [him this report] ... in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail." Am. Compl. at 16 ¶ 14(c). He states that Russo authored the report, which was contrary to the record, and that he refused to allow Koehl to view, obtain, or comment on any of the evidence that was used to find him guilty of the charges. *Id.* He states that this report stemmed from an alleged grievance letter he sent to Brennan, which was "deemed harassment," and that Brennan swore and signed a complaint demanding Koehl be charged for the alleged letter. *Id.* In his memorandum in opposition, Koehl states that he appealed the hearing officer's decision with regard to this report to Fischer, and that Fischer stated that the entire file was classified. *See* Pl. Mem. at 23. Fischer affirmed the sentence on April 27, 2007. *See id.*

The complaint's allegations against Russo are sufficient to show personal involvement as Koehl has alleged that Russo directly participated in the alleged violation. Specifically, Koehl asserts that Russo denied him his due process rights by refusing to allow him to view, obtain, or comment on the evidence used to find Koehl guilty of the charge in the tier III report. *See* Am. Compl. at 16 ¶ 14(c).

 **\*10** On the other hand, the allegations against Brennan are not sufficient to show personal involvement. Brennan, who is "Chairperson, Committee on Professional Standards, Third Judicial Department," apparently received a letter that was traced to Koehl through handwriting analysis and other means —a letter that Koehl denies he wrote. *Id.* The complaint

alleges Brennan demanded that Koehl be charged for writing this letter and that he was so charged. But there is no claim that Brennan had any involvement in the adjudication of the report. Thus, there are no facts sufficient to support a finding that Brennan was personally involved in violating Koehl's due process rights. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.") (citing *Sommer v. Dixon,* 709 F.2d 173, 174–75 (2d Cir.), *cert. denied,* 464 U.S. 857 (1983)); *Anderson v. Banks,* 2008 WL 3285917, at \*2 (N.D.N.Y. Aug. 7, 2008) (writing of false misbehavior reports is "not sufficient to state a due process claim"); *Muhammad v. Pico,* 2003 WL 21792158, at \*16 (S.D.N.Y. Aug. 5, 2003) (filing of an allegedly false report did not personally involve the sergeant who filed it in the due process violations alleged because " 'but for causation' ... is not the standard for Section 1983 liability") (citations omitted); *see generally Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report") (citing *Freeman v.. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)).

As to Fischer, once the hearing on the tier III report was over and the decision was issued, the due process violation was completed. The only opportunity that Fischer had to rectify this violation was through the appeal process itself. To be sure, one of the methods recognized by the Second Circuit to show personal involvement is that the defendant, "after being informed of the violation through [an appeal], failed to remedy the wrong." *Colon,* 58 F.3d at 873. But this category does not apply to Fischer because —as has been held in a related context—"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at \*10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at \*7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at \*7 (citations omitted). "The reference in case law to an

Koehl v. Bernstein, Not Reported in F.Supp.2d (2011)

2011 WL 2436817

official who fails to remedy a violation logically applies only to ongoing, and therefore correctable, constitutional violations—not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded." *See Odom v. Calero,* 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008) (internal quotation marks omitted); *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). Accordingly, the mere allegation that Fischer failed to grant Koehl's appeal is insufficient to show that he was "personally involved" in committing the alleged due process violation.

**\*11** Koehl alleges that defendant Hilliar issued him an allegedly false tier II report stating that he had harassed her. *See* Am. Compl. at 17 ¶ 14(c). However, for the same reasons already stated with respect to Koehl's allegations against Brennan, such allegations are not enough to show personal involvement by Hilliar. *See Williams,* 781 F.2d at 324; *Anderson,* 2008 WL 3285917, at *2.

C. *Retaliation Claims*

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, which includes submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To establish a *prima facie* case of retaliation, an inmate must show: (1) that his speech or conduct was constitutionally protected; (2) that the defendant took adverse action against the plaintiff; and (3) that a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). However, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (internal quotation marks and citations omitted); *accord Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003). "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353

(internal punctuation and citation omitted). Because of the ease with which claims of retaliation can be invoked, the Second Circuit has directed courts to examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *see Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.") (citations omitted).

1. *Facility Transfer*

Here, Koehl asserts that defendant Cunningham retaliated against him for filing grievances by transferring him to the "5 Points" facility. *See* Am. Compl. at 10 ¶ 3. Defendants argue that Koehl's claim should be dismissed because: (1) Koehl "has no liberty interest in a particular location," Def. Mem. at 11; Def. Reply at 6; (2) "the facility transfer claim is moot because plaintiff was not transferred out of Green Haven by the time he filed the complaint," Def. Mem. at 11; Def. Reply at 6; and (3) "the complaint does not explain why the transfers were retaliatory," Def. Mem. at 12; Def. Reply at 6. [2]

[2]    Defendants also cite to the section of their brief discussing Koehl's Eighth Amendment claim in support of their argument that Koehl has not stated a retaliation claim. *See* Def. Mem. at 12 (citing arguments set forth in Point IVa). As this claim is analyzed under a different legal standard than the retaliation claim, and as defendants have not explained their citation to this section, we do not consider this citation to constitute an additional argument in support of dismissal of Koehl's retaliation claim.

**\*12** Defendants' first argument must fail because, although prisoners have no liberty interest in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("[a] prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights") (citations omitted). Because it is well established that the filing of grievances is constitutionally protected activity, prison officials may not transfer inmates in retaliation for such activity. *See Morales,* 278 F.3d at 131. The Court would normally accept defendants' second and third arguments, but inasmuch as Koehl alleges that he was transferred to the "5 Points" facility on June 10, 2010, *see* Pl. Mem. at 20, and

2011 WL 2436817

that the allegedly retaliatory action taken by defendants was the result of Koehl's filing of "grievances and complaints," Pl. Mem. at 19, we will deem these allegations to amend his complaint. *See Woods,* 2002 WL 731691, at *1 n. 2. [3]

[3]   Defendants also argue in a footnote that Koehl's allegations against Cunningham with regard to this claim are "speculative." *See* Def. Mem. at 12 n. 3. Koehl specifically alleges, however, that he filed complaints in writing with Cunningham about his cell conditions and that Cunningham subsequently signed the retaliatory request that Koehl be transferred to "5 Points" Correctional Facility. *See* Am. Compl. at 10 ¶ 3; Pl. Mem. at 19.

### 2. *Executive Clemency Application*

Defendants argue that Koehl has failed to state a claim for retaliation with regard to the sabotage of his executive clemency application by Cunningham, Edwards, Evans, Herman, and Tracy. *See* Def. Mem. at 12–13. Koehl alleges that these defendants sabotaged his application in retaliation for the "redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." Am. Compl. at 15–16 ¶ 14(b). In addition to grievances, the filing of civil lawsuits comprises constitutionally protected activity. *See Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (holding plaintiff's earlier federal lawsuit was a protected activity) (citation omitted). Thus, Koehl has sufficiently alleged that his speech or conduct was constitutionally protected.

In the prison context, the adverse action element of a retaliation claim is satisfied if the plaintiff alleges facts sufficient to demonstrate that the retaliatory conduct by defendants "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (internal quotation marks and citations omitted). A reasonable jury could find that a deliberate effort by a prison official to sabotage an application for clemency fits within this category.

With respect to the personal involvement of the defendants in this activity, we agree with defendants that Koehl does not allege adverse action on the part of Evans, Edwards, Herman, and Tracy. *See* Def. Mem. at 13. The only allegations Koehl makes regarding Evans and Edwards are that these defendants responded to his questions about the DOP's receipt of letters sent as part of the executive clemency application. *See* Am. Compl. at 15 ¶ 14(b); Pl. Mem. at 25–28. Herman is only mentioned as part of Koehl's discussion of the Department's

review of applications for executive clemency. *See* Pl. Mem. at 25–26. No specific allegations are made against him. With respect to Tracy, Koehl states in the complaint that, "[o]n appeal, Defendant Tracy, callously and deliberately falsified official records to continue the conspiracy." Am. Compl. at 15 ¶ 14(b). The problem with this allegation is that it is far too vague and conclusory to identify Tracy's involvement in the scheme.

**\*13**  As for Cunningham, defendants argue that Koehl "does not allege a single actual adverse measure by Cunningham." Def. Mem. at 13. Koehl, however, alleges that Cunningham informed him that "because of [his] past complaints and winning law suits against DOCS employees," he would "submit an unfavorable recommendation to the Division of Parole regarding [Koehl's] pending application for Commutation of Sentence," that he would "do whatever he [could] to stop [Koehl's] mail from leaving the facility," and that he would "call in every favor ... to sabotage [the] application." Am. Compl. at 15 ¶ 14(b). This is sufficient to show Cunningham's personal involvement. It is also sufficient to show a causal connection between the protected speech and the adverse action since Koehl alleges that Cunningham specifically stated that he was taking the adverse action because of Koehl's protected activities.

### 3. *Misbehavior Reports*

As was true for the due process claims, defendants argue that the retaliation claims against Fischer, Russo, Harvey, and Brennan—based on the tier III misbehavior report—should be dismissed on statute of limitations grounds. Def. Mem. at 14. As noted in section III.B.2 above, this argument raises the question of whether the claim accrued when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges alleged.

We believe the answer to this question lies in the specific claim made against a defendant. To the extent a defendant's retaliatory act is the issuance of a false misbehavior report itself, the claim is untimely. *See, e.g., Davidson v. Pearson,* 2007 WL 952047, at *2 (W.D.N.Y. Mar. 28, 2007) ("[p]laintiff's claims initially accrued on December 27, 1998, the date the alleged false misbehavior report was issued"). To the extent a claim against a defendant is that he took some retaliatory action at the hearing on March 7, 2007, the claim would be timely.

Thus, we examine each potential defendant separately. Fischer's role is not alleged at all in the description of this incident, Am. Compl. at 16–17 ¶ 14(c), and thus the claim must be dismissed as to him. With respect to Brennan, as noted in section III.B.3 above, there is no allegation regarding his involvement in the adjudication of the report and thus no claim can survive as to him. The allegations against Russo are somewhat unclear, but it appears that Koehl is alleging that Russo denied him documents both before and after the hearing date, Am. Compl. at 16–17 ¶ 14(c), and thus we will assume that some of his conduct may fall within the limitations period. Harvey is alleged to be the hearing officer, and thus any claim against him would be timely.

Turning to the merits, the allegations are sufficient to show Russo and Harvey's personal involvement in that both are alleged to have personally committed acts of retaliation. They are also sufficient to allege a causal connection between their actions and Koehl's protected activities. *See* Am. Compl. at 16 ¶ 14(c) (defendants actions were done "in retaliation for redressing [Koehl's] grievances and so [Koehl] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter"). Accordingly, the retaliation claim against Russo and Harvey survives.

**\*14** With respect to the claim regarding the tier II report, this claim is not time-barred but must be dismissed as against defendant Sawyer because there are no facts alleged that he had any personal involvement in the issuance of this misbehavior report, let alone that his involvement in the matter arose because of his desire to retaliate. As discussed above, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983.*" *Farrell,* 449 F.3d at 484 (internal quotation marks and citation omitted). Here, Koehl alleges that Sawyer was the hearing officer in the adjudication of the tier II report, *see* Am. Compl. at 17 ¶ 14(c); Pl. Mem. at 24. While Koehl alleges that he was wrongly denied access to certain evidence during the tier II hearing, he does not allege any facts reflecting that Sawyer was aware that the misbehavior report had been allegedly issued in retaliation for the filing of grievances. Thus, the allegations against Sawyer with regard to the tier II misbehavior report must be dismissed.

With respect to Hilliar, defendants make no argument that she should be dismissed from this claim. *See* Def. Mem. at 14. And the complaint contains sufficient allegations reflecting that her involvement in the issuance of the report arose from her desire to retaliate against Koehl's appeal of grievances. *See* Am. Compl. ¶ 14(c) at 17.

### D. *Eighth Amendment Claims*

The Supreme Court has held that "the Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer,* 511 U.S. at 832. To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v.. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind," *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference ." *Wilson,* 501 U.S. at 302–03.

#### 1. *Exposure to Environmental Tobacco Smoke*

Defendants have moved to dismiss Koehl's claim that his exposure to environmental tobacco smoke ("ETS"), including the 60 days he spent in a double bunk cell with inmates who smoked, constituted cruel and unusual punishment. Defendants argue "that DOCS' practice of double-cell housing does not violate the Eighth Amendment," *see* Def. Mem. at 15 (citing *Jones v. Goord,* 435 F.Supp.2d 221, 257 (S.D.N.Y.2006)), and that DOCS not only has an indoor smoking ban, but that DOCS personnel were actively enforcing this ban, *see* Def. Reply at 5.

**\*15** In *Rhodes v. Chapman,* 452 U.S. 337 (1981), the Supreme Court held that "double celling" is generally permissible under the Eighth and Fourteenth Amendments. *Id.* at 347–48, 352. Nevertheless, when combined with other adverse conditions, double bunking may constitute cruel and unusual punishment. *See Bolton v.. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998). Thus,"[e]xposure to secondhand smoke can give rise to an Eighth Amendment violation." *Jones v. Goord,* 435 F.Supp.2d at 249 (citation omitted). Of course, "[a]s with all claims relating to conditions of confinement, an Eighth Amendment claim based on exposure to secondhand smoke must show that the exposure created an 'unreasonable

risk of serious damage' to inmates' future health, and that prison officials were deliberately indifferent to that risk." *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 35 (1993)).

We will address the 60 days Koehl spent in a double cell in October through December 2008 separately from Koehl's general claim that his exposure to ETS at Green Haven constituted a violation of the Eighth Amendment. Koehl alleges that in October 2008, Ercole assigned him to a double bunk cell in which two out of three of his cell mates "were chain smokers, who smoked all day and night in the cell." *See* Am. Compl. at 10 ¶ 3. With regard to this 60 day assignment, Koehl has alleged facts from which it could be inferred that his exposure to secondhand smoke created an unreasonable risk of serious danger to his health and that defendant Ercole was deliberately indifferent to this risk. Koehl alleges that following his transfer to Green Haven he has had difficulty breathing, his lung disease has progressively worsened, his "heart valves [have] started leaking," and his "fingernails have turned yellow." Pl. Mem. at 8–9, 12, 15. Thus, Koehl has satisfied the objective prong of the Eighth Amendment analysis.

Liberally reading the complaint, Koehl also alleges that he complained about both the conditions in the cell and the impact of these conditions on his lung disease to Ercole and Cunningham in person and in writing and that they refused to enforce the smoking ban and ignored his complaints. *See* Am. Compl. at 10 ¶ 3; *id.* at 12–13 ¶ 10. Koehl alleges that it was defendant Ercole who assigned him to this cell and that Ercole "deliberately and repeatedly falsified records" and ordered Koehl's counselor to demand that Koehl sign a waiver so that he would remain in the double bunk cell. *Id.* at 10 ¶ 3. Thus, Koehl's allegations are sufficient to allow the conclusion that Ercole was aware of the risk Koehl faced and that he deliberately disregarded this risk. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Weaver v. Clarke,* 45 F.3d 1253, 1256 (8th Cir.1995) (finding deliberate indifference alleged where the complaint portrayed the prison officials as "consistently unwilling to enforce the smoking ban in [plaintiff's] room and repeatedly unresponsive to any of [plaintiff's] requests and protests"). [4] Accordingly, Koehl has stated a claim that his 60 day assignment by Ercole to double bunk in a cell with "chain smokers" constituted cruel and unusual punishment.

[4]   Defendants argue that Koehl's complaint "acknowledges that DOCS has prohibited indoor smoking, and, in fact, was actively enforcing it." Def. Mem. at 21 (citation omitted). While Koehl does acknowledge that there is an indoor smoking ban, *see* Am. Compl. at 13 ¶ 10, he also alleges that his cell mates "smoked all day and night in the cell," *id.* at 10 ¶ 3, in contravention of the ban, and that Ercole was aware of this noncompliance, *id.* There are no allegations in the complaint that the ban was "actively enforc[e]d" during this particular time period. *See* footnote 5 below and accompanying text.

**\*16** As to defendant Cunningham, Koehl has not alleged that he was personally involved in the alleged deprivation of his Eighth Amendment rights with regard to this 60 day cell assignment. Here, Koehl alleges that it was Ercole who assigned him to this cell, and that Cunningham merely disregarded his complaints, Am. Compl. at 10 ¶ 3, and refused to allow an investigative report into Koehl's medical concerns with regard to his cell assignments, *see* Pl. Mem. at 19. Because "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations," *Greenwaldt v. Coughlin,* 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995), Koehl has failed to allege that Cunningham had any personal involvement in his exposure to ETS.

In addition, Koehl does not state an Eighth Amendment claim with regard to his general allegation that defendants Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein refused to enforce the New York ban on smoking in prisons. *See* Am. Compl. at 13 ¶ 10. Koehl has failed to allege facts from which it could be inferred that defendants Fischer, Lee, Cunningham, and Bernstein were at any time deliberately indifferent to the risk created by Koehl's alleged exposure to secondhand smoke, or that Ercole was deliberately indifferent other than with regard to the 60 days Koehl spent in a double bunk cell with "chain smokers" in October through December 2008. While Koehl makes the broad allegation that Fischer, Ercole, Lee, Cunningham, and Bernstein "callously and deliberately refused to enforce the state's indoor smoking ban," *id.,* this statement is conclusory and unsupported by any allegations regarding either the objective harm to Koehl (outside of the 60 days he spent with the "chain smokers") or these defendants' subjective knowledge of the harm it was causing to Koehl. The complaint's reference to Bernstein's refusal to administer a "cotinine level test," and Ercole, Lee, and Cunningham's failure to install carbon monoxide

detectors, Am. Compl. at 12 ¶ 10, does not show deliberate indifference to Koehl's health.

Notably, "[w]hether a prison has a non-smoking policy bears heavily on the question of deliberate indifference," *Enigwe v. Zenk,* 2007 WL 2713849, at *6 (E.D.N.Y. Sept. 14, 2007) (citing *Helling,* 509 U.S. at 36), and "imperfect enforcement of the policy alone may not support a finding of deliberate indifference," *Enigwe,* 2007 WL 2713849, at *6 (citing *Scott v. District of Columbia,* 139 F.3d 940, 942–43, 944 (D.C.Cir.1998)) (dismissing claims where inmates alleged smoking in housing units but failed to present any evidence in support of claims)). As noted in the exhibits provided by Koehl, attached to his memorandum in opposition, Green Haven policy prohibits smoking in all buildings, and permits it only in restricted outdoor areas. *See* Green Haven Correctional Facility Complaint Investigation, dated May 28, 2009 (annexed as Ex. 23 to Verified Exhibits (annexed to Pl. Mem.) ("Verified Exs.")) ("May 2009 Compl. Invest.") at 1–2. Additionally, these exhibits demonstrate that Green Haven personnel, including defendants Cunningham and Lee, personally investigated Koehl's complaints regarding indoor smoking. *See id.* at 1; Emails from Lee and Devine, dated Mar. 2010 (annexed as Ex. 24 to Verified Exs.) ("Lee Emails") at 2–3. For example, Cunningham was present at the investigation of Koehl's May 6, 2009 complaint and he issued a memo to all Green Haven staff on June 10, 2009, regarding the facility's smoking policy. *See* May 2009 Compl. Invest. at 1; Lee Emails at 2. When Lee became aware of Koehl's complaints and the subsequent report, he issued memos to both staff and inmates regarding the smoking ban and he "directed that security supervisors ensure that staff are enforcing the prohibition." Lee Emails at 2. [5] Thus, while Koehl alleges that the non-smoking policy was not enforced and that defendants were deliberately indifferent to smoking by prisoners, the exhibits provided by Koehl show that at least some efforts were taken to enforce the ban. [6]

[5]     We note that these exhibits do not affect our finding that Ercole's assignment of Koehl to a double bunk cell with "chain smokers" in October through December 2008 constituted a violation of the Eighth Amendment, as these exhibits involve action taken only in 2009 and 2010 and do not involve enforcement of the smoking ban by defendant Ercole.

[6]     As defendants note, Def. Reply at 6 n. 1, Koehl references his treatment and conditions at DOCS' Auburn Correctional Facility for the first time in his opposition brief. *See* Pl. Mem. at 14, 16, 17, 20. As Koehl was not

transferred to the Auburn facility until after he filed the complaint in this action, we do not consider statements in Koehl's memoranda of law regarding the conditions at the Auburn facility.

### 2. Cell Transfers and Assignments

**\*17** Koehl claims that the conditions he endured while he was being transferred between cells constituted cruel and unusual punishment because he was forced to carry his belongings from cell to cell which "aggravated [his] previously complained of [medical] conditions." Am. Compl. at 10 ¶ 2; *id.* at 14 ¶ 14. He alleges that his assignment to non-first floor cells, double bunk cells, and a cell which contained "air-borne, lead paint rust dust" constituted a violation of the Eighth Amendment. *Id.*

However, other than Koehl's allegations regarding the 60 days he spent in a double bunk cell with smokers, discussed above, Koehl fails to allege facts from which it could be inferred that his specific cell assignments or physical transfer between cells constituted a violation of the Eighth Amendment. Koehl alleges that when he first arrived at Green Haven—before Ercole assigned him to spend 60 days in a double bunk cell with "chain smokers"—Ercole assigned him to a double bunk cell on the third floor of the facility. *See* Am. Compl. at 10 ¶ 2. Beyond the conclusory allegation that Ercole "callously and deliberately assigned" him to this cell, *id.,* Koehl alleges no facts from which it could be inferred that Ercole was deliberately indifferent to the risk this assignment allegedly caused Koehl. Koehl does not allege that he made Ercole aware of his medical conditions or that Ercole otherwise knew about them. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"). Thus, Koehl alleges no facts from which it could be inferred that Ercole knew that Koehl faced a substantial risk of serious harm with regard to this cell assignment.

Other than the cell assignments discussed in paragraphs 2 and 3 of the complaint, Koehl does not allege facts from which it could be inferred that defendant Ercole was personally involved in his cell assignments or transfers. Nor does Koehl allege that defendants Cunningham or Lee were personally involved in his assignments and transfers. He merely states that Cunningham, Ercole, and Lee "physically harmed [him] and deliberately ignored medical orders." Am. Compl. ¶ 14(a). This broad statement cannot, however, support a deliberate indifference claim and Koehl

does not allege any facts supporting the inference that these defendants were involved in the cell assignments and transfers discussed in paragraph 14 of the amended complaint. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted); *Joseph v. Fischer,* 2009 WL 3805590, at *2 (W.D.N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement). Thus, Koehl's Eighth Amendment claim regarding cell assignments and transfers cannot be sustained on this ground.

**\*18** Koehl's claim that he was under threat of transfer if he did not agree to double bunking, *see* Am. Compl. at 10 ¶ 3, should be dismissed because threats alone do not deprive a plaintiff of any constitutional rights. *See Lamar v. Steele,* 698 F.2d 1286, 1286 (5th Cir.) (per curiam), *cert. denied,* 464 U.S. 821 (1983); *see also Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987) (threats to deter prisoner from "pursuing legal redress" insufficient to state a claim under § 1983 unless the prisoner was actually deprived access to the court) (internal quotation marks omitted); *Grant v. Fernandez,* 1997 WL 118257, at *2 (N.D.Cal. Mar. 5, 1997) ("[O]nly harassment and threats coupled with conduct implicating the Eighth Amendment's proscription against cruel and unusual punishment ... may present a claim under § 1983.") (citation omitted).

### 3. *Weather Appropriate Clothing*

Koehl claims that Fischer, Ercole, and Lee denied him appropriate clothing for outside recreation in violation of the Eighth Amendment. *See* Am. Compl. at 14 ¶ 13. Koehl alleges that "most of the winter [he] cannot go outside for recreation without endangering [his] life." *Id.* Prison officials "may be held liable ... for failure to provide adequate clothing, if (1) the inadequacy is 'sufficiently serious' *and* (2) the official's failure is the result of his 'sufficiently culpable state of mind'—i.e., his 'deliberate indifference' to the inmate's health." *Shaffer v. Coombe,* 1995 WL 495067, at *1 (W.D.N.Y. Aug. 10, 1995) (quoting *Farmer,* 511 U.S. at 833). "Deliberate indifference to an inmate's health equates to 'recklessly disregarding' a risk to such, and the recklessness *vel non* of the official is judged subjectively." *Shaffer,* 1995 WL 495067, at *1 (quoting *Farmer,* 511 U.S. at 835, 839). We note that this is not a case where Koehl alleges he was

confined to a cold cell without the minimal clothing necessary to keep warm. *See, e.g., Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (claim allowed where prisoner had been deliberately exposed to bitter cold in his cell block for three months).

First, this claim cannot survive in light of the fact that Koehl had a mechanism to stay warm in winter by staying indoors; any time he chose to spend outdoors in the cold was not prolonged, and no substantial harm has been alleged. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.2d 317, 358 (N.D.N.Y.2010) (no Eighth Amendment violation where prisoner was "on many occasions" exposed to "below zero weather for an hour at a time during recreation period") (internal quotation marks and citation omitted); *Davis v.. Buffardi,* 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (denying claim under Fourteenth Amendment where pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm"); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (where prisoner alleged his cell was "extremely cold" and guard would not allow him to enter the hallway for warmth even when prisoner complained about being sick from the low temperatures, claim was dismissed because allegations were "not sufficiently serious" and prisoner could "get warm with some blankets").

**\*19** In addition, the claim fails because Koehl makes only a conclusory allegation that Fischer, Ercole, and Lee "created and enforced unconstitutional customs and policies that ... continually denied [him] adequate clothing for the weather." Pl. Mem. at 28. While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, *Back,* 365 F.3d at 127 (citing *Colon,* 58 F.3d at 873), conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See, e.g ., Green v. Wright,* 2010 WL 3474973, at *2 (W.D.N.Y. Sept. 1, 2010) ("Here, the Court is concerned about the conclusory nature of plaintiff's assertion that defendant was personally involved in his treatment.... Without at least some kind of factual assertion about an unconstitutional policy, not even the liberal standards for assessing *pro se* pleadings can save plaintiff's claim in its current form."); *Joseph v. Fischer,* 2009 WL 3805590, at *2 (W.D .N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement); *Davis v. City of New York,* 2000 WL

1877045, at *9 (S.D.N.Y. Dec. 27, 2000) (merely asserting that "[defendant] was actively involved in" an incident is conclusory and insufficient to establish defendant's personal involvement in the allegedly unconstitutional custom or policy) (internal quotation marks and citation omitted); *Funches v. Reish,* 1998 WL 695904, at *4–5 (S.D.N.Y. Oct. 5, 1998) (dismissing deliberate indifference to medical care claim against warden of prison facility based upon conclusory allegation that warden created "custom" of denying medical care); *Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the plaintiff "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... [—] that [defendant] created or continued a policy or custom which allowed the violation to occur"); *Shaffer,* 1995 WL 495067, at *1 (to satisfy the "deliberate indifference" prong of the Eighth Amendment analysis, "there must be allegations that at least suggest that the defendants were aware of the harm the plaintiff alleges") (citing *Farmer,* 511 U.S. 841). Here, Koehl has failed to allege with the requisite specificity that these supervisory defendants had any personal involvement in the alleged constitutional deprivations. Other than the conclusory statement of their involvement in the unconstitutional policy, Koehl makes no further allegations against them with regard to this claim. Thus, absent from the complaint are any facts suggesting that these defendants knew of, let alone approved, any alleged misconduct with regard to Koehl's clothing. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted). Accordingly, this claim should be dismissed.

#### 4. *Medical Treatment*

**\*20**  To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard consists of both a subjective prong and an objective prong. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the subjective component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The "subjective element of

deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer,* 511 U.S. at 835) (alterations in original); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening the necessary state of mind to "the equivalent of criminal recklessness") (internal quotation marks and citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam) (same). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837 (internal quotation marks and citation omitted); *accord Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). As already noted, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Under the objective prong, the alleged medical need must be "sufficiently serious." *Hathaway,* 37 F.3d at 66 (internal quotation marks and citations omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* (internal quotation marks and citation omitted). "Factors that have been considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citations omitted) (alteration in original).

##### a. *Dental Care*

With respect to Koehl's claim that he has been denied denture adhesive or an implant, *see* Am. Compl. at 13–14 ¶ 12, defendants argue that the claim should be dismissed because the fact that a prisoner may prefer a different course of medical treatment does not give rise to an Eighth Amendment violation, *see* Def. Mem. at 18–19 (citing *Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*21**  In order to state a claim for deliberate indifference under the Eighth Amendment, Koehl "must allege facts indicating that a substantial risk of serious harm would arise from the denial of the requested dental care ... and that the defendants perceived this risk and chose not to provide the

requested treatment." *Partee v. Grood,* 2007 WL 2164529, at *5 (S.D.N.Y. July 25, 2007), *aff'd,* 335 F. App'x 85 (2d Cir.2009). "[I]nsufficient dental treatment may rise to the level of a Constitutional violation if it leads to extreme pain, deterioration of the teeth, and an inability to eat properly." *Id.* at *5 (citing *Chance,* 143 F.3d at 703). However, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean,* 804 F.2d at 215).

Assuming *arguendo* that Koehl has alleged facts indicating that a substantial risk of harm arose from his lack of dental care, he has failed to allege that either Fischer or Wright were personally involved in the deprivation of treatment. *See* Am. Compl. at 12–13 ¶ 12; Def. Reply at 2–3. Koehl merely alleges that he was denied dental care pursuant to "Fischer and Wright's policies and customs," Am. Compl. at 13 ¶ 12. Koehl does not, however, allege what these policies are. Nor are there allegations from which it could be inferred that either Fischer or Wright knew of, let alone were involved in, the failure to provide him with dental adhesives or implants. As already noted, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See Joseph,* 2009 WL 3805590, at *2 ("Plaintiff's complaint contains many conclusory allegations and, therefore, it is not possible to determine if there is personal involvement for each defendant.... Plaintiff needs to describe the events in sufficient detail to allow for a determination of defendants' personal involvement in the alleged incidents.").

### b. *Cervical Spine and Back Injuries*

With respect to Koehl's claim regarding the medical treatment he received for his back, defendants argue that Koehl has failed to allege the subjective component of a deliberate indifference claim. *See* Def. Mem. at 19.

Turning first to the conduct of Dr. Weinstein, Koehl has not alleged facts giving rise to the inference that Dr. Weinstein acted with a "sufficiently culpable state of mind." Koehl alleges that in late 2008, Weinstein conducted an EMG, which Koehl believed contradicted the results of a previous EMG. *See* Am. Compl. at 10 ¶ 4. After Koehl called Dr. Weinstein "a liar," Dr. Weinstein agreed to order an MRI. *Id.* Koehl also alleges that in late 2009, Dr. Weinstein conducted another EMG "and stated that nothing was wrong." *See id.* at 11 ¶ 7. Koehl states that "[l]ater testing revealed that [Dr.] Weinstein's report and conclusions were

knowingly false." *Id.* Apart from the conclusory allegation that Dr. Weinstein's conclusions were "knowingly" false, these allegations do not support the claim that Dr. Weinstein was deliberately indifferent to Koehl's medical problems. Instead, they constitute allegations that Dr. Weinstein did not give Koehl's condition proper treatment—allegations that are insufficient to show a constitutional violation. *See Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir.1999) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *Troy v. Kuhlmann,* 1999 WL 825622, at *6 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim.") (citation omitted).

**\*22** With regard to Fischer and Drs. Wright and Bernstein, however, Koehl has alleged facts creating the inference that these defendants acted with a "sufficiently culpable state of mind," thus satisfying the subjective prong of the deliberate indifference analysis. While defendants argue that Koehl's medical care was "attentive" and that Koehl's claims against Fischer and Drs. Wright and Bernstein regarding his denial of proper diagnostic testing "lack [ ] merit in light of the extensive testing plaintiff received," Def. Mem. at 20, Koehl specifically alleges that, "as a cost saving measure," Fischer and Drs. Wright and Bernstein "callously and deliberately ignored the orders of the neurosurgeons" by canceling Koehl's MRI, changing the type of x-rays ordered, and refusing to order Koehl a new neck brace, Am. Compl. at 11–12 ¶¶ 7, 8. He states that despite his complaints of "extreme pain and weakness in [his] arms, hands, legs, neck and back," Fischer and Dr. Wright repeatedly denied Koehl proper testing for his medical condition. *Id.* at 10–11 ¶ 4. Koehl also alleges that Dr. Bernstein deliberately scheduled Koehl's MRI on the date when Koehl's parents were visiting so that he could later claim that Koehl had refused treatment. *See id.* at 11 ¶ 5. The Second Circuit has held that the "allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment." *Chance,* 143 F.3d at 704. Because Koehl has alleged ulterior motives, including monetary incentives, on the part of Fischer and Drs. Wright and Bernstein, he has alleged facts that create the inference that these defendants had a sufficiently culpable state of mind.

Defendants argue that because Fischer is not a doctor and was not involved in Koehl's medical treatment, that he was

entitled to rely on the treatment of medical staff. *See* Def. Reply at 4–5 (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000)). This argument fails, however, because Koehl does not merely allege that Fischer deferred to the treatment articulated by Koehl's doctors. Instead, he alleges that Fischer directly interfered with Koehl's treatment "as a cost saving measure." Am. Compl. at 11–12 ¶¶ 7, 8.

Defendants also argue that the claims against Dr. Bernstein should be dismissed because they are, "at most, negligence claims." Def. Mem. at 20. While it is true that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim," *Chance,* 143 F.3d at 703 (citing *Estelle,* 429 U.S. at 105–06), "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan," *Chance,* 143 F.3d at 703 (citing *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989) ("choice of an easier but less efficacious course of treatment can constitute deliberate indifference"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). Here, Koehl claims Dr. Bernstein ignored the orders of his doctors not on the basis of his own medical view, but because of monetary incentives, and that he deliberately interfered with Koehl's treatment in order to make it appear as though Koehl had refused treatment. Accordingly, Koehl has alleged that Dr. Bernstein was more than merely negligent.

### c. *Lung Disease*

**\*23** Koehl alleges that his "chronic and life threatening lung diseases have grown progressively worse" because of his exposure to ETS and that defendants have denied him proper medical treatment for his worsening condition. *See* Am. Compl. at 12–13 ¶¶ 10–11. Specifically, Koehl states that Dr. Bernstein refused to administer a "cotinine level test," that "Ercole, Lee and Cunningham denied the installation of detectors," *id.* at 12 ¶ 10, and that Fischer and Drs. Bernstein and Wright denied him access to a pulmonary specialist, *id.* at 13 ¶ 11. He states that he complained both verbally and in writing to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and Lee regarding his medical problems, but that his complaints were "ignored and/or brushed under the rug." *Id.* at 12 ¶ 10.

These allegations are insufficient because the complaint does not allege facts satisfying the subjective prong of the deliberate indifference analysis. Koehl has not alleged facts showing that these defendants consciously disregarded a risk of serious harm. Nor does Koehl state that defendants had an ulterior motive for their actions. *See* Am. Compl. at 12–

13 ¶¶ 10–11. While Koehl alleges that he should have been allowed to see a pulmonary specialist, *id.* at 13 ¶ 11, he also alleges that he was given multiple CT scans and a pulmonary function analysis, *id.* And in the exhibits attached to Koehl's opposition memorandum, he includes a letter from Dr. Hosannah, a cardiothoracic surgeon at Albany Medical Center, stating that on January 29, 2008, Koehl "underwent a successful bronchoscopy and mediastinoscopy." Letter from Dr. Hosannah to Dr. Weissman, dated Apr. 9, 2008 (annexed as Ex. 15 to Verified Exs.). Thus, while Koehl alleges he was "denied proper testing," Am. Compl. at 13 ¶ 11, the complaint and attached papers cannot plausibly be read to suggest that Koehl was not examined, treated, or administered medically-indicated tests for his lung disease—situations that case law has found to constitute deliberate indifference. *See, e.g., Abraham v. DiGugleilmo,* 2010 WL 2136600, at \*9 (E.D.Pa. May 25, 2010) (doctor's "decision to prescribe antibiotics without examining plaintiff or administering tests to confirm the diagnosis" was found to constitute deliberate indifference); *see also Verley v. Goord,* 2004 WL 526740, at \* 13 (S.D.N.Y. Jan. 23, 2004) ("Because, in his Complaint, [plaintiff] alleged no facts indicating that [the doctor] purposely failed to treat his medical condition or that the diagnosis was contrary to accepted medical standards, [plaintiff's] allegations of a failure to diagnose and treat his back ailment, as stated in the Complaint, are insufficient to state a claim."). The mere allegation that Koehl had a painful lung disease that was not alleviated by treatment does not by itself reflect that the defendants acted with deliberate indifference, inasmuch as "there exist many medical conditions that do not respond to treatment." *Bryant v. Wright,* 2010 WL 3629443, at \*9 (S.D.N.Y. Aug. 31, 2010), *adopted by* 2010 WL 3629426 (S.D.N.Y. Sept. 15, 2010).

### E. *Qualified Immunity*

**\*24** The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions "did not violate clearly established law," or where "it was objectively reasonable for the defendant[s] to believe that [their] action[s] did not violate such law." *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (internal quotation marks and citation omitted); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability and that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is

Koehl v. Bernstein, Not Reported in F.Supp.2d (2011)
2011 WL 2436817

doing violates that right' ") (quoting *Anderson v.. Creighton,* 483 U.S. 635, 640 (1987)) (additional citations omitted). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

While defendants' memorandum of law contains a brief section asserting that the doctrine of qualified immunity shields defendants from liability, they argue the applicability of the qualified immunity defense only in the vaguest and most general terms. *See* Def. Mem. at 21–23. Significantly, they do not discuss any of the substantive constitutional rights raised, do not provide any explanation as to what specific right was not "clearly established," and do not discuss why defendants would have been reasonable in believing that their alleged conduct was constitutional for any of Koehl's specific claims. Accordingly, there is no basis on which to conclude that the defendants against which Koehl has sufficiently alleged constitutional claims are entitled to qualified immunity.

IV. *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss (Docket # 25) should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) all claims against the State of New York for damages and against the defendants brought in their official capacities; (2) Fourteenth Amendment Due Process claims against Brennan, Fischer, and Hilliar based on disciplinary proceedings; (3) First Amendment retaliation claims (a) against Evans, Edwards, Herman, and Tracy with regard to Koehl's executive clemency application, and (b) against Fischer and Brennan with regard to the tier III misbehavior report and against Sawyer with regard to the tier II misbehavior report; (4) Eighth Amendment claims (a) against Cunningham for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," (b) against Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein for their failure to enforce the New York ban on smoking in prisons, (c) against Ercole, Cunningham, and Lee with regard to Koehl's cell assignments and transfers generally, (d) against Fischer, Ercole, and Lee for their failure to provide Koehl with weather appropriate clothing, (e) against Fischer and Wright for their failure to

provide Koehl with dental care, (f) against Dr. Weinstein for his failure to treat Koehl's cervical spine and back injuries, and (g) against Dr. Bernstein, Dr. Fein, Dr. Wright, Ercole, Lee, Cunningham, and Fischer for their failure to treat Koehl's lung disease.

**\*25** Thus, the following claims remain: (1) Fourteenth Amendment Due Process claims against Harvey, Sawyer, and Russo based on disciplinary proceedings; (2) First Amendment retaliation claims (a) against Cunningham with regard to Koehl's facility transfer, (b) against Cunningham with regard to Koehl's executive clemency application, and (c) against Russo and Harvey with regard to Koehl's tier III misbehavior report and against Hilliar with regard to the tier II misbehavior report; (3) Eighth Amendment claims (a) against Ercole for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," and (b) against Fischer, Dr. Wright, and Dr. Bernstein for their failure to treat Koehl's cervical spine and back injuries

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Sidney H. Stein, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Stein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

## All Citations

Not Reported in F.Supp.2d, 2011 WL 2436817

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4390007

KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Colon v. Annucci, S.D.N.Y., September 28, 2018

2011 WL 4390007
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Edward KOEHL, Plaintiff,

v.

Dr. Frederick BERNSTEIN, et al., Defendants.

No. 10 Civ. 3808(SHS).
|
Sept. 21, 2011.

*ORDER*

SIDNEY H, STEIN, District Judge.

**\*1** On June 6, 2011, Magistrate Judge Gabriel W. Gorenstein issued a Report and Recommendation recommending that defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) be granted in part and denied in part. The Court has received plaintiff's objections to the Report and Recommendation dated August 19, 2011, and September 13, 2011. After a *de novo* review of the Report and Recommendation dated June 6, 2011, and plaintiff's objections dated August 19, 2011, and September 13, 2011,

IT IS HEREBY ORDERED that:

1. Magistrate Judge Gorenstein's Report & Recommendation is adopted; and

2. Defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) [docket no. 25] is granted in part and denied in part as follows: (1) all claims against the State of New York for damages and against the defendants brought in their official capacities are DISMISSED; (2) the Fourteenth Amendment due process claims against Brennan, Fischer, and Hilliar based on disciplinary proceedings are DISMISSED; (3) the First Amendment retaliation claims (a) against Evans, Edwards, Herman, and Tracy with regard to Koehl's executive clemency application, and (b) against Fischer and Brennan with regard to the tier III misbehavior report and against Sawyer with regard to the tier II misbehavior report are DISMISSED and (4) the Eighth Amendment claims (a) against Cunningham for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," (b) against Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein for their failure to enforce the New York ban on smoking in prisons, (c) against Ercole, Cunningham, and Lee with regard to Koehl's cell assignments and transfers generally, (d) against Fischer, Ercole, and Lee for their failure to provide Koehl with weather appropriate clothing, (e) against Fischer and Wright for their failure to provide Koehl with dental care, (f) against Dr. Weinstein for his failure to treat Koehl's cervical spine and back injuries, and (g) against Dr. Bernstein, Dr. Fein, Dr. Wright, Ercole, Lee, Cunningham, and Fischer for their failure to treat Koehl's lung disease are DISMISSED.

The following claims remain: (1) Fourteenth Amendment Due Process claims against Harvey, Sawyer, and Russo based on disciplinary proceedings; (2) First Amendment retaliation claims (a) against Cunningham with regard to Koehl's facility transfer, (b) against Cunningham with regard to Koehl's executive clemency application, and (c) against Russo and Harvey with regard to Koehl's tier III misbehavior report and against Hilliar with regard to the tier II misbehavior report; (3) Eighth Amendment claims (a) against Ercole for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," and (b) against Fischer, Dr. Wright, and Dr. Bernstein for their failure to treat Koehl's cervical spine and back injuries.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4390007

---

**End of Document**          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6381058
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Trevis L. FUNCHES, Plaintiff,

v.

Anthony RUSSO, et al., Defendants.

9:17-CV-1292 (LEK/DJS)
|
Signed 12/06/2018

**Attorneys and Law Firms**

Trevis L. Funches, Gouverneur, NY, pro se.

Helena Lynch, New York State Attorney General, Albany, NY, for Defendants.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

 *1  This matter comes before the Court following a report-recommendation filed on November 2, 2018, by the Honorable Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 39 ("Report-Recommendation"). Defendants Jeremy Greene, Jeff McKoy, Cheryl Morris, A. Polizzi, and Anthony Russo timely filed objections. Dkt. No. 40 ("Objections"); see also Dkt. No. 42 ("Opposition to Objections").

## II. LEGAL STANDARD

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–

07, 306 n.2 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

## III. DISCUSSION

The Court assumes familiarity with the facts relevant to the present dispute, which were described in the Report-Recommendation. See R. & R. at 2–3.

On August 13, 2018, Defendants filed a Rule 12(b) (6) motion, which argued that both Plaintiff's Fourteenth Amendment due process claims against Polizzi and Greene and Plaintiff's First Amendment retaliation claims against Russo, Morris, and McKoy should be dismissed. Dkt. No. 30 ("Motion to Dismiss"); see also Dkt. Nos. 33 ("Opposition"); 34 ("Reply"). The Magistrate Judge disagreed, and recommended that the Motion to Dismiss be denied in its entirety. R. & R. at 13. Specifically, the Report-Recommendation found with regard to Plaintiff's due process claim that the amended complaint, Dkt. No. 10 ("Amended Complaint"), sufficiently alleged a protected liberty interest and deprivation of due process to survive Defendants' motion, R. & R. at 4–8. The Magistrate Judge also held that Plaintiff's allegation that Defendants interfered with his privacy and correspondence privileges satisfied Plaintiff's burden for pleading a First Amendment retaliation claim. Id. at 8–12. Finally, the Magistrate Judge found that Defendants were not entitled to qualified immunity. Id. at 12–13.

 *2  Defendants now raise four sets of objections to the Report-Recommendation. Defendants' first, second, and fourth sets of objections assert that the Magistrate Judge "applie[d] the incorrect standards" with regard to (1) Plaintiff's due process claim; (2) Plaintiff's retaliation claim against Russo and Morris; and (3) Defendants' qualified immunity argument. Objs. at 1–6, 8–10. Defendants' third set of objection asserts that the Report-Recommendation "err[ed] in recommending that Plaintiff's First Amendment claim against [ ] McKoy [should] survive," because the Amended Complaint nowhere alleged that McKoy retaliated against Plaintiff. Id. at 6–8.

### A. First Set of Objections: Due Process

Defendants' first set of objections raise certain due process arguments that are the mirror image of arguments already made in the Motion to Dismiss. Compare Mot. Dismiss at 9–10 ("[Plaintiff] alleges only that the water for drinking and bathing [in the SHU] was 'discolored.' ... This is insufficient to state a liberty interest. Moreover, the Exhibits to the Complaint ... demonstrate that the water in the SHU was no different from the water in the entire [prison] water system, which was tested and had met all New York State Department of Health requirements for potable water."), with Objs. at 2 ("[T]he *sole* allegation made by Plaintiff is that the water in the [Special Housing Unit ("SHU") ] was discolored, and the exhibits to the Complaint demonstrate, conclusively, that the allegedly discolored water in the SHU ... was present at the entire facility ... and was not unsafe. Accordingly, the Complaint itself refutes Plaintiff's claim that he was subjected to atypical and significant hardship in the SHU."), and Mot. Dismiss at 13 ("By setting forth the evidence relied on at Plaintiff's disciplinary hearing, the Complaint itself demonstrates that the 'some evidence' standard is met."), with Objs. at 3 ("[T]he Complaint itself and the exhibits to the Complaint set forth the evidence relied on for Plaintiff's disciplinary conviction[, which is] more than enough to satisfy due process."). Those portions of Defendants' first set of objections therefore constitute "mere reiteration[s] of [ ] argument[s] made to the magistrate judge," and are subject to review only for clear error. Barnes, 2013 WL 1121353, at *1. Having reviewed both the record and Judge Stewart's reasoning, the Court finds none.

However, Defendants' first set of objections also explicitly identifies two alleged failures in the Magistrate Judge's reasoning that are not related to arguments presented in the Motion to Dismiss. Those portions of the first set of objections are therefore subject to de novo review.

First, Defendants contend that the Report-Recommendation erred in declining to dismiss Plaintiff's due process claim against Greene. Objs. at 2. The Magistrate Judge made that recommendation after finding that, "[a]t this early stage of this litigation," it would be impossible to determine "what documents were and were not provided" to Plaintiff in advance of his disciplinary hearing as well as "the relevance of those [documents] allegedly not provided." R. & R. at 6. According to Defendants, the Amended Complaint expressly identifies the withheld documents as "the Unusual Incident Report and related To/From Memos, and Plaintiff's medical

records," most of which were read into evidence at Plaintiff's hearing. Id. at 2–3; see also Am. Compl. at 15. Therefore, noting that due process does not require "that every document need ... be provided to an inmate in advance of a disciplinary hearing," id. at 2, Defendants argue that the Motion to Dismiss should have been granted, since "Plaintiff cannot prove a due process violation based on the fact that these documents were read into evidence at his disciplinary hearing rather than being given to him in hard copy," id. at 3 (citing Freeman v. Rideout, 808 F.2d 949, 953 (2d Cir. 1986) ).

**\*3** The Court disagrees. The passage from Freeman cited by Defendants examines the Supreme Court's holding in Wolff v. McDonnell, 418 U.S. 539 (1974), that

> [p]rison officials must have the necessary discretion ... to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.... The operation of a correctional institution is at best an extraordinarily difficult undertaking. Many prison officials, on the spot and with the responsibility for the safety of inmates and staff, are reluctant to extend the unqualified right to call witnesses; and in our view, they must have the necessary discretion without being subject to unduly crippling constitutional impediments.

Id. at 566–67. Thus, the Wolff court determined that prison officials would not offend due process when withholding evidence that was, for example, irrelevant or unnecessary, or that could result in a hazardous condition. Id. at 566; see also Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991) ("[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity."). But as the Magistrate Judge rightly pointed out, there is no reason on the face of the Amended Complaint to believe that the documents identified by the Amended Complaint were withheld for a permissible reason. R. & R. at 6–7. Given that they were presented in evidence at the hearing, it is plausible that there was no good reason not to disclose them in advance.

Moreover, even bearing in mind prison officials' need for discretion, multiple courts in this Circuit have nonetheless held that the failure by an inmate's designated employee assistant to provide the inmate with "specific documents that [the inmate] requested," and for which no permissible excuse existed, could give rise to a due process claim. Brooks v. Prack, 77 F. Supp. 3d 301, 316 (W.D.N.Y. 2014); see also Ayers v. Ryan, 152 F.3d 77, 81 (2d Cir. 1998) (finding that an employee assistant violated an inmate's due process rights "by undertaking to act as [the inmate's] assistant and then doing nothing to assist," including by failing to provide "any of plaintiff's requested documents"). Defendants do not provide any reason for the Court to overlook those holdings.

Furthermore, the Court rejects Defendants' argument that Plaintiff's due process rights were satisfied because the documents he requested, though not provided in advance of his disciplinary proceeding, were read into evidence during that proceeding. Defendants provide no support for such a proposition, and cite to no cases in which a court has made such a determination. Defendant's objection is therefore rejected.

Second, Defendants contest the Report-Recommendation's holding that Plaintiff's due process claim against Polizzi should survive the Motion to Dismiss. Objs. at 4. The Magistrate Judge so held for two reasons: First, "Polizzi did not remedy Greene's failure to provide documents that Plaintiff needed in support of his defense," despite the recognized right of inmates to " 'present documentary evidence in [their] defense' at a prison disciplinary hearing." R. & R. at 7 (quoting Wolff, 418 U.S. at 566). Second, the Amended Complaint identified "several factors—the absence of a weapon and the lack of testimony regarding certain injuries allegedly inflicted by Plaintiff, for example—as potential grounds for concluding that there was insufficient evidence for [Polizzi's] guilty determination." Id. Defendants argue that, in coming to those conclusions, the Magistrate Judge improperly " 'examin[ed] the entire record ... [and] weigh[ed] the evidence,' " Objs. at 4 (quoting Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985) ), despite the Second Circuit's guidance that "a court will not overturn a prison disciplinary board's finding of guilt if there is *any* evidence to support the board's conclusion," Franco v. Kelly, 854 F.2d 584, 588 (2d Cir. 1988); see also Hill, 472 U.S. at 455 ("Ascertaining whether the 'some evidence' standard is satisfied does not require examination of the entire record, independent assessment of witnesses' credibility, or

weighing of the evidence, but, instead, the relevant question is whether there is any evidence in the record to support the disciplinary board's conclusion.").

**\*4** The Court agrees with Defendant that the Magistrate Judge's second rationale—regarding the insufficiency of the evidence presented at Plaintiff's hearing—does not provide a sufficient basis for allowing Plaintiff's due process claim against Polizzi to proceed. The relevant inquiry is not whether some evidence was missing from the record, but rather whether any of the evidence that was presented could support the disciplinary board's conclusion. Hill, 472 U.S. at 455. However, that finding has no bearing on the outcome of Defendants' Motion to Dismiss. Only "[u]pon determining that the[ ] procedural due process requirements [related to an inmate's disciplinary hearing] have been met" should a reviewing court move on to determine " 'whether there is *some* evidence which supports the decision of the prison disciplinary board.' " Hamilton v. Fischer, No. 12-CV-6449, 2013 WL 3784153, *9 (W.D.N.Y. July 18, 2013) (quoting Freeman, 808 F.2d at 954–55). Before discussing the sufficiency of the evidence presented at the hearing, the Magistrate Judge had already determined on other grounds that Plaintiff properly pled that Polizzi infringed his due process rights. For that reason, Plaintiff's claim survives and Defendants' objection is rejected.

### B. Second Set of Objections: Retaliation—Russo and Morris

In their second set of objections, Defendants first argue that the Report-Recommendation was wrong to find that Russo's alleged order to search Plaintiff's cell and confiscate his hot pot constituted an adverse action for First Amendment purposes. Objs. at 5; see also R. & R. at 9. Effectively, Defendants ask the Court to reconsider the Magistrate Judge's decision in light of the holding in Jones v. Harris, 665 F. Supp. 2d 384 (S.D.N.Y. 2009), rather than the "contrary case law" cited in the Report-Recommendation. In dismissing an inmate plaintiff's claim for First Amendment retaliation, the district court in Jones found that

> [p]laintiff alleges that the retaliatory searches resulted in the seizure of some of his property and the "trashing" of his cell. Perhaps he is suggesting that these searches were unusually punitive and so were out of the

ordinary. But plaintiff alleges no facts tending to show that, in an ordinary random cell search, property is not seized and cells are not turned upside down and inside out[.] It is to be expected that cell searches will disrupt, not only the prisoner's life, but also the living conditions inside the cell; and since one purpose of a cell search is to locate and recover contraband, the court cannot turn a blind eye to the fact that prisoner property is sometimes seized when cells are searched.

Id. at 398. Accordingly, because "courts have long recognized that periodic cell searches are such an integral part of prison life that only cell searches that rise to the level of an Eighth Amendment violation are actionable," id., Defendants contend that the Magistrate Judge's recommendation should be modified and Plaintiff's claim dismissed, Objs. at 5.

The Court disagrees. The Jones passage quoted above is consistent with the cases cited by the Magistrate Judge. See R. & R. at 9 ("[A] retaliatory cell search accompanied by the confiscation of personal property states a plausible claim for retaliation sufficient to withstand dismissal." (internal quotation marks omitted) (citing Guillory v. Haywood, No. 13-CV-1564, 2015 WL 268933 (N.D.N.Y. Jan. 21, 2015); Yunus v. Jones, No. 16-CV-1282, 2017 WL 9511176 (N.D.N.Y. Aug. 23, 2017), report and recommendation adopted, 2017 WL 5956762 (Dec. 1, 2017) ) ). Taken together, those cases stand for the proposition that periodic cell searches—and any confiscation of contraband property resulting therefrom—cannot provide a foundation for a First Amendment retaliation claim, whereas retaliatory cell searches that result in the unwarranted confiscation of non-contraband personal property may provide such a foundation. Therefore, because the Amended Complaint properly pleads that the Russo's cell search was premised on retaliatory motives, Am. Compl. at 6–7 (pleading that "Russo personally questioned [Plaintiff]" about certain grievances he had filed, and immediately thereafter "ordered [another correctional officer] to have [Plaintiff's] cell searched" and his hot pot confiscated), and because there is no indication in the record that Plaintiff's hot pot was contraband, Defendant's first objection is rejected.

**\*5** Defendants also object to the Magistrate Judge's holding regarding Plaintiff's retaliation claim against Morris. Objs. at 5–6. In the Amended Complaint, Plaintiff alleged that his correspondence privilege with his son was "abruptly discontinued" at the direction of Morris and the "Executive Team" he led. Am. Compl. at 18–20. The Magistrate Judge accepted that Defendants could defend against such a claim by arguing that Plaintiff's correspondence privileges would have been revoked "regardless of any protected activity or retaliatory motive," but held that "discovery is needed to determine whether" that was the case. Objs. at 6 (citing R. & R. at 10). Defendants now object that "no discovery is needed here because the [Amended] Complaint itself ... demonstrates that Plaintiff's correspondence privileges would have been temporarily denied regardless of any protected activity." Id.

Defendants' argument rests on an improperly unfavorable interpretation of Plaintiff's allegations. True, the Amended Complaint states that, between April and September 2017, certain prison officials informed Plaintiff, often through formal letters using DOCCS's official letterhead, see Dkt. No. 10-1 ("Exhibits") at 15–17, that his correspondence privileges were suspended "according to Directive 4422" because the prison was unable to verify Plaintiff's relationship with his son. Am. Compl. at 20. But the Amended Complaint also describes a March 2017 incident between Plaintiff and Morris, which indicates that Morris's involvement in the suspension process may nonetheless have been motivated by retaliation, and that Plaintiff's privilege would not have been suspended absent his First Amendment activity:

> Defendant Morris ... while doing rounds approached [Plaintiff] ... and inquired about [Plaintiff's] approved correspondence with [his] incarcerated kids. [Plaintiff,] finding Morris['s] inquiry to be rather strange since he'[d] been approved [to engage in that correspondence,] asked why ... there [was] a problem. Morris said yes there is [a problem], you have been writing numerous staff complaints and that needs to stop[, then] walked away.

Am. Compl. at 19. Although Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001) instructs courts to "approach prisoner claims of retaliation with skepticism and particular care," it

remains the case that a court presented with "two plausible inferences that may be drawn from factual allegations ... may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). The Court therefore rejects Defendants' objection, and will allow Plaintiff's First Amendment retaliation claim against Morris to proceed.

#### C. Third Set of Objections: Retaliation—McKoy

Defendants' third set of objections argues that the Report-Recommendation "ma[de] an overarching error with respect to the claim against Defendant McKoy"—which relates to McKoy's involvement in the denial of Plaintiff's correspondence privileges, Am. Compl. at 19–20—"by characterizing that claim as a retaliation claim," Objs. at 6 (citing R. & R. at 11). Instead, Defendants assert that the Court should interpret Plaintiff's claim as one for "First Amendment denial of correspondence privileges." Id. at 7. They further contend that such a claim cannot survive the Motion to Dismiss, because McKoy's "compliance with the DOCCS directive regarding correspondence privileges is demonstrated in the [Amended] Complaint and exhibits thereto." Id.

As the Court made clear in its June 7, 2018 Memorandum-Decision and Order, Dkt. No. 19 ("June Order"), "allegations that a supervisory official failed to remedy an ongoing violation of an inmate's constitutional rights after becoming aware of the violation are sufficient to plausibly suggest personal involvement in the violation," id. at 18 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) ). As explained earlier, the Amended Complaint plausibly alleges that Morris terminated Plaintiff's correspondence privilege in retaliation for certain staff complaints Plaintiff had filed. Am. Compl. at 19. The Amended Complaint also pleads that McKoy failed to remedy Plaintiff's correspondence issue until November 1, 2017, despite learning of it directly from Plaintiff on September 5, 2017. Am. Compl. at 19; see also Exs. at 19, 22. Defendants have not raised any other challenges to Plaintiff's claim, and do not question whether the nature and/or duration of McKoy's delay was sufficient to satisfy Colon's failure to remedy standard. Therefore, Defendants' third set of objections is rejected.

#### D. Fourth Set of Objections: Qualified Immunity

**\*6** The doctrine of qualified immunity, as explained by the Magistrate Judge in the Report-Recommendation, "provides a 'shield[ ] ... from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.' " R. & R. at 12 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012) ). Thus, qualified immunity provides an affirmative offense to government officials against civil liability in the event that they have violated a right that was not "clearly established," such that it was not "sufficiently clear that every reasonable official would have understood that what [the official did] violates that right." Id.

As was true of Defendant's first set of objections, many of the arguments raised in Defendants' fourth set of objections —regarding qualified immunity—are identical to those presented in the Motion to Dismiss. Compare Mot. Dismiss at 23 ("There is no clearly established law stating that Plaintiff must be provided with copies of specific documents."), with Objs. at 8 ("It is not clearly established that Plaintiff was required to be provided with the specific documents he identifies."), and Mot. Dismiss at 25 ("[T]he law is clearly established that Plaintiff cannot prove a retaliation claim when the legitimate motives for Morris's action are set forth in the pleadings and demonstrate that Morris would have taken the same actions regardless of any grievances Plaintiff may have filed."), with Objs. at 9–10 ("The law is clearly established that a plaintiff cannot prove a retaliation claim when the defendant would have taken the same actions regardless of any grievances the plaintiff may have filed. Here, the legitimate motives for Morris's action are set forth plainly in the pleadings."). Those arguments are therefore subject to review only for clear error; the Court finds none.

However, Defendants also raise two new arguments not considered by the Magistrate Judge. First, they contend that the Report-Recommendation erred in finding that Russo was not entitled to qualified immunity on Plaintiff's First Amendment retaliation claim, because there is "no clearly established law" that Russo allegedly violated. Objs. at 9. In support of that argument, Defendants once again refer to Jones for the proposition that "the search of Plaintiff's cell and [the] confiscation of his hot pot ... was not an adverse action." Id. But Defendants now argue that the discrepancies between Jones and the cases cited by the Magistrate Judge (e.g., Guillory and Yunus), "only emphasize[ ] that there is no clearly established law governing the issue," meaning qualified immunity should apply. Id. (internal citation omitted). However, the Court has already determined that

the holdings in Jones, Guillory, and Yunus are consistent, and that the Amended Complaint sufficiently pleads a claim pursuant to the standards they have set. See supra Part III.B. As a result, there are no discrepancies in the caselaw that would have rendered its application sufficiently unclear for qualified immunity purposes. Defendants' objection is therefore rejected.

Second, Defendants argue that "McKoy is entitled to qualified immunity because no clearly established law holds that he was required to approve Plaintiff's correspondence request." Objs. at 10. The Court agrees that McKoy is entitled to qualified immunity and that the Magistrate Judge erred in finding otherwise, but not for the reasons Defendants cite. McKoy's liability under the First Amendment depends on the Colon test, which provides that the personal involvement of a supervisory defendant is established if

**\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. As made clear above, the second of those five categories applies in McKoy's case. See supra Part III.C. However, the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), "engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in Colon," Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012). On the one hand, some courts have found that "[o]nly the first and part of the third Colon categories pass Iqbal's muster," Bellamy v. Mt. Vernon Hosp., No. 07-CV-1801, 2009 WL 1835939, at \*6 (S.D.N.Y. June 26,

2009), while others have held that "all five categories under Colon are still valid unless and until the Second Circuit holds otherwise," Aponte v. Fischer, No. 14-CV-3989, 2018 WL 1136614, at \*8 n.5 (S.D.N.Y. Feb. 28, 2018).

As applicable to Defendants' qualified immunity defense, the uncertainty inherent in the continued viability of the Colon test implies that "regardless of whether Colon's second category of supervisory liability survived Iqbal ..., [D]efendants are entitled to qualified immunity based on the very uncertainty of the governing law." Ojo v. United States, No. 15-CV-6089, 2018 WL 3863441, at \*10 (E.D.N.Y. Aug. 14, 2018). The Court therefore finds that McKoy is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim, and will modify the Report-Recommendation to that effect.

## IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 39) is **APPROVED and ADOPTED in part**; and it is further

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 30) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED**, that Plaintiff's First Amendment retaliation claim against McKoy is **DISMISSED**; and it is further

**ORDERED**, that defendant McKoy is **DISMISSED** from this action; and it is further

**ORDERED**, that Plaintiff's Fourteenth Amendment due process claims against Polizzi and Greene, as well as Plaintiff's First Amendment retaliation claims against Russo and Morris, **SURVIVE** Defendants' motion; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on the parties in accordance with the local rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 6381058

2018 WL 6381058

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

Smith v. Hamilton, Not Reported in Fed. Supp. (2016)

2016 WL 3823395

2016 WL 3823395
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason SMITH, Plaintiff,

v.

M. HAMILTON, Correctional Officer; Riverview
Correctional Facility, et al, Defendants.

9:15 -CV-0496 (BKS/ATB)
|
Signed July 11, 2016
|
Filed 07/12/2016

**Attorneys and Law Firms**

Jason Smith, New York, NY 10027, Plaintiff, pro se.

Oriana L. Carravetta, Esq., Hon. Eric T. Schneiderman, Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, U. S. District Judge

**\*1 I. Introduction**

Plaintiff pro se Jason Smith brought this action against defendants under 42 U.S.C. § 1983 alleging violations of his constitutional rights while he was an inmate at Riverview Correctional Facility. Dkt. No. 1. In a July 27, 2015 Decision and Order, the Court determined that the following claims survived sua sponte review under 28 U.S.C. §§ 1915(e)(2) (B) and 1915A(b), and required a response: (1) the Fourteenth Amendment due process claims against defendants A. Rufa, Albert Prack and C. Hillenbrand; (2) the First Amendment retaliation claim against defendant M. Hamilton; and (3) the supervisory claim against defendant John Doe. Dkt. No. 5, p. 18.

On November 6, 2015, defendants filed a motion for partial summary judgment under Fed. R. Civ. P. 56 on the First Amendment retaliation claim for failure to exhaust administrative remedies, and for partial dismissal under Fed. R. Civ. P. 12(b)(6) of the due process claims for failure to state

a claim on which relief may be granted. Dkt. No. 12. Plaintiff filed a response in opposition. Dkt. No. 23.

This matter was assigned to United States Magistrate Judge Andrew T. Baxter, who issued a Report-Recommendation and Order on April 1, 2016, recommending that the motion be granted in part and denied in part. Dkt. No. 27. Magistrate Judge Baxter recommended that defendants' motion for summary judgment as to the First Amendment retaliation claim be granted, based upon the failure to exhaust administrative remedies, and that the complaint be dismissed in its entirety as to defendant Hamilton and as to a First Amendment retaliation claim. Dkt. No. 27, pp. 23-24. Magistrate Judge Baxter recommended that the motion to dismiss the due process claims against defendants Rufa, Prack and Hillenbrand be denied. Dkt. No. 27, at 23-24. Magistrate Judge Baxter advised the parties that under 28 U.S.C. § 636(b) (1) and Local Rule 72.1(c), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. Id.

Plaintiff did not file an objection to the Report-Recommendation. [1] Defendants filed an objection to the Report-Recommendation, objecting to Magistrate Judge Baxter's determination that the Plaintiff had alleged a sufficient liberty interest for his due process claim. Dkt. No. 29. For the reasons set forth below, the Report-Recommendation is adopted in its entirety.

[1]    The Report-Recommendation was served on Plaintiff at Auburn Correctional Facility on April 1, 2016. On April 5, 2016, Plaintiff filed a notice of change of address with the Court. Dkt. No. 28. The Clerk resent the Report-Recommendation to Plaintiff at his new address on April 6, 2016.

**II. Standard of Review**

This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

**\*2** To survive a motion to dismiss a complaint "must plead 'enough facts to state a claim to relief that is plausible

2016 WL 3823395

on its face.' " *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the "court must accept as true all of the allegations contained in a complaint ... [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that is filed *pro se* must be construed liberally, "interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d at 103.

### III. Discussion

The Court has reviewed Magistrate Judge Baxter's determination that plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claim for clear error, and found none. The Court accordingly adopts Magistrate Judge Baxter's Report-Recommendation in its entirety as to Defendants' motion for partial summary judgment under *Fed. R. Civ. P. 56* as to the First Amendment retaliation claim and as to defendant Hamilton.

With respect to Plaintiff's due process claim, Defendants have objected to Magistrate Judge Baxter's rationale for concluding that Plaintiff has alleged a sufficient liberty interest. Dkt. No. 29, p. 1. Specifically, Defendants argue that: (1) Plaintiff has failed to allege atypical and significant hardship for a 90-day confinement in Special Housing Unit ("SHU"); (2) the loss of conditional release or merit board eligibility does not implicate a liberty interest; and (3) Plaintiff's allegation that he suffered "extreme emotional distress due to the evil intentions, willful and malicious conduct, and retaliation, [and] discrimination" is conclusory and irrelevant to the liberty interest analysis. (Dkt. No. 29, pp. 1-2). [2]

[2]    In light of the Court's ruling regarding the sufficiency of the allegations of atypical conditions of confinement, and its adoption of the Report-Recommendation on that basis, the Court has not considered Defendants' other objections. The Court notes that, as Magistrate Judge Baxter found, it is not clear what Plaintiff means when he states that he "lost" his "Merit Board" and his "Conditional Release." Dkt. No. 27, p. 21; *see* Dkt. No. 1, pp.8-10. The Court recognizes that inmates do not have a constitutional right to conditional release from prison prior to the expiration of a valid sentence. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 422 U.S. 1, 7 (1979); *see Abed v. Armstrong*, 209 F.3d 63, 66-67 (2d Cir. 2000) ("Although inmates have a liberty interest

in good time credit they have already earned, no such interest has been recognized in the opportunity to earn good time credit where ... prison officials have discretion to determine whether an inmate or class of inmates are eligible to earn good time credit.") (citation omitted); *Scarola v. Goord*, 266 A.D.2d 598, 599, 698 N.Y.S. 2d 60 (3d Dep't 1999) (finding that enactment of merit time legislation, N.Y. Corr. Law § 803, did not create a constitutionally protected liberty interest); *Lighthall v. Vadlamudi*, No. 9:04-CV-0721, 2006 WL 721568, **14-15, 2006 U.S. Dist. LEXIS 74734, *47 (Feb. 6, 2006) (same), *report recommendation adopted by* 2006 U.S. Dist. LEXIS 74737, (N.D.N.Y. March 17, 2006).

As Magistrate Judge Baxter noted, to establish a due process claim Plaintiff had to show: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted); Dkt No. 27. p. 18. In this case Plaintiff challenges the due process procedures regarding a disciplinary hearing that resulted in a 90-day SHU sentence. Dkt. No. 1, pp. 4-5. [3]

[3]    The Court adopts and incorporates herein the facts set forth in the Report-Recommendation, none of which were the subject of an objection.

**\*3** A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d at 106 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.*, 714 F. 3d at 106; *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. Where the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison

conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). [4] While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133. [5] "Disputes about conditions may not be resolved on summary judgment." *Davis*, 576 F.3d at 134 (quoting *Palmer*, 364 F.3d at 65). The district court may determine the issue of atypicality of confinement as a matter of law "[o]nly when the conditions are uncontested." *Id.*

[4]    A longer confinement under normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections." *Palmer*, 364 F.3d at 65.

[5]    The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short – less than the 30 days that the *Sandin* plaintiff spent in SHU— and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Davis*, 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g., Acevedo v. Fischer*, No. 12-CV-6866 RA, 2014 WL 5015470 at *15, 2014 U.S. Dist. LEXIS 139057, at *48 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege a protected liberty interest because there were no allegations of unusual confinement).

In this case, the duration of the confinement, 90 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Although there are no allegations regarding the conditions of Plaintiff's confinement in the body of the verified Complaint, Plaintiff detailed conditions of his confinement in his prayer for relief, in connection with his claim for damages. Dkt. No. 1, p. 10. Plaintiff alleges that he "was confined for 23 hours a day in a cell roughly 60 feet square for approximately 90 days with a cell mate who you must share 10 minute showers with, with no shower curtain, share an open toilet and sink and deprived of most of my personal property as well as the ability to work, attend mandatory program, watch television, attend out door [sic] recreation in a congregated setting with the ability to engage in sports and other congregate recreational activities, associate with other prisoners, attend meals with other prisoners, attend Jumah services, and extreme emotional distress suffered by him due to the evil intentions, willful and malicious conduct, retaliation, discrimination as well as being denied basic rights to due process of law." Dkt. No. 1, p. 10.

**\*4** Defendants argue, without citation, that the conditions described "are simply normal SHU conditions." Dkt. No. 29, p. 2 While the Court agrees that some of the conditions are normal SHU conditions, *see* N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1-.14, 305.1-.6 (2016); *Palmer*, 364 F.3d at 65 n.3, the Court cannot make a determination at this stage of the litigation regarding the atypicality of Plaintiff's confinement. It is not clear, for example, that the "deprivation of most of [plaintiff's] personal property" was a normal SHU condition. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 302.2 (e); *see also Palmer*, 364 F.3d at 62, 66 n.4 (affirming district court's denial of defendant's motion for summary judgment in a case involving SHU confinement for seventy-seven days when the plaintiff alleged that he was "not permitted any personal property (including his personal food, clothing and grooming and hygiene products), and was placed in restraints whenever he was escorted outside his cell" and was terminated from a program through which he had extended visits with his family).

Construing the pro se complaint liberally and to raise the strongest arguments it suggests, the Court concurs in Magistrate Judge Baxter's determination that "at this stage of the litigation, the court cannot determine whether a liberty interest was created based on the complaint alone," and that Defendant's motion to dismiss should be denied. Dkt. No. 27, p. 23. In so ruling, the Court expresses no opinion about whether this claim can withstand a properly filed motion for summary judgment.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 27) is **ADOPTED** in all respects; and it is further

Smith v. Hamilton, Not Reported in Fed. Supp. (2016)

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 106 of 187

2016 WL 3823395

**ORDERED** that defendants' motion for partial summary judgment under Fed. R. Civ. P. 56 and for partial dismissal under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that defendants' motion for summary judgment as to the First Amendment retaliation claim against defendant Hamilton is **GRANTED,** and that the complaint is dismissed as against defendant Hamilton and insofar as it alleges a First Amendment retaliation claim; and it is further

**ORDERED** that defendant Hamilton is dismissed from this case; and it is further

**ORDERED** that defendants' motion to dismiss the due process claims against defendants Rufa, Prack and Hillenbrand is **DENIED;** and it is further

**ORDERED** that the Clerk of Court shall provide Plaintiff with copies of the unpublished decisions cited in this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3823395

---

**End of Document**                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   4

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 107 of 187
James v. Gage, Not Reported in Fed. Supp. (2018)
2018 WL 2694436

2018 WL 2694436
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Travis JAMES, Plaintiff,
v.
Dana GAGE, Medical Director F.H.S.D.; B. Furco,
Nurse-Administrator; Adek.nami Albert, Nurse;
Bigaud, Provider; Lieutenant Thayer, Defendants.

No. 15-CV-106 (KMK)
|
Signed 06/04/2018
|
Filed 06/05/2018

**Attorneys and Law Firms**

Travis James, Ossining, NY, pro se .

Janice Powers, Esq., Office of the New York State Attorney General, New York, NY, Counsel for Defendants.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Pro se Plaintiff Travis James ("Plaintiff") filed the instant Amended Complaint ("Amended Complaint"), pursuant to 42 U.S.C. § 1983, against Medical Director Dana Gage ("Gage"), Nurse Barbara Furco ("Furco"), Nurse Albert Adeknami ("Adeknami"), provider Bigaud ("Bigaud"), and Lieutenant Thayer ("Thayer") (collectively, "Defendants"). (Am. Compl. (Dkt. No. 39).) Plaintiff alleges that Defendants violated his rights under the Eighth and Fourteenth Amendments because they were deliberately indifferent to his need for hip replacement surgery and punished him for false misbehavior reports. (Id.)

Before the Court is Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(c). (See Notice of Mot. To Dismiss (Dkt. No. 63).) For the following reasons, Defendants' Motion is granted in part and denied in part.

**I. Background**

**A. Factual Background**

The following facts are drawn from Plaintiff's Amended Complaint, (Am. Compl.), and Plaintiff's opposition to the Motion To Dismiss, (Pl.'s Reply to Defs.' Summ. J. Mot. ("Pl.'s Mem.") (Dkt. No. 69) ), both of which include attached exhibits, and are taken as true for the purpose of resolving the instant Motion.[1] During the time of the alleged events, Plaintiff was a convicted prisoner at Sing Sing Correctional Facility in Ossining, New York ("Sing Sing"). (Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 80) Ex. A ("FAC") 1.)

[1]     Both of Plaintiff's submissions were filed as multiple documents, some of which are exhibits which restart the ECF pagination. For ease of reference, when citing to the Amended Complaint, the Court will cite to the version provided as an exhibit to Defendants' Memorandum, because it contains consistent pagination for the entire document, labelled PTLF <number> in the bottom right corner. (Defs.' Mem. of Law in Supp. of Mot. To Dismiss (Dkt. No. 80) Ex. A ("FAC").) The Court notes that this version of Defendants' Memorandum filed on the docket is redacted, but an unredacted version, including all of the exhibits relevant to this Motion, was filed under seal. (See Dkt. (entry for May 11, 2018).) When citing to the exhibits in Plaintiff's opposition, the Court will cite to the ECF-generated page numbers, which re-start with each exhibit. (See Pl.'s Mem.)

In 2004, Plaintiff had hip replacement surgery. (Id. at 4.) Ten years later, in February 2014, he began experiencing "extreme pain" in the hip replacement. (Id.) Plaintiff therefore "put down for emergency sick call to have his hip evaluated," although it is unclear when he did this. (Id.) Plaintiff alleges that, at some point prior to March 8, 2014, he "was seen by ... Furco, who stated that there was nothing wrong with him and sent [P]laintiff back to his cell without any medication or medical attention and said [']you just want to sue[']." (Id.) According to a medical record attached to the Amended Complaint, Plaintiff was evaluated by Bigaud on February 3, 2014; the "exam was unremarkable" and Plaintiff "had an x-ray which showed no disruption of his hip prosthesis, but an ortho[pedist] consult was requested for further evaluation." (Id. at 33.)[2] The orthopedist consult was scheduled for March 6, 2014. (Id. at 14.) A medical note attached to the Amended Complaint also stated that Plaintiff was "seen at sick call" on March 3, 2014, when

2018 WL 2694436

he was "walk[ing] briskly and ris[ing] quickly from sitting position without pain," although the note preparer's signature is illegible. (*Id.*)

2    This quote is taken from an email regarding a grievance Plaintiff filed that outlines his medical history at Sing Sing, although the sender, recipient, and date are redacted. (FAC 33.) Plaintiff attached this email to the Amended Complaint, so the Court will consider it. (*Id.*) *See Blue Tree Hotels Inv. v. Starwood Hotels & Resorts*, 369 F.3d 212, 217 (2d Cir. 2004) (permitting consideration of "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits"). Although the Court normally accepts the allegations in a complaint as true at the motion to dismiss stage, this rule does not apply where a document attached to the complaint contradicts the plaintiff's allegations. *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002); *see also MBIA Inc. v. Certain Underwriters at Lloyd's*, 33 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) ("Allegations in the complaint that are 'contradicted by more specific allegations or documentary evidence' are not entitled to a presumption of truthfulness.") (quoting *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 175 n.1 (2d Cir. 2013) ). Defendants also request that the Court consider several other medical records that they attach to their Motion. (*See* Defs.' Mem. Ex. B). Plaintiff submitted some of these records again as exhibits to his opposition to the Motion. (*See* Pl.'s Mem. Exs. A, B.) At this stage, the Court considers only the documents submitted by Plaintiff, and not any additional records contained only in Defendants' exhibits. However, the Court notes that many of these records are illegible or contain acronyms without any accompanying explanation of what they mean. (*See id.*)

**\*2** Because he "continued to experience extreme pain which grew worse," Plaintiff "went back to emergency sick call on [March 8, 2014]" around 10:30 or 11 am. (*Id.* at 4.) "Plaintiff explained to ... Furco that the pain had grown worse, after being evaluated," and told him "that it was hard for [Plaintiff] to walk and his leg hurt[s] every time he stands on it." (*Id.*) Plaintiff alleges that he asked "Furco to please help him with some medication, cane and[/]or crutches," but Furco said "no I am not giving you anything; go back to your housing area." (*Id.*) However, the medical note from his visit states that Plaintiff laughed "I know I'm in trouble" because he missed his ortho consult on March 6, that Plaintiff was "able to sit/ stand" without pain, and that he had another evaluation with Bigaud scheduled for March 10, 2014. (*Id.* at 14.)

"The pain became persistent and made it very difficult for [P]laintiff to stand up," so Plaintiff put in another emergency sick call. (*Id.* at 4.) On March 9, 2014, Plaintiff again complained about his hip, stating "You people are doing nothing for me," and asked to go to an outside hospital. (*Id.* at 15.) Plaintiff alleges that "Furco stated that there wasn't anything wrong with him and told the officer to remove [P]laintiff." (*Id.* at 4.) However, the medical note indicates that Plaintiff was removed because he "began yelling instead at [Furco]," threatening to "write [her] up too, just like everybody else," and because it was a "non-medical emergency." (*Id.* at 15.) The note also states that Plaintiff had a "mild limp" and was "[ambulating] [full weight bearing]." (*Id.*)

On March 10, 21, 25, and 26, 2014, Plaintiff went to emergency sick call because he "continue[d] to experience extreme pain and difficulty standing and walking." (*Id.* at 4.) Plaintiff alleges he was "seen by Defendant Jane or John Doe and provider Bigaud, who provide[d] [P]laintiff with pain medication which did not help." (*Id.*) The medical notes for these visits show that on March 21, Plaintiff was provided ibuprofen and analgesic balm, another appointment was scheduled with a physician's assistant, his ortho appointment had been rescheduled, and an "MRO" was ordered. (*Id.* at 15.) On March 25, Plaintiff was seen by Bigaud "for hypertension" and a cane request form was completed. (*Id.* at 16.) The March 26 note is largely illegible, but it indicates Bigaud examined Plaintiff on March 25 and Plaintiff was "given [a] call out" to see Bigaud again on March 26. (*Id.*)

On March 30 and 31, 2014, Plaintiff again went to emergency sick call "and complained to ... Furco that he was in extreme pain and could not stand or walk." (*Id.* at 4.) Plaintiff "asked for a cane and crutches to help him get around," but "Furco refused to provide him" with those items, stating that "[P]laintiff['s] complaints w[ere] a non[-]emergency and wrote this on the triage papers." (*Id.*) Specifically, the March 30 medical note indicates that Plaintiff stated he "saw the PA and he is not doing anything for me, I want a[n] MRI" and "a cane." (*Id.* at 17.) However, the evaluator—whose name is illegible but the Court will assume, to be consistent with Plaintiff's allegations, is Furco—determined that a "cane [was] not medically indicated at this time," and noted Plaintiff was to see Bigaud again the next day, remain on a prescription for naproxen and continue medical restrictions, and that he should return to the emergency facility if the situation worsens. (*Id.*) The March 31 medical note is largely illegible, but does state that Plaintiff came to the visit "on crutches,"

had been seen 12 times that month, and was "ambulatory ad lib"—in other words, able to walk when he chose to. (*Id.*)

Plaintiff alleges that on April 4, 2014, "the pain was so intense that [P]laintiff was unable to walk and was escorted to emergency sick call in a wheelchair[ ]." (*Id.* at 5.) "Defendant Jane Doe refused [P]laintiff medical attention and made him walk back to his housing area in pain." (*Id.*) However, the medical note for April 4 indicates that Plaintiff saw a doctor, Dr. Holder, on April 3 and was to see Bigaud that day. (*Id.* at 17; *see also id.* at 18 (stating that "[Patient] just seen by PA Bigaud on 4-4-14.").) Although the records do not identify Dr. Holder's specialty, the medical notes from April 4 indicate that Plaintiff saw an orthopedist, who recommended labs, a "bone scan for evaluation of loosening of prosthesis," and a "cane for ambulation." (Pl.'s Mem. Ex. B at 3.) Plaintiff was given a cane pass and labs were requested. (*Id.*) On April 6, 2014, Plaintiff alleges that "the pain became so unbearable that [P]laintiff had to come in a wheelchair and had to be admitted to the infirmary." (FAC 5.) While there, "[P]laintiff was provided with crutches to help him move around." (*Id.*) The medical note from April 6 indicates that a doctor was consulted and that Plaintiff was "to be admitted to [the] infirmary," "RN Abujaber [was] informed," and that Plaintiff was prescribed several medications, including clonidine, toradol, Tylenol, and ibuprofen. (*Id.* at 18.) A medical note dated April 11, 2014 indicated that Plaintiff was improving and "ambulating without complications." (*Id.*)

***3** On April 13, 2014, Plaintiff alleges that he "went to emergency sick call two ... times" and "was evaluated by Defendant Jane or John Doe." (*Id.* at 5.) "Plaintiff told Defendant that he had an operation 10 years ago, and the recent x-rays would show that his hip had shifted and that he needed a cane or crutches to move about." (*Id.*) The unnamed Defendant allegedly "stated that nothing [Plaintiff] was saying matter[ed] and that [P]laintiff is going back to his cell, [on] medical[ ] keeplock." (*Id.*; *see also id.* at 19 (medical note).) The medical note also states that a doctor ordered that Plaintiff get additional medications daily, "be reevaluated by" another physician's assistant, kept on medical keeplock, and not permitted to exercise. (*Id.* at 19.)

On April 14, 2014, Plaintiff again went to emergency sick call because he was "in extreme pain" and "asked Defendant Jane or John Doe for better medication because what he was getting wasn't helping." (*Id.* at 5.) The medical note indicates that Plaintiff "ambulated without complications" and that Plaintiff had a bone scan scheduled. (*Id.* at 19.) Another medical note dated April 14, but in different handwriting, indicates that Plaintiff was taking "3–4 motrin 600mg frequently," but it was "not effective," he was "using [a] cane to ambulate," and that he was "to see" another physician's assistant. (*Id.* at 20.) Plaintiff also went to sick call multiple times on April 15, 2014, once in a wheelchair, but does not allege who he saw on these visits. (*Id.* at 5.) The medical notes from these visits are mostly illegible. However, they do indicate that Plaintiff complained of "terrible pain," that eventually the medications Plaintiff was taking "kick[ed] in," and that Plaintiff was later "return[ed] to [his] cell," where a corrections officer was to bring Plaintiff more "self[-]carry med[ication]s." (*Id.* at 20–21.)

"Gage requested to see [P]laintiff ... the morning of [April 16, 2015] because of the many emergency sick all request[s]." (*Id.* at 5.) Gage evaluated Plaintiff. (*Id.*) Afterwards, "[P]laintiff was placed in the bullpen waiting to be sent back and ... experienced extreme pain in his hip area." (*Id.*) Officer Sullivan notified Gage, "who looked at [P]laintiff and stated 'He was just examined[,] nothing is wrong with him. [']" (*Id.* at 5–6.)[3] "Gage then told [O]fficer Sullivan to write [P]laintiff a misbehavior report for faking." (*Id.*) Officer Sullivan said he would not do so, because "Gage isn't his boss and [P]laintiff does look in pain." (*Id.* at 6.) Yet, a misbehavior report was still filed, citing Plaintiff's "[r]efusal to obey a direct order," his "[f]ailure to follow staff directions," and his "[d]isturbing the order of the medical area." (*Id.* at 8; *see also* Defs.' Mem. Ex. C. at DEFT 37 ("Misbehavior Report").)[4] Officer Castle, an officer who had taken Plaintiff to medical call out, told Plaintiff that correction officers have "no authority over medical" because "they are their own agency." (FAC 6.) Plaintiff was then "carried to his cell in pain by two inmates helping him on each arm." (*Id.*)

3 The medical notes dated April 16, 2014 are largely illegible, but do show that Plaintiff was seen twice and was "walk[ing] without difficulty," a misbehavior report was issued, and Plaintiff was kept in medical keeplock. (FAC 22-23.)

4 Defendants claim that Plaintiff submitted a "poor copy" of this misbehavior report, and instead offers a "clearer copy." (Defs.' Mem. 11 (citing FAC 8; Defs.' Mem. Ex. C at DEFT 37).) The Court agrees, and therefore will cite to the version submitted by Defendants.

On April 17, 2014, Plaintiff went back to emergency sick call at 9:45 am, and vomited upon entering the emergency room. (*Id.*; *see also id.* at 23.) Plaintiff alleges that Gage

2018 WL 2694436

evaluated Plaintiff and said "I just s[aw] you yesterday" and had Plaintiff removed and sent back to his cell, also ordering the "officer to remove all medication from [P]laintiff." (*Id.* at 6.) The medical notes, taken by another provider, note that Gage did this because, "[u]pon questioning of symptoms [by Gage], [Plaintiff] became loud [and] argumentative." (*Id.* at 24; *see also id.* at 34 ("I again attempted to interview and examine this inmate but he would not stop talking.").) They also noted his "non-compliance" with his medicine plan. (*Id.* at 24.) Plaintiff was told to return later, but instead, Plaintiff ran to the visitor's room, "crying to his mother 'I want to go out to [the] hospital and not come back for re-evaluation.' " (*Id.* at 25; *see also id.* at 34 (same).)

**\*4** Later, "[P]laintiff was called for a visit, when ... Gage called [P]laintiff back down to see the 'Psychologist.' " (*Id.* at 6; *see also id.* at 34 ("[Plaintiff] was brought to medical, was seen by OMH and admitted to the infirmary.") ) Plaintiff saw the psychologist for 5 minutes, "which was uncalled for since [P]laintiff doesn't have '[a] history of mental health problems.' " (*Id.* at 6.) "Plaintiff then proceeded to walk in pain to his visit." (*Id.*) Once at the visit, "[P]laintiff spoke with [Seargent] Johnson and ask[ed] him to help get him to the infirmary." (*Id.*)

Plaintiff was then moved to the infirmary. (*Id.* at 6, 34; *see also id.* at 26 ("Per Dr. Gage: [inmate] to be admitted to infirm[ary]. Strict Bedrest.").) He said to a Sing Sing employee, "I need to go out ... what do I have to do[,] have chest pain?" (*Id.* at 25; *see also id.* at 34 (same).) Meanwhile, Plaintiff was sent out to the bone scan recommended by the orthopedist. (*Id.* at 34.) Plaintiff was "given two ... misbehavior reports for no reason by ... Gage." (*Id.* at 6.) At his hearing, Lieutenant Thayer found Plaintiff guilty. (*Id.*) However, Thayer "said to [P]laintiff 'I would find you not guilty but ... Gage is some[one] important.' " (*Id.*) [5] Plaintiff was "isolated in the infirmary without clothing and pain medication and cane or crutches or the essential necessities" from April 17 through 29, 2014. (*Id.*)

[5] Defendants submit a purported transcript and hearing disposition report, but the Court will not consider these documents at the Motion to Dismiss stage. (*See* Defs.' Mem. 13 (citing these exhibits).)

On May 2, 5, 6, 14, and 25 and June 16, 2014, Plaintiff "complained about the pain and the medication not helping, and ask[ed] Jane or John Doe for a cane or crutches." (*Id.* at 6–7.) However, an unidentified "[D]efendant refused to provide[ ] it." (*Id.* at 7.) [6] The medical notes from May 2 and 5 indicate that Plaintiff was still waiting for his bone scan results. (*Id.* at 26–27.) At some point on May 5, someone with an illegible signature noted in a medical note that "the bone scan reflects prosthetic loosening" and "[d]egenerative changes in [his] bilat[eral] knees," but "no evidence of osteomyelitis" and stated that an orthopedic consult request was submitted. (*Id.* at 27.) [7] On May 6, Plaintiff presented to the emergency room complaining of "severe pain;" a doctor was notified and ordered stronger medication and that Plaintiff see a provider in the morning. (*Id.*) The medical note from May 14 indicates that Plaintiff presented to the clinic for a follow-up and stated that his pain "went down to [a] 3 [out of] 10" after taking the medications and "denie[d] any complaints," but was still "awaiting [the] orthopedic surgeon." (*Id.* at 28.) The medical note from May 25 is illegible. (*Id.*)

[6] The Court notes the inconsistency between Plaintiff's allegations that he was without medications and his allegation that he complained the medications he had were not working.

[7] Osteomyelitis "is an infection of the bone." *Wright v. United States*, No. 13-CV-1379, 2017 WL 3142041, at *11 (E.D.N.Y. July 24, 2017); *see also* WebMD, *Osteomyelitis*, https://www.webmd.com/diabetes/osteomyelitis-treatment-diagnosis-symptoms#1 (last visited May 30, 2018) (same).

"In total [P]laintiff went to the [Sing Sing] emergency sick-call approximately 33 times complaining of his hip pain." (*Id.* at 7; *see also id.* at 2 (same).) As a result of this alleged lack of treatment, Plaintiff was "in intense pain" for "an extreme length of time," including "chronic hip pain for months." (*Id.* at 3; *see also id.* at 7 (same).) "[P]laintiff's hip had shifted to the point that he had to receive another hip replacement surgery on [October 7, 2014]." (*Id.* at 7.) "[P]laintiff had continuously told [D]efendants that his hip felt like it had shifted, because he was unable to walk on it and was requesting a cane or crutches to no avail." (*Id.*; *see also id.* at 3 (alleging that staff were "aware of [his] situation" because they witnessed the "complete disregard" of it "on many occas[ ]ions"); Pl.'s Mem. 1, 4 (alleging that Defendants were aware that Dr. Holder had diagnosed Plaintiff with loosening of prosthetics in his hip).) Plaintiff requests $1,000,000 in punitive damages and $1,000,00 in compensatory damages. (FAC 11.) [8]

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 111 of 187

**James v. Gage,** Not Reported in Fed. Supp. (2018)

2018 WL 2694436

8     Plaintiff also requested an injunction "to receive proper medical care[ ] that [he] fully require[s]." (FAC 11.) However, Defendants argued in the instant Motion that because Plaintiff already received the necessary hip replacement surgery, his request for injunctive relief is moot. (Defs.' Mem. 15.) Plaintiff declined to respond to this point in his opposition "because it is moot." (Pl.'s Mem. 3 n.1.) The Court construes this statement as a concession that his request for injunctive relief is moot, but Plaintiff may allege otherwise in an amended complaint.

### B. Procedural Background

**\*5** Plaintiff filed an initial Complaint against Furco, Gage, and Abe Kanari on January 6, 2015. (Compl. (Dkt. No. 2).) He was granted in forma pauperis status on January 22, 2015. (Dkt. No. 4.) On January 29, 2015, the Court issued an Order directing service on those Defendants. (Order of Service (Dkt. No. 6).) Furco and Gage were properly served, (Dkt. Nos. 13, 14), but service on Abe Kanari was unsuccessful, (Dkt. No. 15.) Plaintiff therefore requested that the Court issue an order pursuant to *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997), to determine the correct name of the nurse he had called "Abe Kanan" or "Abacondi," (Letter from Plaintiff to Court (May 6, 2015) (Dkt. No. 16) ), which the Court did, (Order (Dkt. No. 17) ). In response, on June 10, 2015, Defendants filed a letter identifying Albert Adeknami and providing his service address. (Letter from Jason M. Clark, Esq. to Court (June 10, 2015) (Dkt. No. 28).)

Additionally, on June 2, 2015, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Complaint. (Letter from Jason M. Clark, Esq. to Court (June 2, 2015) (Dkt. No. 27).) The Court held a pre-motion conference at which it granted Plaintiff leave to file an amended complaint by November 13, 2015, (*see* Dkt. (entry for Sept. 24, 2015) ), which Plaintiff did, this time also naming Albert Adeknami, Bigaud, and Thayer as Defendants, (FAC). [9] These Defendants were served. (*See* Dkt. Nos. 44–46.)

9     Plaintiff also filed an application for the appointment of counsel, (Dkt. No. 37), which the Court denied without prejudice on March 31, 2016, (Dkt. No. 50). On April 18, 2016, Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure 15 for "permission to file a second amended petition." (Notice of Mot. (Dkt. No. 51).) The Court denied the motion, explaining that it construed it as either a motion for reconsideration of the denial of Plaintiff's request for appointment of counsel or a second motion for appointment of counsel, and either way Plaintiff had provided no new facts suggesting changed circumstances. (Dkt. No. 52.)

On January 27, 2016, Defendants filed an Answer. (Dkt. No. 49.) On August 25, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move to dismiss the Amended Complaint. (Letter from Janice Powers, Esq. to Court (Aug. 25, 2017) (Dkt. No. 58).) Pursuant to a briefing schedule set by the Court, (Dkt. Nos. 59, 61), Defendants filed their Motion To Dismiss on October 13, 2017, (Notice of Mot.). The Court permitted Defendants to provide the Court with the unredacted accompanying papers without uploading them on ECF, because they contained Plaintiff's confidential medical records. (Dkt. No. 65.) However, the Court later permitted Defendants to file the unredacted Motion under seal and ordered them to file redacted copies on ECF. (*See* Dkt. Nos. 78–81.) Plaintiff filed an opposition on February 20, 2018. (Pl.'s Mem; *see also* Dkt. Nos. 67, 68 (extensions).) The same day, Plaintiff filed a motion for leave to amend, (Mot. for Leave to Amend (Dkt. No. 70) ), which the Court denied because "[n]o reasons for the amendment of this three-year-old case [we]re provided and there is a pending motion to dismiss," (Dkt. No. 71.) Defendants filed a reply on April 13, 2018. (Defs.' Reply Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Reply") (Dkt. No. 74).)

## II. Discussion

### A. Standard of Review

Defendants move to dismiss under Federal Rule of Civil Procedure 12(c). (Not. of Mot.) "In deciding a Rule 12(c) motion, [the Court] employ[s] the same standard applicable to dismissals pursuant to Rule 12(b)(6)." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (alterations and internal quotation marks omitted). The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 112 of 187

James v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 2694436

omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2) ) ); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*6** In considering Defendants' Motion To Dismiss, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[ ] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012) ). Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

### B. Analysis

#### 1. Personal Involvement

Defendant Adeknami argues that the Amended Complaint should be dismissed against him because he was not personally involved in the alleged constitutional violations. (Defs.' Mem. 16–17.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's

James v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 2694436

own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. Therefore, Plaintiff must plausibly allege that Bentivegna's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod,* No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal* ).

 **\*7** Adeknami is not mentioned in the Amended Complaint. (*See* FAC.) However, Plaintiff now argues that "Adeknami is listed as 'John Doe' in [the] [A]mended [C]omplaint." (Pl.'s Mem. 3.) Specifically, he alleges that he "was seen by ... Adeknami on March 21 and 26, 2015, at emergency sick-call in extreme pain and ... was given medication that did not work." (*Id.*) Plaintiff also alleges that he "was seen by ... Adeknami on April 4, 13, 14 and 15[,] 2014, [and] May 2, 5, and 6, 2014," and Adeknami "stated that nothing was wrong with [P]laintiff and sent him back to his cell in pain." (*Id.*) Although the Court may consider factual allegations raised for the first time in a pro se plaintiff's opposition papers, it will only do so if they are plausible and consistent with the allegations in the complaint. *See Vlad-Berindan v. MTA New York City Transit,* No. 14-CV-675, 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (collecting cases); *see also Carson Optical Inc. v. eBay Inc.,* 202 F. Supp. 3d 247, 255 (E.D.N.Y. 2016) ("[W]here [the] plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." (internal quotation marks omitted) ).

Plaintiff's new allegation that Adeknami is "John Doe" does not satisfy these criteria. As an initial matter, Adeknami has been a named Defendant in this Action since Plaintiff filed the initial Complaint on January 6, 2015, (*see* Compl. (naming Abe Kanari as a Defendant) ), and Plaintiff was informed of Adeknami's correct name on June 10, 2015, (*see* Dkt. No. 28), but has *never* named Adeknami in the body of any complaint or made any specific factual allegations against him. It is therefore not plausible that an always-named Defendant is now an unnamed John Doe. Moreover, on May 6, 2015, Plaintiff described Adeknami as a 6"-6'1", bald, dark-skinned male nurse with glasses. (Letter from Plaintiff to Court (May 6, 2015) (Dkt. No. 16).) However, the allegations in the Amended Complaint that Plaintiff now claims are actually about Adeknami reference a "Defendant Jane *or* John Doe," (FAC 4, 5, 7 (emphasis added) ), and at least as to the April 4, 2014 incident, involved *only* a "Jane Doe," (*id.* at 5).

It is thus neither plausible nor consistent with the allegations in the Amended Complaint to infer that Plaintiff, who has always known Adeknami was male, would have referred to him as a Jane Doe. Finally, Plaintiff alleges that, in addition to other listed dates, Adeknami "stated that nothing was wrong with [P]laintiff and sent him back to his cell in pain" on April 14 and 15 and May 2, 5, and 6, 2014, (Pl.'s Mem. 3), but these allegations are different from the allegations for those dates in the Amended Complaint, (*see* FAC 5 (alleging that on April 14, "Plaintiff asked Defendant Jane or John Doe for better medication because what he was getting wasn't helping"); *id.* ("It is worthy to note that [P]laintiff went to emergency sick call three (3) times on 4/15/14...."); *id.* at 6–7 (alleging that on May 2, 5, and 6, "[P]laintiff complained about the pain and the mediation not helping and ask[ed] Jane or John Doe for a cane or crutches, but [D]efendant refused to provide[ ] it"); *cf.* FAC 5 ("On 4/13/14 ... Defendant Jane or John Doe stated that nothing I was saying matter[ed] and that [P]laintiff is going back to his cell.") ).

In light of the implausibility of Plaintiff's new allegations regarding Adeknami's personal involvement and the inconsistencies they create with the allegations in the Amended Complaint, the Court grants Adeknami's Motion To Dismiss the claims against him for lack of personal involvement. [10] If Plaintiff wishes to pursue these claims, he must allege specifically what actions Adeknami took, and on which dates, in the body of an amended complaint.

[10]    Although not necessary to its decision, the Court also notes that at least some of the allegations against Adeknami, even assuming he is "John Doe," fail to state an Eighth Amendment violation. *See Wandell v. Koenigsmann,* No. 99-CV-8652, 2000 WL 1036030, at *4 (S.D.N.Y. July 27, 2000) (collecting cases holding that "[w]hether an injured prisoner should be provided crutches is a medical judgment as to the appropriate course of treatment, and disagreement with that decision is not actionable under the Eighth Amendment"); *Velox v. New York,* 35 F. Supp. 2d 305, 307, 312 (S.D.N.Y. 1999) (dismissing allegations that a doctor did not prescribe the plaintiff a wheelchair, crutches, or a cane after a foot operation as insufficiently serious); *Johnson v. Dep't of Corr.,* No. 93-CV-8365, 1994 WL 665934, at *4 (S.D.N.Y. Nov. 28, 1994) (dismissing Eighth Amendment claim that the pain medicine the plaintiff received "was insufficient and ineffective" because the plaintiff "had no right to his preferred treatment"); *see also Bryant v. Wright,* 451 Fed.Appx. 12, 14 (2d Cir. 2011) ("It is a common exercise of judgment to place

Case 9:19-cv-00193-MAD-TWD Document 34 Filed 01/06/20 Page 114 of 187

James v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 2694436

prisoners on generic medications, and this act, without more, does not suggest the recklessness necessary for a constitutional claim of deliberate indifference.").

## 2. Eighth Amendment Claim

**\*8** Plaintiff alleges that Defendants Furco, Gage, and Bigaud were deliberately indifferent to his medical needs by unreasonably delaying the treatment of, and necessary replacement surgery for, his hip. (*See* FAC; Pl.'s Mem. 3-5.) Defendants argue that Plaintiff fails to plausibly allege an Eighth Amendment violation. (Defs.' Mem. 17–22.)[11]

[11]      As a convicted prisoner, Plaintiff's deliberate indifference claim is analyzed under the Eighth Amendment, because it is an allegation that his "conditions of confinement were a form of punishment." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

### a. Standard of Review

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners.' " *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ). To state a deliberate indifference claim, Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at \*8 (S.D.N.Y. Mar. 30, 2017).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit

has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) ). "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003) (internal quotation marks omitted).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. This means that the defendant must "appreciate the risk to which a prisoner was subjected," and have a "subjective awareness of the harmfulness associated with those conditions." *Darnell*, 849 F.3d at 35; *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (internal quotation marks omitted) ). In other words, "[i]n medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Id.* (internal quotation marks omitted). However, "mere negligence" is insufficient to state a claim for deliberate indifference. *Walker*, 717 F.3d at 125 (internal quotation marks omitted). Neither does "mere disagreement over the proper treatment ... create a constitutional claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703.

**\*9** Defendants argue that Plaintiff fails to satisfy the objective and subjective prongs. (Defs.' Mem. 17–22.) The Court will address each prong separately.

### b. Objective Prong

Defendants briefly argue, without citing any caselaw, that Plaintiff does not satisfy the objective prong, because "[a] mild loosening" of prosthesis—here, pins—in Plaintiff's hip is not an objectively serious medical condition. (Defs.' Mem. 21-22.) The Court disagrees. Plaintiff alleged that, over the course of approximately six months, he suffered severe and chronic hip pain that at times prevented him from standing or walking and that prompted him to visit the medical facility at Sing Sing at least 33 times. (E.g., FAC 3, 7; Pl.'s Mem. 4.) He also alleges that this was caused by a loosening of the pins in his hip, made worse by the delay in his treatment and confirmed by the bone scan results received on May 5, 2014, but he did not receive hip replacement surgery until October 6, 2014. (E.g. FAC 27; Pl.'s Mem. 1, 4.) At this stage, these allegations plausibly state an objectively serious medical condition. See Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994) (finding objective prong satisfied where the plaintiff's "degenerative hip condition required corrective surgery prior to his incarceration" and "[a]fter the initial surgery, [the plaintiff] continued to experience great pain over an extended period of time and had difficulty walking," registering almost 70 "complaints of hip pain" prior to his second surgery); Villafane v. Sposato, No. 16-CV-3674, 2017 WL 4179855, at *20–21 (E.D.N.Y. Aug. 22, 2017) (denying summary judgment on objective prong of claim that medical professionals directed that the plaintiff "be immediately produced for surgery to repair his broken left forearm," but the "[d]efendants were delayed in getting [the] [p]laintiff the requisite medical care," and as a result "doctors were forced to rebreak [the] [p]laintiff's arm and install metal plates and screws"), adopted by 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017); Kucharczyk v. Westchester Cty., 95 F. Supp. 3d 529, 541–42 (S.D.N.Y. 2015) (denying motion to dismiss on objective prong where the plaintiff alleged prolonged "severe" pain and a delay of "many months" in receiving surgery); see also Smith, 316 F.3d at 185-86 (focusing on the delay in treatment "rather than the prisoner's underlying medical condition alone" (emphasis omitted) ).

### c. Subjective Prong

Defendants also argue that Plaintiff fails to plausibly allege they were deliberately indifferent—that is, subjectively reckless—in their denial of medical care. (Defs.' Mem. 17–22.) Construing Plaintiff's submissions liberally, he raises two

deliberate indifference claims—one relating to the delay in receiving hip replacement surgery, and one relating to the ongoing treatment he received for his hip pain. The Court will address each claim separately.

### i. Delayed Surgery

Plaintiff's first claim is that Defendants were aware that Dr. Holder had diagnosed Plaintiff with a loosening of the prosthetic in his hip, but failed to arrange hip replacement surgery for him for six months. (Pl.'s Mem. 4; see also FAC 3, 7.) Specifically, Plaintiff alleges that he "continuously told [D]efendants that his hip felt like it had shifted, because he was unable to walk on it and was requesting a cane or crutches to no avail," (FAC 7), and that Defendants were "aware of [his] situation" because they witnessed the "complete disregard" of it "on many occas[ ]ions," (id. at 3). However, Plaintiff provides no details regarding which Defendants he told this to, or when. The fact that he alleged hip pain, without more, does not show that Plaintiff specifically informed Defendants that he felt his hip pins had loosened or that they knew failure to immediately perform surgery would exacerbate his hip pain.

**\*10** Plaintiff alleges in his opposition that Defendants "were all made aware" of Dr. Holder's diagnosis "[a]s of April 4, 2014," but this allegation is not plausible in light of the other allegations in the Amended Complaint and the attached medical records. (Pl.'s Mem. 4.) For example, the medical note for April 4, 2014 indicates only that Dr. Holder recommended a bone scan "for evaluation of loosening of prosthesis," not that he had diagnosed Plaintiff already or that Defendants were aware of Dr. Holden's recommendation. (Pl.'s Mem. Ex. B. at 3.) Although the medical notes indicate that Bigaud saw Plaintiff at some point on April 4 as well, they do not indicate what time he saw Plaintiff, whether Bigaud was informed of Dr. Holder's recommendation, or whether Bigaud discussed it with Plaintiff. (FAC 17-18.) See, e.g., Veloz v. New York, 339 F. Supp. 2d 505, 525-26 (S.D.N.Y. 2004) (finding no deliberate indifference where the plaintiff "received treatment for his spinal condition" and "none of the specialists reviewing [the] plaintiff's [test results] ever indicated that [the] plaintiff needed surgery," or that his "chronic condition ... was ... a condition of urgency" (internal quotation marks omitted) ), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006); cf. Benjamin v. Schwartz, 299 F. Supp. 2d 196, 200 (S.D.N.Y. 2004) (finding that the plaintiff plausibly alleged deliberate indifference where "an orthopedic surgeon

James v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 2694436

diagnosed the problem definitively and stated that surgery was needed ... but the surgery was not performed until ... a year and more after that"), *aff'd*, 204 Fed.Appx. 979 (2d Cir. 2006). Indeed, even if the Court were to assume that the person who wrote the April 4, 2014 medical note was Bigaud, it is signed by only one person, with an illegible signature, and in no way suggests that the other Defendants were present or also had this knowledge. (Pl.'s Mem. Ex. B at 3.) Further, the medical note indicates that the evaluator, even assuming it was Bigaud, ordered the labs and provided the cane recommended by Dr. Holder, (*id.*), and the medical note from April 14 indicates that the bone scan was scheduled, although it does not state when, (FAC 19). According to other medical notes, Plaintiff did not receive his bone scan results until May 5, 2014. (*Id.* at 27.) The "bone scan reflect[ed] prosthetic loosening" and "[d]egenerative changes in [his] bilat[eral] knees," but "no evidence of osteomyelitis." (*Id.*) Plaintiff does not allege that any of Defendants wrote this medical note, read the results of the bone scan, or were otherwise informed of them, and the signature on the medical note is illegible. Indeed, Plaintiff's allegations and the submitted exhibits do not clearly mention any of the named Defendants in the events described following May 5, 2014. (*See* FAC 6– 7 (factual allegations), 27–29 (medical notes); *but see id.* at 30 (note from June 25, 2014 signed by Bigaud indicating that Plaintiff had labs, a chest x-ray, and an "H&P" completed, was awaiting an EKG ordered on June 17, and had a surgery "RBD" scheduled for July 6).) [12] Thus, Plaintiff's conclusory allegations that Defendants were aware of his condition, and the corresponding need for hip replacement surgery, are insufficient to plausibly allege deliberate indifference. *See Darnell*, 849 F.3d at 35 (requiring a defendant to "appreciate the risk to which a prisoner was subjected" and have a "subjective awareness of the harmfulness associated with those conditions"); *Stewart v. City of New York*, No. 15-CV-4335, 2018 WL 1633819, at \*8 (S.D.N.Y. Mar. 31, 2018) ("To survive a motion to dismiss on this theory [of deliberate indifference to medical needs], [the plaintiff] must still plausibly allege that [the] [i]ndividual [d]efendants intentionally or recklessly delayed his access to care when they knew or should have known that the delay posed an excessive risk to his health or safety."); *Ward v. Capra*, No. 16-CV-6533, 2018 WL 1578349, at \*6 (S.D.N.Y. Mar. 29, 2018) (dismissing claim on subjective prong because the plaintiff "offer[ed] only conclusory allegations that [the defendant] was ... 'fully aware' of [the] [p]laintiff's condition").

[12] The Court therefore concludes that, even if Plaintiff had plausibly alleged deliberate indifference claim relating to the delay in receiving hip replacement surgery, Defendants were not personally involved in this constitutional violation. *See Grullon*, 720 F.3d at 138–39 (describing personal involvement requirement); *see also Hernandez v. Keane*, 341 F.3d 137, 149 (2d Cir. 2003) (noting that even if the evidence "support[ed] findings that someone involved in [the plaintiff's] care (other than the defendants at issue) ... was deliberately indifferent," such evidence is not "relevant to this [case] or to the resolution of any lawsuit brought under 42 U.S.C. § 1983 against these defendants").

Moreover, even assuming one of the Defendants wrote the note describing the bone scan results or that the others were aware of it, this alone would be insufficient to demonstrate deliberate indifference. The same day Plaintiff learned of his bone scan results, a request for an orthopedic consult was submitted, and the next day, a doctor was notified about Plaintiff's pain, resulting in further prescriptions for drugs. (FAC 27.) As of May 14, 2014 Plaintiff was still "awaiting [an] orthopedic surgeon." (*Id.* at 28; *see also id.* at 30 (medical note from June 25, 2014 signed by Bigaud mentioning "surgery RBD 7/6").) Plaintiff ultimately received hip replacement surgery at an outside hospital on October 6 or 7, 2014—approximately 5 months later. (Pl.'s Mem. 1, 4; FAC 7.) Therefore, this is not a case in which Defendants—even assuming they had knowledge of the broken pins in Plaintiff's hip—failed to acknowledge the need for or schedule a surgery, even in the face of Plaintiff's complaints. *Cf. Hathaway*, 37 F.3d at 67 (finding inference of deliberate indifference where the defendant discovered that the plaintiff "had two broken pins in his hip" but "never shared this information with [the plaintiff] or raised the possibility of surgery with him following the discovery of the broken pins"); *see also Hernandez v. Keane*, 341 F.3d 137, 146 (2d Cir. 2003) (distinguishing *Hathaway* because "[i]n that case ... the inmate was kept waiting two years before being evaluated for surgery to abate chronic pain in his hips; and during that time his doctors withheld relevant information regarding the cause of the pain: broken pins from an earlier hip surgery," whereas "[h]ere, it was clear to everyone what was causing [the] plaintiff's pain, but unclear for long periods what to do about it," and "the delays were much shorter than in *Hathaway*"). [13]

[13] Plaintiff attempts to distinguish *Hernandez*, but his argument is incomplete. (Pl.'s Mem. 5 ("This reasoning

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 117 of 187
James v. Gage, Not Reported in Fed. Supp. (2018)
2018 WL 2694436

must fail because the circumstances in Hernandez delay and ...").)

**\*11** Nor does Plaintiff plausibly allege that Defendants "knew the extent of [his] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [his] situation." *Hathaway*, 37 F.3d at 68. Rather, Plaintiff was continuously treated for months following his bone scan results—and indeed received several other medical tests and treatments including stronger medications recommended by doctors, some of which were successful in decreasing Plaintiff's pain and permitting him to ambulate—and received the necessary surgery within 5 months. (*E.g.*, FAC 27–30.) *See Hernandez*, 341 F.3d at 146 (finding no deliberate indifference where "most of th[e] delay [in receiving surgery] was caused by factors outside [the] defendants' control," and that "[t]he intervals attributable to [the] defendants are ... reduced to a matter of months, during which [the] plaintiff was either under evaluation for surgery or under treatment for other medical conditions"); *Waller v. DuBois*, No. 16-CV-6697, 2018 WL 1605079, at \*7 (S.D.N.Y. Mar. 29, 2018) (dismissing deliberate indifference claim because "the alleged delay in scheduling surgery was minimal," and "[d]uring this time, [the] [p]laintiff's doctors were exploring other medical treatments, prescribing him medication, and allowing for [the] [p]laintiff to have access to medical care, as he claims to have been in medical ... every other day"); *Benjamin v. Galeno*, 415 F. Supp. 2d 254, 259 (S.D.N.Y. 2005) (finding no deliberate indifference because the "[p]laintiff's voluminous medical records make clear that [he] was well attended to for his multiple medical conditions," and the plaintiff "provide[d] no evidence that [the defendants] knew that the course of treatment prescribed ... would be ineffective or would cause harmful effects"), *aff'd*, 204 Fed.Appx. 979 (2d Cir. 2006); *id.* at 259-60 (noting that the plaintiff's complaint against one defendant was "that he failed to recommend him for surgery after reviewing the MRI of [the] plaintiff's right shoulder," but "[t]he record ... [wa]s clear that [the defendant] showed concern for [the] plaintiff's well being—including a concern for the treatment of [his] injured shoulder"); *Pabon v. Goord*, No. 99-CV-5869, 2003 WL 1787268, at \*11 (S.D.N.Y. Mar. 28, 2003) ("While Plaintiff was awaiting a consult with a neurosurgeon, his pain was not ignored. He was seen repeatedly by an orthopedist, a neurologist, a physiatrist, and his primary care physicians. During this period, consistent with the neurologist's recommendations, Plaintiff was receiving medication for his pain...."). Absent allegations that Defendants "intentionally or recklessly delayed his access to care when they knew or should have

known that the delay posed an excessive risk to his health or safety"—such as necessitating a more severe surgery or creating permanent, life-altering damage to his hip—Plaintiff has not alleged a deliberate indifference claim. *Stewart*, 2018 WL 1633819, at \*8; *see also Pabon v. Wright*, No. 99-CV-2196, 2004 WL 628784, at \*8 (S.D.N.Y. Mar. 29, 2004) ("The Second Circuit has reserved [a deliberate indifference] classification for cases in which, for example, officials deliberately delayed medical care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." (internal quotation marks omitted) ), *aff'd*, 459 F.3d 241 (2d Cir. 2006). At best, Plaintiff has alleged either negligence, *see Walker*, 717 F.3d at 125, or his preference for a different treatment, *see Chance*, 143 F.3d at 703, neither of which implicates the Eighth Amendment.

### ii. Failure to Treat Hip Pain

Construing the Amended Complaint liberally, Plaintiff also alleges deliberate indifference to his hip pain prior to the recognized need for replacement surgery. In most—but not all—instances, these claims also fail, because Plaintiff does not allege that on specific occasions, Defendants were aware of the risks of not treating his injury but recklessly mistreated it or chose not to treat it. *See Nielsen*, 746 F.3d at 63 (describing deliberate indifference standard). The Court will address the allegations against each Defendant separately.

#### (1) Furco

First, as to Furco, Plaintiff alleges that on several occasions, he went to sick call and told Furco he was in pain and requested medication, a cane, or crutches, but Furco denied him this treatment. (FAC 4 (listing an incident on an unspecified day in February and on March 8, 9, 30, and 31, 2014).) As explained earlier, denials of a cane, crutches, or the medication of Plaintiff's choice, at least in the absence of allegations that a doctor had already prescribed Plaintiff these items, do not violate the Eighth Amendment. *See Curtis v. Williams*, No. 11-CV-1186, 2014 WL 2619805, at \*5 (S.D.N.Y. June 12, 2014) (dismissing claims against Furco that she did not provide Plaintiff with a cane); *Wandell*, 2000 WL 1036030, at \*4 (holding that denials of crutches do not violate the Eighth Amendment); *Johnson*, 1994 WL 665934, at \*4 (dismissing Eighth Amendment claim that the pain medicine the plaintiff received "was insufficient and

2018 WL 2694436

ineffective"). Again, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703.

However, construing the Amended Complaint liberally, Plaintiff alleges that Furco intentionally denied him *all* treatment, despite knowing Plaintiff was in pain, on five occasions. (FAC 4.) For such conduct to constitute deliberate indifference, Furco must have denied Plaintiff treatment "not because he [did not] need it," but "only because" of some other inappropriate consideration. *Harrison v. Barkley*, 219 F.3d 132, 134 (2d Cir. 2000). Only one of the alleged interactions with Furco satisfies this standard. Plaintiff alleges that on his first emergency sick call, on an unspecified date sometime before March 8, 2014, Furco evaluated him, found "nothing wrong," and sent him "back to his cell without any medication or medical attention," stating that Plaintiff "just want[s] to sue." (FAC 4.) The fact that Furco evaluated Plaintiff and concluded that he did not need medical care alone does not show deliberate indifference, as it is a medical judgment. *See Hernandez*, 341 F.3d at 147 ("This is precisely the sort of issue that cannot form the basis of a deliberate indifference claim."). However, drawing all reasonable inferences in favor of Plaintiff, Furco's comment that Plaintiff "just want[s] to sue" evinces an ulterior motive to not treat Plaintiff, despite knowing he is in pain —perhaps retribution for past litigiousness or preempting a future lawsuit over the care received. (FAC 4.) At this stage, this is sufficient to plausibly allege deliberate indifference. *See Chance*, 143 F.3d at 704 ("This allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment."); *Harrington v. Mid-State Corr. Facility*, No. 09-CV-85, 2010 WL 3522520, at *14 (N.D.N.Y. May 21, 2010) (explaining that the defendant's statement of "his intention not to treat [the plaintiff] at all because of his propensity to constantly file complaints" evinced another motivation aside from "medical judgment" for "failing to provide [the plaintiff] with any care at all"), *adopted by* 2010 WL 3522516 (N.D.N.Y. Sept. 2, 2010). Therefore, the Court declines to dismiss this claim against Furco.

**\*12** However, it is significant that Plaintiff did not submit a medical note (or provide a date) for this incident with Furco. The exhibits Plaintiff *did* submit render all of his other allegations against Furco implausible. After Plaintiff began experiencing hip pain in February 2014, *Bigaud*, not Furco, examined him and an x-ray was taken which "showed

no disruption of his hip prosthesis," although an orthopedic evaluation was still requested and scheduled for March 6. (FAC 14, 33.) Plaintiff's first normal "sick call" was on March 3, 2014, and, even assuming this was with Furco, the note indicates that Plaintiff requested "to see a specialist [and] a cat scan," and was observed walking and moving quickly "[without] pain." (*Id.* at 14.) [14] Plaintiff then went to an emergency sick call on March 8, and Furco documented that Plaintiff laughed about the fact that he had skipped his scheduled orthopedic consultation. (*Id.* at 14, 33.) On that visit, Furco also noted that Plaintiff was "able to sit/stand" and that he was scheduled to see Bigaud on March 10. (*Id.* at 14.) Thus, Plaintiff's allegations that Furco again denied him medication, a cane, or crutches, without more, do not plausibly allege deliberate indifference. (*See id.* at 4.)

[14] Because Plaintiff alleges that he saw Furco on March 8 and because the signature on the medical note for March 8 looks identical to the signature on the note for March 3, the Court will assume that Furco handled both of these sick calls. (*See* FAC 4, 14.)

The next day, Plaintiff returned to emergency sick call and asked Furco to send him to an outside hospital, but Furco allegedly "stated that there wasn't anything wrong with him and told the officer to remove [P]laintiff." (*Id.*) However, the exhibits indicate that Plaintiff was removed because he was yelling and threatening to write Furco up, because Furco deemed his condition to be a "non-medical emergency," and because Plaintiff was able to ambulate full weight bearing. (*Id.* at 15; *see also id.* at 33.) Plaintiff does not allege that he saw Furco again until "March 30 and 31," when "Furco refused to provide him with a cane or crutches," stating his "complaints w[ere] a non[-]emergency." (*Id.* at 4.) Again, even assuming the unwarranted denial of these items could violate the Eighth Amendment, the medical records contradict Plaintiff's allegations. On March 30, Furco determined that a "cane [was] not medically indicated at this time," and noted that Plaintiff had appointments to see Bigaud on March 31, was on naproxen and under other medical restrictions, and should return to emergency sick call if his situation worsened. (*Id.* at 17.) The March 31 note indicates that Plaintiff came to his visit "on crutches" and was ambulatory when he chooses to be, belying his claim that he was denied any crutches. (*Id.*) Meanwhile, between March 8 and 30, Plaintiff received additional treatment from other staff members, including pain medications and evaluations by Bigaud. (*Id.* at 4, 15–16.) At best, Plaintiff's allegations against Furco on these dates are disagreements with the treatment he received, rather than allegations that he received no necessary medical care at all,

**James v. Gage, Not Reported in Fed. Supp. (2018)**

2018 WL 2694436

and thus do not plausibly allege deliberate indifference. *See Chance*, 143 F.3d at 703.

### (2) Bigaud

Plaintiff fails to allege any deliberate indifference by Bigaud. Throughout the Amended Complaint and the attached exhibits, Bigaud is mentioned only a handful of times. First, according to a medical record, Bigaud evaluated Plaintiff on February 3, 2014, and the "exam was unremarkable." (FAC 33.) On March 10, 21, 25, and 26, 2014, Plaintiff alleges that he was "seen by ... Bigaud, who provide[d] Plaintiff with pain medication which did not help." (*Id.* at 4.) As explained above, this did not violate the Eighth Amendment. *See Johnson*, 1994 WL 665934, at *4 (dismissing Eighth Amendment claim that the pain medicine the plaintiff received "was insufficient and ineffective"). Indeed, on March 25, Plaintiff saw Bigaud "for hypertension," and Bigaud evaluated him and completed a "cane form." (FAC 16.) The March 30 medical note indicates that Plaintiff complained to Furco that he had seen Bigaud and "he is not doing anything for me, I want a[n] MRI" and "a cane." (*Id.* at 17.) Again, that Plaintiff wanted "a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703; *see also Joyner v. Greiner*, 195 F. Supp. 2d 500, 504 (S.D.N.Y. 2002) ("The fact that [the] plaintiff wanted an MRI done does not mean that the doctor who refused to order one was deliberately indifferent to his medical needs."). At that time, Plaintiff was being evaluated constantly, had a prescription for naproxen, was placed on other medical restrictions, and, at least as of March 31, when Plaintiff was scheduled to see Bigaud again, had crutches and was "ambulatory ad lib." (FAC 17.) Bigaud is also mentioned in two medical notes, which state that Plaintiff was seen by Bigaud on April 4, 2014. (*Id.* at 17, 18.) However, Plaintiff does not allege any facts about what happened at that visit, and the medical note indicates that whoever did see Plaintiff on April 4 recommended labs and a bone scan and provided Plaintiff with a cane, all as recommended by Dr. Holder. (Pl.'s Mem. Ex. B at 3.) Bigaud is not mentioned again.

### (3) Gage

**\*13** Plaintiff also fails to plausibly allege that Gage was deliberately indifferent to his hip pain. Plaintiff alleges that, on April 16, 2015, Gage requested to see Plaintiff "because of the many emergency sick call request[s]" and evaluated him. (FAC 5.) The submitted exhibits indicate that Plaintiff "was without pain or complaint" during the examination and was able to "walk and maneuver without difficulty." (FAC 34; *see also id.* at 22; Misbehavior Report.) However, Plaintiff next alleges that he was in "extreme pain in his hip area" while in the bullpen waiting to be sent back to his cell, and that when Gage was notified, she "looked at [P]laintiff and stated 'He was just examined[,] nothing is wrong with him,' " and "told [O]fficer Sullivan to write [P]laintiff a misbehavior report for faking," even though Officer Sullivan thought Plaintiff did "look in pain." (FAC 5–6.) According to the submitted exhibits, though, Plaintiff was ordered to stop his writhing around in the bullpen, but refused; he was therefore removed back to medical keeplock and issued a misbehavior report. (*Id.* at 23, 34; Misbehavior Report.) These facts do not plausibly demonstrate Gage was deliberately indifferent. Rather, Gage, after completing a full evaluation of Plaintiff and noting no pain or inability to move, sent Plaintiff back to his cell, where he already had medical restrictions, and thus found it not believable that he was suddenly in severe pain and could not walk immediately afterwards. *See Simpson v. Town of Warwick Police Dep't*, 159 F. Supp. 3d 419, 446–47 (S.D.N.Y. 2016) (finding no deliberate indifference where his injury was "not visible" to defendants and they "believed he was faking his injury"); *McClinton v. Connolly*, No. 13-CV-2375, 2014 WL 5020593, at *5 (S.D.N.Y. Oct. 8, 2014) ("If the officers believed [the] [p]laintiff's asthma attack was a mere ruse, they could not have been aware of a substantial risk that [the] [p]laintiff would suffer serious harm."); *Hamilton v. Fisher*, No. 10-CV-1066, 2012 WL 987374, at *7 (N.D.N.Y. Feb. 29, 2012) (finding that "discharging [the] [p]laintiff—after a lengthy hospital stay—under the suspicion that [the] [p]laintiff faked a suicide attempt in order to be removed from SHU might be considered negligent ... but that ... is not sufficient to state an Eighth Amendment claim"), *adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012); *Harris v. Morton*, No. 05-CV-1049, 2008 WL 596891, at *4 (N.D.N.Y. Feb. 29, 2008) ("[The defendant] did a head to toe assessment and found nothing wrong with [the] [p]laintiff, and then advised [the] [p]laintiff to utilize the sick call procedure if he wanted to see a doctor." (internal quotation marks omitted) ). Unlike with Furco, Plaintiff does not allege that Gage had an improper motivation for finding nothing wrong with him or believing he was faking; indeed, as alleged, Gage, the medical director, elected to personally evaluate Plaintiff because he had been to emergency sick call so often. *Cf. Chance*, 143 F.3d at 704 (noting that "ulterior motives" could demonstrate deliberate indifference).

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 120 of 187

James v. Gage, Not Reported in Fed. Supp. (2018)

2018 WL 2694436

Plaintiff also alleges that the next day, on April 17, 2014, Gage evaluated Plaintiff after he vomited at emergency sick call and said "I just s[aw] you yesterday," sent Plaintiff back to his cell, ordering an "officer to remove all medication from [P]laintiff." (FAC 6.) Again, the submitted exhibits render Plaintiff's deliberate indifference allegations implausible. The medical note written by a non-Defendant, and corroborated by Gage's notes, indicate that Gage sent Plaintiff away because he was "loud [and] argumentative" and would not let her examine him, and he was not taking his medications, but Gage told Plaintiff to return to emergency visit later anyway. (FAC 24–25; see also id. at 34 (same).) However, Plaintiff did not return for re-evaluation, instead running to the visitor's room. (Id. at 25, 34.) These facts do not show that Gage was aware of a substantial risk of harm from sending Plaintiff back to his cell, but consciously disregarded this risk. See Mathews v. Pallito, No. 12-CV-58, 2014 WL 4805333, at *11 (D. Vt. Sept. 26, 2014) (noting that noncompliance with prescribed treatment "presents a significant hurdle for [an] Eighth Amendment claim"); Chavis v. Kienert, No. 03-CV-0039, 2005 WL 2452150, at *23 (N.D.N.Y. Sept. 30, 2005) (finding no deliberate indifference where the "[p]laintiff's health record reveals that medical staff frequently saw him and that he often would request medical services and yet fail to appear," or would be belligerent and uncooperative with medical staff).

The remaining allegations against Gage similarly fail to show deliberate indifference. Plaintiff alleges that Gage sent Plaintiff to see a psychologist, "which was uncalled for since [P]laintiff doesn't have '[a] history of mental health problems.' " (FAC 6.) However, at most, this claim is either one of "medical malpractice," which "is not actionable under § 1983," Edwards v. Myres, No. 09-CV-60, 2011 WL 4529367, at *4 (W.D.N.Y. Sept. 22, 2011) (citing Daniels v. Williams, 474 U.S. 327, 330-31 (1986) ), or a "disagreement over the proper treatment," which does not raise a claim under the Eighth Amendment, see Chance, 143 F.3d at 703. Plaintiff does not allege that he was sent to the psychologist as punishment or in lieu of treatment for his hip problems. Rather, after he saw the psychologist for 5 minutes, Gage sent Plaintiff to the infirmary to be placed on bedrest. (FAC 6, 26.) While there, he was sent out for the bone scan. (Id. at 34.) After this date, Gage is not mentioned.

The Court therefore grants Gage's and Bigaud's Motion To Dismiss the Eighth Amendment claims against them, and grants in part and denies in part Furco's Motion on this claim.

### 3. Fourteenth Amendment Due Process Claim

**\*14** Construing the Amended Complaint liberally, it alleges that Gage and Thayer violated Plaintiff's due process rights, because Gage filed false misbehavior against him and Thayer found Plaintiff guilty at his hearing for improper reasons. (FAC 6.) Defendants argue that Plaintiff has not stated a procedural due process claim. (Defs.' Mem. 22–23.)[15]

[15]   Plaintiff did not address this argument in his opposition but, in light of his pro se status, the Court will not deem this claim abandoned. See Jackson v. Fed. Exp., 766 F.3d 189, 197–98 (2d Cir. 2014) (explaining, in the context of summary judgment, that "[w]here a partial response to a motion is made" by a pro se plaintiff, the "court should examine every claim ... with a view to determining whether [judgment in favor of defendants] is legally and factually appropriate"); Lipton v. Cty. of Orange, N.Y., 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) (although courts "may, and generally will, deem a claim abandoned when a party fails to respond to a defendant's arguments that the claim should be dismissed ... [a]pplication of this proposition is, however, tempered by [the court's] discretion").

Gage filed three misbehavior reports against Plaintiff: (1) on April 16, 2014 after Plaintiff was writhing in the bullpen, (Misbehavior Report); (2) on April 17, 2014, after Plaintiff refused to cooperate with an interview and was "belligerent [and] evasive," refusing to obey Gage's "direction to stop talking," (FAC 9); and (3) on unspecified dates after Plaintiff was moved to the infirmary, (id. at 6). Even assuming these misbehavior reports were false, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997); see also Bey v. Griffin, No. 16-CV-3807, 2017 WL 5991791, at *7 (S.D.N.Y. Dec. 1, 2017) ("It is well settled that a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (alteration and internal quotation marks omitted). Rather, the inmate must show something more, such as that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights." Id. (internal quotation marks omitted); see also Boddie, 105 F.3d at 862 (creating retaliation exception).

2018 WL 2694436

Plaintiff fails to satisfy this standard as to Gage, because he does not allege that Gage filed these reports in retaliation for him attempting to exercise a constitutional right; rather, construing Plaintiff's submissions liberally, he contends that Gage filed these reports because she believed Plaintiff was faking his pain, not permitting her to conduct her examination, and creating a disturbance in the medical unit. As explained above, Plaintiff does not have a constitutional right to do any of these things. *Cf. Willey v. Kirkpatrick,* 801 F.3d 51, 65–66 (2d Cir. 2015) (reversing summary judgment on retaliation claim where the plaintiff alleged that the false reports were filed in response to his refusing to provide false information to police officers, which may be a constitutional right). In any event, in the absence of "specific and detailed factual allegations" that Gage filed these reports in retaliation, the Court approaches this claim with "skepticism and particular care" and thus dismisses the due process claims against Gage. *See Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted).[16]

> [16]  Plaintiff does not allege that Gage was present at or involved in the allegedly unfair hearing, so that exception can not save his claim against her.

**\*15** As for the due process Plaintiff received at the disciplinary hearing, Plaintiff alleges almost no facts about the hearing, including which misbehavior reports it covered. He alleges only that "he was found guilty by Defendant Thayer," who said to him, "I would find you not guilty but she [ (]Defendant Gage[) ] is some[one] important." (FAC 6.) At this stage, however, the Court finds that this plausibly alleges a procedural due process claim against Thayer. Due process requires that prisoners receive "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Lunca v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). Construing Plaintiff's allegations liberally, he alleges that Thayer thought, based on the evidence, that Plaintiff was innocent, but found him guilty anyway because of Gage's power, influence, or relationship to him. (FAC 6.) Thayer therefore was not a "fair and impartial hearing officer," but rather a biased one who failed to make a decision supported by the evidence, thereby violating Plaintiff's due process rights. *Luna,* 356 F.3d at 487; *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir. 1989) ("[I]t axiomatic that a prison disciplinary hearing in which the result is arbitrarily and adversely predetermined violates due process.").

Moreover, to the extent that Defendants argue Plaintiff possessed no liberty interest in this hearing because it did not "result[ ] in an atypical and significant hardship in relation to the ordinary incidents of prison life," *Luna,* 356 F.3d at 487 n.3 (alteration and internal quotation marks omitted), the Court disagrees, because Plaintiff was allegedly "isolated in the infirmary without clothing and pain medication and ... the ess[ ]ential necessities" from April 17 through April 29, 2014, (FAC 6.) *See Houston v. Cotter,* 7 F. Supp. 3d 283, 300 (E.D.N.Y. 2014) (finding that lack of food or prescription medications could constitute an atypical and significant hardship); *cf. Sandin v. Conner,* 515 U.S. 472, 486 (1995) ("The record shows that, at the time of [the plaintiff's] punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody.").[17] The Court therefore denies Thayer's Motion To Dismiss the due process claim against him.

> [17]  The Court notes, however, that this claim may face an insurmountable hurdle at the summary judgment stage in light of the documents Defendant submitted, including the purported hearing transcript and hearing disposition. (*See* Defs.' Mem. Ex. C.)

## III. Conclusion[18]

> [18]  The Court declines to reach Furco's or Thayer's arguments that they are entitled to qualified immunity, (Defs.' Mem. 24), because, as this Court has recently warned Defendants' counsel, this defense must actually be *argued* in the briefing to merit consideration. *See Whitley v. Bowden,* No. 17-CV-3564, 2018 WL 2170313, at \*12 (S.D.N.Y. May 10, 2018).

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. The claims against Adeknami, Gage, and Bigaud, and all Eighth Amendment claims against Furco except for the claim relating to the first evaluation are dismissed. The due process claim against Thayer is also not dismissed. Because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *See Terry v. Inc. Vill. Of Patchogue,* 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

2018 WL 2694436

Should Plaintiff choose to file a second amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, the dismissed claims could be dismissed with prejudice, and this case will proceed only with the due process claim against Thayer and the Eighth Amendment deliberate indifference claim for the first incident involving Furco.

**\*16** The Clerk of the Court is respectfully requested to terminate the pending motion, (0kt. No. 63), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2694436

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Elleby v. Martucello, Not Reported in Fed. Supp. (2018)

2018 WL 3769965

2018 WL 3769965
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Taye Lamonte ELLEBY, Plaintiff,

v.

MARTUCELLO, Superintendent, Coxsackie
Correctional Facility and Captain Shanley, DDS,
Coxsackie Correctional Facility, Defendants.

9:16-CV-1335 (MAD/DEP)
|
Signed 08/09/2018

**Attorneys and Law Firms**

TAYE LAMONTE ELLEBY, 14-A-1409, Elmira
Correctional Facility, P.O. Box 500, Elmira, New York 14902,
pro se.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

*1 Plaintiff commenced this action *pro se* on November
8, 2016, asserting claims arising out of his confinement at
Coxsackie Correctional Facility ("Coxsackie"). *See* Dkt. No.
1. On January 29, 2018, the Court adopted in its entirety
Magistrate Judge Peebles' recommendation that Plaintiff's
complaint be dismissed with leave to amend. *See* Dkt. No. 41.
On February 5, 2018, Plaintiff filed an amended complaint.
*See* Dkt. No. 42. Defendants submitted a motion to dismiss
pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure. *See* Dkt. No. 43.

In a June 18, 2018 Report and Recommendation, Magistrate
Judge Peebles recommended that Defendants' motion be
granted and that Plaintiff's amended complaint be dismissed
without leave to amend. *See* Dkt. No. 46 at 25. Neither
party has filed objections to the Report and Recommendation.
For the following reasons, the Court adopts the Report and
Recommendation in its entirety.

**II. BACKGROUND**

Since neither party objected to Magistrate Judge Peebles'
recitation of the relevant background facts, and because it
is consistent with the record, the Court adopts the factual
background set forth in Magistrate Judge Peebles' Report and
Recommendation. *See* Dkt. No. 46.

**III. DISCUSSION**

**A. Standard**

A motion to dismiss for failure to state a claim pursuant
to Rule 12(b)(6) of the Federal Rules of Civil Procedure
tests the legal sufficiency of the party's claim for relief.
*See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007)
(citation omitted). In considering the legal sufficiency, a court
must accept as true all well-pleaded facts in the pleading
and draw all reasonable inferences in the pleader's favor. *See
ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98
(2d Cir. 2007) (citation omitted). This presumption of truth,
however, does not extend to legal conclusions. *See Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although
a court's review of a motion to dismiss is generally limited
to the facts presented in the pleading, the court may consider
documents that are "integral" to that pleading, even if they are
neither physically attached to, nor incorporated by reference
into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d
391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner,
Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ).

To survive a motion to dismiss, a party need only plead "a
short and plain statement of the claim," *see* Fed. R. Civ.
P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the
pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 557 (2007) (quotation omitted). Under this
standard, the pleading's "[f]actual allegations must be enough
to raise a right of relief above the speculative level," *see
id.* at 555 (citation omitted), and present claims that are
"plausible on [their] face," *id.* at 570. "The plausibility
standard is not akin to a 'probability requirement,' but it
asks for more than a sheer possibility that a defendant has
acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).
"Where a complaint pleads facts that are 'merely consistent
with' a defendant's liability, it 'stops short of the line between
possibility and plausibility of "entitlement to relief." ' " *Id.*
(quoting [*Twombly*, 550 U.S.] at 557, 127 S. Ct. 1955).
Ultimately, "when the allegations in a complaint, however

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 124 of 187

Elleby v. Martucello, Not Reported in Fed. Supp. (2018)

2018 WL 3769965

true, could not raise a claim of entitlement to relief," *Twombly, 550 U.S. at 558,* or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed[,]" *id. at 570.*

**\*2** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L.Ed. 2d 652 (1972) ) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) ).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. First Amendment Court Access Claim**
Defendants assert that Plaintiff's complaint fails to state a claim under the First Amendment because Plaintiff failed to allege any facts suggesting that he suffered any prejudice as a result of the alleged interference. *See* Dkt. No. 43-1 at 7.

To successfully pursue a claim alleging denial of access to the courts, the plaintiff must demonstrate that the defendant's "deliberate and malicious" acts caused the plaintiff "actual injury." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted). "To succeed on an access-to-court claim, a plaintiff must demonstrate 'actual injury' by proving that the denial of access "hindered his efforts" to pursue a non-frivolous legal claim." *Whitfield v. Imperatrice*, 477 Fed.Appx. 806, 808 (2d Cir. 2012) (citing *Lewis v. Casey*, 518 U.S. 343 (1996) ).

In his amended complaint, Plaintiff alleges that he needed to access the Uniform Commercial Code as part of his preparations for a lawsuit pending in the Southern District of New York. *See* Dkt. No. 42 at 2. Upon review of the docket for the cited matter, the Court notes that Plaintiff's complaint was dismissed as frivolous on June 7, 2017. *See Elleby v. The Arresting Officers*, No. 16-CV-3675, Dkt. No. 25 (S.D.N.Y.). With respect to the other case that Plaintiff makes mention of —*Elleby v. Doe, et al*—that action was settled in Plaintiff's favor in October of 2016. *See Elleby v. Doe*, No. 14-CV-1436, Dkt. No. 125 (S.D.N.Y.). Because Plaintiff has failed to allege facts suggesting that Defendants interfered with his right to access legal materials in the pursuit of a valid cause of action, the Court finds that Magistrate Judge Peebles correctly recommended that Plaintiff's First Amendment claim should be dismissed.

**C. Procedural Due Process Claim**
In his amended complaint, Plaintiff alleges that his right to procedural due process was violated based on the imposition of a cumulative sentence of ninety days confinement in the SHU. *See* Dkt. No. 42 at 6. Magistrate Judge Peebles recommended that Plaintiff's procedural due process claim be dismissed. *See* Dkt. No. 46 at 17.

**\*3** The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan*, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

"The Supreme Court has established that '[w]e examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) (quoting *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904,

Elleby v. Martuscello, Not Reported in Fed. Supp. (2018)

2018 WL 3769965

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 125 of 187

1908, 104 L.Ed. 2d 506 (1989) ). The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by *Sandin*. *See* Dkt. No. 42 at 3; *see also Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citation omitted). Further, Plaintiff does not allege that the conditions in which he was kept were more onerous than normal SHU conditions. Because Plaintiff fails to allege that he suffered from an atypical and significant confinement, Magistrate Judge Peebles correctly found Plaintiff's due process claim should be dismissed.

### D. Equal Protection

In light of Plaintiff's *pro se* status, Magistrate Judge Peebles liberally construed Plaintiff's complaint to include an equal protection claim. *See* Dkt. No. 46 at 18. Specifically, Plaintiff states "[o]ther inmates had been locked up numerous times for UCC and received less time than 90 [days] for possessing [the] UCC."

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980) ). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ). Thus, a plaintiff asserting an equal protection claim must prove that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right,[1] acted out of malice, or acted irrationally and arbitrarily.

[1]    The fundamental rights protected by the Equal Protection Clause, as identified by the United States Supreme Court, fall into six substantive categories: (1) the right to

freedom of association; (2) the right to vote; (3) the right to interstate travel; (4) the right to fairness in the criminal process (which includes the right to counsel and the right of access to the courts); (5) the right to procedural due process; and (6) the right to privacy "which includes various forms of freedom of choice in matters relating to the individual's personal life" such as freedom of choice in marital decisions, child bearing, and child rearing. 2 Ronald D. Rotunda & John E. Nowak, Treatise On Constitutional Law Substance and Procedure, § 15.7 (4th ed. 2010).

**\*4**  In the present matter, Plaintiff has failed to allege facts to support the claim that he is a member of a protected class or a class-of-one for the purposes of an equal protection claim. *See United States v. Ulloa*, 511 Fed.Appx. 105, 106 n.1 (2d Cir. 2013); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Therefore, Magistrate Judge Peebles correctly recommended that Plaintiff's equal protection claim be dismissed.

### E. Cruel and Unusual Punishment/Deliberate Indifference

Plaintiff's amended complaint makes reference to claims arising from the Eighth Amendment. *See* Dkt. No. 42 at 5. However, Plaintiff does not allege any facts relating to the conditions of his confinement or any instances of deliberate indifference that could form the basis of an Eighth Amendment action. Therefore, Magistrate Judge Peebles correctly recommended that any Eighth Amendment claim that could be liberally construed from Plaintiff's complaint be dismissed.

### F. Amendment of Complaint

As a general matter, " 'the district court has discretion whether or not to grant leave to amend, and its decision is not subject to review on appeal except for abuse of discretion.' " *Shomo v. New York*, 374 Fed.Appx. 180, 182 (2d Cir. 2010) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ). An opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted). As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). However, because "[a] *pro se* complaint is to be read liberally ... the court should not dismiss without granting leave to amend at least once when

2018 WL 3769965

a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco, 222 F.3d at 112* (citation and internal quotation marks omitted).

In the present matter, Magistrate Judge Peebles correctly determined that Plaintiff has failed to plausibly allege a factual basis to his claims. Despite an opportunity to remedy the failings of his complaint, Plaintiff has failed to allege facts that plausibly suggest any unconstitutional conduct by Defendants. Therefore, the Court finds that Magistrate Judge Peebles correctly recommended that Plaintiff should not be provided another opportunity to amend his complaint.

## IV. CONCLUSION

After careful consideration of Magistrate Judge Peebles' Report and Recommendation and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' Report and Recommendation (Dkt. No. 46) is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Plaintiff's complaint in this action is **DISMISSED without leave to amend**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3769965

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 6251245
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Raiquan K. FALLS, Plaintiff,
v.
Sgt. E. CAMPBELL, C.O. A. Pullen,
C.O. Goodenough, C.O. Cardwell,
and Lt. Penney, Defendants.

No. 17-CV-35 (KMK)
|
Signed 11/21/2019

**Attorneys and Law Firms**

Raiquan K. Falls, Elmira, NY, Pro se Plaintiff.

Kellie E. Lagitch, Esq., Office of the Orange County
Attorney, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge:

 **\*1** Plaintiff Raiquan K. Falls ("Plaintiff") brings this pro
se Action, pursuant to 42 U.S.C. § 1983, against Sergeant
("Sgt.") Campbell ("Campbell"), Correction Officer ("C.O.")
A. Pullen ("Pullen"), C.O. Goodenough ("Goodenough"),
C.O. Cardwell ("Cardwell"), and Lieutenant Penney
("Penney") (collectively, "Defendants"), alleging
that Defendants violated his Eighth Amendment rights when they
assaulted him, and his Fourteenth Amendment rights when
they subsequently placed him on keeplock status for 150 days
after a series of disciplinary hearings. (*See generally* Third
Am. Compl. ("TAC") (Dkt. No. 76).) Before the Court is
Defendants' Partial Motion To Dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6), (the "Motion"), seeking to
dismiss Plaintiff's Fourteenth Amendment claim for failure to
state a claim. (*See* Defs.' Not. of Mot. ("Defs.' Mot.") (Dkt.
No. 86).) For the reasons that follow, the Motion is denied.

I. Background

A. Factual Background
The following facts are drawn from Plaintiff's Third
Amended Complaint ("TAC"), and are taken as true for

the purpose of resolving the instant Motion. At the time of
the events underlying this Action, Plaintiff was a convicted
prisoner in the custody of Orange County Jail ("OCJ"). (TAC
¶ 6.)

On July 4, 2016, at approximately 6:00 p.m., Campbell
served dinner to inmates housed in the Delta-1 Housing Unit
("Delta-1"), where Plaintiff resided. (*Id.* ¶ 13.) Before serving
dinner, Campbell demanded that the inmates "kneel on their
beds, face the wall, and place their hands high and flat on the
wall at the back end of the cell." (*Id.* ¶ 15.) Instead of serving
dinner to Plaintiff, Campbell informed him that he would
"starve ... for the way [Plaintiff] acted toward[ ] [Campbell's]
morning shift officers." (*Id.* ¶ 16.) Campbell served the rest
of the inmates, and briefly spoke to C.O. Oriami ("Oriami")
before leaving Delta-1. (*Id.* ¶¶ 18–19.)

Approximately 30 minutes later, Plaintiff asked Oriami to
order dinner for him, but Oriami replied that "it would be up
to Sergeant Campbell," and continued on his rounds. (*Id.* ¶¶
21–22.) After Oriami completed his rounds, he returned to
Plaintiff's cell. (*Id.* ¶ 23.) Plaintiff asked Oriami to contact
"Mental Health Personnel," and stated, "I prefer taking my
own life before I allow y'all to starve me to death." (*Id.*
¶ 24.) Plaintiff also told Oriami that Campbell had been
"unprofessional," and that he hoped Mental Health Personnel
could persuade Oriami or Campbell to order a dinner tray
for Plaintiff "and change the way [he] was feeling at the
moment." (*Id.* ¶ 25.)

In response, Oriami "immediately reported an inmate
attempting to commit suicide over his radio." (*Id.* ¶
26.) "Within [a] matter of seconds," Campbell, Pullen,
Goodenough, and Cardwell entered Plaintiff's cell "without
any provocation." (*Id.* ¶ 27.) Pullen "forcefully threw his
body into [Plaintiff] head on," causing Plaintiff's back to
"crash into the wall ... with full force, and thereafter body
slammed [Plaintiff] to the floor on [his] face/head." (*Id.* ¶ 28.)
Pullen held Plaintiff down while Goodenough and Cardwell
"twisted both [Plaintiff's] arms and legs[,] nearly breaking
them, before securing them with hand and leg restraints." (*Id.*
¶ 29 (quotation marks omitted).) As this happened, Plaintiff
alleges that he did "not resist[ ] in any way." (*Id.*) Then,
Goodenough and Cardwell "overtightened [ ] [Plaintiff's]
hand and leg restraints," and "joined Pullen in dropping their
knees on [Plaintiff's] back and ribs." (*Id.* ¶ 30.) Plaintiff yelled
at them to "get off [his] back," and said, "I can't breathe." (*Id.*
¶ 31 (quotation marks omitted).) At that point, Pullen covered
Plaintiff's mouth and nose "for about 10 seconds," while

Pullen continued to "knee [Plaintiff] in [his] back and [ ] ribs. (*Id.* ¶ 32.) As these events transpired, Campbell stood at the door to Plaintiff's cell. (*Id.* ¶ 33.) Thereafter, Campbell entered the cell and "began kicking and punching [Plaintiff] in [his] face and ribs a few times in [ ] rapid succession for about [five] seconds," and then ordered Pullen, Goodenough, and Cardwell to take Plaintiff to OCJ's Medical Department. (*Id.* ¶¶ 33–34.) According to Plaintiff, an OCJ employee named "Worsdale" began to record the incident on a "hand held video camera" as Plaintiff was leaving his cell. (*Id.* ¶ 35.) Plaintiff was transferred from OCJ's Medical Department to Orange Regional Medical Center, where he was diagnosed with a fractured back and "intermittent explosive disorder." (*Id.* ¶¶ 36–37.) Plaintiff was instructed to see a psychiatrist within one day and a medical doctor within two days for a follow-up appointment and re-evaluation. (*Id.* ¶ 38.)

**\*2** On July 5, 2016, Plaintiff was discharged from Orange Regional Medical Center. (*Id.* ¶ 39.) Upon his return to OCJ, Plaintiff was placed on suicide watch "pursuant to the doctor's order." (*Id.* ¶ 40.) Plaintiff informed a psychiatrist and Mental Health Personnel that Defendants' allegations of Plaintiff's attempted suicide were "false and fabricated," with the intention of "justify[ing] their entry inside [Plaintiff's] cell." (*Id.* ¶¶ 40, 42.) Plaintiff also alleges that Defendants falsely reported that he "jumped up towards them in a[n] aggressive manner with clenched fists in order to justify their use of physical force." (*Id.* ¶ 40.) On July 6, 2016, Plaintiff was taken off suicide watch, and personal possessions, such as his jumpsuit, bedding, and legal documents, were returned to him. (*Id.* ¶ 42.)

On July 6, 2016, between approximately 6:00 p.m. and 7:00 p.m., "[three] separate disciplinary hearings" were conducted in Plaintiff's absence. (*Id.* ¶ 43.) The first, second, and third disciplinary hearings were numbered 16-0628, 16-0632, and 16-0639, respectively. (*Id.* ¶ 62.) Plaintiff was allegedly "not given [ ] advance written notice of the charges against [him], and was not given a[ ] reasonable opportunity to call witnesses or present documentary/written evidence in [Plaintiff's] defense." (*Id.* ¶ 43.) [1] At each disciplinary hearing, Penney "stated into the record ... that the disciplinary hearings [would] be held in absentia due to [Plaintiff's] ongoing non-compliant activity," because Plaintiff had covered his cell window "and was yelling obscenities at the time of the disciplinary hearing." (*Id.* ¶ 45.) Plaintiff was subjected to 30 days of keeplock confinement for the first hearing, and 60 days of keeplock confinement for each of the second and third hearings. (*Id.* ¶ 62.) Thus, Plaintiff was subjected

to a total of 150 days of keeplock, in addition to loss of telephone and commissary privileges for 150 days, and a $75 mandatory surcharge. (*Id.* ¶¶ 47, 62.) As a result of the second disciplinary hearing, the "security slot in [Plaintiff's] cell door" was also restricted from being opened "for any purpose other [than] [ ] meals, issuance of hygiene items, and other security[-]related purposes for the duration of [the] sanctions." (*Id.* ¶ 48.) In order to open the security slot, the Delta-1 Housing Officer was required to obtain permission from a Delta-1 Sergeant or higher rank, which delayed the serving of Plaintiff's meals and his participation in "out-of-cell activities [he] was entitled to attend." (*Id.* ¶ 49.) Plaintiff alleges that "most of the time, due to the [Delta-1] Sergeant's unavailability[,]" he was denied "out-of-cell activities" including "showers, rec[reation], sick call appointments, [and] visits." (*Id.*)

[1]     Plaintiff indicates that non-defendant C.O. Banse entered his cell at 6:00 p.m. on July 6 to ask him to write down "in detail what [ ] transpired on July 4, 2016." (TAC ¶ 44.) Because two incidents took place on July 4, Plaintiff "took it as an opportunity to grieve" the event that occurred at 6:16 p.m. (*Id.*) It is not clear from the TAC what these descriptions were for and how they are related to Plaintiff's claims.

On August 31, 2016, Plaintiff was committed to Mid-Hudson Psychiatric Center and diagnosed with a personality disorder. (*Id.* ¶ 62.)

### B. Procedural History

Plaintiff filed the original Complaint on January 3, 2017. (*See* Compl. (Dkt. No. 2).) Plaintiff's request to proceed in forma pauperis was granted on February 3, 2017. (*See* Dkt. No. 4.) On September 19, 2017, the case was referred to the Honorable Magistrate Judge Lisa M. Smith ("Judge Smith") for pre-trial discovery. (*See* Dkt. No. 24.)

On November 8, 2017, Plaintiff filed a proposed First Amended Complaint ("FAC"), which Judge Smith construed as a Motion To Amend, seeking to add new defendants and claims. (*See* Mot. To Amend (Dkt. No. 30).) Defendants filed an Opposition to Plaintiff's Motion To Amend. (*See* Dkt. Nos. 32, 33.) On December 22, 2017, Judge Smith issued an Order granting in part and denying in part Plaintiff's Motion. (*See* Decision & Order on Pl.'s Mot. To Amend ("Order") (Dkt. No. 37).) Judge Smith denied Plaintiff's Motion To Amend with respect to any claims for deliberate indifference to Plaintiff's medical needs and conditions of confinement,

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 129 of 187

2019 WL 6251245

infringement on Plaintiff's First Amendment right to petition the government for redress, or violations of the Americans with Disabilities Act, 42 U.S.C. § 12132, on the basis that Plaintiff's allegations failed to state a claim. (*See id.* at 7–17, 23–24.) Judge Smith also denied Plaintiff's request to add Kenneth A. Decker, Sgt. Figueroa, Sgt. Hernandez, Correct Care Solutions, and Ibellis Diaz as parties. (*See id.* at 24.) Judge Smith allowed Plaintiff to replead his due process claim "to allege the conditions of his confinement imposed as a result of his disciplinary hearing," and his excessive force claim "to assert the final policymaking authority under state law of Defendants Campbell and Penney" in order to establish municipal liability under *Monell.* (*See id.* at 24.)

**\*3** Plaintiff filed his Second Amended Complaint ("SAC") on February 8, 2018. (*See generally* SAC (Dkt. No. 42).) On February 16, 2018, Defendants filed a letter objecting to Plaintiff's unauthorized addition of C.O. Banse ("Banse") as a defendant in the SAC, and requesting leave to file a motion to dismiss. (*See* Dkt. No. 43.) On February 20, 2018, Judge Smith issued an Order dismissing Banse from the Action, and dismissing Plaintiff's claim for supervisory liability from the SAC on the basis that Judge Smith "did not grant[ ] permission for Plaintiff to add a claim for supervisory liability." (*See* Dkt. No. 45.)

On May 14, 2018, Defendants filed a Partial Motion To Dismiss, seeking to dismiss Plaintiff's claims against Orange County for failure to sufficiently plead municipal liability under *Monell v. Department of Social Services,* 436 U.S. 658 (1978), and Plaintiff's Fourteenth Amendment claim for failure to state a claim. (*See* Defs.' Mot. (Dkt. No. 56).) Plaintiff filed an Opposition to the Motion on September 4, 2018, (Pl.'s Mem. in Opp'n to Defs.' Mot. To Dismiss (Dkt. No. 68), and Defendants filed a Reply on September 21, 2018, (Defs.' Reply in Further Supp. of Mot. To Dismiss (Dkt. No. 69).)

On March 19, 2019, the Court granted Defendants' Motion To Dismiss. (March 9, 2019 Op. & Order on Defs.' Mot. To Dismiss ("Op.") (Dkt. No. 74).) The Court dismissed Plaintiff's claims against Orange County with prejudice, (*id.* at 18), but granted Plaintiff leave to replead his Fourteenth Amendment claim within 30 days of the Opinion and Order ("Opinion"), (*id.* at 24). The Court instructed Plaintiff that he may "replead *only* his procedural due process claims relating to the three disciplinary hearings resulting in 150 days of keeplock confinement, to add specific details of any restrictions placed on his liberty or privileges as compared with typical conditions of prison life." (*Id.* (emphasis added).) The Court further clarified, "[t]hese conditions may include percentage of the day that [Plaintiff must] spend within the cell, hygienic conditions, access to programs, as well as other conditions that may be applicable to his situation." (*Id.* (alterations omitted)) (quoting *Dawkins v. Gonyea,* 646 F. Supp. 2d 594, 607 (S.D.N.Y. 2009).)

On April 16, 2019, Plaintiff filed his TAC. Defendants filed the instant Motion To Dismiss on June 13, 2019. (Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 88); Defs.' Decl. in Supp. of Mot. To Dismiss ("Defs.' Decl.") (Dkt. No. 87).) After receiving an extension of time to respond, (*see* Dkt. No. 91), Plaintiff filed an Opposition to the Motion on July 11, 2019, (Pl.'s Mem. in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 95)). Defendants filed a Reply on August 23, 2019. (Defs.' Reply in Further Supp. of Mot. To Dismiss ("Defs.' Reply") (Dkt. No. 97).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal,* 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' ") (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)); id. at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*4** In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); see also Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." Daniel v. T & M Prot. Res., Inc., 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[ ] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." Sykes v. Bank of Am., 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." Bell v. Jendell, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); see also Caidor v. Onondaga County, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." Leonard F. v. Isr. Disc. Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." Alsaifullah v. Furco, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," Agu v. Rhea, No. 09-CV-4732, 2010 WL 5186839, at *4

n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," Jones v. Fed. Bureau of Prisons, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[ ] had knowledge and relied on in bringing suit," Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

B. Analysis

1. Applicable Law

Plaintiff alleges that he was subjected to 150 days of keeplock in violation of his procedural due process rights under the Fourteenth Amendment. This confinement was the result of three hearings for which Plaintiff was allegedly given insufficient prior notice, and at which he was not given an opportunity to attend or present witnesses or evidence in his defense. "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (citation, alteration, and quotation marks omitted). The Supreme Court has held that inmates retain due process rights in prison disciplinary proceedings. See Wolff v. McDonnell, 418 U.S. 539, 563–72 (1974) (describing the procedural protections that inmates are to receive when subject to significant disciplinary punishment). However, the Supreme Court has clarified that "[p]rison discipline implicates a liberty interest [only] when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Ortiz, 380 F.3d at 654 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). The Second Circuit has further explained that "[t]he length of disciplinary confinement is one of the guiding factors in applying Sandin's atypical and significant hardship test." Hanrahan v. Doling, 331 F.3d 93, 97 (2d Cir. 2003) (citation and quotation marks omitted). The duration of disciplinary confinement, however, is "not the only relevant factor," and the Second Circuit has "explicitly avoided a bright line rule that a certain period of ... confinement automatically fails to implicate due process rights." Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (citations and quotation marks omitted). Indeed, "[t]he conditions of confinement are a distinct and equally important consideration in determining whether a confinement ... rises to the level of atypical and

2019 WL 6251245

severe hardship," and, therefore, courts should consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions." *Id.* (citations and quotation marks omitted); *see also Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

**\*5** As a guidepost to determine whether due process protections are required in the prison context, the Second Circuit has instructed that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days —development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64–65 (citation and quotation marks omitted); *see also Abdur-Raheem v. Caffery,* No. 13-CV-6315, 2015 WL 667528, at \*5 (S.D.N.Y. Feb. 17, 2015) (same). Indeed, the Second Circuit has cautioned that, "[i]n the absence of a detailed factual record, [it has] affirmed dismissal of due process claims only in cases where the period of time spent in [confinement] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual ... conditions." *Palmer,* 364 F.3d at 65–66.

A disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with ... utter certainty ..., how he would assess evidence he has not yet seen.' " *Rahman v. Acevedo,* No. 08-CV-4368, 2011 WL 6028212, at \*7 (S.D.N.Y. Dec. 5, 2011) (italics omitted) (quoting *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir. 1990)).

## 2. Application

### a. Keeplock Confinement

Plaintiff alleges that "three separate disciplinary hearings" were conducted by Penney in Plaintiff's absence on July 6, 2016. (TAC ¶¶ 43, 45.) [2] Plaintiff was subjected to 30 days of keeplock as a result of the first hearing, 60 days of keeplock as a result of the second hearing, and another 60 days of keeplock as a result of the third hearing. (*Id.* ¶ 62.) Plaintiff also lost telephone and commissary privileges for 150 days, was charged $75 in mandatory surcharge fees, and the security slot in his cell door could be opened only "for meals, issuance of hygiene items, and other security[-]related purposes" during his keeplock confinement. (*Id.* ¶¶ 48, 62.) According to Plaintiff, this was an "atypical and significant hardship ... because the assigned Housing Unit Officer had to get an approval from the Delta Wing Sergeant or higher rank before opening [the] security slot, ... [which] prolonged the serving of [ ] meals and out-of-cell activities [Plaintiff] was entitled to attend." (*Id.* ¶ 49.) Plaintiff avers that "most of the time, due to the Delta Wing Sergeant's unavailability, [Plaintiff] would be denied of [his] out-of-cell activities [such as] showers, rec[reation], sick call appointments, [and] visits." (*Id.*) [3]

[2]    The Court notes that Plaintiff's SAC addressed these hearings separately and provided more detail on each. Regarding the first hearing, Plaintiff stated that Penney and Banse "failed to provide [him] with an advance notice of the charges ... and ... advance notice of the disciplinary hearing." (SAC 3.) Plaintiff also asserted that he "was not given the opportunity to call witnesses on [his] behalf or to present written and/or oral rebuttal evidence on [his] behalf." (*Id.*) With respect to the second hearing, Plaintiff alleged that he "was not given the opportunity to view the allegations made against [him] until after the hearings were conducted." (*Id.*) With respect to the third hearing, Plaintiff asserted that he "was given the opportunity to present written rebuttal evidence," but "was not provided with advance notice of the charges alleged against [him]." (*Id.*)

[3]    The account in Plaintiff's Memorandum differs slightly from the facts set forth here, as Plaintiff states that "[d]uring part of [his] keeplock confinement, Plaintiff was deprived of *all* out-of-cell activities, [i.e.], showers, recreation, sick call appointments, visits, etc." (Pl.'s Mem. 2 (emphasis added).) The Court's previous Order made clear, however, that the Court "[would] not consider factual allegations contained in ... memoranda." (Op. 24–25.) Additionally, while the Court is able to consider "materials outside the complaint," such as opposition papers, the Court can do so "only to the extent that they are consistent with allegations in the complaint." *Alsaifullah v. Furco,* No.

12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted); *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010). Therefore, the Court will not consider Plaintiff's allegation that he was denied "all out-of-cell activities." (Pl.'s Mem. 2.)

**\*6** As an initial matter, the Court considers Plaintiff's 150 days of keeplock confinement as an aggregated sentence. "[S]eparate SHU sentences should be aggregated for purposes of the *Sandin* inquiry when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (citation and quotation marks omitted); *see also Sealey*, 197 F.3d at 587 (requiring district court to aggregate sanctions that caused inmate to serve consecutive time in segregation). "Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a sustained period of confinement [that may be aggregated] when (1) they are contiguous and (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions." *Taylor v. Artus*, No. 05-CV-271, 2007 WL 4555932, at *8 & n.40 (N.D.N.Y. Dec. 19, 2007) (citation, quotation marks, and alteration omitted). Plaintiff alleges that he was "subjected to 150 days of keeplock confinement," (TAC ¶ 47), which Defendants do not dispute, and this confinement was imposed by Perrey as the result of three disciplinary hearings that took place consecutively on the same date.[4] The Court therefore considers Plaintiff's keeplock confinement to be an aggregated sentence of "intermediate duration." *Palmer*, 364 F.3d at 64–65.

---

[4]    Discovery may reveal more detail on the length of Plaintiff's keeplock confinement and whether the three sentences were served consecutively, as Plaintiff's TAC does not include the dates of his actual keeplock confinement, and Defendants do not provide clarity on this point.

Defendants contend that Plaintiff fails to allege a liberty interest under *Sandin*, arguing that loss of commissary and telephone privileges, the restrictions on Defendant's security slot, and the $75 disciplinary surcharge cannot constitute an "atypical and significant hardship." (Defs.' Mem. 8–10.) With respect to these allegations, the Court agrees. "Denial of [commissary and telephone] privileges is part and parcel of 'normal' SHU or keeplock conditions." *Aikens v. Royce*, No. 14-CV-663, 2016 WL 5720792, at *5 n.9 (S.D.N.Y. Sept. 30, 2016); *see also Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *7 (S.D.N.Y. Mar. 13, 2018) ("[The] [p]laintiff was [ ] subjected solely to the

loss of privileges such as access to the phones, packages, and commissary .... [which] do not constitute a atypical and significant hardship.") (citation and quotation marks omitted); *Branch v. Goord*, 05-CV-6495, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) ("[L]ost privileges do not constitute a atypical and significant hardship because they are within the expected parameters of the sentence imposed by a court of law." (citation and quotation marks omitted)); *Brooks v. DiFasi*, No. 93-CV-0197, 1997 WL 436750, at *3 (W.D.N.Y. July 30, 1997) (finding that the loss of privileges such as recreation, commissary, and telephone "could [not] reasonably be viewed as imposing atypical and significant hardship on a prison inmate" (collecting cases)). The restrictions placed on Plaintiff's security slot also do not rise to the level of an atypical and significant hardship. *Palmer*, 364 F.3d at 66 ("The atypical and significant hardship th[e] plaintiff suffered ... was being *deprived*[,] [not delayed in receiving,] ... hygienic products and materials, ... [and] personal food...." (citation and alteration omitted) (emphasis added)); *Houston v. Cotter*, 7 F. Supp. 3d 283, 300 (E.D.N.Y. 2014) (finding that a lack, and not a delay, of food could constitute an atypical and significant hardship). With respect to his security slot, Plaintiff alleges that he was merely delayed in, and not prohibited from, receiving some of his meals and from attending events. (TAC ¶ 49.) Standing alone, these restrictions do not rise to the level of an "atypical and significant hardship."[5]

---

[5]    The $75 disciplinary surcharge imposed on Plaintiff is permissible under New York State regulations. N.Y. Comp. Codes R. & Regs. tit. 9, § 7006.9(c) (2019) ("If an inmate is found guilty of a charge of misbehavior, a disciplinary surcharge not to exceed $25 may be imposed upon the inmate in addition to the sanctions...."). Plaintiff was presumably charged $25 for each of the three disciplinary hearings at issue. This surcharge does not "implicate a liberty interest," as it is neither atypical nor significant "in relation to the ordinary incidents of prison life." *Ortiz*, 380 F.3d at 654 (quoting *Sandin*, 515 U.S. at 484).

**\*7** However, Plaintiff also alleges that while in keeplock confinement, he was "denied out-of-cell activities," such as recreation, showers, sick call appointments, and visits "most of the time, due to the Delta Wing Sergeant's unavailability," (*id.*), a claim which Defendants do not specifically address. While Plaintiff does not elaborate on the extent to which he was prevented from participating in these activities, it is plausible that if he were denied some of these activities "most of the time" during a 150-day keeplock

confinement, those restrictions may rise to the level of an atypical and significant hardship in comparison to the general prison population. For example, denial of showers, visits, and sick call appointments may constitute a constitutional violation, depending on the factual circumstances. *See, e.g.,* *Ortiz,* 380 F.3d at 655 (allegations that the plaintiff was prevented from showering for weeks at a time and denied an hour of daily exercise during a 90-day confinement, "if proved, [ ] could establish conditions in SHU far inferior to those prevailing in the prison in general" (citation and quotation marks omitted)); *James v. Gage,* No. 15-CV-106, 2018 WL 2694436, at *15 (S.D.N.Y. June 5, 2018) (denying defendant's motion to dismiss when the plaintiff alleged he had been refused, inter alia, pain medication); *Tolliver v. Skinner,* No. 12-CV-971, 2017 WL 1017649, at *3 n.3 (S.D.N.Y. Mar. 13, 2017) ("Certainly, the [intermediate-length] period of confinement combined with the loss of visitation privileges could constitute conditions atypical and significant enough to form a cognizable liberty interest."); *Hill v. Laird,* No. 06-CV-0126, 2016 WL 3248332, at *10 (E.D.N.Y. June 13, 2016) ("The Court's determination as to whether the denial of visitation [for 150 days] constitutes an atypical [and] significant hardship sufficient to implicate a liberty interest under *Sandin* is fact-specific." (citation and quotation marks omitted)); *Houston,* 7 F. Supp. 3d at 300 (finding that lack of food or medication could constitute an atypical and significant hardship). [6]

[6]     Courts in the Second Circuit have regularly determined that loss of recreation may not amount to an atypical and significant hardship. *See, e.g., Keyes v. Annucci,* No. 18-CV-0372, 2019 WL 4602240, at *13 (N.D.N.Y. Sept. 23, 2019) (finding that the plaintiff did not suffer an atypical and significant hardship when he received only an hour of recreation a day during his 60-day keeplock confinement); *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998) (finding the temporary loss of phone, package, commissary, and recreation privileges during a 180-day SHU confinement did not amount to an atypical and significant deprivation (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996); *Brooks,* 1997 WL 436750, at *3)). Here, the Court concludes it is necessary to develop a further factual record on the type and frequency of recreation denied to Plaintiff before ruling on this issue.

While Plaintiff's TAC is far from detailed, given the intermediate length of Plaintiff's confinement and the "indication that [ ] [P]laintiff [may have] endured unusual [keeplock] conditions," *Palmer,* 364 F.3d at 65–66, "development of a detailed record ... is advisable before the Court will dismiss the claim for failure to plead a protected liberty interest," *Abdur-Raheem,* 2015 WL 667528, at *5; *see also Johnson v. Schiff,* No. 17-CV-8000, 2019 WL 4688542, at *22 (S.D.N.Y. Sept. 26, 2019) ("Because [the] [p]laintiff has plausibly alleged that he possessed a liberty interest ... the Court declines to dismiss [the] [p]laintiff's due process claim...." (citation and quotation marks omitted)); *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (concluding that allegations of 120 days in restrictive housing required discovery and development of record to determine "whether this intermediate sentence constituted an atypical and significant hardship" (citation omitted)), *adopted by* 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011); *cf. Brooks,* 1997 WL 436750, at *4 (holding, on motion for summary judgment and a detailed factual record, that "the plaintiff has failed to factually establish a genuine issue as to whether the conditions of confinement he experienced during the 180 days of keeplock confinement created significant and atypical hardship in comparison to the ordinary incidents of prison life"). Thus, the Court concludes that Plaintiff has, even if barely, alleged enough facts to plausibly state a claim to a liberty interest. Of course, a full record may challenge the strength of the evidence of such a claim, but that day must await the completion of discovery. [7]

[7]     Despite the Court's direction that Plaintiff use the opportunity to file a TAC solely to provide further detail on the conditions of his 150-day keeplock confinement, Plaintiff's TAC also includes facts related to the conditions of his confinement imposed by various deprivation orders and "other determinations also made without due process." (*See* TAC ¶¶ 41, 50–60, 63.) As stated in this Court's previous Opinion, some of these facts "appear to relate to a separate conditions of confinement claim brought in [Plaintiff's] original Complaint ..., a claim that Judge Smith ruled failed to state a claim and accordingly denied [Plaintiff] the right to replead," (Op. 21), while other facts relate to an access to courts claim, for which Judge Smith also denied Plaintiff the right to replead, (Order 15–16). Additionally, "Plaintiff does not allege, nor do Defendants contend, that the deprivation order[s] were issued as a result of the disciplinary hearing," (*id.* at 21 (citation and quotation marks omitted)); therefore, these facts "ha[ve] no bearing on the question of whether Plaintiff has stated a valid claim for violation of his right to due process in connection with his disciplinary hearing," (*id.*), and the Court will not consider them here.

### b. Disciplinary Hearings

**\*8** To survive Defendants' Motion, Plaintiff must also allege that his keeplock confinement was imposed without due process. Plaintiff claims he did not receive advance notice of the charges against him for any of the three disciplinary hearings, and, at least for the first hearing, "was not given [a] reasonable opportunity to call witnesses or present documentary/written rebuttal evidence in [his] defense." (TAC ¶ 43.) [8] Plaintiff also states that the hearings were held in his absence, and he did not "knowingly waive [his] right to be present at the disciplinary hearings." (*Id.* ¶ 46.)

[8]    While Plaintiff's TAC states broadly, "[O]n the [sixth] day of July[,] 2016[,] ... [I] was not given a reasonable opportunity to call witnesses or present documentary/written rebuttal evidence in my defense," (TAC ¶ 43), Plaintiff's SAC stated that with respect to the first hearing, he "was not given the opportunity to call witnesses on [his] behalf or to present written and/or oral rebuttal evidence," but for the third, he "was given the opportunity to present written rebuttal evidence," (SAC 3).

Plaintiff's allegation that he did not receive advance notice of the charges against him is sufficient to sustain his claim at this stage. Due process requires "that a prisoner receive 24 hours advance notice of a prisoner disciplinary hearing." *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (citing *Sira v. Morton*, 380 F.3d 57, 70 (2d Cir. 2004)). The notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 564. Plaintiff's claim that he did not receive written notice of the charges against him 24 hours before the disciplinary hearing must be taken as true. Thus, this claim cannot be dismissed at this stage. [9]

[9]    Defendants do not address Plaintiff's claims about the process he was afforded during the disciplinary hearings, instead arguing that Plaintiff had sufficient recourse to appeal the ruling after the hearings. (Defs.' Mem. 10–11.) Although this may be true, inmates must be provided with certain procedural due process rights before and during the disciplinary hearing itself. *See Wolff*, 418 U.S. at 563–66 (finding that, "if the minimum requirements of procedural due process are to be satisfied," inmates must receive "advance written notice of the claimed violation and a written statement of the factfinders as

to the evidence relied upon and the reasons for the disciplinary action taken," and "should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"); *Lewis v. Murphy*, No. 12-CV-268, 2014 WL 3729362, at \*10 (N.D.N.Y. July 25, 2014) (noting that prisoners are "entitled to advance written notice of the charges against [them]; a hearing affording [them] a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer and a written statement of the disposition[,] including the evidence relied upon and the reasons for the disciplinary actions taken." (quoting *Sira*, 380 F.3d at 69)); *Vogelfang*, 889 F. Supp. 2d at 511–12 (same).

Plaintiff further alleges that he was not permitted to attend the disciplinary hearings, nor was he allowed to call witnesses or present written testimony for at least one, if not more, of the hearings. "Ordinarily, an inmate facing disciplinary hearings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Holland v. Goord*, 758 F.3d 215, 224–25 (2d Cir. 2014) (quoting *Wolff*, 418 U.S. at 566). "The right to call witnesses is limited in the prison context, however, 'by the penological need to provide swift discipline in individual cases' and 'by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff.' " *Id.* at 225 (quoting *Ponte v. Real*, 471 U.S. 491, 495 (1985)). Accordingly, "prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* (citation, alteration, and quotation marks omitted). Moreover, the Second Circuit has "stated that the Supreme Court ... has suggested that a prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Id.* (alterations and quotation marks omitted) (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30–31 (2d Cir. 1991)). Here, Plaintiff does not elaborate on the circumstances surrounding his inability to call witnesses or present documentary evidence, other than to claim that Penney stated into the record at the hearing that Plaintiff could not attend because his "cell window [was] covered[,] and [he] was yelling obscenities at the time of the disciplinary hearing." (TAC ¶ 45.) Defendants do not address these allegations. Although it is possible that Plaintiff's conduct could have been "unduly hazardous to institutional safety or correctional goals," *Holland*, 758

F.3d at 224–25 (citation and quotation marks omitted), it is also plausible that his inability to call witnesses or present documentary evidence may amount to a due process violation. Thus, Defendant's Motion To Dismiss is denied.

## III. Conclusion

**\*9** For the reasons stated above, Defendants' Motion To Dismiss is denied.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 86), and mail a copy of this Opinion to Plaintiff at the address listed on the docket. The Court will hold an initial conference to set a schedule for discovery on January 8, 2020 at 10:00 a.m.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 6251245

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 4602240
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Yolanda KEYES, Administratrix of the
Estate of Francisco DeJesus; Herron
Emerenciano; and Rashad Scott, Plaintiffs,

v.

Anthony ANNUCCI, Acting Commissioner, New
York Dept. of Corrs. and Comm. Supervision;
Michael Kirkpatrick, Former Superintendent,
Clinton Corr. Facility; Donald Venettozzi, Director
Special Housing and Inmate Discipline; Michael
Dixon, Sergeant; Jeffery Rock, Lieutenant; Earl
Bell, Deputy Superintendent of Security; Jerry
Kowalowski, Recreation Program Leader; Daniel
Holdridge, Captain; Karen Crowley, Mailroom
Officer; Richard Houck, Transfer Coordinator;
and Christine Gregory, Inmate Grievance
Resolution Committee Supervisor, Defendants.

9:18-CV-0372 (GTS/DJS)
|
Signed 09/23/2019

**Attorneys and Law Firms**

OF COUNSEL: ALISSA R. HULL, ESQ., MICHAEL E.
CASSIDY, ESQ., PRISONERS' LEGAL SERVICES OF
NY, 114 Prospect Street, Ithaca, NY 14850, 24 Margaret
Street, Suite 9, Plattsburgh, NY 12901, Counsel for Plaintiffs.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, OF COUNSEL: RYAN L. ABEL, ESQ., The
Capitol, Albany, NY 12224, Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Yolanda Keyes (as administratrix of the estate
of Francisco DeJesus), Herron Emerenciano, and Rashad
Scott ("Plaintiffs") against Acting Commissioner of the
New York State Department of Corrections and Community
Supervision ("DOCCS") Anthony Annucci, Former Clinton
Correctional Facility Superintendent Michael Kirkpatrick,

Special Housing and Inmate Discipline Director Donald
Venettozzi, Sergeant Michael Dixon, Deputy Superintendent
of Security Earl Bell, Recreation Program Leader Jerry
Kowalowski, Captain Daniel Holdridge, Mailroom Officer
Karen Crowley, Transfer Coordinator Richard Houck,
and Inmate Grievance Resolution Committee Supervisor
Christine Gregory ("Defendants"), is Defendants' motion to
dismiss Plaintiffs' Amended Complaint for failure to state a
claim upon which relief can be granted. (Dkt. No. 25.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs' Amended Complaint**
In their Amended Complaint, Plaintiffs assert five claims.
(Dkt. No. 17 [Pls.' Am. Compl.].) Generally, Plaintiffs' claims
arise from various adverse actions allegedly taken against
them at Clinton Correctional Facility in 2015 and 2016
following the well-publicized escape of two inmates (Richard
Matt and David Sweat) from the facility's Honor Block,
after which Plaintiffs became members of the prisoner-elected
Inmate Liaison Committee ("ILC").

First, Plaintiffs claim that Defendants retaliated against them
in violation of the First and Fourteenth Amendments. (*Id.*
at ¶ 183.) More specifically, Plaintiff DeJesus alleges that
Defendants Dixon and Rock retaliated against him for filing
grievances and writing letters about staff misconduct in that
Defendant Dixon issued a misbehavior report against him
and Defendant Rock acted as the hearing officer on that
report and found Plaintiff DeJesus guilty of the alleged
misbehavior. (*Id.* at ¶¶ 52-85.) Plaintiff Emerenciano alleges
that Defendants Kowalowski and Bell retaliated against him
for filing grievances, writing letters about staff misconduct,
and speaking up as an ILC representative about prison
policies in that Defendant Kowalowski issued a misbehavior
report against him and transferred him to another prison
facility and Defendant Bell acted as the hearing officer
on that report and found Plaintiff Emerenciano guilty of
the alleged misbehavior. (*Id.* at ¶¶ 86-138.) Plaintiff Scott
alleges that Defendants Crowley, Holdridge, Gregory, and
Houck retaliated against him for writing letters about
staff misconduct, meeting and corresponding with news
organizations and lawyers, and filing grievances in that
Defendant Holdridge ordered a piece of incoming mail that
he received to be destroyed, Defendant Crowley destroyed or
ordered the destruction of a second piece of incoming mail,
Defendant Gregory threatened to write Plaintiff up related to

his use of the grievance system, and Defendant Houck ordered his transfer to another prison facility. (*Id.* at ¶¶ 139-82.)

**\*2** Second, Plaintiffs claim that Defendants Annucci, Kirkpatrick, Venettozzi, and Kowalowski are responsible for the alleged constitutional violations committed by the other Defendants under a theory of supervisory liability. (*Id.* at ¶ 184.) More specifically, Plaintiffs argue that these Defendants failed to intervene, stop or mitigate the harm caused, failed to properly supervise their subordinates in order to prevent retaliation, failed to remedy the alleged unconstitutional actions despite having notice of such actions, and displayed deliberate indifference to and/or authorized or ratified the unconstitutional retaliatory actions. (*Id.*)

Third, Plaintiffs DeJesus and Emerenciano claim that Defendants Rock and Bell violated their rights under the Due Process Clause of the Fourteenth Amendment. (*Id.* at ¶ 185.) More specifically, Plaintiff DeJesus alleges that Defendant Rock, and Plaintiff Emerenciano alleges that Defendant Bell, conspired with the other Defendants and acted in a biased manner in their capacity as hearing officers by dishonestly suppressing evidence of Plaintiffs' innocence as to the misbehavior charges against them and in finding them guilty of those charges without any evidence to support those findings. (*Id.*)

Fourth, Plaintiffs DeJesus and Emerenciano claim that Defendant Venettozzi violated their rights under the Due Process Clause of the Fourteenth Amendment by upholding, affirming, or modifying the hearing decisions despite having been placed on notice of unconstitutional acts through earlier reports, appeals, and other sources of information. (*Id.* at ¶ 186.)

Fifth, Plaintiff Scott claims that Defendants Holdridge and Crowley violated his right to free speech under the First Amendment and his rights under the Due Process Clause of the Fourteenth Amendment by destroying or ordering the destruction of two letters he received, which were allegedly from *New York Times* reporters. (*Id.* at ¶ 187.)

### B. Parties' Briefing on Defendants' Motion

#### 1. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants assert five arguments. (Dkt. No. 25, Attach. 1, at 5-28 [Defs.'

Mem. of Law].) First, Defendants argue that Plaintiffs' claims against them in their official capacities are barred by the Eleventh Amendment. (*Id.* at 5-6.)

Second, Defendants argue that the supervisory liability claims against Defendants Annucci, Venettozzi, and Kirkpatrick should be dismissed. (*Id.* at 6-13.) More specifically, Defendants argue the following: (a) as to Defendant Annucci, Plaintiffs have failed to plead personal involvement because (i) their allegations are based on a single letter from ILC members (including Plaintiffs) to Annucci in July 2015, (ii) other complaints of allegedly unlawful conduct were made by them after that letter was sent, and they have not alleged that Defendant Annucci was made aware of those other complaints, and (iii) Plaintiff Scott has not alleged that Defendant Annucci knew about the alleged tampering with his mail; (b) as to Defendant Kirkpatrick, his receipt of three letters from Plaintiffs about various acts of allegedly unlawful conduct, and a cursory finding that there was no malfeasance as to one of those letters, do not constitute a basis for personal involvement, and a general awareness that meetings were taking place about inmate concerns also does not constitute personal involvement; and (c) as to Defendant Venettozzi, the act of affirming, modifying, or otherwise reviewing the hearing dispositions against Plaintiffs DeJesus and Emerenciano does not constitute personal involvement in the alleged violations underlying the hearing decision, and Plaintiffs have not alleged that Defendant Venettozzi had any opportunity to realistically intervene in the alleged unconstitutional acts or that he showed deliberate indifference by failing to do so. (*Id.*)

**\*3** Third, Defendants argue that Plaintiff DeJesus' claims should be dismissed. (*Id.* at 13-20.) More specifically, Defendants argue that (a) as to the First Claim, (i) Defendant Dixon's issuance of a misbehavior report is not sufficient to support a claim of retaliation because Plaintiff DeJesus has not alleged facts plausibly suggesting that the report was filed in retaliation for his engaging in constitutionally protected activity, and (ii) the Complaint lacks allegations that Defendant Rock conspired to deprive Plaintiff DeJesus of his constitutional rights, including a lack of allegations related to an agreement or overt act; (b) as to the Second Claim, Plaintiff DeJesus has not made any allegations against Defendant Kowalowski; and (c) as to the Third Claim, Plaintiff DeJesus has not plausibly stated a liberty interest given that he has alleged that he was confined to keeplock for only 60 days under conditions that were not unusually harsh. (*Id.*)

Fourth, Defendants argue that Plaintiff Emerenciano's claims should be dismissed. (*Id.* at 20-23.) More specifically, Defendants argue that (a) as to the First Claim, Plaintiff Emerenciano's allegations of retaliation are conclusory and do not plausibly suggest a causal connection between the alleged protected activity and the alleged adverse action, the misbehavior report and lack of evidence at the related hearing do not plausibly suggest a claim of retaliation, and he has not included any factual allegations about the conditions of his confinement in SHU that would plausibly suggest that those conditions were atypical; (b) as to the Second Claim, Plaintiff Emerenciano does not allege what constitutional harm Defendant Kowalowski had the opportunity to prevent; and (c) as to the Third Claim, Plaintiff Emerenciano's allegations are deficient for the same reasons that the allegations of Plaintiff DeJesus are deficient (as discussed above). (*Id.*)

Fifth, Defendants argue that Plaintiff Scott's claims should be dismissed. (*Id.* at 23-28.) More specifically, Defendants argue that (a) as to the First Claim, Plaintiff Scott has (i) failed to plead that Defendant Holdridge's alleged censorship of his mail was motivated by Plaintiff Scott's engagement in protected activities, (ii) failed to allege that Defendant Crowley was motivated by Plaintiff Scott's engagement in protected activities or that she was even aware of his prior conduct, (iii) failed to allege that Defendant Houck's alleged decision to transfer Plaintiff Scott to a different facility was based in retaliation, and (iv) failed to allege sufficient facts to plausibly suggest that Defendant Gregory's mere threat to write Plaintiff Scott up constitutes an adverse action; and (b) as to the Fifth Claim, (i) mail from members of the media is not privileged and Plaintiff Scott had alternative methods of petitioning for the redress of his grievances including meetings with various officials, (ii) the destruction of two letters is not sufficient to sustain Plaintiff Scott's claim, particularly where (as here) each incident involved different individuals, and (iii) whether Defendants' actions in destroying Plaintiff Scott's mail violated DOCCS policy is not a relevant factor for determining whether those actions violated Plaintiff Scott's rights under Section 1983. (*Id.*)

## 2. Plaintiffs' Opposition Memorandum of Law

Generally, in opposition to Defendants' memorandum of law, Plaintiffs make seven arguments. (Dkt. No. 33, at 13-42 [Pls.' Opp'n Mem. of Law].) First, Plaintiffs argue that they have sufficiently stated claims for First Amendment retaliation. (*Id.* at 15-23.) More specifically, Plaintiffs argue as follows: (a) Plaintiff DeJesus has asserted plausible claims against Defendants Dixon, Rock, and Kirkpatrick because (i) Defendant Dixon's statements in the relevant misbehavior report show a direct improper motivation for that report given that the report would not have been issued in the absence of Plaintiff DeJesus' protected activity of sending a letter outlining unlawful behavior, (ii) Defendant Rock upheld the misbehavior report and essentially found him guilty of writing a complaint letter, and (iii) Defendant Kirkpatrick's office received and opened the same letter underlying the misbehavior report, which, along with Plaintiff DeJesus' involvement in ILC and the fact he was contacting outside agencies with complaints of treatment at the prison, allows a plausible inference that Defendant Kirkpatrick directed or ordered the issuance of the misbehavior report; (b) Plaintiff Emerenciano has asserted plausible claims against Defendants Kowalowski and Bell based on his allegations that Defendant Kowalowski issued a misbehavior report against him in response to his filing a grievance against Defendant Kowalowski, and that Defendant Bell upheld that misbehavior report at the disciplinary hearing in response to Plaintiff Emerenciano's criticism of the new yard policy Defendant Bell had developed, as well based on his allegations that he is a member of the ILC; and (c) Plaintiff Scott has asserted plausible claims against Defendants Holdridge, Crowley, Gregory, and Houck because (i) as to Defendants Holdridge and Crowley, Plaintiff Scott filed a grievance related to Defendant Holdridge's destruction of the first letter, and two incidents of mail destruction permit an inference of retaliation, (ii) as to Defendant Gregory, Plaintiff Scott has plausibly alleged that her threat to file a misbehavior report was intended to curtail his ILC activities and filing of grievances, and (iii) as to Defendant Houck, he has plausibly alleged that he was transferred by Defendant Houck to a different facility to curtail his ILC activities, and that there is a close temporal proximity between the transfer and his previous protected activities. (*Id.*)

**\*4** Second, Plaintiffs argue that they have sufficiently stated claims for supervisory liability against Defendants Annucci, Kirkpatrick, Venettozzi, and Kowalowski. (*Id.* at 23-30.) More specifically, Plaintiffs argue the following: (a) all the supervisory Defendants should be deemed to have knowledge sufficient to impute liability based on the unique circumstances surrounding the 2015 prison escape, which highlighted the systemic and widespread abuses occurring at Clinton Correctional Facility; (b) Defendant Annucci was on notice of the alleged violations based on the July

2015 letter sent to him as well the fact that meetings were occurring with other prison supervisors, and he was aware of a pattern of problematic behavior by his staff but acted with gross negligence or deliberate indifference in failing to investigate or take remedial steps; (c) Defendant Kirkpatrick was aware of the allegations of misconduct following the 2015 escape, ILC meetings about staff misconduct, the July 2015 letter to Defendant Annucci, and news articles about perceived staff misconduct, and was also aware of the alleged conduct because he was the highest level of appeal for prison grievances; (d) Defendant Venettozzi was aware of the alleged violations because he reviewed disciplinary hearings; and (e) Defendant Kowalowski authored the misbehavior report against Plaintiff Emerenciano and was present at the ILC meetings where all the Plaintiffs aired their grievances about staff misconduct. (*Id.*)

Third, Plaintiffs make more specific arguments about how the supervisory Defendants are liable. (*Id.* at 31-35.) More specifically, Plaintiffs argue as follows: (a) Plaintiff DeJesus argues that (i) Defendant Kirkpatrick received letters from Plaintiff DeJesus containing complaints and grievances, and there was a temporal proximity between his receipt of those letters and the issuance of the misbehavior report, and (ii) Defendant Venettozzi did more than just rubber-stamp the hearing outcome on the misbehavior report because he considered two letters of appeal and two other letters from Plaintiff DeJesus' counsel about the retaliatory nature of the hearing, and therefore there is a reasonable inference of deliberate indifference in Defendant Venettozzi's refusal to more adequately review the hearing decision or properly supervise that staff; (b) Plaintiff Emerenciano argues that (i) Defendant Kirkpatrick participated in ILC meetings, was aware of the ILC members and their complaints, and would have been informed as to why an ILC member would be transferred to a different facility, (ii) Defendant Kowalowski directly issued the misbehavior report against Plaintiff Emerenciano in retaliation for ILC activity, and (iii) Defendant Venettozzi was grossly negligent or deliberately indifferent in affirming the hearing decision, and the fact that he modified the hearing penalty shows that he did not merely rubber-stamp that decision; and (c) Plaintiff Scott argues that Defendant Kirkpatrick knew he was a member of the ILC and had received multiple grievances regarding instances of retaliation that were not remedied. (*Id.*)

Fourth, Plaintiffs argue that Plaintiffs DeJesus and Emerenciano have pled a cognizable liberty interest for purposes of a Fourteenth Amendment claim by alleging facts plausibly suggesting that they were subjected to atypical and significant hardships during confinement in keeplock or SHU. (*Id.* at 36-39.) More specifically, they argue that (a) Plaintiff DeJesus was confined in keeplock for 60 days, deprived of property, unable to purchase items from the commissary, use the telephone, or have more than one hourly daily of recreation, lost eligibility for merit time and early merit release parole (which resulted in four extra months in prison), and was removed from his position with ILC, and (b) Plaintiff Emerenciano was confined in a SHU facility for 180 days, deprived of property, was unable to purchase commissary items, use the telephone, or have more than one hour daily of recreation, and was removed from his position with the ILC. (*Id.*) Plaintiffs also argue that they were deprived of their due process right to a finding of guilt supported by reliable evidence. (*Id.*)

Fifth, Plaintiffs DeJesus and Emerenciano argue that Defendant Venettozzi violated their due process rights by affirming the hearing decisions for many of the same reasons they previously discussed in connection with their supervisory liability claims. (*Id.* at 39-40.)

Sixth, Plaintiffs argue that they have alleged facts plausibly suggesting that the relevant Defendants acted with an improper motive in destroying Plaintiff Scott's mail and that he was not provided with due process before it was destroyed. (*Id.* at 40-41.)

**\*5** Seventh, Plaintiffs argue that the Eleventh Amendment does not merit dismissal of the entirety of their claims against Defendants in their official capacities because it does not bar Plaintiffs' claims based on injunctive or declaratory relief. (*Id.* at 41-42.)

### 3. Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiffs' opposition memorandum of law, Defendants assert six arguments. (Dkt. No. 39, at 4-11 [Defs.' Reply Mem. of Law].) First, Defendants argue that the claims against the supervisory Defendants should be dismissed. (*Id.* at 4-6.) More specifically, Defendants argue as follows: (a) as to Defendant Annucci, Plaintiffs' allegations of a general awareness of staff malfeasance and pattern of staff behavior is not sufficient to plausibly suggest that he should have known of the specific acts of wrongdoing alleged here, and broad supervisory authority is not a sufficient basis on which to impose liability; (b) as to Defendant

Kirkpatrick, a general awareness of a "pervasive pattern of staff misconduct" through reviewing inmate grievances is not sufficient, and Plaintiffs have made no allegations of knowledge of similar wrongdoings by the specific Defendants or subordinates in the past; and (c) as to Defendant Venettozzi, Plaintiffs have not pled any facts other than their own suspicions as to retaliatory motive for affirming hearing decisions. (*Id.*)

Second, Defendants argue that the claims against Defendant Dixon should be dismissed because Plaintiff DeJesus has alleged that the misbehavior report was not based entirely on the letter he wrote to officials, but also on an interview of him in which he stated he would "have problems" with certain corrections officers if they attempted to discipline him for any misconduct, and such statements by Plaintiff DeJesus go beyond his right to file grievances. (*Id.* 6-8.)

Third, Defendants argue that the claims against Defendant Rock should be dismissed because Plaintiff DeJesus has not offered any factual allegations supporting a conspiracy or plausibly suggesting that he suppressed evidence or otherwise violated Plaintiff DeJesus' due process rights at the hearing. (*Id.* at 8.)

Fourth, Defendants argue that the claims against Defendant Bell should be dismissed because, as to Plaintiff Emerenciano's retaliation claim, the Complaint fails to allege how Plaintiff Emerenciano was deprived of any liberty interest and fails to allege any procedural defect in the hearing or in having Defendant Bell oversee the hearing at the Upstate Correctional Facility after Plaintiff Emerenciano's transfer. (*Id.* at 8-9.)

Fifth, Defendants argue that the claims against Defendant Kowalowski should be dismissed because the issuance of a misbehavior report is insufficient adverse action to give rise to a retaliation claim in the absence of any allegations of fabrication of his testimony. (*Id.* at 9-10.)

Sixth, and last, Defendants argue that Plaintiff Scott's claim related to destruction of his mail should be dismissed, noting that the Supreme Court case that Plaintiff Scott relies upon to establish due process procedures related to censoring inmate mail has been limited to outgoing correspondences only and thus does not apply here. (*Id.* at 10-11.)

## II. GOVERNING LEGAL STANDARDS

**\*6** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211 nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J.) (adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "*a short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212 n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212 n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212 n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213 n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 560-61, 577. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 555. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*7** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted).

Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [1]

---

[1]   *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at \*1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal

quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

## III. ANALYSIS

### A. Whether Plaintiffs' Claims Against Defendants in Their Official Capacities Are Barred by the Doctrine of Sovereign Immunity

**\*8** After careful consideration, the Court answers this question in the affirmative to the extent Plaintiffs request monetary relief, but in the negative to the extent Plaintiffs request declaratory or injunctive relief.

"[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State [or a State official sued in their official capacity] in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). "Under the doctrine in *Ex Parte Young*, 'a plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers ... in their official capacities, provided his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective.' " *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 618 [2d Cir. 2007]). However, "[a] plaintiff may not use this doctrine to adjudicate the legality of past conduct," meaning there must be some "plausible threat of future violations." *Clark*, 510 F. App'x at 51 (citing *Papasan v. Allain*, 478 U.S. 265, 27-78 [1986] ); *see W. Mohegan Tribe and Nation*, 395 F.3d at 21 (noting that, "in determining whether the *Ex Parte Young* doctrine applies to avoid an Eleventh Amendment bar to suit, 'a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective' "); *see also New York State Corr. Officers & Police Benev. Ass., Inc. v. New York*, 911 F. Supp. 2d 111, 129 (N.D.N.Y. 2012) (D'Agostino, J.) ("[D]eclaratory relief is not permitted under *Ex Parte Young*, when it would serve to declare only past actions in violation of federal law: retroactive declaratory relief cannot be properly characterized as prospective.").

The relevant non-monetary relief requested by Plaintiffs in the Amended Complaint includes (a) a declaration that the alleged acts are in violation of their rights under federal law, (b) injunctive relief ordering the defendants and custodians of records to expunge all entries of the disciplinary hearings and dispositions from Plaintiffs' records, and (c) injunctive relief ordering Defendant Annucci to amend DOCCS Directive 4002 to include affirmative protections for ILC members against retaliatory actions for protected conduct. (Dkt. No. 17, at 31-32 [Pls.' Am. Compl.].)

The Court notes that Defendants have not responded to Plaintiffs' arguments that the requested declaratory and injunctive relief is not barred under the Eleventh Amendment, despite filing a reply memorandum of law in which they responded to other arguments raised in Plaintiffs' opposition memorandum of law. However, even if Defendants had responded in opposition to those arguments, the legal authority and the requests present in Plaintiffs' Amended Complaint indicate that not all of Plaintiffs' bases for relief would be barred by the Eleventh Amendment.

Plaintiffs' first basis for non-monetary relief remains under the purview of the Eleventh Amendment because it does nothing more than ask for a declaration that their rights were violated as the result of past conduct, and is thus not prospective. *See New York State Corr. Officers & Police Benev. Ass., Inc.*, 911 F. Supp. 2d at 129 (finding that claims merited dismissal pursuant to the Eleventh Amendment where plaintiffs sought declaratory relief regarding the state defendants' past conduct). Plaintiffs' other two bases for non-monetary relief, however, appear to have some prospective grounding, particularly the request for injunctive relief related to protections for ILC members from retaliation. Consequently, the Court finds that, to the extent Plaintiffs' claims are premised on those prospective bases for relief, any claims against Defendants in their official capacities are not barred by the Eleventh Amendment. However, any claims against them in their official capacities premised on monetary or retroactive declaratory or injunctive relief must be dismissed pursuant to the proper application of the doctrine of sovereign immunity. Additionally, because Plaintiffs have sued Defendants in their individual capacities as well as their official capacities, the claims against them would also survive on that basis. (Dkt. No. 17, at ¶¶ 9-19 [Pls.' Am. Compl.].)

### B. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Claim for Retaliation Under the First Amendment

**\*9** After careful consideration, the Court answers this question largely in the affirmative for the reasons stated in Plaintiffs' opposition memorandum of law. (Dkt. No. 33, at 15-23 [Pls.' Opp'n Mem. of Law].) To those reasons, the Court adds the following analysis.

To state a prima facie case of First Amendment retaliation, a prisoner must allege that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). "In order to satisfy the causation requirement, allegations must be 'sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354. A number of factors may be considered in determining the existence of a causal connection between a prisoner's protected activity and a prison official's adverse action, including the following: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). With regard to the first factor, "[a] plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 280 (N.D.N.Y. 2018) (Hurd, J.) (citing *Espinal v. Goord*, 558 F.3d 119, 129 [2d Cir. 2001]). Adverse action that is taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003); *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996); *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994).

Plaintiffs have alleged that they engaged in protected activity in the form of filing grievances, writing letters to prison authorities, and participating in ILC activities. (Dkt. No. 17, at ¶ 183 [Pls.' Am. Compl.].) These activities are considered protected activities sufficient to satisfy the first element. *See Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (holding that "retaliation against a prisoner for voicing or filing grievances on behalf of the prison population as a member of

an inmate grievance body, such as the ILC, violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments."); *Davis*, 320 F.3d at 352-53 (noting that filing of prison grievances is a protected activity); *Vega v. Artus*, 610 F. Supp. 2d 185, 206 (N.D.N.Y. 2009) (Suddaby, J.) (recognizing that filing grievances is a constitutionally protected activity); *Wheeler v. Goord*, 03-CV-0787, 2005 WL 2180451, at *9 (N.D.N.Y. Aug. 29, 2005) (Peebles, M.J.) ("[P]laintiff's alleged filing of grievances and writing of letters to prison authorities ... constituted protected activity within the ambit of First Amendment retaliation jurisprudence.").

**\*10** In terms of adverse actions, filing false misbehavior reports that result in punishment and transfer to a different facility have been found sufficient to constitute adverse actions. *See Cabbagestalk v. Hudson*, 15-CV-0167, 2016 WL 5404233, at *4 (N.D.N.Y. Aug. 29, 2016) (Hummel, M.J.) ("[A]n inmate's transfer to a different facility does constitute an adverse action if done in retaliation for the inmate's exercise of his or her rights under the First Amendment.") (citing *Smith v. Levine*, 510 F. App'x 17, 21 [2d Cir. 2013]), *adopted by* 2016 WL 5394734 (N.D.N.Y. Sept. 27, 2016) (Sharpe, J.); *Reed v. Doe No. 1*, 11-CV-0250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (Peebles, M.J.) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *adopted by* 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012) (McAvoy, J.); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (Lowe, M.J., Hurd, J.) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

### 1. Plaintiff DeJesus

In the Amended Complaint, Plaintiff DeJesus alleges that he made complaints and filed grievances (both in his individual capacity and as an ILC representative) in November and December 2015, as well as wrote letters about the illegal actions of various corrections officers to officials and the State Commission of Correction on January 3, 2016. (Dkt. No. 17, at ¶¶ 53-60, 62-64 [Pls.' Am. Compl.].) He additionally alleges that, on January 27, 2016, he was issued a Tier III misbehavior report related to statements made in his January 2016 letter and, as a result, was sentenced on February 12, 2016, to a period in keeplock confinement. (*Id.* at ¶¶ 66-69.)

As indicated earlier, these allegations suffice to plausibly suggest both protected activity and an adverse action.

Turning to the third element of a retaliation claim, Plaintiff DeJesus has alleged facts plausibly suggesting that there was a causal connection between his various complaints and letters and the misbehavior report that resulted in his confinement in keeplock. More specifically, the relatively close temporal proximity between when the January 3, 2016, letter was received by Defendant Kirkpatrick's office on January 19, 2016, and when the misbehavior report was issued supports Plaintiff DeJesus' allegation that the two are related. Plaintiff DeJesus' citation to the wording in the relevant portion of that letter and the content of the misbehavior report plausibly suggest that the relevant Defendants used the content of Plaintiff DeJesus' letter and a subsequent interview of him about those complaints as a basis for the misbehavior report. (Dkt. No. 17, at ¶¶ 64, 66 [Pls.' Am. Compl.].) Given that the quoted wording of Plaintiff DeJesus' letter does not substantiate the specific "threat" identified by the relevant Defendants in the misbehavior report (e.g., it does not state that Plaintiff DeJesus would file a civil action in response to "any attempt to discipline him," but rather only if the corrections officers engaged in illegal activities such as inflicting bodily harm on him, destroying his property, and fabricating contraband in his possession), the Court cannot say that Plaintiff DeJesus has failed to allege facts plausibly suggesting that the relevant Defendants inappropriately used his statements in this letter as a basis to institute a false misbehavior report against him.

Consequently, Defendants' motion to dismiss Plaintiff DeJesus' First Amendment retaliation claim is denied.

### 2. Plaintiff Emerenciano

In the Amended Complaint, Plaintiff Emerenciano alleges that, "in the months following the escape," he filed a grievance against Defendant Kowalowski for a failure to call him out for ILC meetings, and that, on October 2, 2015, he raised concerns about a new yard policy on behalf of prisoners at an ILC meeting. (Dkt. No. 17, at ¶¶ 97-104 [Pls.' Am. Compl.].) He additionally alleges that Defendant Kowalowski issued a false misbehavior report against him on October 5, 2015, for threats of a prison riot that he supposedly made at the ILC meeting of October 2, 2015 (which he alleges he did not make), and that he was sentenced to a period of confinement in SHU as a result. (Id. at ¶¶ 105, 127.) Again, as

indicated earlier, these allegations suffice to plausibly suggest both protected activity and an adverse action.

**\*11** Turning to the third element of a retaliation claim, Plaintiff Emerenciano has alleged facts plausibly suggesting that there was a causal connection between his statements at the ILC meeting raising the concerns of his fellow prisoners about the new yard policy and the misbehavior report filed by Defendant Kowalowski. Based on Plaintiff Emerenciano's allegations, the report was served on him only three days after his statements at the ILC meeting and was directly based on those statements. Additionally, as with Plaintiff DeJesus' allegations, the alleged content of the misbehavior report conflicts with what Plaintiff Emerenciano alleges was the content of his statement, a fact that plausibly suggests that the misbehavior report was based on a false premise. (Id. at ¶¶ 115-17, 121, 124-26.)

Consequently, Defendants' motion to dismiss Plaintiff Emerenciano's First Amendment retaliation claim is denied.

### 3. Plaintiff Scott

In the Amended Complaint, Plaintiff Scott alleges that he contacted the *New York Times* and legal advocacy organizations about the prison conditions, including meeting with an attorney from Prisoners' Legal Services of New York, immediately after which he was informed that a letter sent to him that he believes to have been from a *New York Times* reporter had been destroyed by Defendant Holdridge. (Dkt. No. 17, at ¶¶ 144-48 [Pls.' Am. Compl.].) Plaintiff Scott filed a grievance related to the destruction of this letter in July 2015, met with various representatives in his capacity as a ILC representative in August 2015, and filed other grievances in August 2015 related to price increases on commissary items and seeking reinstatement of the Honor Block. (Id. at ¶¶ 155-62.) He additionally alleges that, on September 4, 2015, a *New York Times* reporter attempted to send him another letter, but that the letter was destroyed by Defendant Crowley. (Id. at ¶¶ 163-66.) Plaintiff Scott also alleges that he and other ILC representatives began to write grievances about a new yard policy in September 2015, but that he was told by Defendant Gregory that "he would be written up for starting a riot because there were so many grievances submitted by inmates upset about the new yard policy." (Id. at ¶¶ 167-70.) Plaintiff Scott alleges that he wrote a letter on September 22, 2015, to Defendants Kirkpatrick and Annucci regarding Defendant Gregory's threat and filed a grievance on September 26, 2015,

about a pat-frisk and an attempt by corrections officers to push him down stairs; he was "abruptly" transferred to a different facility in October 27, 2015. (*Id.* at ¶¶ 173-78.)

Without determining whether Plaintiff Scott's contacts with news media and legal services providers could constitute protected activity, the Court finds that the alleged destruction of both letters allegedly from *New York Times* reporters does not constitute an adverse action. *See Rasheen v. Adner*, 356 F. Supp. 3d 222, 243-44 (N.D.N.Y. 2019) (Hurd, J.) (finding an isolated incident of mail tampering did not constitute an adverse action because plaintiff failed to allege facts plausibly suggesting that he suffered any injury as a result); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (Hurd, J.) (collecting cases in which claims of mail tampering did not constitute an adverse action, noting in particular that the plaintiff had alleged only a single instance of mail interference); *Islam v. Goord*, 05-CV-7502, 2006 WL 2819651, at *7 (S.D.N.Y. Sept. 29, 2006) (finding that isolated incidents of tampering with plaintiff's family and legal mail was not an adverse action because it would not deter an ordinary individual from exercising his constitutional rights and plaintiff failed to allege he suffered any injury as a result of the tampering); *cf. Marino v. Watts*, 12-CV-0801, 2014 WL 1794588, at *6 (N.D.N.Y. May 6, 2014) (Mordue, J.) (noting that, depending on the circumstances, the confiscation of a prisoner's *legal* mail might qualify as an adverse action). The Court notes that Plaintiff Scott has alleged that he believed both of these letters were from reporters with the *New York Times* (and thus not ostensibly legal mail);[2] he has also failed to allege that he suffered any harm as a result of the destruction of the letters. As a result, to the extent Plaintiff Scott bases his First Amendment retaliation claim on the destruction of the two letters, he has not stated a claim upon which relief can be granted.

[2]  *See Mann v. Adams*, 846 F.2d 589, 590-91 (9th Cir. 1988) (holding that mail from the news media is not legal mail); *Carriere v. Shabazz*, 06-CV-2768, 2008 WL 4243003, at *4 (S.D. Tex. Sept. 10, 2008) (discussing media mail under the heading of non-legal mail); *Grigsby v. Horel*, 07-CV-2833, 2008 WL 11422633, at *2 (N.D. Cal. Apr. 28, 2008) ("[M]ail sent to prisoners from ... news media ... falls within the ambit of 'media mail,' not 'legal mail.' "); *see also Williams v. Kobayashi*, 18-CV-0336, 2019 WL 97017, at *7 (D. Haw. Jan. 3, 2019) ("[M]ail to the news media ... is not legal mail."); *Means v. Mizell*, 06-CV-4542, 2006 WL 3544857, at *6-7 (E.D. La. Nov. 13, 2006) (finding that the plaintiff's letter to a television weather reporter seeking help with his pending

legal case was not legal mail); *Watson v. Cain*, 846 F. Supp. 621, 627 n. 3 (N.D. Ill. 1993) (noting that, with regard to a letter to a television station, the Seventh Circuit has held that mail from an inmate to the news media is not entitled to special status).

**\*12**  However, Plaintiff Scott has also alleged that he was "abruptly" transferred to a different facility approximately a month after filing a grievance and writing a letter to Defendants Kirkpatrick and Annucci. Plaintiff Scott therefore has alleged facts plausibly suggesting both protected activity and an adverse action in this respect. Additionally, for the purposes of this motion, the temporal proximity between the protected activity and the alleged adverse action is sufficiently close to raise a reasonable inference that there was a causal connection between the two.

Lastly, despite the above, Plaintiff Scott has not alleged an adverse action in the form of Defendant Gregory's threat to write Plaintiff Scott up if he or other inmates continued to file grievances regarding a new yard policy. (Dkt. No. 17, at ¶¶ 169-71 [Pls.' Am. Compl.].) In particular, Plaintiff Scott does not allege that Defendant Gregory actually followed through on her threat or otherwise took action against him in furtherance of that threat. Rather, he alleges that it was Defendant Houck who effectuated his transfer, and he does not allege that Defendant Houck was aware of Defendant Gregory's threat or the history of ILC advocacy or grievance filing related to that threat, and thus Plaintiff Scott has not alleged any causal connection between Defendant Gregory's threat and his transfer to a different facility. This isolated threat, on its own, without any allegations of retaliatory action connected to it, is not sufficient to plausibly suggest an adverse action. *See Gill v. Tuttle*, 93 F. App'x 301, 303-04 (2d Cir. 2004) (finding that threats to continue to file misbehavior reports against the plaintiff might constitute an adverse action where the defendant had filed similar misbehavior reports in the past that resulted in disciplinary confinement, which raised a reasonable expectation that future reports would lead to additional disciplinary confinement and thus could deter a reasonable inmate); *Keitt v. New York State Dep't of Corrs. and Cmty. Supervision*, 11-CV-0885, 2017 WL 9471826, at *10 (W.D.N.Y. Jan. 4, 2017) (finding that an isolated threat to file a misbehavior report did not constitute an adverse action where the defendant never carried out that threat); *Moore v. Kwan*, 12-CV-4120, 2016 WL 9022575, at *14 (S.D.N.Y. Mar. 30, 2016) (finding that a threat to issue a misbehavior report did not qualify as an adverse action); *Wellington v. Langendorf*, 12-CV-1019, 2013 WL 3753978, at *11 (N.D.N.Y. July 15, 2013) (Scullin, J.) (finding no

adverse action where the defendant made a verbal threat, but did not repeat the threat or take any affirmative action to suggest that she would do anything to act on the threat).

Consequently, Defendants' motion to dismiss Plaintiff Scott's First Amendment retaliation claim is granted to the extent that the claim is based on the alleged destruction of his mail by Defendants Holdridge and Crowley and the alleged threat by Defendant Gregory, but denied to the extent that the claim is based on his alleged transfer to a new facility by Defendant Houck.

### C. Whether Plaintiffs DeJesus and Emerenciano Have Alleged Facts Plausibly Suggesting a Claim for a Violation of the Due Process Clause of the Fourteenth Amendment

After careful consideration, the Court answers this question in the negative as to Plaintiff DeJesus' Third Claim under the Fourteenth Amendment for the reasons stated in Defendants' memoranda of law, but in the affirmative as to Plaintiff Emerenciano's Third Claim under the Fourteenth Amendment for the reasons stated in Plaintiffs' opposition memorandum of law. (Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 33 [Pls.' Opp'n Mem. of Law]; Dkt. No. 39 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

**\*13**  To state a due process claim under 42 U.S.C. § 1983 related to a prisoner's restricted confinement within a prison, the plaintiff must show that (1) he possessed an actual liberty interest, and (2) he was deprived of that interest without being afforded sufficient process. Burroughs, 325 F. Supp. 3d at 275.

### 1. Existence of a Liberty Interest

"Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. To constitute an "atypical and significant hardship," "the conditions imposed upon the inmate must be compared with those imposed upon the rest of the population of the facility as well as those in administrative and protective confinement." Id. at 276. The Court should consider both the duration and the conditions of confinement when assessing the severity of the hardship. Id. Generally, confinements in SHU for a period of up to 101 days under normal conditions will generally

not constitute an atypical hardship, while confinement for a period of more than 305 days has been considered atypical even under normal conditions. Id. The Second Circuit has indicated that "the ultimate issue of atypicality is one of law." Sealey v. Giltner, 187 F.3d 578, 585 (2d Cir. 1999).

Plaintiffs DeJesus and Emerenciano's claims for due process violations are premised on a loss of liberty based on their confinement to keeplock or SHU as a result of the allegedly retaliatory misbehavior reports issued against them. In particular, Plaintiff DeJesus alleges that he was confined in keeplock for 60 days [3] with loss of package, commissary, phone, and recreation privileges (other than one hour of recreation per day), and with deprivation of access to his personal property; he also alleges incidental effects of his confinement in keeplock, including an inability to complete a programming requirement that prevented him from qualifying for an appearance before the parole board (which in turn resulted in him staying in prison for an additional four months), loss of his ILC position, and loss of a preference transfer to a facility closer to his home. (Dkt. No. 17, at ¶¶ 69-71, 76-82 [Pls.' Am. Compl.].) Plaintiff Emerenciano alleges that he was confined in SHU for 150 days [4] with loss of access to phone, package, and commissary privileges; he also alleges incidental effects of his confinement in SHU, including loss of his ILC position and lost wages from his job assignment. (Id. at ¶¶ 130-35.)

| 3 | His imposed punishment had been 90 days, but he received reductions for good behavior. (Dkt. No. 17, at ¶ 76 [Pls.' Am. Compl.].) |
|---|---|
| 4 | His imposed punishment had been 270 days, but this was reduced on appeal to 180 days with 90 days suspended. (Dkt. No. 17, at ¶ 130 [Pls.' Am. Compl.].) |

The allegations of Plaintiff DeJesus do not plausibly suggest conditions imposing an atypical and significant hardship. Plaintiff DeJesus' period of keeplock confinement of 60 days is within the range generally not considered atypical, and he has failed to allege any additional abnormal conditions that would make it so. Rather, the conditions alleged by Plaintiff DeJesus (loss of package, commissary, phone, and recreation privileges, and deprivation of access to his personal property) are for all intents and purposes the normal losses of privileges incident to the confinement of any prisoner in administrative segregation. [5]  Notably, a review of the decisions in this Circuit indicate that such normal loss of privileges is not, by itself, sufficient to constitute atypical conditions. See Sealey, 197 F.3d at 589 (finding that a 101-day confinement in SHU

with conditions such as confinement to his cell for 23 hours per day with only one hour for recreation, a limitation to three showers per week, loss of various privileges, more noise than the general population cells, and a few incidents in which other inmates threw feces at him did not meet the required duration and conditions to meet the standard for atypicality); *Spence v. Senkowski*, 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (McCurn, J.) (finding that the 180 days that plaintiff spent in SHU, where he was subjected to numerous conditions of confinement that were more restrictive than those in the general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y. 1996) (Smith, M.J.) (involving 180 days in SHU under numerous conditions of confinement that were more restrictive than those in general population).

5    The Second Circuit has noted that, according to regulations for SHU, normal conditions of confinement include (a) solitary confinement in a cell for 23 hours per day, (b) one hour of exercise in the prison yard per day, (c) a limitation to two showers per week, (d) denial of various privileges available to the general population such as work and out-of-cell schooling, (e) limited visitors, and (f) limited number of books. *Palmer v. Richards*, 364 F.3d 60, 65 n.3 (2d Cir. 2004) (quoting N.Y. Comp. Codes R. & Regs. Title 7, §§ 304.1-.14, 305.1-.6 [2003]).

**\*14** The Court is not convinced by Plaintiff DeJesus' argument that the ramifications of his confinement in administrative segregation (including loss of ILC positions, loss of eligibility for early merit release, and loss of preference transfers) are conditions of confinement for the purposes of this liberty interest analysis. The Court notes in particular that Plaintiff DeJesus has not cited any legal authority in which a court has so considered such facts. (Dkt. No. 33, at 36-38 [Pls.' Opp'n Mem. of Law].)

Although this is a motion to dismiss and Plaintiffs therefore have not yet had the opportunity to present evidence of the conditions of their confinement, the Court finds that Plaintiff DeJesus' complete failure to allege any conditions of confinement beyond the norm for keeplock or SHU confinement, coupled with the fact that his confinement was for 60 days, merits a finding that he has not alleged facts plausibly suggesting a liberty interest to support his due process claim. *See Cole v. New York State DOCCS*, 14-CV-0539, 2016 WL 5394752, at *19 (N.D.N.Y. Aug. 25,

2016) (Peebles, M.J.) (noting that, under the guidance of the Second Circuit, "when the duration of restrictive confinement is less than 101 days, proof of 'conditions more onerous than usual' is required"), *adopted by* 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (Sannes, J.).

Defendant Emerenciano's claim is somewhat different in that, although he also alleged facts suggesting normal SHU conditions, his term of confinement of 150 days is in the intermediate range between what the Second Circuit and other courts have found to be either acceptable or not acceptable with normal conditions. Because of the extended nature of the period of confinement, the Court finds that a closer consideration of the conditions of confinement and the circumstances is warranted to determine whether even the mostly normal conditions alleged would be considered to impose an atypical and significant hardship. Therefore, the Court declines to dismiss Plaintiff Emerenciano's due process claim on the basis of the existence of a liberty interest at this stage.

For the above reasons, Defendants' motion to dismiss Plaintiffs' Third Claim is granted as to Plaintiff DeJesus, but denied as to Plaintiff Emerenciano.

### 2. Deprivation of a Liberty Interest

"An inmate also has a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report," which requires that there must be "some evidence" to support the sanction imposed in that hearing; this standard is "extremely tolerant and is satisfied if there is any evidence in the record that supports the disciplinary ruling." *Diaz*, 2010 WL 1133074, at *6. Having established that Plaintiff Emerenciano has alleged facts plausibly suggesting that he possesses a liberty interest, the Court must also assess whether he has alleged facts plausibly suggesting that the misbehavior report and subsequent hearing deprived him of that liberty interest.

Plaintiff Emerenciano alleges, in relevant part, that (a) Defendant Bell presided over his hearing on the misbehavior charges despite being the promulgator of the policy Plaintiff Emerenciano was challenging at the ILC meeting that led to misbehavior report, (b) it was irregular for Defendant Bell, a member of the staff at Clinton Correctional Facility, to preside over a hearing at Upstate Correctional Facility (to which Plaintiff Emerenciano had been transferred), (c)

Plaintiff Emerenciano and five witnesses testified on his behalf in a way that contradicted the misbehavior report, (d) Defendant Bell refused to allow anyone to question Sergeant Hutti or Defendant Kowalowski as to why Defendant Kowalowski failed to immediately alert staff if he believed Defendant Emerenciano's statements constituted threats of an impending prisoner riot, and (e) Defendant Kowalowski did not provide any testimony indicating that Plaintiff Emerenciano's statements were actually threatening. (Dkt. No. 17, at ¶¶ 108, 110-26, [Pls.' Am. Compl.].)

**\*15** Based on these allegations, the Court finds that Plaintiff Emerenciano has alleged facts plausibly suggesting that there was not the minimum amount of evidence required to support the disciplinary ruling against him. Consequently, Defendants' motion to dismiss Plaintiff Emerenciano's Third Claim for a violation of the Fourteenth Amendment due process claim against Defendant Bell is denied.

Because Plaintiffs DeJesus and Emerenciano's Fourth Claim under the Fourteenth Amendment is asserted against Defendant Venettozzi for his actions in supervising the Defendants who conducted the misbehavior report disciplinary hearings, it is discussed below in Part III.E. of this Decision and Order.

### D. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Claim for Violation of Plaintiff Scott's Free Speech Rights Under the First Amendment and/or Deprivation of Property Under the Fourteenth Amendment

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 25, Attach. 1, at 24-28 [Defs.' Mem. of Law]; Dkt. No. 39, at 10-11 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

Prisoners have a limited right to send and receive mail, and legal mail is entitled to greater protection than nonlegal mail. *Wesolowski v. Washburn*, 615 F. Supp. 2d 126, 129 (W.D.N.Y. 2009) (citing *Johnson v. Goord*, 445 F.3d 532, 534 [2d Cir. 2006]; *Davis v. Goord*, 320 F.3d 346, 351 [2d Cir. 2003]). "[I]n order to establish a First Amendment claim for interference with incoming, non-legal mail, an inmate must show a pattern and practice of interference that is not justified by any legitimate penological concern." *Williams v. Lane*, 13-CV-0965, 2016 WL 4275738, at \*2 (N.D.N.Y. Aug. 15, 2016) (Sannes, J.). Interference with incoming and non-legal mail can generally be justified by a general security interest.

*Cancel v. Goord*, 00-CV-2042, 2001 WL 303713, at \*5-6 (S.D.N.Y. Mar. 29, 2001) (citing *Davidson v. Scully*, 694 F.2d 50, 53 [2d Cir. 1982]).

The Court finds that Plaintiff Scott has not alleged facts plausibly suggesting a First Amendment claim based on free speech rights. The Amended Complaint acknowledges that (a) the incoming letters that Plaintiff Scott alleges were destroyed by the relevant Defendants were from a *New York Times* reporter, and he has made no allegations to even suggest (much less plausibly) that these letters were legal mail, (b) there were only two instances of interference with his mail, and (c) the facility's stated reason for destruction of the first letter was based on security concerns. (Dkt. No. 17, at ¶¶ 148, 151, 156, 163 [Pls.' Am. Compl.].) Generally, two isolated instances of mail tampering do not plausibly suggest a pattern or practice of interference. *See Williams*, 2016 WL 4275738, at \*2 (adopting the magistrate judge's findings that *three* alleged incidents of interference with nonlegal mail were insufficient to establish a pattern or practice) (emphasis added); *Cancel*, 2001 WL 303713, at \*6 (finding that a single instance of withholding incoming non-legal mail did not establish a pattern or practice of interference, as well as that two instances of opening incoming *legal* mail did not indicate ongoing activity) (emphasis added). Additionally, Plaintiff Scott's own allegations admit that prison officials provided a legitimate penological concern in the form of a general security interest to support the destruction of at least the first letter; and, given that the second letter is alleged to have come from the same or similar source, the Court cannot say that, in the absence of any contrary allegations, that reason would not apply also to the second letter.

**\*16** Plaintiff Scott also claims that the destruction of his mail violated his due process rights under the Fourteenth Amendment. In particular, Plaintiff argues that *Procunier v. Martinez*, 416 U.S. 396 (1974), imposes certain procedures, including appropriate notice, a reasonable opportunity to challenge the determination, and an ultimate determination by a disinterested party, before a prisoner's mail can be censored. (Dkt. No. 33, at 40-41 [Pls.' Opp'n Mem. of Law].) However, as Defendants argue, *Procunier* was limited to regulations concerning outgoing correspondences by the Supreme Court in *Thornburgh v. Abbott*, 490 U.S. 401 (1989), which found that incoming mail was instead subject to a standard of whether the regulations are reasonably related to legitimate penological interests. *Thornburgh*, 490 U.S. at 404-14. As has already been discussed, Plaintiff Scott has acknowledged through his allegations that the relevant Defendants explicitly

cited security concerns related to the destruction of the first letter, and Plaintiff Scott otherwise offers no factual allegations plausibly suggesting that Defendants' destruction of mail from a reporter was not neutral (i.e., that other inmates were permitted to receive such correspondence). *See Thornburgh*, 490 U.S. at 415 (noting that, where distinctions are drawn between different incoming publications based on their potential security implications, such action is neutral). Consequently, Plaintiff Scott's reliance on *Procunier* is misplaced.

Additionally, neither a negligent nor intentional deprivation of a prisoner's property can be the basis of a constitutional claim if there are sufficient post-deprivation remedies to address the claim. *Burroughs*, 325 F. Supp. 3d at 275 (dismissing Fourteenth Amendment claim related to property loss for failure to state a claim because plaintiff had not alleged that adequate post-deprivation remedies to recover the value of his property were unavailable); *accord, Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996). Here, Plaintiff Scott has not alleged that he lacked any post-deprivation remedy; rather, he acknowledges that he was able to (and did) file a grievance related to the destruction of the first letter. Plaintiff Scott therefore has not alleged facts plausibly suggesting a procedural due process violation.

To the extent Plaintiff Scott asserts a substantive due process claim based on a liberty interest, "to establish a violation of a prisoner's right to the "free flow of incoming and outgoing mail," he must show that "prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Rasheen*, 356 F. Supp. 3d at 234 (quoting *Davis v. Goord*, 320 F.3d 346, 351 [2d Cir. 2003]). This argument must fail for the same reasons as his First Amendment free speech claim failed in that two instances of mail tampering, one of which was explicitly based on security concerns, do not constitute a regular and unjustified interference with his mail, and the mail in question was not legal mail, but less-protected nonlegal mail.

Lastly, to the extent that Plaintiff Scott argues that Defendants' destruction of his mail violated a DOCCS directive, "a Section 1983 claim brought in federal court is not the appropriate forum to state violations of prison regulations." *Rasheen*, 356 F. Supp. 3d at 236; *see also Doe v. Conn. Dep't. of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990); *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985).

For all of the above reasons, Plaintiff Scott's Fifth Claim under the First and/or Fourteenth Amendments is dismissed.

### E. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting the Supervisory Liability of Defendants Annucci, Kirkpatrick, and Venettozzi [6]

[6]    The Court notes that, although Plaintiffs also asserted this claim against Defendant Kowalowski, it is not apparent that Defendant Kowalowski acted in a supervisory capacity. Rather, Plaintiff Emerenciano's allegations against Defendant Kowalowski involve Defendant Kowalowski's own actions in filing a misbehavior report against him without any reference to the involvement of subordinate officers. (Dkt. No. 17, at ¶¶ 95-105 [Pls.' Am. Compl.].) The fact that Defendant Kowalowski supervised the ILC (a group comprised of elected prisoners) does not plausibly suggest he was acting as a supervisor for the purposes of supervisory liability.

*\*17 After careful consideration, the Court answers this question in the negative as to Defendants Annucci and Kirkpatrick for the reasons stated in Defendants' memoranda of law, but in the affirmative as to Defendant Venettozzi for the reasons stated in Plaintiffs' opposition memorandum of law. (Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 33 [Pls.' Opp'n Mem. of Law]; Dkt. No. 39 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"[I]n order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Rasheen*, 356 F. Supp. 3d at 233 (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 [2d Cir. 2013]). Where the defendants are supervisory officials, "a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 325 [1981]; *Richardson v. Goord*, 347 F.3d 431, 435 [2d Cir. 2003]).

The Second Circuit has previously indicated that supervisory defendants may be considered personally involved only if they "(1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused

the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring." *Rasheen,* 356 F. Supp. 3d at 233 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 [2d Cir. 1995]). "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone,* 770 F.3d 97, 116 (2d Cir. 2014).

The Supreme Court's decision in *Iqbal* has raised the question of whether all of the *Colon* factors continue to be viable. *Montanez v. City of Syracuse,* 16-CV-0550, 2019 WL 315058, at *17 (N.D.N.Y. Jan. 23, 2019) (Sannes, J.). Neither the Second Circuit nor the Supreme Court have made any findings on this issue. Courts within the Second Circuit have taken various approaches post-*Iqbal,* from finding that only the first and third factors remain viable, to continuing to apply all factors in the absence of Second Circuit guidance, to considering the specific constitutional provision underlying the claim and applying all the *Colon* factors to claims that rely on a standard of unreasonable conduct or deliberate indifference but declining to apply all of them where the claim requires instead a showing of discriminatory intent. *See Montanez,* 2019 WL 315058, at *17-18 (collecting cases) (adopting the specific constitutional provision approach and applying all the *Colon* factors to the plaintiff's Fourteenth Amendment claims because they did not require a showing of discriminatory intent); *Carpenter v. Apple,* 15-CV-1269, 2017 WL 3887908, at *9-10 (N.D.N.Y. Sept. 5, 2017) (Suddaby, C.J.) (noting that the majority of district courts have continued to apply all of the *Colon* factors "where the constitutional violation at issue does not require a showing of discriminatory intent" and adopting that majority approach); *Marom v. City of New York,* 2016 WL 916424, at *15 (S.D.N.Y. 2016) (reasoning that *Iqbal* supported the specific constitutional provision approach, and finding that all the *Colon* factors might be viable for false arrest and excessive force claims that were based on a reasonableness standard, but that the second, fourth, and fifth factors would not apply to a First Amendment retaliation claim because such claim contains an intent requirement).

**\*18** The Court agrees with the specific constitutional provision approach discussed above because it is the most consistent with the guidance provided in *Iqbal. See Iqbal,* 556 U.S. at 676 (noting that, "[t]he factors [related to whether a government official's individual actions violated the Constitution] necessary to establish a *Bivens* violation will

vary with the constitutional provision at issue," discussing that the First and Fifth Amendments require that the official acted with a discriminatory purpose, and rejecting the argument that supervisors should be held liable on such claims merely because they knew of a subordinate's discriminatory purpose). The Court will therefore consider all of the *Colon* factors as to Plaintiffs' claims under the Fourteenth Amendment, but will only apply the first and third factors as to Plaintiffs' claims under the First Amendment.

Additionally, the Court is not persuaded that it must follow the direction of cases cited by Plaintiffs in which claims against supervisory personnel were allowed to proceed based on the circumstances following the well-publicized June 2015 prison escape at Clinton Correctional Facility. In particular, U.S. District Judge Mae A. D'Agostino of this District noted in *Coleman v. Cuomo* that the decision to allow those claims to proceed was based not only on the circumstances following the escape, but also on "the allegations and documentary evidence showing potential widespread abuses and similar conduct" within Clinton Correctional Facility. *Coleman v. Cuomo,* 18-CV-0390, 2019 WL 257933, at *4 (N.D.N.Y. Jan. 18, 2019) (D'Agostino, J.). Also notable is the fact that much of the alleged conduct in *Coleman* occurred just days after the prison escape on June 6, 2015, while the events giving rise to the claims in this action occurred in July 2015 or later months. Additionally, *Alexander v. Cuomo* is distinguishable from this case because, in addition to the circumstances of the prison escape, the plaintiff in that case had included factual allegations plausibly suggesting that dozens of other inmates had reported experiences similar to those alleged by the plaintiff, and a report of September 4, 2015, documented similar experiences. *Alexander v. Cuomo,* 17-CV-0309, 2018 WL 2041576 (N.D.N.Y. Feb. 26, 2018) (Sannes, J.). By contrast, Plaintiffs in this case have made general allegations that (1) prisoners made complaints of staff misconduct, (2) a letter was submitted by the ILC in July 2015 related to assaults on prisoners, destruction of property, elimination of incentive programs, restriction of telephone use, destruction of grievances, and financial impropriety, (3) a meeting was held to discuss that letter, and (4) the *New York Times* and local newspapers reported staff abuse. (Dkt. No. 17, at ¶¶ 33-34, 39-44 [Pls.' Am. Compl.].)

Other than Plaintiff Scott's allegations that his mail was destroyed, none of these alleged complaints involve conduct similar to what Plaintiffs reports experiencing (i.e., the retaliatory imposition of keeplock or SHU detainment and transfer to different facilities for filing grievances or acting

in the capacity as an ILC representative). The only allegation specifically related to such similar conduct is Plaintiffs' allegation that the number of ILC members in attendance at meetings fell from 11 on June 3, 2015, to three in April 2016, because, "upon information and belief," Defendants and other DOCCS staff had issued "unwarranted misbehavior reports, unscheduled transfers, and other retaliatory actions" against ILC representatives. (*Id.* at ¶¶ 46-47.) The Court finds that such allegations do not, as a whole, constitute a sufficient basis on which to reasonably infer that Defendants Annucci, Kirkpatrick, and Venettozzi had the requisite knowledge of the abuses relevant to this action by simply virtue of the circumstances surrounding the June 2015 prison escape. The Court will of course consider the totality of the alleged factual circumstances in making its determination, including the environment created in the aftermath of the prison escape; but it declines to afford those circumstances the nearly determinative weight that Plaintiffs appear to be requesting. (Dkt. No. 33, at 25-26 [Pls.' Opp'n Mem. of Law].)

### 1. First Amendment Retaliation Claims

**\*19** As discussed above, because a retaliation claim under the First Amendment requires a showing of discriminatory intent, supervisory liability will be imposed only if Plaintiffs have alleged in the Amended Complaint that the officials either (a) directly participated in the alleged constitutional violation, or (b) created, or allowed to continue, a policy or custom under which the violation occurred. As a result, Plaintiffs' arguments related to gross negligence and deliberate indifference are rejected.

In the Amended Complaint, Plaintiffs allege that their Second Claim is based on Defendants Annucci, Kirkpatrick, and Venetozzi's actions in "failing to intervene, stop, and/or mitigate the harm suffered by [Plaintiffs] and properly supervise the ILC to prevent inmates in general and [Plaintiffs] from being retaliated against for utilizing the grievance process and for actions taken while serving as an ILC representative, and failing to otherwise remedy such wrongs despite having been placed on notice of such practices, wrongs, and unconstitutional acts and violation by earlier reports, appeals, and other sources of information." (Dkt. No. 17, at ¶ 184 [Pls.' Am. Compl.].)

As to creating or allowing a policy or custom, Plaintiffs have not alleged facts plausibly suggesting any policy or custom of punishing ILC members for filing grievances or otherwise

advocating for prisoners. Plaintiffs allege that the number of ILC members present at ILC meetings dropped from 11 on June 3, 2015, to only three at a meeting in April 2016; and they allege that, "upon information and belief," this decrease was the result of retaliatory actions against ILC members. (Dkt. No. 17, at ¶¶ 46-48 [Pls.' Am. Compl.].) However, even accepting the allegation related to the reduction in numbers as true, as the Court must on a motion to dismiss, Plaintiffs have not asserted any factual allegations to support their bare assertion made on information and belief that this reduction was the product of retaliation for those members' ILC activities (apart from the allegations related to the alleged constitutional violations committed specifically against them as Plaintiffs, which are based on more than just their status as ILC members).

Plaintiff assert generally that eleven ILC members authored a letter to Defendant Annucci on July 12, 2015, in which they (a) requested a meeting outside the presence of employees of Clinton Correctional Facility, and (b) stated concerns about assaults on prisoners, destruction of prisoner property, elimination of incentive programs, the restriction of telephones, destruction of grievances, and financial impropriety with the Inmate Benefit Fund. (Dkt. No. 17, at ¶¶ 36-40 [Pls.' Am. Compl.].) This letter resulted in meetings between ILC members, a New York Assemblyman, the Executive Director of Prisoners' Legal Services, and the Correctional Association of New York; Plaintiffs do not allege that Defendant Annucci participated in these meetings. (*Id.* at ¶¶ 40-41.) Plaintiff DeJesus alleges that he sent a letter to Defendant Kirkpatrick on January 4, 2016, regarding retaliatory actions by two corrections officers (not involved in this action) including verbal harassment, threats of harm and placement in solitary confinement, and theft of prisoners' food for grievances that had been filed in response to their actions in prohibiting the inmates from playing dominoes, as well as a letter of January 3, 2016, to the State Commission of Corrections related to retaliation for those same grievances, which also ended up being sent to Defendant Kirkpatrick. (*Id.* at ¶¶ 58-59, 63-65 [Pls.' Am. Compl.].) Plaintiff Emerenciano alleges that he reported malfeasance by corrections staff in the July 2015 letter and raised issues about staff assaults and abuse of authority in various meetings, filed a grievance on his own behalf against Defendant Kowalowski when he was not called out for ILC meetings on multiple occasions, and opposed a yard policy requiring inmates to sit on the ground for thirty minutes; he alleges that these actions resulted in both his transfer to another facility and a misbehavior report. (*Id.* at ¶¶ 87-93, 100-05.) He also alleges that his appeal of

the punishment resulting from the misbehavior report was made to Defendant Venettozzi. (*Id.* at ¶¶ 129-30.) Plaintiff Scott alleges that he reported malfeasance by corrections staff in the July 2015 letter, contacted the *New York Times* about staff assaults on prisoners in the wake of the prison escape, sent letters to legal advocacy organizations, met with an attorney from Prisoners' Legal Services of New York, filed grievances related to the destruction of his mail, the increase in the price of commissary items without putting the matter to the ILC, seeking reinstatement of the Honor Block to the prison, and the use of excessive force, and wrote a letter to Defendants Kirkpatrick and Annucci on September 22, 2015, regarding a threat of retaliation against him if he filed grievances related to a new yard policy; he alleges that he was abruptly transferred to another facility in retaliation for these actions. (*Id.* at ¶¶ 142-45, 155-62, 167-76.)

**\*20** As to Defendant Annucci, the only alleged involvement is that (a) he was the recipient of the July 2015 letter sent by the ILC members and he was aware of both this letter and the resulting meetings (though he did not attend those meetings), (b) he was the recipient of a letter from Plaintiff Scott about being threatened with retaliation over the filing of grievances, and (c) he was the recipient of a letter from Plaintiffs' counsel on or around March 20, 2016, regarding "much of the retaliation described in the complaint." As already discussed above, the July 2015 letter is not alleged to discuss conduct of the same or similar nature as is generally alleged in the Amended Complaint and, as a result, does not plausibly suggest that Defendant Annucci was aware of the alleged policy or custom of retaliation against inmates for ILC involvement. The March 2016 letter alleged to have been sent by Plaintiffs' counsel also does not plausibly suggest that Defendant Annucci was aware of any such policy or custom because Plaintiffs' allegation that the letter discussed "much of the retaliation described in the complaint" is too vague to describe what information about specific incidents that letter supposedly relayed. The remaining letter from Defendant Scott allegedly described one incident of a threat made against Defendant Scott, which does not plausibly suggest a widespread policy or custom. The Court notes that, as a general matter, "the mere receipt of letters protesting unconstitutional conduct is insufficient to allege personal involvement." *Long v. Crowley*, 09-CV-0456, 2010 WL 5129102, at \*1 (W.D.N.Y. Dec. 10, 2010); *see Chambers v. Wright*, 05-CV-9915, 2007 WL 4462181, at \*3 (S.D.N.Y. Dec. 19, 2007) (finding that a supervisor's receipt and denial of a grievance was insufficient to establish personal involvement). Additionally, Plaintiffs do not allege

that Defendant Annucci actually read these letters or made any attempt to investigate them. *See Bennett v. Columbe*, 16-CV-0653, 2017 WL 6049238, at \*4 (N.D.N.Y. Oct. 17, 2017) (Hummel, M.J.) (finding personal involvement had not been adequately pled where the plaintiff did not allege that the letters were sent to the proper address by appropriate means, that the defendant received the letters and read them, or that he personally took action to investigate the letters), *adopted by* 2017 WL 606904 (N.D.N.Y. Dec. 6, 2017) (Sannes, J.). Consequently, the Court finds that Plaintiffs have failed to allege facts plausibly suggesting that Defendant Annucci was personally involved in any First Amendment violation based on direct involvement or allowance of a policy or custom.

As to Defendant Kirkpatrick, Plaintiffs variously allege that they sent him letters outlining incidents of retaliation, that he responded that there was "no evidence of staff malfeasance" as to a grievance about a prohibition of domino games, and that he was present at ILC meetings in which certain issues about physical and verbal abuse by corrections officers were raised. The Court notes that the majority of Plaintiffs' arguments as to why Defendant Kirkpatrick should be held liable revolve around gross negligence or deliberate indifference, which the Court has already found is insufficient to establish supervisory liability on this claim post-*Iqbal*.

Nor have Plaintiffs alleged facts plausibly suggesting that Defendant Kirkpatrick's actions constitute allowance of the continuation of a policy or custom merely based on his alleged awareness of reports of certain alleged incidents of retaliation or abuse. Notably, some of the letters allegedly sent to Defendant Kirkpatrick involve grievances over general abuse or perceived mistreatment, but not specifically complaining that those incidents were in retaliation for protected conduct, and the few instances of reports of retaliatory conduct (a letter from Plaintiff Scott on September 22, 2015, about threats of retaliation by Defendant Gregory and letters from Plaintiff DeJesus from or received January 4 and 19, 2016, related to various acts of retaliation by two corrections officers against prisoners related to grievances over the prohibition of dominos games) are not so pervasive as to plausibly suggest a policy or custom specifically of retaliation for pursuing grievances. After all, the question here is not whether there was a policy or custom of unconstitutional conduct in Clinton Correctional Facility as a general matter, but specifically a policy or custom of retaliation for engaging in protected activity both as individuals and ILC representatives. Plaintiffs' Amended Complaint simply has not alleged facts plausibly suggesting that there was a policy or custom of such

retaliation, much less that Defendant Kirkpatrick knew of it and allowed it to continue.

Lastly, the Court cannot say that Plaintiffs' allegation that Defendant Kirkpatrick read a letter reporting retaliation in combination with the allegation that Plaintiff DeJesus was issued a misbehavior report approximately eight days later plausibly suggests that Defendant Kirkpatrick was personally involved in the issuance of that misbehavior report (which Plaintiff DeJesus alleges was issued by Defendant Dixon), particularly given the fact that Plaintiff DeJesus acknowledges that the misbehavior report was not based solely on the letter but also on his alleged comments during an interview on the date the misbehavior report was issued; Plaintiff DeJesus does not allege that Defendant Kirkpatrick participated in this interview or was even aware of it. (Dkt. No. 17, at ¶¶ 65-66 [Pls.' Am. Compl.].) Consequently, the Court does not find that Plaintiffs have alleged facts plausibly suggesting that Defendant Kirkpatrick was personally involved in the alleged violations.

**\*21** As to Defendant Venettozzi, Plaintiffs DeJesus and Emerenciano allege that Defendant Venettozzi was personally involved in the allegedly unconstitutional disciplinary actions against them because he was responsible for reviewing the appeals from those actions and he affirmed the hearing decisions. This Court has previously found that there is personal involvement (at least for the purposes of a motion to dismiss) "where a supervisory official affirms an allegedly constitutionally infirm hearing decision." *King v. McIntyer*, 11-CV-1457, 2014 WL 689028, at \*10 (N.D.N.Y. Feb. 20, 2014) (Dancks, M.J., Hurd, J.) (collecting cases); *accord Bennett v. Fischer*, 09-CV-1236, 2010 WL 5525368, at \*11-12 (N.D.N.Y. Aug. 17, 2010) (Peebles, M.J.), *adopted by* 2011 WL 13826 (N.D.N.Y. Jan. 4, 2011). Because Plaintiffs DeJesus and Emerenciano specifically allege that Defendant Venettozzi reviewed and upheld the decisions on their misbehavior report hearings, he has sufficiently alleged that Defendant Venettozzi was personally involved in those violations in light of the fact that Plaintiff DeJesus alleges that Defendant Venettozzi eventually reversed the decision on that incident and expunged it from his record, and Plaintiff Emerenciano alleges that Defendant Venettozzi assessed the hearing decision in a thorough enough manner that he found a basis to modify the sanction imposed from 270 days to 180 days in SHU; such allegations plausibly suggest for the purposes of this motion to dismiss that Defendant Venettozzi did more than merely "rubber-stamp" the hearing decision and thus was directly involved in

the alleged violation. (Dkt. No. 17, at ¶¶ 127-30 [Pls.' Am. Compl.].) *See also Ward v. Lee*, 16-CV-1224, 2018 WL 4610682, at \*11 (N.D.N.Y. July 3, 2018) (Hummel, M.J.) (granting motion to dismiss claim of supervisory liability where the supervisory defendant's affirmance of the disciplinary hearing decision was a "mere rubber stamp" on that decision) *adopted by* 2018 WL 3574872 (N.D.N.Y. July 25, 2018) (Scullin, J.); *Barnes v. Fischer*, 13-CV-0164, 2018 WL 5660414, at \*20 (N.D.N.Y. Mar. 16, 2018) (Stewart, M.J.) (noting that affirmance of a disciplinary hearing decision constitutes personal involvement turns on whether "the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results"), *adopted by* 2018 WL 4660380 (N.D.N.Y. Sept. 28, 2018) (Sharpe, J.).

For all of the above reasons, [7] the Court grants Defendants' motion to dismiss Plaintiffs' Second Claim against Defendant Annucci and Defendant Kirkpatrick, but denies Defendants' motion to dismiss Plaintiffs' Second Claim against Defendant Venettozzi as to Plaintiffs DeJesus and Emerenciano's First Amendment claims.

| | |
|---|---|
| [7] | To the extent Plaintiff Scott intended to assert supervisory claims against Defendants Annucci and Kirkpatrick (as suggested by a single paragraph of the Amended Complaint), such claims must be dismissed based on Plaintiff Scott's failure to assert factual allegations as to the nature of any involvement by either of those Defendants related to Defendant Scott's incoming mail, and his failure to assert any factual allegations of a policy or custom of withholding and/or destroying incoming mail from journalists. (Dkt. No. 17, at ¶¶ 139-82 [Pls.' Am. Compl.].) |

### 2. Fourteenth Amendment Claims

Because Plaintiffs DeJesus and Scott's separate Fourteenth Amendment due process claims have already been found to warrant dismissal, the Court need only consider whether Defendant Venettozzi was personally involved in the alleged violations of Plaintiff Emerenciano's Fourteenth Amendment due process rights. [8]

| | |
|---|---|
| [8] | The Court finds that any claims of supervisory liability based on the Fourteenth Amendment claims asserted against Defendants Annucci and Kirkpatrick must be dismissed because (a) the Court has already dismissed all Fourteenth Amendment claims other than Plaintiff |

Emerenciano's against Defendant Bell and thus no supervisory liability can attach as to those dismissed claims, (b) Plaintiffs' Second Claim appears to address supervisory liability only as to the retaliation allegations even though it also cited the Fourteenth Amendment, and (c) there are no factual allegations expressly against Defendants Annucci or Kirkpatrick related to any of the Plaintiffs' Fourteenth Amendment claims (e.g., that they were aware of Plaintiffs' confinement in keeplock/SHU or the hearings that resulted in that confinement, or the tampering with Plaintiff Scott's mail).

Plaintiff Emerenciano's claim of supervisory liability is sufficiently pled for his Fourteenth Amendment claim for the same reasons as discussed above for the First Amendment claim because it relies on the same conduct, namely Defendant Venettozzi's modification of the hearing decision. Consequently, the Court denies Defendants' motion to dismiss the Second Claim against Defendant Venettozzi as to Plaintiff Emerenciano's remaining Fourteenth Amendment claim against Defendant Venettozzi.

### F. Whether Plaintiffs Have Alleged Facts Plausibly Suggesting a Claim for Conspiracy Under 42 U.S.C. § 1983

**\*22** After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law]; Dkt. No. 39 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"A conspiracy claim under Section 1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 235 (N.D.N.Y. 2019) (Hurd, J.) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324-25 [2d Cir. 2002]). "[V]ague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed." *Rasheen*, 356 F. Supp. 3d at 236.

The Court agrees with Defendants that Plaintiffs have not alleged any facts plausibly suggesting that there was any agreement between Defendants Rock and Bell and any other Defendant to violate Plaintiffs DeJesus or Emerenciano's constitutional rights. Rather, the Amended Complaint alleges only that these Defendants conspired "with the other Clinton defendants" in their role as hearing officers to violate Plaintiffs' due process rights. (Dkt. No. 17, at ¶ 185 [Pls.' Am. Compl.].) Nor can the Court find any other factual allegations

that plausibly suggest an actual agreement between any of the Defendants related to the relevant conduct.

Consequently, Plaintiffs have not alleged facts plausibly suggesting a claim of conspiracy and this claim must be dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 25) is **GRANTED in part** and **DENIED in part** as described above in this Decision and Order; and it is further

**ORDERED** that the following claims are **DISMISSED**:

(a) Plaintiff Scott's First Claim under the First Amendment to the extent it is asserted against Defendants Holdridge, Crowley, and Gregory;

(b) Plaintiff DeJesus' Third and Fourth Claims under the Fourteenth Amendment;

(c) Plaintiff Scott's Fifth Claim under the First and/or Fourteenth Amendment; and

(d) Plaintiffs' Second Claims of supervisory liability against Defendants Annucci and Kirkpatrick; and it is further

**ORDERED** that the following claims **SURVIVE** this motion to dismiss:

(a) Plaintiffs' First Claim under the First Amendment as asserted by Plaintiffs DeJesus and Emerenciano against all relevant Defendants, and as asserted by Plaintiff Scott to the extent it is asserted against Defendant Houck based on his alleged transfer of Plaintiff;

(b) Plaintiff Emerenciano's Third Claim under the Fourteenth Amendment against Defendant Bell;

(c) Plaintiff Emerenciano's Fourth Claim under the Fourteenth Amendment against Defendant Venettozzi; and

(d) Plaintiffs' Second Claim of supervisory liability against Defendant Venettozzi; and it is further

**ORDERED** that Defendants Annucci, Kirkpatrick, Holdridge, Crowley, and Gregory are **DISMISSED** from this action.

**All Citations**

Slip Copy, 2019 WL 4602240

---

**End of Document**                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 857528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard AUSTIN, Plaintiff,
v.
Brian PAPPAS, John Does, Yonkers
Police Commissioner Charles C. Coles,
Westchester County, Defendants.

No. 04-CV-7263 (KMK)(LMS).
|
March 31, 2008.

**Attorneys and Law Firms**

Mr. Richard Austin, Stormville, NY, pro se.

Rory Carleton McCormick, Esq., Corporation Counsel, City of Yonkers, Yonkers, NY, for Defendants.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1** Richard Austin ("Plaintiff") filed this suit pursuant to 42 U.S.C. § 1983 ("Section 1983") against Yonkers Police Officer Brian Pappas ("Defendant Pappas"), several John Doe Yonkers Police Officers ("John Doe Defendants"), former Yonkers Police Commissioner Charles C. Cola ("Defendant Cola") (whose name is misspelled in Plaintiff's Complaint as Charles C. Coles), and Westchester County (collectively, "Defendants"), alleging violations of Plaintiff's civil rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, along with various supplemental state law claims.[1] (Compl.¶¶ 17, 19.) Plaintiff alleged that these violations occurred when Defendants failed to protect Plaintiff from Franklyn Kelley, a private individual who physically attacked Plaintiff during the course of Plaintiff's May 16, 2003 arrest. (*Id.* ¶ 10.) Plaintiff alleged that Defendant Pappas and the John Doe Defendants handcuffed him and pinned him to the ground while Franklyn Kelley repeatedly kicked and punched Plaintiff in the face. (*Id.* ("The officers did nothing to protect the plaintiff from this vicious assault, even though plaintiff was helpless and in their custody [.]").) Defendants moved for summary judgment, and this Motion was referred by Judge McMahon to Chief

Magistrate Judge Lisa M. Smith for review pursuant to 28 U.S.C. § 636(b)(1). On August 2, 2007, Magistrate Judge Smith issued a thorough Report and Recommendation ("R & R"), concluding that this Court should grant Defendants' Motion for Summary Judgment on the ground that Plaintiff has failed to demonstrate that there exists a genuine issue of material fact as to whether his constitutional rights were violated. Plaintiff was advised of his right to file objections to the R & R, but he did not do so.

[1]    On August 8, 2005, Plaintiff's claim against Westchester County was dismissed by the Honorable Gerald E. Lynch, to whom this case was initially assigned. On February 28, 2006, the case was transferred to White Plains and reassigned to Judge Colleen McMahon. The case was reassigned to the undersigned on August 6, 2007.

A district court reviewing a report and recommendation " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Donahue v. Global Home Loans & Fin., Inc.,* No. 05-CV-8362, 2007 WL 831816, at \*1 (S.D.N.Y. Mar. 15, 2007) (quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, parties may submit objections to a magistrate judge's report and recommendation. The objections must be "specific" and "written", and must be made "within 10 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).

Where a party does not submit an objection, " 'a district court need only satisfy itself that there is no clear error on the face of the record.' " *Donahue,* 2007 WL 831816, at \*1 (quoting *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985)). In addition, a party's failure to object waives that party's right to challenge the report and recommendation on appeal. *See Fed. Deposit Ins. Corp. v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995) ("Our rule is that 'failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.' " (quoting *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989))).

**\*2** Here, Plaintiff has not filed objections to the R & R. Accordingly, the Court has reviewed the R & R for clear error only. In so doing, the Court adopts the conclusion reached in the R & R that Defendants' Motion for Summary Judgment should be granted, but the Court does so in part on different grounds than those relied on in the R & R.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    1

2008 WL 857528

First, the Court agrees with Magistrate Judge Smith that Defendants' noncompliance with Local Civil Rule 56.2 should be overlooked because any prejudice resulting from noncompliance was cured by the following: (i) Magistrate Judge Smith advised Plaintiff of the nature of summary judgment during a March 23, 2007 conference; and (ii) Magistrate Judge Smith annexed a Rule 56.2 notice to the R & R, a document to which Plaintiff was free to file objections. See Narumanchi v. Foster, No. 02-CV-6553, 2006 WL 2844184, at *2 (E.D.N.Y. Sept. 29, 2006) (refusing to deny defendant's motion for summary judgment based on failure of defendant to comply with Local Civil Rule 56.2 because "[a]ny prejudice to pro se plaintiffs [was] cured" by court's actions).

As expressed in the R & R, though Plaintiff did not file any opposition to Defendants' Motion for Summary Judgment, Defendants were still required to meet their burden of demonstrating to the Court that "no material issue of fact remains for trial." See Amaker v. Foley, 274 F.3d 677, 681 (2d Cir.2001). The Court finds no clear error in Magistrate Judge Smith's determination that Defendants satisfied this burden.

With respect to Defendants Pappas and Cola, the Court finds that Plaintiff has failed to offer any evidence demonstrating that they were personally involved in the alleged violation of Plaintiff's constitutional rights. The " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir.2004) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

'(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ...

by failing to act on information indicating that unconstitutional acts were occurring.'

Id. at 127 (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)); accord Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir.2003); Schiller v. City of New York, No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); Fair v. Weiburg, No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986); see also Fair, 2006 WL 2801999, at *4 (citing Bass ).

*3 In support of their Motion for Summary Judgment, Defendants submitted evidence that Defendant Pappas did not directly participate in the arrest of Plaintiff, but he instead arrested Plaintiff's accomplice. For example, on April 8, 2004, at a hearing before the Honorable Richard A. Molea of the Westchester County Court, Defendant Pappas testified that he remained with Plaintiff's accomplice while other officers arrested Plaintiff. (Defs.' Affirmation in Supp., Ex. J, 50-51.) Further, in response to interrogatories served on him by Plaintiff, Defendant Pappas stated that he "did not observe what transpired during the course of plaintiff's arrest." (Id., Ex. L.) Finally, Defendants offer a police report indicating that "Pappas was detaining [Plaintiff's accomplice] in the garage area, as additional units arrived and placed [Plaintiff] into custody." (Id., Ex. C.)

Plaintiff has failed to offer any evidence refuting Defendant Pappas' version of events. In other words, Plaintiff has offered no evidence demonstrating that Defendant Pappas was actually one of the officers who arrested him and allegedly pinned him to the ground while Kelley assaulted him. In fact, during his deposition testimony, Plaintiff admitted that he was not sure whether Defendant Pappas was one of the police officers who arrested him, and that the reason Defendant Pappas was named as a defendant in the present suit was because Plaintiff had seen his name on Plaintiff's felony complaint. (Id., Ex. G, 32-35.) As such, the unrefuted evidence before the Court demonstrates that Defendant Pappas was not one of the officers directly involved in Plaintiff's arrest. Plaintiff therefore has failed to satisfy a prerequisite to liability under Section 1983-namely that Defendant Pappas had personal involvement in the alleged violation of Plaintiff's constitutional rights.

2008 WL 857528

*See Back,* 365 F.3d at 122. Thus, Plaintiff's claim against Defendant Pappas must be dismissed.

Plaintiff alleged that Defendant Cola, Yonkers Police Commissioner at the time of Plaintiff's 2003 arrest, violated Plaintiff's constitutional rights by "authoriz[ing], tolerat[ing], as institutionalized practices, and ratif[ying] the misconduct [of Defendant Pappas and John Doe Defendants]." (Compl.¶ 14.) More specifically, Plaintiff charges Defendant Cola with failure to properly: (1) discipline subordinate officers; (2) take adequate precautions in hiring subordinate officers; (3) report criminal acts by police personnel to the Westchester County District Attorney; and (4) establish a system for dealing with complaints about police misconduct. (*Id.*) Plaintiff does not assert that Defendant Cola directly participated in the violation of his constitutional rights; instead, Plaintiff urges the Court to find Defendant Cola liable under Section 1983 based on his role as supervisor of Defendant Pappas and the John Doe Defendants.

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut,* 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.; Fair,* 2006 WL 2801999, at *4.

**\*4** Plaintiff has failed to provide the Court with any evidence from which a reasonable jury could conclude that Defendant Cola was personally involved in the alleged violation of Plaintiff's constitutional rights. Plaintiff has offered no evidence demonstrating that Defendant Cola was aware of and failed to remedy constitutional violations by subordinate officers, or that he acted in a grossly negligent or deliberately indifferent manner in supervising or training subordinate officers. There is also no evidence in the record to support a theory that Defendant Cola created a policy or custom that fostered and led to the alleged violation of Plaintiff's rights. *See Hayut,* 352 F.3d at 754 (finding as fatal to plaintiff's Section 1983 claim the fact that there existed "no evidence that, after becoming aware of the alleged harassment, any of the [supervisory officials] failed to respond or remedy the situation, that any of these [supervisory officials] created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the alleged harasser's] conduct"); *Harris v. City of New York,* No. 01-CV-6927, 2003 WL

554745, at *6 (S.D.N.Y. Feb. 26, 2003) ("[P]laintiff has put forth no evidence pointing to defendant ['s] personal involvement in plaintiff's alleged deprivation of rights .... Plaintiff's conclusory allegations regarding defendant['s] alleged supervisory role, without more, cannot withstand summary judgment."). Further, nothing in the record, even drawing all inferences in Plaintiff's favor, suggests any tangible connection between Defendant Cola's training or supervision of subordinate officers and the alleged violation of Plaintiff's rights. In fact, the record contains no evidence with regard to Defendant Cola whatsoever. Without such evidence, no reasonable jury could conclude that Defendant Cola had personal involvement in the alleged violation of Plaintiff's constitutional rights, which means that Plaintiff has failed to satisfy a prerequisite to Section 1983 liability, and therefore that Defendant Cola is entitled to summary judgment in his favor. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) ("After an opportunity for discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

In sum, the Court finds that Plaintiff has failed to establish the personal involvement of Defendants Pappas and Cola in the alleged violation of his rights. For reasons set forth more fully in the R & R, the Court also dismisses the Complaint as to the John Doe Defendants because Plaintiff's time limit to amend the Complaint in order to substitute in named defendants has lapsed. Therefore, the Court finds it unnecessary to reach the question of whether Plaintiff has adequately established an underlying violation of his constitutional rights. Finally, having determined that no cognizable federal claims exist, the Court will follow Magistrate Judge Smith's recommendation in declining to exercise jurisdiction over the state law claims.

**\*5** Accordingly, it is hereby:

ORDERED that the Report and Recommendation dated August 2, 2007, is ADOPTED on the grounds set forth in this Order; and it is further

ORDERED that Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to terminate Defendant's Motion (Dkt. No. 28), and to close this case.

SO ORDERED.

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 159 of 187

2008 WL 857528

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 857528

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 6033421
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dewitt MCGRIFF, Plaintiff,

v.

Superintendent KEYSER; Hearing Officer
Polizzi; Director of Shu Vennetozzi, in
their official and individual capacities, and
Investigator Stephen Keyser, Defendants.

17-cv-7307 (NSR)
|
Signed 11/13/2019

**Attorneys and Law Firms**

DeWitt McGriff, Fallsburg, NY, pro se.

Daphna Frankel, New York State Office of the Attorney
General, New York, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Dewitt McGriff ("Plaintiff" or "McGriff"),
proceeding *pro se*, commenced the instant action on
September 22, 2017. (*See* Complaint, ECF No. 2; Amended
Complaint ("AC"), ECF No. 32.) In this action, Plaintiff
alleges claims pursuant to 42 U.S.C. § 1983 sounding
in the First, Eighth, and Fourteenth Amendments to the United
States Constitution against Defendants Superintendent
Keyser, Hearing Officer Polizzi, Director of SHU Venetozzi,
and Investigator Stephen Keyser (together, "Defendants").
Specifically, Plaintiff alleges that Defendants denied him
due process in relation to an administrative hearing, violated
his First Amendment right to petition the courts, violated
his Fourteenth Amendment right to equal protection, and
subjected him to cruel and unusual punishment in violation
of his Eighth Amendment rights.

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and
12(b)(6), Defendants have moved to dismiss the Amended
Complaint. (*See* ECF No. 54.) For the following reasons,
Defendants' motion to dismiss is GRANTED in part and
DENIED in part.

**BACKGROUND**

**I. Factual Allegations**
The following facts are derived from the Amended Complaint
and are taken as true and constructed in the light most
favorable to *pro se* Plaintiff for the purposes of this motion.

**a. Misbehavior Report**
Plaintiff is an inmate at the Sullivan Correctional Facility.
(AC ¶ 3.) On October 17, 2015, Defendant Inv. Keyser
("Inv. Keyser") wrote a misbehavior report that alleged that
three individuals—Plaintiff, another inmate named Aramas
("Inmate Aramas"), and Inmate Aramas's wife—conspired
to bring drugs into the facility. (*Id.* ¶ 8.) As a result, at
approximately 10:05 a.m. that same day, Plaintiff was placed
in a Special Housing cell ("SHU"). (*Id.* ¶ 9.)

While Plaintiff was in the SHU, Inv. Keyser visited him to
question him about whether he brought drugs into the prison
and stated that they "had plaintiff on a phone making moves
to get drugs in the prison" and "we got the drugs and the
girl and we know you are behind it." (*Id.* ¶ 10.) Though
Plaintiff denied any knowledge of or participation in the drug
smuggling, Plaintiff nevertheless was charged two days later
with "soliciting to smuggle contraband, abuse of telephone
privileges, visiting procedure violations and conspiring." (*Id.*
¶¶ 11–12.)

**b. Administrative Hearing and Sentence**
Subsequently, Plaintiff participated in a Tier III hearing before
Hearing Officer Polizzi ("HO Polizzi"). (*Id.* ¶¶ 5, 13.) At
the hearing, Inv. Keyser failed to produce the two pieces of
evidence that he had relied upon in Plaintiff's misbehavior
report. (*Id.* ¶ 4.) First, while Inv. Keyser testified that Plaintiff
used "coded language" on the phone call to attempt to
purchase and smuggle drugs, Inv. Keyser did not identify
such language while a recording of the call was played at
the hearing. (*Id.* ¶¶ 15–16.) Plaintiff instead testified that
the voices heard on the recording were not his. (*Id.* ¶ 17.)
This testimony went undisputed by both Inv. Keyser and HO
Polizzi. (*Id.*)

**\*2** Second, Inv. Keyser stated that a woman arrested in
the same matter, Inmate Aramas's wife, had implicated the
Plaintiff, however, Inv. Keyser did not supply any signed
statements from her, nor did he read the statements she
allegedly made into the record. (*Id.* ¶ 18.) Instead, the

investigator who had arrested Inmate Aramas's wife testified that Inmate Aramas's wife stated that she did not know Plaintiff and that she had not made any incriminating statements against him. (*Id.* ¶ 19.) Additionally, Plaintiff's assistant at the hearing interviewed both Inmate Aramas and his wife and confirmed that they denied Plaintiff's involvement in the alleged event. (*Id.* ¶ 20.)

During the hearings, both Inv. Keyser and HO Polizzi initially indicated that there was no confidential informant ("CI") involved in the matter. (*Id.* ¶¶ 21–22.) This changed on or about the thirty-fifth day of Plaintiff's Tier III hearing, when HO Polizzi announced that there was a CI. (*Id.* ¶ 24.) At no point did HO Polizzi indicate that he or Inv. Keyser had interviewed the CI to determine the reliability of the testimony. (*Id.* ¶¶ 25–26.) HO Polizzi stated that: (1) Inv. Keyser made him aware of the CI at the start of the hearing; (2) Defendant Keyser had testified during a separate, confidential interview; (3) Plaintiff would not be allowed to know the contents of the "in camera" testimony; and (4) Plaintiff would not be allowed to know the testimony of the CI or submit questions to the CI. (*Id.* ¶ 24.) The record does not include any other evidence of a CI: The witness interview notice did not mention the CI's alleged testimony and did not list the CI as a witness who was requested by Plaintiff and denied by HO Polizzi. (*Id.* ¶ 27.) [1]

[1]  Defendants suggest that Plaintiff has "confuse[d] the taking of 'confidential testimony' from the Investigator [that] was taken at the hearing with the proposition that a confidential informant testified." (Defs. Mem. at 7.) Nevertheless, the Court must take Plaintiff's allegation that HO Polizzi "announced that in fact there was a CI" as true. (*See* AC ¶ 24.)

Plaintiff was found guilty of the misbehavior charges and sentenced to forty-five days of keeplock confinement and loss of privileges. (*Id.* ¶ 33.)

### c. Plaintiff's SHU Placement
While the Tier III proceedings were ongoing, Plaintiff spent thirty-eight days in the SHU. (*Id.* ¶ 41.) While in the SHU, Plaintiff was visited by Defendant Superintendent Keyser ("Sup. Keyser") and informed him about his concerns regarding the investigation, conditions of the SHU, and his administrative hearing. (*Id.* ¶¶ 42–47.) Sup. Keyser stated he would look into the investigation and the conduct of hearing. (*Id.* ¶ 48.) Moreover, Plaintiff informed Sup. Keyser of poor conditions in the SHU, including food that was

contaminated with hair and construction-related debris, as well as disturbances caused by loud construction noises, for which inmates were not provided any earplugs. (*Id.* ¶¶ 49–53.) As a result of the construction noises, Plaintiff could not pray, review or prepare for his hearing, study, or sleep. (*Id.* ¶ 53.) Lastly, Plaintiff informed Sup. Keyser that he was concerned about his ability to defend himself at the hearing because: (1) HO Polizzi was not adhering to proper procedure; (2) Plaintiff was unaware of any reliable evidence against him; and (3) Plaintiff could only receive law materials if an officer delivered them, and Plaintiff felt misled regarding the existence of a CI. (*Id.* ¶ 54.) Despite his promises to do so, Sup. Keyser did not follow up with Plaintiff regarding his complaints. (*Id.* ¶¶ 56–58.)

### d. Plaintiff's Administrative Appeal
Plaintiff filed an administrative appeal and received an affirmation of the disposition from Defendant Venettozzi, the Director of the Special Housing Unit ("SHU Dir. Venettozzi"), who was responsible for reviewing administrative appeals and correcting any violations. (*Id.* ¶¶ 34–35.) There is no record of SHU Dir. Venettozzi requesting any documents other than those submitted by Plaintiff, and there is no indication that SHU Dir. Venettozzi meaningfully reviewed Plaintiff's appeal. (*Id.* ¶¶ 36–39.) Instead, SHU Dir. Venettozzi merely "rubber stamped" the denial of the appeal. (*Id.* ¶ 39.)

**\*3**  In total, Plaintiff served approximately eighty-three days confined in the SHU and keeplock even though he was only sentenced to forty-five days. (*Id.* ¶ 59.) Plaintiff spent thirty-eight days in the SHU prior to the disposition of his misbehavior report appeal, which was not credited towards the keeplock punishment period of forty-five days. (*Id.* ¶ 61.) During his confinement, Plaintiff was prohibited from utilizing the law library, gathering evidence, and laying the foundation for appeal. (*Id.* ¶ 67.)

Plaintiff's alleged co-conspirator, Inmate Aramas, also filed an Article 78 petition. (*Id.*) Instead of litigating the petition, as they had in Plaintiff's case, Defendants conceded the petition and Inmate Aramas's misbehavior report was expunged and his privileges restored. (*Id.* ¶¶ 68–69.) HO Polizzi and Inv. Keyser informed Inmate Aramas of the CI on the third day of his hearing. (*Id.* ¶¶ 71.)

### II. Procedural History

Prior to the commencement of this suit, Plaintiff filed petition in state court pursuant to N.Y. C.P.L.R. Article 78 to review SHU Dir. Venettozzi's determination that Plaintiff was guilty of the misbehavior charges. On January 26, 2017, the New York State Appellate Division, Third Department ruled in Plaintiff's favor. The Appellate Division annulled the determination that Plaintiff was guilty of smuggling and conspiring to introduce drugs into the correctional facility and ordered SHU Dir. Venettozzi to expunge all references to those charges from Plaintiff's institutional record. *See McGriff v. Venettozzi*, 146 A.D.3d 1269 (3rd Dep't 2017).

Specifically, the Appellate Division found that the determination regarding smuggling and conspiring to introduce drugs into the facility was "not supported by substantial evidence," because:

The tape-recorded conversation that was read into the record during the hearing is replete with inaudible portions rendering it impossible to ascertain if ... petitioner was a participant in the smuggling plan....

[T]he investigator who authored the misbehavior report did not identify the coded language allegedly used during the telephone conversation that led him to believe that petitioner was involved in such a plan....

The confidential information considered by the Hearing Officer in camera—which only calls the accuracy of the conversation read into the record at the hearing into further doubt—does not remedy these deficiencies. Thus, the determination must be partially annulled.

*McGriff*, 146 A.D.3d at 1269–70.

**LEGAL STANDARD**

**I. 12(b)(6)**

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable. *Iqbal*, 556 U.S. at 678. To assess the sufficiency of a complaint, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir.

2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678–79.

*Pro se* complaints are to be liberally construed. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). They must be held to less stringent standards than complaints written by lawyers, and only dismissed when the plaintiff can prove "no set of facts in support of his claim which would entitle him to relief." *Estelle*, 429 U.S at 106 (quoting *Conley v. Gibson*, 335 U.S. 41, 45–46 (1957)). This "is particularly so when the *pro se* plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). *Pro se* complaints must be interpreted as raising the strongest claims they suggest, but "must still state a plausible claim for relief." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013).

**II. 42 U.S.C. § 1983 Claims**

**\*4** Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under § 1983, a plaintiff must allege two essential elements: "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).

**DISCUSSION**

**I. Due Process**

Plaintiff contends that he was not afforded proper process before he was placed in SHU and keeplock confinement in violation of his Fourteenth Amendment due process rights. Defendants maintain that Plaintiff has failed to adequately state a claim for due process violations. For the following

reasons, this Court finds that Plaintiff has sufficiently pleaded some, but not all, of his due process claims.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To state a procedural due process claim, Plaintiff must show "(1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

### a. Liberty Interest

Regarding the first prong, a prisoner's liberty interest may be implicated by SHU or keeplock confinement "only if the discipline imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). To determine whether the plaintiff endured an "atypical and significant hardship," courts consider "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" as well as the duration of the segregated confinement. *Davis*, 576 F.3d at 133. Although the Second Circuit has declined to establish bright-line rules in this area, it has explicitly noted that "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions" or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004).

Here, the confinement periods were relatively short: 38 days of SHU confinement during the disciplinary hearing process, and 45 days of keeplock confinement that was subsequently imposed as Plaintiff's sentence. Aside from the duration of confinement, Plaintiff alleges several "harmful conditions encountered in SHU": "unhygienic," "dirty" food served with hair and construction-related debris, as well as "horrendous concussive 'booming' sounds" resulting from construction work. (AC ¶¶ 49–53.) While the corrections "officers, construction workers, and civilians in the area were offered earplugs," the inmates were not. (*Id.* ¶ 52.) As a result of the loud disturbances, Plaintiff could not pray, review or prepare for his hearing, study, or sleep. (*Id.* ¶ 53.) Apart from the allegations regarding conditions in the SHU, the Amended Complaint is bereft of any facts describing the conditions of the keeplock confinement. Plaintiff references the "loss of

[his] privileges" (AC ¶ 33) and asserts the "deprivation of liberty and amenity, and physical torture and emotional injury due to the time ... confined in ... keep-lock" (AC at 14), but nothing more.

**\*5** The Second Circuit, "[i]n the absence of a detailed factual record, [has] affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than [ ] 30 days ... and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65–66. The two periods of confinement in the instant case exceed 30 days each. Furthermore, *pro se* Plaintiff's complaints regarding food contamination and "concussive" noises could plausibly be construed as an atypical and significant hardship. At the motion to dismiss stage, and absent further development of the factual record, this is sufficient to allege an implicated liberty interest with respect to the SHU confinement. *See, e.g.*, *Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir. 1997) ("[W]e have indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement.") (citing cases). It does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim" regarding SHU confinement. *Estelle*, 429 U.S. at 106 (quoting *Conley*, 335 U.S. at 45–46).[2]

[2]   Defendants cite several cases in which confinements of a similar, relatively brief duration were found not to implicate a liberty interest—but these cases were decided at the summary judgment stage, rather than on motions to dismiss. (*See* Defs. Mem. at 5–6; Defs. Reply Mem. at 2.)

Even applying these liberal standards, however, the court finds Plaintiff has failed to establish a liberty interest implicated by his keeplock confinement. Plaintiff has not alleged any facts that could, even generously construed, rise to an atypical and significant deprivation. The "loss" of unspecified "privileges" and "deprivation of liberty and amenity, and physical torture and emotional injury" amount to mere conclusory statements. *See Colon v. Annucci*, 344 F. Supp. 3d 612, 634 (S.D.N.Y. 2018) (dismissing due process claim where "Plaintiff also does not allege any facts suggesting that he was exposed to any conditions of confinement more harsh than typical keeplock; indeed, he cites only the loss of unspecified privileges.").

Accordingly, Plaintiff's due process claim is dismissed without prejudice as to the keeplock confinement. In light of Plaintiff's *pro se* status, Plaintiff is granted leave to

amend his Amended Complaint to allege facts regarding the conditions of his keeplock confinement. Because Plaintiff has properly pleaded a liberty interest with respect to the SHU confinement, the Court next considers whether Plaintiff was afforded constitutionally sufficient process.

### b. Constitutionally Sufficient Process

"Once an inmate demonstrates a liberty interest in avoiding segregated confinement, he or she must also show that assignment to such confinement occurred without due process of law." *Hamilton v. Deputy Waren,* No. 15-CV-4031 (KBF), 2016 WL 6068196, at *7 (S.D.N.Y. Oct. 13, 2016). What process is due, however, depends on the type and purpose of segregation—the procedural protections that must be afforded when the confinement is for "disciplinary" reasons are distinct from those required when the confinement serves "administrative" purposes. *Id.; see also Wheeler-Whichard v. Roach,* 468 Fed. App'x 28, 30 (2d Cir. 2012) (summ. order) (outlining the distinct procedural due process standards for disciplinary versus administrative segregation). Plaintiff's confinement in the SHU, during which his Tier III hearing was conducted, was administrative in nature. *See, e.g., Proctor,* 846 F.3d at 609 ("Ad[ministrative] Seg[regation] is appropriate when necessary to ... 'complet[e] ... an investigation into misconduct charges.' ") (quoting *Hewitt v. Helms,* 459 U.S. 474, 476 (1983)); *El-Shabazz v. Wangenstein,* No. 92 CIV. 7291 (LBS), 1995 WL 489686, at *5 (S.D.N.Y. Aug. 15, 1995) (placing plaintiff in administrative segregation pending a hearing on misconduct charges was "a reasonable response to concerns for institutional order and security"); *see also* 7 N.Y.C.R.R. § 270.3 (describing tiers of disciplinary hearings); 7 N.Y.C.R.R. § 301.4 (describing administrative segregation prior to Tier III hearing "result[ing] from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility").[3]

[3]    Plaintiff argues that the misconduct investigation was completed before he was placed in the SHU, which therefore renders his placement punitive in nature. (*See* AC ¶¶ 64, 67). However, there is no indication that Defendants intended to punish Plaintiff, rather, it was reasonable for Defendants to isolate Plaintiff after he was implicated in a conspiracy to smuggle drugs into the correctional facility. *See, e.g., Taylor v. Comm'r of New York City Dep't of Corr.,* 317 F. App'x 80, 82 (2d Cir. 2009) (where there was no evidence demonstrating the defendants intended to punish plaintiff, administrative

segregation found "not excessive in relation to the purpose of maintaining safety").

Additionally, Plaintiff contends that "Once a report is filed, and an inmate is confined due to that report, the confinement time must count toward any disposition of guilt and the sanctions that may be imposed." (AC ¶ 65). The Court has not found any support for that proposition. "New York law does not require pre-hearing administrative time served to be credited to a disciplinary sentence." *Nowlin v. Selsky,* 91 CIV. 2716 (JFK), 1992 WL 196782, at *3 (SDNY Aug. 5, 1992); *see also Mastropietro v. New York State Dep't of Corr.,* 52 A.D.3d 1125, 1126, 862 N.Y.S.2d 131, 132 (3d Dep't 2008) ("[T]here is no authority for petitioner's assertion that he should have received credit toward his administrative penalty for time spent in confinement before the hearing.") (citations omitted); 7 N.Y.C.R.R. § 251-5.1(a) (addressing timeliness of hearing following an inmate's initial confinement).

**\*6** "Administrative Segregation is not punitive, and thus is governed by less restrictive procedural protections than those required under *Wolff.*" *Colon v. Annucci,* 344 F. Supp. 3d 612, 636–37 (S.D.N.Y. 2018). Assignment to administrative segregation requires only "some notice of the charges against [the inmate] and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir. 2001) (internal quotation marks omitted) (quoting *Hewitt,* 459 U.S. at 476). Once the inmate has had the opportunity to present his views, "prison officials need only conduct 'an informal, nonadversary evidentiary review' of whether the confinement is justified." *Proctor,* 846 F.3d at 609 (quoting *Hewitt,* 459 U.S. at 476). "Their final Ad[ministrative] Seg[regation] decision may 'turn[ ] largely on purely subjective evaluations and on predictions of future behavior.' " *Id.* (quoting *Hewitt,* 459 U.S. at 474). Nevertheless, the Second Circuit has found that federal law requires "some evidence" to support an administrative custody designation that is "reliable." *Taylor,* 238 F.3d at 194; *see also Pusepa v. Annucci,* No. 17-CV-1765 (RA), 2019 WL 690678, at *10 (S.D.N.Y. Feb. 19, 2019) (requiring "some reliable evidence" to support administrative segregation and observing "[i]n the context of assessing confidential informant testimony, *Taylor* held that an 'independent credibility assessment' is required to ensure the evidence is reliable.").

The Amended Complaint states that "On October 17, 2015, defendant Inv. Keyser wrote a misbehavior report alleging that McGriff, Inmate Aramas and inmate Aramas' wife, had

conspired to introduce drugs into the Sullivan Correctional Facility," and that "McGriff was removed from general population and placed in a Special Housing cell (SHU) at approximately 10:05am." (*See* AC ¶¶ 9–10). Plaintiff acknowledges that, two days after being placed in the SHU, he received a written copy of the misbehavior report that outlined the charged against him. (*See id.* ¶ 12). Plaintiff also describes being given the opportunity to present his views to Inv. Keyser, who authored the misbehavior report. (*See id.* ¶¶ 10–11). Thus, it appears Plaintiff received notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation in satisfaction of the first of *Taylor*'s minimum requirements.

The events that transpired during the Tier III hearing that followed, however, call into question whether Inv. Keyser's preliminary evidentiary review was based on "some evidence" that was "reliable." Plaintiff asserts that "[n]one of the evidence claimed to exist by Inv. Keyser was ever produced at the hearing": "the voices heard on the phone recording were not McGriff's, no witness or co-conspirator pointed to his involvement," and "at no time did the HO [Polizzi] state that Inv. Keyser had determined the reliability of the [confidential informant.]" (AC ¶¶ 23, 26, 28–29). For this reason, the Court declines to dismiss Plaintiff's due process claim at this early stage. [4]

[4]    Plaintiff raises collateral estoppel and res judicata claims based on the New York State Appellate Division, Third Department's Article 78 ruling issued in 2017. *See McGriff v. Venettozzi*, 146 A.D.3d 1269 (3rd Dep't 2017). As discussed *supra*, the Appellate Division found that the determination regarding smuggling and conspiring to introduce drugs into the facility was "not supported by substantial evidence." *McGriff*, 146 A.D.3d at 1269–70. Collateral estoppel, or issue preclusion, bars the re-litigation of issues that were "clearly raised in a prior action or proceeding and decided against that party ..., whether or not the tribunals or causes of action are the same." *Town of Ramapo, New York v. Town of Clarkstown*, No. 16 Civ. 2004 (NSR), 2017 WL 782500, at * 6 (S.D.N.Y. Feb. 27, 2017) (quoting *Leather v. Eyck*, 180 F.3d 420, 425 (2d Cir. 1999)). Collateral Estoppel under New York law is applicable upon a showing of two factors: "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair

opportunity to contest the prior determination." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455 (N.Y. 1985).

In the instant case, Defendants are correct that the litigation regarding the Article 78 proceeding determined only the narrow issue of whether there was "substantial evidence" to support his disciplinary sentence, and did not decide whether Plaintiff's rights under federal law were violated. *McGriff*, 146 A.D.3d at 1269–70. Consequently, this Court is not prepared to find that the identical issue was necessarily decided by the New York Appellate Division. *See Kaufman*, 65 N.Y.2d at 455; *Colon v. Coughlin*, 58 F.3d 865, 871 (2d Cir. 1995) (applying the requirements of issue preclusion strictly). Plaintiff's invocation of res judicata principles fails as well. Under the full faith and credit doctrine, federal courts must accord final judgments of state courts the same preclusive effect that such judgments would have in the state courts. *See* 28 U.S.C. § 1738. Under New York law, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (N.Y. 1981). Successive litigation based on the same or connected transactions is barred "if (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action." *Matter of People v. Allied Card Sys., Inc.*, 11 N.Y.3d 105, 122 (N.Y. 2008). Even in a § 1983 case, preclusive effect is given to state-court judgments as to both issues that were "actually litigated" and issues that "could have been raised but were not actually raised." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81–83 (1984).

The present suit and Plaintiff's Article 78 proceeding obviously concern the same transactions. Defendants HO Polizzi, Inv. Keyser and Sup. Keyser, however, were not party to the Article 78 proceeding—and Defendant Venettozzi was only named in his official capacity (whereas in the instant case, he is also named in his individual capacity). Therefore, the current claims cannot be barred by res judicata. *See Graham v. Select Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 509 (S.D.N.Y. 2016) (party asserting res judicata must show, *inter alia*, that "the previous action involved the parties or those in privity with them.") (quoting *Pike v. Freeman*, 266 F. 3d 78, 91 (2d Cir. 2001)).

### c. Claims Against Particular Defendants

**\*7**  Defendants nonetheless contend that even if Plaintiff has stated viable constitutional claims, those claims must be dismissed on the grounds of lack of personal involvement and/or the defense of qualified immunity.

*Personal Involvement Requirement*

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138–39 (2d Cir. 2013). Instead, "a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir.) (emphasis added) (internal quotation marks omitted), *cert. denied sub nom. Brooks v. Pataki*, 137 S. Ct. 380 (2016). As the Second Circuit has explained, the personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Courts in this Circuit, however, are "divided as to whether the five categories addressed in *Colon* may still be used as the bases for liability under § 1983" following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *Allah v. Annucci*, No. 16-CV-1841 (KMK), 2017 WL 3972517 at *6 (S.D.N.Y. Sept. 07, 2017). The Second Circuit has not squarely addressed how *Iqbal*, which "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," affects the standards in *Colon* for establishing liability. *Allah*, 2017 WL 3972517 at *6 (internal quotation

marks and citations omitted); *see also Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("*Iqbal* has, of course, engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*."). Overall, however, "[t]he majority of the district courts ... have held, absent any contrary directive for the Second Circuit, all five *Colon* factors survive where the constitutional violation at issue does not require a showing of discriminatory intent." *Allah*, 2017 WL 3972517 at *6 (quoting *El-Hanafi v. United States*, No, 13-CV-2072, 2015 WL 72804, at *13 (S.D.N.Y. Jan. 6, 2015)) (collecting cases). This Court has already expressed its agreement with that proposition, and will apply it with equal force here. [5]

[5]  *See Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *11 (S.D.N.Y. Mar. 31, 2018); *Marshall v. Annuci*, No. 16-CV-8622 (NSR), 2018 WL 1449522, at *9 (S.D.N.Y. Mar. 22, 2018); *Matteo v. Perez*, No. 16-CV-1837 (NSR), 2017 WL 4217142, at *5 (S.D.N.Y. Sept. 19, 2017).

**\*8** Because Plaintiff's procedural due process claims do not require a showing of discriminatory intent, the Court will apply all five *Colon* factors. *See Marom v. City of New York*, No. 15-CV-201 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016), *partially reconsidered on separate grounds*, No. 15-CV-2017 (PKC), 2016 WL 5900217 (S.D.N.Y. July 29, 2016) (recognizing that, in areas outside of discrimination, *Iqbal* "only requires that a supervisor's action—whether direct or through 'his or her superintendent responsibilities'—must itself violate the terms of the constitutional provision at issue.").

*Qualified Immunity*

"The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.' " *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). As such, "qualified immunity shields both state and federal officials from suit unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). To determine whether a right was clearly established, the Court looks to: (1) whether the right was defined with "reasonable specificity"; (2) whether the Supreme Court and the applicable circuit court support the existence of the right; and (3) whether under existing law a reasonable defendant would have understood that the conduct

was unlawful. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 161 (2d Cir. 2013). "In this Circuit, a defendant may [raise qualified immunity in a pre-answer motion to dismiss], but the defense is held to a higher standard than if it were asserted in a motion for summary judgment." *Sledge v. Bernstein*, No. 11 CV 7450(PKC)(HBP), 2012 WL 4761582, at *4 (S.D.N.Y. Aug. 2, 2012); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (a defense of qualified immunity in a motion to dismiss can only be sustained if plaintiff cannot state any facts that would prevent the application of qualified immunity).

The Court considers the personal involvement and qualified immunity defenses of each Defendant in turn.

### i. SHU Director Venettozzi

Although SHU Dir. Venettozzi occupies a supervisory role as Director of the Special Housing Unit, he did not have any personal involvement in the Tier III hearing itself. Therefore, the Court must consider whether any of the other *Colon* factors are met, such that liability for SHU Dir. Venettozzi in his individual capacity may be established.

Here, Plaintiff sufficiently alleges the personal involvement of SHU Dir. Venettozzi under the second *Colon* factor (*i.e.*, "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong"). *Colon*, 58 F.3d at 873. Plaintiff alleges that he submitted an administrative appeal to SHU Dir. Venettozzi, and that Plaintiff asserted various "violations of statutory and constitutional rights" in that appeal (*Id.* ¶¶ 34, 39.) As the Director of Special Housing, SHU Dir. Venettozzi ostensibly had the ability to remedy the ongoing wrong Plaintiff complained of—his placement in administrative segregation and keeplock confinement without due process of law. Yet, Plaintiff contends that despite being made aware of the alleged due process violations, SHU Dir. Venettozzi affirmed his placement in segregation. Thus, SHU Dir. Venettozzi's actions fall squarely within the second category of *Colon*, rendering him sufficiently involved in the alleged violations. *See* 58 F.3d at 873.[6]

[6]   Courts within this Circuit are split as to "whether an appeal officer may be held liable for failing to reverse the outcome of an allegedly unconstitutional disciplinary hearing." *Colon v. Annucci*, 344 F. Supp. 3d 612, 630 (S.D.N.Y. 2018) (citing *Lebron v. Mrzyglod*, No. 14-CV-10290 (KMK), 2017 WL 365493, at *9 (S.D.N.Y.

Jan. 24, 2017)); *see also Ortiz v. Russo*, No. 13 CIV. 5317 ER, 2015 WL 1427247, at *13 (S.D.N.Y. Mar. 27, 2015) (collecting cases). This Court has already expressed agreement with cases holding that a defendant may be sufficiently involved where, after being informed of an ongoing constitutional violation through a report of appeal, he or she fails to remedy the wrong. *See Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *11 (S.D.N.Y. Mar. 31, 2018).

**\*9**  Having found that the Complaint sufficiently alleges SHU Dir. Venettozzi's personal involvement in the deprivation of Plaintiff's constitutional rights, the Court must now consider whether SHU Dir. Venettozzi is nonetheless immune from liability. The Court finds that he is.

On this procedural due process issue, some uncertainty within this Circuit's case law serves in SHU Dir. Venettozzi's favor. Because "courts in this circuit disagree over whether the failure to remedy a wrong after being informed of a constitutional violation through a report or appeal remains sufficient to establish a supervisor's personal involvement in a constitutional violation," *Richardson v. Williams*, No. 15-CV-4117 (VB), 2016 WL 5818608, at *3 (S.D.N.Y. Oct. 5, 2016),[7] a reasonable official in SHU Dir. Venettozzi's position could have been unaware that denying Plaintiff's appeal would be unlawful. Thus, although SHU Dir. Venettozzi may have "had the authority to review the events at the hearing and dismiss in whole or in part, or order a new hearing, for wrongful acts" (AC ¶ 79), the legal implications of his personal involvement were not "clearly established." Accordingly, SHU Dir. Venettozzi is immune from suit in his individual capacity as to the due process claims, and such claims are dismissed. *See Richardson*, 2016 WL 5818608, at *3 (granting qualified immunity to a defendant who affirmed the result of a prison disciplinary proceeding because at the time of the appeal, it would not necessarily be clear to a reasonable government official that his conduct was unlawful in the situation confronted).

[7]   *See supra* note 6.

### ii. Superintendent Keyser

With respect to Sup. Keyser, Plaintiff makes several attempts to tie him to the alleged procedural due process violations. His individual involvement, however, is attenuated at best. Sup. Keyser did not participate in the Tier III hearing or the administrative appeal. Unlike SHU Dir. Venettozzi, Sup. Keyser did not have the power to review or modify, if needed,

the results of the Tier III hearing. Thus, the first and second *Colon* factors are not applicable to him. *See Colon*, 58 F.3d at 873. Plaintiff alleges that Sup. Keyser "failed to instruct, supervise, control and discipline on a continuing basis HO Pol[i]zzi." (AC ¶77). However, this does not satisfy any of the remaining *Colon* factors: Plaintiff has not alleged facts that would rise to the level of plausibly showing Sup. Keyser's support of any "policy or custom under which unconstitutional practices occurred," "gross[] negligen[ce] in supervising subordinates," or "deliberate indifference" with regard to the alleged due process violations. *See Colon*, 58 F.3d at 873; *Black*, 76 F.3d at 74. Therefore, Plaintiff has failed to allege Sup. Keyser's personal involvement in the alleged due process violations, and the such claims are dismissed as to Sup. Keyser. For this reason, the Court need not address Sup. Keyser's qualified immunity defense to Plaintiff's due process claims.

### iii. Hearing Officer Polizzi and Inv. Keyser

HO Polizzi, by contrast, directly oversaw the Tier III hearing, and therefore his personal involvement is plainly established. Similarly, Inv. Keyser authored the misconduct report and participated in the Tier III hearing, thus, his personal involvement is also clear. As to their qualified immunity defense, the question presented is whether these two defendants violated Plaintiff's due process rights that were "clearly established." *Terebesi*, 764 F.3d at 230. "It is—and was at the time of the alleged conduct—well established that ... denial of due process in Ad[ministrative] Seg[regation] proceedings ... violates the Constitution." *Pusepa*, 2019 WL 690678, at *10 (citing *Hewitt*, 459 U.S. at 476) (rejecting qualified immunity defense to claim of denial of due process in administrative segregation proceedings). Accordingly, the Court will not find HO Polizzi and Inv. Keyser immune from suit at this early stage of litigation. [8]

[8]   The qualified immunity defense is "typically addressed at the summary judgment stage," because it "usually depends on the facts of the case, ... making dismissal at the pleading stage inappropriate." *Woods v. Goord*, No. 01-CV-3255, 2002 WL 731691, at *10 (S.D.N.Y. Apr. 23, 2002) (citing *King v. Simpson*, 189 F.3d 284, 289 (2d Cir. 1999)).

## II. Eighth Amendment Cruel and Unusual Punishment

**\*10** Next, Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. (*See*, AC ¶¶ 1, 49–53, 73, 76, 78.) His complaint, liberally construed, raises two qualms with his conditions of confinement: (1) food contaminated with hair and "dust/plaster-like coatings" from the construction work; and (2) the "booming" construction noises, for which inmates were not provided earplugs. (*Id.* ¶¶ 49–53.)

For a prisoner to prevail on a claim asserting that he was subjected to cruel and unusual punishment, he must prove both "an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or failed to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.' " *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). To meet the objective element, Plaintiff must show that the conditions "pose[d] an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). To meet the subjective element, Plaintiff must "show that the defendant acted with 'more than mere negligence.' " *Id.* at 125 (quoting *Farmer*, 511 U.S. at 835).

Beginning with the objective element, the Court finds that Plaintiff's allegations regarding "dirty" food are not "sufficiently serious ... to reach constitutional dimensions." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted). The Eighth Amendment does require that prisoners be served "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). Plaintiff's Amended Complaint, however, does not allege that the food was served was nutritionally inadequate or posed any threat to his health. While certainly unpleasant, the food described does not give rise to a constitutional violation. *See, e.g., McFadden v. Solfaro*, No. 95 CIV. 1148 (LBS), 1998 WL 199923, at *13 (S.D.N.Y. Apr. 23, 1998) ("One or two instances of finding a hair in one's food is not only not a punitive and unconstitutional violation of rights but a frequent occurrence, even for non-incarcerated diners in better restaurants."); *Atkins v. Cty. of Orange*, 372 F. Supp. 2d 377, 405 (S.D.N.Y. 2005), *aff'd on other grounds sub nom. Bellotto v. Cty. of Orange*, 248 F. App'x 232 (2d Cir. 2007) (food served on a napkin or paper towel not deemed unconstitutionally unsanitary); *cf. Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) (finding *pro se* plaintiff adequately pleaded an Eighth

Amendment claim by alleging that his restricted diet of stale bread and rotten cabbage was unusually unhealthy).

The "concussive" noises, on the other hand, for which earplugs were provided to others in the facility, could plausibly rise to the level of noise that "constitutes a threat to hearing and mental health." *See Rhem v. Malcolm*, 371 F. Supp. 594, 607–08, 628 (S.D.N.Y.), *supplemented*, 377 F. Supp. 995 (S.D.N.Y. 1974), *aff'd and remanded*, 507 F.2d 333 (2d Cir. 1974) (finding Eighth Amendment was violated where volume of noise was "intolerable"); *see also Marhone v. Cassel*, No. 16-CV-4733 (NSR), 2018 WL 4189518, at *9 (S.D.N.Y. Aug. 31, 2018), *appeal dismissed*, No. 18-2972, 2019 WL 5078231 (2d Cir. Apr. 2, 2019) (Eighth Amendment claim sufficiently pleaded where Plaintiff faced "constant clacking" sounds and "suffered from sleep deprivations" as a result). Plaintiff alleges he could not pray, review or prepare for his hearing, study, or sleep as a result of the booming sounds. (AC ¶ 53.) At the point at which other officers in the area were provided ear protection, the exposure to loud noises could have reached a severity level harmful to Plaintiff's hearing and mental wellbeing. *See Arce v. Miles*, No. 85 CIV. 5810 (SWK), 1991 WL 123952, at *10 (S.D.N.Y. June 28, 1991) ("Deliberate exposure to excessive and injurious noise has long been a ground for claims of cruel and unusual punishment.") (collecting cases); *see also Walker*, 717 F.3d at 126 ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment.") (collecting cases). Therefore, on this first element, the Court finds that the alleged conditions were sufficiently serious under the objective prong to plead a constitutional deprivation.

**\*11** Turning to the second element, "traditionally referred to ... as the subjective prong," and better described as the "*mens rea* prong" or "mental element prong," *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017), Plaintiff has adequately alleged that Defendant acted with a sufficiently culpable state of mind. To establish liability in cases involving inhumane prison conditions, the Supreme Court requires that a prison official's "state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998). An official acts with "deliberate indifference" when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. As the

Court stated, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. In other words, "a prisoner must demonstrate more than 'an inadvertent failure to provide adequate medical care' by prison officials to successfully establish Eighth Amendment liability." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).

Liberally construed, Plaintiff's Amended Complaint adequately alleged that Sup. Keyser knew of and disregarded the excessive risks to Plaintiff's health and safety. Plaintiff alleges that he "made Sup. Keyser aware of specific problems he was encountering concerning ... the conditions he faced while confined in SHU." (AC ¶¶ 43, 49–53.) In response, Sup. Keyser instructed Plaintiff to write down his concerns regarding the conditions in SHU, and that Sup. Keyser would "personally look into the matters." (*Id.* ¶ 55.) As instructed, Plaintiff sent letters to Sup. Keyser as well as follow-up inquiries, yet, Plaintiff alleges that Sup. Keyser instead "ignor[ed] McGriff through correspondence and any subsequent rounds in SHU" and acted with "knowing, reckless, and deliberate disregard." (*Id.* ¶¶ 56–58, 78.) The Court assumes, at this stage in the litigation, that Sup. Keyser was on notice of possible risks to Plaintiff's health and wellbeing upon receiving the oral and written grievances from Plaintiff. Moreover, Plaintiff has specifically alleged that Sup. Keyser personally disregarded any such risks to Plaintiff by ignoring Plaintiff's written and in-person pleas for assistance. Therefore, Plaintiff has sufficiently pleaded the subjective element of this claim regarding Sup. Keyser. *See Walker*, 717 F.3d at 129–30; *Arce*, 1991 WL 123952, at *10 (allegation that prison authorities supplied ear plugs to guards and workers but not to inmates satisfies the "deliberate indifference" standard).

Because the Court has also found that the alleged conditions were sufficiently serious under the objective prong as to establish a constitutional deprivation, the Court declines to dismiss Plaintiff's Eighth Amendment claim as to Sup. Keyser. But, because Plaintiff does not allege that Defendants SHU Dir. Venettozzi, HO Polizzi, or Inv. Keyser were at all aware of the conditions that Plaintiff allegedly faced in the SHU, Plaintiff's Eighth Amendment claims are dismissed without prejudice as to those defendants. *See Farmer*, 511 U.S. at 837 (requiring official to "know of ... an excessive risk to inmate health or safety"); *Arce*, 1991 WL 123952, at *10 (dismissing Eighth Amendment claim regarding injurious construction noise against several defendants who were not

aware of conditions). To the extent that Plaintiff can provide more factual allegations relating to SHU Dir. Venettozzi, HO Polizzi, or Inv. Keyser's culpable state of mind with respect to Plaintiff's alleged injuries caused by the loud noises, Plaintiff is granted leave to replead his claim.

Again, Defendants contend that Plaintiff's Eighth Amendment claim must be dismissed on the grounds of lack of personal involvement and/or qualified immunity. The Court finds that neither avenue offers Sup. Keyser a lifeline at this stage.

**\*12** In considering Sup. Keyser's personal involvement regarding the Eighth Amendment claims, which do not contain allegations of discrimination, *Colon*'s five factors will apply for the reasons stated above. The fifth *Colon* factor, that "the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring," *Colon, 58 F.3d at 873*, mirrors the Eighth Amendment's subjective prong analysis. Given that the Court has already found that Plaintiff has adequately pleaded the subjective element of his Eighth Amendment claim, it finds that likewise, Plaintiff has adequately pleaded Sup. Keyser's personal involvement under the fifth *Colon* factor.

Sup. Keyser's defense of qualified immunity turns on whether Plaintiff's Eighth Amendment rights were "clearly established." As courts in this circuit have recognized, a "[p]laintiff's right to safe and sanitary conditions of confinement ... [has been] 'clearly established.' " for purposes of qualified immunity analysis. *See Christian v. Warden of O.B.C.C.*, No. 17CIV2587GBDBCM, 2018 WL 1441401, at *3 (S.D.N.Y. Mar. 22, 2018); *Brandon v. Royce*, No. 16 CV 5552 (VB), 2019 WL 1227804, at *10 (S.D.N.Y. Mar. 15, 2019) ("[P]laintiff's right to humane conditions of confinement, particularly those that do not prevent an inmate from adequate sleep, was clearly established."). Furthermore, in circumstances where a plaintiff's complaint "plausibly alleged conditions of confinement that could constitute cruel and unusual punishment, and that defendants acted (or failed to act) with deliberate indifference," the Second Circuit has held that "further facts are required to decide the question of qualified immunity." *See Walker*, 717 F.3d at 130. In keeping with that approach, the Court declines to dismiss Plaintiff's Eighth Amendment claim at the pleadings stage on this basis.

### III. First Amendment Access to Courts

Plaintiff's also alleges that that Defendants violated his First Amendment rights. The Amended Complaint, however, does not plausibly allege facts to support such a claim for the reasons set forth below.

Inmates have a "constitutional right of access to the courts" under the First Amendment. *Bourdon v. Loughren*, 386 F.3d 88, 92–93 (2d Cir. 2004) (quoting *Bounds v. Smith*, 430 U.S. 817, 821 (1977)). "[T]o establish a constitutional violation based on a denial of access to the courts, a plaintiff must show that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in actual injury to the plaintiff." *Collins v. Goord*, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008) (citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)). "To show actual injury, the plaintiff must demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim." *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 353 (1996)).

Notably, the First Amendment's protection "does not include a constitutionally guaranteed right to a law library, to legal assistance, or to some other specified aid." *Gill v. Pact Org.*, No. 95 CIV. 4510 (LAP), 1997 WL 539948, at *4 (S.D.N.Y. Aug. 28, 1997) (citing *Lewis*, 518 U.S. at 349). The Constitution only requires prison officials to ensure that inmates "be able to present their grievances to the court ... [which can be accomplished by a] limited degree of legal assistance." *Lewis v. Casey*, 518 U.S. 343, 360 (1996).

Plaintiff alleges that "the defendants' goal was to violate McGriff's First Amendment right to petition the courts for judicial review." (AC ¶ 67). In particular, Plaintiff alleges that he was "purposely confined to exact punishment prior to any hearing, prohibit him from properly utilizing the law library, prevent him from gathering evidence to present at the hearing, and prevent him from properly laying a foundation on the record for appeal purposes." (*Id.*) These allegations are conclusory, and do not indicate how Plaintiff's efforts were effectively "frustrated." Plaintiff's Amended Complaint has failed to identify any "deliberate and malicious" conduct, let alone any injury relating to his access to the courts claim. *Cf. Corby v. Conboy*, 457 F.2d 251, 253 (2d Cir. 1972) (plaintiff stated a cause of action by his allegations that prison officials "hindered plaintiff in his ability to prepare legal papers, such as by delaying his letters to courts and law book publishers, by refusing him access to the prison typewriter and law library, and by confiscating nine of his law books, and have placed him in segregated confinement under degrading conditions for his refusal to discontinue his legal activities and

2019 WL 6033421

told "either directly or indirectly" that the segregation would continue until his lawsuits ceased."). Therefore, the Amended Complaint does not include a facially plausible claim for denial of access to the courts upon which relief can be granted and this claim is dismissed with prejudice. [9] The Court thus need not address Defendants' 12(b)(1) arguments regarding this claim.

[9]   It is well-settled that the failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims. *See Wilkov v. Ameriprise Fin. Servs., Inc.*, 753 F. App'x 44 (2d Cir. 2018)* ("We affirm the District Court's dismissal of those claims on the ground that they were 'abandoned' by Wilkov when she failed to oppose them in her opposition to Ameriprise's motion to dismiss."); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313 (S.D.N.Y. 2018)* ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim.") (quoting *Johnson v. City of New York*, 15-CV-8195, 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017)); *see also Robinson v. Fischer*, No. 09 CIV. 8882 LAKAJP, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010)* (collecting cases). Defendants correctly note that Plaintiff has abandoned his denial of access to the courts claim by failing to address any arguments on this issue in his Opposition brief. Plaintiff's Opposition contains no First Amendment analysis or refutation, and therefore Plaintiff has conceded and abandoned this claim.

## IV. Fourteenth Amendment Equal Protection

**\*13** Plaintiff also fails to plausibly allege that Defendants violated his Equal Protection rights. The Equal Protection Clause of the Fourteenth Amendment declares that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). A plaintiff must also demonstrate that the conduct "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.' " *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

Plaintiff's Amended Complaint appears to pursue a "class of one" equal protection claim. The class-of-one theory permits a plaintiff, not in a protected class, to state a cognizable claim if she establishes that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Analytical Diag. Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *Holmes v. Haugen*, 356 F. App'x 507, 509 (2d Cir. 2009) (summ. order). The Second Circuit has clarified that, to prevail on a class-of-one Equal Protection claim, a plaintiff must establish that he and a comparator are "*prima facie* identical" by showing that

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

Facing this high bar, Plaintiff fails to make such allegations. Plaintiff claims he was "treated differently not just from other prisoners, but from his own alleged co-defendant that received the same charges from the same Inv. Keyser concerning the same incident." (AC ¶ 74). Even taking as true that Inmate Aramas received the same charges concerning the same incident, it is not clear that Inmate Aramas was a "similarly situated," "*prima facie* identical" comparator to Plaintiff. For instance, Plaintiff's own complaint describes Inmate Aramas as the "alleged ringleader" (*Id.* ¶ 72), which suggests that Inmate Aramas's involvement in the alleged conspiracy differed from Plaintiff's role. Irrespective of Plaintiff's attempts to point to differential treatment (*see, e.g., id.* ¶¶ 68–71, 74, 80), the claim must be dismissed with prejudice because Plaintiff fails to identify a sufficiently "similarly situated" comparator. *See United States v. Faison*, 670 F. App'x 721, 722 (2d Cir. 2016) (summ. order) (affirming dismissal of equal protection claim where plaintiff "ha[d] not demonstrated that any potential comparators are 'prima facie identical' to him."). [10]

10    In addition, Defendants correctly note that Plaintiff has abandoned his equal protection claim by failing to address any arguments on this issue in his Opposition brief. Plaintiff's Opposition contains no equal protection analysis or refutation, and therefore Plaintiff has conceded and abandoned this claim. *See supra* note 9.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's due process claim with regard to the keeplock confinement is dismissed without prejudice. Plaintiff's due process claims are dismissed as to Defendants Venettozzi and Sup. Keyser. Plaintiff's due process claims as to the SHU confinement, against Defendants HO Polizzi and Inv. Keyser, remain.

**\*14**  Plaintiff's Eighth Amendment claim is dismissed without prejudice as to Defendants Venettozzi, HO Polizzi, and Inv. Keyser. Plaintiff's Eighth Amendment claim against Sup. Keyser remains.

Plaintiff's First Amendment claim and Fourteenth Amendment equal protection claim are dismissed as to all defendants.

Plaintiff may file a Second Amended Complaint within 30 days of the date of this Opinion, on or before December 16, 2019, should he choose to reassert his due process claim with regard to the keeplock confinement and/or his Eighth Amendment claims as to Defendants Venettozzi, HO Polizzi, and Inv. Keyser, which were dismissed without prejudice. Accordingly, the Clerk of the Court is respectfully directed to terminate Defendant Venettozzi and Defendants' Motion to Dismiss at ECF No. 54. If Plaintiff does not file a Second Amended Complaint by December 16, 2019, remaining Defendants are directed to file an answer to the First Amended Complaint on or before January 10, 2020. The parties are directed to confer, complete, and submit to the Court the attached case management plan on or before January 31, 2020. The Clerk of the Court is further directed to mail a copy of this Opinion to Plaintiff at his last address listed on ECF and file proof of service on the docket.

This constitutes the Court's Opinion and Order.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 6033421

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00193-MAD-TWD    Document 34    Filed 01/06/20    Page 173 of 187

Telesford v. Tamer, Not Reported in Fed. Supp. (2016)

2016 WL 5338083

2016 WL 5338083
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Marcus TELESFORD, Plaintiff,

v.

TAMER, Corr. Sergeant, Clinton Corr. Facility;[1] Nice, Mental Health Nurse, Clinton Corr. Facility;[2] Chris Trudeau, Corr. Officer, Clinton Corr. Facility; Kendrick Baker, Corr. Officer, Clinton Corr. Facility, formerly identified as Kendri Parker, Kevin Hart, Corr. Officer, Clinton Corr. Facility; and Randy Brown, Corr. Officer, Clinton Corr. Facility, Defendants.

[1]    The Clerk is directed to change the captioning of Defendant "Tamer" to Defendant "Thomas Tamer" pursuant to the proper identification of that individual by counsel in Defendants' Affidavit in Opposition to Plaintiff's Motion for Preliminary Injunction. (Dkt. No. 36.)

[2]    The Clerk is directed to change the captioning of Defendant "Nice" to Defendant "Traci Nycz" pursuant to the proper identification of that individual by counsel in Defendants' Affidavit in Opposition to Plaintiff's Motion for Preliminary Injunction. (Dkt. No. 36.)

9:14-CV-1209 (GTS/DEP)
|
Signed 09/23/2016

**Attorneys and Law Firms**

MARCUS TELESFORD, 02-A-0506, Upstate Correctional Facility, P.O. Box 2001, Malone, New York 12953, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, OF COUNSEL: MARK G. MITCHELL, ESQ., Assistant Attorney General, Albany, New York 12224, Counsel for Defendants.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1**  Currently before the Court, in this *pro se* prisoner civil rights action filed by Marcus Telesford ("Plaintiff") against the six above-captioned employees of the New York State Department of Corrections and Community Supervision at Clinton Correctional Facility ("Defendants"), are the following: (1) Defendants' motion for summary judgment; (2) United States Magistrate Judge David E. Peebles' Report-Recommendation recommending that Defendants' motion be granted in part and denied in part; and (3) Defendants' objection to the Report-Recommendation. (Dkt. Nos. 64, 78, 79.) For the reasons set forth below, the Report-Recommendation is adopted in its entirety; and Defendants' motion for summary judgment is (1) granted as to Plaintiff's conspiracy claim against Defendant Nycz (who is hereby dismissed from this action), (2) granted as to Plaintiff's claims for damages against all Defendants in their official capacities, (3) granted as to Plaintiff's claims for declaratory and injunctive relief, and (4) denied as to Plaintiff's Eighth Amendment excessive force claim for compensatory and punitive damages asserted against Defendants Tamer, Trudeau, Baker, Brown, and Hart in their individual capacities.

**I. RELEVANT BACKGROUND**

**A. Magistrate Judge Peebles' Report-Recommendation**

Generally, in his Report-Recommendation, Magistrate Judge Peebles rendered the following recommendations: (1) that Plaintiff's conspiracy claim against Defendant Nycz be dismissed for failure to state a claim (and that Defendant Nycz be dismissed as a party to this action); (2) that Plaintiff's damage claims be dismissed against all Defendants in their official capacities; (3) that Plaintiff's claims for declaratory and injunctive relief be dismissed as moot due to Plaintiff's transfer to Upstate Correctional Facility; and (4) that Plaintiff's Eighth Amendment excessive force claim seeking compensatory and punitive damages remain pending because there exists genuine disputes of material fact and credibility determinations for a jury. (Dkt. No. 78, at Part III.)

**B. Defendants' Objections to the Report-Recommendation**

Generally, in their Objections, Defendants argue that the Court should reject the Report-Recommendation for the following two reasons: (1) the Magistrate Judge erred in determining that evidence of the mere presence of Defendants Baker, Hart and Brown in the Mental Health Unit at the

Telesford v. Tamer, Not Reported in Fed. Supp. (2016)

2016 WL 5338083

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 174 of 187

Clinton Correctional Facility on the date of the alleged assault is sufficient to raise a genuine dispute of material fact as to their personal involvement in the alleged constitutional violation (especially given that Plaintiff concedes in his opposition papers that [a] Baker, Hart and Brown were not assigned to the cell area where the alleged assault occurred, and [b] none of them participated in the strip frisk of Plaintiff); and (2) the Magistrate Judge erred in determining that Plaintiff's deposition testimony and sworn allegations, which are blatantly contradicted by the record (which includes [a] contemporaneous photographs and medical records showing no physical injuries and [b] evidence that Plaintiff's alleged injuries pre-dated the alleged assault), are sufficient to raise a genuine dispute of material fact. (Dkt. No. 79, at Points I and II.)

## II. STANDARD OF REVIEW

**\*2** When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). [3] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance. [4] Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first instance. *See Zhao v. State Univ. of N.Y.*, 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley*, 752 F. Supp.2d 311, 312-13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted).

[3]     *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the

statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[4]     *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review. [5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed. R. Civ. P. 72(b), Advisory Committee Notes:

Telesford v. Tamer, Not Reported in Fed. Supp. (2016)

2016 WL 5338083

1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[6]

5     *See Mario*, 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed. R. Civ. P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan*, 806 F. Supp. 380, 382 (W.D.N.Y. 1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady*, 09-CV-0924, 2010 WL 3761902, at *1, n.1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue*, 07-CV-1077, 2010 WL 2985968, at *3 & n.3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole*, 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

6     *See also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. ANALYSIS

After carefully reviewing the relevant papers herein, including Magistrate Judge Peebles' thorough Report-Recommendation, the Court can find no error in those parts of the Report-Recommendation to which Defendants specifically objected, and no clear error in the remaining parts of the Report-Recommendation: Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons stated therein. To those reasons, the Court adds the following analysis.

Defendants' two challenges to the Report-Recommendation (summarized above in Part I.B. of this Decision and Order) are simply reiterations of arguments presented to Magistrate Judge Peebles during their motion for summary judgment.

(*Compare* Dkt. No. 79, at Points I and II [Defs.' Obj.] *with* Dkt. No. 64, Attach. 23, at Points II-III [Defs.' Memo. of Law] *and* Dkt. No. 72 at "Argument" [Defs.' Reply Memo. of Law].) As a result, the challenged portions of the Report-Recommendation are entitled to only a clear-error review, which they easily survive. *See, supra,* Part II of this Decision and Order. In the alternative, the Court finds that those portions of the Report-Recommendation would survive a *de novo* review.

Defendants' first objection, while well-taken, ultimately fails because it ignores the following four facts: (1) the fact that admissible record evidence exists from which a rational fact-finder could conclude that Defendants Baker, Hart and Brown were present in the Mental Health Unit not merely on the *date* of the alleged assault but at the *precise time* of the alleged assault (Dkt. No. 1, at ¶¶ 2, 8, 11 [Plf.'s Sworn Compl.]; [7] Dkt. No. 64, Attach. 14, at ¶ 5 [Hart Decl.]; Dkt. No. 64, Attach. 15, at ¶ 5 [Brown Decl.] ); (2) the fact that admissible record evidence (however circumstantial) exists from which a rational fact-finder could conclude that Defendants Baker, Hart and Brown were present not merely in the Mental Health Unit but on the *relevant floor* of the Mental Health Unit (Dkt. No. 1, at ¶¶ 2, 8, 11 [Plf.'s Sworn Compl.]; Dkt. No. 64, Attach. 2, at 140-53 [Plf.'s Depo. Tr.] ); (3) the fact that admissible record evidence (again, however circumstantial) exists from which a rational fact-finder could conclude that Defendants Baker, Hart were not merely present during the alleged assault but *participated* in that assault (Dkt. No. 1, at 3, ¶¶ 8, 11 [Plf.'s Sworn Compl.]; Dkt. No. 64, Attach. 2, at 140-53 [Plf.'s Depo. Tr.] ); and (4) the fact that, even if Defendants Baker, Hart and Brown did not participate in the alleged assault, they could be liable for failing to intervene in that alleged assault (if they were present during the use of excessive force and failed to intervene to prevent or stop the use of excessive force, despite having had a reasonable opportunity to do so). Simply stated, the lack of other individuals (i.e., other than Defendants Baker, Hart and Brown) who could have been the three correctional officers who allegedly assisted Defendants Tamer and Trudeau in using excessive against Plaintiff nudges Plaintiff's claim over the line from one relying on speculation to one relying one circumstantial evidence.

7     Verified pleadings have the force and effect of affidavits or declarations for purposes of motions for summary judgment. *See, e.g., Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to

Telesford v. Tamer, Not Reported in Fed. Supp. (2016)

2016 WL 5338083

oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), cert. denied, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.").

*\*4* Defendants' second objection, while also well-taken, similarly fails. For the sake of brevity, the Court will not resolve the apparent tension between the case heavily relied on by Defendants, *Scott v. Harris*, 550 U.S. 372, 380 (2007) (permitting a court to reject a party's version of events on a motion for summary judgment when that version is so blatantly contradicted by the record that no reasonable jury could believe it), and the case routinely relied on by defendants in the Second Circuit in such circumstances, *Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (permitting a district court to resolve issues of credibility on motion for summary judgment in narrow circumstances where [1] the testimony of non-movant is largely unsubstantiated by any other direct evidence, and [2] that testimony is *so incomplete and/or replete with inconsistencies and improbabilities* that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant) (emphasis added). More important is the fact that the contemporaneous photographs and medical records cited by Defendants (revealing no physical injuries) would not render impossible a finding by a rational fact-finder of the existence of at least some injury (however insignificant), which may permit liability given the existence of admissible record evidence that the injury was inflicted maliciously and sadistically. Moreover, Defendants' argument that Plaintiff's injuries consisted of pre-existing conditions ignores the evidence reasonably suggesting that the injuries *worsened* those conditions. (*Compare* Dkt. No. 69, Attach. 1, at ¶ 44 [Plf.'s Rule 7.1 Response, stating that his injuries include "migraine headaches" for which he is taking medication, "sharp acute lower back pain," "burning every time I urinate," and "nightmares from ... psychological trauma"] *with* Dkt. No. 72, at 6 [attaching page "4" of Defs.' Reply Memo. of Law, citing record evidence of Plaintiff previously suffering from merely migraine headaches that were "not as sharp as now," "minor ... back problems" in his "upper back," "a shy bladder," and "issues sleeping soundly"].)

**ACCORDINGLY**, it is

**ORDERED** that the Clerk is directed to change the captioning of Defendant "Tamer" to Defendant "Thomas Tamer," and the captioning of Defendant "Nice" to Defendant "Traci Nycz," pursuant to notes 1 and 2 of this Decision and Order; and it is further

**ORDERED** that Magistrate Judge Peebles' Report-Recommendation (Dkt. No. 78) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 64) is **GRANTED** as to the following claims:

(1) Plaintiff's conspiracy claim against Defendant Nycz;

(2) Plaintiff's damage claims against all Defendants in their official capacities;

and

(3) Plaintiff's claims for declaratory and injunctive relief; and it is further

**ORDERED** that Defendant Nycz is **DISMISSED** from this action; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 64) is **DENIED** as to Plaintiff's Eighth Amendment excessive force claim for compensatory and punitive damages and asserted against Defendants Tamer, Trudeau, Baker, Brown, and Hart in their individual capacities; and it is further

**ORDERED** that Pro Bono Counsel be appointed for Plaintiff for purposes of trial only (and not for any appeal) and that, upon assignment of Pro Bono Counsel, a final pretrial conference with counsel be scheduled, at which the Court will schedule trial on the remaining claims. Counsel for both parties are directed to appear with settlement authority.

Dated: September 23, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5338083

---

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 177 of 187
Verley v. Wright, Not Reported in F.Supp.2d (2007)
2007 WL 2822199

2007 WL 2822199
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Harold VERLEY, Plaintiff,
v.
Dr. Lester N. WRIGHT, Chief Medical
Officer and Associate Commissioner
of the New York State Department of
Correctional Services, et. al., Defendants.

No. 02 Civ. 1182(PKC).
|
Sept. 27, 2007.

*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, U.S.D.J.

*1  Plaintiff Harold Verley, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against Dr. Lester N. Wright, Dr. Carl J. Koenigsmann and Dr. Steven Weinstein, each of whom is employed by the New York State Department of Corrections ("DOCS") as a physician (collectively, the "State Defendants"). Also named as defendants are Corrections Physician Services, Inc., ("CPS") and Prison Health Services, Inc., ("PHS") (collectively, the "Corporate Defendants"). Verley suffers from hepatitis C and contends that defendants have violated his rights under the Eighth and Fourteenth Amendments by withholding treatment with deliberate indifference to his medical needs. Plaintiff seeks injunctive, declaratory and monetary relief.

The State and Corporate Defendants now move for summary judgment in their favor. I conclude that plaintiff has failed to administratively exhaust his remedies as to all claims against the State Defendants, with the exception of his claim against defendant Wright for denial of interferon/ribavirin treatment and his claim against defendant Koenigsmann for denial of the referral to a nutritionist and hepatologist. As to defendant Wright, plaintiff has raised a triable issue of fact on the deliberate indifference claim against him; however, I conclude that the claim is barred by the doctrine of qualified immunity. As to defendant Koenigsmann, plaintiff has failed to come forward with evidence which would permit a reasonable factfinder to conclude that he acted with deliberate indifference to plaintiff's medical needs. Plaintiff's claims for money damages against the State Defendants in their official capacities are also barred by sovereign immunity. Plaintiff's claims for declaratory and injunctive relief are deemed moot because of his transfer from the Green Haven Correctional Facility ("Green Haven") to a different facility and because he has received the treatment he initially sought.

The Corporate Defendants do not assert that the exhaustion requirement applies to them. However, plaintiff has failed to come forward with evidence which would permit a reasonable factfinder to find in his favor as against the Corporate Defendants.

For the reasons more fully explained below, summary judgment is granted dismissing plaintiff's claims.

BACKGROUND

A. *Procedural Background*
Defendants, with the exception of Wright and Koenigsmann, moved pursuant to Rule 12(b)(1), (2), and (6), Fed.R.Civ.P., to partially dismiss the Complaint. (Docket # 13, 20, 28) The motions were referred to Magistrate Judge Debra C. Freeman.

In a Report and Recommendation dated January 22, 2004 (the "R & R"), Magistrate Judge Freeman recommended that the Court dismiss all claims against defendants Glenn S. Goord, Charles E. Greiner, Donald Stevens, Dr. Thomas Rush, Dr. Michael Antonelle, Vincent Marrone, Dr. Rosensweig and Phillip Marron, but deny the motion to dismiss claims against defendants CPS and PHS; the Magistrate Judge also recommended denial of Verley's motion to amend certain portions of the Complaint. (Docket # 90) Despite twice seeking extensions of his time to object to the R & R, no objections were received from plaintiff. The Corporate Defendants timely filed objections. On June 2, 2004, I issued an Order which adopted in its entirety the R & R of Magistrate Judge Freeman. (Docket # 94)

*2  In their submissions on the present motion, the Corporate Defendants have annexed a "Second Amended Complaint" ("SAC"). (Corp. Defs. Rule 56.1 Stmt. Exh. A) Plaintiff sought and received permission to file a SAC, (Docket # 107) but the SAC does not appear to have been filed with the Clerk. On the motions, all parties direct their arguments to the SAC and I will therefore consider it the operative pleading and deem it to have been filed.

A. *Background*

Since 1990, plaintiff has been incarcerated within DOCS. In late 1996, physicians at Green Haven, where plaintiff was then located, noted elevated enzyme levels in plaintiff's blood. (Johnson Dec. Exh. E) Following testing in 1997, plaintiff was told that he was likely infected with the hepatitis C virus ("HCV"). (Verley Dec. ¶ 34) HCV is a chronic, viral liver disease. (Verley Brief in Opp. Exh. R; Johnson Dec. Exh. I-1) No broadly effective treatment for HCV exists, although the most successful treatments are a regimen of interferon, ribavirin or some combination thereof. (Verley Brief in Opp. Exh. N; Johnson Dec. Exh I-1)

Plaintiff contends that his "medical provider," a physician assigned to provide medical services to inmates, told him that he should "consider" undergoing a liver biopsy, the most accurate method of testing for HCV, in order to confirm the diagnosis. Plaintiff claims that he was denied a biopsy for over a year, despite having obtained several referrals for one from his medical provider at Green Haven. (Verley Exh. I at 12-17) Verley underwent a liver biopsy on October 6, 1998, which resulted in a finding of "Chronic Hepatitis, Consistent with Hepatitis C, Grade 2, Stage 2." (Verley Exh. I at 20) On or about December 26, 1998, Dr. Thomas Rush, an Infectious Disease Control Specialist at Green Haven, ordered that plaintiff begin combination interferon/ribavirin ("IR") therapy immediately.[1] (Verley Dep. 41-42; Defs. 56.1 ¶ 15)

[1]    In plaintiff's "Declaration in opposition to the defendant's motion for summary judgment," plaintiff states that it was a Dr. Malvarosa, not Dr. Rush, who referred him for IR therapy. In other filings by plaintiff, he asserts that Dr. Rush ordered the referral. Although contradictory, it is immaterial which physician actually issued the referral as it is undisputed that plaintiff was referred for IR therapy.

On February 12, 1999, plaintiff was denied participation in an IR therapy program by defendant Wright, the Associate Commissioner and Chief Medical Officer of DOCS, on the basis that plaintiff did not satisfy the preconditions set forth in the 1998 preliminary protocol (the "1998 Protocol") which governed treatment of HCV within DOCS. (Johnson Dec. Exh. I-4, Q; Johnson Dec. Exh. A, Wright Dec. ¶ 8) The 1998 Protocol was the precursor to the Clinical Practice Guideline on Hepatitis C (the "Guideline") which went into effect on March 31, 1999. (Johnson Dec. Exh. I-5) The 1998 Protocol and the Guideline provide that treatment must not be given to anyone with "evidence of active substance (alcohol or drug)

use during the past two years." (Johnson Exh. I-4 ¶ 2; Exh. I-5 at 3)

Plaintiff was found guilty of two disciplinary violations relating to two separate instances of drug use which occurred in November of 1998. (Johnson Dec. Exhs. K, J) The first incident occurred on November 13, 1998 when a search of plaintiff's cell resulted in the confiscation of five small bags of a substance later determined to be marijuana. (Johnson Dec. Exh. K) Plaintiff was charged with, and pled guilty to, drug possession in violation of prison regulations. (*Id.*) Prior to this incident, plaintiff had been twice tested for drugs and tested negative both times. (Johnson Dec. J "Hearing Transcript" at 17) As a result of this disciplinary violation, plaintiff was placed on a list of inmates subject to random drug testing which he underwent on November 24, 1998. (Johnson Dec. Exh. J) The test resulted in a finding that Verley's urine was "positive for contraband," namely cannabinoid. (*Id.*) A second test confirmed the first result. (*Id.*) In response to the test results, plaintiff was charged with, and pled guilty to, use of a controlled substance in violation of prison regulations. The fact that plaintiff had not been free from drug use for two years as the 1998 Protocol required caused Wright to deny him IR therapy. (Johnson Dec. Exh. Q)

*3  Plaintiff filed a grievance challenging the denial of IR therapy, pursuing the claim through the DOCS grievance procedure and culminating in an Article 78 proceeding in New York Supreme Court. (Verley Aff. Exh. L) In a Decision and Order dated May 1, 2000, Justice Judith A. Hillery concluded "that Dr. Wright demonstrated a deliberate indifference to petitioner's serious medical needs" by denying him IR therapy. (*Id.* at 5) She ordered that plaintiff be immediately enrolled in IR therapy.

Thereafter, plaintiff was admitted to IR therapy but did not respond favorably to the treatment. In August 2001, Rush recommended that plaintiff be given a new type of Interferon treatment called Pegelated Interferon ("PegIntron"), upon its approval by the Food and Drug Administration ("FDA"). (Verley Dep. 57) Plaintiff alleges that PegIntron therapy was approved by the FDA but, despite his repeated requests, he was denied access to it by Wright. (SAC ¶ 24; Verley Dep. 58) Plaintiff contends that the initial denial of IR therapy, delay in his receipt of medical treatment and the denial of PegIntron, combined to result in his suffering additional ills, including loss of hearing. (Verley Dep. 49; 51-52) In addition to claiming that Wright acted with deliberate indifference toward plaintiff's specific medical condition, he alleges that

Wright improperly failed to develop a tracking system or other procedure to monitor inmates with chronic illnesses (the "Monitoring Claim"). (SAC ¶ 25; Verley Dep. 61-63)

Plaintiff also contends that in May 2001, Koenigsmann, Facility Health Services Director at Green Haven, improperly denied him access to the services of a hepatologist, dermatologist and nutritionist on the basis that he had already seen a gastroenterologist ("GI"). (Verley Dep. 72, 74-75; Verley Dec. 61-62) He claims that Koenigsmann denied him a follow-up appointment with the GI, despite a referral for the appointment from his medical provider. (Verley Dep. 75; Johnson Dec. Exh. E "Def" 234) Plaintiff contends that the real reason for the denial of medical treatment by Koenigsmann was a desire to have plaintiff transferred to another facility.

In October 2001, plaintiff complained to Dr. Steven Weinstein, an outside medical consultant at Green Haven, about back pain he believed was attributable to an old gun shot wound and "HCV related neuropathy." (SAC ¶ 35) Following testing, Weinstein determined that Verley had no apparent nerve damage. Plaintiff asserts that Weinstein reached this conclusion by ignoring prior tests which showed nerve damage. (Pl. "Statement of Disputed Factual Material Issues of Fact" ¶ 4) Plaintiff contends that Weinstein's report "was based on personal opinion, not sound medical information." (Id.) When plaintiff questioned the diagnosis, Weinstein allegedly became verbally abusive toward plaintiff. (Id. ¶ 25; Verley Dep. 76) Plaintiff alleges that Weinstein deliberately disregarded any indication that plaintiff may have experienced pain or nerve damage "out of spite" and personal dislike of plaintiff. (SAC ¶ 36)

**\*4** Defendant CPS is a corporate entity which in February 1998 contracted with DOCS to provide off-site review of referrals of DOCS inmates to medical specialists.[2] (CPS 56.1 Stmt. ¶¶ 20-21) According to the terms of the contract, CPS was to "provide or arrange for the provision of all medically necessary specialty physician services ... and to manage the delivery of hospital service to the [inmate] Population ...." (CPS 56.1 Stmt. ¶ 23, Exh. I § 1) As part of its services, CPS engaged in a process of preadmission certification to determine "whether the inpatient care proposed by a physician is appropriate and required" and conducted reviews of patient care. (CPS 56.1 Exh. I § 3.G) If CPS declined to permit a patient to be seen by a specialist, despite a referral from the patient's physician, DOCS could require a review by a committee of two DOCS representatives

and two CPS representatives, all of whom are physicians or health professionals. (Id.) CPS did not provide direct care to DOCS inmates. (CPS Stmt. ¶ 34) Verley appears to contend that CPS was, at least partially, responsible for denying him both the IR therapy and the PegIntron treatments and that these decisions by CPS were motivated by its desire to save money. (Verley Dep. 86; 100-02; SAC ¶ 37) As a result of the denial of the referrals to see specialists, plaintiff contends that he has suffered a "compromised liver," hearing difficulties and joint and muscle pain. (Verley Dep. 119)

[2]     Defendant PHS is the successor to CPS which was the entity active at the time of plaintiff's allegations, CPS 56.1 Stmt. ¶ 20. I will therefore discuss the allegations as they relate to CPS. The SAC refers to CPS as "Corrections Physician Health Services, Inc." but it appears from defendants' 56.1 statement that the correct name is Corrections Physician Services.

*DISCUSSION*

    A. *Summary Judgment Standard*
Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P. In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.' " *Powell v. Nat'l Bd. of Med. Exam'rs,*

364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)).

**\*5** An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (quotations and citations omitted); *accord Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. *See* Rule 56(c), Fed.R.Civ.P. In the absence of any disputed material fact, summary judgment is appropriate. *Id.*

Plaintiff has been served with the requisite "Notice to Pro Se Litigants Opposing Summary Judgment" required by Local Rule 56.2. A *pro se* party's submissions are to be read liberally, a requirement that is especially strong in the summary judgment context, where a *pro se* plaintiff's claims are subject to a final dismissal. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.") However, a party's *pro se* status does not alter the obligation placed upon the party opposing summary judgment to come forward with evidence demonstrating that there is a genuine dispute regarding material fact. *Miller v. New York City Health & Hosp. Corp.,* 2004 WL 1907310, \*9 (S.D.N.Y. Aug. 25, 2004).

**B.** *Claims Against the State Defendants*

a. *Failure to Exhaust*

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.,* was enacted in an effort to address the large number of prisoner complaints filed in federal court. *See Porter v. Nussle,* 534 U.S. 516, 524 (2002) (The PLRA is intended to "reduce the quantity and improve the quality of prisoner suits.") The PLRA does not itself create any substantive rights but "claims covered by the PLRA are typically brought under 42 U.S.C. § 1983 ...." *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 919 (2007). Under the provisions of the PLRA, "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any ...

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement is intended to afford "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter,* 534 U.S. at 524-25. The Supreme Court has made clear that "the PLRA's exhaustion requirement applies to all inmate suits about prison life." *Id.* at 532. Within the Second Circuit, failure to exhaust administrative remedies is an affirmative defense and the defendant therefore bears the burden of proving that claims have not been exhausted. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Where a complaint contains claims which are exhausted and claims which have not been properly exhausted, the Court must dismiss only the unexhausted claims and not the complaint in its entirety. *Bock,* 127 S.Ct. at 924.

**\*6** DOCS has a well-established, three-step, administrative procedure for inmate grievances called the inmate grievance program ("IGP"). N.Y. Correction Law § 139 (2003). First, an inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC") at his facility. 7 N.Y.Codes R. & Reg. ("NYCRR") § 701.5(a)(1). Absent mitigating circumstances, in order to be timely, a grievance must be filed within 21 days of the alleged incident. 7 NYCRR § 701.5(a)(1). If the IGRC is unable to resolve the dispute to the satisfaction of the grievant, a hearing must take place within 16 days of the IGRC's receipt of the grievance. § 701.5(b)(2) After receiving a response from the IGRC, an inmate has seven days in which to appeal to the superintendent of his facility. § 701.5(c) (1). If the IGRC does not respond to an inmate's initial grievance, the inmate may still appeal to the superintendent. § 701.8. Finally, the inmate may appeal the decision of the superintendent to the Central Office Review Committee ("CORC") within seven days of receiving the decision. § 701.5(d)(1)(i). The CORC "consists of the deputy commissioner and counsel, deputy commissioner for correctional facilities, deputy commissioner for program services, deputy commissioner for administrative services, and the deputy commissioner and chief medical officer, or their designees expressly authorized to act for them." § 701.5(d)(2)(i). An inmate may attend a hearing or appeal a grievance unaided or aided by a member of staff or an other inmate. 7 NYCRR § 701.6(a).

The State Defendants contend that plaintiff has failed to exhaust his administrative remedies in regard to the claims against Weinstein, the claim against Koenigsmann as it pertains to the dermatology referral, the claims against Wright

Case 9:19-cv-00193-MAD-TWD   Document 34   Filed 01/06/20   Page 181 of 187
Verley v. Wright, Not Reported in F.Supp.2d (2007)
2007 WL 2822199

in relation to plaintiff's biopsy and denial of HCV retreatment with PegIntron and the Monitoring Claim. Plaintiff's claims against Wright relating to the denial of IR therapy and against Koenigsmann for declining to permit him to see a nutritionist and hepatologist are indisputably exhausted.

Plaintiff appears to contend that the PLRA applies only to administrative remedies "as are available" and there are "no remedies available to exhaust any medical issue" which renders such an issue "ungrievable." Plaintiff also claims that physicians cannot be compelled to comply with the final determination regarding the IGP complaint and thus a grievance proceeding cannot afford a meaningful remedy. Further, plaintiff contends that because of the "diversity of opinions amongst District Court Judges, as to whether the exhaustion requirement, as applied by DOCS, is more of a punative mechanism or fair mechanism for redress of wrongful acts ... there are material issues which should go before trial." (Pl. Brief in Op. at 21)

Verley acknowledged at his deposition that he did not file a grievance in regard to the Monitoring Claim and there is no evidence in the record that such a grievance was filed. (Verley Dep. 64-65) Accordingly, the Monitoring Claim is unexhausted and is dismissed.

**\*7** In regard to Verley's claims against Koenigsmann as they relate to the dermatology referral, Verley testified at his deposition that he did submit a grievance relating to that claim. (Verley Dep. 72) However, there is no record of such a grievance being filed. (Johnson Dec. Exh. P) While Verley did file a grievance against Koenigsmann regarding the denial of a referral to a hepatologist and nutritionist, he did not include the dermatological referral in the grievance and that claim is therefore unexhausted. (Johnson Dec. Exh. G) In response to defendants' evidence, plaintiff failed to come forward with evidence that he exhausted his dermatological claim. His conclusory assertion that he exhausted the claim, without more, is insufficient to raise a triable issue of fact.

As to claims against Wright, it appears from the record that plaintiff only filed a grievance relating to the denial of the referral for IR therapy. (Johnson Dec. Exh. H, P) Accordingly, any other claim against Wright, including those claims relating to the delay in plaintiff's biopsy or the denial of PegIntron, has not been exhausted.[3] Plaintiff's claims against Weinstein are also unexhausted as plaintiff failed to file any grievance relating to Weinstein's alleged deliberate

indifference to either his gunshot wound or his "HCV related neuropathy."

[3]     Even had plaintiff's claim regarding the delay in his receipt of a biopsy been exhausted, there is no evidence in the record that Wright was personally involved in plaintiff's biopsy or its timing. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Rather, the determination was made by plaintiff's treating physicians. Plaintiff may not under § 1983 pursue a theory of respondeat superior to hold Wright liable for actions of plaintiff's treating physicians. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986).

This is not a case where the claim is perceived to be unexhausted simply because plaintiff did not name in his grievance a party who he has now sued. *See Block,* 127 S.Ct. at 923. These are claims which have not been the subject of grievance proceedings.

In *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004), the Second Circuit summarized its holdings in a series of cases as requiring that a three-part inquiry be undertaken when a prisoner counters a defendant's argument that he or she failed to exhaust. First, the court considers whether administrative remedies were "available" to the prisoner. *Id.* (citing *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004)). Second, the court inquires whether the defendants failed to preserve a non-exhaustion argument by failing to raise the issue or preserve it. *Hemphill,* 380 F.3d at 868 (citing *Johnson v. Testman,* 380 F .3d 691 (2d Cir.2004)). Third, the court looks to whether the defendant's own actions inhibited the inmate's exhaustion of remedies, and if so, whether the actions estopped one or more defendant from raising non-exhaustion. *Hemphill,* 380 F.3d at 868 (citing *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004)). If, after considering these three questions, the court finds that administrative remedies were available to the plaintiff, and that defendants are not estopped and have not forfeited their non-exhaustion claims, but that the plaintiff still failed to exhaust, the court considers whether plaintiff plausibly alleges "special circumstances" that justify the prisoner's failure to comply with the exhaustion requirements. *Id.*

**\*8** Here, plaintiff has failed to demonstrate that the administrative remedies were not, in fact, "actually available to him." *Hemphill,* 380 F.3d at 686. It is sheer speculation that meaningful relief, such as a transfer to another correctional facility with different medical staff and access to other

medical facilities, could not have been afforded. Moreover, the Supreme Court has noted that the exhaustion requirement is a legislative mandate that has several important purposes, beyond the direct availability of relief to the prisoner. *Woodford v. Ngo,* 126 S.Ct. 2378, 2385-88 (U.S. June 22, 2006). DOCS has a meaningful grievance procedure which was fully available to plaintiff.

The State Defendants have preserved their exhaustion argument. Exhaustion arguments were timely raised on the motion to dismiss and in both the Answers to the SAC and the original Complaint. (Doc. # 22, 116 ¶ 32)

Finally, there is no evidence in the record that defendants have inhibited plaintiff from administratively exhausting his remedies or used coercive pressure to induce plaintiff not to file a grievance. Rather, the record before the Court indicates that plaintiff was able to file at least seven grievances during his incarceration at Green Haven. (Johnson Dec. Exh. P) There is no evidence of undue delay in the handling of plaintiff's grievances. *See Manos v. Decker,* 2005 WL 545215 (S.D.N.Y. Mar. 7, 2005). The grievance filed in relation to the denial of IR therapy was filed on February 18, 1999 and finally decided by CORAC less than two months later on April 7, 1999. (Johnson Dec. Exh. H) Similarly, the grievance relating to the referrals for a nutritionist and hepatologist was filed on August 8, 2001 and decided by the Superintendent less than a month later. (Johnson Dec. Exh. G) There is also no evidence of "special circumstances" which would excuse plaintiff's failure to exhaust his administrative remedies.

Accordingly, the Monitoring Claim, all claims against Weinstein, the dermatology claim against Koenigsmann and all claims against Wright with the exception of the claim relating to the initial denial of IR therapy are dismissed on exhaustion grounds.

### b. *The Eleventh Amendment*

In prohibiting suits against states, the Eleventh Amendment confirms two presuppositions of constitutional proportion: "first, that each State is a sovereign entity in our federal system; and second, that [i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent,' " *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 (1996) (alteration in original; citations and quotations omitted). "Sovereign immunity does not merely constitute a defense to monetary liability or even to all types of liability. Rather, it provides an immunity from suit." *Federal Maritime Com'n v. South Carolina State Ports*

*Authority,* 535 U.S. 743, 766 (2002). Sovereign immunity may be abrogated by Congressional action, *see Seminole,* 517 U.S. at 55, or a state may waive its immunity provided it does so in an unequivocal fashion, *see Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1 (1985), *CSX Transportation, Inc. v. New York State Office of Real Property Services,* 306 F.3d 87, 95 (2d Cir.2002). Section 1983 does not abrogate a state's Eleventh Amendment immunity and there has been no waiver for section 1983 claims on the part of the State of New York. *See Quern v. Jordan,* 440 U.S. 332 (1979). Absent waiver or abrogation, sovereign immunity extends to all agencies and officials sued in their official capacity because the State is the real party in interest. *See F.D.I.C. v. Meyer,* 510 U.S. 471, 484-86 (1994); *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Suits asserting official capacity claims against employees of DOCS and its facilities have been held to be subject to the State's Eleventh Amendment immunity. *See, e.g., Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (Commissioner of DOCS and officials of Attica).

**\*9** The SAC reflects that all of plaintiff's claims against the State Defendants are asserted against them in their individual and official capacities. (SAC ¶¶ 9-12) Plaintiff's claims for injunctive or declaratory relief and his claims against the State Defendants in their personal capacities are not barred by the Eleventh Amendment. *See id.* at 101-02 (citing *Hafer v. Melo,* 502 U.S. 21, 27-31 (1991); *Kostok v. Thomas,* 105 F.3d 65, 69 (2d Cir.1997)). Plaintiff's claims for money damages against the State Defendants in their official capacities are dismissed.

### c. *Claims for Injunctive and Declaratory Relief*

Subject matter jurisdiction requires that there be an actual controversy "at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citing *Preiser v. Newkirk,* 422 U.S. 395, 402 (1975)). According to the Second Circuit, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006) (citing *Prins,* 76 F.3d at 506). While the issue of mootness was not raised by any party, the Court may nonetheless consider it *sua sponte. See Prins,* 76 F.3d at 506.[4]

---

4     The issue of mootness was considered by Magistrate Judge Freeman in her R & R, adopted by this Court on June 2, 2004. However, because Magistrate Judge Freeman's R & R was addressed to the original complaint

and plaintiff again seeks declaratory and injunctive relief
in the SAC, I will consider the issue of mootness anew.

Plaintiff seeks "a preliminary injunction permanently
enjoining defendant's [sic], their agents, employees, assigns,
and other persons acting in concert with them or their
behalf" from "making plaintiff's Hepatitis C treatment
contingent upon other factors than sound medical practice
and science" as well as compelling the State Defendants to
"promulgate new Hepatitis C treatment guidelines consistent
with prevailing professional norms, establish and maintain
an adequate pain management regiment ... and to establish
a uniformity and systematic system of prison health
care." (SAC "Wherefore Clause" A-C) During the events
giving rise to this case, plaintiff was incarcerated at Green
Haven. On February 18, 2003, Verley was transferred to the
Fishkill Correctional Facility ("Fishkill"). (Doc. # 50) On
April 30, 2003, Verley was again transferred to the Auburn
Correctional Facility ("Auburn"). (Doc. # 74) He was then
transferred to Marcy Correctional Facility ("Marcy"), Doc.
# 140, then to Mohawk Correctional Facility ("Mohawk"),
Doc. # 146, and finally back to his current location at Marcy,
Doc. # 158. To the extent that plaintiff seeks injunctive and
declaratory relief directed at officials at Green Haven, those
claims are now moot as plaintiff is no longer incarcerated at
the Green Haven facility. Thus, the claim for injunctive and
declaratory relief against Koenigsmann and Weinstein, who
are based at Green Haven, is dismissed.

The claim for injunctive and declaratory relief is not moot
against Wright who is a state-wide DOCS official. However,
to the extent that the claims for injunctive and declaratory
relief seek to have Wright implement a "uniform and
systematic" method of tracking and treating inmates suffering
from HCV, those claims are part of the Monitoring Claim
which is unexhausted and, hence, are dismissed.

**\*10** Plaintiff also seeks an injunction enjoining Wright from
"making plaintiff's Hepatitis C treatment contingent upon
other factors than sound medical practice and science ...." As
a result of the Article 78 proceeding before Justice Hillery,
plaintiff received a full course of IR therapy. Plaintiff has
failed to come forward with any evidence that there is "a
likelihood that he ... will be injured in the future," in respect
to the receipt of IR therapy or any other medical treatment.
*Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 344
(2d Cir.1998). Any threat of injury to plaintiff is, at this
time, merely hypothetical, which is insufficient to warrant
injunctive or declaratory relief. *See O'Shea v. Littleton,* 414
U.S. 488, 494-96 (1974) (injunctive relief); *Irish Lesbian and*
*Gay Organization v. Giuliani,* 143 F.3d 638, 647 (2d Cir.1998)
(declaratory relief). Summary judgment is granted dismissing
all of plaintiff's claims against Wright seeking declaratory and
injunctive relief.

### C. *Verley's Eighth Amendment Claims Against the State Defendants and the Corporate Defendants*

According to established law, "the treatment a prisoner
receives in prison and the conditions under which he
is confined are subject to scrutiny under the Eighth
Amendment," *See Helling v. McKinney,* 509 U.S. 25, 31
(1993). The Cruel and Unusual Punishments Clause of
the Eighth Amendment requires that prison officials ensure
that inmates receive adequate medical care. *See Farmer v.
Brennan,* 511 U.S. 825, 832 (1994). However, "not every
lapse in medical care is a constitutional wrong." *Salahuddin,*
467 F.3d at 279. An inmate does not state a cognizable
Eighth Amendment claim by merely disagreeing with prison
officials about what constitutes appropriate medical care. *See
Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992), *aff'd,* 970
F.2d 896 (2d Cir.1992). Rather, a prison doctor's judgment
regarding treatment is presumed valid absent proof that it
was "such a substantial departure from accepted professional
judgment, practice or standards as to demonstrate that the
person responsible did not base the decision on such
judgment." *Richardson v. Blanchette,* 2006 WL 496010, \*7
(D.Conn. Mar. 1, 2006) (citation and quotation omitted).

In the context of the denial of medical care, the actions of a
prison official violate the Eighth Amendment only where two
requirements, one objective and one subjective, are satisfied.
*Farmer,* 511 U.S. at 834. The alleged deprivation of adequate
medical care must be objectively "sufficiently serious."
*Wilson v. Seiter,* 501 U.S. 294, 298 (1991). In determining
whether a depravation of medical care is "sufficiently
serious," courts consider whether the inmate was, in fact,
deprived of medical care and whether there was harm, or is
likely to harm, from the alleged depravation. *See Farmer,*
511 U.S. at 844-47; *Helling,* 509 U.S. at 32-33.

The second requirement for an Eighth Amendment violation,
the subjective component of the inquiry, focuses upon
whether the prison official acted with a sufficiently culpable
state of mind. *Wilson,* 501 U.S. at 300. A culpable state of
mind may be demonstrated by proof that a prison official
acted with deliberate indifference to an inmate's health needs.
*Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Deliberate
indifference may be shown where the prison official "knows
of and disregards an excessive risk to inmate health or

2007 WL 2822199

safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer,* 511 U.S. at 837. Therefore, a prison official must be subjectively aware of the risk to the inmate that the official's conduct creates; it is insufficient for a plaintiff to demonstrate that a prison official was incorrect in his belief that an inmate is not at risk or that the belief itself was unsound under the circumstances. *See Salahuddin,* 467 F.3d at 281 ("The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere. Thus, even if objectively unreasonable, a defendant's mental state may be nonculpable.").

### a. *Claims Against Wright*

**\*11** The State Defendants concede that HCV is a serious medical condition. (Mem. at 16); *Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005). In regard to harm caused by the denial of medical treatment for his HCV, Verley has asserted that he suffered hearing loss and was told by Rush that his HCV had worsened by virtue of the initial denial of IR therapy. (Verley Dep. 39-41) Therefore, interpreting all facts in plaintiff's favor, I conclude that he has satisfied the first prong of the Eighth Amendment inquiry. The question now becomes whether Wright acted with a "sufficiently culpable state of mind," *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), in denying plaintiff IR therapy.

In *Johnson v. Wright,* 412 F.3d 398, the Second Circuit reversed the district court's grant of summary judgment to defendants, including defendant Wright, in a case where the plaintiff, an HCV sufferer, contended that defendants had acted with deliberate indifference toward his medical needs by denying him ribavirin against the recommendation of his treating physicians. *See* 412 F.3d at 404-05. The evidence was that on a single occasion, the plaintiff had tested positive for marijuana and on this basis was denied the drug regimen despite the unanimous view of his treating physicians. *See id.* The Second Circuit concluded that a reasonable jury could conclude that Wright and the other defendants had acted with a sufficiently culpable state of mind "by reflexively following the [Hepatitis C Primary Care Practice] Guideline's substance abuse policy" to deny plaintiff ribavirin therapy. *Johnson,* 412 F.3d at 406.

Here, Wright acted against the recommendation of plaintiff's treating physician, Rush, who had recommended plaintiff for IR therapy. In deciding to deny plaintiff IR therapy,

Wright stated that there was "no detectable progression of plaintiff's Hepatitis C" although the "basis" on which he denied Verley's treatment was that "Verley had not been free from illicit drug abuse for a period of two years" as required under the 1998 Protocol.[5] (Wright Dec. ¶¶ 8, 17-18) Wright stated that Verley's drug use, specifically the two 1998 disciplinary citations for marijuana possession and use, caused him to conclude that Verley was "not committed to taking personal responsibility for assisting in his proposed course of treatment" and might "hinder or negatively impact the treatment." (Wright Dec. ¶¶ 16, 18) However, there is no indication in the record that there were any other legitimate compliance concerns regarding Verley's ability to adhere to the IR therapy treatment regimen. Verley has persistently sought treatment for his HCV. Further, when he was placed on a 24 week IR therapy treatment schedule which failed to yield results, Verley requested to continue on the 48 week treatment cycle, again evincing his commitment to receiving treatment despite potential side effects of IR therapy. (Verley Dep. 57)

[5]     While "[a]n individual defendant is not liable under § 1983 absent personal involvement," *Rivera v. Goord,* 253 F.Supp.2d 735, 747 (S.D.N.Y.2003), plaintiff has produced sufficient evidence that Wright was personally involved in the denial of the referral for IR therapy. *See McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004).

This case presents facts different from those in *Johnson* in that Wright reviewed plaintiff's medical file prior to denying him IR therapy. However, both here and in *Johnson,* Wright denied an inmate medical treatment in reliance on prison protocol without consideration of the degree to which the inmate was non-compliant with the protocol. Here, there is evidence that would permit a reasonable factfinder to conclude that Wright did not act with a sufficiently culpable state of mind in denying plaintiff IR therapy. However, in view of *Johnson,* I conclude that a reasonable factfinder could find in Verley's favor. There is no evidence in the record before the Court that Wright balanced plaintiff's medical and disciplinary record against the recommendation of plaintiff's treating physician and then exercised his considered medical judgment to deny plaintiff IR therapy. Further, there is no indication that Wright even believed that he had the discretion to depart from the 1998 Protocol. Indeed, the language of the 1998 Protocol is mandatory, stating that there *"must* be no evidence of active substance (alcohol or drug) use during the past two years" in order for an inmate to receive IR therapy. (Johnson Dec. Exh. I-4) (emphasis added) Applying *Johnson* to these facts, there is a triable issue of fact as to whether

2007 WL 2822199

Wright, in denying plaintiff IR therapy, acted with deliberate indifference to plaintiff's medical needs.

### b. *Claims Against Koenigsmann*

**\*12** The inquiry as to Koenigsmann turns on whether he acted with a "sufficiently culpable state of mind" in denying Verley consultations with specialists, including a nutritionist and hepatologist. These consultations were recommended in response to plaintiff's request by Dr. Bendheim, plaintiff's medical provider, on May 31, 2001. (Johnson Dec. Exh. E at DEF 234) While Koenigsmann did not follow Verley's treating physician's recommendation of a referral, he did so on the basis of his own medical judgment rather than in reflexive compliance with any prison medical policy. Koenigsmann denied plaintiff's request to see a specialist on the basis that plaintiff was seeing both Infectious Disease and Gastrointestinal Specialists. (*Id.;* Koenigsmann Dec. ¶ 10) He also relied on the fact that "there was no indication in [Verley's] medical records that the Infectious Disease consultant felt [Verley] needed to see a heptaologist," that Verley's condition was stable and that "there was no available retreatment approved by the FDA for patients" in Verley's circumstance who had failed to respond to IR therapy. (Koenigsmann Dec. ¶ 10) It was Koenigsmann's "professional judgment" that there was "no sound medical basis for granting Verley's May 31, 2001, request" to see a hepatologist. (*Id.* ¶¶ 10-11) Similarly, Koenigsmann concluded that, because Verley's weight had been managed without consulting a nutritionist, *Id.* ¶¶ 17-20; Johnson Dec. Exh. E at 244, Verley's health did not require a nutritional consultation. (Koenigsmann Dec. ¶ 22)

Plaintiff has failed to raise a triable issue of material fact as to the second prong of the deliberate indifference inquiry as to his claims against Koenigsmann. There is substantial evidence in the record that Koenigsmann reviewed plaintiff's file and made an independent medical determination that it was unnecessary for Verley to visit a specialist in light of the care that he was already receiving. *Cf. Johnson,* 412 F.3d at 404. Disagreement with a physician's decision, whether that decision is erroneous or not, is insufficient to support a finding of deliberate indifference. *See United States ex rel. Hyde v. McGinnis,* 429 F.2d 864, 867 (2d Cir.1970) ("[D]ifference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983."). There is insufficient evidence in the record before me to permit a reasonable factfinder to conclude that Koenigsmann knew of or disregarded an excessive risk to plaintiff's health or safety.

*See Farmer,* 511 U.S. at 837. Summary judgment is therefore granted dismissing the claims against Koenigsmann.

### c. *Claims Against the Corporate Defendants*

Plaintiff contends that "CPS and PHS' delay and denial of medical treatment to serious medical need constitutes a violation of the Eighth and Fourteenth Amendment[s] to the United States Constitution." (SAC ¶ 46) Although it is unclear from the face of the SAC precisely what medical treatment plaintiff alleges that he was denied by CPS and PHS, it appears that Verley contends that CPS denied him the PegIntron treatment and alternative treatment for HCV, specifically milk thistle. (Verley Dec. 102; 107) However, Verley concedes that no referral for a consultation regarding PegIntron was ever submitted to CPS. (Verley Dep. 108) There is no evidence in the record that a referral for alternative HCV treatment was ever submitted to CPS. While plaintiff contends that there are documents which "would have established the allegations" (Verley Dep. 102), plaintiff was offered a reasonable opportunity to conduct discovery and those documents are not part of the record before the Court. Therefore, even assuming that the first prong of the deliberate indifference inquiry were satisfied, there would be no basis on which a reasonable factfinder could conclude that the subjective component of the deliberate indifference inquiry is satisfied. Summary judgment is therefore granted to the Corporate Defendants.

### D. *Qualified Immunity*

**\*13** The State Defendants contend that even if plaintiff has evidence of the denial of a constitutional or federally protected right by a state actor, the state actor is protected by the defense of qualified immunity. I need only consider the defense as to Wright, as it is only as to him that the claim would otherwise survive. "The doctrine of qualified immunity protects state actors sued in their individual capacity from suits for monetary damages where 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Baskerville v. Blot,* 224 F.Supp.2d 723, 737 (S.D.N.Y.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Immunity applies to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). In considering whether defendant is protected by qualified immunity, a court "must first determine whether the facts alleged, taken most favorably to plaintiffs, demonstrate a violation of a constitutional right. Having already determined that they do, [the court] must turn to the second prong of

the qualified immunity analysis and determine whether the defendants' actions violated clearly established constitutional rights of which a reasonable person would have known." *Zieper v. Metzinger,* 474 F.3d 60, 67 (2d Cir.2007) (internal citations omitted). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The Second Circuit has stated that the right of prisoners to be free from deliberate indifference to serious medical needs under the Eighth Amendment is a clearly established right. *See LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998).

On a motion for summary judgment, dismissal of claims against a defendant on grounds of qualified immunity is appropriate only if "the evidence is such that, even when it is viewed in the light most favorable to the plaintiff [ ] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right." *McKenna v. Wright,* 2004 WL 102752, *8 n. 9 (S.D.N.Y. Jan. 21, 2004) (citation omitted), *aff'd,* 386 F .3d 432 (2004). A government official's actions are objectively unreasonable "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995) (citing *Malley,* 475 U.S. at 341). Whether or not a government official acts reasonably is determined by the state of the law applicable at the time of the alleged acts. *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). Therefore, if reasonable medical professionals could disagree as to whether Wright's actions were unlawful under the then-applicable law, summary judgment in favor of Wright is appropriate. *Lennon,* 66 F.3d at 421. The "ultimate legal determination whether ..." a government actor "... should have known he acted unlawfully is a question of law better left for the court to decide." *Id.*

 **\*14** In a qualified immunity analysis, the court should first define the clearly established right which is allegedly violated by a defendant's conduct. The defense of qualified immunity was not before the Second Circuit in *Johnson v. Wright,* 412 F.3d at 406 n. 4. Thus, it was not necessary for the Court to define a right as clearly established within the meaning of *Saucier v. Katz,* 533 U .S. 194, 202 (2001), and other cases. It may be tempting to read *Johnson* as holding that there is a clearly established right not to be denied

HCV treatment based solely upon isolated instances of drug use during a specific time period and in contravention of the recommendations of treating physicians, but I am not convinced that is a fair reading of the case which arose in the context of a single reported instance of marijuana use. If I were to assume that the foregoing is the clearly established right, then it was not established until *Johnson* which was not decided until 2005, long after the events at issue in this case. To avoid doubt, I will also examine qualified immunity through the lens of the broader right which was clearly established at the time of the operative events-a right to be free from inadequate medical care.

The Court must next determine whether a rational factfinder could conclude that it was objectively reasonable for Wright to believe that by following the 1998 Protocol, he acted in a fashion that was not deliberately indifferent to plaintiff's rights. At the time that Wright denied plaintiff IR therapy, a reasonable prison official would have known that "inadequate medical care can give rise to an Eighth Amendment constitutional violation where prison officials are deliberately indifferent to an inmate's serious medical needs." *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976). However, a reasonable prison medical official would not necessarily have known that denying plaintiff treatment in reliance on the 1998 Protocol would constitute deliberate indifference to plaintiff's medical needs. The 1998 Protocol required that candidates for IR therapy have been drug-free for two years because consuming drugs which are metabolized through the liver may adversely impact treatment and drug abuse raises concerns that a participant may not be compliant with the conditions of treatment. (Wright Dec. ¶ 10; Johnson Dec. Exh. I-4) According to defendants' expert, Mark Korsten, the guidelines in place in 1998-1999 "reflect the generally accepted standards of care in relation to the diagnosis and treatment of Hepatitis at that time," including "the then-prevailing view that substance abuse, whether or not involving intravenous drug use, warranted withholding of drug therapy for Hepatitis C ...." (Johnson Dec. Exh D, Korsten Dec. ¶ 3-4) Wright's treatment of plaintiff, in addition to being in compliance with the applicable prison regulations, did not result in any "departure from accepted standards of care ...." (*Id.,* tab D-2 ¶ 6) Plaintiff has presented no evidence to the contrary. Because reasonable prison medical officials could have concluded that Wright's denial of plaintiff's referral for IR therapy pursuant to the policy then in effect at Green Haven was not unlawful, Wright is protected by qualified immunity.

2007 WL 2822199

*CONCLUSION*

**\*15**  Defendants Wright, Koenigsmann, Weinstein, Corrections Physician Services and Prison Health Services motions for summary judgment are granted. All other claims having been previously dismissed, the Clerk shall enter judgment in favor of defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2822199

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.