UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JONATHAN JACKSON,

                                    Plaintiff,

                                                              9:19-cv-0193
v.                                                            (MAD/TWD)

J. RELF, et al.,

                                    Defendants.
_____

APPEARANCES:                              OF COUNSEL:

JONATHAN JACKSON
*Plaintiff, pro se*
05-A-2182
Otisville Correctional Facility
Box 8
Otisville, NY 10963

LETITIA JAMES                             ERIK BOULE PINSONNAULT, ESQ.
Attorney General of the State of New York  Ass't Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

I.      **INTRODUCTION**

        Jonathan Jackson ("Plaintiff"), an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se*

action pursuant to 42 U.S.C. § 1983, asserting his constitutional rights were violated at Great

Meadow Correctional Facility ("Great Meadow").  (Dkt. No. 1, Plaintiff's complaint.)  The

Honorable Mae A. D'Agostino, United States District Judge, reviewed the complaint in

accordance with 28 U.S.C. § 1915, and found only Plaintiff's Fourteenth Amendment procedural due process claims against Deputy Superintendent of Administration Relf, Correction Officer Brockley, and Lieutenant Scarlotta (collectively, "Defendants") required a response. (Dkt. No. 7.) Plaintiff's claims survived Defendants' motion to dismiss. (Dkt. No. 37.)

Defendants now move for summary judgment on grounds that (1) Plaintiff was not deprived of a protected liberty interest sufficient to support his Fourteenth Amendment due process claims; and (2) Plaintiff's due process claims against Brockley and Scarlotta fail for lack of personal involvement. (Dkt. No. 48.) Plaintiff opposed the motion and Defendants filed a reply. (Dkt. Nos. 52, 53.) This motion was referred for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). For the reasons that follow, the Court recommends granting Defendants' motion.

## II.    BACKGROUND[1]

### A.    July 13, 2018, Misbehavior Report and Resulting Disciplinary Hearing

On July 13, 2018, Plaintiff was confined in a single-bunk cell on 4 company in B block at Great Meadow. (Dkt. No. 48-7, Defendants' Statement Pursuant to Rule 7.1(a)(3),[2] at ¶ 2.) On that date, cell frisks were performed throughout companies 4, 5, 6, and 8 on B block because a used saw blade had been found on 4 company. *Id*. at ¶ 3. At approximately 5:20 p.m., Brockley performed a frisk of Plaintiff's cell (B-4-28). *Id*. at ¶ 4. Brockley issued a misbehavior report or

---

[1]  Unless otherwise noted, the following relevant facts are undisputed for purposes of the pending motion for summary judgment.

[2]  The Local Rules were amended effective January 1, 2021. In the amendment, L.R. 7.1 was dissected and various subsections were renumbered and relocated to correspond with the appropriate Federal Rule. The relevant substance of the rules did not change. In the currently operative version of the Local Rules, L.R. 56.1 deals with summary judgement motions. However, because the instant motion was filed in 2020, the Court refers to the Local Rules as they existed at that time.

"ticket" charging Plaintiff with possession of a weapon and contraband—specifically, a "wooden shank-type weapon" (5-inch long, ¾ inch wide) in an electrical tape sheath. *Id*. at ¶ 5. As a result of the multi-company cell frisk operation, six shank-type weapons were found in different inmates' possession. *Id*. at ¶ 6.

On July 20, 2018, Relf presided over Plaintiff's Tier III disciplinary hearing for violations related to the misbehavior report and Plaintiff pleaded not guilty. *Id*. at ¶¶ 10, 11. Plaintiff selected Sgt. Lyons as his hearing assistant. *Id*. at ¶ 9. Brockley and Scarlotta testified at the hearing. *Id*. at ¶ 12. Plaintiff had no familiarity with Brockley or Scarlotta before July 13, 2018. *Id*. at ¶¶ 6, 7.

On July 31, 2018, Relf found Plaintiff guilty and sentenced him to keeplock confinement, as well as loss of recreation time, full access to commissary, packages, and telephone privileges. *Id*. at ¶ 13.[3] Plaintiff remained in keeplock until November 8, 2018. *Id*. at ¶ 14. In total, Plaintiff was subjected to 118 days of restrictive confinement (18 days in the special housing unit ("SHU") and 100 days in keeplock). *Id*. at ¶ 13.[4]

Generally, Plaintiff alleges his due process rights were violated when Relf acted with "outright bias" and credited the testimony of Brockley and Scarlotta, and the statements in the misbehavior report, even though there was no other physical or verbal evidence procured during

---

[3] Specifically, Relf imposed a penalty of 270 days of keeplock, with a corresponding loss of privileges. (Dkt. No. 48-4, Declaration of Relf, at ¶ 28.) However, 90 days were suspended and deferred. *Id*. Plaintiff appealed the guilty determination and penalty. *Id*. at ¶ 30. Director Venettozzi reversed the determination, expunged the hearing, and ordered a rehearing. *Id*.

[4] Pursuant to DOCCS procedures, upon issuance of the misbehavior report, Plaintiff was confined in the SHU pending the outcome of the disciplinary hearing. (Dkt. No. 48-4 at ¶¶ 13, 19.)

the hearing.  (Dkt. No. 1 at 5, 7.[5])  Plaintiff claims that during the hearing, he made several

objections, including: (1) there was no video footage of the cell search, strip frisk, or his

interrogation by Scarlotta produced during the hearing even though Plaintiff had requested this

material; (2) he was denied his right to call the three inmate witnesses whom he requested testify,

and no refusal statement was introduced into the record showing that any of the witnesses

refused to appear; (3) no photos of the alleged weapon were introduced and Relf "never testified

or placed on the record[ ] that she would secur[e] any [testimony] to prove one . . . existed[;]"

and (4) the hearing was extended twice in violation of DOCCS Directive #4932.  *Id*. at 5.

Plaintiff further alleges the misbehavior report issued by Brockley was false, Brockley and

Scarlotta provided false testimony at the disciplinary hearing, and that prior to the search,

Scarlotta "threatened" Plaintiff that if he did not "take the blame" for a weapon found in the

company trash can, "this could happen."  *Id*. at 5.

　　　　For her part, Relf asserts her determination was supported by the testimony and

documentary evidence presented at the hearing.  (Dkt. No. 48-4, Relf's Declaration, at ¶ 27.)

Specifically, she relied upon the misbehavior report authored by Brockley and Brockley's

testimony, along with Scarlotta's testimony, which provided substantial evidence to support her

determination.  *Id*.  She read the misbehavior report into evidence and Plaintiff declined to

provide testimony, stating he had no testimony to give.  *Id*. at ¶ 20.  As to Plaintiff's allegations

that he requested an inmate to testify at the hearing, which was allegedly disregarded, Relf states

that although he may have requested an inmate witness from his hearing assistant, he did not

request an inmate witness during the hearing.  *Id*. at ¶ 21; *see also id*. at ¶¶ 22, 23.  Similarly, she

---

[5]  Citations to page numbers in the filings refer to the pagination CM/ECF automatically generates.

does not recall Plaintiff asking for any video footage at the hearing. *Id*. at ¶ 24. Relf explains "[t]he determination of guilt and the penalty that I set at the conclusion of the Tier III hearing were not based on any bias toward plaintiff, but instead were designed to promote DOCCS' legitimate noncriminal objectives of maintaining prison safety, discipline, and order by deterring future misbehavior of a similar serious nature." *Id*. at ¶ 29.

For his part, Brockley states that under the direction of Scarlotta, he conducted a suspicion-based cell frisk of Plaintiff's cell and found the wood, shank-type weapon in a laundry bucket between folded clothes under Plaintiff's bunk. (Dkt. No. 49-6, Brockley's Declaration, at ¶ 6.) He testified by telephone at Plaintiff's disciplinary hearing and testified consistent with what he wrote in the misbehavior report. *Id*. at ¶ 10. He states that contrary to Plaintiff's suggestion, "he did not lie about finding a weapon hidden in his laundry bucket, and there was no conspiracy against him." *Id*. at ¶ 12. Brockley further avers he "never interfered with or took any steps to prevent plaintiff from presenting documentary evidence or witnesses at the subject disciplinary hearing." *Id*. at ¶ 14.

Lastly, Scarlotta explains that on July 13, 2018, interviews were conducted of every inmate housed on 4 company in B block in order to investigate the discarded saw blade hidden in a trash can. (Dkt. No. 48-5, Scarlotta's Declaration, at ¶¶ 6, 9.) Plaintiff's cell was first frisked at approximately 2:00 p.m. *Id*. at ¶ 8. Scarlotta interviewed Plaintiff and, thereafter, at approximately 5:20 p.m. sent Brockley to frisk Plaintiff's cell a second time. *Id*. at ¶ 11. Scarlotta explains "there are times when security staff frisks a cell but, for one reason or another, misses something[,]" which is why Brockley was sent to frisk Plaintiff's cell a second time. *Id*. at ¶¶ 10, 11. He avers that contrary to Plaintiff's assertion, he did not threaten Plaintiff in any manner on July 13, 2018. *Id*. at ¶ 17. He states he did not write the misbehavior report or frisk

Plaintiff's cell on July 13, 2018. *Id.* at ¶ 18. To the best of his knowledge, upon information and belief, the misbehavior report was not a false or "sham" ticket, as alleged in the complaint. *Id.* at ¶ 19. Rather, it was issued because Brockley discovered a shank-type weapon in Plaintiff's cell. *Id.* Scarlotta states he never interfered with or took any steps to prevent Plaintiff from presenting documentary evidence or witnesses at the subject disciplinary hearing. *Id.* at ¶ 20.

**B.    Duration and Conditions of Plaintiff's Disciplinary Confinement**

As noted, it is undisputed that Plaintiff was subjected to a total of 118 days of disciplinary confinement as result of the misbehavior report and disciplinary hearing that followed. (Dkt. No. 48-7 at ¶ 15.) Specifically, Plaintiff was confined in the SHU for 18 days and then confined to keeplock for approximately 100 days. *Id.* Plaintiff testified and described his keeplock confinement as "just like the SHU" in that he was "basically" confined to his cell 23 hours per day, and given one hour of recreation in an outdoor enclosure; he had limited access to commissary insofar and had to wait 30 days before having full access to commissary; he had non-contact visitation; he could not use the telephone or receive packages; and he had to wait approximately one week to receive his personal property. (Dkt. No. 48-3, Plaintiff's Deposition, at 51-53, 76.) Plaintiff further testified that although he had access to the showers, he could not shower for about a week because he did not have anything to "use" in the shower, like shampoo. *Id.* at 78. Additionally, Plaintiff's pending transfer request was "shut down" after the misbehavior report and disciplinary hearing. *Id.*

In his opposition submission, Plaintiff states that the night he was placed in the SHU, he was only given half of a bed sheet and his blankets "had a certain urine smell." (Dkt. No. 52, Plaintiff's Declaration, at 7, ¶ 8.) He was placed in "dirty filthy cell that had stains on the wall, which [he] couldn't identify, along with the floors, toilet being dirty." *Id.* The next day he

requested permission to clean and disinfect his cell but was told he had to "wait until cell clean up, which was days away." *Id*. He was also told he would have to wait until more bed sheets and blankets were available. *Id*. Additionally, the SHU was noisy due to prisoners yelling and screaming. *Id*.

When Plaintiff asked about his "property," he was told that "it was still in [his] previous cell waiting to be packed up." *Id*. at ¶ 9. Without his property, Plaintiff was "unable to shower because [he] had no shower slippers, soap or [ ] washrag." *Id*. He had no extra clothing and was "forced to wear the same jumpsuit and under garment for several days." *Id*. He was also "pat frisk[ed] and shackled every time [he] existed (sic) [his] cell." *Id*. Plaintiff states he could not contact his family, friends, or anyone else about the "situation" because he did not have stamps and could not use the telephone. *Id*. His visits were no contact and limited to once a week. *Id*. He wrote several grievances "to the situation" but "there was never a response from any staff because they were never received, indicating [his] facility mail was being tampered with." *Id*.

## III.    LEGAL STANDARD GOVENRING SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

## IV.    DISCUSSION

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV § 1.  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted).  "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).  These protections include providing the inmate with "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken."  *Smith v. Fischer*, 803 F.3d 124, 127 (2d Cir. 2015) (citing *Wolff v. McDonald*, 418 U.S. 539, 564-70 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004)).  Additionally, the hearing officer's findings must be supported by "some" "reliable evidence."  *Sira*, 380 F.3d at 69 (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)) (other citation omitted).

To establish a Fourteenth Amendment procedural due process claim under Section 1983, a plaintiff must show he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

In this case, Plaintiff alleges Defendants deprived him of a liberty interest without due process. (*See generally* Dkt. No. 1; Dkt. No. 7.) Defendants argue Plaintiff's claims fail to implicate a protectable liberty interest. (Dkt. No. 48, Defendants' Memorandum of Law, at 9-14.) Defendants further argue Brockley and Scarlotta are entitled to summary judgment for lack of personal involvement. *Id.* at 14-19.

A.      **Liberty Interest**

An inmate retains a protected liberty interest in remaining free from segregated confinement if he can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Therefore, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; Hynes, 143 F.3d at 658. As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases).

Regarding the second factor, the plaintiff bears the "burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under Section 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998). The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (citation omitted). Thus, while not dispositive, the

duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Confinement for 101 days or fewer under typical punitive segregation conditions "generally do[es] not constitute 'atypical' conditions of confinement." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (quoting *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999)). By contrast, 305 days or more of segregated confinement has been deemed an atypical and significant hardship. *See Colon*, 215 F.3d at 231-32. "A period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting*, 452 F. Supp. 2d at 456 (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65.

As set forth above, the undisputed record evidence demonstrates Plaintiff was housed in disciplinary confinement for approximately 118 days.[6] (Dkt. No. 49-7 at ¶ 15.) Where, as in this

---

[6] The Court notes that "[w]hile some courts have analyzed procedural due process claims stemming from keeplock confinement under principles ordinarily applicable to disciplinary or administrative SHU confinement, . . . , others have concluded that ordinary keeplock confinement conditions are not sufficiently atypical or significant hardships in relation to the ordinary incidents of prison life to trigger the protections of the Fourteenth Amendment." *Smith v. Wright*, No. 9:06-CV-00401 (FJS/DEP), 2011 WL 4902860, at *9 n.17 (N.D.N.Y. Aug. 31, 2011) ("assum[ing] . . . plaintiff's medical keeplock confinement for a period of approximately seven months, with a corresponding loss of privileges, constituted the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's due process protections"), *report-recommendation adopted by* 2011 WL 4458770 (N.D.N.Y. Sept. 23, 2011); *see also Gillard v. Rovelli*, No. 9:12-CV-0083 (LEK/CFH), 2013 WL 5503317, at *13 (N.D.N.Y. Sept. 30, 2013) (recognizing that "keeplock is less confining than SHU," but finding that "questions of fact exist with respect to whether Gillard's 90 days in keeplock amount to a liberty interest" and denying

case, the plaintiff's disciplinary confinement "was not long enough to constitute an atypical and significant deprivation by itself," courts "look to the conditions of confinement" as alleged by the plaintiff. *Smith v. Hamilton*, 9:15-CV-0496 (BKS/ATB), 2016 WL 3823395, at *3 (N.D.N.Y. July 12, 2016) (quoting *Palmer*, 364 F.3d at 66). In this regard, Plaintiff claims he was also penalized with loss of packages, commissary, telephone, and contact visitation. Plaintiff does not claim, and the record does not support, that he endured conditions that could be construed as atypical or unusual. *See McEachin v. Selsky*, No. 9:04-CV-0083 (FJS/RFT), 2010 WL 3259975, at *9 (N.D.N.Y. Mar. 30, 2010) ("It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall 'within the expected parameters of the sentence imposed by a court of law.'") (citations omitted); *Frazier v. Coughlin*, 81 F.3d 313, 315, 317 (2d Cir. 1996) (loss of commissary, recreation, package, and telephone privileges did not amount to an atypical and significant deprivation); *Nogueras v. Coughlin*, No. 94-CV-4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug. 27, 1996) ("Restrictions on telephone use, recreational activities, access to law libraries, visitation, personal property, educational and employment opportunities" did not amount to atypical hardship.); *Thomas v. Smith*, 559 F. Supp. 223, 224 (W.D.N.Y. 1983) (denial of basic hygiene items such as deodorant, soap, shampoo while confined in disciplinary segregation dismissed as frivolous).

Moreover, as Defendants correctly observe in their reply to Plaintiff's opposition, while Plaintiff describes the conditions that he allegedly experienced in the SHU, he does specify the length of time that these conditions persisted, he provides no citation to the record, and he alleges

---

motion to dismiss). The Court assumes, for purposes of this Report and Recommendation only, that keeplock confinement conditions may be sufficiently atypical or significant in relation to the ordinary incidents of prison life to trigger the protections of the Fourteenth Amendment.

several conditions—including allegations about the cleanliness of his SHU cell—for the first time in opposition to Defendants' motion.  (*See* Dkt. No. 53 at 3-4; *compare* Dkt. No. 52 at 3, 7, *with* Dkt. No. 48-3 at 51-53, 76-79; *see also* Dkt. No. 48-7 at ¶ 16.)  Such conclusory and self-serving statements, some of which were raised for the first time in opposition to Defendants' motion for summary judgment, fail to raise a genuine dispute of material fact.

Given the totality of the evidence, Plaintiff has not raised a triable dispute of fact as to whether the 118 days of disciplinary confinement was an atypical hardship under *Sandin*.  *See Jabot v. Correction Officer Minor*, No. 9:13-CV-01407 (DNH/TWD), 2016 WL 5322113, at *8 (N.D.N.Y. July 15, 2016) (holding 200 days of disciplinary confinement in the SHU at county correctional facility, along with a loss of privileges such as telephone and visitation insufficient to warrant constitutional protections even though plaintiff also experienced conditions of lack of sleep, difficulty eating, and being shackled during facility transport), *report-recommendation adopted*, 2016 WL 5173279 (N.D.N.Y. Sept. 21, 2016); *Spence v. Senkowski*, No. 91-CV-955 (NPM), 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (plaintiff's confinement in the SHU for 180 days, with a corresponding loss of packages, telephone privileges, commissary privileges and his prison job was not an atypical or significant hardship to establish the existence of a liberty interest); *Young v. Polizzi*, No. 9:16-cv-0660 (FJS/CFH), 2018 WL 3949967, at *6 (N.D.N.Y. July 18, 2019) (finding no protected liberty interest where deaf plaintiff was confined in the SHU for 120 days and claimed he was "penalized with loss of packages, commissary, and telephone privileges and . . . had limited access to the serves of a sign language interpreter while in SHU).

Based on the forgoing, the Court finds Plaintiff has failed to establish a protected liberty interest and, consequently, Plaintiff's Fourteenth Amendment due process claims fail as a matter

of law.  Without the denial of a cognizable liberty interest, there can be no due process violation.

*See Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998).  Accordingly, the Court recommends

granting summary judgment to Defendants.

### B.    Personal Involvement

Brockley and Scarlotta also contend they are entitled to summary judgment for lack of

personal involvement.  (Dkt. No. 48-2 at 14-19.)  As a fundamental prerequisite "[t]o

establish[ing] a § 1983 claim, a plaintiff must show the defendants' personal involvement in the

alleged constitutional violation."  *Boley v. Durets*, 687 F. App'x 40, 41 (2d Cir. 2017) (citing

*Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Moreover, as recently emphasized by the

Second Circuit, there is no "special rule for supervisory liability."  *Tangreti v. Bachmann*, 983

F.3d 609, 612 (2d Cir. 2020).  Instead, a plaintiff must plead and prove that "each Government-

official defendant, through the official's own individual actions, has violated the Constitution."

*Id.* (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Generally, Plaintiff argues that because Brockley, at the direction of Scarlotta, issued him

a false misbehavior report and both Brockley and Scarlotta provided false testimony at the

disciplinary hearing, they deprived him of his constitutional right to due process.[7]  "However,

---

[7]  Plaintiff also testified that Brockley and Scarlotta "conspired" to deny Plaintiff his
procedural due process rights and were "part of a conspiracy to get [him] out of the facility."
(Dkt. No. 48-3 at 62-67).  Even when construed with the utmost of special liberality, the Court
agrees with Defendants that Plaintiff has failed to state a § 1983 conspiracy claim.  (*See* Dkt. No.
48-1 at 16-17.)  "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between
two or more state actors or between a state actor and a private entity; (2) to act in concert to
inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing
damages."  *Benitez v. Ham*, No. 9:04-CV-1159 (NAM), 2009 WL 3486379, at *18 (N.D.N.Y.
Oct. 21, 2009) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)).  A violated
constitutional right is a natural prerequisite to a claim of conspiracy to violate such right.  *See*
*Malsh v. Austin*, 901 F. Supp. 757, 763-64 (S.D.N.Y. 1995) (citation omitted).  Thus, if a
plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a
claim of conspiracy to violate those rights.  *See id.*; *see also Friends of Falun Gong v. Pacific*

this 'but for causation' argument is not the standard for Section 1983 liability." *Muhammad v. Pico*, No. 02 Civ. 1052, 2003 WL 21792158, at *6 (S.D.N.Y. Aug. 5, 2003); *see Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing."); *see also Freeman v. Rideout*, 808 F.2d 949, 950, 953 (2d Cir. 1986) ("[T]he filing of unfounded charges is not *per se* a constitutional violation under section 1983[.]"). Rather, "[t]he issuance of false misbehavior reports and provision of false testimony against an inmate . . . violates due process only where either procedural protections were denied that would have allowed the inmate to expose the falsity of the evidence against him, . . . or where the fabrication of evidence was motivated by a desire to retaliate for the inmate's exercise of his substantive constitutional rights[.]"[8] *Mitchell v. Senkowski*, 158 Fed. App'x 346, 349 (2d Cir. 2005) (internal citations omitted).

_____

*Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (citations omitted); *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) (citation omitted). Moreover, vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under § 1983. *James v. Will*, No. 9:17-CV-0843 (GTS/ML), 2020 WL 1030648, at *6 (N.D.N.Y. Mar. 3, 2020). Instead, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Id.* (citations omitted). Lastly, according to the intra-corporate conspiracy doctrine, which applies to § 1983 conspiracy claims, *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Fitzgerald*, 2012 WL 5986547, at *23 (citations omitted). Here, Plaintiff's conspiracy claim, if any, is supported by only conclusory and vague allegations of a conspiracy, which is insufficient. Further, for reasons discussed herein, inasmuch as the Court recommends granting summary judgment to Defendants on Plaintiff's due process claims, it follows he cannot sustain a claim of conspiracy to violate those rights. Lastly, any conspiracy claim would also likely be barred by the intra-corporate conspiracy doctrine.

[8] In this case, Plaintiff does not assert retaliation and the record does not support that Brockley's allegedly false ticket and/or Brockley's and Scarlotta's allegedly false testimony were provided in retaliation for Plaintiff exercising a constitutionally protected right.

Here, the Court finds Plaintiff was afforded a hearing that would have allowed him to expose the falsity of the lodged charges. The record demonstrates the misbehavior report was formally served on Plaintiff on July 14, 2018. (Dkt. No. 48-4 at ¶ 14.) Plaintiff met with his assigned assistant on July 18, 2018. *Id*. at ¶¶ 15, 16. The Tier III disciplinary hearing began on July 20, 2018, and Plaintiff was present at the hearing. *Id*. at ¶ 17. Relf read the misbehavior report into evidence at the hearing. *Id*. at ¶ 18. Plaintiff then pleaded not guilty to the charges and declined to provide testimony—he stated that he had no testimony to give. *Id*. at ¶ 20.

Both Brockley and Scarlotta testified at the hearing. (Dkt. No. 48-7 at ¶ 12.) Brockley avers that his testimony was consistent with what he wrote in the misbehavior report. (Dkt. No. 48-6 at ¶ 10.) He states that contrary to Plaintiff's suggestion, "he did not lie about finding a weapon hidden in his laundry bucket, and there was no conspiracy against him." *Id*. at ¶ 12. Further, Brockley further avers he "never interfered with or took any steps to prevent plaintiff from presenting documentary evidence or witnesses at the subject disciplinary hearing." *Id*. at ¶ 14. Scarlotta also declares he "never interfered with or took any steps to prevent Plaintiff from presenting documentary evidence or witnesses at the subject disciplinary hearing, on the charges related to hiding a weapon in his cell on July 13, 2018." (Dkt. No. 48-5 at ¶ 20.) Scarlotta further states avers that he did not threaten Plaintiff in any manner on July 13, 2018. *Id*. at ¶ 17.

On July 31, 2018, relying upon the misbehavior report and Brockley's and Scarlotta's testimony, Relf found Plaintiff guilty. *Id*. at ¶ 13. As discussed above, Relf states that during the hearing, Plaintiff did not request the testimony from any inmate, nor does she recall Plaintiff asking for video footage during the hearing. (Dkt. No. 48-4 at ¶¶ 21, 22, 23.) In her declaration, Relf explains "[t]he determination of guilt and the penalty that I set at the conclusion of the Tier III hearing were not based on any bias toward plaintiff, but instead were designed to promote

DOCCS' legitimate noncriminal objectives of maintaining prison safety, discipline, and order by deterring future misbehavior of a similar serious nature." *Id.* at ¶ 29.

In light of the foregoing, the Court finds Plaintiff was adequately afforded a hearing on his claim that he was falsely accused and denied due process. Consequently, the Court recommends granting summary judgment to Brockley and Scarlotta for lack of personal involvement. *See Amaker v. Boyd*, No. 9:19-CV-1253 (LEKATB), 2020 WL 210317, at *10 (N.D.N.Y. Jan. 14, 2020) (dismissing due process claims against authors of the misbehavior report where plaintiff failed to allege facts to suggest he was not adequately afforded a hearing on his claim that he was falsely accused.).

Moreover, for reasons discussed in Part IV.A. above, the Court finds Plaintiff's disciplinary confinement at issue fails to implicate a protected liberty interest. As noted, without the denial of a cognizable liberty interest, there can be no due process violation. *See Scott*, 156 F.3d at 287 ("No right to due process is implicated in the prison context unless a liberty interest has been deprived[.]"); *Gill v. Riddick*, No. 03-CV-1456, 2005 WL 755745, at *14 (N.D.N.Y. Mar. 31, 2005) ("If, however, no liberty interest is implicated, then a fortiori, our analysis ceases and the claim should be dismissed."). Consequently, Plaintiff's due process claims against Brockley and Scarlotta also fail as a matter of law.

## V.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court recommends granting Defendants' motion and dismissing Plaintiff's complaint in its entirety with prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the Court.  __FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW__.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 12, 2021
    Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9]  If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shihsiang LIAO, a/k/a Shih-
Siang Shawn Liao, Plaintiff,

v.

Faisal MALIK,[1] Defendant.

[1]    The remaining defendant in this action is
identified in plaintiff's complaint as S. Malik.
*Dkt. No. 1 at 3.* It is clear from his motion
papers, however, that defendant's first name is
"Faisal." See, e.g., *Dkt. No. 41-2 at 1.* The clerk
of the court is respectfully directed to adjust
the court's records accordingly.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O. Box 472,
Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, The Capitol, KEITH J.
STARLIN, ESQ., Assistant Attorney General, Albany, NY
12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff
Shihsiang Liao, a former New York State prison inmate
who has also identified himself as Shih–Siang Shawn
Liao, against four employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), including its former commissioner and current
acting commissioner, pursuant to 42 U.S.C. § 1983. While
his complaint contains additional claims, the sole remaining
cause of action in this case is asserted against defendant Faisal
Malik based on allegations that he denied plaintiff due process
while assisting him in preparing for a disciplinary hearing
by failing to interview and obtain witnesses identified by
plaintiff.

Currently pending before the court is a motion brought by the
defendant Malik requesting the entry of summary judgment
dismissing plaintiff's remaining claim. For the reasons set
forth below, I recommend that defendant's motion, which
plaintiff has not opposed, be granted.

I. *BACKGROUND* [2]

[2]    In light of the procedural posture of this case,
the following recitation is derived from the record
now before the court, with all inferences and
ambiguities resolved in plaintiff's favor. *Terry v.
Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).*

Prior to his release from prison in or about September 2014,
*Dkt. No. 25,* plaintiff was an inmate held in the custody of
the DOCCS.[3] *See generallyDkt. No. 1.* At the times relevant
to his remaining claim, plaintiff was confined initially
in the Ogdensburg Correctional Facility ("Ogdensburg"),
located in Ogdensburg, New York, and later the Gouverneur
Correctional Facility ("Gouverneur"), located in Gouverneur,
New York. *Id.*; *Dkt. No. 41–6 at 19.*

[3]    It appears that following his release from prison in
New York, plaintiff served time in two correctional
facilities in Ohio. Dkt. Nos. 25, 30; *see alsoDkt. No.
41–6 at 129.*

On November 19, 2010, plaintiff was issued a series of
misbehavior reports accusing him of violating prison rules
arising from conduct occurring while housed in Ogdensburg.
*Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The charges set
forth in those misbehavior reports accused the plaintiff
of (1) soliciting goods or services without consent from
the superintendent or his designee; (2) the unauthorized
exchange of personal items without authorization; (3)
possession of contraband; (4) taking state property; (5)
providing incomplete, misleading, and/or false statements
or information; (6) impersonation; and (7) providing legal
assistance to another inmate without prior approval from the
superintendent or his designee. *Dkt. No 1 at 21–24; Dkt. No.
41–7.* Those charges were based upon a search of plaintiff's
cell, conducted on November 19, 2010, and the resulting
confiscation of several prohibited items. *Dkt. No. 1 at 4,* 21–
24; *Dkt. No. 41–7;see alsoDkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports, plaintiff
was transferred to a special housing unit ("SHU") in
Gouverneur to await a Tier III disciplinary hearing concerning

**Liao v. Malik, Not Reported in Fed. Supp. (2016)**
Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 20 of 182
2016 WL 1128245

the pending charges. [4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 1,* 6– 7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41– 6 at 21.* One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.*; *see also Dkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

[4]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

 **\*2**  A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010, at the close of the hearing, plaintiff was found guilty on all counts, with

the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendant's Motion*
Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [5]

[5] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at* 3, and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 22 of 182

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

   C. *Analysis of Plaintiff's Procedural Due Process Claim*
In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under Sandin.

Atypicality in a *Sandin* inquiry is normally a question of law. [6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

[6]       In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 23 of 182
Liao v. Malik, Not Reported in Fed. Supp. (2016)
2016 WL 1128245

court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way,[7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso,* 292 F. App'x at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

[7] Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him

approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,* 418 U.S. 539 (1974). In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

Although this is not the occasion to define the assigned assistant's

**Liao v. Malik, Not Reported in Fed. Supp. (2016)**

2016 WL 1128245

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 24 of 182

precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id*. at 898; accord, *Samuels v. Selsky,* 166 F. App'x 552, 556 (2d Cir. 2006). [8]

[8]     The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at *9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at *9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at *6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at *12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generallyDkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.*; *see alsoDkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see alsoDkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7**  Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form.

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 25 of 182

*Id.*; Dkt. No. 41–3. Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9– 10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23.* Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29.* Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11.*

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at 58.* While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at 34– 36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng.* Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel

or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at *6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *See* Dkt. No. 41–2. This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2,* 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

[9]    At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generally* Dkt. No. 41–8.

[10]    In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

IV. *SUMMARY AND RECOMMENDATION*

 **\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff

has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1128245

---

2016 WL 3823395
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason SMITH, Plaintiff,
v.
M. HAMILTON, Correctional Officer; Riverview
Correctional Facility, et al, Defendants.

9:15 -CV-0496 (BKS/ATB)
|
Signed July 11, 2016
|
Filed 07/12/2016

**Attorneys and Law Firms**

Jason Smith, New York, NY 10027, Plaintiff, pro se.

Oriana L. Carravetta, Esq., Hon. Eric T. Schneiderman, Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, U. S. District Judge

**\*1  I. Introduction**

Plaintiff pro se Jason Smith brought this action against defendants under 42 U.S.C. § 1983 alleging violations of his constitutional rights while he was an inmate at Riverview Correctional Facility. Dkt. No. 1. In a July 27, 2015 Decision and Order, the Court determined that the following claims survived sua sponte review under 28 U.S.C. §§ 1915(e)(2) (B) and 1915A(b), and required a response: (1) the Fourteenth Amendment due process claims against defendants A. Rufa, Albert Prack and C. Hillenbrand; (2) the First Amendment retaliation claim against defendant M. Hamilton; and (3) the supervisory claim against defendant John Doe. Dkt. No. 5, p. 18.

On November 6, 2015, defendants filed a motion for partial summary judgment under Fed. R. Civ. P. 56 on the First Amendment retaliation claim for failure to exhaust administrative remedies, and for partial dismissal under Fed. R. Civ. P. 12(b)(6) of the due process claims for failure to state

a claim on which relief may be granted. Dkt. No. 12. Plaintiff filed a response in opposition. Dkt. No. 23.

This matter was assigned to United States Magistrate Judge Andrew T. Baxter, who issued a Report-Recommendation and Order on April 1, 2016, recommending that the motion be granted in part and denied in part. Dkt. No. 27. Magistrate Judge Baxter recommended that defendants' motion for summary judgment as to the First Amendment retaliation claim be granted, based upon the failure to exhaust administrative remedies, and that the complaint be dismissed in its entirety as to defendant Hamilton and as to a First Amendment retaliation claim. Dkt. No. 27, pp. 23-24. Magistrate Judge Baxter recommended that the motion to dismiss the due process claims against defendants Rufa, Prack and Hillendbrand be denied. Dkt. No. 27, at 23-24. Magistrate Judge Baxter advised the parties that under 28 U.S.C. § 636(b) (1) and Local Rule 72.1(c), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. *Id.*

Plaintiff did not file an objection to the Report-Recommendation. [1] Defendants filed an objection to the Report-Recommendation, objecting to Magistrate Judge Baxter's determination that the Plaintiff had alleged a sufficient liberty interest for his due process claim. Dkt. No. 29. For the reasons set forth below, the Report-Recommendation is adopted in its entirety.

[1]     The Report-Recommendation was served on Plaintiff at Auburn Correctional Facility on April 1, 2016. On April 5, 2016, Plaintiff filed a notice of change of address with the Court. Dkt. No. 28. The Clerk resent the Report-Recommendation to Plaintiff at his new address on April 6, 2016.

**II. Standard of Review**

This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue,* 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.*

Smith v. Hamilton, Not Reported in Fed. Supp. (2016)

2016 WL 3823395

**\*2** To survive a motion to dismiss a complaint "must plead 'enough facts to state a claim to relief that is plausible on its face.' " *J.S. v. T'Kach*, 714 F.3d 99, 103 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the "court must accept as true all of the allegations contained in a complaint ... [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that is filed *pro se* must be construed liberally, "interpreting it to raise the strongest claims that it suggests." *J.S. v. T'Kach*, 714 F.3d at 103.

### III. Discussion

The Court has reviewed Magistrate Judge Baxter's determination that plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claim for clear error, and found none. The Court accordingly adopts Magistrate Judge Baxter's Report-Recommendation in its entirety as to Defendants' motion for partial summary judgment under Fed. R. Civ. P. 56 as to the First Amendment retaliation claim and as to defendant Hamilton.

With respect to Plaintiff's due process claim, Defendants have objected to Magistrate Judge Baxter's rationale for concluding that Plaintiff has alleged a sufficient liberty interest. Dkt. No. 29, p. 1. Specifically, Defendants argue that: (1) Plaintiff has failed to allege atypical and significant hardship for a 90-day confinement in Special Housing Unit ("SHU"); (2) the loss of conditional release or merit board eligibility does not implicate a liberty interest; and (3) Plaintiff's allegation that he suffered "extreme emotional distress due to the evil intentions, willful and malicious conduct, and retaliation, [and] discrimination" is conclusory and irrelevant to the liberty interest analysis. (Dkt. No. 29, pp. 1-2). [2]

[2]    In light of the Court's ruling regarding the sufficiency of the allegations of atypical conditions of confinement, and its adoption of the Report-Recommendation on that basis, the Court has not considered Defendants' other objections. The Court notes that, as Magistrate Judge Baxter found, it is not clear what Plaintiff means when he states that he "lost" his "Merit Board" and his "Conditional Release." Dkt. No. 27, p. 21; *see* Dkt. No. 1, pp.8-10. The Court recognizes that inmates do not have a constitutional right to conditional release

from prison prior to the expiration of a valid sentence. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 422 U.S. 1, 7 (1979); *see Abed v. Armstrong*, 209 F.3d 63, 66-67 (2d Cir. 2000) ("Although inmates have a liberty interest in good time credit they have already earned, no such interest has been recognized in the opportunity to earn good time credit where ... prison officials have discretion to determine whether an inmate or class of inmates are eligible to earn good time credit.") (citation omitted); *Scarola v. Goord*, 266 A.D.2d 598, 599, 698 N.Y.S. 2d 60 (3d Dep't 1999) (finding that enactment of merit time legislation, N.Y. Corr. Law § 803, did not create a constitutionally protected liberty interest); *Lighthall v. Vadlamudi*, No. 9:04-CV-0721, 2006 WL 721568, \*\*14-15, 2006 U.S. Dist. LEXIS 74734, \*47 (Feb. 6, 2006) (same), *report recommendation adopted by* 2006 U.S. Dist. LEXIS 74737, (N.D.N.Y. March 17, 2006).

As Magistrate Judge Baxter noted, to establish a due process claim Plaintiff had to show: "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001) (citation and internal quotation marks omitted); Dkt No. 27, p. 18. In this case Plaintiff challenges the due process procedures regarding a disciplinary hearing that resulted in a 90-day SHU sentence. Dkt. No. 1, pp. 4-5. [3]

[3]    The Court adopts and incorporates herein the facts set forth in the Report-Recommendation, none of which were the subject of an objection.

**\*3** A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d at 106 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S., 714 F. 3d at 106*; *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis*, 576 F.3d at 134; *Palmer*, 364 F.3d at 66 n.4.

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 29 of 182

Smith v. Hamilton, Not Reported in Fed. Supp. (2016)

2016 WL 3823395

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer*, 364 F.3d at 65. Where the plaintiff is confined for "an intermediate duration –between 101 and 305 days – 'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). [4] While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Davis*, 576 F.3d at 133. [5] "Disputes about conditions may not be resolved on summary judgment." *Davis*, 576 F.3d at 134 (quoting *Palmer*, 364 F.3d at 65). The district court may determine the issue of atypicality of confinement as a matter of law "[o]nly when the conditions are uncontested." *Id.*

[4]   A longer confinement under normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections." *Palmer*, 364 F.3d at 65.

[5]   The Second Circuit has noted that "[i]n the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short – less than the 30 days that the *Sandin* plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions." *Palmer*, 364 F.3d at 65-66; *see Davis*, 576 F.3d at 133. Absent allegations in the complaint that the conditions of confinement were in some way atypical, however, many courts in this Circuit have granted motions to dismiss claims by plaintiffs with confinement exceeding thirty days when the plaintiffs failed to allege that the conditions of confinement were in some way atypical. *See, e.g.*, *Acevedo v. Fischer*, No. 12-CV-6866 RA, 2014 WL 5015470 at *15, 2014 U.S. Dist. LEXIS 139057, at *48 (S.D.N.Y. Sept. 29, 2014) (citing cases involving confinements of between forty and fifty days which were dismissed for failure to allege

a protected liberty interest because there were no allegations of unusual confinement).

In this case, the duration of the confinement, 90 days, "was not long enough to constitute an atypical and significant deprivation by itself," and the Court therefore must "look to the conditions of confinement." *Palmer*, 364 F.3d at 66; *see also Davis*, 576 F.3d at 133. Although there are no allegations regarding the conditions of Plaintiff's confinement in the body of the verified Complaint, Plaintiff detailed conditions of his confinement in his prayer for relief, in connection with his claim for damages. Dkt. No. 1, p. 10. Plaintiff alleges that he "was confined for 23 hours a day in a cell roughly 60 feet square for approximately 90 days with a cell mate who you must share 10 minute showers with, with no shower curtain, share an open toilet and sink, and deprived of most of my personal property as well as the ability to work, attend mandatory program, watch television, attend out door [sic] recreation in a congregated setting with the ability to engage in sports and other congregate recreational activities, associate with other prisoners, attend meals with other prisoners, attend Jumah services, and extreme emotional distress suffered by him due to the evil intentions, willful and malicious conduct, retaliation, discrimination as well as being denied basic rights to due process of law." Dkt. No. 1, p. 10.

**\*4** Defendants argue, without citation, that the conditions described "are simply normal SHU conditions." Dkt. No. 29, p. 2 While the Court agrees that some of the conditions are normal SHU conditions, *see* N.Y. Comp. Codes R. & Regs. tit. 7, §§ 304.1-.14, 305.1-.6 (2016); *Palmer*, 364 F.3d at 65 n.3, the Court cannot make a determination at this stage of the litigation regarding the atypicality of Plaintiff's confinement. It is not clear, for example, that the "deprivation of most of [plaintiff's] personal property" was a normal SHU condition. *See* N.Y. Comp. Codes R. & Regs. tit. 7, § 302.2 (e); *see also Palmer*, 364 F.3d at 62, 66 n.4 (affirming district court's denial of defendant's motion for summary judgment in a case involving SHU confinement for seventy-seven days when the plaintiff alleged that he was "not permitted any personal property (including his personal food, clothing and grooming and hygiene products), and was placed in restraints whenever he was escorted outside his cell" and was terminated from a program through which he had extended visits with his family).

Construing the pro se complaint liberally and to raise the strongest arguments it suggests, the Court concurs in Magistrate Judge Baxter's determination that "at this stage of the litigation, the court cannot determine whether a liberty

2016 WL 3823395

interest was created based on the complaint alone," and that Defendant's motion to dismiss should be denied. Dkt. No. 27, p. 23. In so ruling, the Court expresses no opinion about whether this claim can withstand a properly filed motion for summary judgment.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Baxter's Report-Recommendation (Dkt. No. 27) is **ADOPTED** in all respects; and it is further

**ORDERED** that defendants' motion for partial summary judgment under Fed. R. Civ. P. 56 and for partial dismissal under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 12) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that defendants' motion for summary judgment as to the First Amendment retaliation claim against defendant Hamilton is **GRANTED,** and that the complaint is dismissed as against defendant Hamilton and insofar as it alleges a First Amendment retaliation claim; and it is further

**ORDERED** that defendant Hamilton is dismissed from this case; and it is further

**ORDERED** that defendants' motion to dismiss the due process claims against defendants Rufa, Prack and Hillenbrand is **DENIED;** and it is further

**ORDERED** that the Clerk of Court shall provide Plaintiff with copies of the unpublished decisions cited in this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3823395

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3259975
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Guy McEACHIN, Plaintiff,

v.

Donald SELSKY; Jeff Minnerly;[1] Virginia Androsko; Porten, Corrections Officer, Defendants.

[1]    Defendants have submitted documents to the Court which bring to light the correct spelling of this Defendant's name as "Minerly," and not "Minnerly;" the Court will refer to this individual by the correct spelling. *See, e.g.,* Dkt. No. 55, Jeff Minerly Decl., dated May 12, 2009.

Civ. No. 9:04–CV–0083 (FJS/RFT).
|
March 30, 2010.

**Attorneys and Law Firms**

Guy McEachin, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Gary M. Levine, Esq., Assistant Attorney General, Rochester, NY, for Defendants.

*REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Guy McEachin, currently incarcerated at Great Meadow Correctional Facility, brings a civil rights action, pursuant to 42 U.S.C. § 1983, claiming violations of his rights protected by the First, Fifth, Eighth, and Fourteenth Amendments. Dkt. No. 1, Compl. Throughout the protracted litigation history of this lawsuit, certain claims have survived, while others have met their demise. Pending before this Court is Defendants' Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56.[2] Dkt. No. 51–58 & 79. Plaintiff opposes the Motion. Dkt. Nos. 76 & 78. For

the reasons that follow, it is recommended that Defendants' Motion be **granted** and the entire Complaint be **dismissed.**

[2]    Approximately one month after Defendants filed their Motion for Summary Judgment, all deadlines were stayed to allow for the Honorable Victor Bianchini, Recalled United States Magistrate Judge, to preside over a mediation session. Dkt. No. 59. When that effort proved unsuccessful, the matter was referred back to this Court to address the pending Motion. Dkt. No. 64.

**I. BACKGROUND**

**A. Underlying Facts**[3]

[3]    The Court notes that many of the essential facts are not truly contested. Instead, the parties diverge as to the interpretation of these facts and whether constitutional rights were trespassed upon.

At all times relevant to the issues raised in the Complaint, Plaintiff was under the custody of the New York Department of Correctional Services (DOCS) and was housed at Auburn Correctional Facility. Dkt. No. 52, Defs.' Statement of Material Facts (hereinafter "Defs.' 7.1 Statement") at ¶ 1. At the core of this litigation are two Misbehavior Reports (MR), which according to Plaintiff, set off a series of constitutional affronts.

The first MR was issued on January 5, 2001, by Defendant Corrections Officer (CO) Jeffrey Porten. *Id.* at ¶ 2. The January MR, which charges Plaintiff with violating Disciplinary Rules 106.10 (refusal to obey a direct order), 116.10 (inmates shall not misuse any type of state property), 102.10 (inmates shall not make any threats spoken, in writing or by gesture), and 107.11 (inmates shall not harass employees verbally or in writing), states the following:

On [January 5, 2001] and approximate time of 9:00 am while doing a round in A-tank on SHU–D south side[,] I passed by A–3 cell and noticed the inmate's blanket on the floor being used as a rug. I then gave [I]nmate McEachin, G. 00–A–5257 a direct order to pick the blanket up off the floor. Inmate McEachin, G. just stood there in the cell staring at me. At that time I continued my rounds on the SHU–D south side. Later on while doing another round on SHU–D south side passing through A-tank I looked into A–

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 32 of 182
McEachin v. Selsky, Not Reported in F.Supp.2d (2010)
2010 WL 3259975

3 cell and observed inmate McEachin G.'s blanket still on the floor being used as a rug. I then gave inmate McEachin, G. another direct order to pick up the blanket off the cell floor. Inmate McEachin, G. then looked at me and said, "Fuck you! You white piece of shit, get away from my cell before kick [sic] your ass!" Inmate McEachin then stated, "You better watch yourself when I come out of here." At that time, I continued my rounds on the south side and notified the area supervisor of the incident at the end of the round. Later at approximately 2:00 pm while doing another round on the south side, upon entering A-tank I noticed A–3 cell was open and the blanket still [illegible] on the floor. At that time I confiscated the state blankets and returned them to SHU–D P-tank property room without further incident.

*2 Dkt. No. 56, Jeffrey Porten Decl., dated May 29, 2009, Ex. A.

Though the MR addresses events occurring at different times throughout that day, the "incident time" reflected on the MR is 2:00 p.m.

On January 11, 2001, Defendant Jeff Minerly, Plant Superintendent, conducted a Tier III Disciplinary Hearing on the January MR. Dkt. No. 55, Jeff Minerly Am. Decl., dated May 12, 2009, Ex. B. In support of his "not guilty" plea, Plaintiff attacked the MR as non-conforming to DOCS Directives because the time reflected on the Report as the "incident time," 2:00 p.m., was not the correct time for all of the allegations and charges therein. As an example, Plaintiff noted the allegation of verbal harassment was not alleged to have occurred at 2:00 p.m. *Id.* At the conclusion of the Hearing, Defendant Minerly found Plaintiff guilty of all charges and sentenced him to 120 days in a special housing unit (SHU) with corresponding loss of privileges and a recommendation of 180 days loss of good time credits. *Id,* Ex. A. On February 20, 2001, McEachin's disciplinary sentence was affirmed on appeal by Defendant Donald Selsky, Director of Special Housing/Inmate Disciplinary Program. *Id.*

The second MR was issued by Defendant Nurse Virginia Androsko on June 9, 2001.[4] Dkt. No. 54, Virginia Androsko Decl., dated May 18, 2009, Ex. A. The June MR, which charges Plaintiff with violating Disciplinary Rules 107.10 (inmates shall not verbally obstruct or interfere with an employee) and 107.11 (inmates shall not verbally harass employees), states the following:

[4]

In their 7.1 Statement, Defendants erroneously list "May 8, 2001" as the date Androsko wrote her MR. Defs.' 7.1 Statement at ¶ 6. In fact, the actual MR reflects the incident date as June 9, 2001, a point clarified by Defendants' counsel at Plaintiff's Deposition. *See* Dkt. No. 58–3, Gary Levine Decl., dated June 5, 2009, Ex. A, McEachin Dep., dated Dec. 2, 2008, at p. 22.

When attempting to do sick call in K tank in SHU D Inmate McEachin was yelling about how he wants copies of sick call procedures and how they are to be done. He was very loud preventing this writer to hear [sic] any requests for sick call. During his tirade he was calling me a "fucking bitch and a mother fucker." Sick call was ended in K-tank due to his interference and harassment.
*Id.*
The June MR bears the signatures of Nurse Androsko and Sergeant Martins, who is not a named party in this litigation. *Id.*

On June 18, 2001, Joseph Wolczyk, who is not a named party in this litigation,[5] conducted a Tier III Disciplinary Hearing on the June MR. Defs.' 7.1 Statement at ¶ 7; *see also* Dkt. No. 58–2, Joseph Wolczyk Decl., dated Mar. 10, 2009, Exs. A & B. During the Hearing, Plaintiff claimed that the MR was false, as evidenced by the fact that there was no sick call on the date in question (purportedly a weekend day) and because his copy of the MR lacked a necessary second signature, without which, he claimed, Defendant Androsko lacked the authority to issue the Report. Wolczyk Decl., Ex. B at pp. 4, 9–10, & 15–17. At the conclusion of the Hearing, Officer Wolczyk found Plaintiff guilty of both charges and sentenced him to forty (40) days in SHU with corresponding loss of privileges and a recommendation of two months loss of good time credit. *Id.,* Ex. A. On September 6, 2001, Defendant Selsky affirmed the Plaintiff's disciplinary sentence. Dkt. No. 58–3, Gary Levine Decl., dated June 5, 2009, Ex. C, Notice to Admit, Ex. F. On January 9, 2002, Plaintiff's request for reconsideration of his appeal was similarly denied by Defendant Selsky. *Id.*

[5]

In his Opposition to Defendants' Motion, Plaintiff repeatedly refers to Officer Wolczyk as "Defendant Wolczyk," however, this individual was not named in his Original Complaint, nor has Plaintiff at any time attempted to amend his Complaint to add Wolczyk as a party to this litigation. *Compare* Dkt. No. 76, Pl.'s Opp'n, at pp. 3, 6, & 11 (consistently

making reference to "Defendant Wolczyk") *with* Compl. at pp. 1–2 (omitting Wolczyk's name from the listed parties) & 5 (no mention of Wolczyk by name nor any implication that the Hearing Officer violated his rights at the June Hearing).

**B. Procedural History**

**\*3** This action, which began on January 23, 2004, with the filing of Plaintiff's civil rights Complaint, has traversed certain procedural obstacles, including a dispositive motion and an appeal to the Second Circuit. We feel it necessary to recite certain aspects of this procedural history to ensure an understanding of what causes of action survived those procedural mileposts.

*1. Plaintiff's Claims*

We begin with a recitation of the causes of action raised in Plaintiff's Complaint. [6] Dkt. No. 1, Compl. As a result of the above described incidents, Plaintiff brought the instant action against Donald Selsky, Jeff Minerly, Virginia Androsko, and Jeffrey Porten asserting violations of his First, Fifth, Eighth, and Fourteenth Amendment rights. Succinctly, Plaintiff accuses Defendant Porten of falsifying the January MR in retaliation for an altercation that occurred on December 30, 2000, between McEachin and other COs at Auburn, and the grievances Plaintiff filed regarding that incident. Compl. at ¶¶ 6C–6D; Dkt. No. 76, Pl.'s Resp. in Opp'n to Defs.' Mot. at p. 7. McEachin asserts he not only filed grievances against the COs involved in the December 30th incident, but he also initiated a federal civil rights suit against them and others in this District, *McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259 (LES/GJD). Pl.'s Resp. in Opp'n to Defs.' Mot. at p. 7. Porten's January MR was issued six days after Plaintiff's altercation with the other COs. Compl. at ¶¶ 6A, 6B, & 6F; Pl.'s Resp. in Opp'n to Defs.' Mot. at p. 7. According to McEachin, Porten's MR, and Minerly's refusal to dismiss the false claims, resulted in violations of his First and Fourteenth Amendment rights. Compl. at ¶¶ 6C–6G. McEachin also claims that Minerly violated his Fifth and Eighth Amendment rights. *Id.* at ¶ 6G. As for Defendant Androsko, McEachin claims she had no authority to issue the June MR, which he also charges was false, and that, in authoring the MR, she violated the *Milburn* Consent Decree issued in the Southern District of New York in the class action case *Milburn v. Coughlin,* Civ. No. 79–CV–5077 (RJW), as well as Plaintiff's

Eighth and Fourteenth Amendment rights. *Id.* at ¶ 6J. As for Defendant Selsky, Plaintiff claims that because he affirmed the appeals of both Disciplinary Hearing Dispositions, he shares responsibility for whatever constitutional rights were affronted. *Id.* at ¶ 6L.

[6]    The factual allegations underlying Plaintiff's claims are fleshed out more fully in his Response in Opposition to the Defendants' Motion for Summary Judgment. In light of his *pro se* status, we utilize all of his submissions to present a complete discourse of his claims for relief. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 472 & 475 (2d Cir.2006) (noting that *pro se* submissions should be construed liberally "and interpreted so as to raise the strongest arguments that they suggest") (internal quotation marks, alterations, and citations omitted).

*2. Magistrate Judge's and District Judge's Decisions*

On June 25, 2004, Defendants filed a Motion to Dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted. Dkt. No. 14. After Plaintiff submitted his Opposition to the Motion, Dkt. No. 16, this Court issued a Report–Recommendation and Order on March 23, 2005. Dkt. No. 19 (hereinafter "RRO"). Contained in that decision are the following recommendations:

1) **Eleventh Amendment:** All claims against the Defendants in their official capacity should be dismissed pursuant to the Eleventh Amendment (RRO at pp. 5–6);

**\*4** 2) **Exhaustion of Remedies:** Plaintiff properly exhausted his Fourteenth Amendment claims through his administrative appeals of the Disciplinary Hearings, however, he failed to exhaust his Fifth and Eighth Amendment claims, and it was unclear whether he exhausted his First Amendment claim (RRO at pp. 6–13). Despite the mixed exhaustion action, the Court opted to proceed to the merits of each claim;

3) **Fifth Amendment:** Plaintiff's Fifth Amendment claims are not cognizable and should be dismissed (RRO at pp. 25–26);

4) **Eighth Amendment:** Plaintiff's allegations concerning the Eighth Amendment violations are conclusory and should be dismissed (RRO at pp. 26–28);

5) **Personal Involvement:** Defendant Selsky should be dismissed for lack of personal involvement (RRO at pp. 13–14);

6) **Fourteenth Amendment Due Process—Androsko June MR:**

a) The *Milburn* Consent Decree did not create a constitutional cause of action as a basis for § 1983 relief, and, in any event, it was only applicable to Green Haven Correctional Facility (RRO at p. 16);

b) Under New York Regulations, N.Y. COMP.CODE. R. & REGS., tit. 7 § 251–3.1(a) & (b), Nurse Androsko was permitted/directed to file a MR when appropriate (RRO at p. 16);

c) Plaintiff has no constitutional right to be free from being falsely accused absent an allegation of retaliation (RRO at p. 17);

d) Plaintiff does not allege any problem with the hearing procedure or the process received (RRO at p. 17);

e) Plaintiff's punishment of forty days in SHU fails to give rise to a liberty interest under *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (RRO at pp. 18–20; [7]

[7]     As mentioned above, Plaintiff did not name Joseph Wolczyk as a Defendant, even though he presided over the Disciplinary Hearing concerning the June MR. *See supra* note 5. In any event, our recommendation of dismissal would have extended to any due process claim against Mr. Wolczyk given the absence of a liberty interest. *See infra* Part II.B.1.

Thus, it was recommended that Defendant Androsko be dismissed from the action; 7) **Fourteenth Amendment Due Process—Minerly Disciplinary Hearing:** Concerning the due process claims stemming from Porten's January MR, Plaintiff's punishment of 120 days in SHU, without more, did not give rise to a liberty interest under *Sandin,* thus the claims against Defendant Minerly should be dismissed (RRO at pp. 18–20);

8) **Retaliation:** The retaliation/substantive due process claim against Defendant Porten should survive because a colorable suspicion of retaliation is set forth in the Complaint (RRO at pp. 21–24); and

9) ***Heck* Rule:** Because both Disciplinary Proceedings resulted in sanctions that affect the duration of Plaintiff's confinement, *vis-a-vis* recommendations for loss of good time credits, Plaintiff's due process claims (both procedural and substantive) and First Amendment retaliation claim are barred by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), thus, the only claim that would have survived the Motion, retaliation, should be dismissed on this basis (RRO at pp. 24–25).

Upon reviewing this Court's RRO, and the Plaintiff's Objections thereto, the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, issued a Memorandum Decision and Order, dated August 30, 2005, dismissing the entire case. Dkt. No. 22 (hereinafter MDO). Within that Order, Judge Scullin noted the following:

**\*5** 1) **Eleventh Amendment:** With no specific objection from Plaintiff, the claims against Defendants in their official capacity are dismissed pursuant to the Eleventh Amendment (MDO at pp. 5–6)

2) **Exhaustion of Remedies:** With no specific objection from Plaintiff, claims of Eighth Amendment violations were not exhausted and are dismissed (MDO at p. 9);

3) **Fifth Amendment:** With no objection from Plaintiff, the Fifth Amendment claims are dismissed (MDO at pp. 6–7);

4) **Eighth Amendment:** With no objection from Plaintiff, and despite the ruling of failure to exhaust, the Eighth Amendment claims are dismissed (MDO at pp. 9–11);

5) ***Heck* Rule:** All due process and retaliation claims against all Defendants are barred by *Heck* and *Edwards,* thus the Court declines to consider the underlying merits of any of these claims (MDO at pp. 11–14).

Of particular importance, because Judge Scullin ruled that *Heck* and *Edwards* barred Plaintiff's due process and retaliation claims, he did not rule on this Court's recommendations regarding the merits of these claims.

Thereafter, a Judgment was entered in favor of Defendants and this case was closed. Dkt. No. 23.

### 3. Plaintiff's Appeal to the Second Circuit

Plaintiff subsequently appealed that MDO to the Second Circuit on September 26, 2005. Dkt. No. 24. During the pendency of McEachin's appeal of Judge Scullin's MDO, the Second Circuit issued its decision in *Peralta v. Vasquez,* 467 F.3d 98 (2d Cir.2006), which had direct implications for this case. The *Peralta* case concerned the situation, like ours, wherein an inmate attempts to challenge a disciplinary proceeding that resulted in mixed sanctions—those that affect the conditions of his confinement, such as a sentence of SHU confinement and/or loss of privileges, and those that affect the duration of his confinement, such as recommendations for loss of good time credit. *Peralta v. Vasquez,* 467 F.3d at 99–100. The inclusion of the latter sanction typically invoked *Heck's* "favorable termination rule," resulting in dismissal of the entire due process challenge.[8] The Second Circuit ruled that a prisoner who received mixed sanctions at a prison disciplinary hearing could proceed with a challenge to the sanctions, as long as the inmate agrees to waive for all time any challenge to the sanction affecting the length of his confinement. *Id.* at 104.

[8]     The "favorable termination rule" set forth in *Heck v. Humphrey,* 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), directs that if a determination favorable to the plaintiff in a § 1983 action would "necessarily imply the invalidity of [the inmate's] conviction or sentence," there must first be a showing that the conviction or sentence had been reversed on direct appeal or declared invalid in order to recover damages for an allegedly unlawful conviction under § 1983. In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Supreme Court stated that the "favorable termination rule" is applicable to challenges made under § 1983 to procedures used in disciplinary proceedings that deprived a prisoner of good time credits.

On May 31, 2007, in ruling on McEachin's appeal, the Second Circuit determined that McEachin had presented a "mixed sanction" claim, much like what was presented in *Peralta,* and therefore vacated the District Court's judgment dismissing his claims under *Heck* and *Edwards.* Upon remand, the District Court was directed to provide Plaintiff with the

opportunity to waive all claims relating to sanctions affecting the duration of his confinement so that he may proceed with claims challenging the sanctions affecting the conditions of his confinement. Dkt. No. 30.[9] Because McEachin did not challenge any other ruling rendered by Judge Scullin, those portions were affirmed. *Id.*

[9]     As an aside, the Court notes that McEachin's appeal had been dismissed by the Circuit on September 29, 2006, due to McEachin's failure to comply with the Second Circuit's Scheduling Order. Dkt. No. 28. In viewing the Second Circuit's docket report for the appeal, it appears that McEachin moved for reinstatement of his appeal, which was duly granted on November 17, 2006. *McEachin v. Selsky, et al.,* 06–PR–1230 (2d Cir.). The Circuit did not issue its Mandate regarding the remand order until August 13, 2007. *Id.* Thereafter, McEachin moved for a rehearing *en banc,* which was denied on May 7, 2008, and issued as a Mandate on July 16, 2008. *Id.; see also* Dkt. No. 43.

### 4. Remand to District Court

**\*6** In conformity with the Second Circuit Mandate, this Court issued an Order, dated September 26, 2007, advising Plaintiff of his opportunity to pursue his due process and retaliation claims if he was willing to forego any challenge to the sanctions affecting the duration of his confinement; such waiver was to be in writing. Dkt. No. 31. Eventually, after multiple extensions of time were provided, Plaintiff filed a letter, dated June 10, 2008, indicating his intention to waive any challenge to the sanction affecting the length of his confinement. Dkt. No. 40. Accordingly, Judge Scullin issued an Order dismissing Plaintiff's claims regarding the loss of his good time credits, and allowing Plaintiff to proceed with his retaliation claim and other challenges to those sanctions affecting the conditions of his confinement. Dkt. No. 41 at p. 3.

After answering the Complaint and engaging in discovery, the Defendants filed the Motion for Summary Judgment currently under review. Dkt. No. 51. In his Opposition to Defendants' Motion, in addition to defending his case on the merits, Plaintiff seems to attack the written waiver he previously submitted to the Court. *See* Dkt. No. 76 at p. 13, McEachin Aff., dated Oct. 23, 2009. Within his Affidavit, Plaintiff postulates that he was "force[d] into agreeing into an unlawful

2010 WL 3259975

waiver to waive any claim against [his] recommended loss of good behavior credit," and, further decries that as a felon, he is somehow precluded by the Uniform Commercial Code into entering into a contract. *Id.* at ¶¶ 1–2. We will not comment on the validity of Plaintiff's understanding regarding his capability to enter into a contract as it may or may not relate to his written waiver. What concerns us, however, is whether by his Affidavit, Plaintiff seeks to rescind his written waiver. Dkt. No. 40. To the extent that he is seeking recission, we recommend that the prior dismissal of all claims be reinstated and this action **dismissed.** *Peralta v. Vasquez,* 467 F.3d at 104. Notwithstanding, because it is unclear to this Court what Plaintiff intended by this Affidavit, and in light of his *pro se* status, we will consider the merits of his underlying claims.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

 **\*7** To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing [that there is] a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than

mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### B. Surviving Claims

After carefully reading both Judge Scullin's MDO and the Second Circuit's Remand Order, this Court concludes that the following claims were not reinstated via the Remand, and thus, remain dismissed: 1) official capacity claims against all Defendants; 2) Eighth Amendment claims; and 3) Fifth Amendment claims. Therefore, the only claims requiring our review are as follows: 1) due process claims against Defendant Androsko; 2) due process claims against Defendant Minerly; 3) due process and retaliation claims against Defendant Porten; and 4) supervisory liability claims against Defendant Selsky. We now consider each of these claims *seriatim.*

*1. Due Process Claims Against Defendant Androsko*

In our March 2005 RRO, prior to rendering a ruling on *Heck* and *Edwards,* we addressed Plaintiff's claims against Defendant Androsko on the merits. We reiterate that analysis herein.

**\*8** The Complaint alleges that Defendant Androsko, a nurse, did not have legal authorization to issue an MR against him. Compl. at ¶¶ 6(J)-(O) & 7. McEachin's underlying premise for why Androsko lacked proper authorization is purportedly found in Chapter XIV of the *Milburn* Consent Decree, dated August 1, 1991, which states, in part, "[i]n any case where disciplinary action is taken against an inmate for an interaction with a health care provider, the disciplinary report shall be written by security staff and not by the health care provider." *See* Levine Decl., Ex. B, *Milburn* Consent Decree, dated Aug. 1, 1991, at p. 24. McEachin's reliance upon the *Milburn* case is fatally flawed. *Milburn* was a class action brought in the Southern District of New York to address several grievances at Green Haven Correctional Facility. *Milburn v. Coughlin,* 79 Civ. 5077(RJW). From that litigation, a series of Consent Decrees were issued that govern the provision of health care services at Green Haven. However, the *Milburn* Consent Decree is not universal as McEachin presumes, but rather, is restricted solely to the health care services at Green Haven, and thus is inapplicable to this case since the circumstances giving rise to Plaintiff's claims occurred at Auburn. *Candelaria v. Coughlin,* 1994 WL 707004, at *8 (S.D.N.Y. Dec.19, 1994) (ruling that the plaintiff did not have any rights under the Consent Decree because he had been moved out of Green Haven). More problematic for McEachin is the fact that the *Milburn* Consent Decrees do not create constitutional causes of action and thus do not provide a basis for a § 1983 claim for damages. *Id.* at *7–8 (citing *Green v. McKaskle,* 788 F.2d 1116, 1123 (5th Cir.1986) & *DeGidio v. Pung,* 920 F.2d 525, 534 (8th Cir.1990) for the proposition that "[r]emedial court orders *per se* ... cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create rights, privileges, or immunities secured by the Constitution and laws") (internal citations omitted)). Since *Milburn* has a limited remedial effect as to health services at Green Haven, and has no implication for this case, we must turn next to the appropriate rules and regulations that govern which DOCS employees may file an MR.

The governing regulations are not merely permissive but, rather, mandatory in that "[e]very incident of inmate misbehavior ... must be reported, in writing, as soon as practicable. The misbehavior report shall be made *by*

*the employee who has observed the incident* or who has ascertained the facts of the incident." N.Y. COMP.CODE. R. & REGS., tit. 7 § 251–3.1(a) & (b) (emphasis added). Defendant Androsko, a DOCS employee, is not only permitted, but directed to file an MR when appropriate, even though she is not security staff.

Since Androsko has authority to register an MR against McEachin, we proceed to assess his due process claim. At the conclusion of the June Disciplinary Hearing, Plaintiff was sentenced to forty (40) days in SHU with corresponding loss of privileges. [10] We note that Plaintiff has not sued the Hearing Officer who presided over the Disciplinary Hearing regarding Androsko's June MR. *See supra* notes 5 & 7. Nevertheless, to the extent Plaintiff attempts to attribute due process violations to Defendant Androsko, he has many hurdles to overcome.

[10]  He further received a recommendation of sixty (60) days loss of good time credits, which is no longer at issue in this litigation.

**\*9** First and foremost, to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In this case, Plaintiff has not described the environment in SHU so as heinous as to invoke the protections afforded by the Due Process Clause itself. We find that his confinement in SHU for forty (40) days, under normal SHU conditions, did not implicate any liberty interest derived directly from the Due Process clause. *See, e.g., Black v. Selsky,* 15 F.Supp.2d 311, 314 (W.D.N.Y.1998).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and

significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). In determining whether a confinement imposes an atypical and significant hardship, courts are directed to look at both the duration and conditions of the confinement. *Ortiz v. McBride,* 380 F.3d 649, 654–55 (2d Cir.2004) (citations omitted); *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citation omitted). With regard to duration, the Second Circuit cautions there is no bright line rule stating that a certain duration of confinement in SHU automatically implicates a liberty interest. *Palmer v. Richards,* 364 F.3d at 64; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life." *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct.4, 1996) (citing cases).

During his Deposition, Plaintiff was asked to expound upon the conditions he endured while serving his forty-day sentence in SHU. Levine Decl., Ex. A, Pl.'s Dep. at pp. 28–29. Plaintiff described nothing more than normal SHU conditions. *Id.* Though confined to his cell most of the day, he admitted he was provided meals, mail, legal materials, medical care, and recreation, though he claimed, without substantiation or specifics, that he was occasionally denied recreation time. *Id.* at pp. 30–32. It is expected that confinement in SHU will be accompanied by a loss of privileges that prisoners in the general population enjoy and such conditions fall "within the expected parameters of the sentence imposed by a court of law." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (quoting *Sandin v. Connor,* 515 U.S. at 485 for the proposition that loss of commissary, recreation, package, and telephone privileges does not amount to an atypical and significant deprivation). Accordingly, we find that Plaintiff's forty-day confinement to SHU under normal SHU conditions did not implicate a state created liberty interest, thus no due process violation is assessed.

**\*10** With regard to Plaintiff's claim that the June MR was untrue, we note that the filing of a false MR by itself does not create a liberty interest as McEachin believes. Similarly, prisoners have no constitutional right to be free from false claims, so long as they are provided due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest[ ]"). Thus, as long as the prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman v. Rideout,* 808 F.2d at 953); *see also Wolff v. McDonnell,* 418 U.S. 539, 564–66, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). McEachin does not charge Androsko with authoring a false report as retaliation for his engagement in constitutionally protected activity. Nor, for that matter, does he claim that the Hearing itself was flawed. Nevertheless, based upon his allegation of falsity, we look to the process he received to ensure its adequacy.

The Supreme Court has set forth the Due Process requirements prisoners must be afforded in disciplinary hearings. *See Wolff v. McDonnell,* 418 U.S. at 564–66. In sum, prisoners must be afforded (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.; see also Freeman v. Rideout,* 808 F.2d at 953.

In our case, notwithstanding his conclusory allegations, it is clear that McEachin was provided all the process he was due in the form of advance written notice of the charges, help in preparing his defense, receipt of evidence requested, opportunity to be heard and present witnesses, and receipt of a written statement of the reasons for the conviction, which was affirmed on appeal. *See generally* Wolczyk Decl., Exs. A & B. Accordingly, McEachin's blanket claim of a false misbehavior report, in and of itself, does not state a cognizable claim that his due process rights were violated and it is clear that he was provided constitutionally adequate process during the June Hearing. In sum, we recommend that all claims against Defendant Androsko be **dismissed.**

### 2. Due Process Claims Against Defendant Minerly

In our March 2005 RRO, prior to rendering a ruling on *Heck* and *Edwards,* we addressed Plaintiff's claims against Defendant Minerly on the merits. We reiterate that analysis herein.

Following the January MR issued by Defendant Porten, Defendant Minerly conducted a Disciplinary Hearing wherein he found Plaintiff guilty of all charges and sentenced him to 120 days in SHU with corresponding loss of privileges. [11] Minerly Decl., Ex. A. Plaintiff accuses Minerly of being biased during the Hearing and violating his due process rights by finding him guilty of charges in the patently false and retaliatory MR authored by Defendant Porten.

[11]    Plaintiff also received a recommendation of 180 days loss of good time credits, which is no longer at issue in this litigation.

**\*11** We incorporate the above standard regarding liberty interests and add the following to the discussion. In *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998), the Second Circuit ruled that in order to endure an atypical and significant hardship a court must measure the "extent to which the conditions of the disciplinary segregation differ from the other routine prison conditions" and the duration of the disciplinary segregation imposed." This is particularly true where the SHU confinement falls within an intermediate duration between 101 and 365 days. *Palmer v. Richards,* 364 F.3d at 64–65 (citing *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) for the proposition that any SHU confinement longer than an intermediate duration may be a sufficient departure from the ordinary incidents of prison life).

Nowhere within his Complaint, nor in other portions of the record, does McEachin assert that his conditions in SHU were outside the expected realm of ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. at 484–85. The loss of packages, commissary, and phone privileges are acceptable and normal SHU conditions and not considered unusual or unduly harsh. Yet, even if we were to find a liberty interest was implicated, it is clear that, like in his June Disciplinary Hearing, McEachin was afforded the minimum requirements of due process in that he received advanced written notice of the charges against him, aid in rendering a defense, opportunity to be heard, and a written disposition of the decision and basis for guilt determination. *Wolff v. McDonnell,* 418 U.S. at 556; *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001); Minerly Am. Decl., Exs. A & B. Therefore, as to Defendant Minerly, we recommend that any claim against him be **dismissed.**

*3. Retaliation Claims Against Defendant Porten*

Plaintiff claims that Defendant Porten issued him a false MR as retaliation for Plaintiff having submitted grievances over an altercation with prison staff that occurred six days prior to his alleged confrontation with Porten. In rendering our March 2005 RRO on the Defendants' Motion to dismiss, we noted that we were obligated to take the Plaintiff's allegations as true and assess whether his retaliation claim was plausible. Under that standard, we determined that the temporal proximity of the alleged constitutionally protected activity and the Porten MR gave a thin colorable suspicion of wrongdoing, thus entitling Plaintiff to some discovery on this issue. Now, at the summary judgment stage, we are able to look at the matter more globally to assess whether Plaintiff has interjected a material issue of fact, thus precluding summary judgment.

*a. Exhaustion of Retaliation Claim*

We start with an issue we left undecided in March 2005— whether Plaintiff properly exhausted his retaliation claim. In our March RRO, we stated the following standard with regard to exhaustion:

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that for actions brought by prisoners under 42 U.S.C. § 1983, the inmate must first exhaust his or her administrative remedies. The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001))....

**\*12** In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Review Committee ("IGRC"), a committee comprised of both inmates and facility employees. [12] The IGRC reviews and investigates the formal complaints and then issues a written determination. Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRC's determination and issues a decision. Finally, if the superintendent's decision is appealed, the Cental

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 40 of 182
McEachin v. Selsky, Not Reported in F.Supp.2d (2010)
2010 WL 3259975

Office Review Committee ("CORC") makes the final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7. Upon exhaustion of these three levels of review, a prisoner may seek relief pursuant to § 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing *Sulton v. Greiner,* 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)); *Petit v. Bender,* 2000 WL 303280, at *2–3 (S.D.N.Y. Mar.22, 2000).

12    The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit. 7, § 701.4.

March RRO at pp. 6–7.

We then noted, *inter alia,* Plaintiff's diametrically opposing accounts of his exhaustion efforts with regard to his retaliation claim against Defendant Porten. On the one hand, Plaintiff claimed that his retaliation claim was not a grievable issue, which was juxtaposed against his alternate justification wherein he claimed that he complained to prison authorities by "fil[ing] an administrative appeal with Defendant Selsky ... and fil[ing] a Reconsideration to Defendant Selsky." RRO at pp. 8–9 (referencing Plaintiff's Complaint at ¶ ¶ 4(b)(ii) & 4(c)(i)). Some of the confusion was created by Plaintiff when he lumped his First Amendment claims with his Fourteenth Amendment due process claims in his Complaint. After disabusing McEachin of the fallacy of his understanding of grievable/non-grievable issues, we analyzed Plaintiff's second explanation of exhaustion through the administrative appeal process. *Id.* at pp. 9–10. At that time, without the full record to assess the viability of this claim, and giving Plaintiff the proper reasonable inferences, we found that a question of fact existed as to whether he properly exhausted his First Amendment claim. *Id.* at pp. 11–12.

Now, with a comprehensive record before us, it remains dubious whether Plaintiff actually exhausted his administrative remedies with regard to his retaliation claim. In support of summary judgment, Defendants submit a Declaration from Chris Lindquist, Assistant Director of Inmate Grievance Program of DOCS. Dkt. No. 58, Chris Lindquist Decl., dated May 12, 2009. Mr. Lindquist states he is one of the custodians of the records maintained by the Central Office Review Committee (CORC), and submitted a printout of CORC appeals filed by McEachin from Auburn in 2001. *Id.,* Ex. A. Amongst the listed appeals are two Grievances filed on January 5, 2001, the same date Defendant

Porten authored the January MR; the Grievances are as follows: 1) AUB–34251–01, Denied Proper Amount of Food; and 2) AUB–34253–01, Assaulted at Strip Frisk. *Id.* Because we do not have the actual Grievances, we do not know whether Plaintiff included his retaliation allegations therein, though it appears at least from the title of the Grievances that retaliation is not the major complaint listed therein. While Plaintiff continues to maintain that he submitted grievances on this issue, he failed to produce any copies of any such grievance, or, for that matter, copies of his Hearing Appeals so we could assess whether he included the complaints therein. One thing we have before us is the transcript from the January Hearing, and, pointedly, at no point during that Hearing does Plaintiff allege retaliatory animus on Porten's part. In fact, the only thing McEachin attacks during the Hearing is whether the "incident time" on the MR is accurate. *See* Minerly Decl., Ex. B. Based upon the record before us, coupled with Plaintiff's conflicting explanations and lack of evidence to create an issue of material fact, we find that McEachin has not properly exhausted his First Amendment retaliation claim and it should be **dismissed** for that reason.

**\*13** In the alternative, as explained below, we find that Plaintiff's retaliation claim should be dismissed on the merits.

### b. Merits of Retaliation Claim

It is well settled, as noted above, that prisoners have no constitutional right to be free from being falsely accused. *Freeman v. Rideout,* 808 F.2d at 951. As long as prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d at 587 (quoting *Freeman v. Rideout,* 808 F.2d at 953); *see also Wolff v. McDonnell,* 418 U.S. at 564–66).

We have already assessed that Plaintiff received all the process due in conjunction with the January MR. Notably, however, there are substantive due process rights, rather than procedural, which cannot be obstructed "even if undertaken with a full panoply of procedural protections," such as the right of access to courts or to be free from retaliation for exercising a constitutional right. *See Franco v. Kelly,* 854 F.2d at 589 (citation omitted). Thus, if a prisoner alleges false disciplinary reports were filed against him in retaliation for exercising a valid constitutional right, the prisoner's claim

may survive a dispositive motion by properly alleging his substantive due process rights were violated. *See id . at 590.*

The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d at 589–90. To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)); *see also Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report).

No evidence has been submitted in this case regarding the protected conduct Plaintiff alleges to have engaged in, thereby provoking the purported retaliatory wrath of Defendant Porten. To ensure a complete record, the Court takes judicial notice of documents submitted in Plaintiff's civil rights case regarding the December 30th altercation. [13] *See McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259 (LES/GJD). These documents were submitted by Assistant Attorney General Maria Moran in support of the defendants' motion for summary judgment and were relied upon by all parties and the District Judge. *Id.,* Dkt. No. 30, Maria Moran Affirm., dated July 15, 2002 (with exhibits attached, but separately filed as Dkt. No. 32). Of specific relevance to our case is McEachin's inmate grievance, dated January 3, 2001, which was stamped "received" on January 5, 2001. *Id.,* Ex. C. The grievance contains the number "34253–01" and relays an altercation between Plaintiff and COs during a strip frisk on December 30, 2000. *Id.* Incidentally, this grievance is also listed on the printout provided to the undersigned by Mr. Lindquist as Grievance Number AUB–34253–01, filed on January 5, 2001, entitled "Assault at Strip Frisk." Dkt. No. 58–1, Lindquist Decl., Ex. A. Further substantiation is found in the companion case with the "Use of Force Report" and "Misbehavior Report" generated after the December 30th incident. *McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259, Moran Affirm., Exs. A & B.

[13] *Federal Rule of Evidence 201(b)* provides that "a judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Furthermore, a court may take judicial notice on its own initiative at any stage of the proceeding. FED.R.EVID. 201(c) & (f). The documents filed in a court satisfy prong two, and therefore can be considered by this Court in considering the Motion for Summary Judgment. *See Sea Tow Servs. Int'l, Inc. v. Pontin,* 607 F.Supp.2d 378, 384 n. 10 (E.D.N.Y.2009) (citing cases); *Desclafani v. Pave–Mark Corp.,* 2008 WL 3914881, at *5 n. 7 (S.D.N.Y. Aug.22, 2008) (citing cases). Furthermore, these records to which we take judicial notice are prison records which fall into the business records exception to the hearsay rule, found in Federal Rule of Evidence 803(6), since they are "kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation." Indeed, all parties and the District Judge relied upon the documents submitted by Assistant Attorney General Maria Moran in that case, which ultimately went to trial. These same exhibits were admitted at the trial as well. *See McEachin v. Goord, et al.,* Civ. No. 9:01–CV–259 (LES/GJD) Dkt. Nos. 75–1, Defs.' List of Exs., & 101, Ct.'s List of Exs. returned to Defs.

**\*14** In light of this judicially noticed information, we may for the moment concede that Plaintiff engaged in constitutionally protected conduct and satisfies the first prong of his retaliation claim. *See United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (noting that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights"); *Franco v. Kelly,* 854 F.2d at 589 (holding that, within the prison context, "inmates must be permit[ted] free and uninhibited access ... to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers.") (internal quotation marks and citation omitted). And, we can easily find that the issuance of the MR is an adverse action since it is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" *Davis v. Goord,*

320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Thus satisfying the second prong of the retaliation claim. But our analysis does not end there, for Plaintiff must satisfy the third prong by linking the adverse action to the protected activity.

To satisfy the third prong, a prisoner must present evidence that the defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003). Furthermore, in satisfying the causal connection requirement, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Dawes v. Walker,* 239 F.3d at 492 (internal quotation marks and citations omitted) (cited in *Davis v. Goord,* 320 F.3d at 353).

The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. In situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct.15,1997)). The Second Circuit has noted that retaliation claims are prone to abuse, therefore courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d at 872 (citation omitted); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

**\*15** As noted above, Plaintiff proffers that the January MR was false and retaliatory. During the Hearing, he only attacked the time indicated on the MR. In this litigation, through his Complaint, during his Deposition, and in his Opposition papers, Plaintiff expounds upon his theory of retaliation and asserts he was not present in his cell during the time stated in the MR, thus, it is clearly false and could only have been issued for retaliatory purposes. *See* Compl. at ¶¶ 6A, B, & F; Levine Decl., Ex. A, Pl.'s Dep. at pp. 13 & 18–19; Dkt. No. 76 at pp. 2, 6, & 8. Plaintiff is correct in stating he was not in his cell at 2:00 p.m. on January 5, 2001, the time the MR was written. In fact, from judicially noticed evidence, it is clear that Plaintiff was attending a disciplinary hearing in conjunction with the December 30th incident. *See McEachin v. Goord,* Civ. No. 9:01–CV–259, Dkt. No. 32, Exs. D & E (records from Plaintiff's Tier III Disciplinary Hearing certifying his attendance at the hearing, which commenced on January 5, 2001, at 1:49 p.m.). Indeed, the Porten Decl. corroborates Plaintiff's absence at the two o'clock hour. Porten Decl., Ex. A ("Later at approximately 2:00 pm ... I noticed [McEachin's] cell was open and the blanket still on the floor."). Clearly, Plaintiff was absent from his "open" SHU cell at that time. Plaintiff, however, does not claim he was absent during the other times identified in the MR, like the altercation allegedly occurring at 9:00 a.m., and soon thereafter. *Id.* From the documents submitted to the Court, including a redacted copy of the log book, it is clear that McEachin had a brief call-out in the morning for an x-ray at 8:25 a.m. and returned at 8:45 a.m., just in time for the 9:00 a.m. altercation. Minerly Am. Decl., Ex. B. Furthermore, Defendant Porten declares under penalty of perjury that the MR was based upon his "observed conduct" of Plaintiff and without retaliatory animus. He also avers to have been unaware of the December 30th altercation and the related grievance. And, further dwindling Plaintiff's ability to connect his protected activity with the adverse MR is the fact that the grievance at issue was submitted by Plaintiff on the very same date the MR was written, making it unlikely that Porten would have been aware of it when he simultaneously wrote his MR.

Based on the above analysis, we find that Plaintiff has not raised sufficient material facts with regard to the causal connection between his protected activity and the adverse action taken against him. Thus, his retaliation claim against Defendant Porten should be **dismissed** on this basis as well.

*4. Supervisory Liability of Defendant Selsky*

Plaintiff seeks to hold Defendant Selsky liable solely for his role in affirming the appeals of his Disciplinary Hearings.

2010 WL 3259975

It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and furthermore, the doctrine of respondeat superior is inapplicable to § 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[I]t is well settled that to state a civil rights claim under § 1983, a complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983") (citations omitted).

 **\*16** The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because he holds a high position of authority).

Because, as explained fully above, no constitutional violations befell Plaintiff, there can be no supervisory liability

assessed against Defendant Selsky. Thus, any claim against Selsky should be **dismissed.**

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that, to the extent Plaintiff rescinds his explicit, written waiver of his challenge to the sanctions affecting the duration of his confinement (Dkt. No. 40), the prior dismissal of all claims should be reinstated and the entire Complaint **dismissed;** and it is further

**RECOMMENDED,** in the alternative, after reviewing the merits of the underlying claims, the Defendants' Motion for Summary Judgment (Dkt. No. 51) should be **granted** and the entire Complaint be **dismissed;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3259975

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 44 of 182

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

KeyCite Yellow Flag - Negative Treatment

Disagreed with by   Justice v. Coughlin,   N.D.N.Y.,   October 15, 1996

1996 WL 487951
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

William NOGUERAS, Plaintiff,

v.

Thomas A. COUGHLIN III, Commissioner,
New York State Department of Correctional
Services, Donald Selsky, Director, Special
Housing Unit and Inmate Discipline; John Keane,
Superintendent, Sing Sing C.F.; Robert McClellan,
Superintendent, Southport C.F.; Melvin Hollins,
First Deputy Superintendent, Southport C.F.;
Charles Griener, First Deputy Superintendent,
Sing Sing C.F.; Kenneth Goewey, Lieutenant,
Sing Sing C.F.; Harry Kerrigan, Corrections
Sergeant, Sing Sing C.F.; and Robert Johnson,
Corrections Officer, Sing Sing C.F., Defendants.

No. 94 Civ. 4094 (JSM).
|
Aug. 27, 1996.

**Attorneys and Law Firms**

William Nogueras, Pine City, New York, pro se.

Alfred A. Delicata, Assistant Attorney General, New York
City, for defendant.

OPINION AND ORDER

JOHN S. MARTIN, Jr., District Judge:

 **\*1** Pursuant to 42 U.S.C. § 1983, plaintiff, William
Nogueras, has filed a complaint against the defendants
for allegedly violating his First, Eighth and Fourteenth
Amendment rights. This action is before the Court on
defendants' motion for summary judgment. For the reasons
stated below, the motion is granted.

*BACKGROUND AND FACTS*

On July 23, 1993, while Nogueras was an inmate at Sing
Sing Correctional Facility, defendant, Robert Johnson, who
was a Corrections Officer, discovered that Nogueras was
in possession of literature pertaining to the Almighty Latin
King Nations ("the Latin Kings"). The New York State
Department of Correctional Services ("the Department")
has not authorized the Latin Kings to function as a group
within the Department's facilities. The materials consisted
of portions of the Latin Kings' constitution including blank
disciplinary forms; rules and codes of conduct for members;
completed disciplinary forms detailing charges against two
members and the actions taken against them; a document
entitled "Towards An A.L.K.N. Prison Movement" which
Nogueras claimed he adapted from a chapter entitled "Toward
A Red Prison Movement" from "Blood in My Eye" by George
Jackson; and a history of the Latin Kings.

The literature was confiscated and reviewed by defendant,
Corrections Sergeant Harry Kerrigan, who filed a
misbehavior report [1] charging plaintiff with possessing
contraband in violation of Rule 113.23 of the Department's
Institutional Rules of Conduct [2] and with participating in acts
which were detrimental to the prison in violation of Rule
104.12 [3]

[1]     The misbehavior report described the incident as
        follows:
                After reviewing the written material from
                inmate Nogueras' cell at the above time,
                date and location, I found the material to be
                of a content dealing with the philosophies
                and actions of the Almighty Latin King
                Nation (ALKN), a group not sanctioned
                by the Department. The literature promoted
                an unauthorized organization, which is not
                in accord with the safety and security or
                good order of the facility. The literature was
                forwarded to the D.S.S. Office.

[2]     Rule 113.23 provides that "[i]nmates shall not be
        in possession of any contraband.... [C]ontraband
        is any article that is not authorized by the
        superintendent or his designee." 7 N.Y.Codes R. &
        Regs, § 270.2(B), Rule 113.23. Violation of this
        Rule may be classified as a Tier III infraction. *Id.*

[3]     Rule 104.12 provides that "[i]nmates shall not
        lead, organize, participate, or urge other inmates
        to participate in work-stoppages, sit-ins, lock-ins,

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 45 of 182

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

or other actions which may be detrimental to the order of the facility" and may be classified as a Tier III infraction. 7 N.Y.Codes R. & Regs, § 270.2(B), Rule 104.12.

A Tier III disciplinary hearing conducted by defendant, Lieutenant Kenneth Goewey, was held on July 27, 1993. The literature in question was not introduced into evidence but Goewey stated that he had reviewed the materials. The only evidence presented by Nogueras was a tobacco rapper which allegedly contained the Latin Kings' logo. Nogueras indicated that he had a box of literature in his cell but did not bring it to the hearing because it was too heavy. Nogueras was found guilty of the charges against him and sentenced to 24 months in a special housing unit ("SHU") with a loss of telephone, package and commissary privileges. Nogueras was subsequently transferred from Sing–Sing to Southport Correctional Facility ("Southport").

He then appealed the decision to defendant, John Keane, Superintendent of Sing Sing, who directed plaintiff to address his appeal to the Director of the Special Housing Unit and Inmate Discipline, defendant, Donald Selsky. After reviewing the matter, Selsky reduced Nogueras' disciplinary sentence to 365 days in SHU with a loss of privileges. Nogueras also wrote to defendant, Charles Griener, a First Deputy Superintendent at Southport, complaining that the literature had not been referred to the Facility Media Review Committee in accordance with the Department's rules. Subsequently, defendant, Robert McClellan, Southport's Superintendent, intervened and directed, defendant, First Deputy Superintendent Melvin Hollins to review Nogueras' case. Hollins found no procedural or substantive errors that would warrant a reversal.

**\*2** Before Hollins conducted this review, however, Nogueras initiated an Article 78 proceeding in New York State Supreme Court against the defendants with the exception of Hollins and McClellan. Nogueras claimed that his rights to due process and free speech had been violated and he sought to be released from SHU. On January 10, 1994, the presiding judge appointed counsel for Nogueras and issued an order to show cause against defendants which was returnable on February 24th. On January 27th, however, Selsky reversed the findings of Nogueras' disciplinary hearing on the grounds that the misbehavior report and the other evidence failed to substantiate the charges against Nogueras. He also ordered that all records pertaining to the disciplinary hearing be expunged. Accordingly, Nogueras' Article 78 proceeding was dismissed as moot without prejudice.

On February 7th, 1994, Nogueras was transferred from Southport to Wende Correctional Facility and a few weeks later he was transferred to Attica Correctional Facility. He then filed this suit alleging that defendants violated his First Amendment right of free speech, his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process.

*DISCUSSION*

Summary judgment will be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In deciding whether a genuine dispute remains as to a material fact, the Court must view the evidence before it in the light most favorable to the nonmovant, *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993), drawing all justifiable inferences in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment should be granted when no reasonable trier of fact could find in favor of the nonmoving party. *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992).

"[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Prison regulations that limit an inmate's constitutional rights are valid if they are "reasonably related to legitimate penological interests." *Turner v. Safely,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The Supreme Court has set forth the factors to be used in determining the reasonableness of a prison regulation:

> First there must be a valid rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.... [T]he governmental objective must be a legitimate and neutral one.... A second factor ... is whether there are alternate means of exercising the right that remain open to prison inmates.... A third consideration is the impact accommodation of the

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 46 of 182

Nogueras v. Coughlin, Not Reported in F.Supp. (1996)

1996 WL 487951

asserted constitutional right will have on the allocation of prison resources generally.... When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

**\*3** *Id.* at 89–90, 107 S.Ct. at 2262.

The Department made a determination that the teachings of the Latin Kings advocate murder, extortion, violence, work stoppages and other activities which undermine the safety of inmates and prison staff. Urban Aff. ¶¶ 6, 8, 9, 10. See also *Benjamin v. Malcolm,* 1995 WL 378529, \*1 (S.D.N.Y.1995) (recognizing Latin Kings as a violent gang). The Department also found that the Latin Kings distribute certain literature, which depicts the gang as a social organization committed to promoting cultural values, in an effort to coax unsuspecting members to join but, once they have done so, they are required to adhere to the Latin Kings' violent philosophies or face discipline meted out by other gang members. *Id.* at ¶ 13. As the Supreme Court has stressed, "[p]rison officials should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). See also *Turner,* 482 U.S. at 84–54, 107 S.Ct. at 2259 (recognizing that federal courts should accord deference to the administrators of state penal systems). Giving deference to the Department's determination of the threat to prison security posed by the Latin Kings, the Court finds no First Amendment violation in the Department's banning Latin Kings literature and declaring it contraband.

Applying the *Turner* factors, the Department's policies requiring groups to be authorized and deeming unauthorized groups' materials contraband are reasonably related to the valid penological interests of maintaining prison security by containing gang activity and inmate violence. Nogueras retains the right to participate in and read about the philosophies of other authorized organizations that promote social and cultural awareness, such as Latinos Unidos of

which he is a member. The Court must also give deference to the Department's determination that recognition of the Latin Kings would have an adverse impact on guards and other inmates by increasing the incidence of inmate violence. Finally, Nogueras' proffered alternative of requiring the Department to allow inmates access to those portions of the Latin Kings' literature which do not openly advocate violence is unacceptable given that the Department has already found that the Latin Kings use such literature to facilitate the recruitment and indoctrination of new members. Additionally, allowing prisoners access to seemingly benign Latin Kings literature overlooks the fact that members would still be able to use codes to convey those messages which the Department has deemed inappropriate. See *Turner, supra,* 482 U.S. at 93, 107 S.Ct. at 2264 (upholding ban on inmate-to-inmate correspondence and rejecting alternative of officials monitoring mail because inmates could easily resort to use of codes to prevent detection of their real messages). Thus, the Court finds that the defendants did not violate Nogueras' First Amendment rights by confiscating his Latin Kings literature. Nor does the Court find any merit in Nogueras' contention that he was punished simply because he was a member of the Latin Kings as there was sufficient evidence to find that he was in possession of contraband.

**\*4** In addition to his First Amendment claims, Nogueras asserts several due process claims which must be analyzed in light of the Supreme Court's holding in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In *Sandin,* the Supreme Court limited the extent to which the Due Process Clause protects the liberty interests of prisoners.

In that case, the plaintiff, Demont Conner, an inmate at a Hawaiian prison, claimed that prison officials had deprived him of due process by sentencing him to 30 days of disciplinary segregation for high misconduct without allowing him to present witnesses at his disciplinary hearing. After Conner had served his thirty days, a deputy administrator found that the high misconduct charge was not supported by the evidence and expunged Conner's record. The District Court originally granted the prison officials' motion for summary judgment. The Ninth Circuit reversed and found that Conner had a liberty interest in remaining free from disciplinary segregation and that a trier of fact should resolve whether Conner received all the process that he was due as outlined in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Supreme Court, however, reasoned that "[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected

1996 WL 487951

parameters of the sentence imposed by a court of law." *Sandin,* 515 U.S. at ——, 115 S.Ct. at 2301. Thus, the Due Process Clause only protects a prisoner from restraint which exceeds his original sentence or which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 2300.

The Court found that Conner's confinement did not fall into either category. His sentence of thirty days in disciplinary segregation did not exceed similar, but totally discretionary confinement [such as administrative segregation or protective custody,] in either duration or degree of restriction." *Id.* at 2301. The disciplinary action did not have any effect on the duration of Conner's sentence. *Id.* at 2302. Moreover, the charges were expunged from his record. *Id.* at 2301.

In analyzing Nogueras' due process claims the Court must first determine whether Nogueras had a protected liberty interest in remaining free from disciplinary segregation. If this question is answered in the affirmative, then the Court must decide if Nogueras' received all the process that he was due. Under the reasoning of Sandin, Nogueras' due process claims must fail because his confinement in SHU did not affect the length of his original sentence nor did the duration and degree of his disciplinary sentence impose any atypical and significant hardships in relation to the ordinary incidents of prison life.

First, Nogueras has not demonstrated any facts which would indicate that the duration of his original sentence was affected by the disciplinary action taken against him. There is no evidence that any good time credits were revoked and, like the plaintiff in *Sandin,* the disciplinary charges were expunged from Nogueras' record.

 **\*5** With respect to the length of Nogueras' disciplinary confinement, 210 days in SHU does not in and of itself trigger due process concerns. See, e.g., *Polanco v. Allan,* 1996 WL 250237, \*3 (N.D.N.Y.1996) ("period of segregation of one year or less affords no protected liberty interest"); *Carter v. Carriero,* 905 F.Supp. 99, 103 (W.D.N.Y.1995); (270 days in SHU did not entitle inmate to invoke *Wolff* standards); *Delaney v. Selsky,* 899 F.Supp. 923, 927 (N.D.N.Y.1995) (197 days); *McMiller v. Wolf,* 1995 WL 529620 (183 days);

*Tulloch v. Coughlin,* 1995 WL 780970, \*2 (W.D.N.Y.1995) (180 days).

Nor has Nogueras shown that the conditions of his confinement forced him to suffer any atypical hardships in relation to the ordinary incidents of prison life. In New York, inmates can be placed in SHU for disciplinary confinement, detention, administrative segregation, protective custody, or for any other reason, with the approval of the deputy commissioner for facility operations. 7 N.Y.C.R.R. §§ 301.1—301.7. Restrictions on telephone use, recreational activities, access to law libraries, visitation, personal property, educational and employment opportunities generally apply to all inmates confined to SHU regardless of the reason that they have been placed there. See *Rosario v. Selsky,* 1995 WL 764178, \*5 (S.D.N.Y.1995); *Carter,* 905 F.Supp. at 103. Thus, because Nogueras has not shown that any particular conditions of his confinement were substantially dissimilar to those faced by inmates placed in administrative segregation or protective custody, the Court finds that his confinement did not impose any atypical hardships. Cf. *Delaney v. Selsky,* 899 F.Supp. 923 (N.D.N.Y.1995) (197 days in SHU could be atypical and significant where inmate, who was almost seven feet tall and was forced to either sit, stand or lay in uncomfortable positions for twenty-three hours each day, suffered back injuries). Accordingly, Nogueras' due process claims must fail.

Finally, Norgueras has not demonstrated any facts which would support his claim that the defendants violated the Eighth Amendment.

*CONCLUSION*

For the foregoing reasons, defendants are entitled to summary judgment on all of Nogueras' claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 487951

---

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)
2016 WL 5322113

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 48 of 182

2016 WL 5322113
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Aaron JABOT, Plaintiff,
v.
CORRECTION OFFICER MINOR, Defendant.

9:13-CV-01407 (DNH/TWD)
|
Signed July 14, 2016
|
Filed 07/15/2016

**Attorneys and Law Firms**

AARON JABOT, 15-A-4539, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13201, Plaintiff, pro se.

FITZGERALD MORRIS BAKER FIRTH P.C., 16 Pearl Street, P.O. Box. 2017, OF COUNSEL: JOSHUA D. LINDY, ESQ., Glens Falls, New York 12801, Attorneys for Defendant.

## REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3(c). Plaintiff Aaron Jabot, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), alleges violations of his civil rights while confined at Washington County Correctional Facility, located in the Town of Fort Edward, New York. (*See generally* Dkt. No. 5.) Specifically, Plaintiff alleges that Defendant Correction Officer Michele Minor, who served as the hearing officer at Plaintiff's November 6, 2013, disciplinary hearing, violated his Fourteenth Amendment due process rights. *Id.* at 2. [1]

[1]
Unless otherwise noted, page references to documents identified by docket number are to the

page number assigned by the Court's CM/ECF electronic docketing system.

Currently pending before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 52.) Plaintiff has opposed the motion. (Dkt. No. 54.) Defendant has filed a reply. (Dkt. No. 55.) For the reasons that follow, the Court recommends that Defendant's motion be granted. (Dkt. No. 52.)

## I. BACKGROUND [2]

[2]
In light of the procedural posture of this case, the following recitation is derived from the record now before the Court, with all inferences and ambiguities resolved in Plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2 [sic] Cir. 2003).

On July 2, 2013, Plaintiff was arrested on a parole violation, and was committed to the Washington County Correctional Facility. (Dkt. No. 52-11 at ¶ 7.) On or about October 20, 2013, at approximately 18:20 hours, Plaintiff asked Correction Officer Jacob Freebern ("C.O. Freebern") if he could have some hot water. (Dkt. No. 52-8 at ¶ 4.) C.O. Freebern reminded Plaintiff that his microwave privileges had been suspended by Sergeant Strain, and advised Plaintiff that if he had any questions regarding the microwave suspension, he could address the issue with Sergeant Strain when he was in the unit. [3] *Id.* at ¶ 5. Immediately thereafter, Plaintiff became verbally assaultive by shouting obscenities and banging on his cell door. *Id.*

[3]
Plaintiff was housed in administrative segregation in the C-Unit. (Dkt. No. 52-8 at ¶ 3.)

Later that evening, C.O. Freebern issued Plaintiff a misbehavior report charging him with the following violations: (1) verbal or written harassment; (2) profanity and unnecessary noise; (3) insolence towards facility staff; and (4) disruptive conduct. (Dkt. No. 52-8 at 10. [4]) C.O. Freebern provided a copy of the Inmate Misbehavior Report to Plaintiff. (Dkt. No. 52-11.) On November 3, 2013, Plaintiff was provided with a "24 Hour Hearing Board Notice," indicating that the disciplinary hearing was scheduled to take place November 6, 2013. (Dkt. No. 52-9 at 41.) Plaintiff refused to acknowledge receipt of that Notice. *Id.*

[4]
Specifically, Plaintiff shouted "suck my dick" and "freebitch" at C.O. Freebern. (Dkt. No. 52-8 at ¶ 6.) Plaintiff also yelled obscenities of a sexual

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 49 of 182

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

nature regarding Correction Officer Kendrick. *Id.* Plaintiff threatened to call social services because C.O. Freebern was planning to harm his son. *Id.* at ¶ 8. Plaintiff also made numerous threats of lawsuits and prison time to C.O. Freebern, if he did not get what he wanted. *Id.* at ¶ 9. Plaintiff claims that the charges were all lies. (Dkt. No. 52-6 at 135.)

**\*2** On November 6, 2013, Defendant served as the Hearing Officer at Plaintiff's disciplinary hearing. (Dkt. No. 52-9 at ¶ 17.) Plaintiff did not object in writing to Defendant serving as the hearing officer, nor did Plaintiff submit in writing (or any other form), a list of questions that he wanted asked of any potential witnesses. *Id.* at ¶ 18.

At the beginning of the hearing, Defendant read the charges to Plaintiff. *Id.* Plaintiff responded that he understood the charges. *Id.* at ¶ 19. Defendant then read C.O. Freebern's statement. *Id.* In response, Plaintiff stated, "I object, you are not laying grounds for proper evidence." *Id.* at ¶ 20. Thereafter, Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant denied that request because she had previously questioned C.O. Freebern and read his statement into evidence. *Id.* at ¶ 21. Plaintiff responded to Defendant's denial by stating, "Monroe vs. Monroe." *Id.* at ¶ 22.

Defendant then asked Plaintiff if he wanted to call other any witnesses. *Id.* Plaintiff objected again. *Id.* Defendant informed Plaintiff that this was his opportunity to present his defense to the October 20, 2013, disciplinary charges. *Id.* at ¶ 23. In response, Plaintiff stated that he no longer felt safe and requested to return to his cell. *Id.* at ¶ 24. Accordingly, two correction officers escorted Plaintiff to his cell. *Id.*

On November 6, 2013, following the conclusion of the disciplinary hearing, Defendant prepared an "Inmate Disciplinary Hearing Record." *Id.* at p. 47. Based upon C.O. Freebern's statement, Defendant found Plaintiff guilty of all charges, and sentenced Plaintiff to 200 days of keep lock, 30 days loss of commissary, reduced showers and shaving for 40 days, loss of 1 visit for 30 days, and a $25.00 fine. *Id.* at p. 47.[5] Plaintiff did not appeal the disposition of the November 6, 2013, disciplinary hearing. *Id.* at ¶ 28.[6]

5    Specifically, Plaintiff was sentenced as follows: (i) 90 days keep lock with 30 days loss of commissary for verbally (or in writing) harassing anyone; (ii) 40 days keep lock with three showers/shaving per week at 08:30 on Monday, Wednesday, and Friday for failing to refrain from profanity and unnecessary noise; (iii) 60 days of keep lock with loss of 1 visit for 30 days for displaying insolence towards facility staff; and (iv) 10 days keep lock and a $25.00 fine for the disruption of facility routine. (Dkt. No. 52-9 at 47.)

6    Although Plaintiff alleges that Washington County Correctional Facility does not have an appeal process, Plaintiff testified that he may have appealed Defendant's decision. Plaintiff has not produced a copy of an appeal. (Dkt. No. 52-6 at 160).

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on November 12, 2013, alleging that on November 6, 2013, Defendant denied him a fair disciplinary hearing. (Dkt. No. 1 at 4-5.) Specifically, Plaintiff alleged he was not permitted to call witnesses at the hearing, he was denied access to the statements made against him by corrections staff, and Defendant failed to make a proper and complete recording of the disciplinary hearing. *Id.* at 4. As a result of these purported injustices, Plaintiff alleged he was being held in the segregated housing unit ("SHU") illegally. *Id.*

Upon initial review, the Court *sua sponte* dismissed Plaintiff's complaint with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted, in part, because Plaintiff failed to include any factual allegations regarding the length of the disciplinary confinement imposed as a sanction, nor did he allege any facts regarding the conditions of that confinement. (Dkt. No. 4 at 6-8.)

**\*3** Plaintiff timely filed an amended complaint on December 4, 2013. (Dkt. No. 5.) Plaintiff alleged he was denied due process at the November 6, 2013, hearing, and claimed the conditions of his disciplinary confinement were atypical and significant, in part, due to his mental illness. *Id.* at 2-13. Plaintiff also attached a copy of Defendant's written statement of the November 6, 2013, decision to the amended complaint. *Id.* at 17. Upon initial review of the amended complaint, the Court found Plaintiff's allegations were sufficient to cure the pleading deficiencies described in the November 12, 2013, Order.[7] Plaintiff's amended complaint was accepted for filing and is the operative complaint in this action. (Dkt. No. 8.) Defendant filed her answer on June 6, 2014. (Dkt. No. 12.)

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 50 of 182
Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

7       Although Plaintiff alleged he was "being placed in SHU for no reason," and thus was being subjected to "cruel and unusual punishment," the Court did not construe the amended complaint to raise a separate Eighth Amendment challenge to the conditions of confinement. (*See* Dkt. No. 8.) Instead, the Court determined Plaintiff's allegations that his SHU confinement "worsened" his "mental illness" and thus was "cruel and unusual punishment" was Plaintiff's attempt to demonstrate an "atypical and significant hardship" under *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). *Id.* at 3.

## III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, including pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006); *see also F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original). To defeat summary judgment, "nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

*4  In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3, (S.D.N.Y. Oct. 28, 1999) [8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)). Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 51 of 182

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

8  The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

## IV. ANALYSIS

### A. Deficiencies in Plaintiff's Opposition

As required under L.R. 7.1, Defendant filed a statement of material facts with citations to the summary judgment record. (Dkt. No. 52-11.) Although Plaintiff has opposed Defendant's motion, Plaintiff failed to respond to the statement of material facts filed by Defendant as required under L.R. 7.1(a)(3). (*See* Dkt No. 54.) Under the rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[9] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[10] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

9  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

10  Defendant has complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to summary judgment motion. (Dkt. Nos. 52, 52-11.)

**\*5** Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendant's L.R. 7.1 Statement, and he failed to do so, the Court recommends that the facts contained in Defendant's Statement be treated as having been admitted to the extent they are supported by accurate record citations. *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011). As to any facts not contained in Defendant's Statement of Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

The Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). The Court has opted to review the entire record in this case.

A verified complaint is to be treated as an affidavit for summary judgment purposes. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). Here, however, Plaintiff's amended complaint is not verified, nor is his opposition to Defendant's motion. (*See* Dkt. Nos. 5, 54.) Unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g., Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11 (E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment).

Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher*, No. 05 Civ. 503(ER), 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford the *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No.

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 52 of 182
Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

09CV718 (HBS), 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012).

In deference to Plaintiff's *pro se* status, the Court has considered Plaintiff's unsworn response (Dkt. No. 54) in opposition to Defendant's motion for summary judgment (Dkt. No. 52). However, the Court's review has revealed that Plaintiff's submission contains very little in the way of admissible evidence.

### B. Due Process Rights under the Fourteenth Amendment

Plaintiff alleges that Defendant deprived him of due process at the November 6, 2013, disciplinary hearing. (Dkt. No. 5.) Defendant moves for summary judgment arguing that (1) Plaintiff was not deprived of a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process to which he was entitled at the disciplinary hearing; and (3) in the alternative, Defendant is entitled to qualified immunity. (Dkt. No. 52-12 at 4-16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

**\*6** To establish a claim under § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Accordingly, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 783-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). Thus, the Court must inquire whether the allegations related to the conditions of Plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*. "Plaintiff has the burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013); *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)); *see Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). However, the Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 53 of 182
Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)
2016 WL 5322113

Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64-65 (citing *Colon*, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued as a matter of law. *Id.* at 65 (citations omitted).

**\*7** Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon*, 215 F.3d at 231-32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder*, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia*, *Palmer*, 364 F 3d at 65-66).

Here, Plaintiff was sentenced to 200 days of segregated confinement. (Dkt. No. 52-9 at 47.) Because Plaintiff's confinement was of an "intermediate duration," the Court must make a fact-intensive inquiry that examines the actual conditions of SHU confinement compared to the ordinary prison conditions at Washington County Correctional Facility. *See Palmer*, 364 F.3d at 65; *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009).

To establish that Plaintiff's 200 day SHU confinement was not atypical and not significant, Defendant submits the affidavit of Eugene McKenna, Jail Administrator at Washington County Correctional Facility. (Dkt. No. 52-10. [11]) McKenna declares that all inmates held at the Washington County Correctional Facility are provided with a handbook to assist them during their incarceration. *Id.* at ¶ 5. The handbook is meant to provide inmates with a written explanation of facility policies, including policies concerning visitation, exercise, hygiene, discipline, and restrictive housing. *Id.* The handbook provides that inmates will be entitled to two contact visits per week, with each visit not to exceed one hour. *Id.* at ¶ 6, p. 9. With regard to hygiene, showers are available to inmates throughout the day, except for mandatory lock-in times. *Id.* at ¶ 7, p. 15. Inmates are afforded a minimum of one hour of exercise per day, which may be extended based upon inmate behavior, including the cleanliness of the housing unit. *Id.*

[11] McKenna was hired as a Correction Officer for the Washington County Sheriff's Office at the Washington County Correctional Facility in October 2003, and was promoted to Sergeant in 2008. (Dkt. No. 52-10 at ¶ 2.) He became the Jail Administrator for the facility on October 23, 2009. *Id.* Prior to his employment at Washington County Correctional Facility, McKenna was a Police Officer at the Whitehall Police Department from 1986 through 2002. *Id.* at ¶ 3. He also served as a Correction Officer at Riker's Island for the New York City Department of Corrections from 1983 through 1985. *Id.* McKenna's affidavit is based upon the records, regulations, directions, and policy guidelines of the Washington County Correctional Facility, as well as he own personal knowledge as the Jail Administrator. *Id.* at ¶ 2. A copy of the handbook is attached to McKenna's Affidavit. *See id.* at pp. 8-36.

With regard to discipline, inmates are subject to different levels of discipline including verbal warnings, being locked in a cell, loss of privileges, or loss of good-time credits. *Id.* at ¶ 8, p. 20. If the infraction is of a more serious or repetitive nature, the inmate will be issued a misbehavior report and will appear in front of a hearing officer. *Id.* at ¶ 9, p. 20. Inmates receive a notice within twenty-four hours of a hearing board proceeding, which can be waived by the inmate. *Id.* at ¶ 10, p. 20. If the charges against the inmate are affirmed as a result of the hearing, sanctions may be imposed based upon the inmate's past history and the severity of the offense, including (1) counsel or reprimand, (2) loss of one or more specific privileges, (3) restitution; and/or (4) confinement to a cell, room, or the SHU. *Id.* at ¶ 11, p. 21.

**\*8** At Washington County Correctional Facility, the SHU consists of ten cells in one linear row, one of which is designated for medical confinement. *Id.* at ¶ 13. Each cell is seven feet by sixteen feet in dimension. *Id.* On the outside of each cell is an attached seven feet by eight feet cage reserved for recreation purposes. *Id.* Inmates housed in the SHU can communicate with other inmates in the SHU based upon their proximity to each other. *Id.*

McKenna declares, and the handbook provides, that all SHU inmates are offered one hour of recreation and a shower between the hours of 8:30am and 2:00pm at the housing unit officer's discretion. *Id.* at ¶ 14, p. 21. In addition, all inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, have access to the

Case 9:19-cv-00193-MAD-TWD Document 55 Filed 05/12/21 Page 54 of 182
Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)
2016 WL 5322113

same healthcare and mental-health services afforded to all other inmates, and are served the same meals in their cells as those served in the facility mess hall. *Id.* at ¶¶ 15-17.

Similarly, in *Vasquez v. Coughlin*, the defendants submitted the affidavit of Anthony J. Annucci, Deputy Commissioner and Counsel for the New York State Department of Correctional Services, which provided a thorough analysis of segregated housing in comparison with other types of confinement. 2 F. Supp. 2d 255, 259-60 (N.D.N.Y. 1998). Relying on Annucci's affidavit, Judge McAvoy held that despite being housed in the SHU for 545 days, the conditions of the inmate's confinement in the SHU did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. *Id.* Indeed, Judge McAvoy noted that the conditions of the inmate's confinement were, for the most part, similar to those of the general prison population with the exception that the inmate received his meals in his cell and received one less shower per week. *Id.*; *cf. Bowens v. Pollock*, No. 06-CV-0457A (SR), 2010 WL 5589350, at *15 (W.D.N.Y. Oct. 12, 2010) (district court concluded that it lacked a sufficient record upon which to assess whether plaintiff had demonstrated a liberty interest where defendants had presented no evidence regarding typical conditions of keeplock confinement compared to the general population and the actual conditions of the plaintiff's keeplock).

Defendant has provided extensive information regarding the conditions of Plaintiff's segregated confinement at Washington County Correctional Facility compared to the general population at the facility. (Dkt. No. 52-10.) However, despite bearing the burden of proving that the conditions of his confinement constituted an atypical, significant hardship, *Vasquez*, 2 F. Supp. 2d at 260, Plaintiff has offered no challenge to the submitted facts of McKenna, nor has he disputed them with facts of his own. (Dkt. No. 54.) Instead, the entire focus of Plaintiff's opposition is on the purported due process violations at his November 6, 2013, disciplinary hearing. *Id.*

Plaintiff alleges that being housed in the SHU "illegally" for twenty-three hours a day, and being denied visitation and telephone calls with family, "worsened" his mental health issues, including having a hard time sleeping and eating. (Dkt. No. 54 at 10-11.) Plaintiff's testimony regarding his loss of privileges (such as telephone, visitation, and use of microwave) and the conditions of his confinement (including lack of sleep, trouble eating, and being handcuffed and shackled during facility transport), is insufficient to warrant

constitutional protections. Indeed, "there is no liberty interest in remaining a part of the general prison population." *Lewis*, 2014 WL 3729362, at *8 (citing *Frazier*, 81 F.3d at 317).

**\*9** While Plaintiff's conditions of confinement are certainly more restrictive than those in general population, they are insufficient to implicate a liberty interest, even when coupled with Plaintiff's 200 days confined to the SHU. *See, e.g.*, *Johnson v. Enu*, No. 08-CV-158 (FHS/DNH), 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) (loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest); *Spence v. Senkowski*, No. 91-CV-955 (NPM), 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (plaintiff's confinement in the SHU for 180 days, with a corresponding loss of packages, telephone privileges, commissary privileges and his prison job was not an atypical or significant hardship to establish the existence of a liberty interest).

At his deposition, Plaintiff testified that he has borderline personality order, depression, and anxiety. (Dkt. No. 52-6 at 176.) As set forth above, McKenna's affidavit established that all Washington County Correctional Facility inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, and have access to the same healthcare and mental health services afforded to all other inmates. (Dkt. No. 52-10 at ¶ 15.) Significantly, Plaintiff never testified that he was denied healthcare or mental-health services while housed in the SHU.

Based on the undisputed evidence in the record, the Court finds that Plaintiff's 200 day confinement to the SHU with loss of certain privileges was not an atypical, significant hardship in relation to other ordinary incidents of prison life. *See Palmer*, 364 F.3d at 65 (if the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law). Thus, Plaintiff is not entitled to the protections of the Fourteenth Amendment. *See Palmer*, 364 F.3d at 64 (plaintiff has "no right to due process [at his hearing] *unless* a liberty interest was infringed as a result") (emphasis in original).

Accordingly, the Court recommends granting Defendant's motion for summary judgment (Dkt. No. 52).

## 2. Due Process

Case 9:19-cv-00193-MAD-TWD Document 55 Filed 05/12/21 Page 55 of 182

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

Even assuming a liberty interest exists, the Court recommends granting Defendant's motion because Plaintiff was afforded the minimum requirements of due process at his November 6, 2013, disciplinary hearing.

The Fourteenth Amendment due process protections afforded to a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). "An inmate is entitled to advance written notice of the charges against him; a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). In some circumstances, an inmate also has a limited right to assistance. *Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1998).

The due process clause requires that a hearing officer's determination be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004).

**\*10** Moreover, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia, Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

### a. Notice

Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are ...." *Wolff*, 418 U.S. 563-64. Here, Plaintiff was provided with a copy

of the October 20, 2013, Inmate Misbehavior Report. (Dkt. No. 52-9 at 34.) On November 3, 2013, Plaintiff was provided with formal notice that his disciplinary hearing involving the October 20, 2013, events was scheduled to take place on November 6, 2013. *Id.* at 41. As such, Plaintiff was provided with adequate written notice. *See Sira*, 380 F.3d at 69.

### b. Opportunity to be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence. *Sira*, 380 F.3d at 69. Here, Plaintiff was afforded the opportunity to be present at his disciplinary hearing on November 6, 2013. *See, e.g., Smith v. Fisher*, 803 F.3d 124 (2d Cir. 2015) (inmate had an "opportunity to attend" where he knowingly waived his right to attend his disciplinary hearing, where he asked to leave the room, and refused to participate).

However, Plaintiff alleges that he was denied all witnesses and deprived of an opportunity to present documentary evidence. (Dkt. No. 5 at 2.) Contrary to Plaintiff's position, the record supports the conclusion that Plaintiff was granted a hearing with a reasonable opportunity to call witnesses and present documentary evidence.

Prior to the hearing, Defendant questioned C.O. Freebern, and he provided a written statement. (Dkt. No. 52-9 at ¶ 20.) At the beginning of the hearing, Defendant read C.O. Freebern's statement into the record. *Id.* Defendant then provided Plaintiff with an opportunity to call witnesses. *Id.* at ¶ 21. Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant explained to Plaintiff he would not be permitted to call C.O. Freebern as a witness, as she had already questioned C.O. Freebern and had just read his statement into the record. *Id.*

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 56 of 182

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative"). Thus, having explained her reasoning for denying Plaintiff's request to call C.O. Freebern as a witness, Defendant was acting within her discretion as a hearing officer to control the hearing. Moreover, despite being offered numerous opportunities to do so, Plaintiff failed to request any other witness to testify at the hearing.

**\*11** In addition, Plaintiff raised several objections throughout the hearing, and although he was provided with an opportunity to present evidence, Plaintiff declined to do so. (Dkt. No. 52-9 at ¶ 21.) Accordingly, the Court finds no triable issue of fact exists as to whether Plaintiff had an opportunity to appear and call witnesses.

### c. Impartial Hearing Officer and "Some Evidence"

Prisoners have a constitutional right to a fair and impartial hearing officer. *Sira*, 380 F.3d at 69. However, it is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent*, 472 U.S. at 455. "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports the disciplinary ruling.'" *Sira*, 380 F.3d at 69 (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.' " *Id.* at 76 (quoting *Luna*, 356 F.3d at 488).

In this case, Plaintiff was charged and found guilty, of the following violations: (i) Rule 2.05 (verbally or in writing harass anyone); (ii) Rule 5.06 (inmate shall refrain from profanity and unnecessary noise); (iii) Rule 5.03 (insolence towards facility staff); and (iv) Rule 5.00 (conduct which disrupts the orderly running of the facility). (Dkt. No. 52-9 at 47.)

Defendant relied upon C.O. Freebern's statement that on October 20, 2013, Plaintiff "became verbally assaultive, shouting obscenities at me and banging on his cell door. [Plaintiff] continued to shout 'suck my dick' and 'freebitch'

as well as many obscenities of a sexual nature pertaining" to Correction Officer Kendrick. (Dkt. No. 52-9 at 36.) C.O. Freebern further declared that Plaintiff "proceeded to threaten me numerous times with lawsuits and prison time if he was not granted what he wanted." *Id.* Thus, Defendant's determination of Plaintiff's guilt was supported by "some evidence" as required in *Hill*, 472 U.S. at 455, and "reliable evidence" pursuant to *Luna*, 356 F.3d at 488. *See Hinton v. Prack*, No. 9:12–CV–1844 (LEK/RFT), 2014 WL 4627120, at \*15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard satisfied where the misbehavior report was made by the officer personally involved in the incident and was based upon his first hand observation and detailed account of the incident; *Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

Moreover, prison officials "enjoy a rebuttable presumption that they are unbiased." *See Rodriguez v. Selsky*, No. 9:07–CV–0432 (LEK/DEP), 2011 WL 1086001, at \*11 (N.D.N.Y. Jan. 25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No. 9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at \*11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis*, 891 F.2d at 46). Thus, Plaintiff's conclusory allegation that he did not "get along" with Defendant fails to create an issue of material fact. [12]

[12]     Plaintiff's claim that he was falsely issued the October 20, 2013, misbehavior report, and thus Defendant was biased for "covering up" the "trumped up charges" is without merit. *See, e.g.*, *Gantt v. Mielenz*, No. 9:10-CV-0083 (GTS/TWD) 2012 WL 4033723, at \*4 (N.D.N.Y. Sept. 12, 2012) (Suddaby, J.) ("[J]ust as an inmate possess no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at disciplinary hearing.").

**\*12** In light of the above, the Court finds that Defendant was impartial and that her guilty determination was supported by "some evidence" sufficient for due process.

### d. Written Statement of Decision

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

An accused prisoner has the right to a written statement of decision, including a statement of the evidence relied upon by the hearing officer. *Sira*, 380 F.3d at 69. In this case, Plaintiff does not allege, nor does the record support, a claim that he was not provided with such a written statement of Defendant's decision. (*See* Dkt. No. 52-9 at pp. 46-47.) In fact, Plaintiff attached a copy of the November 6, 2013, Inmate Disciplinary Hearing Record to his amended complaint. (Dkt. No. 5 at 17.)

### e. Assistance

In certain circumstances, inmates have a "limited" right to assistance. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng*, 858 F.2d at 897. An inmate may need assistance, for example, if they are "illiterate, confined to [the] SHU, or unable to grasp the complexity of the issues." *Silva*, 992 F.2d at (citing *Wolff*, 418 U.S. at 570, *Eng*, 858 F.2d at 897). However an inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva*, 992 F.2d at 22. Indeed, the assistant need only perform what the plaintiff would have done but need not go beyond. *Lewis v. Johnson*, No. 9:08-CV-482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5, 2010). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

Plaintiff argues that he was entitled to assistance, and Defendant fails to address this argument in her motion papers. However, even assuming Plaintiff was entitled to assistance which he did not receive, no reasonable factfinder could conclude that the deprivation resulted in any prejudice to Plaintiff. *See, e.g.*, *Pilgrim*, 571 F.3d at 206 (any error on the assistant assigned to assist the plaintiff, including failing to comply with the plaintiff's instructions on interviewing witnesses and gathering documents, were harmless in light of the plaintiff's failure to identify any relevant testimony that was excluded as a result, his decision not to call witnesses when given the opportunity, and his decision to walk out of the hearing in protest of a particular defendant serving as the hearing officer).

At the outset of the hearing, Defendant read the charges to Plaintiff. (Dkt. No. 52-9 at 45.) Plaintiff stated that he understood the charges. *Id.* Defendant provided Plaintiff with

an opportunity to present witnesses and rebuttal evidence. *Id.* Plaintiff made several objections throughout the hearing. *Id.* Yet Plaintiff failed to name any witnesses, other than C.O. Freebern, that he wished to call. *Id.*

Plaintiff has argued that the October 20, 2013, charges "were all lies." (Dkt. No. 52-6 at 135.) However, Plaintiff has failed to demonstrate that the outcome of his disciplinary hearing would have been any different had he been provided with an assistant. *Lewis*, 2014 WL 3729362, at *13 (the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results); *Liao*, 2016 WL 1128245 at *7 (finding any error on assistant was harmless in light of hearing officer's rejection of plaintiff's request to recall the potential witnesses plaintiff alleges that his assistant should have contacted prior to the hearing).

**\*13** Plaintiff testified that had he been provided with an assistant, the assistant would have interviewed witnesses to the alleged events of October 20, 2013, including "a couple of inmates," and that their testimony would have proven Plaintiff's innocence. (Dkt. No. 52-6 at 135.) Plaintiff's argument that these witnesses' testimonies would have affected the outcome of his hearing is entirely speculative and conclusory. *See Hinton*, 2014 WL 4627120, at *2 (citation omitted). Further, Plaintiff admitted that had his witnesses testified, Defendant would have been presented with two versions of the October 20, 2013, events, C.O. Freebern's and Plaintiff's witnesses. *Id.* However, as set forth above, Defendant based her decision on C.O. Freebern's statement, which was supported by "some evidence."

Finally, Plaintiff testified that he expressed all of his concerns and purported violations of due process, including the denial of assistance and witnesses, to Defendant during the disciplinary hearing. (Dkt. No. 52-6 at 125-128.) However, Plaintiff did not appeal Defendant's decision. (Dkt. No. 52-9 at ¶ 28.)

Accordingly, the Court finds that Plaintiff was not prejudiced, in the sense that the errors affected the outcome of the hearing, based upon his purported lack of assistance.

### f. Additional Due Process Violations

Plaintiff also alleges that his due process rights were violated because Defendant failed to tape record the hearing, there is

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 58 of 182

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5322113

"no verbatim" record of his objections, and therefore, he was unable to appeal Defendant's decision. (Dkt. No. 5 at 2-3 [13] .)

[13]    At his deposition, Plaintiff testified "how can you appeal a record if a record don't exist? How can you appeal your objections if your objections don't exist on paper because there is not a verbatim record?" (Dkt. No. 52-6 at 161.)

As an initial matter, due process does not require that disciplinary proceedings be recorded. [14] *See Livingston v. Griffin*, 9:04-CV-00607-JKS, 2007 WL 1500382, at *5 (N.D.N.Y. May 21, 2007) (while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process); *see also Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

[14]    In fact, Plaintiff should be aware that there is no constitutional right to have disciplinary hearings recorded by stenograph or other means. (*See* November 11, 2012, Decision and Order, Dkt. No. 33 at 6 in *Jabot v. Warren County Sheriff's Office*, No. 9:11-cv-01217 (GLS/DEP)).

Although Plaintiff contends that "[t]here is no appeals process [at Washington County Correctional Facility] ... [t]here is no verbatim records ... [t]here's nothing" (Dkt. No. 52-6 at 126), his argument is undermined by his testimony that he has in fact utilized the appeals process at Washington County Correctional Facility. *Id.* at 154. What's more, Plaintiff testified that he received an appeal form from Defendant on November 8, 2013, and that he "may" have appealed Defendant's November 6, 2013, determination. *Id.* at 160, 162. Thus, Plaintiff's argument is without merit, and his dissatisfaction with the appeals process, in part because disciplinary hearings are not tape recorded at Washington County Correctional Facility, is misplaced.

Based upon the aforementioned, the Court finds that Plaintiff received the minimum due process to which he was entitled during his November 6, 2013, disciplinary hearing. Therefore, the Court also recommends that Defendant's motion for summary judgment (Dkt. No. 52) be granted on the grounds that she did not violate Plaintiff's due process rights during his November 6, 2013, disciplinary hearing.

### C. Qualified Immunity

*14 In the alternative, Defendant seeks dismissal of Plaintiff's Fourteenth Amendment due process claim on qualified immunity grounds. (Dkt. No. 52-12 at 15-16.) Inasmuch as the Court is recommending that Defendant's motion for summary judgment be granted on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 52) be **GRANTED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: July 14, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5322113

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Jabot v. Correction Officer Minor, Not Reported in Fed. Supp. (2016)

2016 WL 5173279

2016 WL 5173279
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Aaron JABOT, Plaintiff,
v.
CORRECTION OFFICER MINOR, Defendant.

9:13-CV-1407 (DNH/TWD)
|
Signed 09/21/2016

**Attorneys and Law Firms**

AARON JABOT, 15-A-4539, Auburn Correctional Facility,
P.O. Box 618, Auburn, NY 13201, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for
the State of New York, The Capitol, OF COUNSEL: RYAN
E. MANLEY, ESQ., Ass't Attorney General, Albany, NY
12224, Attorneys for Defendant James Thomsen.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** *Pro se* plaintiff Aaron Jabot brought this civil rights
action pursuant to 42 U.S.C. § 1983. On July 15, 2016, the
Honorable Thérèse Wiley Dancks, United States Magistrate
Judge, advised by Report-Recommendation that defendant's
motion for summary judgment pursuant to Federal Rule of
Civil Procedure 56 be granted and the complaint be dismissed.

See ECF No. 58. Plaintiff has filed timely objections. See
ECF Nos. 62, 63. Plaintiff has also submitted a letter motion
seeking to amend his complaint. See ECF No. 60.

Based upon a de novo review of the portions of the Report-
Recommendation to which plaintiff objected, the Report-
Recommendation is accepted and adopted in all respects. See
28 U.S.C. § 636(b)(1). Further, plaintiff's motion to amend
his complaint is denied as futile in light of the reasoning
contained in the Report – Recommendation.

Therefore, it is ORDERED that:

1. Defendant's motion for summary judgment (ECF No. 52)
is **GRANTED**;

2. Plaintiff's motion to amend his complaint (ECF No. 60) is
**DENIED**; and

3. The Clerk serve a copy of this Decision and Order upon
plaintiff in accordance with the Local Rules.

The Clerk of the Court shall enter judgment and close this
case.

IT IS SO ORDERED.

Dated: September 21, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5173279

---

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 60 of 182

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

1998 WL 214719
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kirjath SPENCE, Plaintiff,
v.
Daniel A. SENKOWSKI, Superintendent,
W.J. Wilkerson, Captain, Defendants.

No. 91–CV–955 (NPM).
|
April 17, 1998.

**Attorneys and Law Firms**

Kirjath Spence, Brooklyn, for Plaintiff, Pro Se.

Office of John F. Laidlaw, Pro Bono Standby Trial Attorney
for Plaintiff, Syracuse, John F. Laidlaw, Esq.

Honorable Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Christopher W.
Hall, Assistant Attorney General, of Counsel.


MEMORANDUM–DECISION & ORDER

MCCURN, S. J.


I. BACKGROUND

 **\*1** In this prisoner civil rights action, plaintiff Kirjath
Spence alleges his Fourteenth Amendment due process rights
were violated as the result of a disciplinary hearing held at
Clinton Correctional Facility ("Clinton"). Subsequent to the
hearing, plaintiff was sentenced to 180 days confinement in
the Special Housing Unit ("SHU"), 180 days recommended
loss of good time, and 180 days loss of privileges. Plaintiff
appealed his sentence and the hearing results were reversed,
but not before plaintiff served his 180 days in SHU.

Plaintiff subsequently filed this action pursuant to 42 U.S.C.
§ 1983. In August 1992, defendants moved for summary
judgment pursuant to Federal Rule of Civil Procedure 56.
The court granted defendants' motion for summary judgment
on the issue of the denial of a witness at the hearing and on
the issue of damages incurred by reason of punishment prior
to the administrative reversal. See Spence v. Senkowski, No.
91–CV–955, 1993 WL 191163 (N.D.N.Y. June 3, 1993). The

court denied the defendants' motion for summary judgment
regarding the claim of a biased hearing officer and regarding
the claim that then superintendent of Clinton, defendant
Senkowski, was personally involved in the selection of the
allegedly biased hearing officer. See id.

In August 1995, defendants moved to dismiss the action
for failure to state a claim upon which relief can be
granted pursuant to Federal Rule of Civil Procedure 12(b)
(6). In July 1997, the court denied defendants' motion. See
Spence v. Senkowski, No. 91–CV–955, 1997 WL 394667
(N.D.N.Y. July 3, 1997). In November 1997, the court
conducted a bench trial on the remaining issues—i.e.,
whether plaintiff was entitled to procedural due process under
the Fourteenth Amendment, whether the hearing officer,
defendant W.J. Wilkerson ("Wilkerson"), was impartial, and
whether defendant Senkowski had any personal involvement
in selecting Wilkerson as the hearing officer.

At the conclusion of trial, defendants moved for judgment
on their behalf. The court granted the motion on behalf
of defendant Senkowski on the ground that there was no
evidence of his personal involvement. The court reserved on
the motion with respect to defendant Wilkerson.

For the reasons set forth, the court now finds in favor
of defendant Wilkerson and dismisses plaintiff's complaint.
The following constitutes the court's findings of fact and
conclusions of law pursuant to Rule 52(a) of the Federal Rules
of Civil Procedure.


II. FACTS

On May 19, 1990 a fight in the auditorium at Clinton
created a disturbance that escalated to a near-riot. Transcript
of Trial Proceedings ("Tr.") at 9. The atmosphere in the
auditorium was "very tense" and additional fights erupted in
the auditorium. Id . The prison was "locked down" while
prison authorities attempted to maintain order. Tr. at 9–10.

Near the end of the disturbance, then-Captain Wilkerson,
the highest ranking officer at Clinton on May 19, 1990,
was notified of the incident via a distress call. Tr. at 38.
Wilkerson was advised that while the matter was quelled
and the disruptive inmates removed from the scene, the
other inmates refused to leave the auditorium. Tr. at 38–
39. Wilkerson then proceeded to the auditorium and upon
arrival, advised the inmates that if they wanted to leave

1998 WL 214719

peacefully they could line up in the center of the auditorium and leave without repercussions. Tr. at 9, 40. Plaintiff was one of the first inmates to leave the auditorium. Tr. at 9. Within 15 minutes, after being satisfied that the disturbance in the auditorium was under control, Wilkerson left the auditorium and returned to his office. Tr. at 40–41.

**\*2** During the disturbance in the auditorium, a corrections officer—Officer Bishop—was assaulted by an inmate. Tr. at 10. On May 21, 1990, plaintiff was identified and accused by Officer Bishop as the individual who assaulted him in the auditorium on May 19, 1990 during the disturbance. Tr. at 10. The next day, plaintiff was taken to SHU and served with a misbehavior report accusing him of assaulting officer Bishop. Tr. at 11.

On May 23, 1990 a Tier III hearing was commenced by Wilkerson in connection with the misbehavior report that Officer Bishop had filed. Tr. at 11, 42. At the conclusion of the hearing, Wilkerson concluded that plaintiff was guilty as charged and provided plaintiff with the reasons for his decision. Tr. at 43–44; Defendants' Trial Exhibit "8" (Hearing Disposition Form). Plaintiff was sentenced to 180 days confinement in SHU, 180 days recommended loss of good time, and 180 days loss of privileges—which included loss of packages and loss of commissary. Tr. at 15–16. In addition, plaintiff testified that while in SHU he could not "communicate" with his father who was seriously ill, although he was subsequently escorted to his father's funeral by prison officials. [1] Tr. at 15–16.

[1]    During trial, plaintiff testified that he was denied telephone privileges during his confinement to SHU. Tr. at 15. Wilkerson testified that SHU inmates can send and receive regular mail and legal correspondence. Tr. at 59.

Plaintiff administratively appealed as well as filed an Article 78 proceeding in state court and the hearing results were reversed based upon the fact that plaintiff was denied a requested witness, but not before plaintiff served his 180 days in SHU. Tr. at 16. Based upon these events, plaintiff commenced this lawsuit.

### III. DISCUSSION

In this § 1983 action, plaintiff asserts that his Fourteenth Amendment due process rights were violated by defendant

Wilkerson because Wilkerson was not an impartial hearing officer. Plaintiff asserts that Wilkerson was not impartial because he witnessed and investigated the May 19, 1990 incident in the Clinton auditorium. The court, however, need not decide the issue of whether Wilkerson was impartial because it concludes that plaintiff was not entitled to the due process protection of the Fourteenth Amendment. Furthermore, even assuming plaintiff was entitled to due process protection, the court concludes that Wilkerson is immune from liability under the doctrine of qualified immunity.

The Fourteenth Amendment prohibits an individual from being deprived of constitutionally protected liberty interests without due process. *See Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 115 S.Ct. 2293, 2300 (1995). The Constitution "does not protect [inmates from] every change in the conditions of confinement having a substantial adverse impact on the prisoner" if those changes are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Id.* at 478, 115 S.Ct. at 2297 (internal quotations and citations omitted). Rather, the "Due Process Clause protects against restraint or conditions of confinement that 'exceed[ ] the sentence in ... an unexpected manner.' ' *Arce v. Walker,*—F.3d—, 96–2012, 1998 WL 119612 (2d Cir. Mar.18, 1998). The Supreme Court has instructed that federal courts should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin,* 515 U.S. at 482, 115 S.Ct. at 2299.

**\*3** After examining the specific circumstances of plaintiff's confinement during his time in SHU, the court concludes that plaintiff did not have a constitutional liberty interest which was interfered with when he was disciplinarily confined in SHU for 180 days. Other than the length of time plaintiff was confined to SHU, plaintiff has offered little evidence to demonstrate that his punishment was of such a nature as to confer a constitutionally protected liberty interest. As the case law demonstrates, it is clear that plaintiff's confinement in SHU for 180 days was not an atypical or significant hardship, especially when compared to his sentence of six to twelve years. *See Sealy v. Coughlin,*—F. Supp.—, No. 92–CV–47, 1998 WL 113383 (N.D.N.Y. Mar.13, 1998) (152 days in SHU is not an atypical or significant hardship); *Horne v. Coughlin,*

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 62 of 182

Spence v. Senkowski, Not Reported in F.Supp. (1998)
1998 WL 214719

949 F.Supp. 112, 117 (180 days in SHU does not implicate due process protection); *Carter v. Carriero,* 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days in SHU not considered an atypical or significant hardship); *Husbands v. McClellan,* No. 93–CV–6025L, 1998 WL 24232, at *2 (W.D.N.Y. Jan.13, 1998) (180 days in SHU not an atypical or significant hardship); *Ruiz v. Selsky,* No. 96 Civ.2003, 1997 WL 137448, at *6 (S.D.N.Y. March 24, 1997) (192 days in SHU not a significant and atypical hardship); *Nogueras v. Coughlin,* No. 94 Civ. 4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU does not trigger due process concerns).

Moreover, plaintiff's testimony regarding his loss of privileges the conditions of his confinement is insufficient to elevate his claim to constitutional proportions. *See, e.g., Sealey,*—F. Supp at—, 1998 WL 113383 at *5 ("the denial of certain privileges enjoyed by inmates placed in general population fails to identify conditions outside the expected parameters of the sentence imposed by law." (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Plaintiff testified, for instance, that he was deprived of packages, telephone privileges, commissary privileges, and his prison job. Furthermore, he stated that when he was transported anywhere in the facility, he was required to be placed in handcuffs and shackles. While these conditions of confinement are "more restrictive than those in general population," they are insufficient to implicate a liberty interest, even when coupled with the 180 days plaintiff was confined to SHU. *See Arce,* 1998 WL 119612 at * 3–4 (a prison inmate is required to show that his confinement created an atypical and significant hardship to establish the existence of a liberty interest); *Jones v. Kelly,* 937 F.Supp. 200, 203 (W.D.N.Y.1996) (court found that loss of privileges such as telephone was insufficient for finding that plaintiff's confinement was atypical).[2] Accordingly, the court concludes that plaintiff is not entitled to the protections of the Fourteenth Amendment and therefore his § 1983 action must fail.

[2]    During the presentation of his case, plaintiff highlighted the distinction between administrative confinement in SHU and disciplinary confinement in SHU. After reviewing this evidence, the court concludes that the administrative confinement closely resembled the disciplinary confinement in SHU at Clinton. *See* Tr. at 56 (Wilkerson testified that an inmate in SHU for administrative reasons is generally treated the same as an inmate in SHU for disciplinary reasons); *see*

*also Jones,* 937 F.Supp. at 203 ("[d]isciplinary segregation in New York mirrors, with insignificant exceptions, the conditions of administrative segregation and protective custody." (citations omitted)). Moreover, while a "comparison between administrative and disciplinary confinement was part of the Court's analysis in *Sandin,*" the significant analysis focused on a "careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

**\*4**  In the alternative, even if the court assumed that plaintiff's confinement to SHU represented grievous losses of liberty entitling him to due process protections—which the court declines to find—the evidence presented at trial demonstrated that defendant Wilkerson would be entitled to qualified immunity. Qualified immunity protects prison officials from personal liability under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). These officials' action are to be assessed in light of the legal rules that were clearly established at the time the actions are taken. *E.g., Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3037–38, 97 L.Ed.2d 523 (1987). Moreover, public officials may be afforded the protection of qualified immunity "even if the contours of the plaintiff's federal rights and the public officials' permissible actions were clearly delineated at the time of the actions complained of, if it was objectively reasonable for the officials to believe that their actions did not violate those rights." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993).

Plaintiff asserts that his constitutional right to due process was violated because he did not have a hearing before an impartial hearing officer. In this regard, plaintiff contends that New York prison regulations prohibit persons who either witness the incident or investigate the incident from acting as hearing officers in a subsequent hearing concerning that incident. *See* N.Y.C.R.R. tit. 7, § 254.1. Plaintiff contends that inasmuch as Wilkerson was present at the scene he witnessed and investigated the incident and then acted as a hearing officer in violation of the section 254.1. The evidence, however, revealed that Wilkerson did not witness nor investigate the specific incident involving plaintiff (*i.e.,* the alleged assault on Officer Bishop). Wilkerson merely arrived at the auditorium as the facility's acting superintendent

1998 WL 214719

to ensure that order was restored and maintained in a potentially explosive situation. Tr. at 39–41.

On direct examination during trial, Wilkerson testified that he only stayed in the auditorium long enough to observe the inmates begin to be escorted out of the auditorium. Tr. at 40. Further, Wilkerson testified that he was not directly involved in the alleged incident involving plaintiff, that he did not witness Officer Bishop—or any other prison officer —being assaulted, that he only learned at a later time that an officer was assaulted, and that he did not review the plaintiff's misbehavior report. Tr. at 41–42; *cf. Hameed v. Mann,* 849 F.Supp. 169, 173 (N.D.N.Y.1994) (court found that hearing officer's impartiality was not compromised by pre-hearing briefing by superintendent that everyone on B–2 was involved in the incident). Wilkerson also testified that he had no predisposition as to whether plaintiff was guilty prior to the hearing. Tr. at 47. Significantly, Wilkerson testified that there was nothing about the fact that he was present at the scene of the incident which entered into his deliberations at the time of plaintiff's hearing and that he did not consider himself flawed as a hearing officer because he did not possess information prior to the hearing to form an opinion as to plaintiff's guilt or innocence. Tr. at 83, 85.

**\*5** Based upon the testimony adduced at trial, the court concludes that it was objectively reasonable for Wilkerson to believe that he was not violating plaintiff's clearly established constitutional rights to an unbiased hearing officer. *See Walker v. McClellan,* 126 F.3d 127, 128–30 (2d Cir.1997) (hearing officer entitled to qualified immunity because "the hearing officer was well-justified in the belief that his ruling was consistent with [plaintiff's] constitutional rights."); *Russell v. Selsky,* 35 F.3d 55, 61 (2d Cir.1994) (in holding hearing officer entitled to qualified immunity, court set forth that "a reasonable officer would not have recognized a denial of due process in his serving as hearing officer in a case in which he had previously served as review officer."). Accordingly, the court concludes that had plaintiff been entitled to due process protection, defendant Wilkerson would be immune from liability under the doctrine of qualified immunity.

## III. CONCLUSION

For the foregoing reasons, judgment shall be entered on behalf of defendant Wilkerson and plaintiff's complaint is hereby DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 214719

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Young v. Polizzi, Not Reported in Fed. Supp. (2018)

2018 WL 3949967

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 64 of 182

2018 WL 3949967
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

John Shicobra YOUNG, a/k/
a J. Shicobra Young, Plaintiff,
v.
CHO POLIZZI, Defendant.

No. 9:16-CV-0660 (FJS/CFH)
|
Signed 07/11/2018

**Attorneys and Law Firms**

JOHN SHICOBRA YOUNG, a/k/a J. Shicobra Young,
86-A-2673, Eastern N.Y. Correctional Facility, Box 338,
Napanoch, New York 12458, pro se.

HON. BARBARA D. UNDERWOOD, Acting Attorney
General for the State of New York, OF COUNSEL: ERIK
BOULE PINSONNAULT, ESQ., Assistant Attorney General,
The Capitol, Albany, New York 12224-0341, Attorney for
Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for a
Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

*1  Plaintiff pro se John Shicobra Young, a/k/a J. Shicobra
Young ("Young" or "Plaintiff"), an inmate who was, at all
relevant times, in the custody of the New York Department
of Corrections and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 and Title
II of the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101 et seq. against Defendant CHO Polizzi
("Defendant" or "Polizzi"). Dkt. No. 16 ("Am. Compl.").
Additional defendants were named, but the claims against
them have since been dismissed. Dkt. No. 15. Presently before
the undersigned is Defendant's motion for summary judgment
and dismissal of the Amended Complaint pursuant to Federal
Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt. No. 48.
Young did not oppose the motion. For the following reasons,
it is recommended that Defendant's motion be granted.

**I. FAILURE TO RESPOND**

Young failed to oppose Defendant's Motion for Summary
Judgment. Young was notified of the consequences of failing
to respond to a summary judgment motion. Dkt. No. 49.
Given this notice, Young was adequately apprised of the
pendency of Defendant's motion and the consequences of
failing to respond. However, "[t]he fact that there has been
no response to a summary judgment motion does not ... mean
that the motion is to be granted automatically." See Champion v.
Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence
of a response, Defendant is entitled to judgment only if the
material facts demonstrate his entitlement to judgment as
a matter of law. Id.; FED. R. CIV. P. 56(c). "A verified
complaint is to be treated as an affidavit ... and [may] be
considered in determining whether material issues of fact
exist[.]" See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.
1995) (citations omitted). In the Amended Complaint, Young
"declare[d] under penalty of perjury that the foregoing is
true and correct." Am. Compl. at 7, 21. Therefore, as the
Amended Complaint is verified, [2] the undersigned will accept
the pleading as an affidavit to the extent that the statements are
based on Young's personal knowledge or are supported by the
record. See Berry v. Marchinkowski, 137 F. Supp. 3d 495, 530
(S.D.N.Y. 2005) (collecting cases to support the proposition
that a court may consider unsworn assertions on a motion
for summary judgment where they are based on the plaintiff's
personal knowledge and in light of special solicitude).
Additionally, Young's deposition transcript was annexed as
an exhibit to Defendant's motion. Dkt. No. 48-2 ("Young
Dep."). Consequently, the facts set forth in Defendant's Rule
7.1 Statement of Material Facts [3] are accepted as true as to
those facts that are not disputed by the facts set forth in the
Amended Complaint or Young's sworn testimony. N.D.N.Y.
L.R. 7.1(a)(3) ("The Court shall deem admitted any properly
supported facts set forth in the Statement of Facts that
opposing party does not specifically controvert.") (emphasis
omitted).

[2]    The Amended Complaint was properly verified by
declaration under 28 U.S.C. § 1746. Am. Compl. at
7, 21; Young Dep. at 13; LeBoeuf, Lamb, Greene
& MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65-66
(2d Cir. 1999) (holding that use of the language
"under penalty of perjury" substantially complies
with 28 U.S.C. § 1746).

Young v. Polizzi, Not Reported in Fed. Supp. (2018)

2018 WL 3949967

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 65 of 182

[3]     Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall
contain a Statement of Material Facts. The
Statement of Material Facts shall set forth,
in numbered paragraphs, each material fact
about which the moving party contends there
exists no genuine issue. Each fact listed shall
set forth a specific citation to the record
where the fact is established. The record for
purposes of the Statement of Material Facts
includes the pleadings, depositions, answers
to interrogatories, admissions and affidavits. It
does not, however, include attorneys' affidavits.
The opposing party shall file a response to the
Statement of Material Facts. The non-movant's
response shall mirror the movant's Statement
of Material Facts by admitting and/or denying
each of the movant's assertions in matching
numbered paragraphs. Each denial shall set
forth a specific citation to the record where
the factual issue arises. The Court shall deem
admitted any properly supported facts set forth
in the Statement of Material Facts that the
opposing party does not specifically controvert.
The non-movant's response may also set forth
any additional material facts that the non-movant
contends are in dispute. Any facts set forth
in the Statement of Material Facts shall be deemed
admitted unless specifically controverted by the
opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

## II. BACKGROUND

### A. Facts

**\*2**  The facts are related herein in the light most favorable to
Young as the nonmoving party. See subsection III(A) infra. At
the relevant time, Young, a deaf inmate who is able to read and
write in English, was housed in the Sensorially Disabled Unit
("SDU") at Eastern Correctional Facility ("Eastern C.F.").
Dkt. No. 48-5 ("Gibson Decl.") at ¶ 9; Young Dep. at 12. [4] On
December 17, 2015, Sergeant P. Menard ("Menard") prepared
a misbehavior report. Dkt. No. 48-4 ("Polizzi Decl.") at 10. In
the report, Menard described an incident involving Young and
another inmate, identified as Inmate John Doe, as follows:

On 12/17/15 at approximately 9:45
am.[,] I interviewed Inmate John Doe
[ ] in the West Wing SDU unit [sic]
in regards to an incident that occurred
involving inmate Young. Inmate John
Doe states that over the course of
the past few days, [I]nmate Young
began delivering him hand written
love notes, increasing in frequency. On
12/17/15, at approximately 8:00 a.m.
Inmate Young placed a personalized
Christmas card containing 1 candy
cane and additional hand written notes
on the cell bars of 32-23, occupied
by Inmate John Doe. Inmate Young's
increasingly aggressive and sexually
suggestive behavior caused Inmate
John Doe to feel threatened and fear
for his safety. After receiving the most
recent correspondence from [I]nmate
Young, Inmate John Doe immediately
reported to SDU to seek guidance and
direction from his Counselor regarding
the sexual advances. SDU Counselor
Gibson notified me of the above
incident and I then, with the assistance
of Sign Language Interpreter Gibson,
interviewed Inmate Young. Young
admitted to writing and delivering
multiple personalized hand written
letters to Inmate John Doe.

Polizzi Decl. at 10.

[4]     Citations to page numbers within this Report-
Recommendation and Order refer to the pagination
generated by CM/ECF, located at the header of each
page.

Menard searched Young's cell and recovered a cartoon-like
drawing that was placed in a contraband locker. Polizzi Decl.
at 10. Young was charged with a sex offense, stalking, and
threats. Id. Young received a copy of the misbehavior report
and was transferred to the Special Housing Unit ("SHU"). [5]
Young Dep. at 15; Polizzi Decl. at 10.

Young v. Polizzi, Not Reported in Fed. Supp. (2018)
2018 WL 3949967

5      Polizzi claims that the report was formally served upon Young on December 18, 2015. Polizzi Decl. at ¶ 17. Young testified that he received a copy of the ticket on December 17, 2015. Young Dep. at 15-16.

On December 17, 2015, Young executed a form entitled "Assistant List" and chose six assistants from the facility list, including "Meinecke Jr." Polizzi Decl. at 12; Young Dep. at 23. On December 21, 2015, Polizzi presided over a Tier III disciplinary hearing [6] related to the misbehavior report. [7] Polizzi Decl. at ¶ 6. Young had no previous interactions with Polizzi. Young Dep. at 21. Pursuant to 7 N.Y.C.R.R. § 254.2, [8] Jason Gibson ("Gibson"), a Translator in Manual Communications employed by DOCCS, provided American Sign Language ("ASL") translation services for Young during the hearing. [9] Gibson Decl. at ¶¶ 1, 12; Polizzi Decl. at 27. The hearing was also audio-recorded in accordance with 7 NYCRR § 254.6(a)(2). [10] Polizzi Decl. at ¶ 12, 27.

6      DOCCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. Dkt. No. 48-7 at ¶ 9; see Hynes v. Squillace, 143 F.3d 653, 655 (2d Cir. 1998), cert. denied, 525 U.S. 907 (1998).

7      The transcript from the hearing is annexed as an exhibit to the defendant's motion. See Polizzi Decl. at 27-39.

8      A deaf or hard of hearing inmate who uses sign language to communicate shall receive the assistance of a qualified sign language interpreter who shall be present at the hearing. See N.Y.C.R.R. tit. 7, § 254.2

9      Gibson is fluent and certified in ASL. Gibson Decl. at ¶ 4, 6.

10      The entire superintendent's hearing must be electronically recorded. See NYCRR. tit. 7 § 254.6(a)(2).

**\*3** At the commencement of the hearing, Polizzi asked Young if he met with his "assistant, Officer Meineke Jr. on 12/18/15 at 10:20 a.m." Polizzi Decl. at 27. Young replied, "Yes." [11] Id. Polizzi proceeded to read the misbehavior report into the record Young pled "not guilty." Id. at 28. In response to Polizzi's request for an "explanation," Young stated "I didn't do it sir. It was the other inmate. Regarding the candy, the candy cane was inside the garbage can, I just gave it to him." Polizzi Decl. at 29. Young identified letters, a cartoon, a Christmas card, a check-list of questions, and notes and admitted that he wrote and delivered the documents to Inmate John Doe. Id.

11      During Young's deposition, he testified that he did not meet with an assistant prior to the hearing. Young Dep. at 23.

Polizzi asked Young if he had any witnesses to call or documents to submit. Polizzi Decl. at 29. Young responded, "No, nothing, nothing at all." Id.; Young Dep. at 33. Polizzi called Menard to testify, via speaker-phone, while Young was present. Polizzi Decl. at 30; Young Dep. at 35-36. Menard testified that he interviewed Inmate John Doe as well as Young during the course of his investigation. Polizzi Decl. at 31. Inmate John Doe reported that he felt threatened that he asked Young to stop writing letters. Id. at 31-33. Menard testified that the cartoon drawing of a rabbit, notes, check-list, and cards were "sexual in nature" and considered "active solicitation." Id. Menard concluded that Young was attempting to "lure" Inmate John Doe into a sexual relationship. Id.

After Polizzi completed his questioning, Young was given the opportunity to pose questions to Menard through the hearing officer. Polizzi Decl. at 33-35. Menard testified that Inmate John Doe did not report a sexual attack or assault. Id. at 33. Menard also conceded that he did not personally observe any interaction between Young and Inmate John Doe. Id. at 34.

On December 28, 2015, the disciplinary hearing concluded. [12] Polizzi Decl. at ¶ 6. Polizzi found Young guilty of all charges and sentenced him to 120 days SHU confinement with a corresponding loss of packages, commissary, and telephone privileges. Id. at 21. Polizzi considered the time Young had been confined to the SHU

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 67 of 182

Young v. Polizzi, Not Reported in Fed. Supp. (2018)
2018 WL 3949967

prior to the hearing and listed the "start date" for the sentence as December 17, 2015. Id. at ¶ 41, 21. Polizzi explained his decision on the record and issued a written statement of the disposition, including the evidence relied upon and the reasons for the sentence. Id. at 21-22, 38. On December 28, 2015, Young received the disposition. Young Dep. at 38.

12    Young refused to attend the last day of his hearing. Polizzi Decl. at 37.

Young appealed the disciplinary determination. Young Dep. at 46. On February 5, 2016, Director of the SHU/ Inmate Discipline Program Donald Venettozzi ("Venettozzi") modified the decision and reduced the penalty to ninety days. Dkt. No. 48-7 ("Venettozzi Decl.") at ¶ 42, 11. Young claims that despite the modification, he served the entire four month sentence in SHU. Young Dep. at 40. Venettozzi states that Young was confined to the SHU for ninety days for the offenses related to the December 2015 misbehavior report. Venettozzi Decl. at ¶ 47. Venettozzi further avers that Plaintiff served additional time in the SHU for "other offenses." Id. Young did not file a grievance or written complaint concerning the disciplinary hearing. Young Dep. at 47.

**B. Procedural History** [13]

13    The procedural history of this action was set forth in a Decision and Order filed on July 27, 2016 (the "July Order") and is summarized herein for purposes of convenience to the parties. Dkt. No. 12.

**\*4**  Young filed complaints in three separate civil rights actions in the United States District Court for the Southern District of New York. Dkt. No. 12 at 1. Because venue was improper in the Southern District, Chief United States District Judge Loretta A. Preska transferred all three actions to the United States District Court for the Western District of New York ("Western District"). Dkt. No. 4 (the "Transfer Order"); see also 28 U.S.C. § 112(d). In an Order filed on June 3, 2016, United States District Judge David G. Larimer granted Young in forma pauperis status, reviewed the complaints, and consolidated the actions. Dkt. No. 10 ("Western District Order"). After consolidating the actions, Judge Larimer reviewed the allegations and held that claims related to events that allegedly occurred at Wende Correctional Facility were subject to dismissal without prejudice. Id. at 3-4. The Court further noted that the remaining claims involved allegations

related to due process at a disciplinary hearing held at Eastern C.F. in 2015. Id. Thus, those claims were transferred to this Court pursuant to 28 U.S.C. § 1406(a). [14] Id. at 4.

14    The Clerk of the Northern District obtained copies of the complaints in the three actions and docketed the pleadings as the Complaint (Dkt. No. 2), the first supplemental Complaint (Dkt. No. 13), and the second supplemental Complaint (Dkt. No. 14).

In a Decision and Order filed on August 29, 2016 ("August Order"), Senior United States District Judge Frederick J. Scullin reviewed the pleadings and directed the Clerk of the Court to combine copies of the Complaint, see Dkt. No. 2, and the first supplemental Complaint, see Dkt. No. 13, as the Amended Complaint. [15] Dkt. No. 15 at 12. Polizzi was directed to respond to the Fourteenth Amendment due process and ADA claims. Id. In the Amended Complaint, Young seeks monetary damages and injunctive relief ordering Defendant to release him from the SHU. Am. Compl. at 25.

15    The Amended Complaint, Dkt. No. 16, became the operative pleading. Dkt. No. 15 at 12. The Clerk of the Court was directed to strike the second supplemental Complaint (Dkt. No. 14) from the docket. Id.

On February 23, 2018, Defendant filed the within motion pursuant to Fed. R. Civ. P. 56 seeking summary judgment and dismissal of the Amended Complaint. Dkt. No. 48. Young did not oppose the motion.

**III. DISCUSSION** [16]

16    All unpublished opinions cited to by the undersigned in this Report-Recommendation & Order have been provided to plaintiff, unless otherwise indicated.

In the Amended Complaint, Young alleges that Polizzi (1) violated his Fourteenth Amendment Due Process rights during the disciplinary hearing; and (2) discriminated against him in violation of Title II of the ADA. [17] See Am. Compl. at 22-25. Defendant contends that Young (1) was not deprived of a protected liberty interest; (2) was afforded due process; and (3) was not denied the opportunity to participate in or benefit from services, programs, or activities based upon his disability. See Dkt. No. 48-1, generally.

Case 9:19-cv-00193-MAD-TWD Document 55 Filed 05/12/21 Page 68 of 182
Young v. Polizzi, Not Reported in Fed. Supp. (2018)
2018 WL 3949967

Alternatively, Defendant claims that Young failed to exhaust his administrative remedies with respect to the ADA claim. See id.

17    The ADA claim is asserted against Polizzi in his official capacity. See Dkt. No. 15 at 10.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

**\*5** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse

frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. To set forth a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F.Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

#### 1. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484). Although not dispositive, the duration of a disciplinary confinement is significant in determining atypicality. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted). No firmly established, bright-line rule exists to determine the length or type of sanction that rises to the level of atypical and significant hardship. Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (citations omitted). Instead, the Second Circuit has provided a general guideline: "[w]here the plaintiff was

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 69 of 182

Young v. Polizzi, Not Reported in Fed. Supp. (2018)
2018 WL 3949967

confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." Palmer v. Richards, 364 F.3d 60, 64-65 (2d Cir. 2004) (quoting Colon, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." Id. at 65 (citations omitted).

*6 Here, Young alleges that he was confined in the SHU for 120 days, [18] which is within an intermediate disposition. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court must determine if this confinement was atypical and significant by comparing the conditions of Young's SHU confinement with ordinary prison conditions. See Vasquez v. Coughlin, 2 F. Supp.2d 255, 259 (N.D.N.Y. 1998). In this regard, Young was also penalized with a loss of packages, commissary, and telephone privileges and asserts that he had limited access to the services of a sign language interpreter while in SHU. Polizzi Decl. at 21; Young Dep. at 27. Young does not claim, nor does the record support, that he endured any conditions that could be construed as atypical or unusual. See, e.g., Judd v. Guynup, 9:12-CV-58 (NAM/RFT), 2010 WL 5472113, at *6 (N.D.N.Y. Oct. 17, 2012), adopted by 2012 WL 5471139 (N.D.N.Y. Nov. 9, 2012) (concluding that the plaintiff did not demonstrate atypical conditions of confinement in SHU by noting that the plaintiff's claim that his SHU confinement included a loss of packages, phone, and commissary was "insufficient to support the inference that these losses were atypical for SHU or general population inmates at Clinton."). Accordingly, the undersigned concludes that Young has failed to establish a protected liberty interest in this period of SHU confinement. See Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (explaining that although prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population).

[18]     As discussed supra, the parties dispute the length of Young's SHU confinement. For the purposes of the within motion, the Court accepts the allegations in the Amended Complaint as true and views all facts most favorably to Young.

## 2. Procedural Due Process

Even assuming that Young established that he was deprived of a protected liberty interest, he has failed to demonstrate that such deprivation occurred without due process of law. The due process protections afforded an inmate do not equate to " 'the full panoply of rights' due to a defendant in a criminal prosecution." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (quotation omitted).

> Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken.

Id. (citing Wolff v. McDonnell, 418 U.S. 556, 563-67 (1974) ).

### a. Written Notice

In this case, the issue of written notice is undisputed. An inmate must be provided advance written notice at least twenty-four hours before the hearing commences. Wolff, 418 U.S. at 563-64. On December 17, 2015, Young received the misbehavior report authored by Menard. Young Dep. at 15-16. The disciplinary hearing commenced on December 21, 2015. As such, Young was provided with written advance notice. Sira, 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

An accused prisoner has the right to a hearing where he is given the reasonable opportunity to call witnesses and present documentary evidence. Sira, 380 F.3d at 69. Young did not indicate to Polizzi or any prison official prior to the hearing, that he intended or sought to call any witnesses or present any documentary evidence. [19] Young Dep. at 25-33. At the commencement of the hearing, Young told Polizzi that he did not have any witnesses to call or documents/evidence to present. Young Dep. at 33; Polizzi Decl. at 29. During

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 70 of 182

Young v. Polizzi, Not Reported in Fed. Supp. (2018)
2018 WL 3949967

the hearing, Sgt. Menard testified, via telephone, in Young's presence. Polizzi Decl. at 13. Young was provided with an opportunity to question Menard, and, in fact, posed a series of questions to Menard. Id. at 33-35. Accordingly, Young was not denied the opportunity to call witnesses and present documentary evidence. Sira, 380 F.3d at 69.

19    Young testified that did not make any request related to witnesses until six months after the hearing. Young Dep. at 23-32.

### c. Fair and Impartial Hearing Officer

Prisoners have a constitutional right to a fair and impartial hearing officer. Sira, 380 F.3d at 69. However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." Allen v. Cuomo, 100 F.3d 253, 259 (2d Cir. 1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] ..." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 487-88 (2d Cir. 2004); see also Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

*7 Prison officials serving as hearing officers "enjoy a rebuttable presumption that they are unbiased." Allen, 100 F.3d at 259. "Claims of a hearing officer bias are common in [inmate section] 1983 claims, and where they are based on purely conclusory allegations, they are routinely dismissed." Washington v. Afify, 968 F. Supp.2d 532, 541 (W.D.N.Y. 2003) (citing cases). "An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact." Johnson v. Fernandez, No. 09-CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 1, 2011) (citing Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989) ).

Young contends that Polizzi was not fair and impartial and found him guilty with "no evidence." Am. Compl. at 26. Specifically, Young alleges that Polizzi conducted an "off the record" investigation, discriminated against Young due to his race and disability, and failed to consider time already served in SHU when he rendered his decision. Am. Compl. at 22-25; Young Dep. at 48-49. Young's allegations are conclusory and

unsubstantiated. The record reveals that Young was afforded a fair and impartial hearing officer. The Tier III hearing transcript demonstrates that Polizzi explained to Young his rights and the hearing officer's obligations, read a copy of the misbehavior report into the record, and gave Young ample time to respond to the allegations in the misbehavior report and call the appropriate witnesses. Polizzi Decl. at 27-39. Additionally, the transcript establishes that Polizzi's determination of guilt was based on the "some evidence" standard set forth in Hill. Polizzi stated that, in making his determination, he relied on Sgt. Menard's misbehavior report dated 12/17/15; Sgt. Menard's testimony; Young's testimony; and documentary evidence including the cartoon, letters, and notes. Id. at ¶¶ 40, 22, 27-39. T he disciplinary hearing transcript does not support a finding that Polizzi was anything other than a fair and impartial hearing officer, as there was ample evidence to support a guilty determination.

Even though Young's guilty determination was modified, there is no clear evidence that Polizzi was not a fair and impartial hearing officer. According to Venettozzi, the determination was modified to afford Young the opportunity to "improve his behavior and to refrain from re-offending." Venettozzi Decl. at ¶ 46. Accordingly, although Polizzi reached a different outcome from what Young may have preferred, the record is clear that there is no question of material fact regarding bias.

### d. Statement of Disposition

Young voluntarily refused to attend the last day of his disciplinary hearing. Polizzi Decl. at 19, 37-38. The undisputed evidence establishes that Young received a written statement of the evidence relied upon and reasons for the disciplinary action. Young Dep. at 38.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." Neree v. O'Hara, No. 9:09-CV-802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (citing Silva v. Casey, 992 F.2d 20, 22 (2d Cir. 1993) ). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. Id. (citation omitted). In such a case, the assistant need only perform what the inmate would have done but need not go beyond the inmate's

Young v. Polizzi, Not Reported in Fed. Supp. (2018)

2018 WL 3949967

instructions. Lewis v. Johnson, No. 08-CV-482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5. 2010) (citing Silva, 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " Clyde v. Schoellkopf, 714 F. Supp.2d 432, 437 (W.D.N.Y. 2010) (citing Pilgrim v. Luther, 571 F.3d 201, 206 (2d Cir. 2009) ).

**8** Here, Young was confined in SHU and thus, was entitled to an inmate assistant. At the commencement of the hearing, Polizzi inquired:

> Q. The record also indicates that you meet [sic] with your assistant Officer Meineke Jr. on 12/18/15 at 10:20 a.m., correct?
>
> A. Yes.

Polizzi Decl at 27. At Young's deposition, he testified that he selected an inmate assistant, but that he never met with an assistant. Young Dep. at 23. Young's testimony is contradicted by his hearing testimony and at odds with the documentary evidence in the record. Consequently, Young's conclusory assertions do not create a triable issue of fact with regard to his claims related to assistance. See Olle v. Columbia Univ., 332 F.Supp.2d 599, 612-15 (S.D.N.Y. 2004) (finding that the plaintiff's deposition testimony was insufficient evidence to oppose the defendants' motion for summary judgment where that testimony was unsupported by admissible evidence and inconsistent with the plaintiff's other statements).

Even assuming Young's recent version of events as true, if he were deprived of adequate assistance, such a deprivation was rendered harmless and a factfinder could not conclude that Young was prejudiced as a result. Gallo, 22 F.3d at 1223-24. As discussed supra, Young was able to present a defense and pose questions to Menard that evinced an understanding of the charges. Polizzi Decl. at 33-35. For example, Young asked Menard whether the victim reported a sexual attack, whether there was "any solicitation other than the letters" or anything threats in the letters. Id. This line of questioning demonstrates that Young had an understanding of the charges against him. Therefore, any shortcomings in the assistance rendered was harmless error and does not rise to the level of a due process violation. Hernandez v. Selsky, 572 F. Supp.2d 446, 455 (S.D.N.Y. 2008) (concluding that the plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and, thus, any alleged inadequate assistance was harmless error not warranting denial of summary judgment).

### f. Interpreter and Recording

Young claims that Polizzi violated his right to due process when he failed to provide a competent sign language interpreter and failed to video-tape the disciplinary hearing. Am. Compl. at 23-25. The failure to provide interpretive services or assistive devices during disciplinary hearings has been found to be a denial due process. Clarkson v. Coughlin, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995); Bonner v. Arizona Dept. of Corr., 714 F.Supp. 420, 425 (D. Ariz. 1989) (holding that a deaf inmate had a due process liberty interest in a qualified sign language interpreter during disciplinary hearing proceedings). In this case, however, Young does not assert that he was denied interpretive services; rather, he claims that his constitutional right was violated because the services provided were inadequate. In this regard, Young alleges that the sign language interpreter provided for the hearing, Gibson, understands "a little bit" of sign language. Young Dep. at 28.

Although Young claims that he vocalized his objection to Gibson's translation during the hearing, there is no support for this self-serving statement in the record. Polizzi and Gibson state that Young did not object or indicate that he had difficulty with the translation services during the hearing. Gibson Decl. at ¶ 14; Polizzi Decl. at ¶ 46. The hearing transcript, which is attached as an Exhibit to Polizzi's Declaration, supports their claim. Polizzi Decl. at 27. Even assuming Young objected to Gibson's translation, the record before the Court does not demonstrate that Young was unable to understand the charges against him or meaningfully participate in the hearing to support a due process violation. Gibson is fluent and certified in ASL. Gibson Decl. at ¶ 4, 6. Beginning in June 2015, Gibson provided translation services for Young on "numerous occasions." Id. at ¶ 5. Gibson was present during the disciplinary hearing to provide translation services for Young. Id. at ¶ 12; Young Dep. at 20. During the hearing, through Gibson, Young entered a plea, answered questions posed by the hearing officer, and asked questions of the witness. Polizzi Decl. at 29-37. When the hearing officer presented the cartoon, letters, and cards, Young, who is able to read and write, authenticated the documents. Id. Based upon the record, the Court finds that Young was able to comprehend the hearing, the charges, and present a defense. Thus, Young was provided with sufficient due process with respect to the translation services.

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 72 of 182

Young v. Polizzi, Not Reported in Fed. Supp. (2018)

2018 WL 3949967

**\*9** With respect to Young's claims regarding the recording of the hearing, Polizzi recorded the entire Tier III disciplinary hearing pursuant to 7 N.Y.C.R.R. § 254.6(a)(2). Polizzi Decl. at ¶ 12, 28. "While New York law requires that an electronic record of a disciplinary hearing be maintained, 7 N.Y.C.R.R. § 254(b), such a record is not constitutionally required." Dixon v. Goord, 224 F. Supp. 2d 739, 744 (S.D.N.Y. 2002) (citation omitted). "[Section] 254.6(a)(2) provides a procedural requirement in excess of that required by federal due process such that the failure to abide by § 254.6(a)(2) does not run afoul of the basic federal due process required for an inmate disciplinary proceeding." Cepeda v. Urban, No. 12-CV-00408, 2014 WL 2587746, at \*10 (W.D.N.Y. June 10, 2014); see also Richardson v. Williams, No. 15-CV-4117, 2017 WL 4286650, at \*7 (S.D.N.Y. Sept. 26, 2017) ("Because the rule that disciplinary hearings be electronically recorded is derived from state law, and is not required as a matter of constitutional procedural due process, plaintiff's claim that the failure to adhere to the recording requirement violated his constitutional rights is baseless."). Thus, the failure to video record the disciplinary hearing does not create a constitutional claim.

In sum, because Young fails to demonstrate that his procedural due process rights were violated during the disciplinary proceedings, as he received notice of the charges against him, a fair and impartial hearing officer, a reasonable opportunity to call witnesses and present documentary evidence, inmate assistance, and a written statement of the disposition, he has failed to demonstrate that he was denied procedural due process. Accordingly, it is recommended that Defendant's Motion for Summary Judgment and dismissal of the Fourteenth Amendment Due Process claims be granted.

## C. ADA [20]

[20]   Young does not specify what portions of the ADA are triggered. Reading the Amended Complaint liberally, it appears that Young seeks relief under Title II. See Giraldi v. Bd. of Parole, No. 9:04-CV-877 (FJS/DRH), 2008 WL 907321, at \*5 (N.D.N.Y. Mar. 31, 2008) (concluding that Title II applies to state inmates).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity includes "any department, agency ... or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(B). Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016). Title II of the ADA applies to state inmates. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 209-10 (1998); Beckford v. Portuondo, 151 F. Supp.2d 204, 220 (N.D.N.Y. 2001).

To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F.Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

Under the ADA, a "qualified individual with a disability" is an "individual with a disability who, with or without reasonable modifications ... meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity." 42 U.S.C. § 12131(2). A person is an individual with a disability if he has "a physical or mental impairment ... [that] substantially limits one or more of the major life activities of such individual," there is a "record of such an impairment," or the person is "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

### 1. Claim for Monetary Relief

**\*10** Case law provides that an individual cannot be named as a defendant in ADA suits either in their official or representative capacities for monetary damages. See Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001); see also McFadden v. Roy, Nos. 9:03-CV-0931 (GTS/DRH), 9:04-CV-0799 (GTS/DRH), 2009 WL 799968, at \*21 (Mar. 25, 2009); see also Alster v. Goord, 745 F.2d 317 (S.D.N.Y. 2010) (holding that the appropriate party in

Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 73 of 182

Young v. Polizzi, Not Reported in Fed. Supp. (2018)
2018 WL 3949967

interest for a plaintiff's claims against individual defendants in their official capacities is the state itself). Thus, Young's ADA claim for monetary damages against Polizzi should be dismissed.

### 2. Claim for Injunctive Relief

Construing the Amended Complaint liberally, Young seeks an injunction ordering that he be released from the SHU. Am. Compl. at 11, 25. Claims for prospective injunctive relief against state officers in their official capacity may be pursued under Title II of the ADA. See Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003). Even assuming that Young is a qualified individual with a disability under the ADA due to his hearing impairment, Young must establish that he was excluded from participation in, or denied the benefits of, a program.[21]

[21]    Defendant does not dispute that Young has met the first element as he alleges a physical impairment that substantially limits his ability to hear.

With respect to the third element of an ADA claim, the Court must determine "whether, a plaintiff with disabilities 'as a practical matter,' was denied 'meaningful access' to services, programs, or activities to which he or she was 'legally entitled.' " Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016) (citing Henrietta D., 331 F.3d at 272). "A reasonable accommodation must provide effective access to prison activities and programs." Id. at 73 (citation omitted). "Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." McElwee v. Cty. of Orange, 700 F.3d 635, 641 (2d Cir. 2012). "[T]he plaintiff bears the initial burdens of both production and persuasion as to the existence of an accommodation" that is "facial[ly] reasonable[ ]." Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Sci., 804 F.3d 178, 190 (2d Cir. 2015).

As discussed supra, in accordance with DOCCS regulations, Gibson was present during the disciplinary hearing to provide translation services, and Polizzi created an audio-recording of the hearing. Polizzi also provided a written disposition, which Young admits that he received. Polizzi Decl. at 21-22, 38; Young Dep. at 38. Young claims that Polizzi denied him reasonable accommodations because he failed to videotape the disciplinary hearing and failed to provide an acceptable,

professional sign language interpreter. Am. Compl. at 23. First, the evidence does not establish that Young requested any such accommodations from Polizzi either before or during the hearing. Second, as discussed supra, while Young claims he vocalized his objection to the translation services during the hearing, the competent, admissible evidence does not support that contention. Even so, the evidence does not establish how the failure to videotape the hearing and refusal to provide a professional interpreter, prevented Young from participating in his hearing. Young entered a plea and answered several questions regarding the Christmas card, check-list, cartoon, and notes that he wrote to Inmate John Doe. Polizzi Decl. at 29. Young was also able to pose questions to Menard during the proceeding. Id. at 33-35. The record further establishes that, as a result of a prior request for a "reasonable accommodation," Young had a hearing aid.[22] Young Dep. at 63. Young also testified that he was not precluded from participating in any programs within the facility due to his disability. Id. The record lacks any evidence suggesting that Young was unable to communicate through the sign language interpreter during the disciplinary hearing. Additionally, although the hearing was not video recorded, Young was provided with a written disposition and timely filed an appeal. Venettozzi Decl. at ¶ 42.

[22]    Young testified that Gibson provided him with a hearing aid and an alarm. Young Dep. at 63. Young's hearing aid was stolen "three or four weeks" before his deposition. Id. There is no evidence suggesting that Young was not in possession of a hearing aid at the time of the disciplinary hearing.

*11    Although Young may have preferred a different interpreter or means of documenting the hearing, Polizzi did not violate the ADA by failing to provide Young with the accommodations of his choice. See Kearney v. N.Y.S. D.O.C.S., No. 9:11-CV-1281 (GTS/TWD), 2013 WL 5437372, at *8 (N.D.N.Y. Sept. 27, 2013), aff'd sub nom., 581 F. App'x 45 (2d Cir. 2014) (summary order) (holding that DOCCS refusal to grant the plaintiff "the accommodation of his choice" does not subject Defendants to liability for disability discrimination); see Alster, 745 F. Supp.2d at 340 ("[A]s long as [Defendants] reasonably accommodated [the plaintiff's] disability, they need not provide him with the exact accommodations he demanded.") (citation omitted).

Young summarily claims that Polizzi discriminated against him based upon his race and disability. Am. Compl. at 24-25;

2018 WL 3949967

Young Dep. at 49. Young's claims are unsupported by the record and contradicted by his own deposition testimony. Young alleged that "all officers" discriminated against him, but admitted that Polizzi did not make any statements that Young considered discriminatory during the course of his disciplinary hearing. Id. at 52.

Ultimately, the record is devoid of evidence indicating that, by reason of his alleged impairment, Young was denied assistance for marshaling his defenses during the disciplinary hearings. Thus, despite his conclusory allegations, Young was provided with reasonable accommodations for any shortcomings that Young felt he faced in the disciplinary hearings. Accordingly, because Young has failed to establish that he was excluded from participation in, or denied access to, a program, or that he was wrongfully denied a reasonable accommodation, it is recommended that Defendant's Motion for Summary Judgment on this ground be granted. [23]

[23]    In light of the undersigned's recommendation that Young's ADA claim be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust argument related to this claim.

### IV. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 48) be **GRANTED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court**. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. See Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3949967

---

**End of Document**                 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    11

2003 WL 21792158
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Ismaatyl F. MUHAMMAD, Plaintiff,

v.

Jose PICO, Lt. Daniel Connolly, Betty Easter,
Fahiym Mahmud (Mahmood), Donald Selsky,
Sgt. John Dolan, & Norman Baltuch, Defendants.

No. 02 Civ.1052 AJP.
|
Aug. 5, 2003.

**Synopsis**
Corrections defendants moved for summary judgment or dismissal of prisoner's § 1983 suit. The District Court, Peck, United States Magistrate Judge, held that: (1) prisoner was precluded from litigating his free exercise of religion claim and the related conspiracy claim where he did not exhaust Department of Correctional Services' (DOCS) grievance procedures with respect to those claims; (2) summary judgment in favor of corrections defendants was precluded on prisoner's due process claims based on his segregated confinement and disciplinary hearing; (3) facts that certain corrections officers filed or reviewed a misbehavior report which formed basis of disciplinary charges and that both testified at hearing were insufficient, for purposes of § 1983, to find personal involvement in alleged disciplinary hearing due process violations; and (4) amended complaint adding corrections employee as new defendant "related back" to timely filed complaint.

Motions granted in part and denied in part.

West Headnotes (9)

**[1]** **Civil Rights**  Criminal law enforcement;
 prisons

Under Prison Litigation Reform Act (PLRA), state prisoner was precluded from litigating his free exercise of religion claim and the related conspiracy claim where he did not exhaust Department of Correctional Services' (DOCS) grievance procedures with respect to those

claims; prisoner did not file any formal grievances regarding the free exercise claims, only mentioned the problems to prison officials in passing, and that wrote some complaint letters to the DOCS central office. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a).

26 Cases that cite this headnote

**[2]** **Civil Rights**  Criminal law enforcement;
 prisons

**Federal Civil Procedure**  Dismissal of part
of cause of action

Prison Litigation Reform Act (PLRA) does not require district court to dismiss a prisoner's entire § 1983 action if some but not all claims are administratively unexhausted; rather, court may dismiss only those claims that are unexhausted while ruling on the exhausted claims. Civil Rights of Institutionalized Persons Act, § 7(a), as amended, 42 U.S.C.A. § 1997e(a); 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[3]** **Federal Civil Procedure**  Civil rights cases
in general

Genuine issues of material fact existed regarding the conditions of prisoner's 138-day segregated confinement, and thus, as to whether prisoner had a protected liberty interest in not being so confined for that duration, precluding summary judgment in favor of corrections defendants on prisoner's due process claim based on his segregated confinement. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

**[4]** **Federal Civil Procedure**  Civil rights cases
in general

Genuine issues of material fact existed as to whether proper procedures were followed before and at disciplinary hearing, precluding summary judgment in favor of corrections defendants on prisoner's due process claim. U.S.C.A. Const.Amend. 14.

Muhammad v. Pico, Not Reported in F.Supp.2d (2003)

2003 WL 21792158

**[5]**    **Civil Rights**    Good faith and
reasonableness;  knowledge and clarity of law;
motive and intent, in general

Qualified immunity is unavailable where the
allegedly violated right is "clearly established."
42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[6]**    **Civil Rights**    Criminal law enforcement;
prisons

Facts that certain corrections officers filed or
reviewed a misbehavior report which formed
basis of disciplinary charges and that both
testified at hearing were insufficient, for
purposes of § 1983, to find personal involvement
in alleged disciplinary hearing due process
violations.  U.S.C.A.  Const.Amend.  14;  42
U.S.C.A. § 1983.

5 Cases that cite this headnote

**[7]**    **Civil Rights**    Criminal law enforcement;
prisons

If corrections official asked for the documents
that prisoner wanted for his disciplinary hearing
defense and official refused without good cause
to provide them, she may have been personally
involved in the deprivation of prisoner's due
process hearing rights, and therefore subject to
liability under § 1983. U.S.C.A. Const.Amend.
14; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[8]**    **Civil Rights**    Criminal law enforcement;
prisons

New York's three-year statute of limitations
applicable to actions for personal injury
governed prisoner's § 1983 due process claim.
42 U.S.C.A. § 1983; N.Y. McKinney's C.P.L.R.
§ 214.

1 Cases that cite this headnote

**[9]**    **Limitation of Actions**    Intervention or
bringing in new parties

Amended  complaint  adding  corrections
employee  as  new  defendant  in  prisoner's  §
1983  complaint  outside  applicable  limitations
period "related back" to timely filed complaint
where  claim  against  official  arose  out  of
the  same  conduct  referred  to  in  the  original
complaint,  employee,  whose  counsel  was  on
notice  to  prepare  a  defense  for  an  unnamed
but  easily  identifiable  defendant  mentioned  in
original  complaint,  had  "constructive  notice,"
and  prisoner's  failure  to  name  employee  as
a  defendant  until  the  filing  of  the  amended
complaint  was  due  to  a  mistake.  42  U.S.C.A.
§  1983;  Fed.Rules  Civ.Proc.Rule  15(c),  28
U.S.C.A.

22 Cases that cite this headnote

*OPINION AND ORDER*

PECK, Magistrate J.

**\*1**  Pro se plaintiff Ismaaʻiyl F. Muhammad, an inmate in the
custody of the New York State Department of Correctional
Services ("DOCS"), brings this action pursuant to 42 U.S.C.
§ 1983, alleging violations of his constitutional rights by
various DOCS employees. Muhammad alleges that (1)
Fahiym Mahmud, Lieutenant Daniel Connolly, and Sergeant
John Dolan conspired to violate his First Amendment free
exercise of religion rights; and that (2) defendants Jose
Pico, Lt. Connolly, Sgt. Dolan, Donald Selsky, Betty Easter,
and Norman Baltuch violated his Fourteenth Amendment
procedural due process rights in connection with a Tier III
disciplinary hearing. (*See generally* Dkt. No. 2: Compl.;
Dkt. No. 23: Am. Compl. ¶ 4 "Statement of Claim.") After
the close of discovery, defendants Pico, Connolly, Easter,
Mahmud, Selsky, and Dolan moved for summary judgment.
(Dkt. Nos. 36–47: Defs.' S.J. Mot. Papers.) Defendants
Easter, Dolan, and Baltuch also moved to dismiss pursuant
to  Fed.R.Civ.P.  12(b)(1),  (2),  and  (6),  claiming  (1)  lack
of  personal  involvement  by  Easter;  (2)  lack  of  personal
jurisdiction over Dolan; and (3) expiration of the statute of

2003 WL 21792158

limitations as to Baltuch. (Dkt. Nos. 50–51: Notice of Mot. to Dismiss & Br..)

The parties have consented to disposition of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 28.)

For the reasons set forth below: (1) Muhammad's free exercise and conspiracy claims are dismissed without prejudice for failure to exhaust administrative remedies; (2) defendants' summary judgment motion on Muhammad's due process claim is denied due to lack of evidence in the record and issues of material fact in dispute; (3) defendants Sgt. Dolan and Lt. Connolly are granted summary judgment dismissing Muhammad's due process claim for lack of personal involvement; (4) defendant Easter's motion to dismiss Muhammad's due process claim is denied; and (5) defendant Baltuch's motion to dismiss Muhammad's due process claim is denied because the amended complaint relates back to the timely-filed original complaint.

### FACTS

Muhammad, who is currently incarcerated at Clinton Correctional Facility, was an inmate at Green Haven and Downstate Correctional Facilities when the events at issue took place in May 1997. (Dkt. No. 23: Am. Compl. ¶ 4 "Statement of Claim"; Dkt. No. 5: Muhammad 2/21/02 Aff. ¶ 3; Dkt. No. 40: Defs 56.1 Stmt. ¶¶ 18, 22, 25.) Muhammad is serving a 1984 sentence of twenty-five years to life imprisonment for second degree murder. (Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 12–13.)

### The Defendants

At the time of the events at issue, defendants Connolly, Mahmud, and Dolan were employed at Green Haven: Connolly as a Lieutenant (Dkt. No. 41: Connolly Aff. ¶ 1), Mahmud as a Muslim chaplain, or imam [1] (Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 40), and Dolan as a Sergeant (Dkt. No. 42: Dolan Aff. ¶ 1). [2] Defendants Easter and Baltuch were employed at Downstate: Easter as a Corrections Officer [3] (Dkt. No. 21:2/14/03 Conf. Tr. at 11), and Baltuch as a Corrections Counselor (Dkt. No. 44: Pico Aff. ¶ 7). Defendant Pico was a DOCS Commissioner's Hearing Officer (Pico Aff. ¶ 2), and defendant Selsky was (and still is) DOCS' Director of Special Housing/Inmate Disciplinary Program (Dkt. No. 45: Selsky Aff. ¶ 1).

[1]    An imam is "the leader of prayer in a Muslim mosque" or "any of various Muslim leaders and rulers." *Webster's New World Dictionary* 673 (3d Coll. Ed.1994) (hereafter "Webster's Dictionary").

[2]    The Court will refer herein to the positions held by the defendants at the time of the events in issue.

[3]    The parties disagree on defendant Easter's identity. Based on his personal recollection, Muhammad claims that Betty "Easton" was a civilian "key-punch spec[ialist]" employed at Downstate. (Am. Compl. Attach. at 1.) However, defendants claim that Muhammad is incorrect, and that Betty "Easter" was and still is a Corrections Officer at Downstate. (2/14/03 Conf. Transcript at 11.)

### Inmate Hostile Reaction to the Cell Shop Program

**\*2** Green Haven Correctional Facility has an Industry Program employing two hundred to two hundred fifty inmates. (Dkt. No. 43: Smith Aff. ¶ 5.) In May 1997, Green Haven's work shop introduced a new program, employing thirty to forty-five inmates trained in welding, plumbing, mechanical engineering, and electrical wiring, to install prefabricated modular prison cells. [4] (*Id.* ¶¶ 4, 5, 8.) Shortly after the introduction of the cell shop program, many inmates refused to continue to participate in the Industry Program. (*Id.* ¶ 8.) George Smith, the Senior Industrial Superintendent responsible for supervising the inmates employed in the cell shop, learned from some of the inmate employees that they were being harassed by other inmates and threatened with violence if they continued to build cells. (*Id.* ¶¶ 1, 8; *see also* Dkt. No. 41: Connolly Aff. ¶¶ 5–8.) According to Supt. Smith, the reason given for the threatened violence was that "the pre-fabricated cells being constructed would eventually be used to house additional prisoners, including family members of current inmates at Green Haven." (Smith Aff. ¶ 9.)

[4]    The program was created in an effort to alleviate overcrowding in New York State prisons. (*Id.* ¶ 3.) After being built and assembled at off-site locations, the cells were transported to the prison for installation. (*Id.; see also* Dkt. No. 41: Connolly Aff. ¶ 4.)

Supt. Smith stated that the threats against these inmates created a very tense atmosphere and led to a sharp decline in the cell shop's recruitment of new inmates. (*Id.* ¶ 11.)

What was once a sought-after, high-paid work detail with little turnover became a source of serious concern for DOCS, with the inmate and civilian employees fearful of being assaulted by inmates opposed to the cell shop program. (*Id.* ¶¶ 5, 11–13.) As a result of the threats, Green Haven officials were forced to take measures to protect the cell shop inmate-employees, including moving them from the general population to a self-contained unit, and partitioning off the assembly shop with a curtain to prevent any other inmates from looking into the shop and determining who was working in the cell shop. (Smith Aff. ¶ 10; Dkt. No. 41: Connolly Aff. ¶ 9.) Sergeant George Schwartzman and defendant Sgt. John Dolan were ordered to commence an investigation to identify the instigators of the inmate work stoppage and the " 'enforcers' " who carried out the threats. (Connolly Aff. ¶ 6.)

*The Investigation*

In the course of their investigation, Sgt. Schwartzman and Sgt. Dolan interviewed a number of confidential informants and obtained information regarding the threats. (Dkt. No. 42: Dolan Aff. ¶¶ 5–6.) According to Sgt. Dolan, these "informants came forward because they did not like the idea of being terrorized" and because "some inmates in the cell shop wanted the opportunity to earn the higher wages;" the "informants were not offered any favors by the administration" in exchange for the information. (*Id.* ¶ 8.) According to Sgt. Dolan, the informants claimed that Muhammad was one of about ten inmates who played a part in the "Terror Campaign." (Dolan Aff. ¶ 6.) Specifically, they stated that Muhammad was "one of those instigating a demonstration to stop inmates from building cells." (*Id.*) Lt. Connolly, who was responsible for supervising all uniformed officers (Dkt. No. 41: Connolly Aff. ¶ 1), reviewed the investigation and verified that the confidential informants were credible and reliable, and that independent sources corroborated the information they provided. (Connolly Aff. ¶ 6.) Lt. Connolly personally interviewed some of the cell shop inmate-employees to confirm the investigation's findings. (*Id.* ¶¶ 7–8.)

**\*3** Following Lt. Connolly's review of the investigation, he concluded that Muhammad and nine other inmates were involved in the "Terror Campaign." (*See* Connolly Aff. ¶ 10 & Ex. A: 5/8/97 Lt. Connolly Memo to Superintendent Artuz; *see also* Dkt. No. 42: Dolan Aff. ¶ 6.) As a result, Sgt. Dolan issued Muhammad an "Inmate Misbehavior Report" on May 9, 1997, charging him with a violation of Rule 104.12.[5] (Dolan Aff. ¶ 7.) The Misbehavior Report stated that:

[5] Rule 104.12 provides that "Inmates shall not lead, organize, participate, or urge other inmates to participate, in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of facility." 7 N.Y.C.R.R. § 270.2(B)(5)(iii). Such a violation subjects an inmate to a Tier II or Tier III disciplinary hearing. *Id.*

During an interview with an inmate as to why he would not work in the metal assembly shop (cell shop), he informed Sgt. Sch[w]artzmann and myself on a confidential basis, that various inmates and groups were making threats against those who would build cells. Remarks such as "anyone who would build cells should/would be cut." "You build cells, we will burn yours." Inmate MUHAMMAD 84 A 3231 was identified as one of the inmates in this campaign of terror by this source. Due to the fact that this source was unproven, other sources who have proven reliable in the past were questioned in regards to this situation. These sources confirmed inmate MUHAMM[A]D's involvement in this campaign of terror.

This has been an ongoing investigation.

(Dolan Aff. Ex. A: 5/9/97 Inmate Misbehavior Report.) Because the administration perceived the threats and their effect on the cell building program to be a serious problem for the facility, Christopher Artuz, then Superintendent of Green Haven, directed that the instigators and enforcers be transferred to other correctional facilities. (Connolly Aff. ¶ 11 & Ex. B; *see also* Dolan Aff. ¶ 9.)[6]

[6] The decision as to which facility to transfer Muhammad (and the others) was made by DOCS officials in Albany. (*See* Connolly Aff. ¶ 12.)

*Muhammad's Disciplinary Hearing, Sentencing, and Administrative Appeals*

On May 10, 1997, all inmates believed to have been involved in the "Terror Campaign" were transferred out of Green Haven. (Dkt. No. 42: Dolan Aff. ¶ 9; *see also* Dkt. No. 41: Connolly Aff. ¶ 11.) Muhammad was transferred to Downstate Correctional Facility. (Dkt. No. 23: Am. Compl. ¶ 4 "Statement of Claim.") Also on May 10, Muhammad was served with a copy of the May 9, 1997 Misbehavior Report (Dkt. No. 44: Pico Aff. ¶ 7 & Ex. B at 2), which put him on notice that he would be receiving a Tier III disciplinary hearing[7] during which a hearing officer would

"hear and determine allegations of rule violations contained in the misbehavior reports...." 7 N.Y.C.R.R. § 252.2. Pursuant to 7 N.Y.C.R.R. § 254.4, [8] defendant Corrections Counselor Baltuch was assigned to provide Muhammad with employee assistance in preparing for the Tier III hearing. (Pico Aff. ¶ 7.) The misbehavior report was referred to the facility superintendent for designation of a hearing officer to conduct a Superintendent's Hearing (*i.e.*, a Tier III hearing), and defendant Jose Pico was designated to preside over the hearing. (Pico Aff. ¶ 8.)

[7]      As summarized by the Second Circuit:

New York conducts three types of disciplinary hearings for its inmates. Tier I hearings address the least serious infractions and have as their maximum punishment loss of privileges such as recreation. Tier II hearings address more serious infractions and may result in 30 days of confinement in an SHU [Special Housing Unit]. Tier III hearings concern the most serious violations and may result in unlimited SHU confinement (up to the length of the sentence) and recommended loss of "good time" credits.

Scott v. Albury, 156 F.3d 283, 285 n. 1 (2d Cir.1998); *accord, e.g., Hynes v. Squillace,* 143 F.3d 653, 655 n. 1 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998); 7 N.Y.C.R.R. §§ 252.5(a), 254.1–7, 270.3(a); *see also, e.g., Louis v. Ricks,* 01 Civ. 9368, 2002 WL 31051633 at *2 n. 5 (S.D.N.Y. Sept.13, 2002) (Peck, M.J.); *Jackson v. Johnson,* 15 F.Supp.2d 341, 355 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.); *Silva v. Sanford,* 91 Civ. 1776, 1998 WL 205326 at *6 & n. 7 (S.D.N.Y. Apr.24, 1998) (Peck, M.J.); *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at *1 (S.D.N.Y. Mar.24, 1997) (Peck, M.J.); *Duncan v. Keane,* 93 Civ. 6026, 1996 WL 511573 at *1 (S.D.N.Y. Aug.22, 1996) (Baer, D.J. & Peck, M.J.); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1101 n. 1 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.).

[8]      Section 254.4 provides that: "The inmate shall be provided with an assistant in accordance with the provisions of Subpart 251–4 of this Subchapter." Furthermore, § 251–4.2 provides that:

The assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results

of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing.

Muhammad's Tier III disciplinary hearing began on May 13, 1997 at Downstate Correctional Facility. (Pico Aff. ¶ 9 & Ex. C.) Muhammad pleaded not guilty to the charges (Pico Aff. Ex. C) and requested that the following Green Haven witnesses testify on his behalf: two correction officials, including defendant Lt. Connolly; the Industrial Superintendent in charge of the cell shop; defendant Easter; and six inmates. (Pico Aff. ¶ 10 & Ex. C.) Hearing Officer Pico called defendants Sgt. Dolan and Counselor Baltuch to testify. (*Id.*) According to Pico, Muhammad was allowed to question all witnesses except inmate Kevin Coppege, who refused to testify, and Corrections Officer Tabacnick, whose testimony Pico believed would have been redundant.

(Pico Aff. ¶ 11.) *See also* 7 N.Y.C.R.R. § 254.5 (2002). [9] Hearing Officer Pico asserts that he independently verified the information obtained from the confidential informants and found that it was "very detailed and specific" and credible. (Pico Aff. ¶ 13.) Pico further found that Muhammad "was not able to contradict the information or the allegations" contained in the misbehavior report. (*Id.*) Pico found Muhammad guilty of demonstration and imposed a penalty of 730 days keeplock confinement, with an equivalent loss of package, commissary, and phone privileges. (*Id.* ¶ 14.) [10] Muhammad's contradictory testimony about the conduct of the Tier III hearing is discussed on pages 14–16 below.

[9]      Section 254.5(a) sets the rules for inmate witnesses:
(a) The inmate may call witnesses on his behalf provided their testimony is material, is not redundant, and doing so does not jeopardize institutional safety or correctional goals. If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented.

[10]     "The Second Circuit has described keeplock as 'a form of administrative [or disciplinary] segregation in which the inmate is confined to his cell, deprived of participation in normal prison routine, and denied contact with other inmates." ' *Silva v.*

Muhammad v. Pico, Not Reported in F.Supp.2d (2003)

2003 WL 21792158

*Sanford,* 1998 WL 205326 at *6 n. 7 (quoting *Soto v. Walker,* 44 F.3d 169, 171 (2d Cir.1995) (quoting *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989)); *accord, e.g., Gill v. DeFrank,* 98 Civ. 7851, 2000 WL 270854 at *3 (S.D.N.Y. Mar.9, 2000) (Peck, M.J.), *report & rec. adopted as modified on other grounds,* 2000 WL 897152 (S.D.N.Y. July 6, 2000) (Buchwald, D.J.), *aff'd,* 8 Fed. Appx. 35, 2001 WL 388057 (2d Cir. Apr.16, 2001); *see also, e.g., Jermosen v. Coughlin,* No. 98–2318, 198 F .3d 233 (table), 1999 WL 822528 at *1 n. 1 (2d Cir. Sept.27, 1999) (quoting *Gittens v. LeFevre,* 891 F.3d at 39); *Jenkins v. Haubert,* 179 F.3d 19, 21 (2d Cir.1999); *Wright v. Coughlin,* 132 F.3d 133, 135 (2d Cir.1998) ("Keeplock confinement, a form of administrative segregation in which an inmate is confined to his cell and denied participation in normal prison activities, as well as telephone and commissary privileges."); *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995) ("Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities; it is also used as an administrative confinement for prehearing housing of inmates facing disciplinary hearings.").

 *4  According to DOCS personnel: under typical conditions of keeplock, Muhammad was to be confined to his cell for twenty-three hours per day with one hour of exercise outside his cell. (Dkt. No. 45: Selsky Aff. ¶ 6.)[11] Muhammad also could participate in an in-cell study program, with access to books and periodicals from the law library and general library, but he could not participate in any out-of-cell programs.[12] (*Id.* ¶ 9.) Muhammad, in contrast, states that while he could read his own books while in keeplock, he could not participate in DOCS' G.E.D. program or other formal DOCS study programs. (Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 142–43.) He also testified that the keeplock cell was "hot" and "filthy," that inmates can cut their face on the keeplock cell's rim, and that there are more fights. (*Id.* at 140–45.) He also stated that he was placed in the "long-term keeplock block, which is considered a SHU section of [that] jail," and so conditions were different—worse—than keeplock in other jails. (*Id.* at 144–45 .)

[11]    He could leave his "cell for purposes such as showers, visitation, legal visits, visits to the medical department, and guidance/counselor interviews." (Selsky Aff. ¶ 6.)

[12]    Inmates in the general population spend a significant amount of time outside their cells attending one or two out-of-cell programs per day. (Selsky Aff. ¶ 9.) Each program lasts two and one-half to three hours. (*Id.*) Furthermore, even inmates in maximum facility prisons in the general population are limited to one hour of daily exercise and three showers per week. (*Id.* ¶ 8.)

Following defendant Pico's Tier III decision, Muhammad appealed to the Commissioner. (Selsky Aff. ¶ 12.) *See* 7 N.Y.C.R.R. § 254.8. Defendant Selsky, as Director of the Inmate Disciplinary Program, received the appeal on June 9, 1997. (Selsky Aff. ¶ 12.) Selsky reviewed the "Inmate Misbehavior Report, Superintendent Hearing Disposition Rendered form, Assistance Forms, Hearing Records Sheet, and other documentary evidence," and affirmed the Hearing Officer's guilty determination on July 30, 1997. (*Id.* ¶¶ 13–14; *see also* Dkt. No. 38: Singleton Aff. Ex. J: Review of Superintendent's Hearing.) Finding that "the nature of [Muhammad's] misconduct did not warrant the penalty imposed" (*id.*), Selsky reduced the punishment to 365 days keeplock and an equivalent loss of privileges. (Selsky Aff. ¶ 14; Singleton Aff. Ex. J.) Muhammad submitted a letter request for reconsideration, which Selsky received on August 6, 1997. (Selsky Aff. ¶ 15.) Selsky further reduced Muhammad's sentence to 180 days keeplock—138 days for time-served from May 9 to September 26, and forty-two days suspended. (*Id.* ¶ 17–18.)[13] Thus, Muhammad was in keeplock from May 9, 1997 to September 26, 1997. (*See* Selsky Aff. ¶ 19.)

[13]    Selsky's final reduction came after a discretionary review of Muhammad's keeplock confinement by Captain Aidala at Elmira Correctional Facility, where Muhammad then was incarcerated. (Selsky Aff. ¶ 17; Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 141 .)

*Muhammad's Complaint*

Muhammad commenced this § 1983 action by filing a pro se complaint dated February 25, 2000, received by this Court's Pro Se Office on December 13, 2000, and filed as of February 11, 2002.[14] (Dkt. No. 2: Compl.) Muhammad obtained leave from the Court and filed an amended complaint on February 21, 2003 to add Norman Baltuch as a defendant

after obtaining his name from discovery material. (Dkt. No. 23: Am. Compl.) Muhammad seeks a reversal of the Tier III disciplinary hearing, and expungement of the Tier III guilty determination from his prison record, as well as compensatory and punitive damages "in an amount fitting these gross-violations." (Am. Compl. ¶ 5 "Relief.")

14    Muhammad's complaint was signed on February 25, 2000, a date "well within the three-year limitations period" for a § 1983 action. (Dkt. No. 4: 2/11/02 "60 Day" Order at 2.) However, it was not post-marked until December 9, 2000. (*Id.*) The Court directed Muhammad to "show cause, by affirmation, why his claims should not be dismissed as time-barred." (*Id.*) Muhammad responded that he had submitted his complaint and all relevant submissions to prison officials who failed to mail them until December. (Dkt. No. 5: Muhammad 2/21/02 Aff. ¶ 8.) He further claimed that his limitations period did not start running until he received the response to his final request for reconsideration from defendant Selsky in early 1998. (*Id.* ¶ 10.) Therefore, according to Muhammad, he had until early 2001 to file his complaint under § 1983 and his complaint was filed before the expiration of the statute of limitations. The defense has not raised any objections to Muhammad's affirmation, *i.e.,* does not claim that the statute of limitations has run as to the defendants named in the original complaint.

*5    In his complaint, Muhammad denies all involvement with the "Terror Campaign," and alleges that the process by which he was transferred out of Green Haven and found guilty of a rule 104.12 violation "shocks ones very sense of fair-ness" and was laden with Constitutional violations. (Am. Compl. Attach. at 6.)

*Free Exercise of Religion and Conspiracy Claims*
Muhammad alleges that he was the victim of a conspiracy by defendants Mahmud, Connolly, and Dolan to prevent him from freely exercising his chosen religion, Islam. (Dkt. No. 23: Am. Compl. ¶ 4 "Statement of Claim.") Muhammad claims that "in the spring of 97 the Muslim community at Green Haven ... was going-thru problems due to a state-agent 'def. Mahmud' pushing sectarian-ism [,] calling for the majority Sunnis to suppress the minority Shi'as and drive them physically out of the masjid," [15] infringing upon his right to practice the Shiite faith. (Am. Compl. ¶ 4

"Statement of Claim .") Muhammad, a purported Shiite elder in the DOCS Muslim community, states that he spoke out against Mahmud's "foul-plot," repeatedly criticizing Mahmud's oppression of the Shiites and insisting that the Muslim chaplains and DOCS start offering Shiite classes, library materials, and the opportunity to hear guest speakers. (Am. Compl. ¶ 4 "Statement of Claim"; Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 35–47, 58–60.) Muhammad further claims that because of his admonition of the Imam and his anti-Shiite sentiments, Mahmud lied to prison authorities to have Muhammad implicated in the cell shop terror campaign, placed in SHU away from the general population, and transferred from Green Haven to a prison in upstate New York. (Am. Compl. ¶ 4 "Statement of Claim.") Muhammad alleges that defendants Sgt. Dolan and Lt. Connolly conspired with defendant chaplain Mahmud to frame Muhammad through the use of confidential informants that Muhammad calls "snitches/liars." (Am. Compl. Attach. at 4.) [16]

15    A Sunni (or "Sunnite") is "a member of one of the two great sects of Muslims: Sunnites approve the historical order of the first four caliphs as the rightful line of succession to Mohammed and accept the Sunna as an authoritative supplement to the Koran." *Webster's Dictionary* at 1342. On the other hand, "Shiites consider Ali, Mohammed's son-in-law and the fourth of the caliphs, as the first Imam and the rightful successor of Mohammed, and do not accept the Sunna as authoritative." *Id.* at 1237. "Masjid" is the Arabic word for mosque, the Muslim temple or place of worship. *Id.* at 831.

16    Additionally, Muhammad claims that he was under a medical hold at the time of the incident, which should have prevented his transfer from Green Haven to Downstate. (Am. Compl. ¶ 4 "Statement of Claim.") The complaint alleges that Muhammad signed a release to this hold under duress from Dolan and Connolly, fearing that they would place him in Administrative Segregation for "who knows how long." (*Id.*)

Mohammad concedes that he did not file any formal grievances regarding the free exercise claims; he stated that he only mentioned the problems to prison officials in passing, and that he wrote some complaint letters to the DOCS Central Office. (Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 66–67; *see also* Dkt. No. 47: Eagen Aff. ¶ 3–4 & Ex. A; Dkt. No. 46: Alexis Aff. ¶¶ 1–4.)

*Due Process Claims*

Muhammad also asserts that defendants Dolan, Connolly, Baltuch, Easter, Pico, and Selsky violated his procedural due process rights through their involvement with the May 9, 1997 misbehavior report and the Tier III disciplinary hearing at Downstate. [17] First, Muhammad alleges that the misbehavior report endorsed by Sgt. Dolan and Lt. Connolly, was "defective as a matter of law & fact because it['s] too vague." (Dkt. No.23: Am. Compl. Attach. at 2.) Muhammad claims that the misbehavior report should have made more specific factual allegations regarding the alleged role of each of the accused in the "Terror Campaign" and the specific acts of which they were being accused, in order for each defendant to be on notice of the charges being brought against them. (*Id.*) Indeed, Muhammad claims that the misbehavior report that he received, and the misbehavior reports that others accused of being involved in the "Terror Campaign" received, were virtually carbon copies. (Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 95, 106, 110–11.)

[17]    While Muhammad's amended complaint does not expressly reference the Due Process Clause, his allegations, construed liberally, claim a denial of due process in the Tier III disciplinary hearings following the issuance of his May 9, 1997 misbehavior report. (Am. Compl. ¶ 4 "Statement of Claim.") *See, e.g., Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *1 nn. 3–4 (S.D.N.Y. Sept.17, 2002) (Peck, M.J.) (liberally construing pro se plaintiff's complaint where plaintiff's submissions were "not a model of clarity"); *see also, e.g., LaBounty v. Kinkhabwala,* No. 99–0329, 2 Fed. Appx. 197, 200–01, 2001 WL 99819 at *2–3 (2d Cir. Feb. 5, 2001) (reversing dismissal of procedural due process claim arising out of petitioner's disciplinary hearing).

**\*6** Second, Muhammad claims that he was denied "basic meaningful assistance" from defendant Baltuch because Baltuch failed to fulfill his statutory obligations to assist him in preparing for the Tier III hearing. (Dkt. No. 23: Am. Compl. ¶ 4 & Attach. at 1–2; *see* Muhammad Dep. at 116–21.) According to Muhammad, Baltuch did not verify Muhammad's identity when he first met him, did not confirm that Muhammad understood and spoke English, and did not confirm that Muhammad understood the charges against him. (*Id.*) Muhammad also claims that Baltuch never properly addressed his requests for documents and failed to interview

witnesses and report the results of those interviews to him. (*Id.*) *See* 7 N.Y.C.R.R. § 251–4.2 (quoted at page 7 fn.8 above). Finally, Muhammad asserts that Baltuch wrongfully allowed defendant Easter to decide that he could not have certain documents that he needed to mount a meaningful defense. (Am. Compl. Attach. at 1–2; Muhammad Dep. at 116, 118.) Baltuch allegedly violated Muhammad's rights when he let Easter "overstep[ ] her bounds" by denying Muhammad his "regulatory or statutory rights under DOCS Rules." (Muhammad Dep. at 115–16.) Defendant Easter thus allegedly "interfered with the assistant's job" (*id.*), depriving Muhammad of due process protection.

Third, Muhammad claims that he did not receive due process during the hearing conducted by defendant Pico. He alleges that Pico, a "[DOCS] hired-gun," violated "so many [of his] basic rights (some blatantly others not so clearly)." (Am. Compl. Attach. at 1–2.) The complaint states that Pico "illegally" held simultaneous Tier III hearings for several inmates involved in the terror campaign, which Muhammad claims is not authorized. (Am. Compl. ¶ 4 "Statement of Claim"; Am. Compl. Attach. at 2; *see* Muhammad Dep. at 129, 139.) Muhammad asserts that this caused Pico to commit serious mistakes regarding his case—*e.g.,* calling the wrong witnesses and placing evidence from another case in Muhammad's folder. (Am. Compl. Attach. at 2; Muhammad Dep. at 134–35.) Muhammad also claims that Pico did not allow him to fully question witnesses, in order to prevent him from exposing that state agents working for DOCS violated the rights of all those accused of organizing the "Terror Campaign." (Am. Compl. Attach. at 2; *see* Muhammad Dep. at 121–22, 130–32, 136.) Furthermore, the complaint maintains that a "gross vio[lation] took place" because the entire Tier III hearing was not on tape, and that Pico issued off-the-record "thinly-veiled threats" to preclude Muhammad from questioning more witnesses if he continued to object to Pico's rulings. (Am. Compl. Attach. at 3.) Muhammad asserts that Pico relied too heavily on information provided by self-serving confidential informants and prevented Muhammad from obtaining evidence from these informants and from other sources. (*Id.* at 4–5.) The complaint also maintains that the hearing violated Muhammad's due process rights because it was not started and completed "in a timely-fashion as ordered by Chap[ter] V" and that Hearing Officer Pico obtained an extension of time to complete the hearing (*id.* at 3) in an attempt to cover up the fact that Baltuch had provided Muhammad with inadequate assistance (*id.* at 2–3). Muhammad concludes by asserting that the entire hearing was based upon "rumors,

past-charges, and old reputations" and that Pico was biased, predetermined Muhammad's guilt, failed to consider evidence in Muhammad's favor, failed to marshal the evidence, and had "a plot to under-mine [Muhammad's] defense by doing a host of negative things," including sabotaging Muhammad's defense by refusing to hear the witnesses in Muhammad's preferred order. (Am. Compl. Attach. at 4, 8; Muhammad Dep. at 164–65, 168.)

**\*7** Finally, Muhammad claims that he is suing Selsky both in his supervisory position and as an individual, because "he could have stopped this train a long time ago and he refused to." (Muhammad Dep. at 123.) Muhammad explained that he wrote three letters to Selsky to inform him of the "frame-up in Green Haven" and to request reconsideration of the Tier III hearing disposition, and that Selsky should have expunged plaintiff's record on the basis of the letters. (*Id.* at 123–24.) Muhammad claims that Selsky's failure to do so constituted a violation of his due process rights. (*Id.*)

*Procedural Background*

After the close of discovery, on March 28, 2003, defendants Pico, Connolly, Mahmud, and Selsky filed a summary judgment motion. (Dkt. No. 36: Defs.' Notice of S.J. Mot.) Defendants claim that: (1) Muhammad failed to allege a due process claim because his confinement in keeplock was not unconstitutional (Dkt. No. 37: State S.J. Br. at 4–16); (2) they are entitled to qualified immunity (*id* . at 16–20); and (3) Muhammad did not exhaust his administrative remedies with regard to the freedom of religion and conspiracy claims (*id.* at 20–23). On June 2, 2003, defendants Easter, Dolan, and Baltuch filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), (2) and (6). (Dkt. No. 50: State Notice of Mot. to Dismiss.) Defendant Easter claimed that she does not meet the personal involvement requirement of § 1983. (Dkt. No. 51: State Mot. to Dismiss Br. at 2–4.) Defendant Baltuch asserts that Muhammad's claims against him are time-barred, because the complaint was not amended to include him as a defendant until after the expiration of the § 1983 three-year limitations period. (*Id.* at 4–5.) Defendant Dolan alleges that the Court does not have personal jurisdiction over him, because Muhammad did not serve him with the summons and complaint. (*Id.* at 6–7.)

*ANALYSIS*

I. *MUHAMMAD'S FREE EXERCISE OF RELIGION CLAIM AND RELATED CONSPIRACY CLAIM ARE DISMISSED WITHOUT PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES*

a. *Exhaustion of Administrative Remedies*

**[1]** Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA"), a prisoner must exhaust administrative remedies before bringing suit in federal court under federal law:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This provision requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ("DOCS"). Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825, 149 L.Ed.2d 958 (2001).[18] The Supreme Court has made clear that there are no exceptions to the PLRA's exhaustion requirement:

18    *See also, e.g., Beharry v. Ashcroft,* 329 F.3d 51, 58 (2d Cir.2003); *Rivera v. Pataki,* 01 Civ. 5179, 2003 WL 21511939 at \*4, 8 (S.D.N.Y. July 1, 2003); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at \*2 (S.D.N.Y. Sept.17, 2002) (Peck, M .J.).

> **\*8** [W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 534 U.S. at 532, 122 S.Ct. at 992.[19]

19    *Accord, e.g., Feaster v. United States Bureau of Prisons,* No. 00–0118, 37 Fed. Appx. 15, 16, 2002 WL 970941 at \*1 (2d Cir. May 10, 2002) (applying *Porter v. Nussle* holding to

require exhaustion of prisoner's due process and retaliation claims); *Rodney v. Goord,* 00 Civ. 3724, 2003 WL 21108353 at \*1, 3 (S.D.N.Y. May 15, 2003) (requiring exhaustion of claims of harassment, excessive force, and the filing of a false misbehavior report and subsequent disciplinary action); *Rivera v. Goord,* 253 F.Supp.2d 735, 745–46 (S.D.N.Y.2003); *Nelson v. Rodas,* 2002 WL 31075804 at \*2.

Prior to the Supreme Court's decision in *Porter v. Nussle,* the Second Circuit had ruled that claims like Muhammad's which applied only to the plaintiff, such as "particular instances of assault or excessive force," did not relate to general "prison conditions" and thus were not subject to the PLRA's exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000), *rev'd, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In *Porter v. Nussle,* the Supreme Court reversed, declaring that claims of every sort relating to prison life—including claims for excessive force against an individual inmate—had to be exhausted before an action could be commenced in this Court pursuant to 42 U.S.C. § 1983. *Porter v. Nussle,* 122 S.Ct. at 988; *see also Lawrence v. Goord,* 238 F.3d 182, 185 (2d Cir.2001) (retaliation claims need not be exhausted), *vacated,* 535 U.S. 901, 122 S.Ct. 1200, 152 L.Ed.2d 139 (2002).

Dismissal of an action for failure to comply with the PLRA is without prejudice. *E.g., Morales v. Mackalm,* 278 F.3d 126, 128, 131 (2d Cir.2002) (per curiam) (Second Circuit "clarif[ies] that if a district court dismisses a prisoner's complaint for failure to exhaust administrative remedies, it should do so without prejudice."). [20]

[20]    *See also, e.g., Townsend v. Armstrong,* No. 02–0175, 2003 WL 21309185 at \*1 (2d Cir. June 5, 2003); *De La Motte v. Menifee,* No. 01–0313, 40 Fed. Appx. 639, 639, 2002 WL 1635422 at \*1 (2d Cir. July 23, 2002); *Stevens v. Goord,* 99 Civ. 11669, 2003 WL 21396665 at \*4 (S.D.N.Y. June 16, 2003); *Nelson v. Rodas,* 2002 WL 31075804 at \*2.

DOCS has a well-established inmate grievance procedure ("IGP"):

It consists of three levels. The first is the filing of a complaint with the facility's Inmate Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany....A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002) . [21]

[21]    *See also, e.g., Rivera v. Pataki,* 2003 WL 21511939 at \*3; *Rodney v. Goord,* 2003 WL 21108353 at \*4 & n. 2; *Nelson v.. Rodas,* 2002 WL 31075804 at \*2; *Perez v. Blot,* 195 F.Supp.2d 539, 542–43 (S.D.N.Y.2002); *Cruz v. Jordan,* 80 F.Supp.2d 109, 117–18 (S.D.N.Y.1999); *Vasquez v. Artuz,* 97 Civ. 8427, 1999 WL 440631 at \*5 (S.D.N.Y. June 28, 1999) (Peck, M.J.); N.Y. Correct. Law §§ 138–39; 7 N.Y.C.R.R. § 701.1, *etseq.*

Muhammad did not exhaust DOCS' grievance procedures with respect to the free exercise of religion claim and the related conspiracy claim. [22] Muhammad concedes that although Sullivan Prison (where he was confined at the time he filed the complaint) had a prisoner grievance procedure, he did not "present the facts relating to [his] complaint in the state prisoner grievance procedure." (Dkt. No. 23: Am. Compl. ¶ 2(A)-(B).) Muhammad's failure to grieve this claim was confirmed by Richard Alexis, the Inmate Grievance Program Supervisor at Green Haven, who stated that Muhammad did not file any grievances at Green Haven in 1997. (Dkt. No. 46: Alexis Aff. ¶¶ 1–4; *see also* Dkt. No. 47: Eagen Aff. ¶¶ 1–4 & Ex. A (no record of any relevant grievance appeals to Central Office Review Committee).) Muhammad's testimony provides further evidence that he did not follow the formal grievance procedure with respect to these claims. When asked if he filed a formal grievance Muhammad answered that he "[didn't] know it if was a formal grievance[ ]." (Dkt. No. 38: Singleton Aff. Ex. B: Muhammad Dep. at 67.) He explained that he wrote numerous letters of complaint regarding the persecution of the Shiites directly to the facility

2003 WL 21792158

Superintendent (*id.* at 41), DOCS Central Office (*id.* at 67), the "Deputy Superintendent of Programs" (*id.*), and outside masjids (*id.*); he also had informal discussions with prison officials in hallways (*id.*), and discussions with Deputy Supt. of Security George Snyder during a hearing on an unrelated disciplinary matter (Muhammad Dep. at 104).

22      Defendants do not contend that Muhammad failed to exhaust his due process claim. (*See* Dkt. No. 37: State S.J. Br. at 20–23; *see also* Dkt. No. 18: Answer ¶ 2 ("disciplinary hearing determinations are non grievable matters"); Dkt. No. 51: State Mot. to Dismiss Br. Ex. B: 2/14/02 Conf. Tr. at 15.) In fact, Muhammad effectively exhausted his due process claim. An inmate in Muhammad's situation exhausts his administrative remedies by raising his due process-based objections to a prison disciplinary process in an administrative appeals process, not by filing a separate grievance following the IGP. *See, e.g., LaBounty v. Johnson,* 253 F.Supp.2d 496, 501 (W.D.N.Y.2003); *Flanagan v. Maly,* 99 Civ. 12336, 2002 WL 122921 at *2 (S.D.N.Y. Jan.29, 2002)* ("When an inmate challenges the procedure at a disciplinary hearing ..., he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal.... Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless."), *accord Khalid v. Reda,* 00 Civ. 7691, 2003 WL 42145 at *4–5 (S.D.N.Y. Jan.23, 2003); *Mack v. Artuz,* 01 Civ. 11832, 2002 WL 31845087 at *6 (S.D.N.Y. Dec.19, 2002); *Samuels v.. Selsky,* 01 Civ. 8235, 2002 WL 31040370 at *8 (S.D.N.Y. Sept.12, 2002).* Muhammad appealed the Tier III hearing disposition to the Commissioner and further submitted a request for consideration. (*See* page 10 above.)

District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements.[23] *See, e.g., Rivera v. Pataki,* 2003 WL 21511939 at *8 & n. 12; *Nelson v. Rodas,* 2002 WL 31075804 at *3; *Saunders v. Goord,* 98 Civ. 8501, 2002 WL 1751341

at *3 (S.D.N.Y. July 29, 2002)* ("It is well established that '[p]laintiffs may not bypass this procedure by sending letters directly to the superintendent.' "); *Byas v. State,* 99 Civ. 1673, 2002 WL 1586963 at *2 (S.D.N.Y. July 17, 2002)* ("Prisoners may not bypass this procedure [in 7 N.Y.C.R.R. § 701.11(b) ] by sending letters directly to the superintendent.") (citing cases); *Nunez v. Goord,* 99 Civ. 4640, 2002 WL 1162905 at *1 (S.D.N.Y. June 3, 2002)* (inmate's letter to prison Superintendent in lieu of filing grievance failed to exhaust excessive force claim); *Hemphill v. New York,* 198 F.Supp.2d at 548–49 (same; letter to Superintendent does not satisfy 7 N.Y.C.R.R. § 701.11); *Mills v. Garvin,* 99 Civ. 6032, 2001 WL 286784 at *3 (S.D.N.Y. Mar.2, 2001)* (inmate's letters to prison officials were insufficient to exhaust his administrative remedies; "letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA."); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 n. 23 (S.D.N.Y. July 21, 2000)* (Peck, M.J.) ("The Court notes that simple letter complaints to the Commissioner of the New York State Department of Correctional Services about excessive force and medical indifference appear quite common, and such complaints are not normally sufficient to serve as a proxy for following and exhausting proper administrative remedies.") (citing cases), *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.).[24]

23      *Grant v. Hollins,* No. 02–0106, 65 Fed. Appx. 351, 353, 2003 WL 21105357 at *1 (2d Cir. May 14, 2003)* ("This Court has not yet determined whether and in what circumstances a letter to a prison superintendent will be sufficient to satisfy the exhaustion requirement" of the PLRA.). In *Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001), the Second Circuit noted that where the inmate used "informal channels" that resolved the issue in his favor, that satisfied the exhaustion requirement. Here, there is no evidence in the record that Muhammad's informal complaints resolved matters in his favor, and so *Marvin* is inapplicable.

24      *See also, e.g., Beatty v. Goord,* 210 F.Supp.2d 250, 255–56 (S.D.N.Y.2000)* (complaint dismissed without prejudice for failure to exhaust where inmate sent letters to prison medical director, Superintendent and Commissioner rather than following IGP); *Adams v. Galletta,* 96 Civ. 3750, 1999 WL 959368 at *3 (S.D.N.Y. Oct.19, 1999)* (letter to warden insufficient to exhaust

administrative remedies); *Salahuddin v. Mead,* 95 Civ. 8581, 1997 WL 357980 at *4 (S.D.N.Y. June 26, 1997) (letter to Superintendent and Commissioner insufficient to exhaust), *rev'd on other grounds,* 174 F.3d 271 (2d Cir.1999).

**\*9** In short, Muhammad's free exercise of religion and related conspiracy claims have not been administratively exhausted, and therefore should be dismissed without prejudice.

### b. *Total Exhaustion Issue*

Defendants also argue—in passing, in the last substantive sentence of their summary judgment brief—that pursuant to the PLRA's requirement that "no action" may be brought until administrative remedies are exhausted, 42 U.S.C. § 1997e(a), Muhammad's failure to exhaust his free exercise of religion and related claims requires the Court to dismiss the "complaint in its entirety." (Dkt. No. 37: State S.J. Br. at 23.)

**[2]** The issue therefore is whether the PLRA compels a rule of "total exhaustion"—whether a district court must dismiss a prisoner's entire § 1983 action if some but not all claims are administratively unexhausted, or if the Court may dismiss only those claims that are unexhausted while ruling on the exhausted claims. The decisions are divided on the issue. Some require "total exhaustion." *See, e.g., Julian–Bey v. Crowley,* No. 00–2313, 24 Fed. Appx. 393, 395, 2001 WL 1555950 at *2 (6th Cir. Dec.3, 2001) (dismissing "mixed" complaint; rejecting argument that "the exhaustion of at least one claim is sufficient to prevent dismissal"); *Graves v. Norris,* 218 F.3d 884, 885 (8th Cir.2000) ("When multiple prison condition claims have been joined, as in this case, the plain language of § 1997e(a) requires that all available prison grievance remedies must be exhausted as to all of the claims."). [25] Other decisions, however, do not require total exhaustion. *See, e.g., Byers v. Strachan,* No. 03–1028, 2003 WL 21456241 at *2 (6th Cir. June 20, 2003) ("The court may address the merits of exhausted claims and dismiss only those that are unexhausted.... However, [plaintiff] has not cited any authority which requires the district court to do so."); *McElhaney v. Elo,* No. 98–2173, 230 F.3d 1358 (table), 2000 WL 1477498 at *3 (6th Cir. Sept.25, 2000) ("If a [§ 1983] complaint contains exhausted and unexhausted claims, the district court may address the merits of the exhausted claims and dismiss only those that are unexhausted."); *Riley v. Richards,* No. 99–1327, 210 F.3d 372 (table), 2000 WL 332013 at *2 (6th Cir. Mar.23, 2000) (same); *Hartsfield v. Vidor,* 199 F.3d 305,

309 (6th Cir.1999) (same); *Johnson v. True,* 125 F.Supp.2d 186, 188 (W.D.Va.2000) ("total exhaustion" rule contradicts congressional intent and policy), *appeal dismissed,* 32 Fed. Appx. 692 (4th Cir.2002); *Cooper v. Garcia,* 55 F.Supp.2d 1090, 1094–95 (S.D.Cal.1999) (same); *Jenkins v. Toombs,* 32 F.Supp.2d 955, 958–59 (W.D.Mich.1999) (same).

25      *See also, e.g., Smeltzer v. Hook,* 235 F.Supp.2d 736, 743–46 (W.D.Mich.2002); *Rivera v. Whitman,* 161 F.Supp.2d 337, 339–43 (D.N.J.2001) (plain language of § 1997e(a), as well as the legislative intent and policy interests behind it, compel a "total exhaustion" rule); *Lira v. Director of Corr. of State of Calif.,* No. C 00–905, 2002 WL 1034043 at *3 (N.D.Cal. May 17, 2002); *Thorp v. Kepoo,* 100 F.Supp.2d 1258, 1263 (D.Haw.2000); *Keenan v. Twommey,* No. 1:97–cv–549, 1999 U.S. Dist. LEXIS 11829 at *2–17 (W.D.Mich. July 29, 1999), *aff'd,* No. 99–2030, 229 F.3d 1152 (table), 2000 WL 1175621 (6th Cir.2000); *Abenth v. Palmer,* No. C 96–3938, 1997 WL 255332 at *1 (N.D.Cal. Apr.28, 1997).

The Second Circuit has not addressed the issue, and the district court decisions in this circuit also are split. *See Ortiz v. McBride,* 323 F.3d 191, 195 (2d Cir.2003) ("District courts in this circuit are currently split on the question of whether the PLRA requires such 'total exhaustion.' ") (citing cases). *Compare, e.g., Rivera v. Pataki,* 01 Civ. 5179, 2003 WL 21511939 at *8 (S.D.N.Y. July 1, 2003) (dismissing the entire complaint without prejudice, giving the plaintiff "an opportunity to plead [all claims] again if he chooses to do so"); *Vidal v. Gorr,* 02 Civ. 5554, 2003 WL 43354 (S.D.N.Y. Jan.6, 2003); & *Saunders v. Goord,* 98 Civ. 8501, 2002 WL 1751341 at *3 (S.D.N.Y. July 29, 2002) (dismissing inmate complaint containing some unexhausted claims, citing "the plain language of 42 U.S.C. § 1997e(a)"), *with Rivera v. Goord,* 253 F.Supp.2d 735, 749, 753–54 (S.D.N.Y.2003) ("I conclude by rejecting defendants' argument for the adoption of 'total' or 'complete' exhaustion rule—that, under the PLRA, all of [plaintiff's] claims must be dismissed for the failure to exhaust administrative remedies as to even one claim."); *Dimick v. Baruffo,* 02 Civ. 2151, 2003 WL 660826 at *5 (S.D.N.Y. Feb.28, 2003) ("As Magistrate Judge Peck has noted, courts nationwide are divided on this issue, as are courts within this district. The Court agrees with the line of cases that allows the exhausted claims to proceed, despite the fact that claims against other defendants are unexhausted."); & *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450 at *1 (S.D.N.Y. Jan.3, 2002) (dismissing unexhausted claims while

2003 WL 21792158

ruling on merits of exhausted claims, without discussing why court could do so).

**\*10** The Court need not try to predict what the Second Circuit (and eventually the Supreme Court) will do, nor take its own position in this general debate. At least on the particular facts of this case, the Court believes it appropriate to address the merits of the exhausted due process claim while dismissing the freedom to exercise and conspiracy claims without prejudice. *See also Nelson v. Rodas,* 2002 WL 31075804 at *5–6 (taking same approach); *cf. Byers v. Strachan,* 2003 WL 21456241 at *2 (district court may, but is not required to, address merits of exhausted claims and dismiss unexhausted claims).

Here, it is significant that the free exercise and the conspiracy claims are easily separated from the due process claim since they involve discrete events and can be analyzed independently. Even under these facts, the Court could dismiss the entire action without prejudice. However, I see no reason why the Court cannot exercise its discretion in these particular circumstances to dismiss without prejudice the separable freedom of religion and conspiracy claims while reaching the merits of the fully exhausted due process claims. Accordingly, Muhammad's free exercise and conspiracy claims [26] are dismissed without prejudice as unexhausted, while the separable exhausted due process claims will be adjudicated on the merits in the following sections of this Opinion. [27]

[26]   In the event that Muhammad exhausts administrative remedies with regard to the alleged conspiracy claim and files a new action, he is advised to adequately plead (and be able to prove) the elements of conspiracy to violate § 1983. "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *accord, e.g., Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002) (" 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive

allegations are insufficient, unless amplified by specific instances of misconduct' ") (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)); *Stein v. Janos,* 02 Civ. 01295, 2003 WL 21354605 at *5 (S.D.N.Y. June 4, 2003); *Bullard v. City of New York,* 240 F.Supp.2d 292, 301–02 (S.D.N.Y.2003) (questioning whether *Pangburn—Ciambriello* standard for pleading survives the Supreme Court's "notice pleading" decision in *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513–14, 122 S.Ct. 992, 998–99, 152 L.Ed.2d 1 (2002)); *Nelson v. Rodas,* 2002 WL 31075804 at *16; *Espinal v. Goord,* 00 Civ. 2292, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Cipolla v. County of Rensselaer,* 129 F.Supp.2d 436, 449 (N.D.N.Y.), *aff'd,* 20 Fed. Appx. 84, 2001 WL 1220521 (2d Cir.2001); *Santiago v. City of New York,* 98 Civ. 6543, 2000 WL 1532950 at *8 (S.D.N.Y. Oct.17, 2000).

[27]   Muhammad's complaint can be liberally construed to include claims of medical indifference (Am. Comp. Attach. at 5) ("[I have been] deprived of needed daily meds prescribed by an outside neuro-specialist"), racial discrimination (*id.* at 6) ("it was only Nubians (latinos [and] Blacks) targeted for punishment in the whole affair"), and excessive force (*id.* at 7) ("I was assaulted by jack-booted security elites"). However, to the extent that these claims are separate from Muhammad's other claims, they should be dismissed for failure to exhaust administrative remedies, since there is no evidence in the record that Muhammad satisfied the grievance requirement of the PLRA. *See* cases cited in this section.

## II. *SUMMARY JUDGMENT AS TO THE DEFENDANTS IN GENERAL IS DENIED WITH RESPECT TO MUHAMMAD'S DUE PROCESS CLAIMS*

### A. *Summary Judgment Standards in Section 1983 Cases* [28]

[28]   For additional cases authored by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Opinion, *see, e.g., Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *9–10 (S.D.N.Y. Sept.17, 2002) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607,

2002 WL 664040 at *4–5 (S.D.N.Y. Apr.23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *5–7 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *5 (S.D.N.Y. Apr.23, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *4 (S.D.N.Y. Sept.29, 2000) (Peck, M.J.) *Culp v. Koenigsmann,* 99 Civ. 9557, 2000 WL 995495 at *4 (S.D.N.Y. July 19, 2000) (Peck, M.J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *4 (S.D.N.Y. June 13, 2000) (Peck, M.J.); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb.3, 2000) (Peck, M.J.); *Salahuddin v. Coughlin,* 999 F.Supp. 526, 534 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.); *Watson v. McGinnis,* 981 F.Supp. 815, 817 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.).

*Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment—here, defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g.,*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

**\*11**  In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also, e.g., Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party—here, Muhammad—only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

"The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" such as Muhammad and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. at 535 (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[29] Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.g., Irby v. New York City*

*Transit Auth.,* 262 F.3d 412, 413–14 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the pro se litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the pro se litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."); *McPherson v. Coombe,* 174 F.3d at 280–81 (" '[t]he failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted). [30] Defendants here served the appropriate notices on Muhammad. (Dkt. No. 36: Notice of Mot. for Summ. J.; Dkt. No. 39:4/23/03 Notice to Pro Se Litigant Opposing Mot. for Summ. J.)

[29]    *See also, e.g., Commer v. American Fed'n of State, County & Mun. Employees,* 02 Civ. 7930, 2003 WL 21698637 at *1 (S.D.N.Y. July 17, 2003) ("[T]he Court is mindful that the plaintiff is proceeding pro se and that his submissions should be held to 'less stringent standards than formal pleadings drafted by lawyers....' "); *Douglas v. Portuondo,* 232 F.Supp.2d 106, 113 (S.D.N.Y.2002).

[30]    *See also, e.g., Trammell v. Coombe,* No. 97–2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec.23, 1999); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *see generally* S.D.N.Y. Local Civil Rule 56.2 (requiring service of notice explaining the requirements of Rule 56 on litigant proceeding pro se).

**\*12** "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct.28, 1999) (citing cases); *see also, e.g., Viruet v. Citizen Advice Bureau,* 01 Civ. 4594, 2002 WL 1880731 at *9 (S.D.N.Y. Aug 15, 2002) (Peck, M.J.); *Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

B. *Application of* Sandin *Analysis to Muhammad's 138 Days in Keeplock Confinement*

**[3]**    Defendants' summary judgment motion on Muhammad's keeplock due process claim turns on the application of the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which significantly changed the prisoner due process landscape. The Supreme Court there held:

> [W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

515 U.S. at 483–84, 115 S.Ct. at 2300 (fns. & citations omitted). [31]

[31]    In *Wolff v. McDonnell,* 418 U.S. 539, 563–66, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974), the Supreme Court set forth the minimum procedural due process requirements for prison disciplinary hearings. To meet these requirements, an inmate must receive: (1) "advance written notice of the claimed violation"; (2) "a written statement of the factfinders as to the evidence relied upon and the reasons for the disciplinary action taken"; and (3) the opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly

hazardous to institutional safety or correctional goals." Cross-examination and the right to counsel are not required. *Id.* at 566–70, 94 S.Ct. at 2980–81. The Supreme Court also suggested (but did not order) that if the inmate is illiterate or the issue complex, he be given assistance from another inmate or a staff member. *Id.* at 570, 94 S.Ct. at 2982.

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language, and for harassing employees. *Id .* at 475–76, 115 S.Ct. at 2295–96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct, and sentenced him to thirty days disciplinary segregation in the prison's Special Holding Unit ("SHU"). *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Sandin v. Conner,* 515 U.S. at 487, 115 S.Ct. at 2302. The Supreme Court stated:

> We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge nine months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary

> segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.

**\*13** *Id.* at 486, 115 S.Ct. at 2301 (fns.omitted).

As a result of *Sandin,* the Second Circuit follows a two-part standard that prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

> To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint.

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996); *accord, e.g., Anderson v. Recore,* 317 F.3d 194, 199–200 (2d Cir.2003); *Taylor v. Rodriguez,* 238 F.3d 188, 195–96 (2d Cir.2001); *Cruz v. Gomez,* No. 99–0129, 2000 WL 85202 at \*3 (2d Cir. Jan.26, 2000); *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Arce v. Walker,* 139 F.3d 329, 333–34 (2d Cir.1998); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). [32]

[32]   *See also, e.g., Gill v. DeFrank,* 98 Civ. 7851, 2000 WL 270854 at \*17 (S.D.N.Y. Mar.9, 2000) (Peck, M.J.), *report & rec. adopted as modified on other grounds,* 2000 WL 897152 (S.D.N.Y. July 6, 2000) (Buchwald, D.J.), *aff'd,* 8 Fed. Appx. 35, 2001 WL 388057 (2d Cir. Apr.16, 2001); *Jackson v. Johnson,* 15 F.Supp.2d 341, 356–57 (S.D.N.Y. July 23, 1998) (Kaplan, D.J. & Peck, M.J.); *Silva v. Sanford,* 91 Civ. 1776, 1998 WL 205326 at \*9–10 (S.D.N.Y. Apr.24, 1998) (Peck, M.J.); *Williams v. Keane,* 95 Civ. 0379, 1997 WL 527677 at \*4 (S.D.N.Y. Aug.25, 1997) (Peck, M.J.); *Ruiz v. Selsky,* 96 Civ.2003, 1997 WL 137448 at \*5 (S.D.N.Y. Mar.4, 1997) (Peck, M.J.); *Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at \*3 (S.D.N.Y. Aug.14, 1996).

2003 WL 21792158

A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556–58, 94 S.Ct. at 2974–75, and its progeny. *See, e.g., Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir.2001) (finding *Sandin* liberty interest and remanding to district court to consider whether plaintiff had received due process with respect to his placement in segregation); *Gill v. DeFrank,* 2000 WL 270854 at *17; *Jackson v. Johnson,* 15 F.Supp.2d at 357; *Silva v. Sanford,* 1998 WL 205326 at *10. [33]

[33]    *See also, e.g., Foxworth v. Selsky,* No. 95–CV–1168, 1998 WL 59448 at *2, *4 (N.D.N.Y. Feb. 9, 1998); *Charles v. Coughlin,* 985 F.Supp. 88, 93 (E.D.N.Y.1997); *Nicholas v. Remillard,* No. 92–CV–900, 1997 WL 711385 at *5 (N.D.N.Y. Nov.13, 1997); *Williams v. Keane,* 1997 WL 527677 at *3 & n. 1; *Ruiz v. Selsky,* 1997 WL 137448 at *5; *Pacheco v. Vanwyck,* No. 94–CV–456, 1997 WL 642540 at *8 (N.D.N.Y. Oct. 15, 1997); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 & n. 4 (S.D.N.Y. Nov.6, 1996); *Santana v. Keane,* 1996 WL 465751 at *3 & n. 1.
    Because Muhammad's Tier III punishment did not involve loss of any good time credit, his *Sandin* due process claim is not barred by the Supreme Court's decision in *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1554 (1997). *See, e.g., Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2000); *Jenkins v. Haubert,* 179 F.3d at 25; *Gill v. DeFrank,* 2000 WL 270854 at *17 n. 29; *Davis v. State of New York,* No. 99–CV–0307, 1999 WL 1390247 at *4 n. 1 (W.D.N.Y. Dec.14, 1999); *Porter v. Coombe,* 97 Civ. 2394, 1999 WL 587896 at *3 (S.D.N.Y. Aug.4, 1999); *Ramirez v. McGinnis,* 75 F.Supp.2d 147, 151 (S.D.N.Y.1999); *Jackson v. Johnson,* 15 F.Supp.2d at 347–50, 357–60; *Silva v. Sanford,* 1998 WL 205326 at *10–13. Indeed, defendants did not raise the *Edwards* issue in moving for summary judgment.

The Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to both the length and conditions of confinement. *Ortiz v. McBride,* 323 F.3d 191, 195 (2d Cir.2003) (The Second Circuit's prior decisions "made clear that duration is not the only relevant factor. The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship' as required by *Sandin.*" ); *Taylor v. Rodriguez,* 238 F.3d at 195 ("The

inquiry into the severity of confinement assesses whether differences in conditions between a restrictive housing status and the general population or other restrictive statuses constitute a significant hardship.... Equally important, we have emphasized ... that the duration of the claimed deprivation is to be taken into account in deciding whether the prisoner's confinement constitutes an atypical and significant hardship."); *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999) ("Both the conditions [of confinement] and their duration must be considered ..., since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."). [34]

[34]    *See also, e.g., Hanrahan v. Doling,* 331 F.3d 93, 98 & n. 5 (2d Cir.2003) ("The length of disciplinary confinement is one of the guiding factors in applying *Sandin'* s 'atypical and significant hardship' test. Although highly relevant, the duration of confinement need not be the sole consideration in analyzing procedural due process claims under *Sandin.*" ); *Giano v. Selsky,* 238 F.3d at 225; *Sims v. Artuz,* 230 F.3d at 22–23; *Welch v. Bartlett,* 196 F.3d 389, 393–94 (2d Cir.1999), *Arce v. Walker,* 139 F.3d at 336; *Wright v. Coughlin,* 132 F.3d at 137; *Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) (noting the "desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement"); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997) ("The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an 'atypical, significant deprivation.' ... [W]e now state explicitly: *Sandin* did not create a per se blanket rule that disciplinary confinement may never implicate a liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest."); *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Gill v. DeFrank,* 2000 WL 270854 at *15.

Duration is one of the most important factors in that analysis. *See, e.g., Sims v. Artuz,* 230 F.3d at 23; *Scott v. Albury,* 156 F.3d 283, 287 (2d Cir.1998); *Arce v. Walker,* 139 F.3d at 336–37; *Wright v. Coughlin,* 132 F.2d at 136–37; *Brooks v. DiFasi,*

112 F.3d at 48–49; *Gill v. DeFrank,* 2000 WL 270854 at *18 & n. 30 (citing cases).

**\*14** Since *Sandin,* there has been considerable litigation regarding the issue of what duration of segregated confinement within a prison meets the Supreme Court's standards in *Sandin.* The Second Circuit has not set a bright line rule that any particular duration does, or does not, constitute an atypical and significant hardship. *See, e.g., Sims v. Artuz,* 230 F.3d at 23 ("We have not established a bright-line rule as to how lengthy a SHU confinement will be considered atypical and significant."); *Colon v. Howard,* 215 F.3d at 232–34 (Judge Newman proposed "establishing a bright-line rule that confinement in normal SHU conditions of more than 180 days meets the *Sandin* standard" of atypical and significant hardship, but the "majority of the panel ... decided not to proceed with a bright-line approach"); *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999).

Muhammad served 138 days in keeplock.[35] (*See* page 10 above.) The Second Circuit has "advise[d] the district courts of this Circuit that in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days, development of a detailed record will assist appellate review." *Colon v. Howard,* 215 F.3d at 232 (fn.omitted). Moreover, "[a]ggregative sentences of 125–288 days are 'relatively long,' requiring a district court to articulate specific findings before determining whether such confinement is atypical or significant." *Taylor v. Rodriguez,* 238 F.3d at 195; *accord, e.g., Sims v. Artuz,* 230 F.3d at 23; *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998). The Second Circuit has remanded numerous cases that dismissed *Sandin* claims on summary judgment, requiring "amplification of the record and more refined fact-finding." *E.g., Colon v. Howard,* 215 F.3d at 230 (citing *Welch v. Bartlett,* 196 F.3d at 393–95;[36] *Brooks v. DiFasi,* 112 F.3d at 49; & *Miller v. Selsky,* 111 F.3d at 9 (2d Cir.); *see also, e.g., Ortiz v. McBride,* 323 F.3d at 196 (appointing appellate counsel for pro se appellant because of the "complexity" of the *Sandin* issues); *LaBounty v. Kinkhabwala,* No. 99–0329, 2 Fed. Appx. 197, 201, 2001 WL 99819 at *3 (2d Cir. Feb. 5, 2001) ("in most instances, [we] have remanded these cases for amplification of the record"); *Sims v. Artuz,* 230 F.3d at 22–24; *Kalwasinski v. Morse,* 201 F.3d at 107–08 & n. 10; *Jermosen v. Coughlin,* 1999 WL 822528 at *2. District court decisions in this circuit similarly have denied summary judgment where the inmate's segregation is between 101 and 305 days. *See, e.g., Knight v. Keane,* 247 F.Supp.2d 379,

392–93 (S.D.N.Y.2002) (denying motion to dismiss where plaintiff confined to keeplock for 365 days); *Cox v. Malone,* 199 F.Supp.2d 135, 143 (S.D.N.Y.2002) (dicta: "Other courts have held that ... periods of confinement [of one year or less] raise an issue of material fact not suitable to summary judgment.") (citing cases), *aff'd,* No. 02–161, 56 Fed. Appx. 43, 2003 WL 366724 (2d Cir. Feb.20, 2003); *Amaral v. Greis,* No. 00–CV–6299, 2001 WL 1705112 at *2 (W.D.N.Y. Nov.5, 2001); *Alvarez v. Coughlin,* No. 94–CV–985, 2001 WL 118598 at *4 (N.D.N.Y. Feb. 6, 2001); *Scott v. Coughlin,* 78 F.Supp.2d 299, 306–12 (S.D.N.Y.2000); *Hutchinson v. Blaetz,* 94 Civ. 3695, 1996 WL 374164 at *4 (S.D.N.Y. July 1, 1996); *Hernandez v. Tiede,* No. 94–CV–908S, 1996 WL 863453 at *5 (W.D.N.Y. May 29, 1996).

35   The durational test applies not to the potential penalty or even the penalty imposed, but to the actual period the plaintiff served in segregation. *See, e.g., Hanrahan v. Doling,* 331 F.3d at 99 & n. 7; *Colon v. Howard,* 215 F.3d at 231 n. 4; *Sealey v. Giltner,* 197 F.3d at 587–88 & n. 7; *Scott v. Albury,* 156 F.3d at 284, 286–88; *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002); *Jackson v. Johnson,* 15 F.Supp.2d. at 361; *Silva v. Sanford,* 1998 WL 205326 at *14–15, 17 ( & cases cited therein).

36   In remanding, the Second Circuit in *Welch* noted that: "Although confinement to one's cell for half the day has some similarity to such confinement for 23 hours a day, the difference seems to us to be great." *Welch v. Bartlett,* 196 F.3d at 393.

**\*15** Because Muhammad's 138 day confinement falls between 101 and 305 days, the Second Circuit requires a detailed factual analysis that the Court cannot make on the current summary judgment record. Although the *Sandin* standard of "atypical and significant hardship" involves an issue of law, factual disputes regarding the conditions and duration of the confinement must be resolved by the jury. *See, e.g., Sealey v. Giltner,* 197 F.3d at 585. Because the question of whether Muhammad has a protected liberty interest in not being confined to keeplock for 138 days raises a genuine issue of fact, the issue will be more appropriately decided at trial —at which Muhammad will have the assistance of appointed pro bono counsel.[37]

37   The Court previously granted Muhammad's application for appointment of counsel (Dkt. No.

2003 WL 21792158

26: 3/7/03 Order; *see also* Dkt. No. 48: 3/6/03 Conf.
Tr. at 35), but the Court's Pro Se Office has not yet
found pro bono counsel for Muhammad. Now that
the case is trial ready, it should be easier to find
volunteer counsel, and the Court will make sure
Muhammad has such counsel for his trial.

C. *Due Process at Muhammad's Disciplinary Hearing*

 **[4]**     In addition to alleging that 138 days in keeplock
confinement does not trigger a liberty interest under *Sandin,*
defendants claim that Muhammad's due process claim should
be dismissed because Muhammad did receive procedural due
process protection at his Tier III disciplinary hearing. (Dkt.
No. 36: State S.J. Br. at 9–16.)

The Court cannot grant summary judgment on this issue
because the parties provide diverging views of whether
proper procedures were followed before and at the hearing.
As just one example, the parties disagree about whether
Muhammad was allowed to call certain witnesses at his
hearing: Muhammad claims that defendant Hearing Officer
Pico violated his due process rights by refusing to allow him
to call inmate Kevin Coppege and other inmates as witnesses
and by failing to provide adequate explanations for curtailing
Muhammad's questioning (Dkt. No. 38: Singleton Aff. Ex.
B: Muhammad Dep. at 131–32), while defendants claim that
Coppege refused to testify on Muhammad's behalf and in any
event his testimony would have been redundant. (Dkt. No 44:
Pico Aff. ¶ 11; *see also* Dkt. No. 37: State S.J. Br. at 12.)

 **[5]**     Summary judgment might have been possible if
the Court were able to review the tape or transcript
of Muhammad's Tier III hearing. Unfortunately, however,
defendants have failed to provide the hearing tape or a
transcript. (*See* Dkt. No. 37: State S.J. Br. at 14.) The Court
cannot resolve the issues of material fact without the hearing
tape or transcript, and therefore denies defendants' summary
judgment motion. [38]

[38]
Defendants also have raised a qualified immunity
defense. (State S.J. Br. at 16–20.) The Court
believes that such a defense is inappropriate in
this case because qualified immunity is unavailable
where the allegedly violated right is "clearly
established." *See, e.g., Koch v. Town of Brattleboro,*
287 F.3d 162, 165 (2d Cir.2002); *Martinez v.
Simonetti,* 202 F.3d 625, 633–34 (2d Cir.2000);
*Young v. County of Fulton,* 160 F.3d 899,
903 (2d. Cir.1998); *Espinal v. Goord,* 00 Civ.

2242, 2001 WL 476070 at *11 (S.D.N.Y. May
7, 2001) (Peck, M.J.); *Freeman v. Strack,* 99
Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y.
Sept.29, 2000) (Peck, M.J.). The rights to be
afforded an inmate at a disciplinary hearing
were "clearly established" in *Wolff v. McDonnell*
(*see* page 30 fn.31 above) and *Sandin,* before
Muhammad's Tier III hearing. *See, e.g., Hanrahan
v. Doling,* 331 F.3d 93, 98–99 (2d Cir.2003);
*Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989)
(material issues of fact as to whether prisoner
charged with violating state prison regulations
was given hearing before biased hearing officer
and whether he was informed about and had
opportunity to comment on evidence against him
precluded summary judgment in official's favor
on grounds of qualified immunity in inmate's §
1983 action); *Farid v. Goord,* 200 F.Supp.2d 220,
246 (W.D.N.Y.2002) (Because "the basic standards
regarding a prisoner's right to call witnesses
and present evidence at a disciplinary hearing
were articulated in *Wolff v. McDonnell* ... [i]t is
objectively reasonable that defendant ... would
have been aware of such precedent. Thus, there
are genuine issues of material fact" as to whether
defendant's actions were reasonable, so "qualified
immunity does not provide him a defense on
this ground."); *Alvarez v. Coughlin,* 2001 WL
118598 at *7–8 (fact issues preclude summary
judgment on hearing officer's qualified immunity
defense); *Scott v. Coughlin,* 78 F.Supp.2d 299, 313
(S.D.N.Y.2000) ( "Since a trial is necessary to
determine whether [defendant] violated [plaintiff's]
right to call witnesses under *Wolff,* the Court
cannot conclude on summary judgment that
[defendant] did not violate a clearly established
right of which a reasonable person would have
known."); *Wright v. Miller,* 973 F.Supp. 390, 395–
96 (S.D.N.Y.1997) ("As the constitution provides
inmates with a limited right to call witnesses on
their behalf [citing *Wolff v. McDonnell* ], plaintiffs
have raised an issue of fact as to whether their
constitutional rights were violated. As this right to
call witnesses is clearly established ... defendants'
qualified immunity defense fails.") (citations
omitted); *Dawes v. Carpenter,* 899 F.Supp. 892, 898
(N.D.N.Y.1995) (Because plaintiff's right under
*Wolff* were clearly established at the time of
his hearings and "the hearing officers reasonably

should have known of this right at the time of these hearings[,] [d]efendants therefore are not protected by qualified immunity."). Since the right was clearly established, and there is a factual dispute about the defendants' conduct, the Court cannot grant defendants summary judgment on qualified immunity grounds.

The same reasoning applies to defendant Selsky's claim that he did not violate Muhammad's due process rights by affirming Hearing Officer Pico's decision. (*See* State S.J. Br. at 15–16.) Because the hearing tape and transcript is unavailable, and the parties dispute what happened at the hearing, the Court cannot decide on summary judgment whether it was reasonable for Selsky to affirm the verdict. *See, e.g., Samuels v. Selsky,* 01 Civ. 8235, 2002 WL 31040370 at *11 (S.D.N.Y. Sept.12, 2002) (denying motion to dismiss because "[d]efendants have failed to submit ... a transcript of the disciplinary hearing ... without [which] ... it is difficult for this Court fully to evaluate the merits of the parties' arguments").

 **\*16**  For the foregoing reasons, defendants' summary judgment motion on behalf of all defendants as to Muhammad's prison disciplinary hearing due process claim is denied.

III. *MUHAMMAD'S DUE PROCESS CLAIM AGAINST DEFENDANTS CONNOLLY AND DOLAN IS DISMISSED BECAUSE NEITHER DEFENDANT WAS PERSONALLY INVOLVED IN THE ALLEGED CONSTITUTIONAL VIOLATION*

 **[6]**  "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). [39] "It is [equally] well established that in order to be personally liable for an alleged due process violation, including in connection with a Tier III hearing, a defendant must have either: (1) ... participated directly in the alleged constitutional violation, (2) ... after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) ... created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) [been] grossly negligent in supervising subordinates who committed the wrongful acts, or (5) ... exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Jackson v. Johnson,* 30 F.Supp.2d 613,

616–17 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) (internal quotations omitted); *see, e.g., Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *see also, e.g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (Plaintiff did not demonstrate DOCS Commissioner was personally involved in depriving him of any constitutional rights at his administrative segregation hearing; plaintiff failed to allege DOCS Commissioner "(1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation.") (citing *Williams v. Smith,* 781 F.2d 319, 323–34 (2d Cir.1986)).

39      *Accord, e.g., Johnson v. Newburgh Enlarged Sch. Dist. .,* 239 F.3d 246, 254 (2d Cir.2001); *see also, e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001); *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) ("Proof of an individual defendant's personal involvement in the alleged wrong is ... a prerequisite to his liability on a claim for damages under § 1983.").

Muhammad argues that because Sgt. Dolan prepared and Lt. Connolly approved a misbehavior report that allegedly was "defective as a matter of law" and that led to Muhammad's Tier III disciplinary hearing at issue, they deprived him of his constitutional right to due process. (Dkt. No. 23: Am. Compl. Attach. at 2.) However, this "but for causation" argument is not the standard for Section 1983 liability. *See, e.g., Williams v. Smith,* 781 F.2d at 324 (prisoner's but for argument as to guard who prepared misbehavior report but was not involved in Tier III hearing rejected; "The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing."); *see also, e.g., Freeman v. Rideout,* 808 F.2d 949, 951–53 (2d Cir.1986) (filing of false charges does not constitute a § 1983 violation), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988); *Hattley v. Goord,* 02 Civ. 2339, 2003 WL 1700435 at *10 (S.D.N.Y. Mar.27, 2003) ("[T]he 'mere filing' of a misbehavior report does not satisfy the 'personal involvement' requirement of § 1983 liability. Furthermore, '[l]ike one who simply writes a misbehavior report, one who reviews the report does not violate an inmate's rights....' "); *Hyman v. Holder,* 96 Civ. 7748, 2001 WL 262665 at *3 (S.D.N.Y. Mar.15, 2001) (Plaintiff's "allegation that defendants conspired to file a false inmate misbehavior report does not in and of itself state a constitutional claim."); *Cherry v. Selsky,* 99 Civ. 4636,

2000 WL 943436 at *6 (S.D.N.Y. July 7, 2000); *Scott v. Coughlin,* 78 F.Supp.2d 299, 314 (S.D.N.Y.2000) ("[T]he claims against these defendants [cannot] survive summary judgment under the theory that because they filed false charges against [plaintiff], they are liable for any deprivation of due process occurring at the disciplinary hearings which followed. The Second Circuit has clearly established that '[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." ') (quoting *Williams v. Smith,* 781 F.2d at 324); *Taylor v. Macomber,* 97 Civ. 4127, 1999 WL 349696 at *4 (S.D.N.Y. May 27, 1999); *Jackson v. Johnson,* 30 F.Supp.2d at 618; *Kingwood v. Coombe,* 96 Civ. 0432, 1997 WL 323913 at *3 (S.D.N.Y. June 13 1997) ("It is well established in this Circuit that even the filing of false charges against an inmate does not amount to a constitutional violation, and that the mere filing of a misbehavior report does not satisfy the 'personal involvement' requirement for § 1983 liability. [This] rationale ... is equally applicable here. Defendant ... merely reviewed the Inmate Misbehavior Report and recommended that a disciplinary hearing be held. He cannot be liable for any subsequent due process violations that occurred at the disciplinary hearing.") (citations omitted). A defendant must have been involved personally in the allegedly unconstitutional action—here, the Tier III hearing —in order to be liable under Section 1983.

**\*17** Although defendants Sgt. Dolan and Lt. Connolly testified before Hearing Officer Pico (Dkt. No. 39: Pico Aff. ¶ 10), Muhammad does not allege any facts in his complaint (or his deposition or summary judgment papers) that would support a finding of personal involvement on the part of defendants Sgt. Dolan or Lt. Connolly in the alleged deprivation of his constitutional rights during the Tier III disciplinary hearing. Muhammad's due process claim against these defendants is limited to the fact that Sgt. Dolan filed and Lt. Connolly reviewed a misbehavior report against him alleging that he was responsible for the "Terror Campaign" against the cell shop inmate employees. These facts alone are insufficient to find personal involvement as defined in § 1983 jurisprudence, in the alleged disciplinary hearing due process violations. Accordingly, the Court grants summary judgment to defendants Sgt. Dolan and Lt. Connolly dismissing Muhammad's due process claim. [40]

[40]    The Court therefore need not decide defendant Sgt. Dolan's motion to dismiss for lack of personal jurisdiction.

IV. *DEFENDANT EASTER'S RULE 12(B)(6) MOTION TO DISMISS MUHAMMAD'S DUE PROCESS CLAIM AGAINST HER IS DENIED*

**[7]**    Defendant Easter has moved to dismiss pursuant to Rule 12(b)(6) claiming that Muhammad's complaint does not state a claim upon which relief can be granted against her, since she claims that she was not personally involved in the alleged constitutional deprivation. (Dkt. No. 51: State Mot. to Dismiss Br. at 2–4.) [41]

[41]    For a discussion of the legal standard applicable to a Rule 12 motion to dismiss, *see, e.g., Pierce v. Marano,* 01 Civ. 3410, 2002 WL 1858772 at *3 (S.D.N.Y. Aug.13, 2002) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.,* 01 Civ. 4182, 2002 WL 1465907 at *3 (S.D.N.Y. July 9, 2002) (Peck, M.J.); *see also, e.g., Swierkiewicz v. Sorema,* 534 U.S. 506, 508, 514, 122 S.Ct. 992, 996, 998, 152 L.Ed.2d 1 (2002); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003). Defendant Easter's motion to dismiss does not rely on the summary judgment record (*see* Dkt. No. 51: State Mot. to Dismiss Br. at 2–4) and thus the motion is not converted into a summary judgment motion.

Defense *counsel* summarily asserts that Easter is not liable under § 1983 because deciding that Muhammad " 'could not have the documentary evidence' 'does not amount to material participation in the alleged constitutional deprivation. (Dkt. No. 51: State Mot. to Dismiss Br. at 4.) Defense counsel further suggests that if there was a deprivation of Muhammad's due process rights, it was not on the part of defendant Easter but of defendant Baltuch, who was responsible for providing Muhammad with meaningful assistance. (*Id* .) [42]

[42]    The Court notes that defense counsel did not submit an affidavit from Easter explaining what she did, or did not, do.

In his response to the motion to dismiss, Muhammad reaffirms his claims that defendant Easter participated in the deprivation of his constitutional rights. (Dkt. No. 56: Muhammad Response to Defs.' Mot. to Dismiss ¶ 1 at 1.) He states that her participation amounted to personal involvement as required in § 1983 actions because she played an active role in depriving him of due process: Easter "interjected herself into a role not hers (i.e. controller of documents within the Tier Office that were needed by and due

2003 WL 21792158

to the plaintiff [for] his defense" at the Tier III hearing, and that she "over-stepp[ed]" her bounds, and that she "li[ed] to def[endant] N. Baltuch." (*Id.*)

The Court cannot say that there are no facts that Muhammad could present to prove his due process claim against defendant Easter. For example, if the proof were to show that defendant Baltuch asked for the documents that Muhammad wanted for his hearing defense and defendant Easter refused without good cause to provide them, she may have been personally involved in the deprivation of Muhammad's due process hearing rights.

**\*18** Defendant Easter's Rule 12(b)(6) motion to dismiss is denied.

V. *DEFENDANT BALTUCH'S MOTION TO DISMISS MUHAMMAD'S DUE PROCESS CLAIM IS DENIED BECAUSE THE AMENDED COMPLAINT ADDING BALTUCH AS A DEFENDANT "RELATES BACK" TO THE ORIGINAL COMPLAINT FILED BEFORE EXPIRATION OF THE STATUTE OF LIMITATIONS*
Defendant Baltuch has moved to dismiss, claiming that Muhammad's claim against him was time-barred because the complaint was not amended to include him as a defendant within the applicable limitations period. (Dkt. No. 51: State Mot. to Dismiss Br. at 4–5.)

A. The *§ 1983 Statute of Limitations*
**[8]** The statute of limitations for a § 1983 action is three years. *See, e.g., Holiday v. Martinez,* No. 02–7848, 2003 WL 21242641 at \*2 (2d Cir. May 29, 2003) (three-year statute of limitations applies to § 1983 due process claim, which accrues when plaintiff knows or has reason to know of the injury which is the basis of his action); *Warren v. Altieri,* No. 02–69, 59 Fed. Appx. 426, 427, 2003 WL 1191173 at \*1 (2d Cir. Mar.13, 2003) (plaintiff's " § 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury."); *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002), *cert. denied,* 538 U.S. 922, 123 S.Ct. 1574, 155 L.Ed.2d 313 (2003); *Paige v. Police Dep't,* 264 F.3d 197, 199 n. 2 (2d Cir.2001); *Connolly v. McCall,* 254 F.3d 36, 40–41 (2d Cir.2001); *Bristow v. Smith,* 03 Civ. 2663, 2003 WL 21437005 at \*1 (S.D.N.Y. June 18, 2003) (Peck, M.J.); *cf. Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at \*12 (S.D.N.Y. July 21, 2000) (Peck, M.J.) *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.12,

2001) (Wood, D.J.). Because the alleged acts about which Muhammad complains took place in May 1997, the filing of an amended complaint on February 21, 2003 came long after the expiration of the three-year limitations period.

B. *The Relation Back Doctrine*
**[9]** Where a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time-barred if it "relates back" to a timely filed complaint. *See* Fed.R.Civ.P. 15(c). The rule allows amendments to relate back to the date of original filing for purposes of the statute of limitations in appropriate circumstances "to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitation defense." Fed.R.Civ.P. 15 Advisory Committee Notes (1991). Federal Rule of Civil Procedure 15(c) provides:

(c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

**\*19** (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint [*i.e.,* 120 days], the party to be brought in by amendment

(A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and

(B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The delivery or mailing of process to the United States Attorney, or United States Attorney's designee, or the Attorney General of the United States, or an agency or officer who would have been a proper defendant if named, satisfies the requirement of subparagraphs (A) and (B) of

this paragraph (3) with respect to the United States or any agency or officer thereof to be brought into the action as a defendant.

Fed.R.Civ.P. 15(c). Thus, "[t]hree requirements must be met under Rule 15(c) for an amended complaint that names a new party to be deemed to relate back to the original timely complaint: (i) both complaints must arise out of the same conduct, transaction, or occurrence, (ii) the additional defendant must have been omitted from the original complaint by mistake, and (iii) the additional defendant must not be prejudiced by the delay." *S.E.C. v. Montle,* No. 02–6115, 65 Fed. Appx. 749, 754, 2003 WL 21182299 at *3 (2d Cir. May 16, 2003); *accord, e.g., VKK Corp. v. National Football League,* 244 F.3d 114, 128 (2d Cir.2001); *Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 35 (2d Cir.1996); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *13–14 (S.D.N.Y. July 21, 2000)* (Peck, M.J.), *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.12, 2001) (Wood, D.J.); *Byrd v. Abate,* 964 F.Supp. 140, 144–45 (S.D.N.Y.1997); *William H. McGee & Co., v. M/V Ming Plenty,* 164 F.R.D. 601, 604–05 & n. 3 (S.D.N.Y.1995) (Griesa, D.J. & Peck, M.J.).

Muhammad's amendment to add a claim against defendant Baltuch meets these requirements.[43]

[43]    As a preliminary matter, defendants do not dispute that the original complaint was timely. (*See* page 11 fn. 14 above.)

### 1. *Arising Out of the Same Conduct*

The first factor is easily satisfied, since the claim against defendant Baltuch clearly arises out of the same conduct referred to in the original complaint—the Tier III disciplinary hearing. Indeed, the original complaint contains Muhammad's claim against his hearing assistant, but merely failed to name Baltuch as that assistant. (Dkt. No. 2: Compl. ¶ 4 "Statement of Claim.")

### 2. *Notice*

Defendant Baltuch has not submitted an affidavit on this motion, and so the Court cannot determine if he received actual notice of the allegations in the original complaint within the applicable limitations period. Although Muhammad made several allegations regarding his Tier III disciplinary hearing assistant without specifically naming Baltuch (Dkt. No. 2: Compl. ¶ 4 "Statement of Claim"),

it is possible that defendant Baltuch did not receive *actual* notice of Muhammad's suit until he was served with the amended complaint on March 27, 2003, almost three years after the expiration of the limitations period (*see* Dkt. No. 35: U.S. Marshall's Process Receipt & Return of Service). Actual notice is irrelevant here, however, since Baltuch had "constructive notice."

***20**    "Under the constructive notice doctrine, 'the court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the officials originally sued, so long as there is some showing that the attorney[s] knew that the additional defendants would be added to the existing suit.' " *Scott v. Coughlin,* 944 F.Supp. 266, 270 (S.D.N.Y.1996) (quoting *Velez v. Koehler,* 87 Civ.2019, 1991 WL 130913 at *2 (S.D.N.Y. July 18, 1991)), *vacated on other grounds,* 138 F.3d 474 (2d Cir.1998); *see also, e.g., Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (in deciding whether the government attorney possessed the requisite knowledge, the question is whether the attorney "knew or should have known that the defendants ... would be named"); *Mosley v. Jablonsky,* 209 F.R.D. 48, 53 (E.D.N.Y.2002); *Almeda v. City of New York,* No. 00–CV–1407, 2001 WL 868286 at *3 (E.D.N.Y. July 26, 2001); *Mills v. Fenger,* No. 98–CV– 0034, 2001 WL 135824 at *3 (W.D.N.Y. Feb. 15, 2001); *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *15 (S.D.N.Y. July 21, 2000) (Peck, M.J.) (warden's "attorney is the same as that of the other defendants ... and thus notice may be imputed"), *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar.21, 2001) (Wood, D.J.); *Gonzalez v. Officer in Charge of Barber Shop on Duty on May 13, 1999,* 99 Civ. 3455, 2000 WL 274184 at *5 (S.D.N.Y. Mar.13, 2000) ("notice to [added defendant] may be imputed through the Attorney General's office, which represents both [added defendant] and the previously named defendants"); *Blaskiewicz v. County of Suffolk,* 29 F.Supp.2d 134, 139 (E.D.N.Y.1998); *Byrd v. Abate,* 964 F.Supp. 140, 146 (S.D.N.Y.1997) ("Notice of a lawsuit can be imputed to a new defendant state official through his attorney, when the attorney also represents the officials originally sued."); *Samuels v. Dalsheim,* 81 Civ. 7050, 1995 WL 1081308 at *14 (S.D.N.Y. Aug.22, 1995) ("[W]hen both original and added defendants are state officials who are represented by the same attorney, a court can find that the added defendants received constructive notice of the action through their attorney which satisfies Rule 15(c)."; "It is sufficient for the purpose of constructive notice that ... defendants' counsel knew or should have known that a particular category of defendants would be

added to the action, without necessarily knowing the actual identity of each defendant to be added.").

The doctrine of constructive notice applies to Muhammad's claim against Baltuch, satisfying the notice factor. As a DOCS employee, defendant Baltuch is entitled to representation by the Attorney General of the State of New York, whose office is representing Baltuch and all of the other defendants in this case. (*See, e.g.,* Dkt. No. 38: Singleton Aff. ¶ 1; Dkt. No. 51: State Mot. to Dismiss Br.) Muhammad's original complaint clearly made a claim against the unnamed counselor who Muhammad claimed provided ineffective assistance during the Tier III disciplinary hearing: "I got a ... Counselor from D-state who didn't know a thing about his duties or my rights so I was denied basic meaningful aid." (Dkt. No. 2: Compl. ¶ 4 "Statement of Claim"); DOCS "ordered the asst .... back to this writer. Let me be completely clear[:] at our [first] meeting the asst. never ascertained if I was in-fact whom he was to assist ..." (Compl. Attach. at 1); the assistant failed "to ascertain certain things about me[:] if I speak, read & understand English, did I understand the [severity] of the charge(s)[,] which he did not even know was his job" (*id.*); "he allowed the keypunch spec[ialist] Betty E. to decide that I couldn't have the documentary-evid[ence] requested so I could mount a mean [ ]ingful defense" (*id.* at 1–2). The Amended Complaint merely added defendant Baltuch's name to the allegations.

**\*21** The Assistant Attorney General has appeared and vigorously litigated the case on behalf of the originally named defendants since the onset of the litigation. From that time, the Assistant Attorney General was on notice to prepare a defense for the unnamed—but easily identifiable (from the "Assistant Form" relating to the hearing, *see* Dkt. No. 38: Singleton Aff. Ex. F; and the "Hearing Record Sheets, *id.* Ex. G)—assistant mentioned in Muhammad's original complaint. The facts and the law pertaining to defendant Baltuch's defense to the due process claim are closely related to that of the other defendants, and Baltuch will not be prejudiced in maintaining a defense on the merits.

### 3. *Mistake*

The meaning of "mistake" takes on a particular definition in the context of pro se litigation. *See, e.g., Soto v. Brooklyn Corr. Facility,* 80 F.3d 34, 36–37 (2d Cir.1996) (a "mistake" includes mistakes of fact or law and specifically including where plaintiff did not know that he needed to name the individual defendants); *Mills v. Fenger,* No. 98–CV–0034, 2001 WL 135824 at \*2 (W.D.N.Y. Feb. 15, 2001); *Gonzalez*

*v. Officer in Charge of Barber Shop on Duty on May 13, 1999,* 90 Civ. 3455, 2000 WL 274184 at \*4 (S.D.N.Y. Mar.13, 2000); *Robinson v. Matos,* 97 Civ. 7144, 1999 WL 225938 at \*4 (S.D.N.Y. Apr.19, 1999); *Thomas v.. Arevalo,* 95 Civ. 4704, 1998 WL 427623 at \*14–15 (S.D.N.Y. July 28, 1998) (Sotomayor, D.J.); *Byrd v. Abate,* 964 F.Supp. 140, 145–47 (S.D.N.Y.1997). Here, Muhammad needed to obtain the assistant's name from DOCS and he initially was unsuccessful because as a pro se he did not have the ability to conduct an adequate investigation. [44] His failure to name Baltuch as a defendant until the filing of the amended complaint is a "mistake" that satisfies the third factor of the relation-back rule. *See, e.g ., Valentin v. Dinkins,* 121 F.3d 72, 75 (2d Cir.1997).

[44]    Furthermore, Muhammad alleges that not only was the information uniquely within the knowledge of DOCS, but also that his inability to obtain the name of the assistant was due to DOCS' "game-playing ... it was good ole [DOCS] employees who told me the wrong info[rmation]." (Dkt. No. 56: Muhammad Response to Defs.' Mot. to Dismiss ¶ 1 at 1.)

Because Muhammad's amended complaint satisfies the three factors in Rule 15(c), the Court rules that it relates back to the original complaint. Therefore, Muhammad's claim against defendant Baltuch is not time-barred. Defendant Baltuch's motion to dismiss is denied.

### *CONCLUSION*

For the reasons set forth above: (1) Muhammad's free exercise and conspiracy claims are dismissed without prejudice for failure to exhaust administrative remedies; (2) defendants' summary judgment motion on Muhammad's due process claim is denied due to lack of evidence in the record and issues of material fact in dispute; (3) defendants Sgt. Dolan and Lt. Connolly are granted summary judgment dismissing Muhammad's due process claim for lack of personal involvement; (4) defendant Easter's motion to dismiss Muhammad's due process claim is denied; and (5) defendant Baltuch's motion to dismiss Muhammad's due process claim is denied because the amended complaint relates back to the timely filed original complaint.

The case will proceed to trial in the Fall on plaintiff Muhammad's *Sandin* disciplinary due process claim against defendants Pico, Selsky, Easter, and Baltuch.

2003 WL 21792158

**\*22** The Court previously approved Muhammad's application for pro bono counsel. The Court's Pro Bono Office is directed to make further efforts to obtain pro bono trial counsel for Muhammad.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 21792158

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Webster v. Fischer,  N.D.N.Y.,  March 9, 2010

KeyCite Overruling Risk - Negative Treatment

Overruling Risk  Pearson v. Callahan,  U.S.,  January 21, 2009

2005 WL 755745
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony G. GILL, Plaintiff

v.

William RIDDICK, Senior Counselor, Mohawk
Corr. Fac.; T. Brown, Sergeant, Mohawk Corr.
Fac.; J. Rosado, Deputy Supt. of Health Care,
Mohawk Corr. Fac.; K. Adamik, Lieutenant,
Mohawk Corr. Fac.; Kenneth Perlman, Supt.,
Mohawk Corr. Fac.; D. Malloni, C.O., Mohawk

Corr. Fac.; C.O. Cacocutti, [1] C.O., Mohawk Corr.

Fac.; G. Watson, C.O., Mohawk Corr. Fac.; K.
Saxena, M.D., Mohawk Corr. Fac., Defendants.

[1]     Defendants in form this Court that this
Defendant's name is misspelled on the
Amended Complaint and that the correct
spelling is "Cacciotti." Dkt. No. 20 (Defs.'
Mem. of Law at p. 1). The Court will refer to
this Defendant by the correct spelling and will
direct the Clerk of the Court to correct the
docket report.

No. Civ. 9:03-CV-1456.
|
March 31, 2005.

**Attorneys and Law Firms**

Anthony G. Gill, Livingston Correctional Facility, Sonyea,
New York, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New
York, The Capitol, Litigation Bureau, Albany, New York, for
Defendants, of counsel.

Lisa Ullman, Assistant Attorney General, of counsel.

*REPORT-RECOMMENDATION and ORDER*

TREECE, Magistrate J.

**\*1**  Plaintiff Anthony Gill brings this *pro se* action,
pursuant to 42 U.S.C. § 1983, alleging the Defendants
violated his civil rights. Dkt. No. 5, Am. Compl. In his
Amended Complaint, Gill alleges eight causes of action: (1)
Defendant Riddick, Senior Correction Counselor at Mohawk
Correctional Facility (Mohawk), filed a false misbehavior
report against Plaintiff in retaliation for Gill exercising a
First Amendment right; (2) Defendant T. Brown, Sergeant
(Sgt.) at Mohawk, filed a false misbehavior report against
Plaintiff in retaliation for Gill exercising a First Amendment
right; (3) Defendant K. Adamik, Lieutenant (Lt.) at Mohawk,
denied Gill his due process rights at a Tier II Disciplinary
Hearing; (4) Defendant J. Rosado, Deputy Superintendent of
Health at Mohawk, acted in concert with Defendants Riddick,
Brown, and Adamik; (5) Defendant D. Malloni, Correction
Officer (C.O.) at Mohawk, intentionally destroyed and/or
tampered with Plaintiff's legal mail; (6) Defendant Kenneth
Perlman, Supervising Superintendent of Mohawk, failed to
render a decision on Gill's appeal of his Tier II Hearing
disposition; (7) Defendants Cacciotti and G. Watson, C.O.s
at Mohawk, subjected Gill to cruel and unusual punishment
when, while en route to another facility, they denied Gill the
opportunity to use the bathroom causing Plaintiff to urinate
on himself, which was responded to with further taunting
and humiliation; and (8) Defendant Kailash Saxena, Clinical
Physician II, M.D., at Walsh Regional Medical Unit (Walsh or
RMU), acted in concert with Defendants Adamik and Riddick
and transferred Gill to another facility in retaliation for his
exercise of a First Amendment right and to cover up the
constitutional violations of the other Defendants.

Defendants filed a Motion to Dismiss, pursuant to FED. R.
CIV. P. 12(b)(6), on the ground that Plaintiff's Amended
Complaint fails to state a cause of action. Dkt. Nos. 20
(Motion) & 28 (Reply). Plaintiff opposes the Motion. Dkt.

No. 23. [2]  For the reasons explained below, it is recommended
that Defendants' Motion be granted in part and denied in part.

[2]     This matter was referred to the undersigned for
a report-recommendation pursuant 28 U.S.C. §
636(b) and N.D.N.Y.L.R. 72.3(c).

## I. MOTION TO DISMISS STANDARD

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997). On a motion to dismiss, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

 **\*2** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler,* 373 U.S. 647, 648 (1963) (inferring facts from allegations of complaint). In construing the complaint favorably to the pleader, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *see also Scheuer v. Rhodes,* 416 U.S. at 236; *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). In spite of the deference the court is bound to give to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

The Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

' *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (citing, *inter alia, Haines v. Kerner,* 404 U.S. 519, 520-21) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean,* 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing Second Circuit opinion in *Davidson v. Flynn,* 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davidson* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan,* 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun. 11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky,* 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan. 10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district). As the Second Circuit has noted, Anthony Gill, the Plaintiff herein is no stranger to the courts. *See Gill v. Pidlypchak* 389 F.3d 379, 384 (2d Cir.2004) (noting that the plaintiff therein, Anthony G. Gill, "is no stranger either to the grievance system or to the federal courts"). In light of Gill's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein. [3]

3        Gill has filed twenty (20) lawsuits in this district alone:

        (1) *Gill v. LeFevre,* 85-cv-1534 (HGM/RWS) (closed on Jan. 17, 1992-failure to prosecute);

        (2) *Gill v. Padilla,* 88-cv-147 (NPM/RWS) (closed on Mar. 26, 1992-failure to prosecute);

        (3) *Gill v. Burch,* 94-cv-369 (FJS/DNH) (closed on Apr. 1, 1999-Defts.' Mot. for Summ. J. granted);

        (4) *Gill v. Kramer,* 98-cv-45 (FJS/GJD) (closed on Sept. 27, 1999-Stip. of Discont.);

        (5) *Gill v. Anderson,* 98-cv-1472 (LEK/GLS) (closed on Mar. 3, 2003-Defts.' Mot. for Summ. J. granted);

        (6) *Gill v. Gummerson,* 99-cv-761 (NAM/DEP) (closed on Aug. 20, 2003-Jury Verdict for Defts.);

(7) *Gill v. Dann,* 00-cv-566 (NAM/RFT) (closed on Nov. 20, 2001-failure to prosecute);

(8) *Gill v. Tuttle,* 00-cv-585 (DNH/DRH) (currently stayed);

(9) *Gill v. Doe,* 00-cv-983 (GLS/DEP) (closed on June 8, 2004-Defts.' Mot. for Summ. J. granted);

(10) *Gill v. Calescibetta,* 00-cv-1553 (LEK/DEP) (closed on Aug. 5, 2004-frivolous action);

(11) *Gill v. McGinnis,* 00-cv-1787 (LEK/RWS) (*habeas corpus* petition transferred to S.D.N.Y. on Dec. 19, 2000);

(12) *Gill v. Smith,* 00-cv-1905 (FJS/GJD) (currently pending, trial date to be set);

(13) *Gill v. Butero,* 01-cv-82 (LEK/DRH) (closed on Apr. 30, 2003-Defts.' Mot. to Dismiss granted at trial);

(14) *Gill v. Hoadley,* 01-cv-323 (FJS/DEP) (currently pending);

(15) *Gill v. Steinberg,* 02-cv-82 (DNH/DEP) (closed on Feb. 19, 2004-Stip. of Discont.);

(16) *Gill v. Pflueger,* 02-cv-130 (DNH/GJD) (closed on Jan. 30, 2003-Defts.' Mot. to Dismiss granted);

(17) *Gill v. Coyne,* 02-cv-1380 (TJM/GHL) (currently pending);

(18) *Gill v. Pidlypchak,* 02-cv-1460 (JMH/RFT) (currently pending);

(19) *Gill v. Erickson,* 02-cv-1573 (LEK/RFT) (transferred to S.D.N.Y. on Jan. 21, 2003);

(20) *Gill v. Riddick,* 03-cv-1456 (NAM/RFT) (currently pending).

In light of Gill's litigious track record, as stated above, and the Second Circuit's explicit recognition that Gill has stepped into that rare status for inmate litigants as being deemed not entitled to "special solicitude," we place both parties on notice that FED. R. CIV. P. 11 sanctions may be applicable, when warranted, for any future litigation pursued by Gill. However, Rule 11 sanctions will not be considered for this case.

## II. BACKGROUND

**\*3** The following facts are derived from the Amended Complaint, which on a motion to dismiss this Court must construe as an accurate depiction of what took place. Due to the complexity of the facts involved and the numerous Defendants and claims asserted, the Court shall recite

the relevant factual averments, set forth in the Amended Complaint, as it pertains to Gill's separate claims. As a general statement relevant to all claims, the Court notes that on or about June 10, 2002, Gill was transferred from Elmira Correctional Facility to the Walsh Regional Medical Unit (Walsh or RMU). [4] Dkt. No. 5, Am. Compl. at ¶ 1. Gill believed that this transfer was due to his chronic asthmatic medical condition. *Id.* Upon admission to Walsh, Gill was housed in the general population medical unit, C-wing, room C2B3-03, and was informed by Defendant Saxena that he was indeed transferred to Walsh due to his asthma condition and would remain there until his scheduled parole board appearance in July 2003. *Id.* at ¶ 2.

[4]     Walsh Medical Center is a regional medical unit located on the grounds of Mohawk Correctional Facility. N.Y. COMP.CODES R. & REGS. tit. 7, § 100.100.

Retaliation Claims Against Defendants Riddick, Brown, and Rosado-First, Second, and Fourth Causes of Action

Walsh RMU has a "Problem Solving Committee" chaired by prison officials and inmate representatives from each living unit. Am. Compl. at ¶ 3, Ex. A, Vander Bosch Aff. [5] at ¶ 3. The inmate representatives are selected by patient/residents of the respective living units, *i.e.,* A-wing, C-wing. *Id.* The C-wing at Walsh is divided into two separate living units, C-1 and C-2. Vander Bosch Aff. at ¶ 4. In the past, C-wing was permitted two inmate/patient representatives, one from the C-1 and one from C-2 living areas, to represent the C-wing before the Problem Solving Committee. Am. Compl. at ¶ 3; Vander Bosch Aff. at ¶ 5. At the time Gill was transferred to Walsh RMU, the C-wing only had one representative, inmate Samuel Kelly, who resided in the C-1 section. Am. Compl. at ¶ 3; Vander Bosch Aff. at ¶ 6. Having no general or formal election procedures, the residents of the C-2 area approached Gill and collectively asked that he act as the C-2 Problem Solving Committee representative and work in conjunction with the C-1 representative. Am. Compl. at ¶ 3; Vander Bosh Aff. at ¶ 8. After a majority of the patient/residents in the C-2 living area of the C-wing selected Gill as the C-2 representative, Gill accepted such position. Am. Compl. at 3; Vander Bosh Aff. at ¶¶ 9-11.

[5]     Exhibit A, attached to Plaintiff's Amended Complaint, consists of affidavits of eight inmates all housed at Walsh, in the C-wing, during the relevant time. The Court has reviewed the contents

of each affidavit and finds that they generally contain the same information sans names, living assignment, and time spent at Walsh. In light of the fact that the affidavits generally contain the same material information, the Court will, in the interest of expedience, make reference to the first Affidavit submitted by Joseph Vander Bosch. It should be noted that in citing to Mr. Vander Bosch's Affidavit, this Court makes no credibility nor reliability assessments with regard to this Affidavit as being more credible than the other seven Affidavits.

On or about September 1, 2002, Gill discussed his selection as the C-2 representative with Defendant Rosado. Am. Compl. at ¶ 8. On or about September 4, 2002, per the direction of Defendant Rosado, Gill submitted an agenda for the upcoming September 2002 Problem Solving Committee meeting. Am. Compl. at ¶ 4; Ex. B (typed agenda). The agenda, which contained multiple issues that were reviewed and approved by the residents of C-wing, was forwarded to Defendants Rosado and Riddick.[6] Am. Compl. at ¶ 4. Plaintiff also attached to the agenda a memorandum he wrote to Defendant Riddick, dated August 29, 2002, notifying the recipients that he had been selected as the C-2 representative and would work in conjunction with the C-1 representative, Mr. Kelly. *Id.,* Ex. B. On or about September 5, 2002, Defendant Riddick provided Plaintiff with a copy of the August 21, 2002 Problem Solving Committee meeting minutes.[7] Am. Compl. at ¶ 5, Ex. C (Memorandum of Minutes of Aug. 21, 2002 Meeting addressed to "All Concerned" from Defendant Riddick).

[6]    Gill also asserts he hand delivered the agenda to Mr. Pryor who is not a Defendant in this action. Am. Compl. at ¶ 4, n. 1.

[7]    It is unclear, and no inference can be drawn one way or another, whether the minutes were provided to Gill in his capacity as representative or as a general circulation given to all resident inmates.

**\*4**  On or about the morning of September 7, 2002, Gill asked Defendant Brown about a recent memorandum posted by prison officials concerning the Walsh yard staying open until 11:00 p.m., as well as other issues concerning C-wing. Am. Compl. at ¶ 6. In response, Defendant Brown stated that Gill should mind his business and not be concerned about inmate activities. *Id.* at ¶ 7. Gill then informed Defendant Brown that he had been selected as the C-2 representative to the Problem Solving Committee and C-wing patients had asked him to

inquire about their privileges since the posted memorandum was not being honored. *Id.* When Defendant Brown inquired how Plaintiff obtained such representational status, Gill disclosed his previous September 1st conversation with Defendant Rosado who accepted Plaintiff's appointment. *Id.* at ¶ 8. After Gill provided Brown with a copy of his August 29th Memorandum, Brown informed Gill that he would check into the yard matter. *Id.*

On or about September 10, 2002, Gill and inmate Kelly, C-1 representative, met with Defendant Riddick in the C-wing yard to discuss issues presented in the September 2002 proposed agenda. *Id .* at ¶ 9. During this meeting, Gill asked Defendant Riddick if the agenda he submitted had been circulated and also inquired as to the date of the upcoming meeting. *Id.* Defendant Riddick responded that there wasn't going to be a meeting until prison officials saw fit and that at no time in the past did the living units have two inmate representatives as one was sufficient. *Id.* at ¶ 10. Riddick also declared that the agenda was too demanding and that Plaintiff would be subjected to disciplinary action for filing the agenda on the basis that he was submitting legal work on behalf of the inmates in C-wing. *Id.* The following day, Gill wrote Defendant Rosado about the encounter with Defendant Riddick and requested Defendant Rosado to confirm, based on their previous September 1st conversation, whether she now disapproved of Plaintiff's selection as the C-2 representative. *Id.* at ¶ 11, Ex. D (typed letter). Defendant Rosado did not respond to Gill's inquiries.[8] *Id.*

[8]    Gill states that upon information and belief, inmate Kelly also wrote a letter to Defendant Rosado regarding Defendant Riddick's disapproval of Gill's selection. Am. Compl. at ¶ 11, n. 3. Plaintiff did not submit Kelly's letter but did attach a memorandum from Defendant Rosado to Kelly in response to Kelly's correspondence dated September 6, 2002. *Id.,* Ex. E. In this correspondence, Rosado states, "[t]he correct procedure for an inmate to represent his unit on the problem solving committee is to be elected by his peers [and][t]his procedure is overseen by the Guidance Counselor." *Id.* Gill asserts that Rosado's response to Kelly established for the first time a new policy on how an inmate can become an inmate representative to the Problem Solving Committee. *Id.*

On or about September 12, 2002, Gill was issued two separate disciplinary reports authored by Defendants Brown

and Riddick. *Id.* at ¶ 12, Ex. G (misbehavior reports). In his report, dated September 11, 2002, Defendant Brown relayed the substance of his September 7th encounter with Plaintiff, which was in accord with Plaintiff's account, as described above. *Id.* Defendant Brown further stated that, after his encounter with Gill, he wrote to Defendant Riddick to confirm Gill's representations to which Riddick responded in a written statement that Gill was not the Problem Solving Committee representative. [9] *Id.* Brown accused Plaintiff of violating prison rule 107.20 (lying) and 110.10 (impersonation). Defendant Riddick's report, dated September 10 or 11, 2002, [10] recounts the encounter between himself and Gill on September 10th in the C-wing outside recreation area, however, such report is not in accord with Plaintiff's version. According to Riddick's report, while Riddick was sitting talking with other inmates in the yard, Gill approached him in an aggressive manner, stood over him, and demanded certain information about the Walsh Problem Solving Committee. Riddick replied that, as he told him throughout the week, Gill is not an inmate representative. *Id.* Riddick claimed that Gill then became loud, stating "you're a racist. You know I file lawsuits and that's why you oppose me as a representative. I am a rep until Administration says otherwise." *Id.* In his report, Riddick asserted that Gill's loud aggressive speech attracted the attention of the other inmates in the yard. *Id.* Defendant Riddick accused Plaintiff of violating rules 107.11 (harassment) and 104.13 (disturbance). *Id.*

[9]   Brown asserts in his report that he attached to the report a copy of Riddick's written statement, however, such statement was not included as an exhibit to Plaintiff's Amended Complaint. Plaintiff asserts that at his disciplinary hearing he requested Riddick's written statement, which was not produced. Am. Compl. at ¶¶ 14 & 17.

[10]   It is unclear whether the report is dated September 10th or 11th.

**\*5**  Plaintiff believed that these reports were false and were filed as retaliation for Plaintiff exercising his right to make oral requests and for filing his grievance agenda for the Problem Solving Committee to address at an upcoming meeting. *Id.* at ¶ 13. Plaintiff filed institutional grievances against Defendants Brown and Riddick for the filing of false disciplinary reports in retaliation for Plaintiff exercising his right to redress grievances to the Problem Solving Committee. *Id.* at ¶ 13, n. 4, Ex. F (grievance).

Due Process/Retaliation Claims Against Defendants Adamik and Rosado-Third and Fourth Causes of Action
The disciplinary reports authored by Defendants Riddick and Brown were consolidated and a Tier II Hearing on both reports commenced on September 16, 2002, with Defendant Adamik presiding as hearing officer. Am. Compl. at ¶ 14. Gill pleaded not guilty to all charges. *Id.* Plaintiff requested witness testimony from Defendants Brown, Riddick, and Rosado, C.O. Swanson, and inmates Kelly and Cruz. *Id.* Plaintiff also requested document production, specifically, the letter sent by Defendant Brown to Defendant Riddick, as referenced in Brown's misbehavior report, as well as any Walsh RMU written policies disclosing the procedures for inmate elections as Problem Solving Committee representative. *Id.* After Gill testified on his own behalf, [11] the hearing was adjourned "for witnesses and document production." *Id.* at ¶ 15. On or about September 18, 2002, testimony was procured from inmates Kelly and Cruz, C.O. Swanson, and Defendant Brown. Inmates Kelly and Cruz testified that they were present in the C-wing yard on September 10, 2002, and witnessed the encounter between Defendant Riddick and Gill. *Id.* at ¶ 16. Both inmates asserted that Gill did not at any time harass or create a disturbance. *Id.* Inmate Kelly further testified that throughout the duration of his confinement at Walsh, each housing unit had two inmate representatives and that there hadn't been any "elections" for approximately five years. *Id.* C.O. Swanson testified on Gill's behalf and stated that, on September 10, 2002, he was employed as the "A-man" on C-wing and at no time was he informed by Defendant Riddick, or anyone else, that Plaintiff harassed Riddick or created a disturbance in the yard. Defendant Brown testified about the letter he wrote to Defendant Riddick but could not produce a copy of such letter.

[11]   In his Amended Complaint, Gill asserts the sum and substance of his testimony was as follows:

    [P]er [plaintiff's] September 1, 2002, conversation with defendant Rosado about plaintiff being selected as the C-2 inmate Problem Solving Committee representative by his peers, that there was no disapproval of this selection and that defendant Riddick had in fact provided plaintiff with the August 2002 Problem Solving Committee minutes ... and that on information and belief, there hasn't been an election held within the past five years to elect representatives. Further, that

plaintiff never violated the alleged prison rules violation authored by the named defendants. Am. Compl. at ¶ 15.

On the same date, that is September 18 th, Gill submitted a formal complaint to Defendant Perlman to have Defendant Adamik removed from his role as hearing officer due to his prejudice and failure to conduct a fair and unbiased hearing. *Id.* at ¶ 19, Ex. H (typed complaint). In sum Gill complained that during the hearing when he and Adamik disagreed on an issue, Gill stated he would appeal that issue to which Adamik responded "you can appeal this issue, but you're going to los[e]." *Id.* Gill asked Defendant Perlman to assign a different officer to conduct the hearing. *Id.* Defendant Perlman did not respond to Gill's September 18 th complaint. *Id.* On September 27, 2002, Defendant Brown approached Gill at his living quarters and stated, "next week you'll be locked up, just because you requested for Dep. Rosado as a witness, you think she'll testify for you. You're guilty, accept it, you're in a no win situation. You keep filing fucking grievances around here you'll be locked up until July, smart ass jailhouse lawyer." *Id.* at ¶ 20. Later that day, Gill filed a grievance against Defendants Brown and Adamik for collusion regarding Gill's disciplinary hearing and asked that Adamik be removed as hearing officer. *Id.* at ¶ 21, Ex. I (typed grievance).

 **\*6** On or about October 1, 2002, Plaintiff's hearing was set to continue but was briefly adjourned so Gill could retrieve his documents. *Id.* at ¶ 22. Upon his return to the hearing with his documents in hand, Gill witnessed Defendants Adamik, Rosado, and Riddick exiting a room adjacent to the hearing office. *Id.* at ¶ 23. It appeared to Gill as though the three had been in a conference behind closed doors prior to the re-commencement of his hearing. *Id.* When the hearing re-convened, Gill attempted to place on the record what he had witnessed with respect to these Defendants conversing in a separate room, however, Defendant Adamik prevented Plaintiff from placing such information on the record and arbitrarily dismissed Defendant Rosado as Plaintiff's witness and proceeded instead with the testimony of Defendant Riddick.[12] *Id.*

[12]    Gill asserts that Defendant Riddick supplied contradictory testimony that did not support his written report. Am. Compl. at ¶ 23.

At the conclusion of Gill's hearing, on October 1, 2002, Defendant Adamik found Plaintiff guilty of all charges and

sentenced Plaintiff to thirty (30) days keeplock confinement with corresponding loss of privileges, recreation, telephone, packages, and commissary. *Id.* at ¶ 24, Ex. G. Plaintiff's sentence was set to run from October 1 st through October 31 st. *Id.* In his hearing disposition statement, Defendant Adamik stated the evidence he relied upon was the misbehavior reports and testimony rendered by Gill, Brown, inmates Kelly and Cruz, C.O. Swanson, and Riddick. *Id.,* Ex. G. Adamik further stated that Rosado was dismissed in the middle of the hearing due to Gill's refusal to ask questions when instructed. *Id.*

### Due Process and First Amendment Claims Against Defendants Malloni and Perlman-Fifth and Sixth Causes of Action

On October 2, 2002, Plaintiff had his Tier II Hearing Appeal notarized by the facility's law library officer. Am. Compl. at ¶ 25. The following morning, Plaintiff issued Defendant Malloni his appeal in a sealed envelope addressed to Superintendent Perlman, with the belief that Defendant Malloni would deposit Plaintiff's mail accordingly. *Id.* at ¶ 26, Ex. J (copy of typed and notarized appeal). As of October 24, 2002, more than fifteen days had elapsed since the filing of Gill's appeal and Defendant Perlman had still failed to render a decision on such appeal. *Id.* at ¶ 34. On or about April 15, 2003, while incarcerated at Five Points Correctional Facility, Gill received a memorandum decision from Captain Bellnier stating that Defendant Adamik's October 1 st Tier II Hearing Decision had been reversed and all hearing records were expunged. *Id.* at ¶ 40, Ex. N.

### Eighth Amendment Claims Against Defendants Watson and Cacciotti-Seventh Cause of Action

On or about October 17, 2002, Plaintiff was transferred from Walsh RMU back to Elmira Correctional Facility. Am. Compl. at ¶ 27. At approximately 9:30 a.m., on October 17 th, Gill was escorted to the transporting vehicle by Defendants Watson and Cacciotti. *Id* . at ¶ 28. At approximately 11:00 a.m., while en route to Elmira, Gill informed Watson and Cacciotti that he needed to urinate. *Id.* at ¶ 29. Both Defendants laughed and dismissed Gill's request. *Id.* Plaintiff then urinated on himself. *Id.* When he informed Defendants of his condition, Defendant Cacciotti replied, "Howard Stern would love you on his show." *Id.* Defendants then pulled into a mini-mart gas station at which time Plaintiff again requested use of the facility to relieve himself; such request was again denied. *Id.* at ¶ 31. Plaintiff was unable to control himself and

urinated on himself for a second time. *Id.* When Gill reported his condition to Defendants, Defendant Cacciotti replied, "I don't care if you shit on yourself." *Id.* Plaintiff arrived at Elmira at approximately 12:10 p.m.

Retaliation Claim Against Defendant Saxena-Eighth Cause of Action

**\*7** On or about November 12, 2002, while confined at Elmira, Plaintiff's correction counselor informed Plaintiff that he had been transferred from Walsh for "medical reasons." *Id.* at ¶ 37. On or about December 11, 2002, Gill filed a grievance against Defendant Saxena for retaliatory transfer. *Id.* at ¶ 38, Ex. M (grievance). In his grievance, Gill stated that Saxena's transfer was retaliation for his exercise of his constitutional rights and Saxena conspired with other Walsh RMU officials to deny Gill his rights. *Id., Ex. M.* Gill also requested Saxena explain the medical reasons that led to his transfer. *Id.*

### III. DISCUSSION

#### A. Retaliation Claims

In Plaintiff's First, Second, Third, Fourth, and Eighth Causes of Action, Gill asserts that Defendants Riddick, Brown, Adamik, [13] Rosado, and Saxena retaliated against him for engaging in constitutionally protected activity and in doing so, violated his First Amendment rights as well as his Fourteenth Amendment Substantive Due Process rights.

[13]    In moving for dismissal, the Defendants have not construed a retaliation claim to have been asserted against Defendant Adamik. However, Plaintiff clearly states in his Amended Complaint that "the protected conduct was the substantial and motivating factor in the decision by defendant Adamik to punish and discipline plaintiff[ .]" Am. Compl. at ¶ 47.

The retaliatory actions vary with each Defendant. With regard to Defendants Riddick and Brown, the adverse action is the filing of false misbehavior reports; Defendant Adamik is alleged to have conspired with Defendants Riddick, Brown, and Rosado in rendering a guilty determination on both reports; Defendant Rosado acted in concert with Defendants Riddick, Brown, and Adamik; and Defendant Saxena transferred Gill to another facility.

First, with regard to Gill's assertion that Defendants Riddick and Brown filed false misbehavior reports against him, we note that prisoners have no constitutional right to be free from being falsely accused, and thus, the filing of a false report does not give rise to a constitutional violation *per se.* *Freeman v. Rideout,* 808 F.2d 949, 950 (2d Cir.1986) (holding that prison inmates do not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest[ ]"). Rather, the Constitution guarantees that such inmates will not be "deprived of a protected liberty interest without due process of law." *Id.* Thus, as long as the prison officials provided the inmate with procedural due process requirements, *i.e.,* a hearing and an opportunity to be heard, "the filing of unfounded charges d[oes] not give rise to A *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman,* at 953); *see also Wolff v. McDonnell,* 418 U.S. at 564-66. In the case at bar, however, Gill is asserting that Defendants Riddick and Brown filed false reports against him as *retaliation* for the exercise of a constitutional right and thus violated his substantive due process right, under the Fourteenth Amendment, as well as his First Amendment right. The Second Circuit has made it clear that an inmate has a substantive due process right not to be subjected to false misbehavior charges or be harassed in retaliation for the exercise of a constitutional right such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d at 587-90 (citing cases) ("Although our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, ... that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights."). Thus, we may properly proceed with an assessment of Gill's retaliation claims against these Defendants.

**\*8** To state a claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)); *see also Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (alleging false disciplinary report); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997) (alleging retaliatory transfers).

The Second Circuit has noted that retaliation claims are prone to abuse, therefore, courts should examine such claims "with skepticism and particular care." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003); *Dawes v. Walker,* 239 F.3d at 491 ("[V]irtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467-68 (S.D.N.Y.1998).

In *Flaherty v. Coughlin,* the Second Circuit described three different methods of pleading retaliation, each requiring separate analysis by the court. 713 F.2d 10, 13 (2d Cir.1983). First, a retaliation claim supported by "specific and detailed allegations" must be pursued with full discovery. *Id.* (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)). Whereas, a claim asserting retaliation in "wholly conclusory terms may safely be dismissed on the pleadings alone." *Id.* ("In such a case, the prisoner has no factual basis for the claim other than an adverse administrative decision and the costs of discovery should not be imposed on defendants."). The third situation involves a complaint alleging facts that give rise to a "colorable suspicion of retaliation." *Id.* This third type of case will support at least documentary discovery. *Id.; see also Carpio v. Walker,* 1997 WL 642543, at *6.

The first prong of a retaliation analysis requires this Court to assess whether Gill was engaged in constitutionally protected activity. In construing Gill's Complaint, it appears that the protected activity at issue is two-fold. On the one hand, Gill asserts he had a constitutional right to serve as the C-2 wing inmate representative to the Walsh Problem Solving Committee and to participate on that Committee without repercussion. On the other hand, Gill asserts that the filing of his "Grievance Agenda" and making oral complaints about the facility's procedures and enforcement therewith was the protected activity and the motivating factor for the retaliation he received. While the Defendants focus on the former theory, this Court finds that it is Gill's latter theory which saves his claim from dismissal at this juncture. Such theory is not raised for the first time in his opposition to the Defendants' Motion as Defendants suggest.[14] In fact, Gill makes multiple references in his Complaint to his filing a "Grievance Agenda" as well as making oral complaints which, in his estimation, served as the basis for the retaliatory backlash he received, namely, false reports, guilty determinations, and a facility transfer. Our assessment that the agenda and statements

are the primary constitutional activities at issue is further bolstered by Gill's assertion that Defendants Riddick, Brown, Rosado, and Adamik violated New York's Correction Law § 138, which states in pertinent part: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4). We now assess whether Gill has properly met the first prong of the retaliation analysis.

[14]    In their Reply, Defendants assert that Plaintiff, in his Opposition, "shifts his focus towards arguing that the retaliation against him was instead because he filed grievances, which defendants admit would be constitutionally protected conduct under the law." Dkt. No. 28, Defs.' Reply at p. 2. Defendants then point out that Plaintiff only mentions the filing of grievances in a footnote in his Amended Complaint. *Id.* It is this Court's estimation that Defendants have misconstrued, to some extent, Plaintiff's use of the word "grievance," in categorically stating that he shifted his focus. It is clear from both the Amended Complaint and Plaintiff's Opposition to Defendants' Motion that the "grievance" Plaintiff refers as the basis for the retaliatory acts is primarily the "grievance agenda" he submitted for the upcoming Problem Solving Committee meeting. That is not to say that the Plaintiff has not alleged, that the Grievance he filed against Defendant Riddick for threatening him with disciplinary conduct, attached to the Amended Complaint as Exhibit F, may also have played a role in the retaliatory actions. We only point out that Gill has not attempted to salvage his claims by asserting new theories in his Opposition papers.

*9  First, we address Gill's participation on the Problem Solving Committee, which Defendants assert is not protected conduct. While the Second Circuit has not definitively weighed in on the matter, other district courts throughout this Circuit have held that an inmate's participation as a member of a formal problem solving committee, such as the Inmate Grievance Resolution Committee (IGRC) or the Inmate Liason Committee (ILC), is protected activity. In *Alnutt v. Cleary,* 913 F.Supp. 160 (W.D.N.Y.1996), the court held that an inmate has a protected First Amendment right to "engage in his duties as IGRC representative without fear of reprisal or retaliation." 913 F.Supp. at 169. In reaching this determination, the court relied on a multitude of precedents establishing an inmate's protected right to seek redress for

grievances. First, the court began with the premise recognized by the Second Circuit in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988) that "prisoners must be permitted the 'free and uninhibited access' to both administrative and judicial forums for the purpose of seeking redress of grievances." *Id.* (quoting *Franco,* 854 F.2d at 589). The court then cited the following precedents amongst the district courts in this Circuit, as well as cases from sister Circuits, holding that petitioning for redress of grievances is protected activity:

> *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995) (inmate stated cause of action where he alleged retaliation as result of administrative complaint he filed against corrections officer); *Morrison v. Lefevre,* 592 F.Supp. 1052 (S.D.N.Y.1984) (inmate stated cause of action where he alleged retaliation, due, in part, to assistance he provided to other prisoners in filing lawsuits); *McCorkle v. Walker,* 871 F.Supp. 555 (N.D.N.Y.1995) (inmate stated a claim where he alleged that a prison nurse filed false charges against him in retaliation for his informing prison officials that she was nurse on duty when another inmate nearly drowned in infirmary); *Payne v. Axelrod,* 871 F.Supp. 1551 (N.D.N.Y.1995) (inmate stated cause of action where he alleged that a razor blade was planted in his cell in retaliation for reporting that a corrections officer set a fire in an inmate's cell); *Cale v. Johnson,* 861 F.2d 943 (6th Cir.1988) (inmate stated cause of action by alleging retaliation for complaining to associate warden concerning the poor quality of the food); *McDonald v. Hall,* 610 F.2d 16 (1st Cir.1979) (inmate stated cause of action where he alleged that he was transferred in retaliation for filing suits against prison officials, and for giving legal assistance to other inmates).

*Alnutt v. Cleary,* 913 F.Supp. at 169.

The court then noted that the *principles* established in the above cases "support the concept that [the inmate plaintiff] has a protected First Amendment right to engage in his duties as IGRC representative without fear of reprisal or retaliation." *Id.* (emphasis added). Then, after explaining the statutory evolution of the IGRC, the court noted that the inmates who filed grievances with the IGRC were exercising their First Amendment right to petition the government for redress of grievances and that "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Id.* at 169-70. As such, the court held that the inmate possessed a "constitutional right to be protected against retaliation by state officers who are not pleased with the activities engaged in and decisions made by [the inmate plaintiff] as IGRC representative." *Id.* Thus, it appears to this Court that an inmate's constitutionally protected right to serve as a grievance committee representative is derived from the inmates' protected rights to petition for redress. This derivative right has been upheld in other courts in this Circuit. *See Greene v. Coughlin,* 1995 WL 60020, at *15 (S.D.N.Y. Feb. 10, 1995) (analyzing, in the context of a procedural due process claim, whether an inmate had a liberty interest in maintaining position as IGRC representative and if certain procedures were mandated prior to removal from such position); *McCorkle v. Juchenwicz,* 1999 WL 163205, at *1 (S.D.N.Y. Mar. 23, 1999) (upholding an inmate's right to serve on the ILC and citing *Alnutt, inter alia,* in support of the ruling that "an inmate grievance committee representative has a constitutional right to seek redress of the grievances of other inmates without fear of retaliation"); *Maurer v. Patterson,* 197 F.R.D. 244, 247 n. 3 (S.D.N.Y.2000) (noting, in the context of deciding a Rule 50 motion for judgment as a matter of law, that an inmate has a protected right to engage in duties as IGRC representative); *Garrett v. Reynolds,* 2003 WL 22299359, at *4 (N .D.N.Y Oct. 7, 2003) (citing *Alnutt* for the proposition that an inmate has a "constitutional right to be protected from retaliation based upon his activities as an IGRC representative").

**\*10** Thus, in construing *Alnutt,* we find that prisoners have a constitutional right to serve as a grievance committee representative. While other courts have limited the *Alnutt* holding to participation on the IGRC and ILC, we do not believe the reasoning applied therein supports such limitation in the case at bar. [15] If an inmate's right to serve on a "formal" committee, like the IGRC, is derived from an inmate's right to

seek redress of grievances, and not from the "formal creation" or state mandate of the committee, then it cannot be said that such right is solely limited to activities on a formal resolution committee.[16] It would be more consistent to rule that an inmate serving on an "informal" grievance committee would also be entitled to constitutional protection since he would be performing the same tasks as a representative on a formal committee, such as the IGRC.[17] The difference between formal and informal grievance committees is a distinction without form or reason. This leads us to an analysis of the other protected activity Gill asserts was the basis for retaliatory conduct imposed on him, that is, his filing of the grievance agenda and making oral complaints. We find that such conduct is clearly protected. *See McCorkle v. Walker*, 871 F.Supp. 555, 559 (N.D.N.Y.1995) (protected conduct at issue in plaintiff's retaliation claim was that he informed prison officials that the defendant nurse had been on duty at the infirmary when another inmate nearly drowned); *Gaston v. Coughlin*, 81 F.Supp.2d 381, 386 (N.D.N.Y.1999) (protected conduct at issue was plaintiff's complaints to mess hall staff that his work schedule was a violation of state law). Moreover, New York State has enacted legislation that specifically protects Gill's conduct: "Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of insitutional conditions, policies, rules, regulations, or laws affecting an institution." N.Y. CORRECT. LAWW § 138(4); *see also Gaston v. Coughlin*, 81 F.Supp.2d at 386 (noting that the prisoner's "attempts to obtain redress of a perceived violation of State law" were protected under both the Constitution and New York law); *Salahuddin v. Harris*, 657 F.Supp. 369, 376 (S.D.N.Y.1987) (noting that § 138(4) "suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests and the order and security of the inmate population). Thus, since clearly Gill's attempts to seek redress of grievances is protected activity, it is worth repeating, "[i]t would be curious indeed for this Court to recognize the rights of inmates to petition for redress of grievances without fear of retaliation but deny [the inmate plaintiff] the same right in connection with his role in reviewing inmate grievances and ruling on them." *Alnutt*, 913 F.Supp. at 169-70.

15    Defendants similarly construe that an inmate's right to serve on a grievance committee is limited to the formal committee, namely, the IGRC. Dkt. No. 20 (arguing that "activities conducted as part of an informal problem resolution committee do not

have the same protection" as IGRC activities, if protected, since "there is no case law supporting such an argument").

16    In researching the genesis of an inmate's right to serve on a grievance committee, the Court found an unpublished Tenth Circuit opinion where the court was asked to decide whether an inmate has a protected right to provide legal work on behalf of another inmate. *See Northington v. Zavaras*, 229 F.3d 1164 (Table), 2000 WL 1133128 (10th Cir. Aug. 10, 2000). The circuit court stated that precedence in that circuit mandated the holding that such a right was not acknowledged. *Id.* at *2. In so ruling, the court noted in a footnote that "other federal courts have held that, *if a state creates a position* such as inmate representative, it must allow the representative to engage in his duties without fear of retaliation." *Id.* (emphasis added) (citing, *inter alia, Alnutt* ). We mention this unpublished decision only to point out that we do not interpret *Alnutt* the same. While the court in *Alnutt* referenced the state creation of the IGRC, the constitutional right to serve on that committee was not derivative of the state created nature of the committee, but rather, on the nature of the inmates' rights to seek redress for grievances.

17    In any event, even if we were to find that an inmate is only protected for participation on a formal committee, it is not clear to this Court whether or not the Problem Solving Committee at Walsh RMU was a formal tribunal.

Defendants ask this Court to find that, in light of the Supreme Court decision in *Shaw v. Murphy*, 532 U.S. 223 (2001), the rulings of the various district courts in our Circuit that hold that an inmate's activities on a grievance committee are protected are "no longer with force." Dkt. No. 20 at p. 7. The Court declines this invitation and finds *Shaw* completely distinguishable. First, *Shaw* concerned the constitutionality of a prison policy restricting inmate-to-inmate correspondence. In *Shaw*, Kevin Murphy, an inmate incarcerated at the Montana State Prison, served as an " 'inmate law clerk,' providing legal assistance to fellow prisoners." 532 U.S. at 225. Murphy learned that another inmate had been charged with assaulting a correctional officer and decided to assist the inmate with his defense. *Id.* Prison rules prohibited Murphy from providing assistance, but Murphy nonetheless investigated the alleged assault. *Id.*[18]

Murphy then sent a letter to the accused inmate discussing his investigation. However, in accordance with prison policy, such correspondence was intercepted by prison officials. *Id.* at 225-26. Based upon the content of the letter, specifically, the accusations against the assaulted correction officer, Murphy was cited for violations of various disciplinary rules, and, after a hearing, was found guilty of violating two of those rules. *Id.* at 226.

18    Prison policy forbade Murphy, a "high-security" inmate from meeting with maximum security inmates. *Murphy,* 532 U.S. at 225 n .1.

 **\*11**  Before examining the Supreme Court's holding, we pause to point out some other distinctions, that is, in *Shaw* the inmate acted as a *legal representative* for inmates and sought to represent another inmate in court on his criminal charge of assault; whereas a representative on a grievance committee does not act as a legal representative, but rather, as a facilitator or adjudicator of grievances. Furthermore, the Court in *Shaw* was asked to decide "whether prisoners have *any* First Amendment rights when they send legal correspondence to one another." *Id.* (emphasis in original). Thus, the Court analyzed whether the prison policy at issue restricting inmate-to-inmate communications passed the constitutional test established in *Turner v. Safely,* 482 U.S. 78 (1987), which directs courts to ask wether the "restrictions are reasonably related to legitimate and neutral governmental objectives ." *Id.* (citing *Turner,* 482 U.S. at 89). Here, we are not asked to construe the constitutionality of any prison policy restricting Gill's communications.

In applying the *Turner* Test to the prison policy at issue, the Supreme Court in *Shaw* declined to afford First Amendment protection to inmates providing legal assistance to other inmates "beyond the protection normally accorded prisoners' speech." *Id.* at 231. We find such holding to be inapplicable to inmates participating on grievance committees in light of the fact that such participation and activities do not constitute legal work, but rather, involve a duty to investigate and adjudicate matters being grieved. Thus, it can hardly be said that a grievance committee member's role is analogous to an inmate performing legal work on behalf of other inmates. Taking this one step further, we also believe that the filing of an institutional grievance by an inmate on behalf of himself as well as others who share the same grievance is not comparable to providing legal assistance to other inmates. We also note that, as explained above, the right to serve as a grievance committee representative derives from an inmate's right to

seek redress of grievances, a right undoubtedly protected by the Constitution.

The inmate in *Shaw* argued that his right to provide legal advice "follows from a right to receive legal advice." 532 U.S. at 231 n. 3. In response, the Supreme Court noted that "even if one right followed from the other, Murphy is incorrect in his assumption that there is a free-standing right to receive legal advice." *Id.* (citing previous Supreme Court precedence limiting an inmate's right to receive legal advice from other inmates "only when it is a necessary means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (internal quotation marks and citations omitted). Neither the Supreme Court nor any court in our Circuit has similarly limited an inmate's right to seek redress of grievances.

 **\*12**  Finding that Gill has satisfied the first prong, our analysis of his retaliation claims continues. Under the second prong, a prisoner must allege that the Defendants took adverse action against him. The third prong requires an assessment of whether there was a causal connection between the protected speech and the adverse action in that the alleged conduct was substantially motivated by the protected activity. To satisfy the second prong, a prisoner must present evidence inferring that Defendants acted with an improper motive. Such evidence may include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995). A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d 133, 139 (2d Cir.2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d at 493). Otherwise, the retaliatory act is *"de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal

proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 492 (cited in *Davis,* 320 F.3d at 353).

As stated above, the adverse conduct varies with each Defendant. First, with regard to Defendant Rosado, it is unclear to this Court the precise role Gill alleges Rosado played in retaliating against him. Stated another way, it is unclear what adverse action was taken by Rosado. Gill's bald assertion that Rosado conspired with other Defendants to deny Gill his constitutional rights is wholly conclusory. It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a § 1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Defendant Rosado's involvement is rather limited. According to Gill's Amended Complaint, he discussed his selection as C-2 representative with Rosado on or about September 1, 2002. Rosado then directed Gill to submit a grievance agenda for the upcoming meeting. Then, after his altercation with Defendant Riddick in the yard, Gill wrote Rosado a letter to confirm their previous conversation regarding his selection as a representative on the committee. Gill never received a response from Rosado. Then, Rosado was set to testify at Gill's hearing but was dismissed by the hearing officer. Based on the above facts, it has not been shown what *action* was taken by Rosado. From these bare facts, we cannot draw the inference that Rosado actively impeded Gill's ability to participate on the committee. It is clear from the facts alleged that, at best, Rosado's failure to speak on Gill's behalf or answer his correspondence, if received, amounts to nothing more than indifference or inactiveness, which is clearly not a constitutional violation. Furthermore, the fact that Plaintiff may have written a letter does not automatically render Rosado responsible for any constitutional violation. *See Thomas v. Coombe,* 1998 WL 391143, at *6 (S.D.N.Y. July 13, 1998) (ignoring letter is insufficient for personal involvement); *Young v. Kihl,* 720 F.Supp. 22, 23 (W.D.N .Y. Sep. 22, 1989) (the wrong must have been capable of mitigation at the time the supervisory official was apprised thereof); *Woods v. Goord,* 1998 WL 740782 (S.D.N.Y. Oct. 23, 1998) (receiving letters or complaints does not automatically make a supervisor liable for the denial of medical care). Since Gill has not established any adverse conduct, he has failed to state a retaliation claim against Defendant Rosado. We therefore recommend dismissal of Gill's retaliation claim against Defendant Rosado.

**\*13** Turning to the other Defendants, Gill asserts that Defendants Riddick and Brown filed false misbehavior reports, Defendant Adamik found Plaintiff guilty of the false reports, and Defendant Saxena transferred Gill to another facility. In moving for dismissal, Defendants focus solely on Gill's transfer from a medical facility to a non-medical facility as the only retaliatory conduct at issue and that such conduct is not adverse where the Plaintiff has not alleged that "his medical needs can only be treated adequately at Walsh and not the facility to which he was transferred." Dkt. No. 20. In his Amended Complaint, Gill explains that upon his arrival at Walsh in June 2002, he was informed by Defendant Saxena that he had been transferred to Walsh due to his asthmatic condition and that he would remain at Walsh until his parole board appearance set for July 2003. The chronology of events unfolded as follows:

| | |
|---|---|
| September 1, 2002 | Gill and Rosado converse about his selection as representative; |
| September 4, 2002 | Gill circulates the grievance agenda; |
| September 7, 2002 | Confrontation between Defendant Brown and Gill; |
| September 10, 2002 | Confrontation between Defendant Riddick and Gill; |
| September 12, 2002 | Gill receives two misbehavior reports, one from Brown, the other from Riddick; |
| September 16, 2002 | Hearing on reports with Defendant Adamik presiding; |

| October 1, 2002 | Defendant Adamik finds Gill guilty and dispenses keeplock |
| | punishment for thirty days and corresponding loss of privileges; |
| October 17, 2002 | Gill transferred to another facility on Dr. Saxena's orders |
| April 15, 2003 | Disciplinary disposition overturned; records expunged. |

Based upon this chronology, and focusing on the temporal proximity of Gill's exercise of his constitutional rights and adverse action, coupled with the fact that his disciplinary disposition was overturned on appeal, we find that Gill's retaliation claims against Defendants Riddick, Brown, Adamik, and Saxena, raise at least a colorable suspicion of retaliation such that he is entitled to pursue some discovery. While it is true that Gill has not asserted that the medical care he received at another facility was inadequate, he has at least stated a claim that the transfer itself was improperly motivated. As such, he has stated a cause of action for retaliation. [19] Based on the above analysis, we recommend that Defendants' Motion for dismissal of Gill's retaliation First Amendment and substantive due process claims against Defendants Riddick, Brown, Adamik, and Saxena be denied and discovery proceed on these claims.

[19]   We note that in situations where the defendant's actions are the result of both retaliatory and legitimate reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citing *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (cited in *Carpio v. Walker,* 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997)); *see also Gayle v. Gonyea,* 313 F.3d at 682 (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report"). Thus, Defendants may pursue and defend their motives for their actions in a motion for summary judgment.

### B. Procedural Due Process Claims

Gill asserts that Defendant Adamik violated Gill's constitutional rights when Adamik failed to conduct a fair and impartial hearing, denied Gill the opportunity to present his own witnesses, failed to issue a written statement as to the reason for such denial, and conspired with Defendants Riddick, Brown, and Rosado to violate Gill's First and Fourteenth Amendment rights. Gill also asserts that, in committing the conduct above, Defendant Adamik violated New York Correction Law § 138. As to Defendants Malloni and Perlman, Gill maintains that these Defendants violated his constitutional rights when Defendant Malloni destroyed Gill's notarized appeal of his disciplinary hearing and Defendent Perlman failed to render a timely decision on such appeal. It appears to this Court that the claims against these three Defendants center around the disciplinary hearing and are primarily rooted in Fourteenth Amendment Procedural Due Process.

*14   With regard to procedural due process allegations, we note that in order to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are typically derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* If the prisoner successfully establishes the presence of a protected liberty interest, he must then demonstrate that he was deprived of that interest without due process. *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). If, however, no liberty interest is implicated, then *a fortiori,* our analysis ceases and the claim should be dismissed.

The deprivation at issue in this case is the thirty (30) day disciplinary sentence in keeplock with corresponding loss of privileges. Therefore, in order for the Court to assess

the viability of the process Gill received at his hearing, Gill must initially show that he possessed a liberty interest in remaining free from keeplock and receiving recreation, packages, commissary, and phone privileges. As explained below, the Court finds that Gill cannot establish the existence of such a liberty interest and therefore cannot maintain procedural due process claims against Defendants Adamik, Malloni, and Perlman.

With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates if those changes are "within the normal limits or range of custody which the conviction has authorized the state to impose." *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Instead, the Due Process Clause protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner." *Id.* at 484 (quoted in *Arce v. Walker,* 139 F.3d at 333).

State statutes and regulations may also confer liberty interests on prisoners. *Arce v. Walker,* 139 F.3d at 334 (citing *Kentucky Dep't of Corr.,* 490 U.S. at 460). Such interests, however, are generally limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d at 392. Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that his confinement or restraint (1) created an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *Sandin,* 515 U.S. at 484, and (2) that the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

 **\*15** Clearly, the thirty-day sentence to keeplock and corresponding loss of privileges would not fall under the auspice of "the most basic liberty interests" and, therefore, Gill would not have a valid liberty interest arising under the Due Process Clause. As for a state created liberty interest, Gill fails to allege any facts demonstrating that the conditions

surrounding his thirty-day punishment were "atypical" or "significant" as to create a liberty interest. As such, where no liberty interests are at stake, no procedures are required. *Kentucky Dep't of Corr.,* 490 U.S. at 460. Since Gill cannot establish he had a liberty interest in remaining free from the punishment imposed at the disciplinary hearing, the Court need not assess the adequacy of the process he received. Accordingly, Plaintiff has failed to state a procedural due process claim. *See Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) for the proposition that loss of privileges, *i.e.,* commisary, recreation, package, and telephone, did not amount to an atypical and significant deprivation and clearly fell within the expected parameters of the sentence imposed by a court of law); *see also Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9 (1979) ("There is a crucial distinction between being deprived of a liberty one has ..., and being denied a conditional liberty that one desires.") (quoted in *Rouccchio v. Coughlin,* 923 F.Supp. 360, 371 (E.D.N.Y.1996)). We further note that, with regard to Defendant Rosado, Gill has failed to allege Rosado's personal involvement in any alleged due process violations. It is therefore, recommended that Defendant's Motion to Dismiss be granted and any procedural due process claims asserted against Defendants Adamik, Malloni, Perlman and Rosado be dismissed. Since we recommend dismissal of the claims asserted against Defendants Perlman and Rosado, these Defendants should be dismissed from this lawsuit.

### C. Interference with Legal Mail

In his Fifth Cause of Action against Defendant Malloni, Gill asserts that Defendant Malloni also violated his First and Fourteenth Amendment rights when he tampered with Gill's "legal mail." In this regard, Gill analogizes his prison disciplinary appeal to legal mail and Malloni's interference therewith denied Gill access to the courts. Were we to draw the same analogy, we would nevertheless find such claim to be wholly conclusory and should be dismissed. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) ("[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead a litany of general conclusions that shock but have no meaning."); *see also Cekic v. Coombe,* 2000 WL 1373136, at *1 (N.D.N.Y. Mar. 27, 2000) (quoting *Barr* ). Notably, Gill's legal mail claim fails to properly allege a cognizable cause of action for interference with legal mail since he only cites to this one instance, he has not pled malicious intent, and he

cannot show that he was prejudiced by the interference in light of the fact that the appeal was ultimately decided in his favor.[20] *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir.2003) (citing cases for the proposition that an isolated incident of tampering is insufficient to state a constitutional violation and in cases where the incidents are few and a violation is not patent, the plaintiff must specifically allege invidious intent or actual harm); *Cancel v. Goord*, 2001 WL 303713, at *4-6 (S.D.N.Y. Mar. 29, 2001) (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir.1986) for the proposition that a prisoner who asserts a First Amendment violation resulting from interference with mail must show that the prison officials "regularly and unjustifiably interfered with the incoming legal mail," and citing *Lewis v. Casey*, 518 U.S. 343, 353 (1996) for the proposition that "in order to survive a motion to dismiss a plaintiff must allege not only that the defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.")). Accordingly, such claims, to the extent stated, should also be dismissed against Defendant Malloni. Since we recommend dismissal of the only claims asserted against Defendant Malloni, we accordingly recommend dismissal of Defendant Malloni from this lawsuit.

[20]    We also note that his claim against Defendant Malloni involves a significant leap in logic: *If* there was a delay in the decision, *then* Malloni interfered with his mail.

### D. Eighth Amendment Claims

**\*16** Gill asserts that Defendants Cacciotti and Watson violated his Eighth Amendment right to be free from cruel and unusual treatment when they denied him the opportunity to use the bathroom while en route to Elmira Correctional Facility and further tantalized him when he informed them that he had urinated on himself. According to the Complaint, Plaintiff boarded the transferring vehicle at approximately 9:30 a.m., he asked to use a bathroom at 11:00 a.m., and arrived at Elmira at approximately 12:10 p.m. Plaintiff's Eighth Amendment claim centers around the hour and ten minutes he was denied access to a lavatory.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666-67 (1962) (cited in *Tramell*

*v. Keane, et al.*, 338 F.3d 155, 161 (2d Cir.2003)). The Eighth Amendment is violated only by those deprivations which deny "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Conditions of confinement rise to the level of an Eighth Amendment violation only when extreme deprivations are imposed. *Hudson v. McMillian*, 503 U.S. 1 (1992). A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is " 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' " and that the defendant possessed a " 'sufficiently culpable state of mind' associated with 'the unnecessary and wanton infliction of pain.' " *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir.2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Wilson v. Seiter*, 501 U.S. 194 (1991). The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed. *Graham v. Fries*, 1996 WL 1057212, at *8 (E.D.N.Y. Oct. 16, 1996). When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the "duration of the condition and the potential for serious physical harm." *Whitted v. Lazerson*, 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998); *see also Graham v. Fries*, 1996 WL 1057212, at *8 ("While many conditions may be restrictive and harsh, they do not violate the Eighth Amendment unless they deprive inmates of the minimal civilized measures of life's necessities."). To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was "deliberately indifferent" to the severe deprivation. *Wilson v. Seiter*, 501 U .S. at 304-05.

Applying these standards to the case at bar, we find that, in accordance with case law in this circuit, "[t]he temporary deprivation of the right to use the toilet, in the absence of serious physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation." *Whitted v. Lazerson*, 1998 WL 259929, at *2 (no violation where prisoner urinated and defecated on himself after being deprived the opportunity to use a toilet for approximately ninety minutes); *see also Odom v. Keane*, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept. 17, 1997) (absence of a working toilet in prison cell for approximately ten hours, absent any allegation that the prisoner risked contamination by contact with human waste, did not rise to the level of cruel and unusual punishment); *Bourdon v. Roney*, 2003 WL 21058177, at *30-31 (N.D.N.Y. Mar. 6, 2003) (pre-trial

detainee deprived of bathroom privileges for a maximum of three hours "failed to adequately allege that he was denied minimal necessities of civilized life for a substantial period of time").[21] Gill has not alleged any injury to his health as a result of being forced to hold his urine and any discomfort he experienced lasted only seventy minutes, at most. No matter how humiliating urinating on oneself can be, since Gill has failed to prove the objective component, we need not reach the subjective component because "without a constitutional violation, Defendants clearly could not have acted with "deliberate indifference." *Odom v. Keane,* 1997 WL 576088 (S.D.N.Y. Sept. 15, 1997). As such, Gill has failed to allege a cognizable cause of action under the Eighth Amendment. We therefore recommend granting Defendants' Motion to Dismiss as to this ground and, since this Eighth Amendment violation was the only cause of action asserted against Defendants Cacciotti and Watson, we recommend dismissing these Defendants from this lawsuit.

[21]    Plaintiff's reference to *Hope v. Pelzer,* 536 U.S. 730 (2002), in support of his Eighth Amendment claim is misplaced. The plaintiff in *Hope* had been handcuffed, naked, to a hitching post for seven hours and was exposed to an extraordinary summer sun. Here, the discomfort Gill experienced lasted, at most, seventy minutes.

### D. Qualified Immunity

  **\*17** As an affirmative defense, Defendants Riddick, Brown, Rosado, Saxena, Cacciotti, and Watson assert they are entitled to qualified immunity. Because we have already recommended dismissal of the Eighth Amendment claims asserted against Cacciotti and Watson, and the retaliation/ due process claims against Defendant Rosado, we need not address the applicability of any immunity doctrine. *Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, with regard to Defendants Riddick, Brown, and Saxena, since a constitutional violation has been established, at least at this limited stage of the litigation, we may proceed with an assessment of immunity.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Harlow v. Firzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). The doctrine protects public officials from 'personally facing the risk of incurring ruinous liability in the form of money damages, which would deter qualified people from public service." *Eng,* 858 F.2d at 895.

Qualified immunity analysis involves a three step inquiry. *See Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, a plaintiff has established a constitutional violation. *Id.* If yes, the court must then question whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001)). Finally, if a plaintiff had a "clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law." *Gill v. Hoadley,* 261 F.Supp.2d 113, 125 (N .D.N.Y.2003) (citing, *inter alia, Harhay,* 323 F.3d at 211); *see also Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999).

Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. at 815). The only pleadings filed in the present case, thus far, are the Original and Amended Complaints. Defendants have not raised this affirmative defense in a responsive pleading as set forth in FED. R. CIV. P. 8(c), but rather have done so in their Memorandum of Law in support of their Motion to Dismiss. Generally, however, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 2004 WL 2334909, at \*2 (2d Cir. Oct. 18, 2004) (quoting *Green* ). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 2004 WL 2334909.

  **\*18** The Second Circuit has further held that qualified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss] stage of proceedings." *Taylor v. Vermont Dep't of Ed.,* 313 F.3d 768, 793 (2d Cir.2002). For

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 116 of 182

these reasons, any adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of the litigation." *Denton v. McKee,* 332 F.Supp.2d 659, 666 (S.D.N.Y.2004).

Essentially, Defendants contend that it was not clearly established that an inmate has a First Amendment right to participate on an informal grievance committee and that the Supreme Court ruling in *Shaw* suggests otherwise. As explained above, we do not agree with the Defendants assessments and find that the conduct engaged in was clearly protected. However, the Court declines to fully adjudicate this affirmative defense until some discovery has been undertaken in this case. Further development of the retaliation claims would put this Court in a better position to assess this defense and would provide Defendant Adamik the opportunity to assert this defense on his behalf.[22]

[22]    As noted above, the Defendants did not construe the Amended Complaint to have stated a retaliation claim against Defendant Adamik.

WHEREFORE, based on the foregoing, it is hereby

RECOMMENDED, that Defendants' Motion to Dismiss (Dkt. No. 20) should be denied in part as to Plaintiff's retaliation claims set forth against Defendants Riddick, Brown, Adamik, and Saxena, and these Defendants should be directed to file a response to Plaintiff's Amendment Complaint; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to Plaintiff's retaliation claims against Defendant Rosado; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all due process claims asserted against Defendants Adamik, Perlman, Rosado, and Malloni; and it is further

RECOMMENDED, that Defendants' Motion to Dismiss be granted in part as to all Eighth Amendment claims asserted against Defendants Cacciotti and Watson; and it is further

RECOMMENDED, that if all the above recommendations are accepted, then Defendants Rosado, Perlman, Malloni, Cacciotti, and Watson be dismissed from this action as all claims against them have been dismissed; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

*FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b), 6(a), & 6(e).

**\*19** IT IS SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 755745

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4902860
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Randolph SMITH, Plaintiff,
v.
Dr. Lester WRIGHT, Deputy Commissioner for
Health Services; Dr. Paulano, Chief Medical
Officer, Great Meadows Correctional Facility; Dr.
Silverberg, Physician, Great Meadows Correctional
Facility; Jane Doe, Acting Nurse Administrator,
Great Meadows Correctional Facility; and John
Doe, Director of Ministerial Services, Defendants.

Civil Action No. 9:06–CV–00401 (FJS/DEP).
|
Aug. 31, 2011.

**Attorneys and Law Firms**

Randolph Smith, Bronx, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Cathy Y. Sheehan, Esq, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT, RECOMMENDATION AND ORDER*

Hon. DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Randolph Smith, a former New York
state prison inmate, brings this action against three named
individuals and two unidentified "Doe" defendants pursuant
to 42 U.S.C. § 1983 claiming violation of his rights under the
First, Eighth, and Fourteenth Amendments to the United
States Constitution as well as the Religious Land Use
and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C.
§ 2000cc. In support of his claims Smith maintains that
he was unlawfully placed and kept in medical keeplock
based upon his refusal, on religious grounds, to submit to
a Purified Protein Derivative ("PPD") test for tuberculosis
("TB") . [1] Plaintiff contends that the current version of
the controlling prison policy for TB testing, even though it
allows for alternative testing of religious objectors, unlike
earlier versions, is unconstitutional both as drafted and as
was applied to his particular situation since it resulted in his
confinement in segregated housing for some seven months

due to his religious-based refusal to be tested. As relief,
plaintiff's amended complaint seeks both compensatory and
punitive damages as well as declaratory relief.

[1]   The PPD test involves injection of a TB derivative
between layers of the skin. In the event of a
reaction to the injection, including skin thickening
with a measurable induration, it is determined
the individual has most likely been infected with
latent tuberculosis, meaning that he or she has
been exposed to TB and as a result has contracted
the disease even though not necessarily exhibiting
its symptoms. *See generally Selah v. Goord,* 255
F.Supp.2d 42, 45–46 (N.D.N.Y.2003). DOCCS
inmates are required to undergo PPD testing at
three different points: upon entering into prison,
annually thereafter, and additionally in the event
the inmate is identified as part of a contact trace.
*Id.* at 54.

Currently pending before the court is defendants' motion
to dismiss plaintiff's amended complaint for failure to state
a claim upon which relief may be granted. At the heart
of defendants' motion is their contention that plaintiff's
complaint fails adequately to set forth their involvement in
the constitutional violations alleged to support a finding of
liability.

Having carefully considered both defendants' motion to
dismiss and plaintiff's opposition, I recommend a finding that
plaintiff has not alleged sufficient facts to state plausible cause
of action under the Eighth Amendment and the due process
clause of the Fourteenth Amendment, but that his First
Amendment and RLUIPA claims are sufficiently pleaded to
pass muster under the controlling standard. I also recommend
dismissal of certain of plaintiff's claims against the defendants
based upon the lack of their involvement in the conduct giving
rise to the particular cause of action, of certain claims based
upon qualified immunity, and of plaintiff's remaining claims
for prospective relief for lack of standing.

*I. BACKGROUND* [2]

[2]   In light of the procedural posture of the case,
the following recitation of facts has been drawn
principally from plaintiff's complaint, Dkt. No. 1,
as well as the materials submitted by the plaintiff in
opposition to the defendants' motion, Dkt. No. 52,
to the extent they are consistent with the allegations

set forth in his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). While plaintiff's amended complaint is the operative pleading and the object of defendants' motion, superceding his earlier filed complaint, *see Harris v. City of New York,* 186 F.3d 243, 249 (2d Cir.1999), I have also considered the contents of plaintiff's initial complaint when evaluating the plausibility of his claims. *Hale v. Rao,* No. 9:08–CV–1612, 2009 WL 3698420, at *3 n. 8 (N.D.N.Y. Nov.3, 2009) (Hurd, D.J. and Lowe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint.)

Prior to September 2010 when, according to publically available information, he was released on parole, plaintiff was an inmate entrusted to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") (formerly the New York State Department of Correctional Services, or the "DOCS").[3] At the times relevant to his claims, plaintiff was designated by the DOCCS to the Great Meadows Correctional Facility ("Great Meadows"), located in Comstock, New York. Plaintiff is a practicing Rastafarian. Amended Complaint (Dkt. No. 36) ¶ 11.

[3]    *See* nysdocslookup.docs.state.ny.us (screenshot attached); *see also* Amended Complaint (Dkt. No. 36) (notifying the court of the plaintiff's present apartment address listed on the docket sheet).

Among the DOCCS policies in effect at the relevant times is a provision, on occasion referred to as DOCCS Health Services Policy No. 1.18, requiring TB testing for DOCCS inmates.[4] *See generally* Amended Complaint (Dkt. No. 36). Under the DOCCS TB testing policy, as revised effective on June 21, 2004, inmates who refuse PPD testing are put on tuberculin hold and offered testing daily for one week, weekly for one month, and thereafter monthly until acceptance. *See* DOCCS Health Services Policy No. 1.18 at § IV. Inmates placed on tuberculin hold receive monthly medical assessments and weight checks, and chest x-rays every six months. *Id.* Inmates whose monthly assessments and chest x-rays are all negative for TB may be released one year after admission to tuberculin hold. *See id.* While on tuberculin hold, an inmate is required to remain in his or her cell at all times with the exception of one hour of solitary recreation daily and three solitary showers per

week. *See id.; see also Redd v. Wright,* 597 F.3d 532, 533 (2d Cir.2010).

[4]    The DOCCS' Health Services Policy No. 1.18 was submitted to the court in connection with an earlier motion for summary judgment. *See* Klopf Decl. (Dkt. No. 12–4) Exh. A. Although the policy is not attached as an exhibit to plaintiff's complaint, the court nonetheless may properly take judicial notice of it since it is prominently referenced in and forms an integral part of plaintiff's amended complaint, and in fact appears in the record in this case. *See Holowecki v. Federal Express Corp.,* 440 F.3d 558, 565–66 (2d Cir.2006); *Coleman v. B.P. Sulzle, Inc.,* 402 F.Supp.2d 403, 417 (N.D.N.Y.2005).
The DOCCS' TB testing protocol was first established in November of 1991, based upon findings issued by the New York State Department of Health and the Centers for Disease Control of the United States Public Health Service. *Jolly v. Coughlin,* 76 F.3d 468, 471 (2d Cir.1996). The DOCCS TB testing policy, the centerpiece of which is yearly PPD testing of inmates, was modified somewhat in 1996 in light of the Second Circuit's decision in *Jolly. Reynolds v. Goord,* 103 F.Supp.2d 316, 328–331 (S.D.N.Y.2000).

**\*2**   The policy at issue includes a specific provision for those inmates with religious objections to the PPD testing. DOCCS Health Services Policy No. 1.18 at § VII. Where an inmate refuses the PPD test for this reason, he or she will be placed on tuberculin hold immediately, pending a determination by the DOCCS as to the legitimacy of the objection, which determination is to be made within sixty days. *See id.* The Chief Medical Officer ("CMO") of the DOCCS is responsible for evaluating the situation, including the results of an investigation that is required to be conducted by the DOCCS Director of Ministerial Services, and determine what accommodation, if any, is possible; the inmate must be informed of that determination within sixty days of the commencement of the TB hold. *See id.* If it is determined that the inmate's sincerely held religious beliefs precludes his or her submission to PPD testing, the policy allows the CMO to order a blood test as an accommodation, which is to be performed as expeditiously as possible. *See* DOCCS Health Services Policy No. 1.18 at § VII. The inmate may be released from TB hold when the results of the blood test, chest x-ray, and physical examination do not indicate the presence of latent TB.

2011 WL 4902860

Because as a practicing Rastafarian plaintiff's religious beliefs prohibit the injection of foreign substances into his body, apparently as a preemptive measure plaintiff objected to PPD testing on religious grounds through "grievance channels" on January 12, 2006, requesting that alternative procedures be utilized to screen him for the disease. Amended Complaint (Dkt. No. 36) ¶ 11. Plaintiff was formally summoned to the clinic at Great Meadow for TB testing on January 25, 2006, and again on February 24, 2006; on both occasions he refused to be tested on religious grounds and requested alternative testing consistent with his beliefs. Id. at ¶¶ 12–13. Following the second refusal, plaintiff was placed in medical keeplock on TB hold. [5], [6] Id. at ¶ 13.

[5]    Plaintiff's original complaint cited February 24, 2006 as the date of his first refusal to be tested. See Complaint (Dkt. No. 1) p. 3.

[6]    Generally speaking, keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. Gittens v. LeFevre, 891 F.2d 38, 39 (2d Cir.1989); Warburton v. Goord, 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing Gittens ); Tinsley v. Greene, No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M .J.) (citing, inter alia, Green v. Bauvi, 46 F.3d 189, 192 (2d Cir.1995)). The DOCCS TB testing policy has a specific provision dictating the parameters of TB keeplock. See Health Services Policy No. 1.18 § IV.A.4.c.

While in keeplock plaintiff submitted several grievances and less formal complaints regarding his circumstances, on each occasion emphasizing that he was entitled to alternative testing. See generally Amended Complaint (Dkt. No. 36). Just two days after his placement in medical keeplock, plaintiff submitted a formal complaint to DOCCS Commissioner Glenn Goord, asserting that he was unlawfully being held in keeplock. [7] Id. at ¶ 14. Having received no response to either his January 12, 2006 grievance or his February 26, 2006 complaint to the DOCCS Commissioner, on February 28, 2006 plaintiff filed a second grievance, reiterating his objection to medical keeplock and requesting an alternative procedure for the testing. Id. at ¶ 15.

[7]    Former DOCCS Commissioner Goord was originally named as the sole defendant in this

action, but was dismissed from the action on motion for summary judgment based upon lack of personal involvement. See Dkt. Nos. 22, 27. That determination was upheld on appeal to the United States Court of Appeals for the Second Circuit, although the matter was remanded with instructions to permit the plaintiff to amend his complaint to assert claims against other defendants more directly responsible for any alleged religious deprivations. See Mandate, dated June 10, 2010 (Dkt. No. 32).

Plaintiff pursued the issue further by submitting a complaint on March 1, 2006 to Stephen Bernardi, the DOCCS Deputy Commissioner for policy and compliance, regarding his circumstances. Amended Complaint (Dkt. No. 36) ¶ 16. Plaintiff followed that with a second formal complaint to Commissioner Goord on March 28, 2006, objecting to the manner in which the DOCCS Health Services Policy No. 1.18 was being administered at Great Meadow, arguing that the plain and unambiguous terms regarding alternative testing for religious objectors was being disregarded. Id. at ¶ 19.

**\*3** Plaintiff commenced this action on March 29, 2006, complaining of the manner in which Health Services Policy No. 1.18 was being applied in his case. Amended Complaint (Dkt. No. 36) ¶ 20. On that same date, Smith received an answer from the superintendent at Great Meadow, denying his January 12, 2006 grievance. Id. at ¶ 21.

Plaintiff subsequently received a decision from the Central Office Review Committee ("CORC") denying his February 28, 2006 grievance. Amended Complaint (Dkt. No. 36) ¶ 22. The following day, Smith complained to Commissioner Goord regarding the denial, arguing that his grievance was based on two federal court opinions, both finding the practice under Health Services Policy No. 1.18 of holding prisoners in confinement for lengthy periods after exercising religious beliefs in connection with TB testing to be unconstitutional. [8] Id. at ¶ 23.

[8]    Although the plaintiff does not specify in his amended complaint the cases referenced in his communication to the Commissioner, it may be that he is relying upon Reynolds v. Goord, 103 F.Supp.2d 316 (S.D.N.Y.2000) (denying defendants' motion for summary judgment with regard to the plaintiff's First Amendment challenge to the 1996 health services policy) and Selah v. Goord, 255 F.Supp.2d 42 (granting the plaintiff's

motion for a preliminary injunction preventing the DOCS from administering the PPD test to him during the pendency of that lawsuit based upon his sincerely held religious beliefs and finding that plaintiff may succeed on a First Amendment challenge to the policy as applied to him).

Not satisfied with the responses to his grievances and still in medical keeplock, plaintiff continued to file complaints. On August 1, 2006, plaintiff lodged a complaint with Dr. Lester Wright, the DOCCS Deputy Commissioner for Health Services, complaining that the failure of prison officials to provide him with an alternative testing procedure was infringing on his religious beliefs and demanding immediate intervention and corrective action. Amended Complaint (Dkt. No. 36) ¶ 26. That complaint was referred to Steven Van Buren, the Regional Heath Services Administrator for the DOCCS. *Id.* at ¶ 27. By letter dated August 22, 2006, Van Buren advised the plaintiff that his complaint regarding misapplication of Health Services Policy No. 1.18 was being denied. Upon receipt of that denial, plaintiff filed a formal complaint with an unnamed member of the Great Meadows medical staff, arguing that he should be released from keeplock since it was clear from x-ray results that he did not pose a risk to the general prison population. *Id.* at ¶ 28.

On September 11, 2006, plaintiff received a written communication from Steven H. Schwartz, Assistant Attorney General, which included a "declaration of special interest in this action."[9] Amended Complaint (Dkt. No. 36) ¶ 29. That month plaintiff learned that the DOCCS Health Services Policy No. 1.18 had been misapplied in his case apparently as a result of a misinterpretation of the policy by a nurse administrator at Great Meadows. Amended Complaint (Dkt. No. 36) ¶ 29. A second x-ray was taken of plaintiff on September 12, 2006, and an alternative blood test was administered on September 20, 2006. *Id.* at ¶¶ 29–32. The TB hold of the plaintiff was rescinded on October 6, 2006 by Dr. Paulano, a defendant in the action, and plaintiff was released to general population. *Id.* at ¶ 33.

[9]     Since this letter is not before the court it is unclear precisely what it contained, and specifically what is meant by the plaintiff when utilizing that phrase.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 29, 2006, soon after being confined to medical keeplock, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1,

6. The only named defendant in Smith's original complaint, which asserted violations of his rights under the RLUIPA and to the free exercise of his religion under the First Amendment, was former DOCCS Commissioner Goord.

**\*4** Defendant Goord answered the complaint and soon thereafter moved for summary judgment on the ground that plaintiff had not made any showing of his personal involvement in any constitutional deprivations. Dkt. No. 12. The court granted defendant's motion and dismissed the complaint in its entirety. Dkt. Nos. 22, 27. Upon appeal to the United States Court of Appeals for the Second Circuit, however, while the judgment dismissing defendant Goord from the action was affirmed, the Second Circuit remanded the action to this court with instructions to allow plaintiff an opportunity to amend his complaint in effort to state claims against individual staff members at Great Meadows responsible for the alleged misapplication of the controlling DOCCS policy. Dkt. No. 32.

On September 17, 2010, plaintiff filed an amended complaint naming as defendants, in both their official and individual capacities, Dr. Lester Wright, Deputy Commissioner for Health Services for the DOCCS; Dr. Paulano, the chief medical officer at Great Meadows; Dr. Silverberg, plaintiff's primary care provider; John Doe, the DOCCS Director for Ministerial Services; and Jane Doe, an acting nurse administrator at Great Meadows. Dkt. No. 36.

In response to plaintiff's amended complaint, the newly-named defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) for its dismissal on the grounds that 1) the plaintiff has failed to state a cognizable claim under the First, Eighth, or Fourteenth Amendments; 2) plaintiff has failed to establish their personal involvement in the constitutional violations alleged; 3) the state officials sued in their official capacities are entitled to Eleventh Amendment immunity; and 4) the defendants are protected from suit by the doctrine of qualified immunity. Dkt. No. 49. Plaintiff has since responded in opposition to the defendants' motion. Dkt. No. 52.

Defendants' motion is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

2011 WL 4902860

A. *Standard of Review*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

**\*5** To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile Twombly does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig. .,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94 127 S.Ct. 2197, 2200 (2007) (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); see also Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Eleventh Amendment Immunity*

In their motion defendants' seek dismissal of all claims against them in their official capacities, arguing that as state officials they are entitled to the immunity afforded under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[10] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[11] *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991). Moreover, it is clear Congress did not abrogate New York's Eleventh Amendment immunity by enacting section 1983. *Quern v. Jordan,* 440 U.S. 332, 343–45, 99 S.Ct. 1139, 1147–49, 59 L.Ed.2d 358 (1979).

**10**    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

**11**    By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30–31, 112 S.Ct. at 364–65.

**\*6**  Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). Those claims are therefore subject to dismissal. The defendants are not, however, necessarily entitled to dismissal of all claims asserted against them in their official capacities; plaintiff's complaint seeks declaratory relief and appropriate equitable relief, which could in theory include an injunction against defendants' implementation of Health Services Policy No. 1.18 in the event that it is found to be unconstitutional as written. To the extent such declaratory and equitable relief may be available to the plaintiff, the defendants are properly named in their official capacities for purposes of effectuating that relief. *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437, 124 S.Ct. 899, 903, 157 L.Ed.2d 855 (2004) ("[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.") (citations omitted).

### C. *Eighth Amendment Claim*

Among the claims raised by the plaintiff is one bottomed on the Eighth Amendment's prohibition against cruel and unusual punishment. That claim is based upon plaintiff's contention that by subjecting him to keeplock confinement for in excess of seven months, exposing him to conditions normally reserved for those committing serious acts of misconduct warranting disciplinary action, he was subjected to cruel and unusual punishment. Defendants now seek dismissal of that claim.

The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291; *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at \*7–8 (E.D.N.Y. Mar.8, 2010). [12] Addressing the objective element, to prevail a plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs. *Delisser v. Goord,* No. 09CV00073FJSGLS, 2003 WL 133271 at \*6 (N.D.N.Y. Jan.15, 2003) (Scullin, S.J. and Sharp, M.J.) (citing *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

**12**    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display]

**\*7**  In this instance, plaintiff's complaint does not provide factual context regarding his keeplock confinement. The complaint does not indicate, for example, whether Smith was confined to a regular cell in general population, or instead to

2011 WL 4902860

a special housing unit ("SHU") cell at Great Meadow during the TB isolation. [13] Nor does his complaint disclose whether he was in a single or double cell, or whether he was afforded the recreation and shower privileges to which he was entitled under the DOCCS TB policy. [14] More importantly, other than the loss of movement and privileges, plaintiff does not allege any condition to which he was subjected that resulted in the deprivation of a basic human need. *See Delisser,* 2003 WL 133271 at \*6; *Lee v. Frederick,* 519 F.Supp.2d. 320, 327 (W.D.N.Y.2007). This omission is fatal, particularly in view of cases holding that confinement in keeplock under normal conditions does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See, e.g, Bunting v. Nagy,* 452 F.Supp.2d 447, 455 (S.D.N.Y.2006) (citing *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004)); *Harris v. Russett,* No. 02 Civ. 6481, 2006 WL 2239693, at \*3 (S.D.N.Y. Aug. 4, 2006) (citing *Sealey v. Gittner,* 197 F.3d 578, (2d Cir.1999)).

[13]   Prisoners may be placed in SHU for a variety of reasons, including though not limited to those relating to discipline. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (quoting, *inter alia,* 7 N.Y.C.R.R. § 301.6); 7 N.Y.C.R.R. § 301.7. Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N .Y.C.R.R. pt. 304. They are allowed two showers per week and one of hour of outdoor exercise per day, are entitled to unlimited legal visits and one non-legal visit per week, have access to counselors and sick call, and additionally can participate in cell study programs and receive books from the library. *Id.*

[14]   Health Services Policy § 1.18(IV)(A)(4)(c) provides that "[i]nmates on Tuberculin Hold must remain in their cell at all times except for one hour of solitary recreation per day and three solitary showers per week. Leaving their cell for telephone calls is not permitted. Any exception to the above must be cleared through the Deputy Commissioner/ Chief Medical Officer or designee."

In addition to failing to meet the objective prong of the Eighth Amendment test, plaintiff's allegations similarly fail to establish the requisite degree of subjective culpability on the part of the defendants. Plaintiff's complaint, as amended, makes only conclusory allegations of "reckless indifference" in the grievance process, resulting in the denial of his request for alternative testing and, ultimately, his prolonged confinement in medical keeplock. Although reckless indifference could suffice to support an Eighth Amendment claim if coupled with allegations of a subjective awareness of a substantial risk of harm to the inmate, *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811), it is clear that this allegation is directed at the procedural remedies within the prison, not the physical conditions experienced while in keeplock. Nothing in the complaint alleges or even suggests that any defendant deliberately misapplied Heath Services Policy No. 1.18 in order to punish Smith, or that such punishment was intended to subject him to an excessive risk of harm. Instead, the pleadings show, at best, only that someone at Great Meadows seemingly failed to properly follow the DOCCS TB testing procedures. For these reasons, I find plaintiff's allegations insufficient to support a plausible cruel and unusual punishment claim under either the objective or subjective prong of the Eighth Amendment test, and therefore recommend that plaintiff's Eighth Amendment claims be dismissed. [15]

[15]   To the extent plaintiff's complaint can be read to make a claim under the Eighth Amendment for verbal harassment to which he may have been subjected as a result of his failure to submit to the PPD screening test, it is well-established that such complaints are insufficient to give rise to a constitutional claim. *See Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457, at \*3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at \*6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. and DiBianco, M.J.) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation"). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995).

### D. *Fourteenth Amendment Claim*

As a separate cause of action, plaintiff's complaint alleges violations of his right to substantive due process under the Fourteenth Amendment, a claim that defendants argue is also insufficiently stated. The basis for this claim is plaintiff's contention that by arbitrarily and capriciously overlooking

2011 WL 4902860

the plain terms and language of Health Services Policy No. 1.18, prison medical personnel at the Great Meadows violated his right to substantive due process. When broadly construed, it seems that plaintiff's complaint also alleges a potential procedural due process claim challenging the constitutionality of the procedures outlined in Health Services Policy No. 1.18 with regard to placement in keeplock confinement. Both of these due process claims fail as a matter of law.

1. *Substantive Due Process*

**\*8** The due process clause of the Fourteenth Amendment contains both substantive and procedural elements. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component of the Fourteenth Amendment "bars certain arbitrary and wrongful government action regardless of the fairness of the procedures used to implement them." *Id.* at 125, 110 S.Ct. at 983 (internal quotations and citation omitted). "Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotations and citations omitted) (citing cases). To establish a violation of substantive due process rights, "a plaintiff must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin v. Vil. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 431 (2d Cir.2009) (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). The first step in a substantive due process analysis is to identify the constitutional right at stake." *Excell v. Woods,* No. 9:07–CV–0305, 2009 WL 3124424, at \*23 (N.D.N.Y. Sept.29, 2009) (Suddaby, J. and Lowe, M.J .) (citing *Lowrance,* 20 F.3d at 537). It should be noted, parenthetically, that there are few circumstances arising in the context of prison life that rise to the level of shocking and suffice to state a substantive due process violation. *Shuler v. Brown,* No. 07–CV–0937, 2009 WL 790973, at \*9 (N.D.N.Y. Mar.23, 2009) (McAvoy, S.J. and Lowe, M. J.).

Placement in medical keeplock for objecting to PPD testing on religious grounds, while potentially within the ambit of the protection afforded under the First Amendment, is not the sort of condition of prison life that implicates substantive due process, nor does Health Policy No. 1.18 create a substantive right to alternative testing. *Cf. Barnes v. Craft,* No. 9:04–CV–1269, 2008 WL 3884369, at \*5 (N.D.N.Y. Aug.18, 2008)

(Mordue, C.J. and Lowe, M.J.) (finding that the DOCCS beard exemption policy did not create a substantive due process right). Moreover, even if the court were to ultimately find that the Health Services Policy No. 1.18 did create a substantive due process right, any attempt to allege a substantive due process violation nonetheless must fail. At best, based upon the allegations in plaintiff's complaint, it seems clear that defendants' failure to follow Health Services Policy No. 1.18 amounts to nothing more than incorrect or ill-advised conduct and falls far short of the type of conscience-shocking behavior that would support a substantive due process claim. *See Lowrance,* 20 F.3d at 537. For these reasons, I recommend the plaintiff's substantive due process claim under the Fourteenth Amendment be dismissed. [16]

[16]     There is yet another reason why a substantive due process claim would fail in the case. The Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision ... it must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219 n. 7, 137 L.Ed.2d 432 (1997) (citing *Graham v. Conner,* 490 U.S. 386, 394, 109 S.Ct. 1870, 1871 (1989)); *see also Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005). Here, plaintiff's claim relating to the denial of alternative testing because of his religious objection to the PPD test is more appropriately analyzed under the First Amendment and the RLUIPA.

2. *Procedural Due Process*

**\*9** Although plaintiff's second cause of action specifically claims only a substantive due process violation, when liberally construed the complaint could be interpreted to have embedded within it a procedural due process claim. *See, e.g.,* Amended Complaint (Dkt. No. 36) ¶ 37 (alleging that the policy's procedures are even inconsistent with the minimum due process requirement afforded ... for the most serious disciplinary matters calling for the very form of restrictions plaintiff was subject to without due process of law."). As plaintiff notes, subjecting a prison inmate to a period of seven months of disciplinary confinement would ordinarily be deemed a sufficient liberty interest deprivation to trigger procedural due process rights. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000); *Bunting v. Nagy,* 452 F.Supp.2d 447, 455–56 (S.D.N.Y.2006) (citing cases); *Beckford v. Portuondo,* 151 F.Supp.2d 204, 219 (2d Cir.2001). Similarly, an inmate

2011 WL 4902860

placed in administrative confinement segregation for such reasons as a need for protection for seven months would also be entitled to basic due process rights, including an initial hearing and periodic reviews. *See Davis v. Barrett,* 576 F.3d 129 (2d Cir.2009) (holding that forty-one days in administrative confinement could represent the deprivation of a cognizable liberty interest, depending upon the conditions to which the plaintiff inmate was subjected). Plaintiff's complaint suggests that he, on the other hand, was not afforded the same safeguards despite being placed in keeplock confinement based upon his exercise of his First Amendment rights. This could form the basis for a plausible procedural due process claim.

The concept of procedural due process under the Fourteenth Amendment is a flexible one, with its requirements being dependent upon the nature of the deprivation at issue and the process associated with it. In a prison setting, an inmate who is subject to the deprivation of a constitutionally significant liberty interest is entitled under the Fourteenth Amendment to notice and an opportunity to be heard. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)).

I will assume for the sake of argument that plaintiff's medical keeplock confinement for a period of approximately seven months, with a corresponding loss of privileges, constituted the deprivation of a liberty interest sufficient to trigger the Fourteenth Amendment's due process protections.[17] Plaintiff was therefore entitled to both notice and a meaningful opportunity to be heard with regard to that deprivation. *Sira,* 380 F.3d at 69.

[17]    While some courts have analyzed procedural due process claims stemming from keeplock confinement under principles ordinarily applicable to disciplinary or administrative SHU confinement, *e.g., Delisser,* 2003 WL 133271, at *7 (N.D.N.Y. Jan.15, 2003), others have concluded that ordinary keeplock confinement conditions are not sufficiently atypical or significant hardships in relation to the ordinary incidents of prison life to trigger the protections of the Fourteenth

Amendment. *See, e.g., Luis v. Coughlin,* 935 F.Supp. 218, 220–22 (W.D.N.Y.1996).

Under Health Services Policy No. 1.18, before being placed in keeplock confinement for refusing to be tested for TB, an inmate must "be carefully counseled about the importance of [the] test." Health Services Policy No. 1.18 at § IV.A.4. The policy also requires that inmates on TB hold be offered testing "daily for one week, weekly for one month and monthly thereafter until the inmate accepts testing or prophylaxis" going on to provide that "[i]nmates can agree to testing/prophylaxis at any time." *Id.* at § IV.A.4.ii. Accordingly, assuming the validity of Health Service Policy No. 1.18—a matter that has yet to be determined—"the requirements of due process were met, in that plaintiff had both notice of the reason for his keeplock confinement and the means of ending it." *Rossi v. Goord,* No. 9:00–CV–1521, 2006 WL 2811505, at *8 (N.D.N.Y. Sep.28, 2006) (Kahn, J. and Peebles, M.J.). Under these circumstances, no reasonable factfinder could conclude that plaintiff was denied procedural due process in connection with its medical keeplock confinement. Accordingly, I recommend dismissal of plaintiff's procedural due process claim.

E. *Plaintiff's Religious Freedom Claims*

**\*10**  The centerpiece of plaintiff's complaint is his claim that he was deprived of his religious liberties deriving from two different sources—the RLUIPA and the First Amendment.[18] In their motion defendants appear to focus their argument solely upon the First Amendment claim and fail to address the sufficiency of plaintiff's claim under the RLUIPA.

[18]    That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I. The RLUIPA, provides, in pertinent part, that

no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person—1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). To establish a violation of the RLUIPA a plaintiff must prove that prison officials, through their actions, have substantially

burdened his or her religious exercise through actions not found to promote a compelling governmental interest advanced through the least restrictive means. *Pilgrim v. Artus,* No. 07–cv–1001, 2010 WL 3724883, at *10 (N.D.N.Y. Mar.18, 2010) (Treece, M.J.), *report and recommendation adopted,* 2010 WL 3724881 (N.D.N.Y. Sep.17, 2010) (Sharpe, J.). The RLUIPA places a higher burden on the defendants than does the First Amendment, which requires only a burden that is "reasonably related to legitimate penological interests." *Id.*

Defendants' contention that plaintiff's First Amendment claim lacks merit, *see* Defendants' Memorandum (Dkt. No. 49–1) at p. 6, which is presented in two succinct paragraphs, does not appear to invite the court at this early stage to weigh the proprietary of DOCCS Health Services Policy No. 1.18, either as drafted or as applied to the plaintiff, under the First Amendment or the RLUIPA. Instead, the focus of the defendants' argument is upon the alleged lack of personal involvement on the part of the four named defendants in the constitutional deprivations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983. *Iqbal,* 129 S.Ct. at 1952. In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). That requirement may be satisfied by showing that the defendant 1) directly participated in the alleged violation; 2) after being informed of the violation through a report or appeal, was in a position to remedy the wrong, and failed to do so; 3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; 4) was grossly negligent in supervising subordinates who committed the wrongful acts; or 5) exhibited deliberated indifference to others' rights by failing to act on information indicating that unconstitutional acts were occurring. *Barnes v. Fedele,* 760 F.Supp.2d 296, 304 (W.D.N.Y.2011) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)) (other citation omitted).[19]

[19]    Although in their motion defendants have not actively challenged the plaintiff's RLUIPA claims, it should be noted that the Second Circuit has yet to address whether personal involvement is a prerequisite to a claim under the RLUIPA. *Pilgrim,* 2010 WL 37224883 at *14. Courts in this district and elsewhere have held that it is. *Id.* (citing *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at *18 (S.D.N.Y. Oct 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* No. 9:06–CV–0805, 2009 WL 3199520, at *9 (N.D.N.Y. Sept.30, 2009) (Suddaby, J.) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at *2 (S.D.Ohio Sept.9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* No. 2:07–CV–1076, 2009 WL 890521, *3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* No. 1:07–CV–1003, 2008 WL 4185945, at *3 (W.D.Mich. Sep.8, 2008)); *see also Keesh v. Smith,* 9:04–CV–799, 2011 WL 1135931, at *11 (N.D.N.Y. Feb.2, 2011) (Baxter, M.J.) (citations omitted), *report and recommendation adopted,* 2011 WL 1135929 (Mar. 25, 2011) (Mordue, C.J.).

Before evaluating the level of personal involvement for each of the named defendants it is important to understand the extent of plaintiff's claims. Plaintiff's complaint alleges that the current version of the DOCCS Health Services Policy No. 1.18, while since 2004 incorporating an alternative procedure for religious objectors, nonetheless still impinges upon the rights of objecting inmates under the First Amendment and the RLUIPA by virtue of the testing procedures specified. *See* Amended Complaint (Dkt. No. 36) ¶¶ 40–41. Smith also alleges that the policy was unconstitutionally applied to him since the alternative testing for religious objectors available under the testing policy was not provided to him by local prison officials at Great Meadows. *Id.* at ¶¶ 43–46. These two claims are conceptually distinct for purposes of analysis of the level of participation of the four named defendants.

1. *Dr. Lester Wright*

2011 WL 4902860

**\*11** Plaintiff's amended complaint names Dr. Wright, the DOCCS Deputy Commissioner for Health Services and the agency's CMO, as a defendant. Dr. Wright's alleged involvement includes having developed the current DOCCS TB policy and maintaining responsibility for its enforcement. As was stated in the court's prior report and recommendation, all indications show that Dr. Wright did hold primary authority and responsibility for protecting the health of inmates and administering DOCCS health policies. Indeed, as was noted, it is Dr. Wright's signature that appears on the TB testing policy now at issue. *See Fox v. Poole,* No. 06CV148, 2008 WL 1867939, at \*8 (W.D.N.Y. Apr.24, 2008). Accordingly, to the extent the plaintiff asserts that the DOCCS policy is unconstitutional as drafted, Dr. Wright is open to exposure on that claim, for purposes of both declaratory and injunctive relief and for damages, subject to his claim of entitlement to qualified immunity.

Turning to plaintiff's claim that the policy is unconstitutional as was applied to him, the basis for asserting liability against Dr. Wright stems from a complaint sent by Smith to defendant Wright on August 1, 2006 placing him on notice that Smith had been on TB hold since February of that year and requesting immediate intervention. Investigation into the matter was apparently delegated by Dr. Wright to Steven Van Buren, the DOCCS Regional Health Services Administrator, who responded to plaintiff's complaint. It is well-established that the receipt by a high ranking DOCCS official of correspondence from an inmate complaining of a constitutional deprivation and the forwarding of that correspondence to an appropriate staff member for investigation and response is insufficient to trigger a finding of personal involvement. *See Barnes,* 760 F.Supp.2d at 305.

Plaintiff also alleges, in conclusory fashion, that by virtue of his position Dr. Wright has the responsibility to enforce the TB testing policy and to ensure that the policy is properly carried out. This broad allegation is similarly insufficient to establish a plausible claim against Dr. Wright as relates to the policy as applied to Smith. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *see also Wright,* 21 F.3d at 501 (a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under that provision).

In sum, I find that Dr. Wright is entitled to dismissal of plaintiff's claims regarding the application of the DOCS TB testing policy to his circumstances, but not with regard to his contention that the policy, as presently drafted, remains constitutionally infirm.

### 2. *Dr. Silverberg*

Plaintiff's amended complaint names Dr. Silverberg, his primary health care provider during the relevant times, as a defendant. Amended Complaint (Dkt. No. 36) ¶ 9. Dr. Silverberg's involvement in the constitutional deprivation allegedly included a responsibility to provide, upon request, the alternative procedures to test plaintiff for TB. *Id.* Plaintiff alleges he was taken for an examination by Dr. Silverberg on March 24, 2006, and that later, on September 14, 2006, he was again sent to see Dr. Silverberg to discuss alternative testing. *Id.* at ¶¶ 18, 131. Plaintiff does not allege any other specific facts regarding his interaction with Dr. Silverberg.

**\*12** I find that at this early procedural juncture, these allegations are sufficient to establish the existence of a plausible constitutional claim against Dr. Silverberg insofar as plaintiff has alleged that the DOCS TB testing policy, as applied to his circumstances, violated his rights under the First Amendment and the RLUIPA. There is no basis, however, to conclude that Dr. Silverberg bears responsibility for development of Health Services Policy No. 1 .18, and he therefore lacks responsibility with regard to plaintiff's claim that the policy is unconstitutional as drafted.

### 3. *Dr. Paulano*

Plaintiff's amended complaint identifies Dr. Paulano as the "head doctor" at Great Meadows. Amended Complaint (Dkt. No. 36) ¶ 8. Dr. Paulano's involvement in the violations alleged included supervising and training the medical staff in the Great Meadows medical unit and implementing the TB testing policy through his medical staff. *Id.* Plaintiff alleges that on October 6, 2006 Dr. Paulano discussed with him the results of the Quanteferon Blood Test administered to Smith and released him from TB Hold. *Id.* at ¶ 33. Dr. Paulano also informed plaintiff that the procedure would be repeated the following year. *Id.* The plaintiff does not allege any other specific facts concerning his interaction with Dr. Paulano. These allegations are insufficient to establish Dr. Paulano's personal involvement in either the drafting of the allegedly unconstitutional TB testing policy or its application to plaintiff's circumstances.

### F. *Qualified Immunity*

Seizing upon the lack of clarity regarding the interplay between the DOCCS TB testing policy and the rights guaranteed to inmates under the First Amendment and the RLUIPA, in the alternative defendants seek a finding that they are entitled to qualified immunity from suit in this action. Failing to appreciate the distinction between claims for damages, which may properly be dismissed based upon qualified immunity, and claims seeking other forms of relief including declaratory and injunctive, which are not, defendants assert that "all claims against the defendants" are subject to dismissal on the basis of qualified immunity. *See* Defendants' Memorandum (Dkt. No. 49–1) p. 11.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*13** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at 232, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[20] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[21] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts

of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[22] *Pearson,* 555 U.S. at 236, 242, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

20    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

21    In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433 n. 11 (citation omitted).

22    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* 555 U.S. at 231, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, ——— (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts

Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 129 of 182
Smith v. Wright, Not Reported in F.Supp.2d (2011)
2011 WL 4902860

do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

The Second Circuit has instructed that for purposes of the qualified immunity inquiry, the constitutional right at stake must be defined narrowly. *McCarroll v. Federal Bureau of Prisons,* No. 08–CV–1343, 2010 WL 4609379, at *5 (N.D.N.Y.2010) (Lowe, M.J.) (citing *Redd,* 597 F.3d at 532). Generally speaking, the right at issue in connection with both of plaintiff's claims is Smith's right under the First Amendment and the RLUIPA to a religious exemption from the PPD test requirement under Health Services Policy No. 1.18. The most recent Second Circuit decision to address the issue, involving events that occurred in 2001, held that the right to religious exemption from such testing was not well-established at that time. *Redd,* 597 F.3d at 536; *see also McCarroll,* 2010 WL 4609379, at *5–6 (holding that the right to submit a saliva or hair sample rather than a blood sample was not clearly established or foreshadowed by any Second Circuit or Supreme Court ruling).

**\*14** In *Redd,* the plaintiff was placed in TB hold in 2001 after refusing to undergo a PPD test on religious grounds. *Redd,* 597 F.3d at 534. The 1996 policy then in effect, unlike the 2004 version, did not contain a religious objector exception. *Id.* The district court determined that the 1996 policy was unconstitutional as applied,[23] but held that the defendants in that case were entitled to qualified immunity and dismissed plaintiff's First Amendment and RLUIPA claims.[24] *Id.* The court reasoned that conflict among the state and lower federal courts on the issue demonstrated that the right at issue was not clearly established. *Id.*

[23]   "The district court also concluded in a footnote that the 1996 Policy violated the RLUIPA, which 'imposes a standard of strict scrutiny upon burdens on the free exercise of religion of incarcerated persons in state prisons.' " *Redd,* 597 F.3d at 534–35 (quoting *Redd v. Wright,* No. 9:04–CV–00401(N.D.N.Y. filed Aug. 9, 2006) at 7 n.9).

[24]   Unlike plaintiff's complaint in this action, *Redd*'s complaint sought only money damages and did not request declaratory or injunctive relief. *Redd,* 597 F.3d at 534.

On appeal, the Second Circuit declined the opportunity to determine whether Redd's rights were violated under the First Amendment and RLUIPA. *Id.* at 536 (citing *Pearson,* 121 S. Ct at 808). Instead, the court held that at the time Redd was confined, it had not been clearly established that the 1996 policy, or any substantially similar policy, was invalid under either the First Amendment or RLUIPA. *Redd,* 597 F.3d at 536. Moreover, the court held that its earlier decision in *Jolly* had not clearly foreshadowed a holding that the 1996 policy would be facially invalid under either the First Amendment or the RLUIPA, and furthermore, that neither *Jolly* nor the district court decision in *Reynolds* had signaled that the 1996 policy, as applied to Redd, violated Redd's free exercise right under the RLUIPA or the First Amendment. *Id.* at 537–38. Accordingly, the Second Circuit affirmed the district court's determination that the defendants were entitled to qualified immunity with regard to Redd's claims under the First Amendment and the RLUIPA.

Though the events giving rise to plaintiff's complaint occurred some five years later than those in *Redd,* the Second Circuit's decision in that case dictates the same result here. Presumably to accommodate the potential First Amendment and RLUIPA concerns of religious objectors, in 2004 the DOCCS amended its TB testing policy to include an alternative testing provision for religious objectors. Having reviewed that policy against the backdrop of existing caselaw, I conclude that no reasonable prison official could have understood the policy, as currently drafted, as unlawfully impinging upon the First Amendment and RLUIPA rights of inmates. In this regard the law has not matured significantly since *Redd.* No decision of the Supreme Court or Second Circuit issued prior to 2006, when plaintiff was relegated to TB hold, would have alerted someone such as Dr. Wright to any alleged First Amendment or the RLUIPA violation associated with the 2004 testing policy. In fact, *Redd,* in which the court expressly declined to address whether the earlier version of the policy violates the First Amendment or the RLUIPA, was not decided until some three years later and seems, at this time, to be the last word on this issue.[25] Accordingly, I recommend a finding that Dr. Wright, the only defendant potentially exposed with regard to the as-written claim, be entitled to qualified immunity exempting him from liability for damages, though not for equitable relief potentially awardable against him in his official capacity.

[25]   Despite exhaustive research, the court has not identified a more recent decision within the Second Circuit, even at the district court level, addressing

the validity of either the1996 or the 2004 policy on free exercise grounds.

**\*15** Turning to plaintiff's as-applied challenge, unlike the policy at issue in *Redd,* the more recent 2004 policy provides for accommodation for those with religious objections to the PPD test, requiring that an inmate be advised within sixty days of being placed in TB hold as to what accommodation, if any, will be made. While it is undisputed that this provision of the 2004 policy was not followed with regard to plaintiff, that failure in and of itself is insufficient to support a constitutional challenge. [26] Moreover, like the plaintiff in *Redd,* Smith "can point to no relevant case law declaring the [2004] Policy, or any substantially similar policy, invalid under either the First Amendment or RLUIPA", nor has any case clearly foreshadowed that result. [27] *Redd,* 597 F.3d at 536. Accordingly, I conclude that defendant Silverberg, the only named defendant potentially exposed to liability for damages with regard to the as-applied claim, should be afforded qualified immunity.

[26]   A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson,* 01–CV–1039, 2008 WL 4416411, at \*6 n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) (internal quotation marks and citation omitted). Notably, with regard to the policy at issue, even where it is determined that the inmate's religious belief forbidding the PPD testing is sincerely held, the policy does not require alternative testing. Instead, to the extent the policy provides that the CMO "may" order a blood test, it appears to be in the discretion that DOCCS official to allow that to occur. In light of the discretion afforded the CMO, it is not at all clear in this case that the delay in providing plaintiff with an alternative test violated Health Service Policy No. 1.18.

[27]   As the *Redd* court observed, "the factual predicate that led the court to grant a preliminary injunction in *Jolly*–Jolly's confinement for three and a half years, ... significantly differs from the facts in this case", *Redd,* 597 F.3d at 532 (citation omitted), in which Smith was held in keeplock for less than eight months. *"Jolly* specifically declined to draw a line as to the length of confinement beyond which a constitutional violation would occur."*Id.* (citing *Jolly,* 76 F.3d at 478 n. 5). Likewise, *Reynolds* did not "foreshadow a ruling that DOCCS lacked a compelling interest in implementing a TB hold policy", in that it did not address "the compelling interest in administering an effective TB program or compiling health information on inmates."*Id.* at 537–38 (citing *Reynolds,* 103 F.Supp.2d at 340).

### G. *Standing*

In view of the foregoing, all that remains of plaintiff's claims is his cause of action against Dr. Wright alleging that the current DOCCS TB testing policy is unconstitutional on its face and seeking declaratory and injunctive relief. Although not raised by defendants in their motion, it appears that since he has been released from prison, plaintiff lacks standing to pursue this claim.

"In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 2308, 159 L.Ed.2d 98 (2004). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The standing requirement is born partly of " 'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.' " *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1178–1179 (D.C.Cir.1982) (Bork, J., concurring)). "Standing 'is an essential and unchanging part of the case-or-controversy requirement of Article III.' " *Central States Southeast and Southwest Areas Heath and Welfare Fund v. Merck–Medco Managed Care, L.L.C.,* 433 F.3d 181, 197 (2d Cir.2005) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). As such, standing directly implicates the court's subject matter jurisdiction, and may therefore be raised by the court *sua sponte. Id.*

To establish standing to pursue injunctive or declaratory relief, a plaintiff must show that he or she has sustained or is in danger of immediately sustaining an injury as a result of the challenged official conduct. *MacNamara v. City of New*

*York,* No. 04 Civ. 9216(RJS)(JCF), 275 F.R.D. 125, 2011 WL 1991144, at *11 (S.D.N.Y. May 19, 2011) (citing *Shain v. Ellison,* 356 F.3d 211, 215 (2d Cir.2004)) (other citation omitted). "[The s]tanding doctrine ... generally precludes a § 1983 plaintiff from obtaining injunctive relief unless she can demonstrate that she is likely to be subjected to the same conduct in the future, a showing that can be very difficult to make." *Ciraolo v. City of New York,* 216 F.3d 236, 248 (2d Cir.2000) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 105–06, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1893)).

**\*16** In this case, plaintiff is no longer within the custody of the DOCCS, having been released from prison in September 2010 and therefore is no longer subject to Health Services Policy No. 1.18 and the requirement that he undergo PPD testing. Because Smith is no longer incarcerated and does not face the likelihood of being subjected to this policy in the future, his request for declaratory and prospective injunctive relief must be dismissed for lack of standing. *Brown v. City of New York,* No. 09 CV 1809(RJD)(MG), 2010 WL 60914, at * 2 (E.D.N.Y. Jan. 8, 2010) (citing *Shain,* 356 F.3d at 215); *Thomas v. New York State Dep't of Corr. Servs.,* No. 00 Civ. 7163(NRB), 2006 WL 435718, at *1 n. 2 (S.D.N.Y. Feb.23, 2006) (citing *Shain* ).

### H. *Motion to Stay Discovery*

In addition to seeking dismissal of plaintiff's claims, defendants also move order pursuant to Federal Rule of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss. Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed.R.Civ.P. 26(c)(1). When exercising the discretion conferred under Rule 26(c), in response to a motion to stay

discovery during the pendency of a dismissal motion, a court must determine whether the party seeking the stay has established the existence of "good cause" for the requested delay. *Chesney v. Valley Stream Union Free Sch. Dist.,* 236 F.R.D. 113, 115 (E.D.N.Y.2006); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.,* 206 F.R.D. 367, 368 (S.D.N.Y.2002). The mere filing of a dismissal motion, without more, does not guaranty entitlement to such a stay. *Spencer Trask,* 206 F.R.D. at 368 (citations omitted); *see Moran v. Flaherty,* No. 92 Civ. 3200, 1992 WL 276913, at *1 (S.D.N.Y. Sept.25, 1992) ("[D]iscovery should not be routinely stayed simply on the basis that a motion to dismiss has been filed.").

Among the factors which inform the analysis of whether to grant a stay of discovery, in the face of a dispositive motion, are the burden of responding to the contemplated discovery, and the strength of the dispositive motion forming the basis for the stay request. *Chesney,* 236 F.R.D. at 115; *Spencer Trask, LLC,* 206 F.R.D. at 368. The court must also consider any unfair prejudice which may be suffered by the party seeking to engage in discovery during the pendency of the dismissal motion. *OMG Fidelity, Inc. v. Sirius Techs., Inc.,* 239 F.R.D. 300, 304–305 (N.D.N.Y.2006) (citing *Chesney,* 236 F.R.D. at 115).

Here, defendants have filed a persuasive motion which warrants a stay of discovery. Issue has not been joined in the action, and the court has not yet to issue its standard Rule 16 pretrial scheduling order in the case. Moreover, there is no indication that plaintiff has sought to commence discovery in the last six months. It therefore appears unlikely that prejudice will result from staying discovery pending the final determination of this motion. I therefore grant defendant's motion to stay discovery pending the final determination of this motion.

### IV. *SUMMARY AND CONCLUSION*

**\*17** Clearly the DOCCS has a strong, legitimate interest in containing contagious diseases, including TB, within its facilities. *See Lee v. Frederick,* 519 F.Supp.2d at 326 (citing *Word v. Croce,* 230 F.Supp.2d at 511 ("[T]here is no dispute that NYDOCS has a legitimate interest, in containing Tuberculosis.") and *Jolly v. Coughlin,* 76 F.3d at 477 (correctional officials have an affirmative obligation to protect inmates from infectious diseases)). Plaintiff maintains, however, that the means by which the DOCCS has chosen to address TB in its prisons has resulted in his

experiencing constitutional deprivations and denial of his rights under the RLUIPA.

Plaintiff's complaint in this action asserts multiple constitutional challenges to both the current DOCCS TB testing protocol, despite its inclusion of an alternative provision for religious objectors, and the application of the policy to him, resulting in TB hold for seven months and a significant delay in offering the alternative procedure to him, claiming violations of the First, Eighth, and Fourteenth Amendments to the United States Constitution as well as the RLUIPA. Having carefully reviewed plaintiff's complaint, I conclude that it fails to state plausible Eighth Amendment and due process claims, but that it does assert potentially viable First Amendment and RLUIPA causes of action against all or some of the named defendants. Nonetheless, I find that all defendants other than Dr. Wright are entitled to dismissal with regard to the plaintiff's facial challenge to Health Services Policy No. 1.18. With regard to plaintiff's as-applied challenge to that policy, Drs. Wright and Paulano are entitled to dismissal of those claims based upon lack of personal involvement, and Dr. Silverberg is entitled to qualified immunity. I further find that Dr. Wright is entitled to a finding of good faith immunity precluding all claims for damages against him individually, but that he is not entitled to dismissal of plaintiff's declaratory and potential injunctive claims against him in his official capacity on that basis; those claims for prospective relief, however, are subject to dismissal due to plaintiff's lack of standing.[28]

---

[28]     Ordinarily, when a *pro se* action is dismissed *sua sponte,* the plaintiff should be allowed to amend his or her complaint. *See Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (finding that repleading

would be futile) (citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *cf. Gomez,* 171 F.3d at 796 (granting leave to amend is appropriate "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."). Here, for the reasons discussed above, I find that the deficiencies with plaintiff's claim are substantive, and that providing an opportunity to amend would therefore be futile.

Accordingly, it is hereby respectfully

RECOMMENDED, that plaintiff's motion to dismiss (Dkt. No. 49) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety; and it is further

ORDERED that pending final disposition of this motion, all discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 4902860

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4458770

2011 WL 4458770
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Randolph SMITH, Plaintiff,

v.

Dr. Lester WRIGHT, Deputy Commissioner for
Health Services; Dr. Paulano, Chief Medical
Officer, Great Meadows Correctional Facility; Dr.
Silverberg, Physician, Great Meadows Correctional
Facility; Jane Doe, Acting Nurse Administrator,
Great Meadows Correctional Facility; and John
Doe, Director of Ministerial Services, Defendants.

No. 9:06–CV–401 (FJS/DEP).
|
Sept. 23, 2011.

**Attorneys and Law Firms**

Randolph Smith, Bronx, NY, pro se.

Office of the New York State Attorney General, Cathy Y.
Sheehan, AAG, of Counsel, Albany, NY, for Defendants.

## ORDER

SCULLIN, Senior District Judge.

 *1 On January 25, 2011, Defendants filed a motion to
dismiss Plaintiff's amended complaint. *See* Dkt. No. 49. On
March 17, 2011, Plaintiff filed papers in opposition to that
motion, *see* Dkt. No. 52; and, on March 31, 2011, Defendants
filed a reply in further support of their motion, *see* Dkt.

No. 53. On August 31, 2011, Magistrate Judge Peebles
issued a Report, Recommendation and Order, in which he
recommended that this Court grant Defendants' motion and
dismiss Plaintiff's amended complaint in its entirety. *See* Dkt.
No. 54 at 53. Neither Plaintiff nor the Defendants filed any
objections.

When a party does not object to a magistrate judge's
report-recommendation, the court reviews that report-
recommendation for clear error or manifest injustice. *See
Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660,
*10 (N.D.N.Y. July 16, 2009)* (citation and footnote omitted).
After conducting this review, "the Court may 'accept, reject,
or modify, in whole or in part, the ... recommendations made
by the magistrate judge.' " *Id.* (quoting 28 U.S.C. § 636(b)
(1)(C)).

The Court has reviewed Magistrate Judge Peebles' August 31,
2011 Report, Recommendation and Order for clear error and
manifest injustice; and, finding none, the Court hereby

**ORDERS** that Magistrate Judge Peebles' August 31, 2011
Report, Recommendation and Order is **ACCEPTED in its
entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's
complaint in its entirety is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in
favor of Defendants and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4458770

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5503317
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gary GILLARD, Plaintiff,

v.

Michael ROVELLI, et al., Defendants.

No. 9:12–CV–0083 (LEK/CFH).
|
Sept. 30, 2013.

**Attorneys and Law Firms**

Gary Gillard, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Richard Lombardo, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

LAWRENCE E. KAHN, District Judge.

## I. INTRODUCTION

 **\*1** This matter comes before the Court following a
Report–Recommendation filed on July 18, 2013, by the
Honorable Christian F. Hummel, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3
of the Northern District of New York. Dkt. No. 84 ("Report–
Recommendation"). After fourteen days from the service
thereof, the Clerk has sent the entire file to the undersigned,
including Defendants' and *Pro se* Plaintiff Gary Gillard's
Objections. Dkt. Nos. 85 ("Defendants' Objections"); 86
("Plaintiff's Objections"). For the following reasons, the
Court approves and adopts the Report–Recommendation in
its entirety and grants in part Defendants' Motion to dismiss.
Dkt. No. 41 ("Motion").

## II. BACKGROUND

### A. Factual Background

The Court presumes the parties' familiarity with the facts
underlying this case. For a complete statement of the facts,
reference is made to the Report–Recommendation.

### B. Procedural History

On January 18, 2012, Plaintiff commenced this action,
seeking relief under 42 U.S.C. § 1983. Dkt. No. 1
("Complaint"). Plaintiff alleges that Defendants, fourteen
current and retired employees of the New York State
Department of Correctional and Community Supervision
("DOCCS") and one inmate, violated his constitutional rights
under the First, Eighth, and Fourteenth Amendments. *See
generally id.*

On October 17, 2012, all Defendants except Defendant Jose
Nunez filed the Motion seeking: (1) dismissal pursuant to
Federal Rule of Civil Procedure 12(b)(6); and (2) a protective
order pursuant to Federal Rule of Civil Procedure 26(c)(1).
Mot. Plaintiff then filed a Response opposing the Motion.
Dkt. No. 50 ("Response").

Judge Hummel recommends that Defendants' Motion be
granted as to Plaintiff's: (1) § 1983 claims against all
individual Defendants in their official capacities; and (2)
conspiracy claims against all Defendants. *See* Report–Rec.
However, Judge Hummel recommends that the Motion be
denied as to the Fourteenth Amendment procedural due
process claims. *Id.* Judge Hummel also recommends that
Plaintiff's First Amendment claims based on access to courts
and interference with mail be dismissed without prejudice. *Id.*
Finally, Judge Hummel recommends that Defendants' request
for a protective order staying discovery be granted. *Id.*

## III. LEGAL STANDARDS

### A. Review of a Magistrate Judge's Report–Recommendation

A district court must review *de novo* any objected-to portions
of a magistrate judge's report-recommendation or specific
proposed findings or recommendations therein and "may
accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge." 28 U.S.C.
§ 636(b); *accord* FED. R. CIV . P. 72(b); *see also Morris
v. Local 804, Int'l Bhd. of Teamsters,* 167 F. App'x 230, 232
(2d Cir.2006); *Barnes v. Prack,* No. 11–CV–0857, 2013 WL
1121353, at *1 (N.D.N.Y. Mar. 18, 2013). If no objections are
made, or if an objection is general, conclusory, perfunctory,
or a mere reiteration of an argument made to the magistrate
judge, a district court need review that aspect of a report-
recommendation only for clear error. *Chylinski v. Bank of
Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011); *Barnes,* 2013
WL 1121353, at *1; *Farid v. Bouey,* 554 F.Supp.2d 301, 306–

07 & n. 2 (N.D.N.Y.2008); *see also Machicote v. Ercole*, No. 06 Civ. 13320, 2011 WL 3809920, at *2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). A district court also "may receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b); *accord* FED. R. CIV. P. 72(b)(3).

**B. Motion to Dismiss**

**\*2** To survive a motion to dismiss pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 12(b) (6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir.2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U .S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *See id* . at 678–79. Additionally, when a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir.2006). "[A] pro se litigant's submissions must be construed liberally, and ... such submissions be read to raise the strongest arguments that they suggest." *Id.*

**IV. DISCUSSION**

**A. The Report–Recommendation**

In the Report–Recommendation, Judge Hummel refused to dismiss Plaintiff's Fourteenth Amendment due process claim, in which Plaintiff argues that Defendants deprived him of a hearing regarding his 90–day keeplock confinement. *See* Report–Rec. at 19. Judge Hummel found that there were questions of fact as to whether Plaintiff's confinement was an atypical and significant hardship in relation to the ordinary incidents of prison life, such that a liberty interest protected by the Due Process Clause of the Fourteenth Amendment was implicated. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995); Report–Rec. at 18–19. The Report–Recommendation acknowledged that: (1) the length of Plaintiff's confinement failed to amount to even the "intermediate duration' " for which the Second Circuit has determined that " 'a detailed record of the conditions of confinement relative to ordinary prison conditions is required[ ]' " to establish a liberty interest; and (2) the Complaint did not contain any such record or "any allegations to indicate that [Plaintiff's] confinement was atypical or significant in relation to the ordinary prison life." Report–Rec. at 18–19 (citing *Palmer v. Richards*, 364 F.3d 60, 64–65 (2d. Cir.2004)). However, the Report–Recommendation noted that dismissal of due process claims unsupported by a factual record is generally proper only where the period of time spent in solitary confinement is less than thirty days and there is no indication the prisoner endured unusual Special Housing Unit ("SHU") conditions. *See Palmer*, 364 F.3d at 64–65. Because Plaintiff is a *pro se* litigant whose submissions must be construed liberally, and because Plaintiff's keeplock confinement exceeded the thirty-day period set forth in *Palmer*, Judge Hummel denied Defendants' Motion with respect to Plaintiff's Fourteenth Amendment procedural due process claims. *Id.* at 19.

**B. Objections**

**\*3** In their Objections, Defendants argue that Judge Hummel erred in finding that *Palmer* 's thirty-day rule is controlling in the present case. Objs. at 3–4. They base this contention solely on the Second Circuit's holding in *Sealey v. Giltner*, 197 F.3d 578, 589–90 (2d Cir.1999), that an inmate's 101–day confinement in SHU did not constitute an atypical or significant hardship under *Sandin*. Objs. at 4 Defendants argue that because: (1) Plaintiff's 90–day confinement was shorter than the 101–day confinement in *Sealey;* and (2) keeplock is less confining than SHU, Plaintiff's confinement cannot constitute an atypical and significant hardship. *Id.* (citing *Sealey,* 197 F.3d at 589–90). Defendants argue that even if Plaintiff had been confined to keeplock for up to 305 days, he still could not establish a liberty interest because

2013 WL 5503317

he neglected to provide details of the conditions of his confinement, as *Palmer* requires. *Id.*

Plaintiff asserts that the Report–Recommendation failed to understand that Plaintiff is asserting a Fourteenth Amendment claim based on Defendants' denial of his access to a hearing regarding his 90–day confinement, rather than on the confinement itself. Pl's Objs.

## C. Decision to Adopt the Report–Recommendation

### *1. Defendants' Objections*

Upon a *de novo* review of the record and the Report–Recommendation, the Court concludes that the Report–Recommendation's denial of Defendants' Motion to dismiss Plaintiff's Fourteenth Amendment claim was proper. Defendants contend that, because *Sealey* held that up to 101 days of SITU confinement under normal conditions is not an atypical and significant hardship, any confinement below 101–day threshold necessarily fails to implicate a liberty interest. Defs' Objs. at 4. But *Sealey* did not set any durational floor or deem duration dispositive; rather, the Second Circuit held that *"[b]oth* the conditions [of confinement] and their duration must be considered ... since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey,* 197 F.3d at 586 (internal citation omitted and emphasis added). Nor does *Sealey* even remotely suggest that, because keeplock is generally less confining than SITU, keeplock confinement of less than 101 days is necessarily insufficiently harsh to implicate a liberty interest. Under *Sealey,* even if Plaintiff's keeplock stay had been merely a "brief interval" rather than 90 days, it could still implicate a liberty interest if the conditions are sufficiently harsh.

Defendants, after making their 101–day–absolute–minimum argument, assert that the Complaint should also be dismissed because Plaintiff must offer evidence of the conditions of his confinement, which he has not done. But Defendants fail to distinguish between the Report–Recommendation's treatment of: (1) the showing Plaintiff must make to *prevail* on his Fourteenth Amendment due process claim; and (2) the showing Plaintiff must make to *avoid dismissal* of that claim. Defendants argue that the Complaint fails to allege the requisite non-durational facts suggesting atypicality. Defs' Objs. at 4. The Report–Recommendation holds likewise. Report–Rec. at 18–19. The Report–Recommendation, however, holds that, in light of

Plaintiff's *pro se* status, his failure to allege such facts does not necessitate dismissal. Report–Rec. at 19. The only authority cited by Defendants allegedly pertaining to dismissal involved a motion for summary judgment, *not* a motion to dismiss. *See Gee v. Fischer,* No. 9–CV–1057, 2011 WL 4965297 (N.D.N.Y. Sept. 30, 2013); Defs' Objs. at 6. It is therefore inapposite. In light of the Second Circuit's command that a *pro se* litigant's complaints "must be construed liberally, and ... read to raise the strongest arguments that they suggest," *Palmer,* 364 F.3d at 64–65, the Court adopts the Report–Recommendation so that Plaintiff may further elaborate on the conditions of his keeplock confinement.

### *2. Plaintiff's Objections*

**\*4** Plaintiff argues that the Report–Recommendation failed to recognize that his Fourteenth Amendment claim is premised on Defendants' denial of his access to a disciplinary hearing. Pl's Objs. This is incorrect. The Report–Recommendation examines the nature of Plaintiff's confinement not to determine whether the confinement is itself actionable, but rather whether that confinement was sufficiently atypical and significant to implicate a liberty interest entitling Plaintiff to a hearing. *See* Report–Rec. at 17–19.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 84) is **APPROVED and ADOPTED in its ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 41) to dismiss is **GRANTED** as to Plaintiff's: (1) § 1983 claims against all individual Defendants in their official capacities; and (2) conspiracy claims against all Defendants; and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 41) to dismiss is **DENIED** as to: (1) Plaintiff's Fourteenth Amendment due process claims; and (2) Defendants' qualified immunity defense; and it is further

**ORDERED,** that Plaintiff's First Amendment claims based on access to courts and interference with mail are **DISMISSED without prejudice;** and it is further

**ORDERED,** that as to those claims, Plaintiff may file an amended complaint **within twenty days** from the filing date of this Order if he wishes to pursue those claims; and is is further

**ORDERED,** that, if **within twenty days,** such an amended complaint is not filed, those claims shall be dismissed pursuant to this Order without further action of the Court; and it is further

**ORDERED,** that Defendants' request for a protective order is **GRANTED** and discovery in this matter is stayed until the issuance of a scheduling order pursuant to Federal Rule of Civil Procedure 16; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Decision and Order upon the parties to this action.

**IT IS SO ORDERED.**

GARY GILLARD, Plaintiff,

v.

MICHAEL ROVELLI, Correctional Officer, Great Meadow Correctional Facility; THOMAS LAFOUNTAIN, Correctional Officer, Great Meadow Correctional Facility; CURTIS POIRIER, Correctional Officer, Great Meadow Correctional Facility; TOM LYNCH, Correctional Officer, Great Meadow Correctional Facility; GARY LIPHA, Correctional Officer, Great Meadow Correctional Facility; ANDREW ROSE, Correctional Officer, Great Meadow Correctional Facility; DARIN WILLIAMS, Correctional Sergeant, Great Meadow Correctional Facility; KEITH HENDRY, Correctional Sergeant, Great Meadow Correctional Facility; NICHOLAS DELUCA, Correctional Sergeant, Great Meadow Correctional Facility; PETER BESSON, Correctional Lieutenant, Great Meadow Correctional Facility; PAUL ZARNETSKI, Correctional Lieutenant, Great Meadow Correctional Facility; CHARLES F. KELLY, Deputy Superintendent of Security, Great Meadow Correctional Facility; GARY RAMEY, Industrial Supervisor, Great Meadow Correctional Facility; DAVID ROCK, Superintendent, Great Meadow Correctional Facility; JOSE NUNEZ, Inmate: DIN # 98–A–6830, NOW AT SING SING C.F., previously housed at Great Meadow Correctional Facility, Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

**\*5** Plaintiff pro se Gary Gillard ("Gillard"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, fourteen current and retired DOCCS employees and one inmate, violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on behalf of all defendants except for defendant Nunez. [2] Dkt. No. 41. Defendants also move for a protective order pursuant to Fed.R.Civ.P. 26(c) (1). Gillard opposes this motion. Gillard Resp. (Dkt. No. 50). For the following reasons, it is recommended that defendants' motion be granted in part and denied in part.

[2] By letter motion dated June 7, 2013, defendants' counsel requested that defendant Deluca be permitted to join in the motion to dismiss. Dkt. No. 79. By decision and order dated July 10, 2013, the Honorable Lawrence E. Kahn granted that motion for joinder. Dkt. No. 83. Deluca was served on April 29, 2013. Dkt. No. 75. Given the Court's decision and order, as well as service of summons and complaint on Deluca, Gillard's objections as to the Office of the Attorney General's representation of Deluca in this action are effectively negated. Gillard Resp. (Dkt. No. 50) at 2.

**I. Background**

The facts are related herein in the light most favorable to Gillard as the non-moving party. *See* subsection II(A) *infra.* At all relevant times, Gillard was confined at the Great Meadow Correctional Facility ("Great Meadow"). Compl. ¶ 4.

On January 23, 2009, at approximately 7:00 p.m., defendant Williams, a sergeant, approached Gillard with an inmate-

authored note dated January 22, 2009 and asked Gillard whether he wanted to be placed in protective custody. Compl. ¶ 21. Because of the nature of Gillard's criminal history, [3] the inmate wrote the note requesting that Gillard be transferred out of Great Meadow. *Id.* ¶ 20. Gillard advised Williams that the correctional staff issued that note, not an inmate, in retaliation for Gillard lodging complaints against the staff. *Id.* ¶ 21. Despite Gillard's explanation, on January 25, 2009, Williams recommended Gillard for Involuntary Protective Custody ("IPC"), stating that

[3]
> Based on the allegations contained in the complaint, it appears that Gillard was accused of committing sexual assault on a nine-year-old girl. Compl. ¶¶ 20, 35.

> Gillard's verbal statement that inmates wanted to hurt him because of his criminal history and anonymous[ly] written note threatening to kill Gillard are the reasons for this recommendation. Also because of this inmate[']s litigious nature and his statement that it is my responsibility to put him in [IPC] for the safety of his person and this facility. *Id.* ¶ 22.

On January 28, 2009, the IPC hearing commenced but it was adjourned because Williams was unavailable for the hearing. Compl. ¶ 23. On February 4, 2009, defendant Lynch, a corrections officer, escorted Gillard to the courthouse for the hearing. *Id.* ¶ 24. Gillard was ordered to sit and wait because defendant Hearing Officer and Supervisor Ramey was absent at the time. *Id.* ¶ 25. Lynch entered an unidentified room along with other unidentified officers, leaving Gillard alone. *Id.* ¶ 26. Defendant Lieutenant Besson approached and advised Gillard that Gillard was to blame for the ongoing issues. *Id.* ¶ 27. Besson proceeded to walk into the room with defendants Lynch, Lipha, Rose, all correction officers, and other unidentified individuals. *Id.*

At this point, Lipha left the room. Compl. ¶ 28. Besson followed, taking another inmate into the hearing room and left Gillard alone. *Id.* ¶ 29. Lipha returned with defendant Inmate Nunez and ordered Nunez to sit next to Gillard as Lipha walked into the room with Lynch and other unidentified individuals. *Id.* ¶ 30. Gillard could see in the room that Rose and Besson were conducting a hearing. *Id.*

**\*6** While Gillard was sitting with his hands in his pockets, watching Rose and Besson, Nunez grabbed Gillard's right tricep with his left hand, cut Gillard's neck, and pushed Gillard off balance. Compl. ¶ 31. Nunez proceeded to run

to the center of the room, used his back to block the views of Rose and Besson, and held out a weapon. [4] *Id.* Gillard yelled, staff personnel exited from different rooms, and Nunez surrendered his weapon to unidentified persons. *Id.* Gillard refrained from hitting or swinging at Nunez, complied with all staff orders, and was handcuffed and transported for medical review. *Id.* Gillard contends that defendant Rovelli, a corrections officer, ordered Nunez to murder Gillard. *Id.* at 14.

[4]
> In his response to defendants' motion, Gillard characterized the weapon as a "can top." Gillard Resp. at 1.

On February 5, 2009, a false misbehavior report was issued against Gillard, stating that Besson witnessed Gillard punching Nunez in the head. Compl. ¶ 33. Gillard also alleged that the misbehavior report "confirmed this was a sanctioned hit and setup and conspiracy on behalf of Michael Rovelli and all named defendants played parts by filing false ... reports against [Gillard] in retaliation and revenge to all the grievances that have been filed." *Id.* At some point, Rovelli came to Gillard's cell to threaten him. [5] *Id.* ¶ 34. On the same day, at approximately 9:45 a.m., Gillard was ordered to pack and leave his cell. *Id.* ¶ 35. When Gillard reached the lobby area, Rovelli was standing with unidentified individuals and told Gillard, "Gary, it's not over yet ...." *Id.* Gillard did not respond. *Id* . Gillard filed a grievance against Rovelli, naming inmates as witnesses. *Id.* ¶ 36. The grievance was denied. *Id.* Finally, at some point during the same day, Gillard was on his way to a visit when Rovelli, who was standing in the hall area with unidentified officers and inmates, called Gillard "a rat." *Id.* ¶ 37. All the unidentified officers and inmates turned to look at Gillard. *Id.*

[5]
> To the extent Gillard attempted to allege a potential Eighth Amendment claim against Rovelli for making verbal threats, such a claim must fail. A claim of threats and harassment alone, without allegations of accompanied injury or use of force, is insufficient to state an Eighth Amendment claim. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) (per curiam) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of

any federally protected right and therefore is not actionable under ... § 1983."). Because Gillard does not allege that Rovelli used force against him and no injury resulted from the verbal threats, Gillard has failed to state an Eighth Amendment claim based on such threats. Accordingly, Gillard's potential claim based on verbal threats against Rovelli cannot withstand this motion to dismiss.

On February 6, 2009, defendant Lafountain, a corrections officer, came to Gillard's cell and told Gillard, "you['re] refusing the hearing right[s]." Compl. ¶ 38. Gillard replied that he did not refuse his hearing rights and wanted to attend his hearing; however, Lafountain walked away. *Id.* Non-party Inmate Johnson witnessed this exchange. *Id.* Shortly thereafter, Gillard was ordered to pack his cell in preparation again to be placed in IPC. *Id.* ¶ 39. At approximately 1:30, presumably in the afternoon, Lafountain provided Gillard the disposition of the hearing through Gillard's feed-up slot, saying, "you can read it." *Id.* Non-party Inmate Hooper witnessed this exchange. *Id.* Thereafter, while defendant Kelly, a deputy superintendent of security, made rounds, Gillard advised Kelly that he was denied the right to participate in his hearing, to which Kelly responded that he would investigate Gillard's claim and grant a rehearing if the claim was valid. *Id.* ¶ 40.

**\*7** On February 9, 2009, the IPC hearing resumed. Compl. ¶ 41. Williams testified and lied about Gillard expressing fear of other inmates wanting to hurt him. *Id.* Ramey denied Gillard's request to have Williams take a lie detector test. [6] *Id.* Ramey, relying on Kelly's testimony that Gillard's issues involved security staff and not inmates, stated off-the-record he would not grant the IPC placement because such placement was unsupported by the evidence. *Id.* ¶ 42.

[6]  Gillard asserts that Rovelli attempted to use the inmate population against Gillard as justification for placing Gillard in IPC. Compl. ¶ 41.

On February 10, 2009, Gillard moved to another cell. Compl. ¶ 43. On February 11, 2009, Rovelli went to Gillard's cell and stated, "I have the power not you, I brought you back. It's not over yet and the next one will be better .... " *Id.* ¶ 44. All the inmates in nearby cells overheard these comments; thus, creating a hostile living environment for Gillard. *Id.* Gillard asserts that Rovelli also ordered security officers to impede Gillard's ability to send legal papers by refusing to take out legal disbursements from Gillard's prisoner account. *Id.* ¶ 45, at 14.

On February 17, 2009, Gillard received the tape of his IPC hearing for review. Compl. ¶ 46. On the tape, Lafountain testified Gillard "stated he did not want to get cut again." *Id* . Defendant Hearing Officer and Lieutenant Zarnetski conducted that hearing; however, Gillard asserts that Zarnetski was not impartial, the hearing was staged, and Zarnetski never stated on-the-record that Gillard was offered to sign a hearing denial form and never signed it. *Id.*

On February 20, 2009, Gillard was denied a callout to review his medical file. Compl. ¶ 47. Gillard alleged that he was denied access to the law library during his three months of keeplock confinement. [7] *Id.* at 14. Gillard specifically alleged that he was denied access to legal supplies on February 10, 18, and 23, 2009 because of keeplock confinement, which prevented him from responding to motions. *Id.* ¶ 48. Gillard further asserts that the use of force incident report filed against him, presumably resulted in his keeplock confinement, was based on false and conspiratorial accusations by defendants Deluca and Hendry, both sergeants, that Gillard admitted to striking Nunez on the head. *Id.* ¶ 49.

[7]  "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre*, 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

Williams continued to tamper with Gillard's grievances by ensuring those grievances were devoid of wrongdoing on the part of the security staff. Compl. ¶ 50. Gillard's grievance appeals were denied. *Id.*

Kelly has been continuously advised of the ongoing threats made by Rovelli. Compl. ¶ 51. Specifically, Rovelli has been "lobbying for inmates to take a contract hit on [Gillard]." *Id.* Kelly refused to relocate Gillard in order to prevent contact between Gillard and Rovelli and allowed for the continuing physical and mental abuse on Gillard in retaliation for Gillard's filing of grievances. *Id.*

Defendant Superintendent Rock continued to disregard the conflicts between Gillard and Rovelli despite Gillard having filed over fifty complaints. Compl. ¶ 52. Rock was responsible for investigating these grievances but relied on Rovelli's denial of all wrongdoing. *Id.* Gillard also contends

that Rock failed to review all available facts in denying his grievance appeals. *Id.*

**\*8** Gillard was further denied the right to press criminal charges of conspiracy to commit murder, attempted murder, and assault with a dangerous weapon, against the staff and prisoners who acted on behalf of defendants. [8] Compl. at 15. Gillard seeks declaratory and injunctive relief as well as compensatory and punitive damages. *Id.* at 16–17.

[8]
> Here, Gillard asserts that he has a constitutional right to press charges against defendants and the defendants violated this right by preventing him from doing so. However, the United States Constitution does not confer a judicially cognizable interest to a private citizen for the prosecution or non-prosecution of another. *Bourguignon v. Lantz,* No. 05–CV–245 (SRU), 2006 WL 214009, at *6– 7 (D.Conn. Jan. 25, 2006) (citing *inter alia Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)); *see also Marsh v. Kirschner,* 31 F.Supp.2d 79, 81 (D.Conn.1998). Therefore, even if defendants indeed prevented Gillard from pressing criminal charges against them, such a claim must be dismissed as meritless.
>
> All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

## II. Discussion

Gillard contends that defendant Rovelli violated his (1) First Amendment right of access to courts by ordering officers to refrain from taking legal disbursements from his prisoner account and (2) Eighth Amendment rights by ordering Nunez to murder him and creating hostile conditions of confinement by making other inmates aware of his criminal history. Gillard contends that defendant Williams violated his (1) First Amendment right of access to courts by tampering with his grievances, (2) Fourteenth Amendment rights by recommending IPC for Gillard and lying at Gillard's IPC hearing. Gillard also contends that defendant Rock violated his (1) Eighth Amendment rights by exhibiting deliberate indifference to his safety and (2) Fourteenth Amendment rights by denying his grievances without reviewing all available facts.

Gillard further contends that: (1) defendants Lynch, Lipha, Rose, Besson, Kelly, Rock violated his Eighth Amendment rights by failing to protect him from Nunez; (2) defendant Lafountain violated his Fourteenth Amendment due process rights by denying him participation at his IPC hearing; (3) defendants Hendry, Deluca, Besson, and Williams violated his Fourteenth Amendment rights by making false allegations against him; (4) defendant Zarnetski violated his Fourteenth Amendment rights by acting as a partial hearing officer, staging a hearing, and never confirming he wanted to give up his hearing rights; and (5) defendant Ramey violated his Fourteenth Amendment rights by denying his request that Williams take a lie detector test. Lastly, Gillard generally alleges that all defendants conspired against him by authoring false reports in retaliation for the grievances he filed. Gillard does not make specific allegations against defendant Poirier.

Defendants contend that Gillard failed to allege a conspiracy claim as well as First Amendment and procedural due process claims. Defendants further contend that they are entitled to Eleventh Amendment immunity, qualified immunity, and a protective order barring discovery pending the resolution of this motion. The balance of Gillard's complaint was not addressed.

### A. Legal Standard

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

**\*9** Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see*

*also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law ....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). It follows that,

> the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's paper in opposition to a defendant's motion to dismiss as effectively amending the allegations of the

plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.

*Robles v. Bleau,* No. 07–CV–0464, 2008 WL 4693153, at *6 & n. 41 (N.D.N.Y. Oct. 22, 2008) (collecting cases).

**B. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

**\*10** A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, Gillard seeks monetary damages against defendants for acts occurring within the scope of their duties at Great Meadow. Thus, the Eleventh Amendment bar applies and serves to prohibit Gillard's claims for monetary damages against defendants in their official capacity.

Accordingly, defendants' motion on this claim should be granted.

Case 9:19-cv-00193-MAD-TWD Document 55 Filed 05/12/21 Page 142 of 182
Gillard v. Rovelli, Not Reported in F.Supp.2d (2013)
2013 WL 5503317

## C. First Amendment

Defendants contend that Gillard failed to allege claims of right of access to courts and interference with legal mail under the First Amendment.

### 1. Access to Courts

Gillard alleged that defendants denied him his constitutional right of access to courts by refusing to take out disbursements from his prisoner account for legal fees and denied him access to the law library and legal supplies during his keeplock confinement, which led to his failure to respond to certain motions.

Prisoners have a constitutional right of access to the courts. *Lewis v. Casey,* 518 U.S. 343, 346 (1996). This right is implicated when prison officials "actively [interfer[e] with inmates' attempts to prepare legal documents ... or file them ...." *Id.* at 350 (citing cases). The plaintiff must further allege that the defendant "took or was responsible for actions that 'hindered [his] efforts to pursue a legal claim.' " *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citations omitted). While only minimal assistance to file legal claims is required of prison officials, courts have cited *Lewis* to support "the right to 'proceed with a legal claim' ... suggest [ing], at least, that *pro se* inmates should have the means to defend against dispositive motions and to prepare for trial." *Arce v. Walker,* 58 F.Supp.2d 39, 43 (W.D.N.Y.1999) (listing cases). An inmate would sufficiently state a denial of access to the courts claim by stating that a prison practice prevented him from "raising an argument or asserting a claim in his pleadings, in response to a dispositive motion ...." *Id.* However, a prison regulation or practice that impinges on an inmate's constitutional right must be upheld if it is reasonably related to a legitimate penological interest. *Id.* at 44.

In order to establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citation omitted); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (citation omitted). Second, a showing of an actual injury is required, which "is not satisfied by just any type of frustrated legal claim," because the Constitution guarantees only the tools that "inmates need ... in order to challenge the conditions of their confinement." *Collins v. Goord,* 438 F.Supp.2d 399,

415–16 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 355); *Howard,* 845 F.Supp. at 946 (citation omitted). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Collins v. Goord,* 438 F.Supp.2d at 415–16.

**\*11** Viewing the facts in the light most favorable to the plaintiff, if properly pled, Gillard may state a plausible First Amendment claim based on the denial of access to the law library, legal supplies, and his prisoner account. First, Gillard alleged that defendants actively interfered with his ability to prepare legal documents in response to motions filed by opposing counsel. Second, Gillard alleged that Rovelli had ordered other defendants to deny him access to his prisoner account. This could plausibly constitute a prison practice established by Rovelli to impede Gillard from responding to opposing counsel's motions. Such would also indicate that defendants had acted deliberately and maliciously against Gillard. Despite Gillard's failure to proffer any factual allegations going to how defendants' misconduct had adversely affected or impacted his legal claims and lawsuits, as well as the merits of such claims and lawsuits, a properly pled complaint may resolve such defects. *Collins,* 581 F.Supp.2d at 573 (citation omitted) ("To show actual injury, the plaintiff must demonstrate that the defendant's conduct frustrated the plaintiff's efforts to pursue a nonfrivolous claim."). Gillard should be provided this opportunity. *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (per curiam) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (citation omitted)). Gillard should amend his complaint to make specific allegations of an injury in connection to defendants' alleged misconduct.

Accordingly, it is recommended that this First Amendment claim be dismissed without prejudice and Gillard be granted an opportunity to file an amended complaint containing all relevant facts regarding this claim against specific defendants.

### 2. Mail Tampering

Gillard also alleged that defendants prevented him from sending legal mail. "A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351 (citations omitted). "Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed

2013 WL 5503317

by the First and Fourteenth Amendments to the U .S. Constitution." *Id.* In order to state a claim for denial of access to courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Id.* (*citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (*quoting Lewis v. Casey,* 518 U.S. 343, 351 (1996)).

"[A]n isolated incident of mail tampering is usually insufficient to establish a constitutional violation .... Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Davis,* 320 F.3d at 351 (citations omitted); *see also Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986) (explaining that an action may not give rise to damages if there was "no showing ... that the inmate's right of access to the courts was chilled or the legal representation was impaired."); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975) (holding that a single instance of mail tampering which did not lead the plaintiff to suffer any damage was insufficient to support a constitutional challenge).

**\*12** Additionally, the First Amendment protects an inmate's right to the free flow of incoming and outgoing mail and courts consistently afford greater protection to legal mail than non-legal mail and to outgoing mail then incoming mail. *Davis,* 320 F.3d at 351 (citations omitted). "Restrictions ... are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the particular government interest involved." *Id.* (citations omitted).

In this case, defendants merely contend that Gillard failed to allege that he sustained an actual injury from defendants' conduct in failing to take legal disbursements from his prisoner account. Defs.' Mem. of Law at 11. Gillard alleged that his outgoing legal mail was affected by defendants. Specifically, Gillard alleged that defendants' conduct led him to fail to respond to certain motions. Further, Gillard claims that Rovelli ordered the other defendants to continually carry out this conduct. Thus, Gillard has alleged that defendants' conduct was regularly done or an ongoing practice. Even though Gillard does not expressly allege that he suffered an injury from failing to respond to certain motions, if properly pled, Gillard may sufficiently allege a plausible First Amendment claim based on interference with his outgoing legal mail. Because a liberal reading of the complaint may

present a valid claim, it is recommended that Gillard be granted an opportunity to amend his complaint to include all allegations relevant to this claim. *Gomez,* 171 F.3d at 795. "This is especially true since [Gillard] alleges that [defendants tampered with] ... his outgoing legal mail, which is subject to greater constitutional protection because of the lesser security concerns presented." *Davis,* 320 F.3d at 352 (citations omitted). Gillard should amend his complaint to make specific allegations of an injury in connection to defendants' alleged misconduct.

Accordingly, it is recommended that this First Amendment claim be dismissed without prejudice and Gillard be granted an opportunity to file an amended complaint containing all relevant facts regarding this claim against specific defendants.

### D. Fourteenth Amendment

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*13** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of [Special Housing Unit] SHU confinement automatically fails to implicate due process rights." [9] *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff

was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F .3d at 232). "[I]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM)(ATB), 2012 WL 4093791, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).

9    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

In this case, defendants' contention against Gillard's procedural due process claims rests solely on whether Gillard has established a liberty interest from being confined in keeplock. Defs.' Mem. of Law at 12–13. Gillard was in keeplock confinement for ninety days, over the thirty-day time period that courts have found to not reach atypicality absent unusual conditions. Other than the length of the keeplock confinement, Gillard's complaint does not contain any allegations to indicate that his confinement was atypical or significant in relation to the ordinary prison life. Even though keeplock is less confining than SHU, 10 in the past, this Court has concluded that such a period of confinement requires "refined fact-finding" in order to resolve claims under *Sandin.* *White v. Bergenstock,* No. 08–CV–717 (FJS)(DRH), 2009 WL 4544390, at *7 (N.D.N.Y. Nov. 25, 2009) (citing *Colon v. Howard,* 215 F.3d 227, 230 (2d. Cir.2000)) (denying a motion to dismiss the procedural due process claim for development of facts going to plaintiff's liberty interest arising from his ninety-day keeplock confinement). Thus, questions of fact exist with respect to whether Gillard's ninety days in keeplock amount to a liberty interest. Given Gillard's pro se status and the length of his keeplock confinement, Gillard's due process claims should not be dismissed at this stage of the litigation.

10    Inmates in keeplock enjoy more amenities than do inmates in SHU such as showers, on-site social

and legal visits, sending and receipt of mail, and materials from the law library. *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998).

Accordingly, defendants' motion on this ground should be denied.

**E. Conspiracy** [11]

11    Defendants also asserts that any conspiracy claims are effectively barred by the intra-corporate conspiracy doctrine. However, because it is recommended herein that defendants' motion as to the conspiracy claim be granted on other grounds, their motion based on the intra-corporate conspiracy doctrine need not be addressed.

In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). While exact specifics are not required, "the pleadings must present facts tending to show agreement and concerted action." *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

**\*14** Here, Gillard failed to allege sufficient facts to support a viable conspiracy claim between defendants in their alleged failure to protect him as well as retaliation for the filing of grievances. Gillard's claims of conspiracy are solely conclusory. *Ciambriello,* 292 F.3d at 325. There were no factual allegations showing that defendants had any type of agreement between them. Further, there were no allegations outlining with specificity when, why, or how this alleged

2013 WL 5503317

conspiracy occurred. *Warren, 33 F.Supp.2d at 177.* Even though specifics are unnecessary, Gillard fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of the defendants. *Anilao, 774 F.Supp.2d at 512–13.*

Accordingly, defendants' motion on this claim should be granted.

### F. Qualified Immunity

Defendants claims that even if Gillard's constitutional claims against them are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002)* (McAvoy, J.), *aff'd, 80 F. App'x 146 (2d Cir.2003).* However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir.1990)* (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz, 533 U.S. 194, 201 (2001).* Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken, 236 F.Supp.2d at 230.* Here, the second prong of the inquiry must be discussed with regard to Gillard's First Amendment right to access to courts and interference with mail claims as well as Fourteenth Amendment procedural due process claims.

It is well-settled that between January 23, 2009 and February 20, 2009, the First Amendment protected an inmate's right to access to the courts and the free flow of incoming and outgoing mail. *Lewis, 518 U.S. at 346; Davis, 320 F.3d at 351.* It is also well-settled that during this relevant time period, the Fourteenth Amendment protected an inmate's right to procedural due process. *Wolff v. McDonnell, 418 U.S. 539, 555 (1974)* ("Prisoners may also claim the protections of the

Due Process Clause. They may not be deprived of life, liberty, or property without due process of law ." (citations omitted)). Thus, accepting all of Gillard's allegations as true, qualified immunity cannot be granted to defendants for their alleged misconduct.

**\*15** Accordingly, defendants' motion on this ground should be denied.

### G. Protective Order

Pursuant to Federal Rule of Civil Procedure 26(c)(1), defendants moved for a protective order staying discovery in this matter pending the resolution of their motion to dismiss. Defs.' Mem. of Law at 16–17. Rule 26(c)(1) provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

FED. R. CIV. P. 26(c)(1). Good cause can be shown where, upon the filing of a dispositive motion, the stay is for a modest period of time and not prejudice the opposing party. *Spencer Trask Software and Information Servs., LLC v. Rpost Int'l Ltd., 206 F.R.D. 367, 368 (S.D.N.Y.2002)* (citation omitted). When considering the issuance of a protective order, a Court may consider "the breadth of discovery sought and the burden of responding to it" as well as "the strength of the dispositive motion that is the basis of the discovery stay application. *Id.* (citations omitted). "This rule is often invoked to avoid potentially expensive and wasteful discovery during the pendency of a determination which could potentially reshape pending claims." *Dabney v. Maddock,* No. 10–CV–0519 (GTS)(DEP), 2011 WL 7479164, at \*11 (N.D.N.Y. Nov. 29, 2011) (collecting cases) (recommending stay of discovery pending a Rule 16 pretrial scheduling order is issued and until the claims are framed, and when plaintiff would not be prejudiced by modest delay).

2013 WL 5503317

In this case, until a standard Rule 16 pretrial scheduling order is issued, permitting discovery to go forward would serve no purpose. This is particularly in light of the fact that this report recommends Gillard's First and Fourteen Amendment claims, as discussed *supra,* be dismissed without prejudice and Gillard be granted an opportunity to amend his complaint. Further, Gillard has provided no reasons for the Court conclude that he would be prejudiced by a modest delay due to stay of discovery at this stage. *Spencer Trask Software,* 206 F.R.D. at 368. Moreover, the Office of the Attorney General represents fourteen separate defendants in this action. To engage in discovery before the resolution of this motion to dismiss, as well as the potential filing of an amended complaint, would result in potentially expensive and wasteful discovery.

Accordingly, defendants' motion for a protective order to stay discovery should be granted.

### III. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 41) be:

A. **GRANTED** as to the (1) Eleventh Amendment bar to § 1983 claims against all individual defendants in their official capacities; (2) conspiracy claim against all defendants; AND

**\*16** B. **DENIED** as to the (1) Fourteenth Amendment due process claims; and (2) qualified immunity defense.

2. It is further **RECOMMENDED** that Gillard's First Amendment claims based on access to courts and interference with mail be **DISMISSED** without prejudice;

3. It is further **ORDERED** that, as to those claims, Gillard may file an amended complaint within **twenty days** from the filing date of any Order adopting this Report–Recommendation, if he wishes to pursue those claims; AND

4. It is further **RECOMMENDED** that, if within twenty days, such an amended complaint is not filed, those claims shall be dismissed pursuant to any order adopting this report-recommendation without further action of the Court.

5. It is also **RECOMMENDED** that defendants' request for a protective order be granted.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5503317

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3486379

KeyCite Yellow Flag - Negative Treatment
Distinguished by   McRae v. City of Hudson,   N.D.N.Y.,   January 21, 2015

2009 WL 3486379
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.

No. 9:04–CV–1159.
|
Oct. 21, 2009.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Chief Judge.

 **\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION AND ORDER

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez

2009 WL 3486379

alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL SUMMARY

*2 Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12–13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

[1]  Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman—contradicts Plaintiff's version of events.

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4–10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

*3 (Weissman Aff. ¶¶ 11–13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff[2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff. Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

[2]     Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee

alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35–36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean– Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05–CV– 5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on."[3] (Dkt. No. 1 ¶ 19.)

[3]     In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt.

No. 92–10 at 35–36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

**\*4** On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21–22.)

[4]     In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92–10 at 35–36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor. [5] (Dkt. No. 1 ¶ 23.)

[5]     The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

[6]     The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92–10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his

2009 WL 3486379

asthma was acting up. Nurse "Goon" 's note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

[7]   The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

[8]   It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch. Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17–18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was over and left the area." (Defs.' Ex. 15 at 2–3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and

2009 WL 3486379

an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28–34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1–2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2–3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

*7 On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [10] In determining whether a genuine issue of material [11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [12]

[9]    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in

Benitez v. Ham, Not Reported in F.Supp.2d (2009)
Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 153 of 182
2009 WL 3486379

this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

[10] *Ross v. McGinnis,* No. 00–CV–0275, 2004 U.S. Dist. LEXIS 9367, at * 20–21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

[11] A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[12] *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

[13] The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. §

1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[14] or (2) a challenge to the legal cognizability 14 of the claim.[15]

[14] *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

[15] *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.")

2009 WL 3486379

(citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5, 2004 WL 2613993, at *1–2 (E.D.N.Y. Nov. 18, 2004)* (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No. 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002)* (identifying two sorts of arguments made on a Rule 12(b)(6) motion—one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [16] The main purpose of this rule is to "facilitate a proper decision on the merits." [17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [18]

[16] *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

[17] *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

[18] *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) ( McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98–CV–0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not *shown*— that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

2009 WL 3486379

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

[19] *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

[20] *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [24] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [25]

[21] "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96–CV–7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d

192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

[22] *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

[23] *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

[24] *Yang v. New York City Trans. Auth.,* No. 01–CV–3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

[25] *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05–CV–0836, 2007 U.S. Dist. LEXIS

48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07–CV–0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00–CV–1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[29]

[26]  *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

[27]  *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

[28]  *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124,

128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

29    *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 13–14.)

#### 1. *Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element

of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious

treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92–10 at 13–14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need. [30] Applying the analytical framework described above, I must first address whether Plaintiff was actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A–9.)

| [30] | Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92–10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28–30.) |
|---|---|

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Benitez v. Ham, Not Reported in F.Supp.2d (2009)

2009 WL 3486379

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92–10 at 13–14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7–8, Ex. A–9 and A–10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A–9.) His requests were denied. (Weissman Aff. ¶¶ 7–8, Ex. A–9 and A–10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

[31] Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

[32] *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended

when their request for approval of knee surgery was denied).

### 3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92–10 at 13–14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A–13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A–14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24–25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards. [33]

33    Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

### B. Ham/Grievances

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9–10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28–29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92–10 at 21–23, 38.)

### 1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92–10 at 21–23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." [34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some

other wrong." [35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program. [36]

34    42 U.S.C. § 1997e.

35    *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

36    7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. [37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. [38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

37    7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00–CV–3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

38    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d

546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01–CV–0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03–CV–0671, Report–Recommendation, at 15–16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92–4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[39] *Id.*

[39]  The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92–4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards's denial of Atarax. (Dkt. No. 92–4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92–4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92–3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92–4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had

not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

[40]   See *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

[41]   *Hemphill,* 380 F.3d at 686 (citation omitted).

[42]   *Id.* (citations omitted).

[43]   *Id.* (citations and internal quotations omitted).

2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92–10 at 22–23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> **\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant

to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[44]

> [44]   Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92–11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled too tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

### 3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28–29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50–51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92–10 at 38.) Defendants are correct.

> The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29,

2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

### C. Frisk Room Incident/Aftermath/Grievances

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[45] (Dkt. No. 1 ¶¶ 16–22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30–31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32–34.)

> [45]   The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92–10 at 40–42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

1. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92–10 at 25–26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92–4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner*, 366 F.3d 161, 163–64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole*, 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim.[46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[47] (Dkt. No. 92–10 at 31–32.)

[46] Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

[47] Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92–10 at 31–32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92–10 at 31–32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21–22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

Benitez v. Ham, Not Reported in F.Supp.2d (2009)
Case 9:19-cv-00193-MAD-TWD   Document 55   Filed 05/12/21   Page 165 of 182
2009 WL 3486379

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92–10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases. [48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

[48] *See Green v. Greene,* No. 9:07–CV–0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09–cv–98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08–CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08–CV–61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* —— F.Supp.2d ——, No. 05–CV–5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06–CV–2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03–CV–202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL

925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV–05–2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05–CV–297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06–2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92–10 at 33–35.) Specifically, Defendants argue that:

> [P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records

for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

*20   (*Id.* at 34–35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46–47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten

Benitez v. Ham, Not Reported in F.Supp.2d (2009)
Case 9:19-cv-00193-MAD-TWD    Document 55    Filed 05/12/21    Page 167 of 182
2009 WL 3486379

everywhere." (Bannister Aff. ¶ 10).) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551–52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92–5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

[49]    Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 4. *False Misbehavior Reports*
Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17–18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92–10 at 25–29.)

#### a. *Forfeiture*
Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his

opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92–10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953–54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim —a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights—in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere provision of procedural due process could eliminate all

2009 WL 3486379

liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590–91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman.*" *Id.* at 679–80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.* The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

**\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which

*Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[50]

[50]   I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections ...* only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91–CV–717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92–10 at 39.)

   b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92–10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92–5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[51] (Dkt. No. 92–5, Ex. 11.) The most serious of these charges was the threat charge.

[51]   Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92–5, Exs.11–12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y.

Benitez v. Ham, Not Reported in F.Supp.2d (2009)

2009 WL 3486379

Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19–20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92–10 at 36–37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants'

motion for summary judgment regarding the failure to intervene claim against Defendant Bezio. [52]

[52]   Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30–34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92–10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36–37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21–day loaf diet (Dkt. No. 1 ¶ 36–37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [53] (Dkt. No. 1 ¶ 35.)

[53]    The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated 'Get what I want or I'll fuck you up.'" Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92–5, Ex. 15 at 2–3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84, 115

S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair. [54]

[54]    Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92–10 at 38–39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92–10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived

of a liberty interest, it is not necessary to reach this issue.

## 2. Failure to Call Witnesses

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92–10 at 39–40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

## 3. Imposition of Loaf Diet

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37–38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 14–20.)

### a. Exhaustion of Administrative Remedies

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92–10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy,

Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

### b. Deliberate Indifference

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92–10 at 15–20.) Defendants are correct.

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92–8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved of the loaf diet. To establish deliberate

indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet." (Weissman Aff. ¶¶ 14–15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

#### 4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

### E. Five Points Health Care

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23–26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a

serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 6, 20.)

#### 1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92–10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

[55]    This 120–day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM–285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7–8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.' " (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

#### 2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that

2009 WL 3486379

he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23–26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92–10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279–80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92–10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S–08–1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment—not deliberate indifference." (Dkt. No. 92–10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment.

The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31  ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be ***GRANTED IN PART AND DENIED IN PART;*** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to

2009 WL 3486379

intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05–CV–5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3486379

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1030648
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tyrone JAMES; Mark Crowder; Jalone Davis;
Wayne Haywood; Kevin Redd, Kenneth Elmore;
Christopher Gray; and Terry Wilson, Plaintiffs,

v.

Scott WILLIS; John Amato; Michael Comito; Jeffrey
Badendyck; and Daniel McCulough, Defendants.

9:17-CV-0843 (GTS/ML)
|
Signed 03/03/2020

**Attorneys and Law Firms**

OF COUNSEL: AMY JANE AGNEW, ESQ., LAW OFFICE
OF AMY JANE AGNEW, P.C., Counsel for Plaintiffs, 24
Fifth Avenue, Suite 1701, New York, NY 10011.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, OF COUNSEL: KYLE W. STURGESS,
ESQ., HELENA LYNCH, ESQ., Assistant Attorney General,
Counsel for Moving-Defendants, The Capitol, Albany, NY
12224.

OF COUNSEL: RYAN E. MANLEY, ESQ., HARRIS,
CONWAY & DONOVAN, PLLC, Counsel for Defendant
Michael Comito, 50 State Street, 2nd Floor, Albany, NY
12207.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1**  Currently pending before the Court, in this
prisoner civil rights action filed by Tyrone James,
Mark Crowder, Jalone Davis, Wayne Haywood, Kevin
Redd, Kenneth Elmore, Christopher Gray, and Terry
Wilson (collectively "Plaintiffs"), against Scott Willis, John
Amato, Jeffrey Dadendyck, Daniel McCullough (collectively
"moving-Defendants"), and Michael Comito ("non-moving
Defendant"), is the moving-Defendants' motion to dismiss
Plaintiffs' claims against them for failure to state a claim
and lack of subject-matter jurisdiction. (Dkt. No. 99.) For the
reasons set forth below, the moving-Defendants' motion to
dismiss is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiffs' Claims**

Generally, liberally construed, Plaintiffs' Amended
Complaint alleges that on or about January 14, 2015,
Defendants violated Plaintiffs' civil rights by desecrating,
and/or allowing to be desecrated, Plaintiffs' designated room
for religious study and prayer at Shawangunk Correctional
Facility. (*See generally* Dkt. No. 85 [Plf.'s Am. Compl.].)
More specifically, Plaintiffs allege that (1) Defendant Comito
trampled on prayer rugs with muddy and dirty boots, (2)
the room's Nation of Islam ("NOI") flag was missing and
ultimately found in the correctional facility's dumpster, and
(3) the moving-Defendants subsequently conspired amongst
themselves to interfere with the preservation of evidence
and Plaintiffs' reporting of the incident to the administrators
at Shawangunk Correctional Facility. (*Id.*) Based on these
factual allegations, Plaintiffs' Amended Complaint asserts the
following five claims: (1) a claim that Defendant Comito
violated the Federal Freedom of Access to Clinic Entrances
Act ("FACEA"); (2) a claim that all Defendants violated the
Fourteenth Amendment's Equal Protection Clause under 42
U.S.C. § 1983; (3) a claim that all Defendants conspired to
interfere with the preservation of evidence and the reporting
of the incident under 42 U.S.C. § 1983; (4) a claim that
all Defendants conspired to interfere with Plaintiffs' civil
rights under 42 U.S.C. § 1985(3); and (5) a claim that all
Defendants violated Plaintiffs' rights under the New York
State Constitution Article I, § 3. (*Id.*)

**B. Parties' Briefing on the Moving-Defendants'
Motion**

Generally, in support of their motion to dismiss, the moving-
Defendants argue as follows: (1) Plaintiffs' equal protection
claim fails to allege facts plausibly suggesting either
disparate treatment or discriminatory intent; (2) Plaintiffs'
conspiracy claims fail to allege facts plausibly suggesting
an agreement, an act in furtherance of the conspiracy, or
discriminatory animus, or, in the alternative, are precluded
by the intracorporate conspiracy doctrine; and (3) Plaintiffs'
state-law claims are barred under New York State Correction
Law § 24, or, in the alternative, are duplicative of Plaintiffs'
Section 1983 claims. (*See generally* Dkt. No. 99-2 [Defs.'
Memo. of Law].) [1]

[1]    Defendants are respectfully reminded that, pursuant to the Court's Local Rules of Practice, memoranda of law must contain a table of contents. N.D.N.Y L.R. 7.1(a)(1).

**\*2** Generally, in response to Defendants' motion to dismiss, Plaintiffs argue as follows: (1) Plaintiffs have alleged a viable Equal Protection claim because Defendants have confused an Equal Protection claim based on intentional discrimination and an Equal Protection claim based on a "class of one" theory of liability, pursuant to which Plaintiffs need show only intentional disparate treatment of a similarly situated individual and no rational basis for that difference in treatment, which they have done, especially through their reference to a reference by Defendants to a recent attack by Muslim terrorists in the Charlie Hedbo massacre; (2) Plaintiffs have sufficiently alleged Section 1983 and 1985 claims because they have alleged facts plausibly suggesting both an agreement and act in furtherance of the conspiracy, and because, even if the Second Circuit were to extend the intracorporate conspiracy doctrine to Section 1983 claims, the "personal stake" exemption thwarts the application of the doctrine under the circumstances (where individuals are pursuing personal interests wholly separate and apart from the New York State Department of Corrections and Community Supervision ["DOCCS"] ); and (3) Plaintiffs withdraw their state-law claim against the moving-Defendants. (*See generally* Dkt. No. 104 [Plfs.' Opp'n Memo. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Motion to Dismiss for Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211 nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J.) (adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief

is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp.2d at 212 n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212 n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212 n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213 n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the

speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

**B. Claim Under Section 1983 and Fourteenth Amendment Equal Protection Clause**

In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S. Ct. 1920 (1980) (internal quotations omitted)). "Section 1983 is not itself a source of substantive rights[,] but merely provides a method for vindicating federal rights elsewhere conferred[.]" *Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 [1979]).

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Kregler v. City of New York*, 821 F. Supp. 2d 651, 655-56 (S.D.N.Y. 2011) (quoting *Wright v. Smith*, 21 F.3d 496, 501 [2d Cir. 1994] [internal quotation marks omitted] ). A plaintiff may allege the personal involvement of a defendant who occupies a supervisory position by alleging that the defendant did the following:

> (1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in managing subordinates who caused the unlawful condition or event; or (5) exhibited 'gross negligence' or 'deliberate indifference' to the constitutional rights of [the plaintiff] by having actual or constructive notice of the unconstitutional practices and failing to act.

*Kregler*, 821 F. Supp. 2d at 655-56 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501).

The Equal Protection Clause of the Fourteenth Amendment, which provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws" (U.S. CONST. AM. XIV, § 1), "requires the government to treat all similarly situated individuals alike." *Young v. Suffolk Cty.*, 705 F. Supp. 2d 183, 204 (E.D.N.Y. 2010) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 [1985]).

**\*4** To establish a violation of the Equal Protection Clause, a prisoner must prove the following two elements: (1) that he was treated differently from similarly situated individuals and (2) either (a) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person (called "selective prosecution" equal protection) or (ii) that there was no rational basis for the difference in treatment (called "class-of-one" equal protection). *Cobb v. Pozzi*, 363 F.3d 89, 109-10 (2d Cir. 2004); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

In proving the second element, the prisoner must show that the alleged disparity in treatment cannot survive the appropriate level of scrutiny. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). More specifically, where the alleged classification involves a "suspect class" or "quasi-suspect class," the alleged classification is subject to "strict scrutiny" by a court. *Travis v. N.Y. State Div. of Parole*, 96-CV-0759, 1998 WL 34002605, at *4 (N.D.N.Y. Aug. 26, 1998) (Sharpe, J.), *adopted*, 96-CV-0759, Decision and Order (N.D.N.Y. filed Nov. 2, 1998) (McAvoy, J.). However, neither imprisonment nor disability is a suspect classification under the Equal Protection Clause. *Chick v. Cty. of Suffolk*, 546 F. App'x 58, 60 (2d Cir. 2013) ("[A] disability is not a suspect classification under the Equal Protection Clause."); *Lee v. Governor of N.Y.*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class....").

Where the alleged classification does not involve a "suspect class" or "quasi-suspect class" (or where the prisoner is asserting a "class of one" equal protection claim), the alleged classification is subject to only "rational basis scrutiny." *Travis*, 1998 WL 34002605, at *4. To survive such scrutiny, the alleged classification need only be "rationally related" to a "legitimate state interest." *Id.*

Finally, where a "class of one" equal protection claim is asserted, there must be "an extremely high degree of similarity" between the class-of-one plaintiff and the alleged comparators in order for the plaintiff to succeed. *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds, Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008). Specifically, such a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake. *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010); *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). The standard for determining whether another person's circumstances are similar to the plaintiff's must be whether they are *prima facie* identical. *Neilson*, 409 F.3d at 105.

## C. Claim of Conspiracy to Violate Plaintiffs' Rights

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Thomas v. City of Troy*, 293 F. Supp. 3d 282, 303 (N.D.N.Y. 2018) (Suddaby, C.J.) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 [2d Cir. 1999]).

**\*5** To state a claim for conspiracy to violate one's constitutional rights under 42 U.S.C. § 1985(3), a plaintiff must allege: "1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protections of the laws ... and 3) an act of furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right of privilege of a citizen of the United States." *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 297 (E.D.N.Y 2018) (quoting *Britt v. Garcia*, 457 F.3d 264, 270 n.4 [2d Cir. 2006]). A defendant "must 'do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it.' " *Zhang Jingrong*, 287 F. Supp. 3d at 298.

## III. ANALYSIS

### A. Whether Plaintiffs' Equal Protection Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons set forth in Defendants' memorandum of law. (Dkt. No. 99-2.) To those reasons, the Court adds only the following point.

"It is well settled that the Equal Protection Clause 'protect[s] persons, not groups." *Engqyist v. Oregon Dept. of Agr.*, 553 U.S. 591, 597 (2008) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 [1995] [emphasis deleted] ). Although discrimination based upon religion may support an equal protection violation, a plaintiff "must present evidence that he [or she] was treated differently from similarly situated members of other religions," to prove such a claim. *Green v. LaClair*, 07-CV-0351, 2012 WL 1144569, at *11 (N.D.N.Y. Feb. 24, 2012) (Peebles, J.) (citing *Ramsey v. Goord*, 661 F. Supp. 2d 370, 398 [W.D.N.Y. 2009]) (quoting *Jackson v. Mann*, 196 F.3d 316, 321 [2d Cir. 1999]); *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 590-91 (S.D.N.Y. 2015). Additionally, a plaintiff must demonstrate "that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he [or she] must demonstrate that his [or her] treatment was not 'reasonably related to [any]

legitimate penological interests.' " *Phillips*, 408 F.3d at 129 (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 [2001]).

In a class-of-one context, a plaintiff must use "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff ... to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose–whether personal or otherwise–is all but certain." *Prestopnik v. Whelan*, 249 F. App'x 210, 212-13 (2d Cir. 2007). "Generally, whether parties are similarly situated is a fact-intensive inquiry." *Clubside, Inc.*, 468 F.3d at 159 (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 [2d Cir. 2001]). As explained above in Part II.B. of this Decision and Order, there must be "an extremely high degree of similarity" between the class-of-one plaintiff and the "alleged comparators in order to succeed on an equal protection claim." *Sloup v. Loeffler*, 745 F. Supp. 2d 115, 128 (E.D.N.Y. 2010); *Neilson*, 409 F.3d at 104. (2d Cir. 2005). " '[T]he standard for determining whether another person's circumstances are similar to the plaintiff's must be ... whether they are prima facie identical.' " *Kamholtz v. Yates Cty.*, 08-CV-6210, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008) (quoting *Neilson*, 409 F.3d at 105).

In this case, Plaintiffs' Amended Complaint fails to state a claim because it fails to allege facts plausibly suggesting a comparison of themselves to similarly situated members of other religions. (*See generally* Dkt. No. 85; Dkt. No. 99-1.) Throughout Plaintiffs' 213-paragraph Amended Complaint, Plaintiffs do not once compare themselves to other prisoners who are members of other religions. (*See generally* Dkt. No. 85.) Instead, Plaintiffs conclusorily allege that Defendants would have reported employee misconduct, substantially damaged property, and stolen property if these transgressions occurred against another group of prisoners. (Dkt. No. 85, at ¶¶ 196-98.)

**\*6** For all of these reasons, Plaintiffs' equal protection claim is dismissed.

### B. Whether Plaintiffs' Conspiracy Claims Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 99-2.) To those reasons, the Court adds the following analysis.

"A violated constitutional right is a natural prerequisite to a claim of conspiracy to violate such right. Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *Fitzgerald v. City of Troy, N.Y.*, No. 10-CV-0451, 2012 WL 5986547, at *23 (N.D.N.Y. Nov. 28, 2012) (D'Agostino, J.) (citing *Malsh v. Austin*, 901 F. Supp. 757, 763-64 [S.D.N.Y. 1995]). Moreover, vague and conclusory allegations that defendants entered into an unlawful agreement will not suffice to state a conspiracy claim under either Section 1983 or Section 1985(3). *Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183, at *5 (2d Cir. 2012) (citing *Gyadu v. Hartford Ins. Co.*, 197 F.3d 590, 591 [2d Cir. 1999]); *Emmerling v. Town of Richmond*, 434 F. App'x 10, 12 (2d Cir. 2011). Instead, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Kiryas Joel All.*, 495 F. App'x at *5 (quoting *Webb v. Goord*, 340 F.3d 105, 110-11 [2d Cir. 2003]).

According to the intra-corporate conspiracy doctrine, which applies to both Section 1983 and Section 1985 conspiracy claims, *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Fitzgerald*, 2012 WL 5986547, at *23 (quoting *Jefferson v. Rose*, 869 F. Supp. 2d 312, 317-18 [E.D.N.Y. 2012] [quotations and citations omitted] ); *see also Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 291 (E.D.N.Y. 2010) (stating that officers, agents, and employees of a single corporate entity are legally incapable of conspiring together); *Baines v. Masiello*, 288 F. Supp. 2d 376, 394-95 (W.D.N.Y. 2003) (holding that a conspiracy claim brought against "the Common Council, the Mayor, and the City Clerk" was barred by the intra-corporate conspiracy doctrine).

### 1. Plaintiffs' 42 U.S.C. § 1983 Conspiracy Claim

In this case, despite the fact that the Court has construed all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have failed to state a conspiracy claim against the moving-Defendants under 42 U.S.C. § 1983. More specifically, Plaintiffs have failed to state an equal protection claim against the moving-Defendants. (*See, supra,* Part.III.A. of this Decision and Order.) Because a violation of a constitutional right is a natural prerequisite for a conspiracy claim, Plaintiffs cannot claim that the moving-Defendants

2020 WL 1030648

conspired to violate their equal protection rights. *Fitzgerald*, 2012 WL 5986547, at \*23; *see also Droz v. McCadden*, 580 F.3d 106, 109 [2d Cir. 2009]) (stating that a plaintiff's Section 1983 conspiracy claim fails if plaintiff is unable to allege the underlying Section 1983 cause of action). By failing to allege facts plausibly suggesting a constitutional violation, Plaintiffs fail to meet the "act in concert to inflict an unconstitutional injury" element necessary to state a Section 1983 conspiracy claim. *Thomas*, 293 F. Supp. 3d at 303.

**\*7** For all of these reasons, Plaintiffs' Section 1983 conspiracy claim is dismissed.

### 2. Plaintiffs' 42 U.S.C. § 1985(3) Conspiracy Claim

"Similar to [Section] 1983, section 1985 also requires a plaintiff to plead a violation of a constitutional right." *Richard v. Fischer*, 38 F. Supp. 3d 340, 352 (W.D.N.Y. 2014) (citing *Barr v. Abrams*, 810 F.2d 358, 363 [2d Cir. 1987]). "As the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb*, 340 F.3d at 110.

Here, as previously discussed above in Part III.A. of this Decision and Order, Plaintiffs have failed to plead a constitutional violation against the moving-Defendants. Pursuant to *Richard*, and for the reasons stated in Part III.B.1, Plaintiffs cannot state a Section 1985 conspiracy claim against the moving-Defendants. *Richard*, 38 F. Supp. 3d at 352.

Moreover, Plaintiffs' conspiracy claims fall squarely under the intra-corporate conspiracy doctrine. The intra-corporate conspiracy doctrine applies DOCCS employees. *Vega v. Artus*, 610 F. Supp. 2d 185, 205 (N.D.N.Y. 2009) (Suddaby, J.). The intra-corporate conspiracy doctrine has a "scope of employment" exception, "which exists 'when individuals pursue personal interests wholly separate and apart from the entity.' " *Vega*, 610 F. Supp. 2d at 205 (quoting *Orafan v. Goord*, 411 F.Supp.2d 153, 165 [N.D.N.Y.2006] [Magnuson, J.] [internal quotation marks and citations omitted], *vacated and remanded on other grounds sub nom., Orafan v. Rashid*, 249 F. App'x 217 [2d Cir. 2007]). " '[I]n order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity, more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against the plaintiff.' " *Id.* (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 470 [N.D.N.Y. 2009] [Suddaby, J.] ).

Here, Plaintiffs do not allege any facts giving rise to a conspiracy, but instead assert conclusory allegations relating to an alleged conspiracy among Defendants. Plaintiffs' allegations identify each of the named Defendants as employees of a single corporate entity, DOCCS. (Dkt. No. 85, at ¶¶ 21-29.) Additionally, the events underlying Plaintiffs' Amended Complaint all allegedly took place in a DOCCS facility, while Defendants were on duty, and otherwise carrying out functions for which they are employed. (Dkt. No. 85, at ¶¶ 59-143.) However, Plaintiff's Amended Complaint fails to plausibly allege how the alleged vandalism advanced the moving-Defendants' personal interest wholly separate and apart from DOCCS. Plaintiffs rely on Defendant McCullough's alleged offer (to "ow[e] Plaintiffs a favor) as the grounds for a conspiracy among all Defendants. (Dkt. No. 85, at ¶ 107.)

For all of these reasons, Plaintiffs' Section 1985(3) conspiracy claim is dismissed.

### C. Whether Plaintiffs' State Law Claim Should Be Dismissed

After carefully considering the matter, the Court answers this question in the affirmative. In their opposition memorandum of law, Plaintiffs attempt to withdraw their state law claim against each of the moving-Defendants. (Dkt. No. 104, at 22.) The Court has some trouble finding that this attempt constitutes an adequate "notice of dismissal" for purposes of Fed. R. Civ. P. 41(a)(1)(A)(i). *See Shinn v. FedEx Freight, Inc.*, 16-CV-0777, 2016 WL 7130911, at \*2 (D. N.J. Dec. 7, 2016) (making distinction between statement in response brief that "Plaintiffs voluntarily withdraw Count III of their Amended Complaint" and "the appropriate Notice of Dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i)"); *Vigil v. Lobo Campus Pharm.*, 04-CV-0863, 2004 WL 7337429, at \*4 (D. N.M. Dec. 8, 2004) (expressing reluctance at construing a statement in a plaintiff's reply brief as a "notice of dismissal"); *but see Bennett v. Michigan Dep't of Corr.*, 15-CV-14465, 2017 WL 3208591, at \*2, n.2 (E.D. Mich. July 24, 2017) (recommending that statement in plaintiff's response brief that he voluntarily dismisses Count IV be "construed as a "Notice of Dismissal" pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i)), *adopted*, 2017 WL 423065 (E.D. Mich. Sept. 25, 2017).

**\*8** This issue is material because, if the attempt were to constitute an adequate "notice of dismissal," then Plaintiffs' state law claim against the moving-Defendants would be dismissed only without prejudice. If the attempt were not to

constitute an adequate "notice of dismissal," then that state law claim would be dismissed with prejudice (assuming the moving-Defendants have met their lightened burden on their unopposed argument for the dismissal of this claim).

Out of special solicitude to Plaintiffs as civil rights litigants, and because the Court perceives little chance that Plaintiffs will seek to re-assert this challenged claim, the Court will construe this attempt as an adequate "notice of dismissal" for purposes of Fed. R. Civ. P. 41(a)(1)(A)(i). [2]

[2]    The Court finds that this notice was timely for purposes of Fed. R. Civ. P. 41(a)(1)(A)(i), because the sole Answer that had been served by the time of the notice had not been served by the moving-Defendants. (Dkt. No. 47.) *See also Welsh v. Correct Care, L.L.C.*, 915 F.3d 341, 344 (5th Cir. 2019) ("[T]he Rules permit voluntary dismissal by notice and without a court order of any defendant who has not served an answer, which in this case is all defendants except McLane [who had served an answer].").

For these reasons, Plaintiffs' state law claim against the moving-Defendants is dismissed *without prejudice*.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 99-2) is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' claims against the moving-Defendants in the Amended Complaint (Dkt. No. 85) are **DISMISSED with prejudice, EXCEPT** for Plaintiffs' State law claim against the moving-Defendants, which are **DISMISSED without prejudice**, and it is further

**ORDERED** that surviving this Decision and Order are Plaintiffs' claims against Defendant Comito; and it is further

**ORDERED** that, in any motion to dismiss for failure to state a claim and/or motion for summary judgment that Defendant Comito may choose to file in this action, he shall be free to rely on any rulings in this Decision and Order, pursuant to the law-of-the-case doctrine.

**All Citations**

Slip Copy, 2020 WL 1030648

---

    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    7